RYAN G. WELDON
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT   59403
119 First Ave. North, Suite 300
Great Falls, MT   59403
Phone:   (406) 761-7715
FAX:   (406) 453-9973
E-mail:   Ryan.Weldon@usdoj.gov


ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| UNITED STATES OF AMERICA, | CR 16-43-GF-BMM |
|---|---|
| Plaintiff, | |
| vs. | |
| DEBORAH JOY DURAND, | TRIAL BRIEF OF THE UNITED STATES |
| Defendant. | |

1

INTRODUCTION

This is a case about Ms. Durand embellishing and inflating her injuries to obtain total disability, through workers' compensation benefits, for more than a decade.   For example, Ms. Durand claimed she could not bend, twist, and that she was "totally sedentary."   Doctors now believe that Ms. Durand was dishonest with them during their previous evaluations of her physical abilities.   After the doctors saw Ms. Durand's outside activities, they concluded that she could work "indefinitely."

Importantly, at no point in trial will the United States allege that Ms. Durand should have engaged in arduous physical labor while at work.   Nor will the doctors.   But Ms. Durand indeed could work—she could answer phones, case mail, and engage in numerous other light-duty activities.   Ms. Durand, however, preferred not working at all, which is why she committed fraud in order to obtain total disability.

ANTICIPATED PROOF

A. **Deborah Durand begins to claim workers' compensation benefits while in Texas.**

Durand has been an employee of the Postal Service since August 22, 2001, and previously worked as a letter carrier at Tomball Post Office, in Tomball, Texas, prior to collecting workers' compensation benefits.   Durand claimed that

2

she injured her upper back, shoulder, arm, and hand, which prohibited her from working any further.

On February 8, 2006, Durand was investigated by the United States Postal Inspection Service (USPIS).  During that investigation, USPIS interviewed Durand's co-worker at the Home Depot in College Station, Texas.  The co-worker stated that Durand regularly lifted five-gallon cans of paint while working for Home Depot.  This, of course, was contrary to Durand's medical claim of an injured upper back, shoulder, arm, and hand.  After the Office of Worker's Compensation Programs' encouragement, Durand returned to work in a limited capacity, and in December of 2006, Durand was terminated from workers' compensation benefits because she was capable of work and the Postal Service provided Durand a position within her medical restrictions.  On July 3, 2007, Durand claimed to have re-injured herself and began to receive, yet again, workers' compensation benefits.

In 2007, the United States Postal Service again investigated Durand.  The investigation discovered that Durand was conducting the following activities, along with many others: shoveling manure, pitching hay, pushing 400-pound hay bales, carrying chainsaws, and running after dogs.  Agents interviewed Durand, and she admitted to conducting these activities, which significantly exceeded her

medical restrictions.

The Office of Worker's Compensation Program canceled Durand's compensation benefits and she was encouraged to take a job offer from the Postal Service. After Durand's benefits were terminated, Durand sought further medical opinions to support her injury claim. Durand submitted those medical opinions to the Office of Worker's Compensation on April 28, 2008. Durand's workers' compensation benefits were reinstated, and since that time, she has been compensated from the Office of Workers' Compensation Program for $255,117.51 in wages and medical compensation of $412,997.02, and continuing.

### B. Durand moves to Montana and is ultimately taken on an undercover kayaking trip.

Durand moved to Montana and agents set up an undercover operation. For example, on December 15, 2014, federal agents mailed Durand a survey. On the survey, Durand indicated that she kayaks and camps outside as part of her outdoor activities. The agents took this information in order to formulate a ruse kayaking trip to identify whether Durand was accurate in her claims that she was unable to work for the Post Office, thereby entitling her to workers' compensation benefits.

On April 24, 2015, agents contacted Durand, posing as members of a marketing company and advised Durand that she won a free kayaking trip. Durand agreed to go on the trip during the week of July 13, 2015. Durand was

provided the website for the company called "Crystal Seas."

On May 6, 2015, Durand contacted the undercover USPS OIG agents to confirm the date she would like to travel, which changed to two weeks later—July 26, 2015. Durand requested airfare from Boise, Idaho, to Seattle, Washington.

On June 22, 2015, undercover agents mailed Durand the itinerary and required Crystal Sea forms. The forms included a questionnaire regarding any requests Durand may have and an acknowledgement of risk associated with kayaking on the ocean.

