1  Julie Pesanti DeLong (Sampson)
   Registered Professional Reporter
2  PO Box 163
   Saint Ignatius, Montana  59865
3  Phone:  (406) 498-3941
   Email:  fortherecord1103@gmail.com
4
   _____
5
             IN THE UNITED STATES DISTRICT COURT
6               FOR THE DISTRICT OF MONTANA
                   GREAT FALLS DIVISION
7
   UNITED STATES OF AMERICA,          )
8                                     )
                       Plaintiff,     )
9                                     )        CR-16-43-GF-BMM
     versus                          )
10                                    )
   DEBORAH JOY DURAND,                )
11                                    )
                       Defendant.     )
12 _____

13             TRANSCRIPT OF PROCEEDINGS

14                  MOTION HEARING

15      BEFORE THE HONORABLE JOHN T. JOHNSTON
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16            FOR THE DISTRICT OF MONTANA

17             Chief Mountain Courtroom
              Missouri River Federal Courthouse
18         United States District Court Great Falls
                125 Central Avenue West
19              Great Falls, MT 59404

20               August 9, 2017
                   2:00 p.m.
21

22

23

24

             Proceedings recorded by machine shorthand
25    Transcript produced by computer-assisted transcription

**APPEARANCE OF COUNSEL:**

**For the Plaintiff:**

Mr. Ryan G. Weldon
Assistant United States Attorney
United States Attorney's Office - Great Falls
P.O. Box 3447
119 First Avenue North, Suite 300
Great Falls, MT 59403
(406) 761-7715 (Phone)
(406) 453-9973 (Fax)
Email: Ryan.Weldon@usdoj.gov

**For the Defendant:**

Ms. Joslyn Hunt
Assistant Federal Defender
Federal Defenders of Montana
Helena Branch Office
50 West 14th Street, Suite
Helena, MT 59601-3332
(406) 449-8381 (Phone)
(406) 449-5651 (Fax)
Email: joslyn_hunt@fd.org

1 **PROCEEDINGS**

2

3 **(Open court)**

4 **(Defendant present)**

5 **(Proceedings began at 2:01 p.m.)**

6

7 THE BAILIFF:  All rise.  The United States District

8 Court is now in session.

9 THE COURT:  Well, good afternoon, and please be

10 seated.

11 MR. WELDON:  Good afternoon, Your Honor.

12 CLERK OF COURT:  This Court will now conduct a

13 motion hearing in Criminal 16-43, Great Falls, Judge Morris

14 and Judge Johnston, United States of America versus Deborah

15 Joy Durand.

16 THE COURT:  And, Ms. Hunt, how are you today?

17 MS. HUNT:  I'm doing well, Your Honor.

18 THE COURT:  And who is seated with you at counsel

19 table?

20 MS. HUNT:  Ms. Durand is here today.

21 THE COURT:  All right.  Welcome to my courtroom, Ms.

22 Durand.

23 THE DEFENDANT:  Thank you, sir.

24 THE COURT:  And, so, we have a consolidated hearing,

25 basically, on a couple of motions pending before the Court.

1       One is a motion to dismiss for entrapment.

2              MS. HUNT:  (Nods head affirmatively)

3              THE COURT:  And the second is a motion in limine in

4   relation to this video and interview that was conducted.

5       Is that correct?  Am I --

6              MR. WELDON:  (Nods head affirmatively)

7              THE COURT:  -- on track?

8              MR. WELDON:  I agree, Your Honor.

9              THE COURT:  All right.

10             MS. HUNT:  Yes.

11             THE COURT:  So, Ms. Hunt, they are your motions, are

12  you ready to proceed?

13             MS. HUNT:  I am, Your Honor.

14             THE COURT:  Okay.  Please do.

15             MS. HUNT:  Thank you.

16      So, good afternoon, Your Honor.

17             THE COURT:  Good afternoon.

18             MS. HUNT:  I'm glad to be here today to speak to you

19  about the motions that we filed.  We understand that rulings

20  on a motion to dismiss aren't typical, because, in a large

21  majority of the cases, there would be a factual dispute.  But

22  the facts in Ms. Durand's case, uhm, are not in dispute.