On July 26, 2015, undercover agents went with Durand to conduct undercover surveillance in the San Juan Island, Washington, area. Durand and the undercover agents participated in a three-day, two-night, kayaking tour. Durand was observed participating in three days of continuous kayaking for approximately four to seven hours a day, which totaled approximately 10 to 12 miles. Durand routinely used both arms carrying equipment, setting up and taking down her campsite, and paddling. Durand is even seen attempting to "Judo-chop" and "Karate-kick" an object that another individual held for her. Durand displayed full use of her back, arms, and hands during the entire trip, and she did not complain of pain or discomfort, even when provided an opportunity to do so.

To ensure their observations were correct, on August 6, 2015, agents mailed

Durand a follow-up survey to evaluate the Crystal Seas kayaking adventure Durand recently attended. One of the questions asked:

> Question: Crystal Seas prides itself on accommodating all kayaking levels. How would you rate the physical demands of the kayaking portion of this tour?
>
> Durand: It is of course the major portion of the tour, however, I found that it wasn't difficult keeping up kayaking, *but I'm fairly strong*. I know that we stopped when needed and Dakota asked us if we needed to rest. We kayaked approximately 10-12 miles all together. It didn't seem like it!

(Emphasis added). Another survey question asked the following:

> Question: Did the physical demands of this trip cause you to be uncomfortable in any way?
>
> Durand: I thought I might have trouble—but I was really surprised by the different ways of paddling, sitting, and placing your legs to be more comfortable! The only problem I had was about the last hour. I developed a chronic pain in my left elbow, which I found out later was just an inflammation.

In the concluding remarks of the survey, Durand stated, "I hope I get to participate in more of these recreational or non-recreational customer experiences—whatever is available. Please include me—I truly enjoyed it, and I hope my survey notes help."

6

### C. Agents scheduled a medical appointment for Durand to compare her statements with her kayaking activities.

Agents coordinated with Haidee Schouten, the Health Resource Manager, out of Salt Lake City, Utah. The purpose was to compare Durand's activities on the kayak trip versus her claim to doctors when she was evaluated for workers' compensation benefits. Schouten therefore mailed Durand a letter from a USPS Contractor, requesting that Durand attend an interview to determine her ability to return to work. The letter, which is dated August 26, 2015, stated as follows:

> The U.S. Postal Service has undertaken an initiative to significantly reduce Workers' Compensation costs during the next fiscal year. Each Area Office has been tasked to meet aggressive cost reduction goals. In the Western Area, we are making a concerted effort to improve our case management techniques in order to reduce the number of employees who are on the Periodic and Daily Rolls. To achieve this goal, it is critical that we identify claimants who can be placed either, in a productive limited duty position, or referred to an outplacement vocational rehabilitation program.
>
> We are currently coordinating an initiative whereby a Postal Service contractor will be interviewing claimants in [the] Western Area. This interactive process will enable our staff to determine what steps are necessary to achieve a positive end result. This contractor will be in the Boise, Idaho, area conducting interviews with employees, and former employees, who are currently receiving periodic benefits, from September 21, 2015, through September 25, 2015. An appointment has been scheduled for you on September 22, 2015, at 10:00 a.m., at the Marriott Courtyard, 1789 S. Eagle Road, Boise, ID 83642. Please contact Contract Vocational Rehabilitation Specialist Tonya Wall at (503) 278-4165 if you have questions or need to reschedule your appointment.

> Please note that failure to cooperate with this process will be reported to the Office of Workers' Compensation Programs and could affect your Workers' Compensation benefits.

Durand also completed a Current Capability Evaluation, which is dated September 22, 2015. In the form, Durand states that she has chronic pain, back pain, leg pain and weakness, and sciatic nerve pain, among numerous other claims. Durand stated that the last date she worked for the Postal Service was around 2007 for "limited duty." She then described that her injuries during 2015 have been "getting somewhat worse." Durand claimed that each day she can stand for 30 minutes, sit for 30 minutes, walk for 120 minutes, kneel for 15 minutes, squat for 0 minutes, climb for 0 minutes, bend for 0 minutes, reach for 10 minutes, and drive for 120 minutes. She cannot wash dishes, and she spends "most days lying in bed or laying in a recliner because sitting is unbearable and standing is very limited." She described her life as "[t]otally sedentary." Durand stated that she considers herself "totally disabled" and unable to perform any assignment for the Postal Service.