23      The government, of course, has filed its response, and

24  put in its response quite a few facts, but the facts that I

25  want this Court to focus on today are very simple.  Ms. Durand

1   was employed by the post office.  She suffered work-related

2   injuries as a result of her employment there.  She then went

3   through the process to obtain Workers' Comp benefits, having

4   done what was asked of her in the evaluations and medical

5   appointments.  She then got Workers' Comp benefits, and

6   continues, still, to receive those benefits.

7        Those facts are what drive the motions in this case.  And

8   discussion today might overlap with regard to the motion to

9   dismiss and the motion in limine, but, again, that's the

10  central focus of what is going on here.

11       Ms. Durand, when she was in the process of obtaining

12  these benefits, saw Doctor Hood at some point, and I think --

13  I believe that was in 2008.  He evaluated her, ran tests,

14  talked with her, and determined that she was totally disabled,

15  that she could not return to her work and be gainfully

16  employed in that capacity.

17            THE COURT:  Her doctor determined that.  Is that

18  right?

19            MS. HUNT:  Doctor Hood, yes.  One (indicating).

20            THE COURT:  "A," one of her doctors.

21            MS. HUNT:  One of her doctors, yes.  But one that

22  actually she saw, uhm, as a result of another investigation

23  that was in place.

24       So, she is rendered totally disabled, and she relies on

25  that.  She does not return to work.  And this continues for

1  years, until there is this kayak trip set up by the government

2  to induce her to go recreate.

3      Having done so, they videotaped this, and then used that

4  as evidence that she somehow, years beyond -- or years prior,

5  I should say, was fraudulent, that she misled the doctor in

6  his assessment of her being totally disabled.

7      And that is the gist of the government's case, and that

8  is the gist of why this entrapment and estoppel argument

9  exists.  She was given advice, that is that she cannot return

10  to work, that she is totally disabled.

11          THE COURT:  Well, did the government advise her that

12  she couldn't go to work?

13          MS. HUNT:  It wasn't --

14          THE COURT:  I thought her doctor did.

15          MS. HUNT:  It was a Workers' Comp doctor, that is

16  followed through with a Workers' Comp claim, which is a

17  government employee -- a government agency.

18          THE COURT:  Well, sure.  But the doctor -- this is

19  my understanding of Workers' Comp.  So, someone gets hurt at

20  work, they go to their own doctor, and then they might have to

21  go to a doctor for the insurance company or the government.

22          MS. HUNT:  Uh-huh.

23          THE COURT:  The government can say, well, we want

24  our doctor to look at you, too.  Right?

25          MS. HUNT:  Right.

1    THE COURT:  Is that what happened here?  Is that who

2    this doctor is?

3    MS. HUNT:  Doctor Hood, I believe, is somebody,

4    again, who they had evaluate for -- for the Workers' Comp

5    purposes.  I don't believe that it was somebody that she

6    sought out alone.

7    THE COURT:  Okay.  So, Doctor Hood.  Let's pretend

8    -- well, I'll -- I'll call him an independent medical

9    examiner.

10    MS. HUNT:  Uh-huh.

11    THE COURT:  Okay?

12    MS. HUNT:  Uh-huh.

13    THE COURT:  Because he's not her treating physician,

14    so I'll call him an IME doctor.  Okay?  Have you ever heard of

15    those?

16    MS. HUNT:  Right.  Yes.

17    THE COURT:  Okay.

18    MS. HUNT:  Yes, Your Honor.

19    THE COURT:  That's what I'll call him.  I don't know

20    if that's what he is or not.

21    MS. HUNT:  Okay.

22    THE COURT:  So, a person seeking work comp benefits

23    goes to their own doctor, and then they are requested by the

24    insurer or the government to go to an IME doctor.  And, then,

25    she goes to the IME doctor -- let's leave you out of it for

1    now.  A hypothetical person goes to the IME doctor and says,

2    well -- the doctor says, "Well, how you doing?"  And the

3    patient says, "Well, not very good.  I can't lift my legs and

4    I can't walk, and my job requires walking."  And the doctor

5    says, "Oh, okay.  So, does this hurt to move your legs?"

6    "Yeah."  "Well, that hurts.  And does this hurt?"  "Yeah, that

7    hurts."  "And can you stand?  How long can you stand?"  "Well,

8    no more than five minutes."