During the undercover interview by claimed medical personnel, Durand discussed her physical capabilities with an undercover agent. Durand indicated that she had significant difficulty running errands, walking outdoors or on uneven ground, and she could not sit or reach above her shoulders. Durand stated her left

8

hand had so much nerve damage that she could not grab objects and her left hand simply gives out, even when folding clothing. She was unable to walk up an incline due to the pain down her left side, and she even tried to volunteer for a church, but had to stop due to the pain.

Durand did discuss the undercover kayaking trip at Crystal Seas. Contrary to the video and evaluation, Durand now claimed her left hand hurt her so much she could not paddle and other occupants in the tandem kayak did all the work. Durand stated that she won the kayaking trip because of her medical condition— *i..e*, Crystal Seas wanted to see if it could accommodate her medical condition. That claim was wholly inaccurate.

The above is further bolstered by law enforcement sending a ruse application for activities in which Durand claimed to be physically active. On December 22, 2014, agents sent Durand a Snow Birds RP Consumer Application. In the application, Durand claimed that she was "retired." According to Durand, she rode horses "every day," and she exercised regularly, including free weights. She also walked, hiked, fished, biked, and kayaked. Her favorite activities included camping, fishing, boating, kayaking, snowmobiling, and sledding. When asked to indicate any other activities that she was involved in, she stated, "hunting, tracking, [and] pack-in camping."

### D. Doctors believe that Durand was dishonest when describing her injuries to them.

Dr. James F. Hood saw the defendant on July 23, 2008. Given the statements of Durand, Dr. Hood initially concluded that she was totally disabled.

After the conclusion of the investigation, Dr. Hood was then given the surveillance videos of Durand. Dr. Hood concluded that Durand was disingenuous and misled him during the initial physical exam. During the initial physical exam, Dr. Hood found no significant objective findings beyond the subjective complaints by Durand. Based upon Dr. Hood's review of the additional evidence, coupled with the physical exam, Dr. Hood has now concluded that Durand was fully capable at that time of employment. Durand's injury is one where others have led fully productive lifestyles, including working full-time employment. Dr. Hood concluded that Durand could have worked an eight-hour shift with light to medium work restrictions. Durand therefore could have lifted various weights as part of her full-time employment. Dr. Hood stated that if Durand was honest with him, then his original medical opinion that Durand was totally disabled would have changed significantly.

Dr. Strausser likewise saw Durand and even performed surgery on her. When Dr. Strausser reviewed the videos, he concluded that Durand could return to work "indefinitely." Dr. Strausser confirmed the kayaking video "further

corroborated" his opinion that Durand had the capability to return to work.

### E. Durand admits to law enforcement that she engaged in physically demanding activities.

Special Agent Ryan Haywood interviewed Durand about her activities in Texas. Durand first admitted that she engaged in physical activities that violated her medical restrictions but claimed that she did so only when on medication. Agent Haywood then confronted Durand with his observations of Durand where she was riding a lawn mower, cutting branches above shoulder level, using a chainsaw, carrying buckets, running after dogs, pushing around a 400-pound hay bale, and shoveling horse manure. All of this required twisting, bending, squatting, climbing, and kneeling. Durand ultimately admitted her inability to return to work was 90% her injury and 10% her boss.

## THE PLEA

The United States of America, by and through its counsel, Ryan G. Weldon, notifies the Court and opposing counsel that, though Durand is proceeding to trial, the United States notes for the record that a motion for change of plea would have been more beneficial to Durand than a conviction following trial. Durand nevertheless proceeds to trial. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## LENGTH OF TRIAL AND NUMBER OF WITNESSES

The United States anticipates calling approximately 17 witnesses. The trial should last no more than three days.

## EXHIBITS

1. Department of Labor Forms

2. Medical Travel Refund Requests

3. Snow Birds RP Consumer Application

4. Snow Bird Recreational Promotions

5. Crystal Seas Kayaking / TerraTrek Bicycle Vacations

6. Picture of Durand with Backpack and Suitcase

7. Picture of Durand and Undercover Agents

8. Picture of Durand's Journal

9. Snow Birds Recreational Promotions – Customer Experience

10. Current Capability Evaluation Form

11. Undercover Kayaking Video

12. Surveillance Video from Texas

## LEGAL ISSUES

### A. Forfeiture and Restitution Proceedings

The United States has alleged a forfeiture of a money judgment against the defendant. This therefore requires a two-step process: (1) the court determines guilt or innocence of the defendant on the counts of the Indictment; and, (2) if guilty, then the Court must also decide the forfeiture issue. *See, e.g.* Fed. R. Crim. P. 32.2(b)(1).