9          So, doctors are like -- lots of them are like this,

10   "Well, the claimant says that her legs won't work, and it

11   hurts when she moves her legs, her job requires her to walk,

12   she is totally disabled, as far as I'm concerned," and sends

13   that in.  Right?

14              MS. HUNT:  Correct.

15              THE COURT:  Okay.  And, then, you know, they

16   continue to treat, see the doctor from time to time, their own

17   doctor.

18              MS. HUNT:  Right.

19              THE COURT:  That's, I'm sure, what happened here.

20   And then just, coincidentally, they run in the Governor's Cup

21   and get third in the marathon.  Right?  Just say that that

22   happened.

23              MS. HUNT:  (Nods head affirmatively)  (Shrugs

24   shoulders)  Yes, that could happen.

25              THE COURT:  And that there was a taping of the

1    marathon, and then somebody from the Workers' Compensation

2    company says, "Geez, I think that woman is on Workers'

3    Compensation benefits for being totally disabled because she

4    can't move her legs, and she just got third place in the

5    marathon."

6         Whereas -- that this is sort of like that.  I mean, the

7    government didn't tell her to do anything in the beginning.  I

8    mean, the crime is telling the doctor that she has got these

9    problems, when she doesn't have them.

10              MS. HUNT:  But the evidence --

11              THE COURT:  Isn't that right?

12              MS. HUNT:  -- the evidence that the government

13   suggests that she was fraudulent is because of the trip that

14   they set up --

15              THE COURT:  Oh, sure.  But that's not the crime.

16   The crime isn't going on a kayaking trip.  If there is a crime

17   at all.  It's not going on the kayaking trip, it's telling

18   somebody that I can't move my arms and I can't lift this and I

19   can't do that, when, in fact, you can.

20              MS. HUNT:  But, again, the government's evidence --

21   the sole evidence in this case is that trip, an isolated event

22   where she is -- we don't know how much medication she had

23   taken to be able to do some of the things, if she was able to

24   do some of the things on that trip.  An isolated event.  Set

25   up by the government.  To try to prove that, years prior, she

1    somehow did -- she told a falsehood to the doctor.

2          THE COURT:  Well, it's a persistent thing, when you

3    are on Workers' Compensation, that if you are no longer

4    disabled you've got to tell your employer that you aren't,

5    right?

6          MS. HUNT:  In general.

7          THE COURT:  That makes sense, right?

8          MS. HUNT:  In general, yes.  As far as Workers' Comp

9    goes, yes.

10          THE COURT:  That makes sense.  Right.  And, so, how

11   long was this kayaking trip?  Like, four or five days?

12          MS. HUNT:  A few days, yes.

13          THE COURT:  All right.  And, so, what happens is the

14   government is suspicious of your client so they set up the

15   trip.  They say, "Hey, Ms. Defendant, you won a trip."  And

16   then they film the trip, and it's contrary to the statements

17   that she's made to the doctor, right?

18          MS. HUNT:  I think it goes beyond just setting up a

19   trip and filming the trip.  They encourage her to go on a

20   trip, and encourage her to do things, that, again, uhm, maybe

21   she is assessing that risk on her own, based on her injuries,

22   we don't know that, and is just deciding, well, I'm still

23   injured, this still hurts, but I'm still going to do this

24   because I won this trip.

25          THE COURT:  Right.

1    MS. HUNT:  Again, no evidence of her having

2  committed a falsehood years prior.

3    THE COURT:  Right.  But you're talking about

4  dismissing the case on entrapment.  And, I mean, everything

5  you are saying -- like, is this a judge trial?

6    MR. WELDON:  It is, Your Honor.

7    MS. HUNT:  It is, Your Honor.

8    THE COURT:  Yeah?  Okay.  So, everything you are

9  saying Judge Morris can listen to and say, "Yeah, maybe she

10  was on a lot of medication at the time that she was on the

11  kayak trip, and maybe" -- whatever, whatever the things are

12  that you were just saying right now.  He will listen to all of

13  that, and he will judge the evidence, then Mr. Weldon has to

14  prove beyond a reasonable doubt that, in fact, you know, if

15  she says X to work comp, but she can do everything.