> As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1)(B).

When proving forfeiture, courts may rely on the evidence "already in the record" or "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). Importantly, the standard for forfeiture proceedings is preponderance of the evidence, not proof beyond a reasonable doubt. *United States v. Garcia-Guizar*, 160 F.3d 511, 523 (9th Cir. 1998).

In this case, the Indictment alleges forfeiture of a money judgment against Durand in the amount of $683,443.32. (Doc. 1 at 6-7). Any defendant who commits fraud to obtain a benefit must forfeit "*all* benefits that [s]he obtained during the period covered by the fraud." *United States v. Webber*, 536 F.3d 584, 602 (7th Cir. 2008) (citing 5 U.S.C. § 8148(a)); *see also United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009) (agreeing with analysis of *Webber*). If convicted of wire fraud, then Durand must forfeit the money she received between February of 2006 and May of 2016. (Doc. 1 at 3). The restitution amount, however, might be different based upon what Durand actually needed. If convicted, restitution may be addressed at sentencing.

### B. Elements of the Crimes

A federal grand jury has indicted Ms. Durand with four federal felonies. The elements of those crimes are outlined as follows:

**Count I—False Statements Regarding Workers' Compensation Benefits.**

**First**, the defendant knowingly and willfully made a false statement or report to the Department of Labor, Office of Workers' Compensation Programs;

**Second**, the false statement or report was made in connection with an application for or receipt of Federal Workers' Compensation benefits; and,

**Third**, the false statement or report was material.

> A statement or report is "false" if it is untrue when made and the person making it knows it is untrue.
>
> A "material fact" is an important fact, not some unimportant or trivial detail, that could influence a decision of the Department of Labor, Office of Workers' Compensation Programs.
>
> The heart of the crime is attempting to influence the Office of Workers' Compensation Programs by willfully making a false statement or report concerning a material fact. The Government does not have to prove that anyone was actually influenced or misled.

Pattern Crim. Jury Instr. 11th Cir. OI 069 (2016).

> **Count II – Wire Fraud**
>
> **First**, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements or half-truths may constitute false or fraudulent representations;
>
> **Second**, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> **Third**, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and,
>
> **Fourth**, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.
>
> In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.
>
> To convict a defendant of wire fraud based on omission of material facts,

15

you must find that the defendant had a duty to disclose the omitted fact arising out of a relationship of trust. That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise.

Ninth Circuit Model Jury Instruction, Wire Fraud, 8.124.

### Count III – False Claims Act/Fraudulent Claims Relating to Workers' Compensation Benefits

**First**, the defendant knowingly presented a false claim against the United States to an agency of the United States;

**Second**, the claim was based on a false or fraudulent material fact; and,

**Third**, the defendant acted intentionally and knew that the claim was false and fraudulent.

A claim is "false" or "fraudulent" if it is untrue when made, presented, and the person presenting it knows it is untrue. But the government does not have to show that the governmental department or agency was in fact deceived or misled.

It is not a crime to make a false claim unless the falsity or fraudulent aspect relates to a material fact. A misrepresentation is "material" if it contains a "material fact" that is false. A "material fact" is an important fact—not some unimportant or trivial detail—that has a natural tendency to influence or is capable of influencing a department or agency in reaching a required decision.

The defendant does not have to directly submit the claim to an employee or agency of the United States. It is sufficient if the defendant submits the claim to a third party knowing that the third party will submit the claim or seek reimbursement from the United States or a department or agency thereof.

Pattern Crim. Jury Instr. 11th Cir. OI O11.2 (2016).

**Count IV – Theft of Government Property**

**First**, the defendant knowingly stole money with the intention of depriving the owner of the use or benefit of the money;

**Second**, the money belonged to the United States; and,

**Third**, the value of the money was more than $1,000.

DATED this 14th day of August, 2017.

                                          LEIF JOHNSON
                                          Acting United States Attorney


                                          */s/ Ryan G. Weldon*
                                          RYAN G. WELDON
                                          Assistant U. S. Attorney

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule, this certifies that the body of the attached trial brief contains 3,510 words, excluding the caption and certificate of compliance.

LEIF JOHNSON
Acting United States Attorney


*/s/ Ryan G. Weldon*
RYAN G. WELDON
Assistant U. S. Attorney