16    She can certainly work if she can go on the kayaking

17  trip.  I don't think it's that complicated, right?

18    MS. HUNT:  Well, I think, as far as whether this is

19  proper to dismiss at this juncture, we still have the

20  government stating to her that she is totally disabled, and

21  that just -- that statement by Doctor Hood in 2008, that she

22  cannot return to work, is not a statement that she can't

23  assess some day to recreate.  And that is an affirmative

24  misleading on their part to then suggest to her that she

25  should go on this trip and do these actions, and then they

1    will use that as evidence that she was fraudulent.  That's the

2    affirmative misleading portion and the entrapment portion

3            THE COURT:  Well, the government is telling -- well,

4    I don't know if the government -- Doctor Hood might not be the

5    government, I don't know.  Is Doctor Hood the government?

6    Does Doctor Hood work for the government, do you know?

7            MS. HUNT:  I don't know that he works for the

8    government.

9            THE COURT:  Okay.  So, that's a problem, if he

10   doesn't, right?

11           MS. HUNT:  Well, if he works for Workers' Comp, and

12   she is referred to by Workers' Comp and seeks that, you'll see

13   that agency as connected with the government.

14           THE COURT:  All right.  So, let's try this a

15   different way.  I'll be the government, you be the work comp

16   -- the person who wants Workers' Compensation, I'll be the

17   government.  And I say to you, "Well, Joslyn Hunt, can you

18   walk?"  And I want you to say "No" to me.

19           MS. HUNT:  No.

20           THE COURT:  Okay.  "Then you're totally disabled,"

21   Right?  "Because you have told me that you can't walk, I am

22   telling you that you are totally disabled," right?

23           MS. HUNT:  In this very simplistic --

24           THE COURT:  Yes.

25           MS. HUNT:  -- scenario?

1   THE COURT:  Yes.

2   MS. HUNT:  Yes.

3   THE COURT:  And, so, then, when you turn around and

4   go to sit down, I'm going to say, "Well, you can walk."

5   MS. HUNT:  But that also discounts that that's not

6   what occurred in this case when she saw Doctor Hood.  That he

7   ran his own tests and made his own assessment, beyond what was

8   stated by her.

9   THE COURT:  Uh-huh.  And what does Doctor Hood have

10  to say about this kayaking trip?

11  MS. HUNT:  Doctor Hood, years later, after seeing

12  the kayaking trip, suggests that he was wrong in his

13  assessment.

14  THE COURT:  Right.

15  MS. HUNT:  Which is convenient.  Because whatever

16  fault he may have is -- lies with -- I mean, is placed just on

17  Ms. Durand.  That he doesn't have any independent obligation,

18  as a medical doctor, to make his assessment, which he did.

19  THE COURT:  When you talk about estoppel, I mean,

20  that's sort of what's running through the case against your

21  client.  I think that's the government's point of view, is

22  you're estopped from claiming that you're criminally liable

23  because you're claiming that you can't do some thing, when, in

24  fact, you can.  I think that's how they are seeing it.  That

25  you can do a lot more than you told Doctor Hood that you could

1   do; and if you would have told him the truth, he never would

2   have said that you were disabled in the beginning.

3        Isn't that what their case is?

4             MS. HUNT:  That's what they are suggesting.

5             THE COURT:  Well, they are more than suggesting it.

6   That's what the Indictment says.  Basically, that.  Right?

7             MS. HUNT:  Yes.

8             THE COURT:  Okay.  So, but you are saying that she

9   was entrapped.  Was she entrapped by Doctor Hood saying that,

10  "You're totally disabled"?

11            MS. HUNT:  I think she relied upon him telling her

12  that she cannot return to work and be gainfully employed in

13  that capacity --

14            THE COURT:  She was asserting that, though.  She was

15  the one saying that "I can't go back to work," right?

16            MS. HUNT:  But he still -- she followed through with

17  the process that exists for obtaining Workers' Comp benefits.

18  And that was part of the assessment, was to run tests; do her

19  evaluation, which included, of course, a discussion with her,

20  uhm, and he made his determination.  And that determination

21  was that she is totally disabled.

22       So, she should be able to rely on that.  Which she did,

23  obviously, for years, until they, then, set up this ruse kayak

24  trip.

25            THE COURT:  Right.  The kayak trip was a ruse.  But

1  what your client was doing on the kayak trip isn't a ruse,

2  that's just reality, right?

3        MS. HUNT:  As far as -- again, that's an isolated

4  incident, showing that she may have, uhm -- who knows, again,

5  how medicated she was, or what she was suggested to try.  And,

6  again, a totally disabled assessment, but not being gainfully

7  employed with the U.S. Postal Service does not negate

8  recreation in its entirety.

9      I don't believe that her recreating once, even on this

10  ruse trip, would suggest that she was fraudulent years

11  prior.

12        THE COURT:  Okay.  But isn't -- aren't these all

13  just arguments about how to weigh the evidence to Judge

14  Morris?  Because the latter part of what you sort of leap off

15  into, well, this was over a short duration and we don't know

16  how much medicine she was on, --

17        MS. HUNT:  Uh-huh.

18        THE COURT:  -- and we don't know how much pain she

19  was in at nighttime when nobody can see her, that's more like

20  for Judge Morris to weigh in determining whether the

21  government has met its burden of proof, right?

22        MS. HUNT:  I see -- I appreciate what the Court is

23  saying, but I still --

24        THE COURT:  You can disagree with me.  I don't get

25  mad if you disagree with me.

1    MS. HUNT:  I do disagree with that assessment, only

2    from the standpoint that it's still, I believe, an affirmative

3    misleading by the government.

4    THE COURT:  But what's misleading?  The --

5    MS. HUNT:  The fact that she was told that she is

6    totally disabled, she -- and she relied on that, obtained

7    benefits, still obtains benefits in this regard, followed

8    through with everything she was told, and, yet, now she is

9    being indicted for fraud.

10   THE COURT:  Right.

11   MS. HUNT:  Based on a trip that they set up.

12   THE COURT:  Right.  I think what the government's

13   position is, is we are charging you with fraud because you

14   were able to engage in these activities that you are saying

15   that you can't engage in to the doctor.

16   MS. HUNT:  I guess, and that would lead me into, if

17   we want to go into the motion in limine, because it gets into

18   -- it spills into the isolated -- the actual kayak trip and

19   the videotaping of that trip.

20   Again, it is an isolated trip, it's an isolated video of

21   that trip.  To suggest to -- to have that video, along with a

22   picture-in-picture video of an interview that she did later

23   after that trip -- I think beyond it not being direct proof of

24   fraud, as we've discussed today, as I've argued because,

25   again, one trip (indicating) years later does not equate to,

1    years prior, a fraud, that she didn't tell the doctor properly

2    how much pain she was in, but, beyond that, I think it's

3    unduly prejudicial to have the jury -- or the judge, I guess,

4    now, in our case, review a picture-in-picture video, which is

5    pretty much what the government's argument is, that she went

6    on the kayak trip and she says that she is injured.

7         I think that that picture-in-picture video shouldn't be

8    admitted.  It should be separated, at a minimum.  But we would

9    argue that it should be excluded, because we do not believe

10   that it's relevant to this case because it's an isolated

11   incident.  But, beyond that, it is unduly prejudicial.

12             THE COURT:  Okay.  So, Rule 403 says that it has to

13   be unfairly prejudicial, and it has to substantially outweigh

14   its probative value.

15             MS. HUNT:  Right.

16             THE COURT:  Okay.  So, if somebody is looking at it,

17   it's -- you can look at it and say, "Well, here's the little

18   picture, and then here's the activities."  Right?

19             MS. HUNT:  Right.

20             THE COURT:  And, so, I think the way it works is,

21   "Well, are you able to lift anything?"  "No, I'm not able to

22   lift anything," and then -- then there is video of her lifting

23   the kayak and carrying it down to the river, or something.

24   Right?

25             MS. HUNT:  Correct.

```
 1          THE COURT:  And then there is, "Well, can you use
 2   your arms?"  "No, I can't use my arms, they are in too much
 3   pain," and then there is pictures of her kayaking down the
 4   river, or something.  Right?
 5          MS. HUNT:  Correct.
 6          THE COURT:  Okay.  So, it's highly prejudicial.
 7          MS. HUNT:  Yes.
 8          THE COURT:  Right?  That's, like, all evidence
 9   against your case is always -- the other party always puts on
10   the most prejudicial evidence that they can get their hands
11   on, right?
12          MS. HUNT:  That is correct.
13          THE COURT:  Okay.  So, why is it unfair?
14          MS. HUNT:  It's unfair because they can still
15   present their case without the picture-in-picture video.  They
16   could display the kayak trip, they could display the interview
17   later.  They don't need to have the video make their argument,
18   and have the video play a concocted video of a
19   picture-in-picture of what is -- the trip is and what she is
20   saying.  That's one piece of it.
21       But, beyond that, because it is a kayak trip, an isolated
22   incident, as we've talked about.  And that we don't know,
23   again, how medicated she was, and even what medical testimony
24   might be needed to assess whether she even had that ability.
25   If she was still injured, what the kayak trip did to her to
```

1    further injure her, or that kind of assessment of the kayak

2    trip, that kind of testimony is needed from a medical doctor.

3        Again, it goes -- it links back into what I've said at

4    the beginning, because we are talking about an isolated

5    incident, it's not proof that she was lying years prior.

6        THE COURT:  Is it a crime to continue to take

7    benefits if you recover?  So, like, on a certain date, like,

8    five years ago, "I can't use my legs."

9        MS. HUNT:  Uh-huh.

10       THE COURT:  Okay?  And then over the next four

11   years, five years I get better and I am able to use my legs,

12   and I can walk, and I have a treadmill in the basement, and I

13   can run, and isn't it a crime, then, to continue to perpetuate

14   that you are totally disabled if you no longer are?

15       MS. HUNT:  But I think she has followed, again,

16   through with the process as it exists to assess that

17   determination.

18       THE COURT:  Okay.

19       MS. HUNT:  She has done all that was asked of her.

20       THE COURT:  So, in relation to the

21   picture-in-a-picture video, that's an efficient way for the

22   government to present its case, and you don't think that they

23   should efficiently present it because it's prejudicial.

24       MS. HUNT:  I don't think it's an efficient way.  I

25   think they can do it in a different manner.  And, again, I

1  think that they need to -- at a minimum, there needs to be

2  some medical testimony that coincides with the video.

3         THE COURT:  Well, I think what their point is, is

4  it's not really medical testimony, it's that her statements

5  don't match her activities.

6         MS. HUNT:  And they can present that separately from

7  the picture-in-picture video.

8         THE COURT:  The Rules of Evidence don't require --

9  they don't say, well, the judge says the way you have to

10  present it.  As long as they present it in a way that's

11  admissible, it's admissible, right?

12        MS. HUNT:  If it's admissible.  But if it's -- what

13  we are saying is that it is unduly prejudicial in her case.

14        THE COURT:  Okay.  Well, thank you very much.

15        MS. HUNT:  Thank you.

16        THE COURT:  I appreciate your arguments.

17     And, Mr. Weldon, what do you have for the government

18  today?

19        MR. WELDON:  Very briefly, Your Honor.

20     I did want to start a little bit with the facts.  I know

21  that it's a motion to dismiss, and that was the first issue,

22  but I think it's important to, at least, discuss that.

23     The statement was that she was told she was disabled, and

24  I always fall back to the question of why?  Why was she told

25  that she was disabled?  And it's because she lied to the

1    doctors.  And that's the key in Workers' Comp.  If you

2    convince a doctor to say that you're totally disabled, then

3    you can perpetuate that fraud throughout the system.

4        And Doctor Hood was the individual who was brought up in

5    this particular proceeding, and he will be here to testify.

6    And we filed an expert witness disclosure for him, it's

7    Document 69 in the Court's file.

8        I think that some of the information that he provides is

9    particularly relevant, where he says initially that she is

10   totally disabled.  And then he was actually shown the

11   additional evidence, and on Page 3 of that expert witness

12   disclosure he states that the first video -- because there

13   were actually two videos in this case, one was in 2008, where

14   there was video of her lifting hay, feeding horses, and her

15   neighbors will be here to testify about all of the activities

16   that she was doing when she was working on a five-acre plot of

17   land, but then Doctor Hood was able to see that, as well as

18   the kayaking video.

19       And he states that, "The video even showed Doctor Hood

20   that Durand could bend fully at 90 degrees, she walked without

21   a limp, and she carried heavy objects without indicating any

22   evidence of discomfort.  The second video showed Doctor Hood

23   that Durand was kayaking, and she was fully engaged and active

24   throughout the video.  Doctor Hood also made -- was also made

25   aware that Durand was riding horses, which also supports the

1    conclusion that she could do almost any type of activity.

2    After reviewing this evidence, Doctor Hood concluded that

3    Durand was disingenuous and misled him during the physical

4    exam."

5        So, that's really the basis.  So, when we talk about

6    Doctor Hood, he says, "Absolutely, I provided the opinion that

7    she was totally disabled, I provided that opinion because she

8    lied to me."  And that's the basis for the fraud allegations

9    for Ms. Durand.

10       Then I did want to talk just about the elements, because

11   I think that's important, for the motion to dismiss.  We have

12   the element that I outlined on Page 11 of the brief, and it

13   states that, "The defendant was given advice by an authorized

14   federal government official empowered to render the claimed

15   erroneous advice."  We can just assume for a minute that

16   Doctor Hood and Doctor Strausser were government officials.  I

17   think there certainly is an argument that they are not, but I

18   think that the piercing part is Number 2 where it states that,

19   "The authorized federal government official was made aware of

20   all of the relevant historical facts."

21       If Ms. Durand can do all of these things, and she is

22   claiming that she can't, then, of course, these individuals,

23   even assuming that they are government officials, are not made

24   aware of the historical facts.  And, so, that's why I think

25   that it doesn't go and fit within the estoppel argument.  And,

1   of course, it can't be for the substantive, because they have

2   to show that the person doesn't have a propensity to commit

3   the fraud, and they can't do that in this case.

4        When we talk about the kayaking video, the kayaking video

5   is a really interesting piece of evidence, because it has the

6   picture-in-picture, where we have a direct claim, and then a

7   direct contrast.  And it is exactly proving what Doctor Hood

8   and Doctor Strausser experienced when they were working with

9   Ms. Durand.

10        So, the government, in our Indictment, we've alleged a

11  large period, I believe it begins in 2006, and then runs all

12  the way until 2015.  That kayaking video is during that time

13  period.  And I think you asked the question that gets right to

14  the issue, if an individual can work during that kayaking

15  trip, then they are committing fraud on that kayaking trip

16  when they are also collecting Workers' Comp.  That is direct

17  evidence of fraud.

18        I agree with the Court one hundred percent, it is highly

19  prejudicial.  It is also critically probative.  Because it

20  shows the actual statements that Ms. Durand makes.  And you

21  can see that even in the video.

22        I think one of the best statements in that entire video

23  is the claim that the kayaking trip was really for handicapped

24  people, and that that's what they were trying to see, if they

25  could help handicapped people.

1    And then you look at the disclosures, like in the

2    authorized portions that she has to sign, and it basically

3    says that you have to be very physically fit to engage in this

4    sort of activity, that you are assuming all risks as a result

5    of you kayaking in the ocean.  Ms. Durand signed that with no

6    problems, whatsoever.

7        And, then, after the fact, when she provided a review of

8    the kayaking trip, she said that there was really no such pain

9    at all.  She mentioned that she had some pain in her elbow,

10   but it turned out that it was just inflammation.  So, when she

11   is not talking to her doctors, people who allow her to

12   basically take funds from the Workers' Comp fund, then she is

13   more than willing to say that everything is okay.

14       And I will mention for the Court, also, the parting shot

15   that Ms. Durand said when she was evaluating this particular

16   trip is, "Please consider me for any and all other future

17   trips" that can be recreational activities.  So, I think that

18   that goes right to the direct heart of the fraud.

19       I know there were some other claims about 404(b)

20   evidence, we are not claiming this is other acts, we are

21   claiming it is directly part of the --

22           THE COURT:  It's not character evidence.

23           MR. WELDON:  Correct.

24           THE COURT:  It's evidence of actual fraud in this

25   case.

1        MR. WELDON:  Exactly right.  And, then, the other

2   thing that I want to finish, and then answer any other

3   questions that the Court had, is this idea that the Code of

4   Federal Regulations are cited.  And I saw that a few times in

5   the brief, and I think it's important for the Court to

6   understand that there are really two processes at issue here.

7        We have a civil side, or an administrative side, where

8   there is an administrative function where people are obtaining

9   benefits.  When they are doing that, there are always advisory

10  components on these documents saying if you start committing

11  fraud, you can be prosecuted criminally for that.

12       So, when we have the CFRs and the sections that people

13  are operating within the administrative side, that is very

14  different than the criminal side.  And, so, I saw one of those

15  citations.  For example, going directly to a doctor, that has

16  to do with the civil side.

17       Now, I understand that those principles apply; but when

18  we get into Title 18, that's when we talk about wire fraud and

19  false statements.  (Nods head affirmatively)

20           THE COURT:  All right.  Well, thank you very much.

21           MR. WELDON:  All right.  Thank you, Your Honor.

22           THE COURT:  And, Ms. Hunt, do you have some rebuttal

23  to that?

24           MS. HUNT:  I just have a few comments.

25           THE COURT:  All right.

1          MS. HUNT:  I will just follow up on what Mr. Weldon

2     indicated with regard to the CFRs and the administrative side

3     of things.

4          We did, of course, cite in our brief, and stand on what

5     we cited, as far as it concerns other administrative problems

6     in this case; but, beyond that, the case cite to the Ninth

7     Circuit about not just having a video, and having somebody

8     look at that video and make some sort of medical assessment by

9     just that one video, that goes into our argument as to why

10     this video, also, is unfairly prejudicial.  Because without

11     having that assessment, that medical testimony to coincide

12     with that video, uhm, it should be excluded.

13          That's the Thomas v. Barnhart.  And I understand that

14     that is before an administrative law judge, but it states that

15     they shouldn't accept the opinion of a physician that's just

16     brief, conclusory, and unsupported by clinical judgment.  By

17     just looking at that video, that that's what they submitted to

18     Doctor Hood, that's the situation we have here.

19          And, yes, there is a different administrative side, a

20     criminal side, but that still plays into this case.

21          THE COURT:  But, here, this Doctor Hood says, "After

22     reviewing additional evidence," that's the video, "I have now

23     concluded that Durand was disingenuous and misled me during

24     the physical examination."

25          MS. HUNT:  Uh-huh.

1          THE COURT:  I mean, he's not just looking at one --

2     just the video, he has a whole history with her before.

3          MS. HUNT:  He has the review from before, his

4     assessment from before, and now we are to believe that he was

5     -- oh, I was wrong back then, but right now that she is a

6     liar?  (Shakes head negatively)  That's what he is claiming.

7          THE COURT:  I think that's exactly what he is

8     claiming.

9          MS. HUNT:  Uh-huh.  Based on a video.

10          THE COURT:  Right.

11          MS. HUNT:  Which, again, we would claim is unfairly

12     prejudicial and should not be submitted.

13          THE COURT:  Okay.  Well, I understand your

14     arguments.  And I appreciate the attorneys for both the

15     government and Ms. Durand.  I'll take it under advisement.  I

16     hope to have an order out soon.  I mean, is the trial next

17     Monday?

18          MR. WELDON:  Not this Mon -- upcoming Monday, it's

19     the following Monday, Your Honor.

20          THE COURT:  It's the following Monday.

21          MR. WELDON:  Correct.

22          THE COURT:  So, I know that there is a right to

23     appeal my findings and recommendation.  Is it going to be

24     inside the time frame by the time the trial starts?  So, if

25     you want to object to this, I suggest that you do it as soon

```
 1   as possible, or at the final pretrial with Judge Morris.
 2             MS. HUNT:  Okay.
 3             MR. WELDON:  Certainly, Your Honor.
 4             THE COURT:  All right.
 5             MS. HUNT:  Thank you.
 6             THE COURT:  Well, thank you very much.  Have a good
 7   day.
 8             MS. HUNT:  Thank you.
 9             MR. WELDON:  Thank you, Your Honor.
10             THE COURT:  Court's in recess.
11
12             (Proceedings concluded at 2:31 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**<u>CERTIFICATE</u>**

I, Julie L. DeLong, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my knowledge, skill, and ability.


<u>  /s/ Julie L. DeLong              </u>          <u>02/05/2018</u>
Julie L. DeLong                               Date