1   **Julie Pesanti DeLong (Sampson)**
    **Registered Professional Reporter**
2   **PO Box 163**
    **Saint Ignatius, Montana   59865**
3   **Phone:   (406) 498-3941**
    **Email:   fortherecord1103@gmail.com**
4   _____

5               **IN THE UNITED STATES DISTRICT COURT**
                 **FOR THE DISTRICT OF MONTANA**
6                   **GREAT FALLS DIVISION**

7   UNITED STATES OF AMERICA,          )
                                       )
8                     Plaintiff,  )
                                       )          CR-16-43-GF-BMM
9     versus                           )
                                       )
10  DEBORAH JOY DURAND,                )
                                       )
11                    Defendant.  )
    _____
12
              **TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
13
                **DAY 1 OF WITNESS TESTIMONY**
14
          **BEFORE THE HONORABLE BRIAN M. MORRIS**
15           **UNITED STATES DISTRICT COURT JUDGE**
               **FOR THE DISTRICT OF MONTANA**
16
                Charles N. Pray Courtroom
17            Missouri River Federal Courthouse
            United States District Court Great Falls
18                125 Central Avenue West
                  Great Falls, MT 59404
19
                    **August 21, 2017**
20                     **8:30 a.m.**

21

22

23

24
              Proceedings recorded by machine shorthand
25      Transcript produced by computer-assisted transcription

**APPEARANCE OF COUNSEL:**

**For the Plaintiff:**

Mr. Ryan G. Weldon
Assistant United States Attorney
United States Attorney's Office - Great Falls
P.O. Box 3447
119 First Avenue North, Suite 300
Great Falls, MT 59403
(406) 761-7715 (Phone)
(406) 453-9973 (Fax)
Email:  Ryan.Weldon@usdoj.gov

Mr. Jared Cobell
Assistant United States Attorney
United States Attorney's Office - Great Falls
P.O. Box 3447
119 First Avenue North, Suite 300
Great Falls, MT 59403
(406) 761-7715 (Phone)
(406) 453-9973 (Fax)
Email:  Jared.Cobell@usdoj.gov

**For the Defendant:**

Mr. Evangelo "Vann" Arvanetes
Assistant Federal Defender
Federal Defenders of Montana
Office Headquarters, Great Falls
104 2nd Street South, Suite 301
Great Falls, MT 59401-3645
(406) 727-5328 (Phone)
(406) 727-4329 (Fax)
Email:  vann_arvanetes@fd.org

Ms. Joslyn Hunt
Assistant Federal Defender
Federal Defenders of Montana
Helena Branch Office
50 West 14th Street, Suite 1
Helena, MT 59601-3332
(406) 449-8381 (Phone)
(406) 449-5651 (Fax)
Email:  joslyn_hunt@fd.org

1

**INDEX:**

2

3

**TESTIMONY**

4

**WITNESS:**                                                    **PAGE:**

5

6  **KATHERINE RAE SIMMONS:**
   Direct Examination by Mr. Weldon . . . . . . . . . . .     15
   Voir Dire Examination by Mr. Arvanetes . . . . . . .     45
7  Direct Examination (Continued) by Mr. Weldon . . . . .     46
   Voir Dire Examination by Mr. Arvanetes . . . . . . .     52
8  Direct Examination (Continued) by Mr. Weldon . . . . .     53
   Cross-Examination by Mr. Arvanetes . . . . . . . . .     75
9  Redirect Examination by Mr. Weldon . . . . . . . . .    108

10 **DAVID WILLIAM STRAUSSER, M.D.:**
   Direct Examination by Mr. Weldon . . . . . . . . . .    116
11 Cross-Examination by Mr. Arvanetes . . . . . . . . .    132
   Redirect Examination by Mr. Weldon . . . . . . . . .    167
12 Recross-Examination by Mr. Arvanetes . . . . . . . .    170

13 **ADRIENNE ANN MARIE TAYLOR:**
   Direct Examination by Mr. Weldon . . . . . . . . . .    174
14 Cross-Examination by Mr. Arvanetes . . . . . . . . .    181

15 **TRACI LEE WALLACE:**
   Direct Examination by Mr. Cobell . . . . . . . . . .    183
16 Cross-Examination by Mr. Arvanetes . . . . . . . . .    207
   Redirect Examination by Mr. Cobell . . . . . . . . .    227

17

18 **JAMES FURNISS HOOD, M.D.:**
   Direct Examination by Mr. Weldon . . . . . . . . . .    230
   Cross-Examination by Mr. Arvanetes . . . . . . . . .    245
19 Redirect Examination by Mr. Weldon . . . . . . . . .    268

20

21

22

23

24

25

1    **EXHIBITS**

2

**EXHIBIT:**          **DESCRIPTION:**                                **ADMITTED:**

3

EXHIBIT 1     Form CA-2 Department of Labor,
4             April 23, 2003. . . . . . . . . . . . . .      19

5    EXHIBIT 2     Form CA-2 Department of Labor,
              February 23, 2005 . . . . . . . . . . .      23
6

EXHIBIT 5     Offer of Modified Assignment
7             (Limited Duty) November 21, 2005. . . . .     33

8    EXHIBIT 6     Offer of Modified Assignment
              (Limited Duty) September 28, 2006 . . . .     37
9

EXHIBIT 7     Offer of Modified Assignment
10            (Limited Duty) December 8, 2006 . . . . .     38

11   EXHIBIT 9     Offer of Modified Assignment
              (Limited Duty) March 7, 2007. . . . . . .     46
12

EXHIBIT 11    Dr. Strausser's Letter for
13            Durand's Work Capacity -
              July 24, 2007 . . . . . . . . . . . . . .     53
14

EXHIBIT 12    Dr. Strausser's Letter for
15            Durand's Work Capacity -
              July 24, 2007 . . . . . . . . . . . . . .     55
16

EXHIBIT 13    Dr. Strausser's Letter - Durand Now
17            Can Work - January 18, 2008 . . . . . . .     56

18   EXHIBIT 14    Dr. Strausser - Work Capacity
              Evaluation - January 18, 2008 . . . . . .     58
19

EXHIBIT 15    Offer of Modified Assignment
20            (Limited Duty) - January 25, 2008 . . . .     60

21

EXHIBIT 16    Letter from Department of Labor
22            to Durand - March 6, 2008 . . . . . . . .     63

23   EXHIBIT 17    Memorandum to File from Claims
              Examiner - September 15, 2008 . . . . . .     64

24

25

1   EXHIBIT 18      Change of Status for Durand
                to PN based on Dr. Hood's
2               Medical Opinion . . . . . . . . . . . .      67

3   EXHIBIT 8       Dr. Strausser's Work Capacity
                Evaluation - May 22 2006. . . . . . . . .    93
4
    EXHIBIT 3       July 5, 2006 1032 - Department
5               of Labor. . . . . . . . . . . . . . . .     111

6   EXHIBIT 69      Compiled Video from 2008. . . . . . . .  130

7   EXHIBIT 501     Work Status Form - 9/8/2007 . . . . . .  152

8   EXHIBIT 502     Doctor Strausser's Restrictions . . . . . 157

9   EXHIBIT 66      Letter from USPS - Salt Lake
                City District . . . . . . . . . . . . . .   186
10
    EXHIBIT 67      Current Capability Evaluation . . . . .  195
11
    EXHIBIT 68      Compiled Video from Kayak Trip. . . . .  197
12
    EXHIBIT 56      Snow Birds RP Consumer
13              Application . . . . . . . . . . . . . . .    204

14  EXHIBIT 503     Report of Dr. James Hood. . . . . . . .  266

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

1

2

3                          **(Open court)**

4                       **(Defendant present)**

5                 **(Proceedings began at 9:07 a.m.)**

6

7              THE BAILIFF:  Judge Brian Morris, the United States

8    District Court for the District of Montana.

9              THE COURT:  Please be seated.  Madam clerk, please

10   call the first case on the Court's calendar.

11             CLERK OF COURT:  This Court will now conduct a bench

12   trial in Criminal 16-43 of the Great Falls Division, Judge

13   Morris, United States of America versus Deborah Joy Durand.

14             THE COURT:  Good morning, Mr. Weldon.

15             MR. WELDON:  Good morning, Your Honor.

16             THE COURT:  Mr. Cobell.

17             MR. COBELL:  Good morning, Your Honor.

18             THE COURT:  And who is your agent?

19             MR. WELDON:  Agent Boynton, Your Honor.

20             THE COURT:  Boynton.  And where are you from, Mr.

21   Boynton?

22             THE AGENT:  I'm with the Postal Service/Office of

23   Inspector General, and my office is out of Federal Way,

24   Washington.

25             THE COURT:  Welcome.

1    Good morning, Mr. Arvanetes.

2          MR. ARVANETES:  Good morning, Your Honor.

3          THE COURT:  Good morning, Ms. Hunt.

4          MS. HUNT:  Good morning.

5          THE COURT:  Good morning, Ms. Durand -- Ms.

6    Durand.

7          THE DEFENDANT:  Good morning.

8          THE COURT:  Are you ready to proceed, Mr. Arvanetes?

9          MR. ARVANETES:  Uh, yes, sir.

10          THE COURT:  Okay.  And --

11          MR. ARVANETES:  And just for the record, my expert

12    will be coming along.

13          THE COURT:  All right.

14          MR. ARVANETES:  I don't know where he's at right

15    now.

16          THE COURT:  All right.  Thank you.

17     Before we get to witnesses, we have one legal issue to

18    address.  I referred -- the defendant filed several pretrial

19    -- two pretrial motions:  One motion to dismiss the Indictment

20    based upon estoppel by entrapment; and, second, a motion to

21    exclude the government from using a demonstrative exhibit, a

22    video, at the trial.

23     Judge -- or I referred those issues to Judge Johnston,

24    and he has filed findings -- proposed findings and

25    recommendations.  The time period for objections has not yet

1    run, Judge Johnston recommended denying both of those motions.

2        Mr. Arvanetes, would you wish to raise objections to

3    those proposed findings?

4        Or Ms. Hunt?

5        MS. HUNT:  Yes, Your Honor, we would object to those

6    findings denying both motions.  Uhm, as it concerns the

7    entrapment by estoppel argument, it is still our contention

8    that the judge could have ruled on the motion to dismiss,

9    especially as it concerns Ms. Durand's ability to rely on what

10   was told to her, that she was disabled.  Uhm, she did what she

11   was told, and the entrapment by estoppel factors are met.

12       Secondly, we still believe and object to the finding, to

13   the contrary, that the picture-in-picture video should be

14   admitted as a -- as a picture-in-picture video.  We believe

15   that that is unduly prejudicial and requires medical testimony

16   to actually understand the picture-in-picture video.

17       THE COURT:  Well, why couldn't the government be

18   allowed to play that video, and, if you have issues with it,

19   present the medical testimony to explain why it's misleading

20   or not accurately reflective of Ms. Durand's condition?

21       MS. HUNT:  They could play the video.  Uhm, the --

22   the problem with the video is the picture-in-picture as it

23   concerns her kayaking, and then playing in the upper

24   right-hand corner statements about her injuries.

25       If they played separately, that would be one matter; but

1   the fact that they're combined is where the unduly

2   prejudice -- the undue prejudice comes in.

3           THE COURT:  All right.  What about the -- the

4   estoppel?  Typically, entrapment involves a claim that the

5   government induced someone to commit a crime.  And the cases

6   cited in your briefs related to that, where the government

7   seeks out a person, for example, to engage in methamphetamine

8   trafficking, the person is not -- there is no evidence that

9   the person is, at the time, engaged in activity, the

10  government induces them to get involved in a scheme to sell

11  methamphetamine, or to commit some other offense like that.

12          As I understand this case, the argument -- the

13  government, it is their position that they didn't induce Ms.

14  Durand to commit fraud, they simply provided a platform for

15  her to demonstrate her physical abilities.  What's the

16  entrapment?  I'm not --

17          MS. HUNT:  (Nods head affirmatively)

18          THE COURT:  I don't quite understand.  I mean,

19  certainly, the government induced Ms. Durand, allegedly, to

20  engage in these activities that might be inconsistent with her

21  disability status, but they didn't do anything to induce Ms.

22  Durand to report to her doctors about her condition like

23  that.

24          MR. ARVANETES:  And, Your Honor, are you referring

25  to Johnston's motions, or my motion for Rule -- Rule 29

1    motion?

2            THE COURT:  Whose motion -- I'm referring right now

3    to the pretrial motions.

4            MR. ARVANETES:  Okay.  All right.  That's fine.

5            MS. HUNT:  So, Your Honor, you are correct that the

6    government provided Ms. Durand an opportunity to partake in a

7    trip, and it is because the government, to that point, did not

8    have any evidence of any fraud on her part given her daily

9    activities, given her daily life.

10           THE COURT:  Well, in reviewing the file -- pretrial

11   filings, Ms. Durand had a -- had a disability designation, I

12   think, in 2005 or '06, and that was then changed because of,

13   as I understand, evidence of her daily activities at a new

14   job, to cause the government to reevaluate that, and, instead,

15   the disability status was discontinued.  And then Ms. Durand

16   alleged further problems, and then went through this

17   process.

18           MS. HUNT:  She did allege, that is correct, at the

19   beginning, she had her injuries.  She went through the process

20   to obtain Workers' Comp benefits, they had concerns about it,

21   and some modifications were made to her work restrictions.

22       But, in 2008, even after that, she saw Doctor Hood,

23   beyond having seen her treating physician, and he rendered her

24   totally disabled, as well.  And that is beyond her treating

25   physician also proclaiming that --

1        THE COURT:  But, as I understand the proposed

2   testimony of both treating physicians, they're going to

3   testify, well, that they made their diagnoses based largely

4   upon subjective comments from Ms. Durand, that she told them I

5   have pain doing X, I have pain bending over, I have pains that

6   go into my head, things of that nature.  That there was --

7   that they didn't find, necessarily, objective physical

8   evidence.

9        The imaging that was done, I don't know if it was MRIs or

10  x-rays, didn't reveal something that would say, yes, Ms.

11  Durand is disabled, it was more of her own feedback to the

12  medical providers that led them to make those diagnoses.

13       MS. HUNT:  And as we discussed at -- and Judge

14  Johnston had a lot of questions about this, uhm, when she did

15  see Doctor Hood, that second opinion doctor, he had all of

16  that medical evidence of all of her other treatments from all

17  of her other doctors, which -- and he did his own tests, he

18  did his own exams.

19       So, to say that he solely relied on what she was saying,

20  so that, years later, he can backtrack and say that she must

21  have been lying to me to commit this fraud, that is the

22  problem.

23       THE COURT:  Well, I think that goes to the weight of

24  this evidence.  And I think you created -- this is more a Rule

25  29 motion.  We'll get to that --

1          MS. HUNT:  Okay.

2          THE COURT:  -- after we've heard the government's

3     case.  I don't think it rises to the level of a motion to

4     dismiss, pretrial, on the Indictment, I think the government's

5     claim is -- as I understand, is that their theory is that Ms.

6     Durand provided misleading or inaccurate information to her

7     medical providers, who designated her disabled, and then she

8     continued to engage in activities inconsistent with that

9     designation.

10         So, I'm going to deny that first motion to dismiss.  You

11    can raise it again at the conclusion of the government's case

12    through a Rule 29 motion, after I see more fully the

13    government's case.

14         MS. HUNT:  Thank you, Your Honor.

15         THE COURT:  With regard to the video, the picture in

16    a picture, if this were a jury trial I'd be more concerned

17    about that.  I think I have seen enough attempts by the

18    government to puff up their case over the years that I can --

19    I can discern from when they're wolfing versus when they have

20    actual evidence here.

21         So, I'm gonna -- I'm gonna deny that motion.  And you can

22    -- certainly can present your testimony and cross examine the

23    government's witnesses about why that presentation would be

24    misleading or inaccurate.

25         MS. HUNT:  Thank you, Your Honor.

1          THE COURT:  Okay.  All right.  Thank you.

2      Anything else with regard to pretrial motions?

3          MR. WELDON:  Not from the United States, Your

4   Honor.

5          THE COURT:  Mr. Arvanetes, anything else on the

6   pretrial motions?

7          MR. ARVANETES:  No, Your Honor.  I see Mr. Harris is

8   here.

9          THE COURT:  All right.  Glad he could join us.  Why

10   don't you have him come forward.

11          MR. ARVANETES:  May I?

12          THE COURT:  Yes.  (Indicating)

13          MR. HARRIS:  Your Honor, my name is Brad Harris.

14   I'm an attorney proposing to perform as an expert witness

15   today.  I'm licensed in Texas, Kentucky, and D.C.

16          THE COURT:  All right.  Well, welcome.

17          MR. HARRIS:  Thank you.

18          THE COURT:  Mr. Arvanetes is trial counsel here,

19   you'll be assisting him, as I understand it.

20      All right.  Mr. Arvanetes, are you ready to go?

21          MR. ARVANETES:  Yes, sir.

22          THE COURT:  Mr. Weldon?

23          MR. WELDON:  Yes, Your Honor.

24          THE COURT:  All right.  I assume we can forego the

25   opening statements?

1       MR. WELDON:  I believe that would be appropriate,

2   unless you would like something, Your Honor.

3       THE COURT:  No.  I think I -- I've read the pretrial

4   filings, your trial briefs, why don't we get to the evidence

5   here.  We've got a lot of witnesses to call.

6       Go ahead, Mr. Weldon.

7       MR. WELDON:  Yes, sir.  Thank you.  The United

8   States calls Kathy Simmons.

9       THE COURT:  Mr. Weldon, I'm a little concerned.

10  Every person who comes in is rolling in a suitcase, are we

11  going to be here until Labor Day?

12      MR. WELDON:  It is, Your Honor.  And it must be for

13  the eclipse.

14      CLERK OF COURT:  Raise your right hand.

15

16                **(The witness was duly sworn.)**

17

18      THE WITNESS:  Yes.

19

20                **(Discussion off the record.)**

21

22      THE COURT:  Good afternoon -- or good morning, Ms.

23  Simmons.

24      THE WITNESS:  Good morning.

25      THE COURT:  Would you please state your first name

1   and spell your last name?

2           THE WITNESS:  Katherine Rae Simmons, it's

3   S-I-M-M-O-N-S.

4           THE COURT:  Go ahead, Mr. Weldon.

5           MR. WELDON:  Thank you, Your Honor.

6

7                    **DIRECT EXAMINATION**

8   **BY MR. WELDON:**

9   Q. Ma'am, will you please tell the Court what you do for a

10  living?

11  A. I am the Houston District Health and Resource Management

12  Manager, so I oversee the staff for the Eastern District on

13  our federal work comp claims for the U.S. Postal Service.

14  Q. How long have you worked in that capacity?

15  A. I've been in Houston for about three months.  Prior to

16  that, I was in Central Plains, and in Omaha, Nebraska, for a

17  year-and-a-half, in the same capacity.   And I had served

18  eight years prior as an Entry Compensation Specialist.

19  Q. Can you explain to the Court some of your job duties?

20  A. My job duties are to oversee our staff to make sure that we

21  are processing our claims timely and getting them to the

22  Department of Labor, so that our employees get their medical

23  processed timely, make sure the claim forms are handled

24  properly, completely filled out, and to provide the proper

25  documentation to the Department of Labor on our employee

1    claims.

2    Q. Could you explain your relationship with the Department of

3    Labor and the U.S. Postal Service as it relates to Workers'

4    Compensation, ma'am?

5    A. Okay.  Well, we basically -- I work for the U.S. Postal

6    Service, and we oversee our processes for them.  They are a

7    separate government agency.  We are required, under federal

8    law, to send all of our federal work comp claims to them for

9    adjudication and determination of their claims.

10   Q. And, so, as part of your job duties, then, do you work with

11   the Department of Labor?

12   A. Uhm, working with is a difficult question.  We -- we have

13   correspondence with them, yes.  We do do correspondence with

14   them to try to maintain knowledge of where our employees' work

15   status and medical status is, so that we can determine how we

16   can get our employees back to work in some capacity.

17   Q. In your job duties, ma'am, what is the goal of the Workers'

18   Comp program?

19   A. The goal in my department is to ensure that our employees,

20   first, are taken care of, and that their process -- that their

21   claims are handled properly and they are processed timely.

22       And, then, I am in charge of overseeing our costs

23   associated with the Postal -- the Postal Service, to ensure

24   that we're not paying out on claims that are excessive or not

25   being paid -- or paid out on things that are not approved on

1   the case.

2   Q. Is part of your job duty, then, to make sure that workers

3   go back to work when they have those certain restrictions

4   issued -- issued by doctors?

5   A. Absolutely.  I have that same -- the work covered under the

6   -- the process and policies provide us with guidelines, and

7   one of our procedures, then, requires us to get our employees

8   back to work, they -- they kind of correlate with the

9   Department of Labor's guidelines of returning employees back

10  to work.

11  Q. Is the Workers' Comp program a retirement program, ma'am?

12  A. No, it is not.  It is not a -- it is a system designed to

13  assist our injured employees, to get them back to some kind of

14  work capacity.

15      Ultimately, my job would be, when they are filing a claim

16  under the MMI process, if they have any type of injury that

17  sustains long-term, that I would eventually offer them some

18  kind of a position -- a modified position, is what it would

19  be, and we would design a job for them.

20      And we've had to do that before.  It's got a position

21  title.  Our job is to get them back to work and not to -- it's

22  not a retirement system.

23  Q. Can you explain that process?  You mentioned the offering

24  of a modified job, can you explain that to the Court,

25  please?

1    A. Yes.  Any time our employees have some type of a restricted

2    duty, whether it be the day after their injury, or if,

3    subsequently, the restrictions change, we are required, under

4    federal law -- under our rules and regs and under federal law,

5    to bring them back to work in a -- some capacity within their

6    own physical restrictions, as provided by the medical

7    provider.

8        So, our obligation is to do that.  And we can offer that

9    verbally, but, with our policies, within 24 hours you put that

10   in writing to the employee, to give that employee an

11   opportunity to see what job duties we would have for them

12   under their current medical restrictions.

13   Q. And, so, when you have that offer of a modified job duty,

14   it's an offer that's made within those work restrictions; is

15   that right, ma'am?

16   A. Absolutely.  And we rely strictly on the medical evidence

17   to do that, and then try to contain or to figure out what job

18   duties that would fit within those physical restrictions.

19   Q. And is part of that, then, the offer of the job duties, to

20   put them back to work?

21   A. That's correct.  We offer that as a written 2499 Modified

22   Job Offer Form.

23   Q. Let's focus, then, on Ms. Durand's case.  Are you familiar

24   with the documents and the procedures that happened with her

25   case, ma'am?

1   A. Yes, I have familiarized myself with the file.

2        MR. WELDON:  If we could please show the witness

3   Government's Exhibit 1?

4   **BY MR. WELDON:**

5   Q. Ma'am, do you recognize Government's Exhibit 1?

6   A. Yes, I do.

7   Q. And what is Government's Exhibit 1?

8   A. This is a CA-2 Claim Form for the -- for -- an occupational

9   illness claim for compensation.

10        MR. WELDON:  Your Honor, I move for the admission of

11   Government's Exhibit 1.

12        MR. ARVANETES:  No objection, Your Honor.

13

14        **(Exhibit Number 1 was admitted.)**

15

16        THE COURT:  All right.  Do we have any objection to

17   the exhibits?

18        MR. ARVANETES:  I believe, uhm, we stipulated to the

19   exhibits on foundation purposes, there may be objections to

20   relevance or --

21        THE COURT:  All right.  Okay.  You've listed some,

22   and we will get more as you -- make sure you admit each

23   exhibit, Mr. Weldon.

24        MR. WELDON:  Certainly, Your Honor.

25        THE COURT:  I will remind you, if you don't.

1          MR. WELDON:  Thank you, Your Honor.

2          THE COURT:  Go ahead.

3    **BY MR. WELDON:**

4    Q. Ms. Simmons, will you explain to the Court what this

5    document shows and what it says?

6    A. It's a document Ms. Simmons signed on 4/23/03 indicating

7    that she first became aware of her -- that she has an

8    occupational illness claim for a low back, shoulder pain, and

9    arm and hand pain.  She is alleging that it was caused by her

10   work duties, that it was the source.

11   Q. Well, Ms. Simmons, can you just explain the difference

12   between the CA-1 Form and the CA-2 Form?

13   A. Sure.  The CA-1 Form is an occupational illness claim.

14   That would happen for a traumatic injury, somebody, for

15   example, like, "Stepped off a porch at lunch at 123 South Main

16   and rolled my ankle," it's a traumatic injury, it happened at

17   a specific time, date, location, place.  The mechanics of an

18   injury that occurred at a traumatic time, at one time.

19       A CA-2 claim, it's an occupational illness claim that

20   happens to some -- a condition occurs over a period of time,

21   you can't identify anything specific that happened in a

22   one-work-shift tour, or one tour, it happens over a period of

23   time.  A good example is carpal tunnel, something that is

24   repetitive in nature.

25   Q. Now, then, what does the CA -- so, CA-2 is the repetitive

1  nature claim?

2  A. Occupational claim, yes.

3  Q. Right.  Which one did Ms. Durand file?

4  A. A CA-2 claim, the occupational claim.

5       MR. WELDON:  All right.  And, then, Agent Boynton,

6  if we could please zoom in to Section 12 -- or 13, please?

7  **BY MR. WELDON:**

8  Q. And, then, could you explain what was identified by Ms.

9  Durand in Section 13?

10  A. She said, I am required to carry, deliver all mail and

11  packages.  Until two weeks ago, I have been able to carry this

12  with -- this out with minimum discomfort.  Two weeks ago, I

13  began to -- to receive large, heavy phone books -- uhm,

14  (shakes head negatively) I can't read the word -- daily.

15  Being required to carry them, and deliver them, I have and

16  can't contin -- continue to do this.  The pain increased to --

17  to the point of seeking medical attention.

18  Q. And, then, in Section 14, what did she identify as the

19  nature, ma'am?

20  A. "Lower back pain, shoulder pain, and arm and hand pain."

21  Q. And then you identified the date.

22       MR. WELDON:  But if we could just scroll down,

23  please, Agent Boynton?

24  **BY MR. WELDON:**

25  Q. What was the date that Debbie signed them?

1   A. 4/24/04.  Or after -- I'm sorry, '03.  4/24/03.

2   Q. And while we're on that topic, Ms. Simmons, this is

3   identified as "Debbie Simmons;" is that right?

4   A. That's correct.

5   Q. Okay.  Now, you're not related to Debbie Simmons, are you,

6   ma'am?

7   A. No, sir.

8   Q. All right.  And, then, her name has now changed; is that

9   right, ma'am?

10  A. That's correct.  From my understanding, it's Durand.

11  Q. Okay.  So, at that time, she was signing as Ms. Simmons.

12  A. That's correct.

13  Q. All right.  Then was there another form that Ms. Durand

14  filed, or Ms. Simmons, on a later date?

15  A. She filed a subsequent CA-2.  She has filed -- according to

16  the files, there is two additional CA-2s that she has filed.

17  Q. Let's show you, then, the one in 2005.

18          MR. WELDON:  Agent Boynton, can we please show the

19  witness Government's Exhibit 2?

20  **BY MR. WELDON:**

21  Q. Do you recognize Government's Exhibit 2, Ms. Simmons?

22  A. Yes.  Yes, I do.

23  Q. Okay.  Could you explain what this is?

24  A. That was a CA-2 where it appears that she's asking for --

25  for her case to be expanded, and she is adding a condition to

1    the original case.  She is using the same date of injury,

2    which is the item listed in Number 11, that line, and the date

3    listed in Number 11 is the date of 4/23/05.

4            MR. WELDON:  Your Honor, I would move for the

5    admission of Government's Exhibit 2.

6            MR. ARVANETES:  No objection.

7            THE COURT:  2 is admitted.

8

9            **(Exhibit Number 2 was admitted.)**

10

11           MR. WELDON:  Now, then, if we could scroll and zoom

12   in on Section 15, Agent Boynton?

13   **BY MR. WELDON:**

14   Q. And can you read that, then, Ms. Simmons, in Section 15?

15   A. Yes.  "I was only told within the last month that the neck

16   was not included in the original claim and it needed to be

17   refiled as a new claim."

18   Q. All right.  And then the date of that filing?

19           MR. WELDON:  If we could scroll down, Agent Boynton?

20           THE WITNESS:  2/23/05.

21   **BY MR. WELDON:**

22   Q. Then, could you explain to the Court the process?  Once the

23   CA-2 is filed, what happens next?

24   A. Once the CA-2 is filed, our office processes it and codes

25   it out.  You'll see where the codes are, the -- our codes are

1    the typed codes.  We code that out, and then we process it,

2    and send it to the Department of Labor for adjudication.

3       Then they make the determination.  They have the sole

4    authority on determining whether the case is going to expand,

5    to accept that additional condition.

6    Q. Does the Postal Service make that determination?

7    A. No, we do not.

8    Q. Okay.  So, that's ultimately left exclusively with the

9    Department of Labor.

10   A. It's exclusively the Department of Labor's decision.

11   Q. Okay.  Then what happens once it's accepted, Ms. Simmons?

12   A. Typically, the agency or the Postal Service will receive a

13   notification of acceptance or expansion of the claim.  And

14   they will let us know what condition, the type of conditions

15   that the claim has been approved for.

16   Q. Let's talk about the payment and the disability status of

17   Ms. Durand.  Was there -- were there time periods, from 2003

18   until the present time, that Ms. Durand was on different

19   statuses as far as her pay?

20   A. Yes.  Do you mind if I refer to -- I've got a timeline, can

21   I refer to that?

22   Q. Absolutely, ma'am.

23            MR. WELDON:  Is that acceptable, Your Honor?

24            THE COURT:  If it refreshes her recollection, yes.

25            MR. WELDON:  Thank you, Your Honor.

1          THE WITNESS:  There is too many dates.  Okay.  She

2    has -- she was paid -- or she was off work April 24th of 2003,

3    to June 9th, 2004.  She -- between the periods of April 24th

4    to May 1st, she did not have wage loss, according to the note

5    that was in the file, but she did -- was paid by the

6    Department of Labor during that period of time.

7    **BY MR. WELDON:**

8    Q. Now, let's just make sure that we're understanding that,

9    Ms. Simmons.  So, we have the first CA-1 in Government's

10   Exhibit 1 that's filed on April 24th of 2003; is that right?

11   A. It's a CA-2.

12   Q. Or, excuse me, a CA-2.

13   A. Yes.

14   Q. And, so, that was filed, and then that put Ms. Durand in

15   payments of temporary total disability; is that right?

16   A. That's correct.

17   Q. And, then, that went until about almost a year and a few

18   months, until June 19th of 2004.

19   A. Yes.

20   Q. Okay.  And, then, within that time period, can you explain

21   some of the relevant dates for Ms. Durand's file?

22   A. Are we going till -- till 2004?

23   Q. Correct, June 19th of 2004.

24   A. Okay.  So, she did -- the Department of Labor determined

25   there was no wage loss between April 24th, 2003, to May 1st,

1 | 2003.

2 |     During May -- May 17th of 2003, to November 13th, 2003,

3 | the Department of Labor did compensate Ms. Durand.  And --

4 | Q. And, Ms. Simmons, while we are talking about the Department

5 | of Labor compensated Ms. Durand, can you explain that

6 | compensation process to the Court?

7 | A. The Department of Labor determines wage loss based on their

8 | earnings at the time of their injury.  In this case, Ms.

9 | Simmons was hired as an RCA.  She was hired, basically, to

10 | essentially work one day a week or --

11 |     THE COURT:  Could you explain "RCA," Mr. Weldon?

12 |     MR. WELDON:  Absolutely.

13 | **BY MR. WELDON:**

14 | Q. Ma'am, could you explain what an RCA is?

15 | A. I'm sorry.  Rural carrier associate.

16 | Q. Okay.

17 | A. So, the rural carrier associate covers for a rural carrier

18 | on their day off.  So, what they do is the Department of Labor

19 | will ask the wage earnings of the employee, if they were

20 | non-career, one year prior to the date of injury.  If we do

21 | not have that type of data, we have to go back and find the

22 | like or similar employee with the same title, the same job

23 | duties, and then we provided them that.

24 |     They do a computation based on the status of whether they

25 | have a spouse or dependents and determine the compensation

1    rate.  It's either 75 percent of the gross pay, or

2    66-and-two-thirds if they have no dependents.

3    Q. And, of course, that 66-and-two-thirds is based on what

4    they originally were making, or somebody in a similar

5    circumstance.

6    A. It could be either, depending on what -- which selection

7    they choose.

8    Q. All right.  Now, are taxes paid on that, ma'am?

9    A. No.  No, that is a tax-free rate.

10   Q. All right.  So, then, after -- you mentioned that from May

11   17th of 2003, until November 13th of 2003, Ms. Durand was

12   compensated by the Department of Labor and the United States

13   Postal Services; is that right?

14   A. Yes --  well, the Postal Service wouldn't have compensated.

15   We actually would reimburse the Department of Labor, once

16   we're billed, but -- and they give us a charge-back fee, so...

17   Q. And what's a charge-back fee?

18   A. A charge-back fee is like -- like a handling fee the

19   Department of Labor charges the U.S. Postal Service to monitor

20   and process their claims.

21   Q. So, the Department of Labor pays the money, and then does,

22   ultimately, the United States Postal Service pay that money?

23   A. Yes.  At the end of the year, we get one large bill from

24   the Department of Labor.  And they add a charge-back fee onto

25   that, plus a handling fee on that, so we end up paying an

1    additional 7, and there could be up to a 9 percent difference

2    of additional money.

3         It's everything, the compensation and medical benefits

4    that were paid out on all of our employees.  And that totaled,

5    last year, around $1.4 billion.

6    Q. So, then, IN Ms. Durand's case, for example, there was the

7    payment by the Department of Labor, which was ultimately

8    charged to the United States Postal Service.

9    A. That's correct.

10   Q. And, then, in addition to that, you had to pay the 7

11   percent handling fee to the Department of Labor.

12   A. That's correct.

13   Q. Okay.  Now, you mentioned that it was how much that the

14   United States Postal Service paid in Workers' Compensation?

15   A. Yeah.  The last year's earning or the last year's payout

16   was $1.4 billion.

17   Q. Okay.  How is that paid, ma'am?  In terms of -- from the

18   United States Postal Service?  What does the post office do in

19   order to obtain that money?

20   A. It's not so much that the pos -- the U.S. Department of

21   Labor issues us a statement, and then we have to pay that to

22   them.  So, they just issue us one large statement saying,

23   "Here is the bill, and here is what you owe us."

24   Q. And, then, the Postal Service pays that bill.

25   A. That's correct.

1  Q. And what funds do you pay that out of?  For example,

2  stamps?

3  A. Yes.  We're nonprofit, so everything we earn with the

4  Postal Service is based on our revenue that we generate off of

5  what we sell:  Parcels, delivery, purchasing products from our

6  Postal Service.

7  Q. Okay.

8  A. So, everything is based on what -- if stamp rates go up,

9  it's because we're trying to cover our end.

10  Q. All right.  So, we talked about the payment of permanent

11  total disability from the initial filing of April 24th of

12  2003, until June 19th of 2004, so, then, let's explain the pay

13  status of Ms. Durand from June 20th of 2004, to December 13th

14  of 2004.

15  A. During that period of time, she worked for the Postal

16  Service on restricted duty.

17  Q. Okay.

18  A. She was given an assignment and worked within her modif --

19  within her medical restrictions.

20  Q. Then, after that time period, what about December 14th of

21  2004, until September 30th of 2006?

22  A. She was placed back on temporary total disability and was

23  drawing compensation from the Department of Labor.

24  Q. Okay.  And then we talked about Government's Exhibit 2,

25  which is the second filing of the CA-2.  Is that right, Ms.

1    Simmons?

2    A. That's correct.

3    Q. Okay.  Let's show you, then, the process, and have you

4    explain to the Court how jobs are offered to individuals.

5    A. Okay.

6    Q. Can you explain that process, please?

7    A. Yes.  Once we receive medical information that provides us

8    with the restrictions that an employee has --

9         MR. ARVANETES:  Your Honor, I can't -- I'm having

10   trouble hearing the witness.

11        THE COURT:  Ms. Simmons, would you mind slowing down

12   a little bit, and speak into the microphone.

13        THE WITNESS:  I've never been told I couldn't be

14   heard.

15        THE COURT:  The microphone -- pull the microphone

16   down.  There you go.  Thank you.

17        THE WITNESS:  Okay.

18        THE COURT:  Go ahead, Mr. Weldon.

19        MR. WELDON:  Thank you, Your Honor.

20        THE WITNESS:  What happens is we receive the medical

21   information from the employee, we ask for them to provide us

22   with the restrictions their doctor has provided.  We review

23   the medical, determine what duties we would have available

24   within their medical restrictions, put that in writing to

25   them, and then -- then offer them the written job offer on a

1   2499 form.

2           MR. WELDON:  Agent Boynton, can we please show the

3   witness Government's Exhibit 5?

4   **BY MR. WELDON:**

5   Q. Do you recognize Government's Exhibit 5, Ms. Simmons?

6   A. Yes, I do.

7   Q. Can you explain that a little bit, please, ma'am?

8   A. This was a limited duty job offer, it's dated November 21st

9   of 2005, in which we outlined the job duties and what her

10  physical restrictions would be.  And it was offered to her,

11  subsequently, too -- and, oh, it identifies the work location

12  and work hours.

13  Q. Now, can you explain the work hours that were identified

14  for Ms. Durand?

15  A. I have to get that enlarged.

16          MR. WELDON:  And could we please highlight that and

17  zoom in, Agent Boynton?

18          THE AGENT:  Yes.

19          THE WITNESS:  Thank you.

20          It appears that she was going to be working from

21  7:00 a.m. to noon, with Sunday and Fridays off.

22  **BY MR. WELDON:**

23  Q. Okay.  And, then, what were the job duties that she could

24  do, ma'am?

25  A. She was going to answer the phones.  "UDBM" is

1    undeliverable business mail, and we have to sort that to

2    determine whether it goes into waste.  "Lobby direct" is she

3    would stand up in the lobby and assist customers as they came

4    in to determine what their needs were.  "Assist customers at

5    the side door" is the same thing, she would receive packages

6    or letters, or certified letters that have been put on notice.

7    "And other duties, as assigned, within the restrictions,"

8    those are just usually miscellaneous office duties or

9    administrative duties.  It says that she had a five-pound

10   lifting restriction, and she could walk or stand one to five

11   hours a day.

12   Q. Now, when these are offered, explain that process.

13   A. When they are offered, we ask the employees, with a

14   sit-down, do you -- this is the job that we have for you, and

15   this is why, here's the medical evidence that says this is

16   what you can do.  And then we get the employee to either

17   accept or decline the offer.

18   Q. Now, in this case, did you have an acceptance of the

19   offer?

20   A. On this particular one, I believe she declined the offer.

21   There was no signature on this one.

22           MR. WELDON:  Okay.  Your Honor, I move for the

23   admission of Government's Exhibit 5.

24           MR. ARVANETES:  No objection.

25           THE COURT:  5 is admitted.

1

2          **(Exhibit Number 5 was admitted.)**

3

4     **BY MR. WELDON:**

5     Q. Now, Ms. Simmons, we were talking about the post office

6     trying to get people back to work, is this an example of that

7     with the work restrictions?

8     A. Absolutely.  If -- it's what we are required to do.  We

9     have to write -- we have to -- under our own policies and

10    under federal regulations, have to provide them a written

11    request, a written offer of assignment.

12    Q. Okay.  And some of those jobs duties, for example, can even

13    include answering phones, for example.

14    A. Absolutely.  Anything.  One-armed, I did -- whatever your

15    restriction is.  My policy is that unless you're -- short of

16    bed rest, if you're on bed rest I can't get you a bed in the

17    office, but I can provide you with duties within the office.

18    Q. And is that how you see your role, as you work for the post

19    office, is to get people back to work?

20    A. (Nods head affirmatively)  Absolutely.

21    Q. Why is that, ma'am?

22    A. It reduces costs to the Postal Service.  And whatever

23    productivity you can utilize out of that employee, it's a

24    benefit to have the Postal Service bring that employee back to

25    work.

1    One thing, it keeps them in the environment -- in a work

2    environment, to have them get up, shower, come to work

3    everyday and be a productive part of society.  Coming in, even

4    if you're doing the minimal type of activity in the office, if

5    you could answer the phone for an office for five hours a day.

6    If anyone has tried to call the post office, you'll know how

7    difficult that is, sometimes, to get through.

8    But it's a customer service business, we are -- we're

9    relying upon that.  So, if we could get anybody in just to do

10   -- going through -- through UDA mail, which is our

11   undeliverable business mail.  Anything they can do, an

12   activity that can assist us, that's one more piece of

13   productivity that keeps us running smoother and better.

14   Q. I'm going to show you, then, Government's Exhibit 6,

15   please, Ms. Simmons.  Do you recognize Government's Exhibit

16   6?

17   A. (Viewing document)  Yes.  It is a letter from the Postal

18   Service, uhm, providing Ms. Simmons with a written job offer

19   and instructing her to report for duty on September 29th at

20   9:00 a.m.

21   Q. All right.  So, then, in Government's Exhibit 5, we were

22   talking about November 21st of 2005, and now we're talking

23   about almost a year later, in September of 2006.

24   Is that right, ma'am?

25   A. Yes, sir.

1    Q. Okay.  And, then, if I could show you the second page in

2    that document.

3              MR. WELDON:  And if we could zoom in to the top

4    portion, Agent Boynton?

5    **BY MR. WELDON:**

6    Q. Can you explain what this is, Ms. Simmons?

7    A. This is another offer of a modified assignment for limited

8    duty dated May -- or it's dated September 26th of '06.  It

9    looks like the duties were going to be from 9:00 a.m. to 1:00

10   p.m., with Sunday off.

11   Q. And, then, what were the restrictions, ma'am?

12   A. Scroll --

13             MR. WELDON:  If we could scroll down, Agent Boynton?

14             THE WITNESS:  She had a no greater than ten-pound

15   work restriction.  She could bend, stoop, or twist

16   intermittently two hours a day, and an ability to perform all

17   of the carrier functions within the exception of the above,

18   which was the ten-pound lifting and the intermittently

19   two-hours a day of bending -- or stooping and bending.

20   **BY MR. WELDON:**

21   Q. Okay.  And, then, again, she can answer phones?

22   A. Absolutely.  That was one of the duties assigned.

23   Q. Okay.  Case rural routes?

24   A. That's correct.

25   Q. Okay.  What does "case rural routes" mean?

1 A. You stage out a case.  We have mail that comes in in the

2 morning, it's raw mail, and you literally just put it into

3 case slots in delivery order.

4 Q. Then work undeliverable bulk business mail, you mentioned

5 that earlier?

6 A. Yes.

7 Q. Okay.  And, of course, this wouldn't even be for a full

8 day; is that right, ma'am?

9 A. That's correct.  She is only doing it for one to four hours

10 daily.

11 Q. All right.  And, then, of course, you mentioned the

12 restrictions.

13         MR. WELDON:  And if we could please scroll down,

14 Agent Boynton?

15 **BY MR. WELDON:**

16 Q. This is the document with the signature that was the offer;

17 is that right?

18 A. That's correct.

19         MR. WELDON:  And then if we could go to the next

20 page, please, Agent Boynton?

21 **BY MR. WELDON:**

22 Q. Ultimately, we have --

23         MR. WELDON:  And if you could scroll to the bottom

24 to Ms. Simmons' signature.

25 **BY MR. WELDON:**

1    Q. Is there an acceptance of this offer?

2    A. Yes, sir, there is.

3    Q. Okay.  Explain that to the Court, please.

4    A. Apparently, it was reviewed by Ms. Simmons; and once she

5    reviewed the duties, she accepted the offer on 9/30/06.

6          MR. WELDON:  Your Honor, I move for the admission of

7    Government's Exhibit 6.

8          MR. ARVANETES:  No objection, Your Honor.

9          THE COURT:  6 is admitted.

10

11          **(Exhibit Number 6 was admitted.)**

12

13          MR. WELDON:  If we could show the witness

14   Government's Exhibit 7, please?

15   **BY MR. WELDON:**

16   Q.  Now, Ms. Simmons, could you explain, there was another

17   offer that ultimately occurred; is that right?

18   A. Yes.

19   Q. Okay.  And can you explain that, please?

20   A. Apparently, there had been some change in restrictions.

21   And, possibly, if you will -- can you make that a little bit

22   bigger?  It looks like she had her hours increased to 8:30 to

23   5:00 p.m.  So, that was an eight-hour increase in pay.  She

24   had restrictions that actually increased her ability to work

25   more hours, so we followed that up with another offer to

 1   expand and make sure her hours were covered.  In writing, we

 2   offered her the work.

 3   Q. And, so, then, Ms. Simmons, we talked about Government's

 4   Exhibit 6, that was an offer that occurred in September of

 5   2006, and, then, with Government's Exhibit 7, we have,

 6   essentially, three months later and the offer from the post

 7   office for increased duties.  Is that right?

 8   A. That's correct.

 9           MR. WELDON:  And, Agent Boynton, if we could scroll

10   down, please?

11   **BY MR. WELDON:**

12   Q. Was that accepted by Ms. Durand?

13   A. Yes.  Ms. Durand -- or Simmons actually signed the document

14   December 8th of '06, accepting the offer.

15   Q. All right.  Now, then, there was a follow-up to even that,

16   as well.

17           MR. WELDON:  And before I move on, Your Honor, I

18   move for the admission of Government's Exhibit 7.

19           MR. ARVANETES:  I'm trying to keep up.  Where are

20   we?  7?  Yeah, 7.

21           THE COURT:  It comes right after 6.

22           MR. ARVANETES:  No objection.

23           THE COURT:  7 is admitted.

24

25           **(Exhibit Number 7 was admitted.)**

**1**

**2**        THE COURT:  Go ahead, Mr. Weldon.

**3**        MR. WELDON:  Thank you, Your Honor.

**4**  BY MR. WELDON:

**5**  Q. Now, then, Ms. Simmons, we have another job offer that

**6**  occurs approximately three months later in Government's

**7**  Exhibit 9; is that right?

**8**  A. (Viewing document)  Did you switch?

**9**        MR. WELDON:  Please bring up Government's Exhibit 9.

**10**        THE WITNESS:  Yes.

**11**  BY MR. WELDON:

**12**  Q. All right.  And can you explain this document, ma'am?

**13**  A. It looks like they modified -- again, the restrictions

**14**  appear to have possibly changed, therefore, they offered an

**15**  assignment of 8:30 to 5:00, with Thursdays off.  And the

**16**  salary is all indicated on there, so that -- and it gave her

**17**  the duties that she'd be doing at that time.  Under the

**18**  restrictions that we would have been provided.

**19**  Q. And was that accepted, ma'am?

**20**  A. Yes, she did accept that offer on March 7th of '07.

**21**  Q. Now, the difference in Exhibit 9, Ms. Durand does not have

**22**  to deliver express mail; is that right?

**23**  A. That's correct.

**24**  Q. So, in other words, if we compare them --

**25**        MR. WELDON:  Agent Boynton, if we could go back to

1   Government's Exhibit 7, please?

2   **BY MR. WELDON:**

3   Q. This is the 12/8 of '06.  And, in there, do you see

4   "Delivery of express mail"?

5   A. Yes.

6   Q. Okay.  And, then, three months later --

7         MR. WELDON:  If we could go back to Government's

8   Exhibit 9?

9   **BY MR. WELDON:**

10   Q. Do they eliminate the "Delivery of express mail"?

11   A. Yes, they did.

12   Q. Again, Ms. Simmons, is this an example of the post office

13   trying to work with Ms. Durand to get her back to work?

14   A. Absolutely.  Typically, unless a physician -- and they may

15   identify a duty specific to, like, no delivery of express

16   mail, but, typically, we're allowed -- we ask the physician to

17   give us physical limitations so that we can assign duties.

18   Because physicians don't typically assign duties for our

19   offices.

20      So, when we have a change like that, it could be a

21   subjective complaint from the employee that says, "Hey, I

22   don't think I can do this."  And we don't want to risk injury,

23   so we will, instead, work with them, and find out what you can

24   do to keep them working the eight hours, because our job is to

25   keep them working until they heal.

1    Q. Okay.  And, so, this is an example where it's a removal of

2    a particular item.

3    A. Yes.

4    Q. For example, the delivery of express mail.

5    A. That's correct, sir.

6    Q. Okay.  And, so, we talked about the time period when Ms.

7    Durand was working for the post office and some of the job

8    offers, and you mentioned that she worked from September 30th

9    of 2006, until May 6th of 2007, was there a change after that

10   time period, after May 7th of '07?

11   A. Uhm, she no longer had to do the express mail.  And, then,

12   as of -- then on May 7th of '07, she went out again on

13   disability, for temporary disability.

14   Q. Okay.  And, then, when did she return to work for the post

15   office?

16   A. I don't think she did return to work for the Postal

17   Service.  I believe that, at that time, she didn't return.

18   Q. Okay.  So, after May 7th of 2007, until the present, what

19   was her pay status, ma'am?

20   A. She was paid by the Department of Labor.

21   Q. Okay.  And that was on temporary disability?

22   A. Yes.

23          MR. WELDON:  All right.  Your Honor, I move for the

24   admission of Government's Exhibit 9.

25          MR. ARVANETES:  Your Honor, there is a question

1    about the second page.  It doesn't appear to be the same as

2    the first page.  It doesn't appear to be part of the same

3    document.  I would agree with the first page, I would not

4    agree with the second page.

5         THE COURT:  Mr. Weldon, can you explain this alleged

6    discrepancy?  I can't see it well enough on the screen.

7    **BY MR. WELDON:**

8    Q. Can you explain the second page, please, Ms. Simmons?

9    A. Yes.  Yes.  Uhm, typically, if -- when we give a job offer,

10   their management has to do a priority of assignment worksheet

11   to determine whether or not we are going to keep it.  Because

12   our ELM process identifies the pecking order in which we can

13   identify job duties for employees.

14        So, when -- this is a priority of assignment worksheet,

15   where the supervisor or manager went in to find out why -- if

16   they have to do it contractually, we start to move them

17   outside of their facility, their tour and their job title, we

18   have to identify why we're doing that, and this is -- appears

19   that they were doing the priority of assignment worksheet to

20   typ -- from a rural carrier, an RCA, to craft duties -- or

21   clerk duties.

22   Q. Now, and, then, for example, in Number 1, what does that

23   say?

24   A. Uhm, it's completed by a supervisor, and it says, "The

25   employee can only case a route, she will not be able to drive

1    a vehicle."

2    Q. And, again, that's the post office trying to work --

3    A. Yes.

4    Q. -- with Ms. Durand.

5    A. Right.  Those are the notes that we are just continuing to

6    do the search for her.

7            MR. WELDON:  Your Honor, I would move for the

8    admission of Government's Exhibit 9.

9            THE COURT:  Let me be clear, Mr. Weldon.  This

10   Exhibit 9, it's a two-page document?

11           MR. WELDON:  Yes, Your Honor.

12           THE COURT:  Okay.  And where did -- where did the

13   witness -- where did she obtain this document?

14           MR. WELDON:  Ms. Simmons?

15           THE WITNESS:  It was in the file.  It was in our

16   Workers' Compensation file at the HR department.

17           THE COURT:  And was it in -- was it these two pages?

18           THE WITNESS:  Yes.

19

20               **(Discussion off the record.)**

21

22   **BY MR. WELDON:**

23   Q. Let me ask this, Ms. Simmons.  When you look at the second

24   page, what is the date that the supervisor is signing the

25   document?

1   A. 3/7 of '07.

2   Q. All right.  Let's go, then, to the first page.

3            THE COURT:  Where is the "3/7," Mr. Weldon?  Show

4   me.

5            MR. WELDON:  Yes.  If we could --

6            THE WITNESS:  To the right of her signature.

7   There's a signature and the date.

8            THE COURT:  Okay.  I got it.  Thank you.

9   **BY MR. WELDON:**

10  Q. And, then, Ms. Simmons, if we look on the first page of the

11  job offer, what is the date when it was offered and the date

12  that it was accepted?

13  A. The date it was -- I can't see.  Scroll to the top.  3/7 of

14  '07 for both.

15  Q. All right.  The same dates.

16  A. The same dates.

17  Q. All right.

18            THE COURT:  Mr. Arvanetes, any objection?

19            MR. ARVANETES:  Uhm, one moment, Your Honor.

20            THE COURT:  Okay.

21            MR. ARVANETES:  (Viewing documents)  Permission to

22  voir dire for a moment?

23            THE COURT:  You may.

24            MR. ARVANETES:  Thank you.

25

1 **VOIR DIRE EXAMINATION**

2 **BY MR. ARVANETES:**

3 Q. So, Ms. Simmons, from Paragraph -- or Page -- the first

4 page of Exhibit 9, Government's Exhibit 9, that's from the --

5 do you know if it's from the OWC -- OWCP file, or not?

6 A. I do not.  We typically will send it date-stamped out.  I

7 don't know if that's in their file, we don't have access to

8 their files.

9 Q. Okay.  So, you don't know if that's from the OWCP file or

10 not at this time?

11 THE COURT:  Mr. Arvanetes, is that the Office of

12 Workers' Compensation Program?

13 MR. ARVANETES:  I'm sorry, yeah, Office of Workers'

14 Compensation.

15 THE COURT:  All right.  Don't make -- don't make me

16 guess at those, please.

17 **BY MR. ARVANETES:**

18 Q. All right.  And, then, the second -- second page, where is

19 that -- what is that page from?

20 A. That is a postal form where we document our priority of

21 assignment worksheets.  That's for our -- our records.

22 Q. Okay.  That is not from, uhm, --

23 A. This -- I'm sorry.  This is to ensure that we follow

24 procedures for us (indicating).  So, that's not a -- it's not

25 an Office of Workers' Compensation form.

1    Q. Okay.  So, there -- these two forms come from two different

2    departments.

3    A. No.  No.  The first form, our -- our prior -- our job

4    offers are Postal Service forms, also.  (Nods head

5    affirmatively)  We can send them to the Department of Labor.

6                MR. ARVANETES:  Okay.  All right.  At this time, I

7    have no objection.

8                THE COURT:  All right.  9 will be admitted at this

9    time.

10

11               **(Exhibit Number 9 was admitted.)**

12

13               THE COURT:  Go ahead, Mr. Weldon.

14               MR. WELDON:  Thank you, Your Honor.

15

16               **DIRECT EXAMINATION (Continued)**

17   **BY MR. WELDON:**

18   Q. Ms. Simmons, just to make sure that I'm clear on a couple

19   of things, as well.  Page 1 of Government's Exhibit 9, you

20   mentioned that that's the United States Postal Service form,

21   now, explain, it's the Postal Service that offers the job; is

22   that right, ma'am?

23   A. That is correct.  It's a PS Form 2499.

24   Q. All right.  And that's this form that was the offer.

25   A. That's the job offer, yes.

1  Q. Okay.  And, then, the second page that Mr. Arvanetes was

2  just discussing with you, is that also a United States Postal

3  Service form?

4  A. That's correct.

5          MR. WELDON:  All right.  And, in fact, if we could

6  scroll down to the bottom, Agent Boynton?

7  **BY MR. WELDON:**

8  Q. Do you see the fax that's on there?

9  A. (Viewing document)  Yes.

10  Q. All right.  And where does it say that that came from?

11  A. The U.S. Postal Service.

12  Q. All right.

13  A. It came from the zip code -- 77735 is the zip code for my

14  facility.

15  Q. All right.  Now, then, we were talking about the paid

16  temporary disability status of Ms. Durand, and, so, that began

17  on May 7th of 2007?

18  A. Yes, that's correct.

19  Q. And that has continued until the present time.

20  A. That's correct.

21  Q. Okay.  When will that end?

22  A. It never ends.  She was placed on the Periodic Rolls cases

23  as a PN status.  The Department of Labor has placed her as

24  such, where we cannot offer her any additional job offers

25  because the last medical exam said she was permanently

1    disabled with no possibility of ever returning to work, or any

2    kind of work capacity.

3    Q. Does she ever go into retirement status or anything that

4    would take her off that disability status?

5    A. No.  (Shakes head negatively)

6    Q. So, she would receive this amount for how long?

7    A. Or more.  She gets $2,403 a month every 28 days, she'll

8    receive that for the rest of her life, including any COLAs or

9    increases in contractual pay, such as her contract.  She will

10   get that for the rest of her life, unless we can get her back

11   to work in any capacity.

12   Q. Does she pay any taxes on that money?

13   A. No.  That money is given to her at a tax-free rate.

14   Q. How much money has Ms. Durand received as a result of her

15   temporary -- or her paid temporary disability status?

16          MR. ARVANETES:  Your Honor, just the scope of the

17   question, the Indictment goes up -- goes from '06, and we've

18   been talking about '03, '04, so I just want some clarification

19   on that.

20          THE COURT:  All right.  I understand the

21   distinction.

22       So, Mr. Weldon, make sure we are distinguishing any

23   payments before the time period of the Indictment and from the

24   time period of the Indictment.

25          MR. WELDON:  Certainly, Your Honor.

1          THE WITNESS:  I know what her total compensation has

2   been up until July 19th -- or August 19th, which was just

3   Friday, and that total -- from the period of April of '07 to

4   August 19th, it was $328,963.19.

5   **BY MR. WELDON:**

6   Q. And, then, how much did she receive for medical, as well,

7   ma'am?

8   A. Medical through what we -- oh, let me see.  This is for the

9   month of --

10          THE COURT:  So, let me interrupt you.  So the time

11  period was --

12          THE WITNESS:  From 4/23 to 8/19/17.  That -- I have

13  those --

14          THE COURT:  Hold on.  Hold on.  April of 2000 --

15          MR. WELDON:   '03, Your Honor.

16          THE COURT:  '03?  Through the present.

17          MR. WELDON:  Correct.

18          THE COURT:  Okay.

19          MR. WELDON:  And, Your Honor, just so the Court's

20  aware, what we'll do is we will link that up with Agent

21  Boynton when he testifies.

22          THE COURT:  All right.  Thank you.

23          THE WITNESS:  Sorry, I forgot the question.

24  **BY MR. WELDON:**

25  Q. Yes.  How much did she receive for medical compensation?

1   A. Medical, which we're a month behind with the Department of

2   Labor.  They put in their system the medical and we are a

3   month behind from actually seeing that data.  So, they're

4   always 30 days behind us, but the data we can see right now

5   shows $477,660.07 in medical benefits so far.

6   Q. And, then, what was the total between the compensation for

7   her pay as well as the medical, Ms. Simmons?

8   A. Does somebody have a calculator?

9   Q. It's, basically, over $800,000.  Is that fair?

10  A. Oh, yes.  Absolutely.

11  Q. All right.

12  A. Yes, it was 800 when I looked at -- it was over the

13  $803,000.  That was prior to this last payment, so...

14  Q. When was Ms. Durand paid last?

15  A. August 19th was the last check that was issued, of 2017.

16  Q. So, that would have been two days ago.

17  A. That's correct.

18  Q. And, again, you mentioned that that will continue on --

19  A. Every 28 days.

20  Q. -- indefinitely.

21  A. That's correct.

22  Q. Now, you mentioned that there were no more job offers that

23  are made to Ms. Durand, why is that the case?

24  A. At this time, the medical establishes that she was at

25  permanent total disability and could not -- could never return

1    to work in any capacity, indefinitely.  She was placed by the

2    Department of Labor on a PN status, which is that they have

3    identified her as placed on the Periodic Rolls, with a 28-day

4    payment, indefinitely, uhm, because there was no potential of

5    a return to work in the future.

6    Q. And, then, does your office work with her to obtain other

7    job offers, or provide her anything in order to work for the

8    post office?

9    A. We would request a medical update every three years to

10   establish whether or not she remains on any kind of

11   restrictions or if she has updated her medical since then.

12   But, no, we don't -- even if we attempted to give her an offer

13   based on what we thought we could probably provide to her,

14   uhm, we wouldn't -- the Department of Labor would not uphold

15   that to be a suitable offer because the medical doesn't

16   establish it, and wouldn't support it.

17   Q. And, then, of course, the post office, basically you're

18   listening to what the medical doctors are saying when you're

19   making the job offers.  Is that right?

20   A. Absolutely.

21   Q. Okay.  So, you're not making that independent determination

22   on your own.

23   A. No, we are not.

24   Q. All right.  I'm going to show you, then -- because you

25   mentioned the doctors, I'll show you Government's Exhibit 11,

1   please, ma'am.

2            MR. WELDON:  Can we blow that up, Agent Boynton?

3   **BY MR. WELDON:**

4   Q. Do you recognize Government's Exhibit 11, --

5   A. Yes, sir.

6   Q. -- Ms. Simmons?

7   A. Yes.  It's a letter from her treating physician, Doctor

8   Strausser.

9            MR. WELDON:  All right.  Your Honor, I move for the

10  admission of Government's Exhibit 11.

11           MR. ARVANETES:  May I have a moment, Your Honor?

12           THE COURT:  You may.

13           MR. ARVANETES:  (Viewing document)  Permission to

14  voir dire on one question?

15           THE COURT:  You may.

16

17                    **VOIR DIRE EXAMINATION**

18  **BY MR. ARVANETES:**

19  Q. Ms. Simmons, in Government's Exhibit 11, this is a document

20  from Doctor Strausser?

21  A. Yes, it is.

22  Q. And, in this document, she says -- he says that she has

23  received -- undergone a lumbar spine -- spine dorsal column --

24  column stimulator?

25  A. Yes.

1   Q. Is that right?

2   A. Yes.

3   Q. And he also says that she has undergone a cervical --

4   cervical and lumbar fusions, plural?

5   A. Yes.

6   Q. Are you aware if that is correct, if she has gone --

7   undergone both a cervical and a lumber fusion?

8   A. I rely on the medical that tells me that.  I'm assuming the

9   doctor is telling the truth.

10          MR. ARVANETES:  Okay.  Thank you.  Nothing

11  further.

12          THE COURT:  Any objection?

13          MR. ARVANETES:  No objection.

14          THE COURT:  All right.  11 is admitted.

15

16          **(Exhibit Number 11 was admitted.)**

17

18          THE COURT:  Go ahead, Mr. Weldon.

19          MR. WELDON:  Thank you, Your Honor.

20

21          **DIRECT EXAMINATION (Continued)**

22  **BY MR. WELDON:**

23  Q. Ma'am, you were asked some questions about the document,

24  not necessarily the authenticity of the document, but

25  certainly as to other areas of the document, --

1    A. Uh-huh.

2    Q. -- so I want to just ask you.  When you receive letters

3    like this, do you challenge the medical evidence of the

4    doctors?

5    A. No.

6    Q. All right.  So, you rely on that.

7    A. I rely on that.

8    Q. Okay.  And, in there, Doctor Strausser, what is he

9    explaining to the U.S. Postal Service and to the Department of

10   Labor?

11   A. That Ms. Simmons had undergone the treatments that he

12   indicates, the fusions and the stimulator insert, but he also

13   indicates that she is currently totally disabled.  So, she is

14   unable to work for us right now.

15   Q. And, then, I'll show you --

16           MR. WELDON:  Your Honor, I move for the admission --

17           THE COURT:  It's already been admitted, Ms. Weldon.

18           MR. WELDON:  All right.  Then, if we can show the

19   witness Government's Exhibit 12, please?

20   **BY MR. WELDON:**

21   Q. Again, a letter on the same date, Ms. Simmons.  Do you

22   recognize this letter?

23   A. Yes, I do.

24   Q. And what is this letter?

25   A. It's another letter from Doctor Strausser to the Department

1   of Labor indicating that she -- she received her letter to

2   return to work, but, basically, she isn't working.  That she

3   continues to be totally disabled because she has to change

4   positions so frequently.

5   Q. And, so, then, again, that was relied on by the Postal

6   Service and the Department of Labor.

7   A. Yes.

8   Q. All right.

9           MR. WELDON:  Your Honor, I move for the admission of

10   Government's Exhibit 12.

11           MR. ARVANETES:  No objection.

12           THE COURT:  12 is admitted.

13

14           **(Exhibit Number 12 was admitted.)**

15

16   **BY MR. WELDON:**

17   Q. Now, there came a time when it changed; is that right, Ms.

18   Simmons?

19   A. Yes.

20   Q. With respect to Doctor Strausser?

21   A. Yes.

22           MR. WELDON:  If I could show the witness, please,

23   Government's Exhibit 13?

24   **BY MR. WELDON:**

25   Q. Because, now --

```
1          MR. WELDON:  And if we could scroll down -- or up,
2     please, Agent Boynton?
3     BY MR. WELDON:
4     Q. The date of that letter is approximately how much longer
5     afterward, Ms. Simmons?
6     A. The letter before was July of 2000 -- July 24th of 2007, so
7     probably almost six months later.
8     Q. Okay.  So, six months later, then we have the letter from
9     Doctor Strausser.  And do you recognize this letter?
10    A. I do.
11          MR. WELDON  Your Honor, I move for the admission of
12    Government's Exhibit 13.
13          MR. ARVANETES:  No objection at this time.
14          THE COURT:  13 is admitted.
15
16          (Exhibit Number 13 was admitted.)
17
18    BY MR. WELDON:
19    Q. Ms. Simmons, will you please read this letter, then, and
20    the contents of it?
21    A. "To whom it may concern.  Brian Haywood, a Special Agent
22    for the Postal Service, stopped by.  He has been following Ms.
23    Simmons for quite some time now.  He has been videoing her.
24    Apparently, she had some land that she has been working on
25    clearing, and he showed me a video of her activities.  She has
```

1    been performing multiple activities, including carrying

2    objects, bending, riding a lawnmower, and activities similar

3    to this.  He is wondering whether or not I thought the patient

4    could work.  After I have reviewed some of this video, I think

5    she can work.  I am going to fill out a work release for her

6    with restrictions.  So, given the information in the video,

7    and assuming it is correct, I think she can perform light

8    duty."

9    Q. And, then, if we can show you Government's Exhibit 14, Ms.

10   Simmons.  Do you recognize this document?

11           MR. WELDON:  Could we please zoom in to 100 percent?

12   Perfect.

13           THE WITNESS:  Doctor Strausser -- OWCP-5c, it's a

14   Department of Labor form.  The doctor completed this to

15   identify her work restrictions so that we could provide her

16   with a job offer.

17           MR. WELDON:  And, then, if we could scroll down to

18   the bottom, Agent Boynton?

19   **BY MR. WELDON:**

20   Q. What is the date of that?

21   A. It's 1/18 of '08.

22   Q. Okay.  And then he provides the work restrictions that Ms.

23   Durand can work within; is that right?

24   A. That's correct.

25   Q. Okay.

1        MR. WELDON:  And if we can scroll up, Agent Boynton?

2   BY MR. WELDON:

3   Q. Then it says -- in Subsection B, what is that representing

4   for the Postal Service?

5   A. The number of hours that she could work, and how many hours

6   of restrictions would apply.

7   Q. And, in this case, what does Mr. Strausser document for the

8   Postal Service?

9   A. That she can work eight hours a day.

10  Q. And then how long can she work?

11  A. Indefinitely, under those restrictions.

12  Q. And then the portion down below outlines how many hours,

13  and then what she can and cannot do; is that right, ma'am?

14  A. That is correct.

15        MR. WELDON:  And, Your Honor, has Exhibit 14 been

16  admitted yet?

17        THE COURT:  It has not.

18        MR. WELDON:  I move for the admission of

19  Government's Exhibit 14.

20        MR. ARVANETES:  No objection.

21        THE COURT:  14 is admitted.

22

23        **(Exhibit Number 14 was admitted.)**

24

25  BY MR. WELDON:

1  Q. Now, then, once you have the restrictions, Ms. Simmons,

2  then out comes the job offer; is that right?

3  A. That's correct.

4       MR. WELDON:  If we could show the witness

5  Government's Exhibit 15, please, Agent Boynton?

6  **BY MR. WELDON:**

7  Q. And, so, what is the date of this offer?

8  A. 1/25/08.

9  Q. Okay.  So, a few days -- roughly, a week thereafter, a

10 couple weeks thereafter, out comes the job offer.

11      MR. WELDON:  And, then, could you please scroll

12 down, Agent Boynton?

13 **BY MR. WELDON:**

14 Q. And then there are the restrictions and the duties of the

15 modified assignment; is that right, ma'am?

16 A. That is correct.

17 Q. And, again, what's the purpose behind those restrictions

18 and why it is being offered to Ms. Durand?

19 A. The Postal Service wants to ensure that we are not going to

20 injure our employees any further, but it also benefits us by

21 getting us our employee back to work in some capacity.  So, it

22 provides the -- it meets all of the requirements for the

23 Department of Labor and our own policies, to get them back to

24 work at a written offer -- with a written offer.

25 Q. And was this offer accepted, at least on this document?

1          MR. WELDON:  If we could scroll down, Agent Boynton?

2          THE WITNESS:  No.  This was not accepted at this

3   time.

4   **BY MR. WELDON:**

5   Q. Okay.  And who was the individual who offered that job?

6   A. Carolyne Bowi, who was the supervisor of customer services.

7          MR. WELDON:  Your Honor, I move for the admission of

8   Government's Exhibit 15.

9          MR. ARVANETES:  No objection.

10          THE COURT:  15 is admitted.

11

12          **(Exhibit Number 15 was admitted.)**

13

14   **BY MR. WELDON:**

15   Q. Now, then, there is, ultimately, the Department of Labor

16   that becomes involved in the process; is that right, Ms.

17   Simmons?

18   A. That's correct.

19   Q. Okay. Explain that, please, ma'am.

20   A. If an employee decides to decline the offer, or not

21   acknowledge the offer, the Department of Labor -- we ask the

22   Department of Labor to get involved by saying, We offered a

23   valid offer, we've met our obligations under federal law to

24   offer them work within their mod -- within their restrictions,

25   a modified job offer.  We've provided that to them in writing.

1    If they decide not to report, or to refuse the offer, to

2    decline it or to ignore it altogether, we would ask the

3    Department of Labor to use their 5 U.S.C. Code, which is 8106,

4    to terminate benefits for this employee

5            MR. ARVANETES:  Your Honor, I didn't get the last --

6    those last numbers.

7            THE WITNESS:  5 U.S.C. 20 -- 80 or 20 --

8            THE COURT:  Ms. Simmons, again I'm going to ask you

9    to slow down.  Some of the information is familiar to you, but

10   not to the rest of us, so...

11           THE WITNESS:  I apologize.

12   **BY MR. WELDON:**

13   Q. Ms. Simmons, when you mention that, that's just a process

14   that you go through at the Postal Service.

15   A. Right.  It's a procedure that the Department of Labor

16   follows.  And that's what our -- we just ask or request that

17   that happen.  The Department of Labor then makes a

18   determination if they are going to or not.

19   Q. And when you're explaining that, for example, that is the

20   process that Workers' Compensation benefits are being offered,

21   and, then, also, that they can be denied.

22   A. That's correct.

23   Q. So, Ms. Durand, when she has been receiving benefits

24   throughout this whole time, it's been under that Title 5 that

25   you were just describing.  Is that right, ma'am?

1    A. That is correct.

2    Q. Okay.  And just so that we are clear, that's under

3    Subchapters 1 and 3 of Chapter 81 of Title 5.

4    A. That's correct.

5    Q. All right.  Now, then, the letter from the Department of

6    Labor comes out.

7            MR. WELDON:  And if we could show the witness

8    Government's Exhibit 16?  Excuse me, 15.

9    **BY MR. WELDON:**

10   Q. And explain this, please, Ms. Simmons.

11   A. This is the letter, where the Department of Labor sent Ms.

12   Simmons the letter and explained that under 5 U.S.C. --

13   explains what that code is and what it references, and

14   indicated that they reviewed the job offer that we had offered

15   her in accordance with Doctor Strausser's medical report dated

16   1/18/08 and they found that the job offer was suitable and

17   remains available.  She had 30 days to -- 30 days, from the

18   date of the letter, to either accept the position or provide

19   an explanation as to why she wouldn't accept the position.

20   Q. And that's when the Department of Labor gets involved,

21   then, is if there becomes a dispute.

22   A. That's correct.

23   Q. Otherwise, explain the process if it's just accepted.

24   A. If she just accepted it, she would go to work and we'd be

25   paying her postal time.  She'd be clocking in.

1    Q. All right.  Now, we showed you Government's Exhibit 16.

2    And it references Doctor Strausser's report on 1/18 of 2008,

3    and those are the work restrictions that you and I just

4    discussed; is that right, ma'am?

5    A. That is correct.

6    Q. Okay.  And that was after Doctor Strausser was showed the

7    video by Agent Haywood.

8    A. Yes.

9              MR. WELDON:  All right.  Your Honor, I move for the

10   admission of Government's Exhibit 16.

11             MR. ARVANETES:  No objection.

12             THE COURT:  16 is admitted.

13

14             **(Exhibit Number 16 was admitted.)**

15

16   **BY MR. WELDON:**

17   Q. Now, then, did Ms. Durand go back to work?

18   A. No, she did not.

19   Q. Okay.  Then, did she ultimately get placed on a different

20   status?

21   A. She was then placed, on September 15th of '08, on the

22   Periodic Roll status, as a PN status.

23   Q. Okay.  And we are going to go through that, but let's show

24   you Government's Exhibit 17.  Do you recognize this

25   document?

1    A. Yes, I do.

2    Q. And explain what this is to the Court, please.

3    A. Uhm, it was from the claims examiner, and it indicates that

4    as a result of the -- our investigative reports and an offer

5    of employment made to her, an independent medical exam was

6    being performed by Doctor James Hood on 7/23 of '08.

7         The Doctor indicated -- Doctor Hood indicated in his

8    report that the claimant could not work in any capacity.

9    Doctor Hood also indicates a functional capacity evaluation

10   was not warranted due to a high probability of injury.  He

11   indicated that the claimant is totally disabled and may

12   require surgery in the future if deconditioned, and indicates

13   the claimant had failed back syndrome as a result of surgery

14   on 8/11/05 and 2/27/06.

15         MR. WELDON:  Your Honor, I move for the admission of

16   Government's Exhibit 17.

17         MR. ARVANETES:  No objection.

18         THE COURT:  17 is admitted.

19

20         **(Exhibit Number 17 was admitted.)**

21

22   **BY MR. WELDON:**

23   Q. Now, then, Ms. Simmons, we'll talk about Government's

24   Exhibit 18.  Do you recognize Government's Exhibit 18?

25   A. Yes.

1   Q. Can you explain what this document is, ma'am?

2   A. It indicates the medical condition from the Department of

3   Labor saying that the doc -- the work-related disability is

4   too severe for employment and is unlikely to improve.  And

5   they used the medical reports on 7/31/08, checked off as a

6   second opinion from Doctor James Hood.  And that some of the

7   work-related disability continues, and chronic and current

8   disabilities together with work-related disability prevents

9   employment.  Conditions causing disability are failed back

10  syndrome.  The second opinion, total disabil -- disable --

11  disabled, and refused a functional capacity exam, that it may

12  result in an injury.

13  Q. Okay.  So, then, explain to the Court the difference

14  between what Ms. Durand was before this document comes out and

15  what she was on after?

16  A. Before this document, she would have had a potential to

17  return to work.  She was on our Periodic Rolls cases, but it

18  was coded as a "PR" so that she was -- she had a potential of

19  returning to work once we got her to a point where she had

20  restrictions that we could accommodate, which has been usually

21  bed rest.

22      However, subsequent to this report, we had two doctors

23  saying that she's totally disabled, they placed the -- the

24  Department of Labor placed her on a PN status, which is the

25  Periodic Roll status with no possibility of returning to work

1   due to her disabling conditions for the indefinite future.

2   Q. And what does that mean, practically speaking, ma'am?

3   A. She just got free money for the rest of her life.  Right

4   now, she's off.  She is off, and she's going to get money

5   every month off the Periodic Rolls.  The Postal Service will

6   be paying her for the rest of her life.

7   Q. And, then, you are not going to offer her job duties or

8   anything that might be consistent with work restrictions; is

9   that right?

10  A. No, sir.  It would not -- it wouldn't behoove us to

11  continue to pursue it, only because we have so many others

12  that we try -- are trying to get back to work.  On this

13  status, we had no medical that would support our suitability

14  rating from the Department of Labor, so we would not be able

15  to pursue -- we wouldn't pursue her any longer.

16  Q. And, of course, you have other cases that you have to

17  administer; is that right?

18  A. Yes.  I have 400 over in the Houston District, alone.

19  Q. Okay.  So, then, you're not even administering this case

20  and analyzing it for work restrictions or anything of that

21  nature.

22  A. No, we are not.

23          MR. WELDON:  Your Honor, I move for the admission of

24  Government's Exhibit 18.

25          MR. ARVANETES:  No objection.

1          THE COURT:  18 is admitted.

2

3          **(Exhibit Number 18 was admitted.)**

4

5     **BY MR. WELDON:**

6     Q. Ms. Simmons, when these jobs are being offered that we've

7     talked about, uhm, with the Court, does the office have to

8     comply with those work restrictions?

9     A. Yes.  Absolutely, we have to comply.

10    Q. Okay.  So, in other words, it can't be increased once the

11    individual is there; is that right, ma'am?

12    A. As far as the hours?

13    Q. Oh, hours, or job duties, for example.

14    A. No.  No.  Once an employee is there and is out, we consider

15    -- we tell management, the instruction is they stay under the

16    work restrictions until those restrictions are modified by the

17    physician.

18    Q. Okay.  Now, when you have these Workers' Comp cases, is a

19    boss a reason to stay on Workers' Compensation?

20    A. No.

21    Q. Okay.  Now, the basis that you had for that PN status and

22    changing Ms. Durand into, essentially, totally disabled, was

23    that based, then, on Doctor Hood's opinion?

24    A. That was based on his opinion, yes.

25    Q. Okay.

1  A. I believe the Department of Labor ruled who would be -- who

2  held the medical -- the weight of value in the decision, but

3  both of them had opined that -- Doctor Hood opined that she

4  could not ever come back to work.

5  Q. Would you have administered the claim differently had

6  Doctor Hood reached a different conclusion?

7  A. Absolutely.  We would be trying to offer her work within

8  the restrictions provided.

9  Q. Even today.

10  A. Even today.

11  Q. All right.  What about vocational training?

12  A. Voc rehab is something that we utilize in the event an

13  employee has such limited capabilities that we can't really

14  identify work within the Postal Service.  Because most of the

15  jobs are physical in nature of some sort.

16      And if the job duties are too disabil -- if they are too

17  debilitating for an employee to have those kind of

18  restrictions, we would look to the Department of Labor to hire

19  a voc rehab specialist to come in and try to work with that

20  employee, to get them employed in another -- at another

21  business.

22  Q. (Nods head affirmatively)

23  A. But the Postal Service still would be paying the difference

24  in their earnings.  We're still obligated to that, if they --

25  the injury -- the wage they were earning on the date of

1    injury, we're still obligated to that.

2    Q. So, in other words, you're still going to always pay Ms.

3    Durand the certain amount, but, then, if she were to work

4    somewhere else, then that would offset the difference.

5    A. Yes.  More recently -- yeah, we would -- if she was making

6    $20 an hour when she was working for the Postal Service, and

7    she got a job making 10 in a voc rehab position, we'd be

8    paying the difference of $10 for the rest of her life, $10

9    dollars an hour for the rest of her life.

10   Q. Why does the Postal Service and all agencies support the

11   voc rehab program?

12   A. When we can't identify something that she could be

13   productive in for the Postal Service, we would actually look

14   to have her at voc rehab, so that she does -- it reduces our

15   costs.  It eventually reduces our costs.  In that case, it

16   would be half -- it would be a 50 percent cost reduction.

17         It also frees up the position she was holding down.  The

18   Postal Service has a compliment for every office, so we're

19   only allowed to have so many positions filled.  If she is in a

20   limited-duty status or a no-work status, where she can't ever

21   come back, she is holding the position that that office cannot

22   -- under contract, we can't -- and under the compliment

23   regulations that we have, she cannot -- it cannot place that

24   position up for bid to an totally -- a totally whole person

25   that could actually do the position with the full functions

1   and job duties.

2        So, it allows the Postal Service the flexibility to

3   remove that person from that job, frees it up, so that bus --

4   the business can continue to run and we can hire somebody that

5   could actually do the job.

6   Q. And, then, that voc rehab or that training could be --

7   range from any other job that's out there.

8   A. Absolutely.  Anything within their medical restrictions

9   that they are capable of performing.

10  Q. What about, for example, telemarketing?

11  A. And they do special training for telemarketing.  They

12  actually do voc rehab for telemarketing.

13  Q. All right.  So, it would be answering the phone, that,

14  then, they would be paid for, and that would be offset by the

15  Postal Service.  And they still would be guaranteed their

16  total check, but it would be reduced.

17  A. Right.  Because the other agency, the other company that

18  they're working for is going to be paying the other part of

19  it.

20  Q. Okay.  Now, do you have problems placing people at all?  I

21  mean, are you able, as the Postal Service, to get people

22  jobs?

23  A. I haven't yet -- I have yet to -- my personal history is

24  that the work comp has never been able to not place employees.

25  Because we can create a position, we can create a position at

1   the Human Resources Shared Service Center, HRSSC, to identify

2   a job number -- a special number for this employee, create the

3   work around their restrictions, give them assigned jobs.

4        And then we code them, so that they understand that any

5   time they attempt to bid to a job in their craft, that that --

6   that would pop up on their application, that they are in RD

7   status, that they have restricted duty, and then there's a

8   compliance with the union contract about whether or not their

9   -- the time length, to show that they can demonstrate the

10  abilities and the full capabilities of the position.

11  Q. And that would include Ms. Durand, for example.

12  A. That would include Ms. Durand, yes.

13  Q. Now, then, these several plans that are given to Ms.

14  Durand, they're wherever she moves; is that right, ma'am?

15  A. That's correct.

16  Q. Okay.  And, so, in Montana, she was paid by the Postal

17  Service and the Department of Labor; is that right?

18  A. That's correct.

19  Q. Okay.  And in Texas?

20  A. Yes, that's correct.

21  Q. All right.  And, then, also currently in Idaho; is that

22  right, ma'am?

23  A. That's correct.

24  Q. Okay.  Can you explain, once Ms. Durand moved out of the

25  Houston Division, what happened with the file?

1    A. It pretty much got put on the back burner.  We had no --

2    it's hard to track an employee if they up and move and leave

3    the state.  We have to then try to identify outside OIG that

4    would actually do the investigation, who would be willing to

5    do that for us.  And that's a lot more complicated, because

6    they're all busy everywhere they are.  So, it's complicated.

7    We pretty much put them on the back burner, and out of sight,

8    out of mind.

9    Q. Now, once somebody moves, then, say, for example, to

10   Montana, and they're no longer in the Houston Division, are

11   the people who are watching Montana overlooking that file?

12   A. Yes, they are.

13   Q. Okay.

14   A. Actually, it's probably a coordinated effort.  Because I'm

15   not really sure how the OIGs work that out.  But it is through

16   the Office of Inspector General, but it's worked out between

17   the two.

18   Q. Okay.  And what about, for example, the Houston Division

19   with your employees?  I mean, when you're monitoring the

20   files.  Are you monitoring it in Montana, or is that done by

21   Montana?

22   A. I actually still have the case file.  So, like I said, it

23   was out of sight, out of mind.  But the investigation would be

24   conducted -- done with the OIG.  And, typically, we're not

25   informed about an updated or a status from the Department --

1   from the OIG's office, because -- until it becomes a criminal

2   investigation.  Because they are not obligated to tell us

3   anything about their investigations.

4   Q. You mentioned the OIG, can you explain to the Court your

5   relationship as it relates to the Office of Inspector

6   General?

7   A. The Office of Inspector General, it's a different -- it's a

8   different entity.  They -- actually, the U.S. Postal

9   Service/Office of Inspector General investigates our internal

10   crimes and frauds for the Postal Service.  They help to

11   identify and alleviate any misconduct issues, they investigate

12   those types of things, and do audits, to make sure the

13   propriety of our business stays stable and that we're making

14   sure that everything is running like it should be.  So, they

15   investigate our -- they have their -- they are federal agents

16   that work for the department -- or for the OIG's office, they

17   don't work for us.

18   Q. Right.  So, in other words, you're part of the

19   administrative side.

20   A. That's correct.

21   Q. And, then, they are part of the criminal investigation

22   side.

23   A. That's correct.

24   Q. All right.  Now, then, the final thing I wanted to ask you,

25   Ms. Simmons, is Doctor Hood, did he see the video and the

1   surveillance video that was done in 2008?  Was that provided

2   to him?

3   A. No, not on the second -- the Department of Labor doesn't

4   normally provide a video to the doctor on a second opinion.

5   Q. And can you explain --

6           MR. ARVANETES:  Your Honor, I -- again, I didn't

7   hear what she -- what her answer was.

8           THE WITNESS:  No.  The Department of Labor does not

9   typically provide a copy of the video evidence to the second

10  opinion doctor.  In my experience, that has not ever

11  happened.

12  **BY MR. WELDON:**

13  Q. And why have you seen that, in your experience, ma'am?

14  A. I was -- you know, my -- my opinion about it, it would be

15  that it's because you -- the doctor -- they want the doctor to

16  get a clear vision based on objective findings and the

17  subjective complaints from the employee.

18      If you're showing them -- you skew their opinion by

19  giving them a pre-vision of what was videotaped, this person

20  was videotaped doing.  They want a pure, clean vision from the

21  doctor about what the doctor saw and observed during his

22  second opinion exam.

23  Q. And those second opinion exams rely on the individual who

24  is the injured worker; is that right?

25  A. Yes, the participating employee.

1     MR. WELDON:  May I have a moment, Your Honor?

2     THE COURT:  Mr. Weldon, you -- I don't believe you

3  discussed Exhibit Number 8.  It's listed with this witness.

4     MR. WELDON:  (Viewing document)  Certainly, Your

5  Honor.  I was going to address that with another witness.

6     THE COURT:  Okay.  Thank you.

7     MR. WELDON:  Okay.  Thank you, Your Honor.

8     THE COURT:  Are you finished, Mr. Weldon?

9     MR. WELDON:  Yes, please, Your Honor.

10     THE COURT:  Okay.  Cross examine, Mr. Arvanetes.

11     MR. ARVANETES:  Yes, sir.

12

13                     **CROSS-EXAMINATION**

14  **BY MR. ARVANETES:**

15  Q. Ms. Simmons, so you're from which office?

16  A. I am from the Houston District office.

17  Q. And how long have you been working there for?

18  A. At the Houston District, for three months.

19  Q. So, why were you asked to come testify in this case?

20  A. They wanted a subject matter expert for the HRM Department

21  out of Houston -- from Houston.  (Nods head affirmatively)

22  Q. Okay.  And, uhm, have you ever (shakes head negatively) had

23  any chance to meet Ms. Durand at all?

24  A. No, I have never met Ms. Durand.

25  Q. Where were you before Houston?

1    A. Omaha, Nebraska.

2    Q. Omaha.  Omaha.  And, so, your relation to this case is

3    basically what you've read in the case file, in your case

4    file?

5    A. That's correct.  It's the way of most of my cases.  I don't

6    have a chance to meet most of my -- the injured employees.

7    Q. And your case file, you've been able to review your case

8    file?

9    A. That is correct.

10   Q. Yeah.  So, just to be clear -- and I'll talk a little

11   slower, just because.  (Shakes head negatively)  So, Ms.

12   Durand was initially placed on Workers' Compensation back in

13   2003, according to your Exhibit 1.

14   A. That's when she filed her first CA-2.

15   Q. And that was based upon a work-related injury.

16   A. It was originally not accepted as a work-related injury,

17   but, subsequently, was overturned on appeal and accepted as a

18   work-related injury.  And goes back for illness -- and goes

19   back -- dated back retroactive to April 24th of 2003.

20   Q. Okay.  And, so -- and that was in -- that's in your --

21   that's in your file?

22   A. Yes.  Yes.

23   Q. Now, what would the file be called?  Is it a Department of

24   Labor HR file, is it an OWCP file?  What is -- what is it

25   called?

1    A. It's a Health and Resource Management file.

2    Q. Health and Resources.  With the -- with the USPS?

3    A. With the Postal Service.

4    Q. I mean, the United States Postal Service.

5    A. That's correct.  We do not -- we don't have everything,

6    because we don't typically get everything in a file.  We

7    always ask the employees, "If you're requesting a copy of your

8    records, ask the Department of Labor, they're going to have

9    all records."

10       Because employees will circumvent our office, and not

11   submit all of the documentation to our office.

12   Q. So -- so, okay.  So, you have -- okay.  You have the --

13   most of the file -- most of the records, but you may not have

14   all of the records, because the Department of Labor may have

15   all of the records.

16   A. The Department of Labor should have all of the records.

17   Q. Should have all of the records.  And, then, where does the

18   OWCP, the Office of Workers' Compensation program, where does

19   that come in within the context of your file?

20   A. Any correspondence to the employee.  They would correspond

21   to us, copy us with a correspondence.  If there is a

22   correspondence directly related to something we've requested,

23   they would correspond with us, that would all go into our

24   files.

25   Q. Okay.  And your agency, would you say -- characterize your

1  agency, the United States Postal Service, about how they do

2  Workers' Comp, unique to other federal agencies?

3  A. I don't know, I've never worked at another federal

4  agency.

5  Q. Well, for example, the United States Postal Service, do

6  they have to balance their budget each year?  Do you know?

7  A. I know that we've never been able to balance our budget.

8  We have a budget --

9  Q. (Laughing)

10  A. We have a budget, but it's subject to anything else that

11  comes in.  Its just -- we are a business.

12  Q. You're --

13  A. So, like any other business, everybody has a budget, or you

14  try to stay within the constraints of your budget.

15  Q. But within the federal agencies, you're one of the few, if

16  not only, that's a profit-making agency, is that fair to

17  say?

18  A. We are not a profit agency.  We are not a profit agency.

19  All of our money goes and is distributed to products,

20  employees' wages, benefits, salaries, everything we do.  It's

21  not a -- we're not a profitable business.

22  Q. All right.  Well, then, I'm not going to ask that question.

23  Let me ask -- let me ask a better question.  Compared to other

24  agencies, you make your money by selling things.

25  A. That's correct, products.

1   Q. Like a stamp.

2   A. Product.  (Nods head affirmatively)

3   Q. Whereas, other agencies, they may get funding directly from

4   Congress and they don't have to sell things.

5   A. That's correct.

6   Q. All right.  So, because it's an agency where -- I guess, in

7   your opinion, is the bottom line pretty important with the

8   USPS?

9   A. Yes.

10   Q. And would -- and you said you paid 7 percent of a fee, is

11   that a fee going to the Office of Workers' Compensation

12   program to kind of help out with this program, the Workers'

13   Comp program, or where does that 7 percent fee come from?

14   A. It comes from the United States Postal Service.

15   Q. And who do they pay that to?

16   A. To the Office of Workers' Compensation programs.

17   Q. The OWC does?

18   A. Department of Labor.

19   Q. And you have off -- every agency has an office of

20   investigator -- investigator general.  Isn't that right?

21   A. OIG.  Yes.

22   Q. OIG.  Well, yeah, I'm saying -- I'm saying the words, just

23   because I want to make sure, you know.

24   A. Yeah.  I understand.

25   Q. All right.  So, lets call it "OIG."  Every agency has an

1    OIG.

2    A. Yes, the way I understand it.

3    Q. And your agency has an OIG office, as well.

4    A. That's correct.

5    Q. And do you know what percent of your budget is paid to the

6    OIG program?

7    A. No, I have no idea.

8    Q. Okay.  All right.  So let's get back to Ms. Durand a little

9    bit.  So, back in 2003, she put in for a Workers' Comp

10   office-related injury, but it got denied.

11   A. Yes.

12   Q. Right?  And then she appealed, and it got accepted.

13   A. It was returned accepted.

14   Q. Who was the appealing part of that?  I mean, was it --

15   A. It's not -- she didn't appeal to us, she appealed it to the

16   Department of Labor.

17   Q. Okay.  All right.  So, she appeals to an agency outside of

18   your agency.

19   A. That's correct.  Because she asked for an oral hearing.

20   Q. Even though you guys are paying her, right?

21   A. Yes.  (Nods head affirmatively)

22   Q. That doesn't seem fair.

23   A. (Shakes head negatively)  (Indicating)  Is there a

24   question?

25   Q. I don't know.  Does it seem fair?

1    A. Does it seem fair?

2    Q. Yeah.

3    A. I've never known anything in life to be fair.  But it's the

4    way it is.  It's an established process.  I don't control it,

5    I just manage what I'm given.

6    Q. So, the Department of Labor controls a lot of what's going

7    on with Ms. Durand, correct?

8    A. That's correct.

9    Q. But a lot of times there may be some disagreements between

10   what the USPS thinks about a certain client or employee and

11   what the DOL, Department of Labor, decides what they should do

12   with people.  Is that fair to say?

13   A. (Indicating)  (Shakes head negatively)  I -- yeah, I

14   suppose.  I -- the process they -- there -- that they have the

15   sole adjudicating authority over our claims.  It doesn't --

16   our opinion doesn't count when we -- so, our opinion, we have

17   our opinion, but it doesn't matter.  There is law that

18   determines the medical.

19   Q. Kind of like in Ms. Durand's case, where, based upon Doctor

20   Hood's report back in 2008, he said she's totally disabled,

21   right?

22   A. Yes.  (Nods head affirmatively)

23   Q. And you mentioned another doctor.  You said, "doctors," was

24   that just a mistake or --

25   A. Strausser?  Strausser had also been seeing her.

1   Q. Right.  But Strausser wasn't the one who recommended that

2   she is totally disabled in 2008, he actually changed his mind.

3   A. After Doctor -- or after Agent Haywood had seen him.  He

4   originally had her placed on total disability.

5   Q. Right.  So, is there any other doctor besides Hood who said

6   she is permanently disabled?  At the time, that you know.

7   A. Not to my knowledge.  Not that I'm aware of.

8   Q. All right.  But based upon that report, the Department of

9   Labor put her on what is called the Periodic Rolls.

10   A. That's correct.

11   Q. And she has been on those Periodic Rolls since then.

12   A. That's correct.

13   Q. And every -- how many -- how many years, every three -- you

14   said three years?

15   A.  Three years, we can request updated medical on the file.

16   Q. And, so, and that's "we" being the USPS?

17   A. The Postal Service.

18   Q. The Postal Service.  So, how many -- how many cases do you

19   have right now?  You said 400 or something?

20   A. On the Periodic Rolls?

21   Q. Well, no.  Just -- I mean, do you have a caseload or

22   anything, or --

23   A. I don't, personally.  I manage my staff that has the

24   caseloads.  There are probably over 800 cases.

25   Q. 800 cases.  All right.  So, how do they -- how do they

1    monitor that part of the program?  I mean, do they have, like,

2    (indicating) dates where, okay, we've got to send out

3    something every three years to figure out if these people can

4    get back to work, or what?

5    A. Headquarters has assigned a Periodic Roll staffing for each

6    district.  And I have one assigned to our -- she has the

7    Houston District, but she has multiple other districts within

8    the southern area.  And she does the monitoring of those case

9    files and the tracking of that data for medical updates.

10   Q. So what would that entail?

11   A. As far as what?  I have never done that job --

12   Q. Like, what has your setup been for years?  Yes, like --

13   A. It would just entail a request for the employee to provide

14   the updated medical from her physician, that she was examined

15   and remain in -- remains in a non-paid or in a disability

16   status.

17   Q. And, sometimes, those physicians, I assume, would change?

18   A. It's rare, but I've -- I've seen it very rarely, but

19   occasionally.

20   Q. Let's say for Ms. Durand's case, uhm, was it always Doctor

21   Hood who would -- would she have to provide updated medical

22   records every three years, from 2008, from Doctor Hood, or how

23   would that happen in Ms. Durand's case?

24   A. That would be up to the Department of Labor.  We don't

25   oversee what -- typically, we don't even see that medical.  We

1    can only provide -- ask the Department of Labor to provide us

2    with a work status for our employee every three years.

3         We're not entitled to see the medical.  So that if she

4    sent the medical report directly from whoever doctor, whatever

5    doctor she sends it into, they sen -- it goes to the

6    Department of Labor.  And then we would ask, "We have

7    requested this, have you received a work status on our

8    employee?  What is the current work status for our employee?"

9    Q. And, then, what -- so, the employee doesn't send it

10   directly to you, the Department of Labor sends it to you?

11   A. They don't send us the medical.  They would provide us with

12   a work status report.

13   Q. A work status.  All right.  And, so -- and from there,

14   that's it, you're powerless to do anything else.

15   A. Pretty much.  (Nods head affirmatively)

16   Q. And, so, in that sense, once you're on Periodic Rolls and a

17   physician says you're permanently disabled, and it's updated

18   every three years, then is there any -- I guess, any burden or

19   any -- I mean, what about the employee in this case?  Like,

20   let's say Ms. Durand.  I mean, if her doc says every three

21   years that she is still permanently disabled, and sends the

22   medical to DOL and the DOL sends that sheet, whatever sheet to

23   you, saying she is still permanently disabled, is it her

24   fault?

25   A. (Pause)

1  Q. If a doc says that she is disabled every three --

2  permanently disabled every three years?

3  A. I don't know that "fault" is the correct word that I would

4  use.  It's based on a medical decision and her -- the

5  employee's presentation during an exam.

6  Q. Okay.  All right.  So, then, does the DOL require a

7  physical exam every three years of this person?

8  A. That, I don't know what the requirement is, as far as --

9  you mean actually being seen?

10  Q. Right.  Right.

11  A. I don't know that they would know any different unless they

12  received the billing on it.  You would have to ask somebody

13  from the Department of Labor.

14  Q. So -- so, if someone is on permanently -- permanent

15  disability status, and she's on the Periodic Rolls and every

16  three years DOL says she's still permanently disabled, uhm,

17  would an employee just try to overrule them and say, "Wait,

18  wait," you know, "I can work.  I can work"?  I mean, is it her

19  onus, is it her burden to do that?

20  A. Yes.  Under federal law, if she is able to seek employment,

21  she is supposed to do so.  That's part of the federal

22  regulations, too.

23  Q. But if she's told by the doc -- if she's told by -- every

24  three years by her doc and the DOL that she is permanently

25  disabled, then how is she to know to do that?

1   A. If she is giving an accurate subjective?

2   Q. Yeah, if she's telling the truth.

3   A. What she is telling the doctor, and she's telling the

4   truth?

5   Q. Yeah.

6   A. It's based on what the doctor says.

7   Q. Based upon what the doctor says, not upon what she says.  I

8   mean, she has to tell the truth.  But it's not based upon what

9   she says, it's based upon what the doctor says.  And they go

10   by what the doctor says.

11   A. Well, I know that if she would argue that, "Hey, I think I

12   can work," they would probably send her out for a different

13   opinion.

14   Q. Okay.  All right.  But if she follows what the doctor says,

15   then (shakes head negatively) she's still on the Periodic

16   Rolls?

17   A. That's correct.

18   Q. All right.  Thank you.  So, let's get back to Ms. Durand.

19   So, 2005, she sends another report concerning a shoulder

20   issue; is that right?

21   A. Uhm, that's correct.  That was -- in 2005, she added her

22   neck.

23   Q. Added?

24   A. Or she wanted to add -- include her neck, her cervical

25   condition.

1  Q. Well, let's go to Exhibit 2 for a minute.

2         MR. ARVANETES:  Does anybody have -- madam clerk?

3  Mr. Clerk.

4  **BY MR. ARVANETES:**

5  Q. So, let's read that.  It says, "I have terrible pain in my

6  left shoulder, arm, hand, and lower back."  So, she is

7  claiming all of the above, not just her neck.

8  A. Right.  She ends up -- ended up saying "severe" -- when she

9  says the nature of her disease or illness, she talks about

10 severe pain in left shoulder, upper left numbness in hands and

11 back, and left chest, and left hand and fingers.

12        But in Number 15, she asked -- she explains what she is

13 trying to ask, and it does say, "I was told within the last

14 month that the neck was not included in the original claim and

15 that it needed to be refiled in a new claim."

16 Q. And, so -- so, this is what that -- that is here.

17 A. Yes.

18 Q. And that was accepted, wasn't it?

19 A. Yes.

20 Q. And it was accepted based upon -- which doctor did she see

21 to get that accepted, do you know?

22 A. I don't remember at all.

23 Q. Do you have it in your files?

24 A. Probably Strausser.  Well, are you going to hold me to it?

25 I'm assuming everything that we have up until a doctor did a

1    sec op, a second opinion, was based on Doctor Strausser's

2    exam.

3    Q. All right.  And I'm not -- you know, I may ask you to go to

4    your files in case you don't remember something else, but

5    that's not as important, so I'm going to move on.

6        So, let's see.  So, then -- so, she's placed on,

7    eventually, restricted -- what's called restrictive duty,

8    correct?

9    A. Correct.

10   Q. And that is basically where the doc says she has certain

11   restrictions.

12   A. That's correct.

13   Q. Is that correct?  All right.  And those restrictions allow

14   her to work, but she can't do certain things.  Or if she --

15   or, for example, let's go to -- so I can better explain myself

16   here.

17       So, let's go to Exhibit 6, Government's Exhibit 6, for

18   example.  And let's scroll up.  Lets go to the next page, it

19   looks like.

20       All right.  So, in here, there are certain restrictions;

21   is that correct?  2.4 hours of case work; answer phones,

22   1.4 --

23   A. Actually, those are the duties.  The restrictions are

24   below, listed under the physical requirements.

25   Q. Okay.

1    A. So that we stay within the restrictions below, yeah, three

2    hours -- four hours.

3    Q. Four hours.  Okay.  All right.  Thank you.

4        Now, her -- her job was a RCA, a rural carrier associate.

5    A. That's correct.

6    Q. Is that right?  And there is -- and is that considered a

7    certain craft within the employment?

8    A. They're separated under a separate contract, for the rural

9    carriers, the National Rural Letter Carriers' Association.

10   Q. So, if you were to give her, you know, for example, here

11   what the physician title modified as RCA, rural carrier

12   associate, but if she is to be offered a different job, would

13   it be in a different craft?

14   A. It could be.

15   Q. And does she have to accept it if it's in a different

16   craft?

17   A. That would be a grievance issue, not an issue for us.  She

18   would -- yes, we would offer the work duties, because the

19   Department of Labor doesn't care about the union contracts.

20   We try to stay contractual in all of our offices, in addition

21   to being compliant with the Federal Regulations, to provide

22   her a written job offer.  So, the contract, as far as craft,

23   that becomes a union issue, not a Department of Labor issue.

24   Q. So, in Ms. Durand's case, at a certain point she had to be

25   switched to a different craft because of all the medicine she

1  was taking, plus her surgeries.  Is that fair to say?

2  A. (Shakes head negatively)  These duties continue her in the

3  same craft.  She's cap -- she has 50 percent of her assignment

4  in the craft that she was doing, casing and using -- casing

5  mail, casing rural routes.  That assignment is half of her

6  day, that would be her craft.  That's considered her craft for

7  purposes of --

8  Q. All right.

9  A. -- contractual issues.

10  Q. So -- so, she initially saw -- back in 2006, she saw Doctor

11  Strausser, correct?

12  A. Yes.

13  Q. Okay.  And, at that time, Doctor Strausser put her on a

14  restricted duty assignment.

15  A. Okay.

16  Q. And at a certain point he told her that she is totally

17  disabled; is that correct?

18  A. Yes.

19  Q. Now, so -- well, let's look at Exhibit 8.  And I believe --

20  let's see.

21          THE COURT:  Mr. Arvanetes, would you touch your

22  screen and clear the purple, please?

23          MR. ARVANETES:  Yes.

24  **BY MR. ARVANETES:**

25  Q. So, this is a report signed by Doctor Strausser.

1         MR. ARVANETES:  If a person can just -- yeah, it

2   will make it smaller so we can kind of fit it -- fit it all

3   in.  Well, not that -- we can't see that.

4         THE AGENT:  Scroll down?

5         MR. ARVANETES:  Just keep it like that, and we'll

6   try to -- yeah, just scroll down.

7         THE AGENT:  Okay.

8   **BY MR. ARVANETES:**

9   Q. So, this is his report.  Are you aware -- and this is from

10   5/22/06.

11         MR. ARVANETES:  And scroll down just a little bit.

12   Up.  I mean up.  Sorry.

13   **BY MR. ARVANETES:**

14   Q. It says here -- what is -- it says, "Patient unable to

15   work."  And he highlights that, he focuses on that.  Is that

16   correct?

17   A. He underlines "unable," yes.

18   Q. And, so, at that point, what is your -- what does USPS do

19   about that?

20   A. We may --

21   Q. Do they offer a limited-duty assignment?

22   A. We may ask the doctor to clarify why he's providing

23   restrictions.  Yet, to me, that's a conflicting piece of

24   medical.  He provides what her limitations are; yet, he

25   provides that she is unable to work.

1    I would ask that we clarify that.  I would ask my nurse

2    to write a letter, and copy Ms. Durand on it to let her know

3    that we are asking for clarification on that medical.

4    Q. Okay.  And what -- do you know if that was done?

5    A. I don't want to assume.

6    Q. And, so, after this, when is she seen next by Doctor

7    Strausser?

8    A. I don't have the dates in front of me.  What date was this?

9    Q. This was 2006.

10   A. May of 2006?

11   Q. I don't know what day it is.

12        MR. ARVANETES:  Scroll up.

13   **BY MR. ARVANETES:**

14   Q. Yeah, May of 2006.  So, when was the next time she saw

15   Doctor Strausser?

16   A. I can refer to my file.

17   Q. Sure.

18        THE COURT:  This is Exhibit 8, Mr. Arvanetes?

19        MR. ARVANETES:  Yes.

20        THE COURT:  Do you intend to admit that?  It's not

21   been admitted yet.

22        MR. ARVANETES:  Yes.  Yes, we'll admit that.

23        MR. WELDON:  No objection, Your Honor.

24        THE COURT:  All right.  Then Exhibit 8 is

25   admitted.

1

2            **(Exhibit Number 8 was admitted.)**

3

4            THE WITNESS:  It looks like subsequent to the May

5    meeting -- do you want -- you want to know when she saw Doctor

6    Strausser, then?

7    **BY MR. ARVANETES:**

8    Q. Yes.  After May.

9    A. Okay.

10           THE COURT:  I think it's Exhibit 11, Mr.

11   Arvanetes.

12           THE WITNESS:  (Viewing documents)

13   **BY MR. ARVANETES:**

14   Q. Why don't we look at Exhibit 11.  Government's Exhibit 11.

15   That may help out.

16       So, in this letter he says that -- how many operations,

17   do you know, that Doctor Strausser did on her?  How many

18   surgeries?

19   A. I didn't count them.  I don't know.

20   Q. So, in this letter, though, she is still having problems,

21   and he says, "She has recently undergone a lumbar spine dorsal

22   stimulation."  Do you agree with that?

23   A. That's what the medical says -- or what the letter says.

24   Q. Okay.  And then he does say, "She did try" -- "and toward

25   the end, she did try to work in the past, but she is unable to

1  continue."  Is that right?

2  A. Yes, that's what the letter says.

3  Q. Okay.  And, at this time, was she allowed to work,

4  according to Strausser?  Or is she still unable to work?

5  A. She's still unable to work, according to Mr. -- or Doctor

6  Strausser.

7  Q. Okay.  And, then, let's go to Exhibit 12.  Exhibit 12 is a

8  letter dated the same day to the Department of Labor, and it

9  talks about the fact that she had undergone a spinal or a

10  dorsal column stimulator implantation by Doctor Jue.  And,

11  also, she is being seen by Doctor Heiman for a left shoulder.

12  Is that correct?

13  A. That's what the letter says, yes.

14  Q. Yeah.  Now, are you aware that -- in your records, that

15  she -- that, according to Doctor Jue, before he put in the

16  dorsal stimulator, that she had to see a psychologist, Doctor

17  Bricken?

18  A. That is not in this file and I'm not aware of that.

19  Q. That wouldn't be in your file?

20  A. In this file?

21  Q. Well, in your file.

22  A. The only -- for this case.  We do -- if she has a separate

23  case, I wouldn't know about that.  I wouldn't have that

24  information with me.  This is about her -- the CA-2 claim she

25  filed for her neck, shoulder, and back.

1    Q. But --

2    A. I'm not aware of a Doctor Jue.  So that's -- that's the

3    first I know about him.

4    Q. Well, do you know the term "primary care physician"?

5    A. Yes.

6    Q. That's a pretty important term for your field.

7    A. Yes.

8    Q. And, at this point, in 2007, did the USPS consider Doctor

9    Strausser her primary care physician?

10   A. In my review of the file, I would think Doctor Strausser is

11   her primary care physician.  I don't know for a fact, because

12   I wasn't here when the incident occurred.  And it does look

13   like there is multiple doctors in the file, but I received

14   predominately Doctor Strausser's information.

15   Q. Okay.  So --

16   A. And he writes this letter, so I'm assuming it --

17   Q. Well, then, let's -- let's jump ahead a little bit, then,

18   because I want to talk about this.  Uhm, that will be five --

19   let's go to Exhibit 13.

20        Now, this is the letter that Doctor Strausser writes

21   after an agent from the OIG visited her -- visited him; is

22   that correct?

23   A. It appears to be, yes.

24   Q. And is it something in your guidelines that is allowed, for

25   a doctor to view a videotape by the OIG?

1  A. I think, as I established in my previous testimony with the

2  attorney (indicating), Ryan Weldon.  The Office of Inspector

3  General, they are a separate entity.  We don't rule or govern

4  anything they do.  They are exempt form our Postal Service

5  policy, because they are federal agents, they work under --

6  for a -- as a federal agent for the Office of Inspector

7  General.  They do fraud investigations and criminal

8  investigations.

9  Q. So, are you -- but are you aware, based upon your

10 experience working in Omaha and Houston, and all that, are

11 they allowed to use videotape?

12 A. I don't know that -- we are not.  The Postal Service is

13 not.  My department is not allowed to do that.  But that is --

14 they are doing investigative processes, their processes are

15 separate and different than ours.

16 Q. Are you aware that the Department of Labor does not allow

17 that?

18 A. They --

19 Q. The --

20 A. The Department of Labor does not allow us to do that.  They

21 do allow -- they do accept Office of Inspector General

22 investigations.

23 Q. Right.  But are you aware that the Department of Labor does

24 not accept, uhm, a doctor's opinion simply based on videotaped

25 evidence?

1  A. I'm not aware of how they make their decisions.

2  Q. So, there is a little problem, though, with -- after 2008.

3  After this appointment, what is -- Doctor Strausser changes

4  his mind, doesn't he?  And he says -- after seeing the

5  videotape, he says, "I think she can perform light duty."  Is

6  that right?

7  A. Yes.  Yes.

8  Q. And do you know whether, under your rules, that in order to

9  change someone's status whether a doctor actually has to see

10  the claimant, the patient?

11  A. I don't govern the rules for the Department of Labor.  So,

12  as far as -- we are subject to whatever their decisions are.

13  I don't know what their rules are as far as whether they

14  require an exam.

15  Q. All right.  So, let's go to 15 -- 15.  So, what happens is

16  -- how is -- how is this report processed?  How does it get to

17  Carolyne Bowi, who is, at the time, Ms. Durand's boss?  How

18  does it get to her within a week, even though it has to go

19  through the Department of Labor?

20  A. We could have asked for work -- the work status of the

21  employee.  And once the Department of Labor provides us with

22  that information, or if the employee provides us with that

23  information, we would proceed with a 2499 job offer.

24  Q. So, how did this get to Doctor -- or to a -- Doctor

25  Strausser's report, how did it get to Ms. Bowi within a

1   week?

2   A. I have no idea.

3   Q. You don't know.  And, so, she writes this form, this

4   limited-duty assignment, and what does Deborah Durand do?

5   A. What does she do?

6   Q. What does she do, based upon this job offer?

7   A. Oh.

8            THE WITNESS:  Scroll down.

9        She declined the offer.

10  **BY MR. ARVANETES:**

11  Q. She declined the offer.

12  A. I believe she declined the offer.

13  Q. And you -- are you aware that she declined the offer

14  because she said that Doctor Strausser wasn't her primary care

15  physician?

16  A. I'm not aware of why she declined the offer.  I know she

17  didn't accept the offer, because we don't have an acceptance

18  letter in our files, and she remained on the rolls for the

19  Department of Labor.

20  Q. Are you aware that part of the guidelines for reemployment

21  is not only the position to become compatible with an

22  employee's medical condition, but, also, that includes non

23  work-related medical conditions?

24  A. I'm aware that we have to do whole body job offers.

25  Q. So you have to take the person as a whole.

1    A. Correct.

2    Q. Is what you're saying.

3    A. Yes.

4    Q. And that would include not only the back issue, for

5    example, correct?

6    A. (Pause)

7    Q. That would only -- that would not only take into account

8    the back issue that Doctor Strausser was talking about or that

9    he treated her for, correct?

10   A. As long as we have the restrictions and limitations.  We

11   have two different things at the Postal Service, there is

12   limited-duty or work-related conditions, and there is light

13   duty for non-work-related conditions.  If she provided the

14   restrictions for both, we would have to consider whole body

15   for a temporary modified assignment.

16   Q. And, so, that would include, for instance, her back issue

17   that Doctor Strausser was treating her for, for example,

18   correct?

19   A. That's correct.

20   Q. That would include the shoulder issue that Doctor Heiman

21   was treating her for; is that correct?

22   A. If that was provided to us, yes.

23   Q. Okay.  That would include, also, the psychological issue

24   that Doctor Bricken was treating her for, as well; is that

25   correct?

1  A. I don't -- I don't really know about -- I don't know about

2  the psychological issues, so I don't know how that related to

3  it.  Because psychological is really separate, is it's own

4  thing.

5  Q. Well, but you said --

6  A. It is not a physical -- it's not a physical limitation.

7  So, when they do psychological, it becomes a different issue.

8  That -- we would refer to the Department of Labor to give us

9  the guidance on that.

10  Q. Okay.  Do you know that their guidance is taking the person

11  as a whole, psychological and physical?

12  A. Okay.

13  Q. So -- so, Ms. Simmons -- or at this time Ms. Simmons,

14  Deborah Durand, she objected to this because Doctor Strausser

15  was not her primary care physician.  Is that your

16  understanding?

17  A. I didn't -- I don't have anything in the file that says

18  that.  Sorry, I don't know.

19  Q. Is there anyone named Doctor Martin in her file?

20  A. Yes.  Right after that visit, on the last visit -- or, I'm

21  sorry, the last visit from Doctor Strausser, it does refer to

22  a Doctor Martin.  It looks like she went to a Doctor Martin

23  after that.

24  Q. And was she claiming Doctor Martin as her primary care

25  physician?

1    A. I do not know.  It doesn't specifically say, "I am her"

2    spelled out in the letter, we just received the medical and

3    were obligated to be compliant with the medical.

4    Q. Okay.  So, you don't -- you don't know the -- why she was

5    objecting.

6    A. No.

7    Q. And you don't know that she was claiming Doctor Martin was

8    her primary care physician.

9    A. No.  It's not in our files, it's not in our records.

10   Q. Okay.  And, so, at first -- let's see.  Let's go to Exhibit

11   16.  At first, the claims examiner, Jim Hulsey, agreed with

12   Doctor Strausser's report.

13   A. (Viewing document)  Yes.

14   Q. And that's from a letter of March 6th, 2008.

15   A. Yes.

16   Q. And he states, "Medical limitations provided by Doctor

17   Strausser" in the report dated what we just saw, 1/18/2008,

18   correct?

19   A. That's what the letter states.

20   Q. So, let's go to doc -- Exhibit 17.  So, between that letter

21   in March, to this letter in September in 17, was she still on

22   the Periodic Rolls?

23   A. (Viewing documents)  I believe so, but let me check the

24   records.  March of 2008 to July of 2008?

25   Q. To -- I'm going to the letter, September of 2015 -- or

1    September 15th of 2008.

2    A. September of what?  I'm sorry.

3        MR. ARVANETES:  If you can scroll down -- scroll up,

4    please.

5        THE COURT:  Scroll up, please.

6        MR. ARVANETES:  To the date of this.

7    **BY MR. ARVANETES:**

8    Q. Between the letter and the prior exhibit to this letter.

9    She was on the Periodic Rolls, wasn't she?

10   A. She was.

11   Q. And who sent her to Doctor Hood?

12   A. I believe that the Department of Labor scheduled a sec -- a

13   second opinion.

14   Q. And why was that?

15   A. Possibly, a conflict in medical?  I -- they -- I -- we

16   don't always understand why they -- well, we can request it.

17   We can request a second opinion, if we believe the medical is

18   not moving the claimant in any direction, or if the district

19   medical director at the Department of Labor reviews the

20   medical and determines that we are needing somebody else's

21   opinion on the case.

22   Q. So, "we" being USPS.

23   A. Department of Labor, no.

24   Q. No?

25   A. The Department of Labor.

1    Q. It would be Department of Labor.

2    A. We get only to request.  We don't get to demand or --

3    Q. So, do you know what was going on, why the claims examiner

4    sent her for a second opinion?

5    A. I do not.

6    Q. Was there a request from the USPS to have her sent for a

7    second opinion based upon her objection that Strausser wasn't

8    her primary doctor?

9    A. No.  There's no record of that in our files, no.

10   Q. So, she sees Doctor Hood, and Doctor Hood -- and we'll go

11   to -- it's up already.  Doctor Hood indicates in his report,

12   "The claimant cannot work in any capacity."  Doctor Hood

13   indicates, "A functional capacity evaluation was not warranted

14   due to the high probability of injury."  Do you know what a

15   functional capacity evaluation is?

16   A. Yes, I do.

17   Q. What is that?  Explain it to the Court.

18   A. It determines -- it puts the employee through a series of

19   events with a -- with a physician to determine just what

20   capabilities they would have to perform these certain

21   functions, certain duties.

22   Q. And does -- can that be done if you never see the patient?

23   Or does that have to be done with the patient in the office?

24   A. I don't know how they do functional capacities.

25   Q. Well, it sounds like they would have to physically see the

1  patient, would you agree?

2  A. I would agree.

3  Q. All right.

4  A. That's what it sounds like.

5  Q. Yeah, that's what it is.  Okay.  So, he says -- Doctor Hood

6  indicates, "The claimant is totally disabled and may require

7  surgery in the future if deconditioned, and indicates the

8  claimant has failed back syndrome as a result of surgeries 8

9  of '05 and 2 of '06."  That's a -- that's what Doctor Hood

10 writes.  Or that's what the claim writes about Doctor Hood's

11 report.  Is that fair to say?

12 A. Yes, that's what the letter says.

13 Q. And, so, based upon that report, has she ever been back to

14 work?

15 A. No, she has not.

16 Q. Based upon that report, it's fair to say that she was

17 placed at that time by USPS on the Periodic Rolls.

18 A. No, she was placed by the Department of Labor on the

19 Periodic Rolls.

20 Q. On the Periodic Rolls.  But fair to say she is placed on

21 Periodic Rolls as --

22 A. PN status.

23 Q. Which is?  Explain what "PN" --

24 A. It's a Periodic Rolls case where the employee shows no

25 potential for reemployment for the indefinite future.

1   Q. And are you aware, based upon your view of the file,

2   whether Doctor Strausser did any functional capacity

3   evaluation in January of 2008, when he changed his opinion?

4   A. (Viewing documents)  There is a functional capacity exam in

5   here, I just don't know who did it.

6   Q. You can go back to -- back to his 2008 report.

7   A. I'm looking at Doctor Hood's report, and the functional

8   capacity -- there appears to be a functional capacity report

9   with that information.

10  Q. Correct.  I'm talking about Doctor Strausser.

11  A. No, I'm not aware.

12  Q. You're not aware?

13  A. Nothing in the file shows that.

14  Q. Are you aware of why a primary care physician is important?

15  In the sense that -- what is that primary care -- what is the

16  duty of the primary care physician?

17  A. To oversee the employee's medical care.

18  Q. Is it also connecting with other doctors who are taking

19  care of the patient?

20  A. Yes, I would hope that they would be connecting with other

21  physicians.  If they are doing referrals, or if they are not,

22  at least the other physicians are making some kind of

23  communication.

24  Q. And are you aware of whether Doctor Strausser made any

25  communication with, for example, Doctor Martin, in your

1  file?

2  A. No, I'm not aware of any.

3  Q. Doctor Bricken?

4  A. It's not -- it's not documented in our files.

5  Q. Doctor Bricken?  Any communication with Doctor Bricken?

6  A. I don't know.

7  Q. No.

8  A. I don't know -- I don't know if I have Doctor Bricken in

9  any information within my file.

10          MR. ARVANETES:  May I have a moment, Your Honor?

11          THE COURT:  You may.

12

13          **(Discussion off the record.)**

14

15  **BY MR. ARVANETES:**

16  Q. Ms. Simmons, you mentioned that you don't have present with

17  you the OWCP file for the -- for your testimony today?

18  A. I don't maintain OWCP files.

19  Q. But you have access to it, and you could have brought it

20  today.

21  A. It's in -- actually, in Seattle.  I would have had to have

22  more information to be able to find it.  Because you would

23  have to actually go there physically and print off anything

24  you would want out of that file.

25  Q. So, you could have got it.  Somehow, you could have got it,

1    you would think?

2    A. (Shakes head negatively)  Yeah.  I guess, with enough

3    notice, I could have gone over and asked the Department of

4    Labor.  I have to ask permission for it, and they want to know

5    what I want out of the file.

6    Q. Okay.  Well, did you have enough notice for this, to

7    testify today?

8    A. I knew enough notice to be here and -- make reservations to

9    be here and review the file.

10   Q. How much notice did you have?

11   A. Ten days.

12   Q. Just ten days from today?

13   A. Yeah.  About ten days from today, backwards.

14   Q. Okay.  All right.  Fair enough.  Thank you very much.

15              MR. ARVANETES:  I pass this witness, or at least --

16              THE COURT:  Mr. Weldon, you need to redirect?

17              MR. WELDON:  Very, very briefly, Your Honor.

18              THE COURT:  All right.  Well, why don't you do it

19   after the eclipse.

20              MR. WELDON:  Yes, Your Honor.

21              THE COURT:  All right.  We will be in recess.

22              THE WITNESS:  Thank you.

23

24                        **(Recess taken.)**

25

1    THE BAILIFF:  The United States District Court is

2    again in session.

3    THE COURT:  Please be seated.  Thank you.

4    I'm sorry for the break, Mr. Weldon, I was worried that

5    this trial might last until the next eclipse in 2076.

6    MR. WELDON:  I was worried about that, as well, Your

7    Honor.

8    THE COURT:  Didn't want to miss it.  It was quite a

9    -- quite a view for those who haven't had a chance.

10   All right.  We are on redirect, then, Mr. Weldon.  Go

11   ahead, please.

12   MR. WELDON:  Yes.  Very briefly, Your Honor.  Thank

13   you.

14                    **REDIRECT EXAMINATION**

15   **BY MR. WELDON:**

16   Q. Ms. Simmons, I just wanted to step back through some of the

17   questions that Mr. Arvanetes asked you.  First of all, you

18   were asked about the relationship between the Office of

19   Inspector General and, then, your side of the operations.  Do

20   you remember those questions?

21   A. Yes, I do.

22   Q. Now, do you treat the two separate?

23   A. Yes.

24   Q. And can you explain that?

25   A. We normally don't have any correspondence with the Office

1    of Inspector General at all, unless we have -- once we -- we

2    make referrals, and then we don't know nothing -- sorry, we

3    know nothing after that.

4    Q. All right.

5    A. Unless it's brought to our attention.

6    Q. So, you treat it separately -- separately, then; is that

7    right?

8    A. Yes.

9    Q. Okay.  Now, you were asked some questions about Ms. Durand

10   just simply relying on her doctors.  Do you remember those

11   questions?

12   A. Yes.

13   Q. So, let's first start with the PN status.

14   A. Okay.

15   Q. Where Ms. Durand was transferred in September of 2008 to

16   that PN status.  Do you remember those questions, ma'am?

17   A. Yes.

18   Q. Now, then, are your doctors shown the videos or the

19   investigation when they see Ms. Durand into the future?

20   A. (Pause)

21   Q. So, for example, if she was in Montana seeing doctors, or

22   somewhere else, would they know about the previous Office of

23   Inspector General investigation?

24   A. No.

25   Q. Okay.  So --

1    A. Not unless Ms. Durand showed them.

2    Q. All right.  So, they -- they would have no way of knowing

3    about the outside activities of Ms. Durand, then.

4    A. That's correct.

5    Q. Okay.  Now, then, you were also asked about whether or not

6    it was the doctors' fault for their, essentially, saying that

7    she was disabled.  Do you remember those questions, ma'am?

8    A. Yes, I do.

9    Q. I would like to show you, then, Government's Exhibit 3.

10            MR. WELDON:  If we could, please?  Agent Boynton,

11   could we show the witness that?

12   **BY MR. WELDON:**

13   Q. Do you recognize this form, Ms. Simmons?

14   A. Yes.

15   Q. What is this form?

16   A. It's a form the Department of Labor asks about their --

17   their completion of -- it's, basically, a development.  They

18   are trying to find out information that they don't have

19   information -- they don't have enough information to make

20   their determination, so they are asking additional

21   questions.

22   Q. All right.  And, so, this correspondence is what both the

23   Department of Labor and the post office is involved in; is

24   this right, ma'am?

25   A. Actually, the Department of Labor sends this out.  This is

1    from the Department of Labor.

2    Q. And, then, of course, you would take any information that

3    was gleaned from that, as well; is that right?

4    A. Absolutely.  We would be asking for that information.

5              MR. WELDON:  Your Honor, I move for the admission of

6    Government's Exhibit 3.

7              MR. ARVANETES:  No objection.

8              THE COURT:  3 is admitted.

9

10             **(Exhibit Number 3 was admitted.)**

11

12   **BY MR. WELDON:**

13   Q. Now, Ms. Simmons, I'm going to direct your attention to the

14   warning.  Do you see that --

15   A. Yes, I do.

16   Q. -- language there?  Could you please read that?

17   A. "A false or evasive answer to any question or the omission

18   of an answer may be grounds for forfeiting your compensation

19   benefits and subjects you to civil liability.  A fraudulent

20   answer may result in criminal prosecution.  All statements are

21   subject to investigation for verification."

22   Q. And, then, let's go -- because that's at the beginning of

23   the form, but then they also have something at the end, as

24   well.

25        So, if I could please show you Page 5 of that document.

1              MR. WELDON:  Please scroll down, Agent Boynton.

2      **BY MR. WELDON:**

3      Q. All right.  Now, do you see who signed that document, Ms.

4      Simmons?

5      A. Debbie Simmons.

6      Q. Okay.  And what was the date of that?

7      A. August 8th, 2006.

8      Q. All right.  And, then, do you see the first clause in the

9      second paragraph?

10     A. Yes, I do.

11     Q. What does that say, ma'am?

12     A. "I understand that I must immediately report to OWCP any

13     improvement in my medical condition, any employment, any

14     change in the status of claimed dependents, any third-party

15     settlement, and any change of income from federally assisted

16     disability or benefit program."

17     Q. Okay.  So, then, that first clause, then, identifies that

18     she has to report any improvement that she has.  Is that

19     right?

20     A. That's correct.

21     Q. Okay.  You were also asked questions about the rural

22     carrier.  Do you remember the rural carrier position?

23     A. Yes.

24     Q. And you mentioned the difference between a union dispute

25     and, then, the modified limitations.  Could you explain that,

1  ma'am?

2  A. Right.  There is a grievance process -- if they are moving

3  her outside of the craft, the union could grieve it and say

4  we're moving -- typically, it's the opposing unit, if we moved

5  her from her rural carriers' union to a clerk union, the APWU,

6  that rural carriers' union or the clerks' union, they would

7  grieve, saying that we've taken work away from their craft

8  employees.

9  Q. Sure.

10  A. So, that's the -- the grievance process is different than

11  what we are obligated to do under Federal Workers' Comp.

12  Q. And, so, your obligated to offer her a position; is that

13  right?

14  A. That's correct.  Regardless of the craft.

15  Q. Okay.  And, then, this position, and these positions that

16  we've discussed, were offered to Ms. Durand; is that right?

17  A. Based on medical restrictions, yes.

18  Q. Okay.  She was able to operate within those restrictions

19  for the time period that she was working for the Postal

20  Service.

21  A. That's correct.

22  Q. All right.  And that was within the rural carrier craft; is

23  that right, ma'am?

24  A. Yes.  Based on most of the jobs that I post are union,

25  yes.

1    Q. All right.  And, then, that could have continued on for an

2    indefinite period of time.

3    A. Absolutely.

4    Q. So, even to present day.

5    A. Yes.

6    Q. Now, these work restrictions, then, the post offices, are

7    they required to follow those work restrictions?

8    A. Absolutely.

9    Q. Okay.  Now, let me ask you this, ma'am.  Do you have any

10   jobs at the post office where somebody could sit for two hours

11   and 43 minutes at a time?

12   A. Most of the jobs -- craft jobs that we would have for an

13   employee would not require them to sit for that length of

14   time.

15   Q.  So, in other words, if somebody could sit for two hours

16   and 43 minutes, you would have a job for them.

17   A. I would.  We would provide them work.

18            MR. WELDON:  I have no further questions, Your

19   Honor.

20            THE COURT:  Thank you, Mr. Weldon.  Is the witness

21   excused?

22            MR. WELDON:  Yes, please, Your Honor.

23            THE COURT:  You may step down.  Thank you, Ms.

24   Simmons.

25        Mr. Weldon, your next witness.

```
 1            MR. WELDON:  Yes, Your Honor.  The United States
 2   calls Doctor Strausser.
 3            THE COURT:  Is this in person, or video?
 4            MR. WELDON:  In person, Your Honor.  Yeah, the video
 5   is Doctor Ellis for the defense, Your Honor.
 6            THE COURT:  Mr. Weldon, how long do you expect for
 7   this witness?
 8            MR. WELDON:  I expect, Your Honor, it would be
 9   approximately 20 minutes, depending on what cross would be.
10            THE COURT:  All right.  I would -- we'll break after
11   this witness.
12            MR. WELDON:  Yes, Your Honor.
13            THE COURT:  So, we may go to 12:30.  We'll finish
14   him, regardless.  It depends on how much cross-examination Mr.
15   Arvanetes has.
16            MR. WELDON:  Thank you, Your Honor.
17            MR. ARVANETES:  Your Honor, my only issue -- my only
18   issue is I want -- I want to be able to see -- if he brings
19   his file, I want to make sure that what we have is what is in
20   his file.  So, I would ask for a recess before I do cross.
21            THE COURT:  All right.  Call the witness.  Let's go,
22   Mr. Weldon.
23            MR. WELDON:  Yes, Your Honor.  (Indicating)
24
25                    (Discussion off the record.)
```

1

2          CLERK OF COURT:  Raise your right hand.

3

4                    **(The witness was duly sworn.)**

5

6          THE WITNESS:  I do.

7          CLERK OF COURT:  (Indicating)

8          THE COURT:  Good morning, Doctor Strausser.

9          THE WITNESS:  Good morning.

10         THE COURT:  State your full name and spell your last

11   name.

12         THE WITNESS:  David William Strausser,

13   S-T-R-A-U-S-S-E-R.

14         THE COURT:  Go ahead, Mr. Weldon.

15         MR. WELDON:  Thank you, Your Honor.

16

17                    **DIRECT EXAMINATION**

18   **BY MR. WELDON:**

19   Q. Sir, how are you currently employed?

20   A. I'm a physician.

21   Q. How long have you worked as a physician, sir?

22         MR. ARVANETES:  Your Honor, I can't hear him.

23         THE COURT:  Hold on.  We'll get there.  Mr.

24   Strausser, will you please pull the microphone towards you?

25         THE WITNESS:  Uh, 20 years.

1    **BY MR. WELDON:**

2    Q. 20 years?  Can you please provide the Court some of your

3    training and education that you've received, sir?

4    A. Uhm, medical school was Baylor College of Medicine,

5    orthopedic surgery residency was Baylor College of Medicine,

6    And a spine surgery fellowship at the Texas Back Institute.

7    Q. And how long have you worked in -- as a spinal doctor,

8    sir?

9    A. Uhm, 1999, so 18 years.

10   Q. And you've worked out of Texas; is that right, sir?

11   A. Correct.

12   Q. Did you have the opportunity to review, and, then, also

13   perform surgery on Ms. Durand?

14   A. Yes.

15   Q. Now, I'm going to show you Government's Exhibit 8, if I

16   could, sir.

17          MR. WELDON:  Exhibit 8, please, Agent Boynton.

18   **BY MR. WELDON:**

19   Q. Now, Doctor Strausser, could you explain some of the

20   surgeries that you performed on Ms. Durand?

21   A. Uh, yes.  She underwent a lumbar fusion, which consists of

22   putting implants in the bottom two levels, segments of the

23   spine, to stabilize it.

24   Q. Okay.  And is that a surgery that you performed, Doctor

25   Strausser?

1    A. Yes.

2    Q. Okay.  And when you say "stabilize it," could you just

3    explain the process to the Court, please?

4    A. Uhm, the basic concept with a fusion is that there is

5    motion in segments of the spine that are causing pain, and, if

6    you eliminate the motion, the pain will diminish.

7    Q. And, so, then, you did that for Ms. Durand.

8    A. Correct.

9    Q. What part of her spine did you perform that fusion on?

10   A. It would be the bottom two discs.

11   Q. The bottom two discs?

12   A. Correct.  Low back, yes, sir.

13   Q. And was that, then, in order to help her with her pain?

14   A. Yes.

15   Q. Okay.  And, then, did you perform -- or provide, then, some

16   restrictions for Ms. Durand?

17   A. Yes.

18   Q. Okay.  And if you could please look at Government's Exhibit

19   8.  Do you recognize this document, sir?

20   A. Yes.

21   Q. Okay.  And what did you say about Ms. Durand's ability to

22   work?

23   A. Uh, well, at that time, I said she was unable to work.

24   Q. Okay.  Now, is this a type of a surgery that somebody can

25   recover from?

1    A. Yes.

2    Q. Can you explain that to the Court?

3    A. Uh, well, there's recovery from the actual surgery, which

4    involves, obviously, incisions and dissection, which is a

5    period of time.  There is a recovery time for the fusion,

6    where you're expecting the elements of the spine to fuse

7    together and heal completely so that that pain resolves, as

8    well.

9    Q. Okay.  And what is the time period, generally, for those

10   sorts of recovery periods?

11   A. I mean, this is a large surgery, so I (shrug shoulders) try

12   to be reasonable with patients in terms of saying a 6- to

13   12-month process, because it is a large surgery.  Patients

14   vary in terms of a recovery rate.

15   Q. Okay.  And then would you expect Ms. Durand to recover

16   after that time period and able -- be able to function, both

17   personally, as well as at work?

18   A. Yeah.  Generally, I -- I would give it up to a year.

19   Because it can take a rather long period of time, but (nods

20   head affirmatively) --

21   Q. Okay.

22   A. -- we get to a point where we're at a maximum, yes.

23   Q. Sure.  And, then, in this case, then, if you look at

24   Subsection F, Doctor Strausser.  If we could zoom in for that

25   -- on that for you.  You put the restrictions for her, that it

1   was approximately three to six months; is that right?

2   A. Correct.

3   Q. And, then, what did you explain, and would she be able to

4   go back to work at some point in time?

5   A. Well, the hope is that all patients will eventually be able

6   to have gainful employment, yes.

7   Q. Sure.  And then if you look --

8           MR. WELDON:  And if we could scroll over to the left

9   a little bit, Agent Boynton?

10  **BY MR. WELDON:**

11  Q. You will see it says, "Subsection D, do you anticipate her

12  going back to work?"  And what was your answer for that,

13  sir?

14  A. "Yes."

15  Q. And, then, that was -- was that part of the goal of your

16  treatment for Ms. Durand?

17  A. Yeah.  Yes.  Uh-huh.

18  Q. All right.  Now, then, I will show you Government's Exhibit

19  11, please, Doctor Strausser.  Now, you ultimately were having

20  correspondence with the Department of Labor, as well as the

21  United States Postal Service, and do you recognize this

22  letter, sir?

23  A. Yes.

24  Q. What is this?

25  A. Uh, well, it's a letter to the Department of Labor

1  regarding the patient's status.

2  Q. Okay.  And what did you say as it relates to Ms. Durand?

3  A. Uh, well, that -- in that letter, I said that she was

4  currently totally disabled.  Uhm, and she had also had another

5  procedure, uhm, by a pain management physician, and there was

6  going to be a modification of that procedure.

7  Q. Okay.  So -- just so that we're clear on that, you did the

8  fusions --

9  A. Right.

10  Q. -- for Ms. Durand?  But then there was also the lumbar

11  spine dorsal column stimulator.

12  A. Correct.

13  Q. And you didn't do the stimulator.

14  A. No.

15  Q. Okay.  Now, at that time, were you treating Ms. Durand for

16  her spine?

17  A. I believe I was still following her, yes.

18  Q. Okay.  And, of course, why did you send this letter to the

19  Department of Labor?

20  A. Uh, I presume there was some interest in terms of what her

21  work status was at that time.

22  Q. And, so, you provided that for her.

23  A. Yes.

24  Q. Now, then, let's go to Government's Exhibit 12.  Do you

25  recognize Government's Exhibit 12, Doctor Strausser?

1    A. Yes.

2    Q. Okay.  And what is this, sir?

3    A. Uhm, another letter regarding the same work status.

4    Q. Okay.  And this was on the same date that you sent that

5    letter?

6    A. Yes.

7    Q. All right.  And, again, it was identifying the treatment

8    that she had received.

9    A. Yes.

10   Q. Now, you ultimately changed your status; is that right,

11   sir, about what you thought as -- as far as whether Ms. Durand

12   could work?

13   A. Yes.

14   Q. Okay.  I'll show you, then, Government's Exhibit 13.

15        Doctor Strausser, could you please read this letter to

16   the Court?

17   A. Uh, "To whom it may concern.  Brian Haywood, a Special

18   Agent for the Postal Service, stopped by.  He has been

19   following Ms. Simmons for quite some time now.  He has been

20   videoing her.  Apparently, she has some land that she has been

21   working on clearing, and he showed me a video of her

22   activities.  She has been performing multiple activities,

23   including carrying objects, bending, riding a lawn mower, and

24   activities similar to this.  He is wondering whether or not I

25   thought the patient could work.  After I reviewed some of this

1   video, I think she can work.  I am going to fill out a work

2   release for her, with restrictions.  And, so, given the

3   information in the video, assuming it's correct, I think she

4   can perform light duty."

5   Q. Now, Doctor Strausser, can you explain what led you to that

6   conclusion, why you ultimately determined that Ms. Durand

7   could work?

8   A. Uhm, well, in the type of medicine I practice, a return to

9   work at a functional level is, in part -- large part deemed by

10  the patient's recovery from surgery, and the patient's

11  subjective complaints, and how they are doing.  So, there's a

12  lot of factors involved.

13      Uhm, and I will take the patient for their word.  I'm a

14  physician, that's what we do, we believe in our patients.  So,

15  uhm, I have to go with how they are doing structurally with

16  respect to the surgery, and, then, also, their subjective

17  complaints, and physically how they're doing.

18      But, I also have to take all of the evidence into -- in

19  the case with me in terms of evaluating the patient's

20  functional level.  If there is evidence going against what I'm

21  hearing and seeing, then I'm going to have to weigh that, like

22  I said, in terms of what, also, I think the patient can do, in

23  terms of their functional level.

24  Q. And how did that apply to Ms. Durand?

25  A. Well, I mean, just based on the video that I received of

1    the patient, I thought that if she was able to carry out those

2    activities, I suspect that she would be able to perform some

3    type of occupation, at least in a sedentary fashion.

4    Q. Was that inconsistent with what she was telling you for her

5    subjective complaints?

6    A. Uhm, yeah.  According to the patient, she was quite limited

7    functionally.  And -- I mean, again, as a physician, I take

8    care of patients.  I'm here to take care of the patient, I'm

9    here to do what's best for you, and -- but I also have to take

10   all the information into -- into consideration.  So...

11   Q. Sure.  And when you're relying on the patient, basically

12   you have to take their word at face value about their level of

13   pain.

14   A. Correct.  Sure.

15   Q. And, so, then, did you rely on Ms. Durand for that?

16   A. Yes.

17   Q. Okay.  Was that inconsistent with what you saw, then, in

18   the video?

19   A. Correct.

20   Q. Okay.  Now, would that -- and that ultimately did change

21   your mind; is that right, Doctor Strausser?

22   A. Yes.

23   Q. Okay.  I'm going to show you Government's Exhibit 14,

24   please, sir.  Do you recognize Government's Exhibit 14, Doctor

25   Strausser?

1    A. Yes.

2    Q. And what is this, sir?

3    A. It's also a return to work status, or ability to return to

4    work.

5    Q. Okay.  And this was done right after you sent the letter,

6    then; is that right?

7    A. Yes.

8    Q. Okay.  Can you explain the restrictions that you put on Ms.

9    Durand and what you expected her limitations would be with the

10    Postal Service?

11    A. Uhm, well, it gets a little bit detailed.  But, basically,

12    number of hours, restrictions for just sitting, standing,

13    walking, amount of lifting, having sit and stretch breaks at

14    certain periods of time.  I don't know how detailed you want

15    me to get.  There's limitations, but ability to work.

16    Q. Now, then, what would these restrictions be on Ms. Durand,

17    how long would they last?

18    A. Uhm, it's indefinite.  It's difficult to say something

19    permanently.

20    Q. And, then, in fact, Doctor Strausser, you identified in

21    Subsection F what, sir?

22    A. "Indefinite."  I said, "How long will the restrictions

23    apply?"  And "Indefinite."  So...

24    Q. And, then, of course, you thought that she had her maximum

25    medical improvement; is that right, sir?

1   A. Uhm, yes.

2   Q. Now, is it fair to say there are certain things that you

3   didn't want Ms. Durand doing, Doctor Strausser?

4   A. Uh, yes, of course.

5   Q. Could you explain that to the Court?

6   A. Generally, patients that undergo this surgery, I prefer

7   they restrict and stay away from high-impact activities,

8   repetitive bending, stooping, sitting, heavy lifting.  Just a

9   common sense, reasonable, rational approach to physical

10  activity level.

11  Q. Sure.  So, you didn't want her doing CrossFit, for

12  example?

13  A. No, that would not be ideal.

14  Q. Okay.  But could she answer phones?

15  A. Sure.

16  Q. All right.  And could she sit at a desk?

17  A. Yes.

18  Q. All right.  What about walking?

19  A. Yes.  And, again, as the form says, uhm, with

20  modifications, an ability to change positions, sit, stand,

21  take stretch breaks, you know, something reasonable.

22  Q. Sure.  And, then, reaching, she could do that?

23  A. Correct.

24  Q. All right.  Twisting?

25  A. Yes, for a limited number of time -- amount of time per

1    day, sure.

2    Q. Bending?

3    A. Yes.

4    Q. All right.  What about stooping?

5    A. Yes.

6    Q. Now, then, were you ultimately shown some exhibits by the

7    government when you were interviewed by agents, Doctor

8    Strausser?

9    A. Uh, additional, or the ones you originally just discussed?

10   Q. Well, let's start with the initial one.

11   A. Yes.

12   Q. Did you meet with Mr. Haywood?

13   A. Yes.

14          MR. WELDON:  Okay.  I'm going to show you, then, if

15   we could, madam clerk, Government's Exhibit 69.

16   **BY MR. WELDON:**

17   Q. Do you recognize Government's Exhibit 69, --

18   A. Yes.

19   Q. -- Doctor Strausser?  Now, the time when Mr. Haywood came

20   to you back in 2008, did he let you review this particular

21   video?

22   A. Yes.

23   Q. Okay.  And what did it show you, sir?

24   A. Uhm, it showed the patient just doing activities outdoors

25   that I described earlier.

1   Q. Sure.  Now, Doctor Strausser, when you had your
2   consultations with Ms. Durand, did she tell you that she was
3   using chainsaws?
4   A. No.
5   Q. Did she tell you that she was putting up fences?
6   A. No.
7   Q. Digging post holes?
8   A. No.
9   Q. What about clearing land of about five acres?
10  A. No.
11  Q. That she mowed her lawn?
12  A. No, not that I recall.
13  Q. Okay.  Did she tell you that she was feeding her horses
14  daily?
15  A. Uhm, not that I can recall, no.
16  Q. Did she tell you that she was lifting big bales of hay?
17  A. No.
18  Q. What about picking up trash cans?
19  A. No.
20  Q. Did she tell you that she was moving stumps from pine
21  trees?
22  A. No.
23  Q. Did she tell you that she was riding her horses two to
24  three times a week?
25  A. No.

1   Q. That she was walking consistently?

2   A. No.

3   Q. Okay.  What about moving plants?

4   A. Uhm, most likely not.

5   Q. All right.  And, now, would that have changed your mind, if

6   you would have known that Ms. Durand was engaging in all of

7   those activities?

8   A. That would definitely play a factor, yes.

9   Q. Okay.  And, then, had you known all of those things, would

10  you have concluded that Ms. Durand could work with

11  restrictions?

12  A. Yes.

13  Q. All right.  Now, then, let's show you Government's Exhibit

14  68, please, Doctor Strausser.

15       This is the one that was shown to you more recently of

16  the kayaking trip.  Do you recognize this particular CD, sir?

17  A. Yes.

18  Q. And would you --

19            THE COURT:  Hold on, Mr. Weldon.  Did you want to

20  introduce 68?

21            MR. WELDON:  I was going to do it at the same time.

22  But I can do it now, that's fine.  Your Honor, I move for the

23  admission of Government's Exhibit 69.

24            MR. ARVANETES:  No objection.

25            THE COURT:  69 is admitted.

1

2                    **(Exhibit Number 69 was admitted.)**

3

4    **BY MR. WELDON:**

5    Q. Doctor Strausser, did you have the opportunity to see the

6    video in Government's Exhibit 68?

7    A. Yes.

8    Q. Okay.  And were you able to see the kayaking trip that Ms.

9    Durand took?

10   A. Yes.

11   Q. Would -- did that change your opinion, also, about the

12   activities that Ms. Durand could engage in?

13   A. Change my opinion again, or --

14   Q. No.  In other words, did you think that she could still

15   work, based on what you saw in that video?

16   A. Yes.

17   Q. Could you explain to the Court why?

18   A. Well, if someone can engage in that degree of activity, I

19   would suspect that a sedentary occupation would be reasonable.

20   Q. So, kayaking, for example?

21   A. Yes.

22   Q. All right.  What about camping?

23   A. Well, the activities associated with it, yes.

24   Q. Okay.  Did you see the judo chopping and karate kicking in

25   the video, sir?

1   A. Yes.

2   Q. All right.  And, of course, would that make sure that you

3   thought that Ms. Durand was capable of working in a sedentary

4   job?

5   A. Correct.

6   Q. Were those things that you saw Ms. Durand doing in the

7   video actually more labor intensive than what she would have

8   to do at work?

9   A. Yes.

10  Q. Now, Doctor, you're not aware of anything that changed Ms.

11  Durand's status from the time you saw her in 2008 until the

12  present time; is that right, sir?

13  A. Correct.

14  Q. So, in other words, the same restrictions would apply for

15  her throughout that time period.

16  A. Yes.

17  Q. At this point, based on all of the evidence that you've

18  seen of Ms. Durand, what would you conclude that she could do

19  when working for the post office?  What would be her

20  restrictions?

21  A. Uhm, well, again, a sedentary-type position.

22  Q. Okay.

23  A. With the understanding that someone can have a degree of

24  pain, but a sedentary position should be reasonable, if

25  they're able to have that level of activity at times.

1   Q. Okay.  So, like, a desk job would be something that you

2   would agree with that Ms. Durand could do?

3   A. Correct.

4         MR. WELDON:  May I have just a moment, Your Honor?

5         THE COURT:  You may.

6         MR. WELDON:  I have no further questions, Your

7   Honor.

8         THE COURT:  All right.  Mr. Arvanetes, cross

9   examine?

10         MR. ARVANETES:  Yes, sir.

11

12                       **CROSS-EXAMINATION**

13   **BY MR. ARVANETES:**

14   Q. Good afternoon.

15   A. Good afternoon.

16   Q. Doctor Strausser, let's talk a little bit about Ms. Durand.

17   When was the last time you saw Ms. Durand?

18   A. I don't have that note.

19   Q. Would it be -- would there be an opportunity to review your

20   file at this time to determine whether we have all of your

21   records today?

22   A. (Pause)  What is the question?

23   Q. I'm sorry?

24   A. What is the question?

25   Q. Would it be okay if we review your file today to make sure

1   that we have all the records that you have?

2   A. Sure.

3   Q. May I review your file?

4   A. Sure.

5   Q. Where is your file?

6   A. I don't have the file.  (Shakes head negatively)

7   Q. You don't?  Okay.  You didn't bring the file for today?

8   A. I don't have a file.

9   Q. Would it -- can you explain that?

10  A. This was 12, 13 years ago.

11  Q. But you're here today, sir.

12  A. Correct.

13  Q. Respectfully.  Testifying in federal court about someone,

14  Ms. Durand, who is being charged with a felony today.  You

15  understand that?

16  A. Correct.

17  Q. Do you take that seriously?

18  A. Yes.

19  Q. But not enough to bring a file.

20  A. I don't have a file.

21  Q. Well, I'm going to ask you some questions, and I hope you

22  can recall facts, but I'm going to ask you about your

23  relationship with Ms. Durand.  Is that okay?

24  A. Yes.

25  Q. All right.  Do you consider, at the time when you first saw

1  her in, I believe, 2006, did you have a patient/client

2  relationship --

3  A. Yes.

4  Q. -- with her.  And when you saw her in 2007, did you have a

5  patient/client relationship with her?

6  A. Yes.

7  Q. Now, when you -- on January 18th, 2008, an agent from the

8  OIG, Haywood, visited you in your office.  Do you remember

9  that?

10  A. Based on the note.

11  Q. Do you remember why he was there?

12  A. What I have is based on the note.

13  Q. Did you talk to Mr. Haywood?

14  A. Sir, that was 2008.  Respectfully, what I'm saying is it's

15  what's based on that note.

16  Q. Did you consult with Ms. Durand about her HIPAA rights

17  prior to talking to the agent?

18  A. I do not recall.

19  Q. Did you sign anything, do you recall, about her HIPAA

20  rights?

21  A. I do not recall.  (Shakes head negatively)

22  Q. Are you aware of the Code of Ethics published by the

23  America Medical Association?

24  A. Yes.

25  Q. Is it fair to say that is a very important document as part

1 of your profession?

2 A. Yes.

3 Q. And, in fact, you've been a back surgeon, I believe, since,

4 you said, 2000 -- or 1999?

5 A. Correct.

6 Q. And you even have a diplomat, don't you, in surgery, in

7 spinal surgery; is that correct?

8 A. What do you mean by "diplomat"?

9 Q. I'm just reading your -- from your CV.

10 A. I completed a spine surgery fellowship in board certified

11 orthopedic surgery.

12 Q. And you have a diplomat in there, in that specialty.

13 A. There's not a board certification in spine.

14 Q. Did you review your own CV before you testified today?

15 A. At some point, yes.

16 Q. Okay.  Do you know when?

17 A. I cannot recall.

18 Q. Would you agree that in your CV it says, "Diplomat,

19 American Board of Orthopedic Surgery"?

20 A. Yes, in orthopedic surgery, not spine.

21 Q. Do you believe in the statement put out by the AMA Code of

22 Ethics that medicine is founded in a covenant of trust between

23 the patient and you and that patients must be able to trust

24 that their physician will require and maintain the knowledge,

25 skills, and values that are central to the healing profession?

1   Do you agree with that statement by the AMA?

2   A. Yes.

3   Q. Do you also agree that, in exchange for that special

4   promise, to be trustworthy, that the society grants the

5   profession considerable authority to set ethical and

6   professional standards of practice and the privilege to

7   self-regulate?

8   A. Yes.

9   Q. Do you agree with that statement?  Is that a yes?

10  A. Yes.

11  Q. Thank you.  Are you experienced -- or let's -- let's go

12  back to 2008, when you met with the agent.  Were you

13  experienced with interacting with government agencies?

14  A. No.

15  Q. Had you ever seen an OIG agent before then?

16  A. Not that I can recall.

17  Q. So, you weren't necessarily a -- what they call a

18  federal -- you are not on a Federal Workers' Comp list is it

19  fair to say?

20  A. I'm not sure what that list is.  But I would guess not, I'm

21  not sure.

22  Q. Okay.  So, right now, as you stand here today, are you

23  serving as a witness for the government?  Is that fair to

24  say?

25  A. I am here because I was subpoenaed.

1   Q. By whom?

2   A. The Department of Justice, whomever subpoenaed me.

3   Q. The Department of Justice is an agency of the government,

4   correct?

5   A. Correct.

6   Q. All right.  So, how much are you charging the government

7   today for your testimony?

8   A. Nothing.

9   Q. Who paid for your flight?

10  A. The government paid for my flight, and I've requested to

11  reimburse them for that.  I am here because I was subpoenaed

12  to be here, and that's why I'm here.

13  Q. As an expert, though.

14  A. I don't want to be an expert.  I've had this discussion.

15  I'm here because I was legally told to be here to testify

16  regarding the records regarding this patient, and that's why

17  I'm here.

18  Q. You had the discussion with whom?

19  A. The Department of Justice.

20  Q. Is that person here that you had a discussion with?

21  A. With the team, that's Ryan Weldon's team.

22  Q. Did you talk to Ryan Weldon, himself?

23  A. Yes.

24  Q. Well, according to the file, you were noticed as an expert

25  witness.  Okay?  Is that --

1   A. (Shakes head negatively)  I'm not sure what the file

2   represents.  I made it clear with myself that I'm here because

3   I was subpoenaed, and it's the law for me to be here to

4   testify in this particular trial.  That is why I'm taking time

5   off to be here, because I'm legally required to be here.  And

6   that is why I'm here, and that's why I want to be here.

7   Q. Do you want to be here and representing the government,

8   though, because they subpoenaed you?

9   A. I'm here because I am following the law.  This is what I

10  was told do, sir.  And I'm being completely honest with you

11  with this.

12  Q. And I respect that.  I want you to be honest, because

13  you're taking -- you took an oath.

14  A. Obviously.

15  Q. All right.  So, I have a report here that says "Report of

16  Doctor Strausser."  Did you write this report?

17  A. That was written, and I reviewed it and agreed with that

18  report.

19  Q. You did not write this report.

20  A. No.  (Shakes head negatively)

21  Q. You signed this report.

22  A. Correct.

23  Q. Do you know who wrote this report?

24  A. I'm not sure who wrote that report.

25  Q. When you first saw Ms. Durand back in 2006, did you charge

1    her, or were you (shakes head negatively) doing it pro bono?

2    A. I assume there was a bill submitted to the carrier covering

3    the patient.

4    Q. When you saw her in 2007, September 14th, 2007, did you

5    charge her, as well, for that visit?

6    A. I would presume, as a normal course of business, yes.

7    Q. And who paid you?  Was it Durand, or was it the Workers' --

8    the Federal Workers' Comp program?

9    A. Whoever was billed, I assume, reimbursed me.

10   Q. Now, when Agent Haywood visited you on January 18th, 2008,

11   in your office, did you bill any time to the government for

12   that interview?

13   A. I have no idea.  (Shakes head negatively)  I presume

14   probably not, because it's not a thing that occurs.

15   Q. He showed you a video, it's 12 minutes long.  Did he show

16   you a video that day?

17   A. According to that note, he did.

18   Q. All right.  Did he show you the whole video?

19   A. Whatever is in that note, (shakes head negatively) that's

20   all I can attest to.

21   Q. When you were shown -- you testified to a video,

22   Government's Exhibit 68, about a kayak trip, about six hours

23   long, did you see that video?

24   A. Yes.

25   Q. The full six hours?

1  A. It wasn't the six hours.

2  Q. How long -- how long did you see the video, do you

3  remember?

4  A. Ten minutes, maybe, a guesstimate.

5  Q. Ten minutes?

6  A. Correct.

7  Q. Are you testifying that was the whole video?

8  A. I just watched what they sent me.  (Nods head

9  affirmatively)

10 Q. And they only sent you ten minutes worth?

11 A. Roughly.  I did not record the time.

12 Q. Roughly, ten minutes.  Okay.  Do you agree with the

13 American Medical Association Code of Ethics that when you're

14 serving as a witness that you must accurately represent your

15 qualifications?

16 A. Correct.

17 Q. Testify honestly?

18 A. Correct.

19 Q. Not allow your testimony to be influenced by financial

20 compensation?

21 A. Correct.

22 Q. In fact, they have a caveat to that, that says, "Physicians

23 must not accept compensation that is contingent upon the

24 outcome of the litigation;" is that correct?

25 A. Correct.

1    Q. And based upon your direct, it's fair to say that you're

2    not testifying here on behalf of Ms. Durand in her favor.

3    A. I'm sorry, repeat the question?

4    Q. Based upon your direct testimony, is it fair to say that

5    you are not here today testifying in federal court under oath

6    in favor of the interests of Ms. Durand?

7    A. I'm here to just try and give you the truth of whatever I'm

8    asked.

9    Q. Do you agree with the statement that physicians who

10   testify -- are you -- physicians who testify as fact witnesses

11   to legal claims involving a patient they have treated must

12   hold the patient's medical interests paramount?

13   A. I would agree with that, sure.

14   Q. Are you doing that today?

15   A. I am going to give the truth in what I say.

16   Q. Are you holding Ms. Durand's interests paramount?  That's

17   my question.

18   A. Yes.

19   Q. And, then, do you agree, also, that physicians who testify

20   as expert witnesses testify only in areas in which they have

21   appropriate training and recent substantive experience and

22   knowledge?  Is that correct?

23   A. Correct.

24   Q. All right.  Now, when you first saw -- when did you first

25   see Ms. Durand, do you remember?

1   A. I do not have that, no.

2   Q. It's 2006.  Is it fair to say it was 2006?  Do you

3   recall?

4   A. That would probably be an appropriate -- approximately

5   correct, yes.

6   Q. May -- it's Government's Exhibit 8, May 22nd, 2006.  Is

7   that fair to say?

8   A. That's probably in the ballpark.

9   Q. Okay.  And, at that time, you had a patient/client

10  relationship with her; is that correct?

11  A. Correct.

12  Q. And, at that time, you had -- had you conducted the first

13  surgery?

14  A. (Shakes head negatively)  (Shrugs shoulders)

15  Q. On her back?  At that time?

16  A. I can't recall.

17  Q. Well, let me -- let me -- let's read from this report, so

18  we can --

19          THE COURT:  It's on the screen to your left.

20  **BY MR. ARVANETES:**

21  Q. 1-A.

22          MR. ARVANETES:  Can you scroll up?

23  **BY MR. ARVANETES:**

24  Q. 1-A.  (Indicating)  It says, "Is the worker capable of

25  performing the usual job?"  And you answered -- checked "No."

1    And is this your writing, by the way?

2    A. Uhm, that's probably my office staff.  Not my writing.

3    (Nods head affirmatively)

4    Q. So, how do you -- how do you -- how do you ensure that it's

5    accurate, if it's not you're writing?

6    A. Because, in a medical office, we have medical assistants

7    that help us fill out forms.

8    Q. So, this isn't your writing.  Do you agree with this

9    statement, though, that, "Not at this time, patient is still

10   recovering from surgery," and it says, "L-4/5, L-5," I think

11   it says, S-1, and then some letters there.

12       Do you agree with that statement?

13   A. Yes.

14   Q. And what does that statement mean?

15   A. Uh, she was not recovered enough to return to work.

16   Q. Recovered from surgery?

17   A. Correct.

18   Q. And that was her first surgery?

19   A. That would have been the second surgery, because it says

20   "Re-exploration of laminectomy."  So, she had a laminectomy

21   prior to this surgery, according to that.

22   Q. So, you -- you had -- you had surgery twice with her.

23   A. I -- I know that it appears that I had one surgery, the

24   fusion, I'm not sure of the prior surgery.

25   Q. You don't remember doing two surgeries with her?

1    A. No.

2    Q. Do you remember recommending a -- an electronic stimulator

3    for her because the first two surgeries did not take?

4    A. I don't remember that, no.

5    Q. Are you aware that certain -- do you know Doctor Jue, by

6    the way?

7    A. Doctor Jue?

8    Q. Yes?

9    A. Yes.

10   Q. All right.  He's the one, according to the records, that

11   did the -- the implant in her back, is it normal to have

12   psychological counseling prior to putting an electronic

13   stimulator implant in her back -- in a patient's back?

14   A. That may be part of their protocol.

15   Q. Would you know or would you agree with Doctor Jue when he

16   advised that she needed to see a psychiatrist?  Would you have

17   agreed with that at the time, before putting the stimulator

18   in?

19   A. That would be considered a reasonable option, sure.

20   Q. Thank you.  Now --

21           MR. ARVANETES:  Can the government put up

22   Government's Exhibit 11?  Scroll up.

23   **BY MR. ARVANETES:**

24   Q. This is Government's Exhibit 11.  And at the bottom here --

25           MR. ARVANETES:  Can you scroll up just a little bit

1  more?

2  **BY MR. ARVANETES:**

3  Q. Is that your signature?

4  A. Yes.

5  Q. In this letter, you state that the patient has undergone

6  cervical and lumbar fusions.  What is a cervical fusion?

7  A. Uhm, it's the same as a lumbar, where you put implants in

8  to fuse the spine, but it's in the neck.

9  Q. It's in the neck?

10  A. Correct.

11  Q. And, that, you also write, "More recently, she has

12  undergone a lumbar spinal dorsal column stimulator."  Is that

13  what I was talking about that Doctor Jue put in?

14  A. Correct.

15  Q. Then you write, "With respect to her ability to work, she

16  is currently totally disabled."  Is that fair to say?

17  A. Correct.

18  Q. That's in the letter?

19  A. Correct.

20  Q. Are you aware that she never went -- she never underwent a

21  cervical fusion?

22  A. No.

23  Q. Are you aware that this letter is inaccurate because of

24  that?

25  A. It would be inaccurate, if that is the case.

1    Q. Thank you.

2                MR. ARVANETES:  Can the government put up Exhibit

3    12?

4    **BY MR. ARVANETES:**

5    Q. And, Doctor Strausser, this is a letter you wrote to the

6    Department of Labor.  And you mentioned that she's totally

7    disabled because she has to change positions frequently.  You

8    also talk about the stimulator that Doctor Jue put in.

9         But there was an issue, wasn't there, with the

10   stimulator?  It had to be moved.

11   A. Correct.

12   Q. Is that fair to say?

13   A. Correct.

14   Q. Why did it have to be moved?

15   A. Uh, the location of the battery.  The implant was

16   irritating her, the location of it. (Nods head affirmatively)

17   Q. So, where was it, initially?

18   A. Well, based on that, it was probably too -- a little bit

19   low, lower in the buttock, as opposed to up higher, where it

20   wouldn't be on the buttock/sciatic nerve location.

21   Q. Okay.

22   A. So, the location of the implant was, maybe, not ideal,

23   obviously.

24   Q. Okay.  Fair to say.  And then you also write that she's

25   also undergoing -- "She is going to undergo treatment by a

1  Doctor Heiman for her left shoulder."

2  A. Correct.  (Nods head affirmatively)

3  Q. And Doctor Heiman is a partner or was a partner at the time

4  in your office?

5  A. Correct.

6  Q. And the issue with the shoulder, she ended up having to

7  have thoracic outlet surgery, is that fair to say?

8  A. I have no idea what happened with that.

9  Q. Thank you.  Now, in your report that you didn't write but

10 you did sign, in it is an actual paragraph from the January

11 18th report when -- after, or on or about the time that Agent

12 Haywood visited you.  And, in the report, you say -- would you

13 agree that you say, "After I reviewed some of this video, I

14 think she can work."  So, it's fair to say that you did not

15 see the whole video.

16 A. Based on that, sure.

17 Q. And, then, you also write, of course, as we talked about

18 earlier, that you reviewed the kayak video, as well.  And each

19 time you state, after watching the video, that you change

20 your -- or, at least, in 2008, you changed your opinion from

21 not able to work to she can work.

22 A. Correct.

23 Q. Now, you -- you also saw her, would you agree, on September

24 14th of 2007?

25 A. If you show me that note to verify that date.

Q. Sure.

MR. ARVANETES:  May I approach, Your Honor, with the report?

THE COURT:  Yeah.  Approach the clerk, please.

MR. ARVANETES:  And, for the record, for the trial, this would be Exhibit 501.  Is that fair to say?  Or do we go by what we've already filed from previous motions?  How does the Court want to --

THE COURT:  Was it different in pretrial motions?  Lets go with 501, keep it simple.

MR. ARVANETES:  501.  For trial purposes, this is Exhibit 501?

THE COURT:  Yes.

MR. ARVANETES:  And if the clerk could go to the second page.

THE COURT:  Would you make that slightly larger, madam clerk?

**BY MR. ARVANETES:**

Q. Now, it says, "Physician's signature" there, and there's a line, and is that your signature?

A. Yes.

Q. Okay.  And are these -- is this -- is this your writing here (indicating)?

A. No, that would be office staff.

Q. That's office staff?

1            MR. ARVANETES:  And can the clerk go to the first

2     page, please?

3     **BY MR. ARVANETES:**

4     Q. And what about this here (indicating), is this office

5     staff?

6     A. Yes.

7     Q. And you'll notice --

8            MR. ARVANETES:  If the clerk can magnify it a little

9     bit?

10    **BY MR. ARVANETES:**

11    Q. -- there's something here (indicating) and here

12    (indicating) and -- that says "error" on it.  Can you explain

13    what the error on the first one is for?  What was the error?

14    A. I can't -- I can't say.

15    Q. Well, what about this second error?  You can kind of see

16    something crossed out.  Can you explain what that is?

17    A. No.

18    Q. It looks like, you would agree, that it says "40"?

19    A. I would say it's illegible.

20    Q. And then it says -- it says -- I don't know what that --

21    this is here (indicating), but it says "15."  Would you agree

22    that says "15 pounds"?

23    A. Yes.

24            THE COURT:  Mr. Arvanetes, the first error, isn't

25    that related to the full duty, light limited duty?

1    MR. ARVANETES:  I'm sorry, Your Honor?

2    THE COURT:  The first error on the exhibit, someone

3  had checked "full duty," and they have written "error" above

4  that, crossed it out, and they checked "limited duty."

5    MR. ARVANETES:  I see that.

6  **BY MR. ARVANETES:**

7  Q. Do you -- would you know, or is that what that error was

8  about?

9  A. Whatever it says there.  That one says "limited duty," and

10  "full duty" was in error, according to what this says.

11  Q. Now, it also says, "Patient seeing Doctor Jue for dorsal

12  column stimulator."  Is that right?

13  A. Correct.

14  Q. And it also says, "Seeing Doctor Heiman for left shoulder."

15  Is that what it says?

16  A. Correct.

17  Q. It also says, "Seeing USPS RN;" is that correct?

18  A. Correct.

19  Q. Now, did you actually see the patient that day, on

20  September 14th of 2007?

21  A. All we have is this note, so I can't say if I did or did

22  not.

23  Q. So, what?  I'm sorry?

24  A. I don't have an office note, so I can't tell you if I saw

25  the patient that day or not.

1    Q. Okay.  Well, what is your basis for these -- these

2    restrictions, then?

3    A. They would most likely be based on the most recent

4    evaluation.

5    Q. Which was from you?

6    A. Yes.

7    Q. Which would be when?

8    A. I don't have that.

9    Q. Do you recall -- I know you can't recall that you saw her

10   on September 14th, but do you recall if you did see her --

11   well, let's put it this way.  Strike that.

12        When you see a client to deal with this kind of work

13   status form, okay?  Do you do physical testing to determine

14   their strength capacity?

15   A. No.

16   Q. Are you considered or do you have any experience in

17   occupational therapy?

18   A. No.

19   Q. Because you're a spine surgeon.  Is that fair to say?

20   A. Correct.

21   Q. And do you know what occupational therapy -- a therapist

22   is?

23   A. Yes.

24   Q. What is it?

25   A. They, basically, help with -- patients deal with pain, and

1    return to work, and increase their functional level.

2    Q. Okay.  Yeah.  Now, --

3              MR. ARVANETES:  May I approach the clerk, Your

4    Honor?

5              THE COURT:  You may.  Do you want to admit 501,

6    first of all?

7              MR. ARVANETES:  Oh.  I would like to admit 501, Your

8    Honor.

9              MR. WELDON:  No objection, Your Honor.

10             THE COURT:  501 is admitted.

11

12             **(Exhibit Number 501 was admitted.)**

13

14   **BY MR. ARVANETES:**

15   Q. Now, I have provided this to the government.  This is a

16   comp -- this is a comparison of your work restrictions from

17   the report in 501 with the report from Government's Exhibit

18   14.

19       Can you see that?

20   A. Yes.

21   Q. And let's go through this comparison.  Eight hours a day,

22   work restrictions, you say "yes" to both?

23   A. Correct.

24   Q. Sitting, you say five hours in 2007, but you actually

25   reduce -- or, no, rather, increase the work restrictions in

1    2008, after seeing the video.

2    A. Correct.

3    Q. Does that make any sense, considering you saw the video in

4    2008, and you told her -- you told the agent she could and

5    should go back to work?  Why would the work restrictions

6    actually increase in 2008, versus 2007?  Do you have an answer

7    for that?

8    A. No.

9    Q. Let's go to walking.  Same thing, your work restrictions

10   actually increase in 2008, versus 2007.  Is that fair to

11   say?

12   A. Correct.

13   Q. Lifting.  Again, in 2008, your work restrictions actually

14   increase from four hours to two hours of lifting (sic).

15   A. Correct.

16   Q. Bending, unrestricted versus one hour.  Is that correct?

17   A. Correct.

18   Q. And what does "unrestricted" mean?

19   A. No restrictions.

20   Q. No restriction.  So, with squatting and climbing, both, you

21   say unrestricted in 2007, but you increase that and say,

22   actually, no squatting allowed, and no climbing allowed in

23   2008.  Is that correct?

24   A. According to this document, yes.

25   Q. All right.  Well, this document is based upon your -- your

1    own reports.  Twisting you actually decrease by three hours

2    after you see the videotape in 2008.  Is that correct?

3    A. Correct.

4    Q. Driving is the same.  Hand restrictions, "yes, not a

5    choice."  What does "not a choice mean"?

6    A. I'm not sure what that means.

7    Q. Okay.  Well, that's from your 2008 report, sir.  I don't

8    know what it means, either, you're the one who did it.  And

9    then pushing/pulling, allowed up to 40 pounds, 2007;

10   restriction two hours in 2008.

11           MR. ARVANETES:  And could you please scroll down?

12   **BY MR. ARVANETES:**

13   Q.   And then we go to "fine manipulation work," "reaching,"

14   "not a choice."  Does "not a choice" mean -- what does that

15   mean in doctor parlance?

16   A. I'm not sure where "not a choice" is coming from.  I'm

17   sorry.

18   Q. Well --

19           MR. ARVANETES:  May I have 501, please?

20   **BY MR. ARVANETES:**

21   Q. And, then, "reaching above shoulder," "not a choice," and

22   then you have "one hour;" is that correct?

23   A. Correct.

24   Q. All right.  Now, you were talking about, I guess -- the

25   prosecutor was asking you about whether -- let me look at my

1   notes here.

2       The prosecutor asked her (sic) about whether you could

3   do -- or she could do things like what was seen in the video

4   in 2008.

5   A. Correct.

6   Q. And you said that -- well, what did you say to that

7   question?  Do you remember?

8   A. You would have to be more specific.

9   Q. Well, you were asked about whether she could do the things

10  in the video, like pushing hay, riding a lawnmower.  You even

11  said "mowing a lawn," is that right?  And your answer was

12  those are not things that she should be doing.

13          MR. WELDON:  Your Honor, I object, that's a

14  mischaracterization.

15          THE COURT:  Sustained.

16          MR. ARVANETES:  I don't remember the quote, I don't

17  remember the answer.  So, we may have to look at the video,

18  but we will get to that in a second.

19  **BY MR. ARVANETES:**

20  Q. The question, though, for this Court and for me is if you

21  don't remember seeing her -- well, let's take that back.

22      If you don't remember seeing her in September 2007, when

23  would she have had an opp -- when would she have had an

24  opportunity to ask you what kind of things, activities she

25  could do?

1  A. (Pause)  I'm still not clear exactly what you're asking me.

2  I'm sorry.

3  Q. Well, in your patient/doctor relationship, when you met

4  with her, did you tell her specifically things that she

5  couldn't do, for example?

6  A. That would be based on the medical record.

7  Q. And there's nothing in the medical records about a

8  conversation that you've had with her.  So, I'm asking you if

9  you remember having a conversation?

10  A. No, I do not remember.

11  Q. Do you remember telling her things that she couldn't do?

12  A. No.

13  Q. Were you aware that a week after the OIG agent saw you --

14  saw you in January of 2008, that they created a certain -- a

15  (indicating) work program with restrictions, based upon your

16  report, for her to get back to work?

17  A. They created a position for her?

18  Q. Or they tried to, yes.  Were you aware of that?

19  A. I believe so, yes.

20  Q. And were you aware that, uhm, UPS (sic), and, later, in

21  March of 2008, the Department of Labor agreed that you were

22  her primary care physician?

23  A. I'm not aware of that, no.

24  Q. You are not aware of that?  Let me --

25         THE COURT:  Mr. Arvanetes, I have another case with

1   UPS as a defendant, so we'll leave them out of this one.  It's

2   USPS.

3           MR. ARVANETES:  USPS.  I apologize.

4           THE COURT:  Before you go on, Mr. Arvanetes, did you

5   want to try to admit this exhibit that's on the screen?

6           MR. ARVANETES:  Yes, I would like to enter this into

7   -- as an exhibit, Your Honor.

8           MR. WELDON:  No objection, Your Honor.

9           THE COURT:  That would be 502?

10

11              **(Exhibit Number 502 was admitted.)**

12

13  **BY MR. ARVANETES:**

14  Q. Do you know what a primary care physician is within the

15  context of -- within any context?

16  A. A primary care physician?

17  Q. Yes.

18  A. You mean a general medical health physician?

19  Q. Sure, yes.

20  A. Yes.

21  Q. And were you aware that both the USPS and the Department of

22  Labor said that you were her primary care physician?

23  A. I'm not aware of that.  (Shakes head negatively)  I'm not

24  trained as a primary care physician.

25          MR. ARVANETES:  Hold on a second.

**(Discussion off the record.)**

MR. ARVANETES:  Can the government -- can you put up, please, Government's Exhibit 8?

What about 9, Government's Exhibit 9?  Can you scroll down?

All right.  Let's go to 10, please.  And can you scroll down?

**BY MR. ARVANETES:**

Q. Sir, this is a letter signed by the Department of Labor. All right.  I can't find the letter I'm looking for, but...

So, I want to get your testimony right.  You did not -- you were not aware that the Department of Labor classified you as her primary care physician?

A. Uhm, if I don't have a document stating that, I'm not aware of it.

Q. And you would agree that a primary care physician is someone who would be -- who would have knowledge about the patient, fair to say?

A. (Pause)  Yes.

Q. Also knowledge about other doctors working on that same patient?

A. (Nods head affirmatively)  Yes.

Q. It's fair to say that when you were -- well, is it fair to

1  say that you did you not consider yourself her primary care

2  physician?

3  A. (Shakes head negatively)  I don't look at myself as a

4  primary care physician.  I'm not trained to be a primary care

5  physician.

6  Q. So, when she was going through the appointment -- or when

7  she was going through your meeting with her in September of

8  2007, and, later, when the OIG met with you in 2008, uhm, and

9  when you were altering or changing your opinion (nods head

10  affirmatively), uhm, did you consult with Doctor Heiman before

11  you did that?  About her shoulder, for example?

12  A. If it's not in the notes, I can't say that I did or did

13  not.  Are you saying a primary care physician, or the treating

14  physician?

15  Q. I'm saying a primary care physician.

16  A. A primary care is an internal medicine and family practice

17  physician.

18  Q. Exactly.  You're -- you're not that person.

19  A. No.

20  Q. And that person would be someone who would be -- have con

21  -- have -- essentially know what's going on with different

22  parts (indicating) of the person, different parts of the

23  person's body, for example.

24      Psy -- psychology, you would be in contact with a

25  psychologist, for example, correct?

1  A. Correct.

2  Q. In contact with, say, if there was shoulder issues like

3  Debbie Durand had, correct?

4  A. Correct.

5  Q. Okay.  And, also, the thoracic outlet syndrome that she

6  ended up having an operation on?

7  A. Correct.

8  Q. Correct?

9         MR. ARVANETES:  May I have a moment, Your Honor?

10        THE COURT:  You may.

11        MR. ARVANETES:  Thank you.  (Viewing documents)

12  **BY MR. ARVANETES:**

13  Q. Were you aware that the same day that -- that OIG Agent

14  Haywood met with you in January -- on January 18th, 2008, that

15  Debbie Durand was actually in your office waiting for an

16  appointment on that same day?

17  A. I'm not aware of that, no.

18  Q. Now, you recall me talking about early -- at the very

19  beginning of your testimony, my question about ethics?

20  A. Correct.

21  Q. Okay, ethics?  As a doctor, as a doctor and his patient,

22  correct?

23  A. Correct.

24  Q. And I know you don't recall whether you saw her on

25  September 14th of 2007, correct?

1   A. Correct.

2   Q. And I know you don't recall that she was out in the waiting

3   room January 18th of 2008.

4   A. Correct.

5   Q. And that was when -- and you don't recall whether Agent

6   Haywood had you sign a form, or, at least, warn you and sign a

7   form about her HIPAA rights and whether they can be waived; is

8   that right?

9   A. Correct.  (Shakes head negatively)

10  Q. Are you aware that you still had a relationship with her up

11  to May 18, 2010?

12          MR. WELDON:  Objection, Your Honor, asked and

13  answered.

14          THE COURT:  Overruled.

15  **BY MR. ARVANETES:**

16  Q. Are you aware that you had a relationship with her, with

17  Debbie Durand, a professional relationship, after you gave

18  evidence that was against your patient's interest?

19  A. I'm not aware of that.

20  Q. Well, would it be ethical if you had that relationship

21  after meeting with Haywood in 2008?

22  A. (Pause)  (Shakes head negatively)  I'm confused.

23  Q. Would it be ethical for you, after giving an opinion

24  against the interest of your patient --

25          MR. WELDON:  Objection; irrelevance, Your Honor.

1          THE COURT:  Overruled.  Let's get to the point here,

2     Mr. Arvanetes.

3     **BY MR. ARVANETES:**

4     Q. After giving information contrary to HIPAA, and giving

5     information against the interest of my client, Debbie Durand,

6     your patient at the time, would it be ethical for you to have

7     seen her afterwards?

8     A. I can't answer that question.  (Shakes head negatively)

9     Q. Why?

10    A. I'm just not -- I'm sorry, sir, I'm not clear on what

11    you're asking me.

12    Q. That's okay.  I understand.  (Nods head affirmatively)

13          MR. ARVANETES:  May I have a moment, Your Honor?

14          THE COURT:  You may.  Briefly.

15

16          **(Discussion off the record.)**

17

18          MR. ARVANETES:  Your Honor, at this time, I would

19    like to show the video, Government's Exhibit 69, which is the

20    video he was shown by Haywood on the 18th.

21          THE COURT:  Is this the kayaking, or the --

22          MR. ARVANETES:  The -- the first one.

23          THE COURT:  That's 68.

24          MR. ARVANETES:  68.  I'm sorry.  Yeah, 68.

25       And I would ask the witness to raise his hand if there

1   was any time during that video where my client lied to him.

2           THE COURT:  Well, wait a minute, Mr. Arvanetes.

3   He's not speaking to -- Doctor Strausser's not speaking with

4   Ms. Durand during the video.

5           MR. ARVANETES:  I understand that.  But they had --

6           THE COURT:  You said raise -- you said raise your

7   hand if she lied to him at any point during the video.

8           MR. ARVANETES:  Well, Your Honor, this is a -- this

9   is a fraud case, and he is --

10          THE COURT:  I -- I -- my -- my point is, I don't

11  believe anyone was speaking in the video.  It's a video of her

12  performing activities, isn't it?

13          MR. ARVANETES:  Correct.

14          THE COURT:  So, you asked him to raise his hand if

15  he -- she lied to him at some point, do you mean to raise his

16  hand if he lied -- she lied about activities that she's able

17  to perform?

18          MR. ARVANETES:  Correct.  In their relationship.

19          THE COURT:  All right.  Well, you're questioning.

20  Go ahead.

21          MR. ARVANETES:  So, I would like to, at this time,

22  play Government's Exhibit 68.

23  **BY MR. ARVANETES:**

24  Q. And if you see, during the video, where during the

25  conversations you had with her, during your relationship with

1  her she lied to you about activities, I would like you to

2  raise your hand.

3          THE COURT:  Well, wait a minute.  Mr. Arvanetes --

4          THE WITNESS:  I -- what I have available to me --

5          THE COURT:  Hold on.  Hold on.

6     Okay.  You're asking him -- if he sees something on the

7  video that contradicts her statements to Doctor Strausser

8  about her abilities, is that what you're saying?

9          MR. ARVANETES:  Yes.

10         THE COURT:  Okay.  Madam clerk, would you play the

11 video, please?

12         MR. WELDON:  Your Honor, just for the record, it's

13 69, is the exhibit.

14         THE COURT:  Oh, I'm sorry.

15         MR. ARVANETES:  No, I believe it's 68.  It's 69?  So

16 I was right the first time.

17         THE COURT:  You're right.  I'm sorry, Mr. Arvanetes,

18 I'll stay out of your way.  Go ahead.

19    It's on the screen to your left, sir.

20

21                    **(Video played.)**

22

23 **BY MR. ARVANETES:**

24 Q. For the record, is it fair to say that you did not raise

25 your hand once?

1    A. No.

2    Q. Okay.  Final -- final set of questions, and I'll be quick.

3    People with back pain are on medication, fair to say?

4    A. That's a generalization, but...

5    Q. Oh.

6    A. To a degree.

7    Q. What?

8    A. Case-dependent.  That's a very general statement.

9    Q. Okay.  I respect.  So, let's go over her medication, and

10   let me ask you what it's for and whether it would help with

11   her pain.

12       Uhm, do you see -- do you use Buspirone -- Buspirone, 10

13   milligrams?  What is that -- do you know what that's for?

14   A. That's for depression.

15   Q. And it's one tablet three times a day.  Gabapentin, 600

16   milligrams.  Do you know what that is?

17   A. Yes.  That's for nerve-related pain.

18   Q. One tablet three times a day.  Levothyroxine.  What is

19   that?

20   A. That's for thyroid.

21   Q. 25, one everyday.  Meloxi -- Meloxicam?

22   A. Meloxicam.

23   Q. Meloxicam.

24   A. That's an anti-inflammatory and for pain.

25   Q. 15 milligrams, one -- one everyday.  Metaxalone?

1   A. It's a muscle relaxant for muscle-related pain.

2   Q. 800 milligrams.  Is that a normal quantity, an 800

3   milligram tablet?

4   A. That's one of the doses, yeah.

5   Q. A high dose, or low?

6   A. Higher, yeah.

7   Q. Higher?  Three times a day.

8   A. Correct.

9   Q. Morphine ER, 20 milligrams, extended release, twice a day.

10       So, and I don't know a lot about Morphine, obviously --

11   well not obviously, but I don't.  Morphine, 20 milligrams, how

12   high are the doses on Morphine?

13   A. I don't prescribe that level of an opioid analgesic, but

14   that's a significant opiate analgesic dosage.

15   Q. And that's twice a day.  And, then, finally, Topamax.  What

16   is that?

17   A. That's an alternative pain medication, to help with pain,

18   yeah.

19   Q. And that's one tablet twice a day.  That's what she takes

20   in a whole day for her pain.

21   A. Okay.

22   Q. Thank you.

23           MR. ARVANETES:  I don't have anything further.

24           THE COURT:  Mr. Weldon, any redirect?

25           MR. WELDON:  Very briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. WELDON:**

Q. Doctor Strausser, I just wanted to start by asking about the videos.  When you were initially consulted by both the Department of Justice, as well as the investigators, were the recordings all made available, if you wanted to look at all of them?  Do you remember that, sir?

A. (Pause)  Yes.

Q. Okay.  And, of course, you actually saw the Government's Exhibits 68 and 69, which are the summaries; is that right, Doctor Strausser?

A. Yes.

Q. Now, you were just shown Government's Exhibit 69, which is the 2008 video.  Do you remember that, sir?

A. Yes.

Q. Now, did Ms. Durand ever tell you that she could do those activities, when you had consultations with her?

A. Uh, not to my recollection, no.

Q. Sure.  And why do you know that, sir?

A. (Nods head affirmatively)

Q. If you would have known, what would you have done?

A. Most likely, if you can engage in that degree of activity, I would presume that you could work in a sedentary position, to a degree.

1    Q. And that's exactly what you told Agent Haywood and why you

2    write the letter -- wrote the letter; is that right, sir?

3    A. Correct.

4    Q. Okay.  Now, do you remember Ms. Durand ever telling you

5    about any of those activities that she was engaging in at

6    home?

7    A. I don't recall, no.

8    Q. Okay.  And, then, of course, the time span between 2008,

9    which is Government's Exhibit 69, and, then, 2015, the

10   kayaking video, is her level of activity consistent, based on

11   what you saw in those videos, sir?

12   A. Yes.

13   Q. (Nods head affirmatively)  Now, then, you were also asked

14   about your expert report.  Do you remember those questions,

15   sir?

16   A. Yes.

17   Q. Now, you -- would you have signed that had it not been

18   completely accurate?

19   A. No.

20   Q. So, you reviewed what you had for the documents; is that

21   right, sir?

22   A. Yes.

23   Q. Now, was there anything objective that you were able to

24   find that showed Ms. Durand was incapable of working from 2008

25   to 2015?

1    A. Uhm, as a follow-up in the office, you mean?  Or, like --

2    Q. From anything that you were shown or that you've been made

3    aware of?

4    A. Oh, no.

5    Q. Okay.  What were you relying on when you were working with

6    Ms. Durand, Doctor Strausser?

7    A. Uhm, well, her subjective complaints and the radiographic

8    findings and -- basically, those two.

9    Q. Okay.  And what -- what is the second one you mentioned?

10   A. Well, in terms of how the fusion is coming along and

11   everything.  So...

12   Q. Now, her fusion, how did it progress?

13   A. Uhm, I don't recall her having any objective structural

14   problems with the surgery at the follow-up and after the

15   surgery.

16   Q. So, then, after that point in time, what were you relying

17   on as it relates to Ms. Durand?

18   A. Probably relying on the patient's -- or her subjective

19   complaints, you know, how she's feeling.

20   Q. And then once you saw the evidence, the outside evidence,

21   was that why you, then, ultimately changed that she could do

22   work restrictions?

23   A. Yes.

24          MR. WELDON:  I have no further questions, Your

25   Honor.

1    THE COURT:  Is the witness excused?

2    MR. WELDON:  Yes, please, Your Honor.

3    THE COURT:  You may step down.

4    MR. ARVANETES:  May I ask one follow-up?

5    THE COURT:  Pardon?

6    MR. ARVANETES:  May I ask one follow-up?

7    THE WITNESS:  (Sigh)

8    THE COURT:  Based on what?  Do you think he exceeded

9    the scope of the --

10   MR. ARVANETES:  No.  Redirect.  I just want to ask

11   one question.

12   THE COURT:  One question.

13

14                    **RECROSS-EXAMINATION**

15   **BY MR. ARVANETES:**

16   Q. Did you ever ask her whether she could do those

17   activities?

18   A. I don't have that in my notes, so I can't say that I did or

19   did not.

20   Q. Thank you.

21   THE COURT:  Okay.

22   MR. WELDON:  I have no further questions, Your

23   Honor.

24   THE COURT:  You may step down.  Thank you.

25   THE WITNESS:  Thanks, Your Honor.

1     MR. WELDON:  And the witness is excused, Your Honor?

2     THE COURT:  Yes, he is.

3     MR. WELDON:  Thank you, Your Honor.

4     THE COURT:  He's released from his subpoena.

5     MR. WELDON:  Thank you, Your Honor.

6     THE COURT:  All right.  It's 1:20, we are going to

7   take a lunch break.  We're going to restart here at 2:30.

8     MR. WELDON:  (Nods head affirmatively)

9     THE COURT:  I hope we are picking up the pace this

10  afternoon.

11    MR. WELDON:  We are quite slow right now, Your

12  Honor.

13    THE COURT:  We are, yes, that's what I'm saying.

14    MR. WELDON:  Yes.

15    THE COURT:  Hopefully, it improves.

16    MR. WELDON:  Yes, Your Honor.

17    THE COURT:  All right.  One question I had.  I had

18  consulted with counsel, do you -- do you wish to submit

19  proposed findings and conclusions after you have a transcript

20  in this case, or do you want me to rule after the trial?

21    MR. WELDON:  Can we consult about that, Your Honor?

22    THE COURT:  All right.  Mr. Arvanetes, come back

23  after lunch ready to talk about that issue.

24    MR. ARVANETES:  And what?

25    THE COURT:  Whether you wish to present proposed

1    findings and conclusions after you have the benefit of a

2    transcript, or whether you wish me to make a ruling at the end

3    of the evidence.  Wednesday, I guess.

4            MR. ARVANETES:  I would just ask to --

5            THE COURT:  All right.  We'll talk about that after

6    lunch, at 2:30, when we're here.

7            MR. WELDON:  Thank you, Your Honor.

8            THE COURT:  All right.  We will see you at 2:30,

9    sharp.

10           MR. WELDON:  Yes, Your Honor.

11           MR. ARVANETES:  Thank you.

12

13                  **(The lunch recess was taken.)**

14

15           THE BAILIFF:  The United States District Court is

16   again in session.

17           THE COURT:  Please be seated.  Good afternoon.

18           MR. WELDON:  Good afternoon, Your Honor.

19           THE COURT:  Are we ready to proceed, Mr. Weldon?

20           MR. WELDON:  Certainly, Your Honor.

21           THE COURT:  Mr. Arvanetes?

22           MR. ARVANETES:  Yes, sir.

23           THE COURT:  All right.  Have we -- before we call

24   witnesses, I have to talk about the end of trial, whether we

25   are going to have written findings.

1      Mr. Weldon, what's your view?

2              MR. WELDON:  Your Honor, I would be fine with the

3      Court's decision in open court at the end of the trial.

4              THE COURT:  Mr. Arvanetes?

5              MR. ARVANETES:  (Nods head affirmatively)  Your

6      Honor, I would ask that a transcript be made and have us do a

7      findings of fact.

8              THE COURT:  That's probably more appropriate.  Given

9      the complexity of this case and the number of witnesses, I

10     think it would be appropriate to have a transcript available

11     to the parties, and you can submit brief, written proposed

12     findings and conclusions.

13             MR. WELDON:  Yes, Your Honor.

14             THE COURT:  We will talk about that as we get

15     through the rest of the trial.

16             MR. WELDON:  Certainly, Your Honor.

17             THE COURT:   All right.  Go ahead, Mr. Weldon.

18             MR. WELDON:  Thank you, Your Honor.

19        The United States calls Adrienne Taylor.

20             CLERK OF COURT:  Raise your right hand.

21

22             **(The witness was duly sworn.)**

23

24             THE WITNESS:  Yes.  (Nods head affirmatively)

25             CLERK OF COURT:  (Indicating)

1    THE COURT:  Good afternoon, Ms. Taylor.

2    THE WITNESS:  Good afternoon.

3    THE COURT:  Would you please state your full name

4  and spell your last name?

5    THE WITNESS:  Adrienne Ann Marie Taylor,

6  T-A-Y-L-O-R.

7    THE COURT:  Would you pull the microphone down a

8  little bit?  Thank you very much.

9    Go ahead, Mr. Weldon.

10    MR. WELDON:  Thank you, Your Honor.

11

12                  **DIRECT EXAMINATION**

13  **BY MR. WELDON:**

14  Q. Ma'am, how are you currently employed?

15  A. I'm full-time employed with the U.S. Postal Service.

16  Q. How long have you worked with the U.S. Postal Service?

17  A. Since May 15th, 1985.

18  Q. And you've worked from that time period until the present

19  day.

20  A. Yes.

21  Q. Can you explain some of your job duties in your current

22  position, ma'am?

23  A. Uhm, my position is a Headquarters Injury Compensation

24  Specialist Team Lead.  I'm currently with the Western Area.

25  My primary duties is I assist the districts within the Western

1    Area with the processes that headquarters rules out.

2    Q. Now, then, when files are transferred or individuals move

3    from one division to another division, can you explain what

4    happens to their file?

5    A. Usually, it would be under workers, when they move from one

6    district to another district, if there is current employees,

7    their files are transferred to the Gainesville District's HR

8    office.

9    Q. Now, are you familiar with Ms. Durand's file?

10   A. No.

11   Q. And why is that, ma'am?

12   A. She is not a Western Area employee, and I didn't know

13   anything about her file.

14   Q. Where was her file located?

15   A. In the Houston District, I understood.

16   Q. Okay.  Now, even though she moved, why are you not familiar

17   with the file, when she's in your area?

18   A. Well, she's a separated employee.  So, once the employees

19   are separated, those files are not moved.

20   Q. Then do you know whether or not Ms. Durand was put into PN

21   status?

22   A. I saw that on some of the documents, yes.

23   Q. Okay.  And can you explain that to the Court?

24   A. PN means that that employee has no potential for any type

25   of work at all, and that --

```
 1    Q. And then  -- so, then, will there ever be job offers or
 2    anything done out of different areas?
 3    A. Usually, no.
 4    Q. If she was not in a PN status and she moved, what would
 5    happen?
 6    A. If she was still a current employee and she moved, then we
 7    would search for work for her.
 8    Q. Okay.  And that would be in the Western Division, then, or
 9    wherever she moved to?
10    A. Correct.
11    Q. Okay.  Now, it was different with Ms. Durand's file,
12    though, and why is that, Ms. Taylor?
13    A. She was a separated employee, and, so, from what I
14    understand, when she moved, her case stayed with Houston.  And
15    her claim was actually transferred within the Department of
16    Labor's OWCP.  So, when she moved, the OWCP District 14,
17    Seattle, was managing her case.
18    Q. Now, then, is it fair to say that Ms. Durand's file was,
19    essentially, on autopilot at that point?
20    A. I would say yes.
21    Q. And why do you say that?
22    A. Well, because the Department of Labor does not actively
23    manage our injured employee's claims, at all.
24    Q. Now, was there -- what is the goal of the Workers' Comp
25    program?
```

1    A. The goal is always to get our employees back to their

2    date-of-injury position.  And, if not, as close as possible.

3    We try to find work for them within the restrictions.

4    Q. Is it considered a retirement program, ma'am?

5    A. Absolutely not.

6    Q. Let's talk a little about the pay status of Ms. Durand.  Is

7    that something that will last for the rest of her life, now?

8    A. Yes.  If it's a PN, usually, yes.

9    Q. And why is that?

10   A. There is no potential for that employee to work at all.

11   And that's based solely on the medical documentation.

12   Q. Does she have to pay taxes, Ms. Taylor?

13   A. No.  Those -- those employees that are on the Periodic

14   Roll, or a PN status, they get their salary, either a 66th and

15   sixth percent of their full salary, or 75 percent, if they

16   have a family, of their full salary.  And they don't pay

17   taxes, at all.

18   Q. Is Ms. Durand still receiving Workers' Compensation

19   benefits?

20   A. Yes.  I checked yesterday, and she still is.  She got a

21   check August 19th.

22   Q. That would have been two days ago, then; is that right?

23   A. Yes.

24   Q. Now, is there any incentive to stop and get off Workers'

25   Compensation, then?

1    A. Not from the claimant's perspective.

2    Q. Why do you say that?

3    A. Well, they are getting paid their -- 75 percent of their

4    salary, if they have a family, tax free, and they don't have

5    to come to work, so most people don't want to come back to

6    work after that.

7    Q. What about with retirement benefits and Social Security?

8    Is it better to be on Workers' Comp or to go through the

9    retirement process?

10   A. Workers' Compensation pays much more than the retirement or

11   Social Security.

12   Q. And is that why there is no incentive, then, to go off

13   Workers' Compensation?

14   A. Yes.  I -- I see that quite a bit.

15   Q. And, then, once you have the PN status, is that almost like

16   hitting the lottery for Workers' Compensation?

17   A. Yes --

18              MR. ARVANETES:  Objection; speculation.

19              THE COURT:  Lay some foundation, please.

20   **BY MR. WELDON:**

21   Q. Ma'am, are you familiar with the PN status?

22   A. Yes, I am.

23   Q. Okay.  And what does that mean?

24   A. That means both -- they -- the employee or the claimant

25   would only have to provide medical documentation, maybe, once

1    every three years, and every year, they have to fill out a

2    form that the Department of Labor sends out, a 1032, letting

3    them know what they are -- what they -- if they are

4    volunteering, if they worked anywhere, that sort of thing.

5    But that's all they have to do.  They don't have to go back to

6    work.

7    Q. Now, you mention that it's once every three years, how is

8    that different than if they are not on the PN status?

9    A. If they are not on a PN status deeming -- well, that's just

10   the requirement for the Department of Labor.  The medical is

11   every -- once every three years.  So, the PR status, for

12   instance, if they are on the Periodic Roll, they have to

13   provide medical once every year.

14   Q. Certainly.

15   A. A PR once every two years.

16   Q. Now, then, with that, Ms. Taylor, would there also be job

17   offers that would be offered to Ms. Durand?

18   A. As a PN status?  Probably not.

19   Q. Okay.  Now, if she weren't on the PN status, would the post

20   office be working with her to try to get her back to work?

21   A. Yes, we would.

22   Q. And would that include job offers?

23   A. Yes.

24   Q. Okay.  But since she was in the PN status, that ended.

25   A. Yes, that's correct.

1  Q. And did it end even more so after she moved into a

2  different division?

3  A. Yes.

4         MR. WELDON:  Can I have just a moment, Your Honor?

5         THE COURT:  You may.

6

7              **(Discussion off the record.)**

8

9  **BY MR. WELDON:**

10  Q. Very briefly, Ms. Taylor.  If -- Ms. Durand, when she did

11  return to work, is she covered for the full amount of the time

12  period from OWCP?

13  A. When she returns to work?

14  Q. Correct.  So, if she goes back on work restrictions, when

15  she was in your division, would she still be protected and

16  covered for that entire amount, even if she is not working the

17  full amount?

18  A. I'm sorry, I'm not really understanding.

19  Q. Let me ask it this way.

20  A. Okay.

21  Q. If a job were to be offered, if Ms. Durand weren't on the

22  PN status and she was working within her restrictions, would

23  she still receive pay from the Postal Service?

24  A. (Pause)  She would receive her salary, her pay -- yeah, her

25  salary from the Postal Service.

1   Q. Okay.  Would she get less because she was working less

2   hours, or would she receive the equal pay?

3   A. She probably would get less, because we'd take taxes out.

4   Q. Yes.

5   A. So, it would be her regular salary with the taxes taken

6   out.

7          MR. WELDON:  All right.  I have no further

8   questions, Your Honor.

9          THE COURT:  Mr. Arvanetes, cross-examination?

10

11          **(Discussion off the record.)**

12

13                    **CROSS-EXAMINATION**

14  **BY MR. ARVANETES:**

15  Q. Good morning, Ms. Taylor.

16  A. Good morning.

17  Q. If -- if Ms. Durand was restricted to only work, say, six

18  hours a day, which would be three hours a week, uhm, would she

19  get ten hours of, essentially, disability pay?

20  A. She would have to file for that from the Department of

21  Labor, and they would -- depending on if she had a medical,

22  they would probably pay her, yes.

23          MR. ARVANETES:  Okay.  Thank you.

24          THE COURT:  Any redirect?

25          MR. WELDON:  No, Your Honor.  Thank you.

1          THE COURT:  Is the witness excused?

2          MR. WELDON:  Yes, please, Your Honor.

3          THE COURT:  You may step down.  Thank you, Ms.

4    Taylor.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Mr. Cobell, you've risen.

7          MR. COBELL:  Yes, Your Honor.

8          THE COURT:  Do you have something for us?

9          MR. COBELL:  Well, the government would call Agent

10   Traci Wallace as its next witness.

11         THE COURT:  All right.  Go ahead and call Agent

12   Wallace.

13         MR. COBELL:  (Indicating)

14         CLERK OF COURT:  Raise your right hand.

15

16              **(The witness was duly sworn.)**

17

18         THE WITNESS:  I do.

19         CLERK OF COURT:  (Indicating)

20         THE COURT:  Good afternoon, Ms. Wallace.

21         THE WITNESS:  Hello, sir.

22         THE COURT:  Would you please state your full name

23   and spell your last name?

24         THE WITNESS:  Yeah.  Traci Lee Wallace,

25   W-A-L-L-A-C-E.

1    THE COURT:  Could you scoot up a bit, please?  Thank

2  you.

3    Go ahead, Mr. Cobell.

4    MR. COBELL:  Thank you, Your Honor.

5    Agent Boynton, if we could have Government's Exhibit 66,

6  please?

7

8                         **DIRECT EXAMINATION**

9  **BY MR. COBELL:**

10  Q. And good afternoon, Agent Wallace.

11  A. Good afternoon.

12  Q. Can you tell the Court what you do and how long you've been

13  employed?

14  A. Sure.  Okay.  So, I -- I'm a Special Agent with the Postal

15  Service, Office of Inspector General, I've been with the

16  agency for two years.

17  Q. And what are your job duties?

18  A. I investigate postal-related offenses with employees, so

19  anything that has to do with a postal employee.  That could be

20  an administrative- or a criminal-type offense, we will look

21  into.

22  Q. And where -- where's your current duty station?  Where are

23  you located?

24  A. Anchorage, Alaska.

25  Q. And do your job duties take you elsewhere in the United

1   States?

2   A. They do.

3   Q. Okay.

4   A. Pretty much anywhere where an investigation needs an

5   additional agent.

6   Q. Okay.  And are you familiar with Ms. Deborah Durand,

7   formally Deborah Simmons?

8   A. I am.

9   Q. And do you see her in the courtroom today?

10  A. Uhm, yes, she is right over there (indicating).

11  Q. And could you identify a piece of clothing that she's

12  wearing?

13  A. She's wearing a -- it appears to be a plaid, blue type

14  top.

15          MR. COBELL:  Okay.  May the record reflect that the

16  witness has identified the defendant, Your Honor?

17          THE COURT:  The record will reflect.

18  **BY MR. COBELL:**

19  Q. Okay.  Agent Wallace, you can see what's been marked here

20  as Government's Exhibit Number 66, do you recognize this

21  letter?

22  A. Yes, I do.  It's a --

23  Q.  Go ahead.

24  A. It's a letter that we sent to her requesting her attendance

25  at an interview that I conducted.

1  Q. Okay.  And what -- what started this process?  Why did you

2  send this letter?

3  A. So, she was being investigated for a Workers' Compensation

4  claimant fraud, and the letter specifically was sent for us to

5  conduct an undercover interview of her specific to the

6  allegations of that investigation, that basically she was

7  falsely claiming injuries, and receiving compensation for

8  those injuries.

9  Q. Okay.  And were there any events that -- relevant to these

10  proceedings that happened shortly before you sent this

11  letter?

12  A. Uh, yes.  So, this letter specifically was prompted as a

13  result of an undercover operation where she went on a kayaking

14  trip with some other agents.

15  Q. Okay.  And, so, what was your role in sending this

16  letter?

17  A. Uhm, I didn't actually send the letter, it was sent through

18  -- through the case agent.  But my role was to actually

19  conduct the interview that's referenced in this letter.

20  Q. Okay.  And in an undercover setting?

21  A. That's correct.

22  Q. And who would you be posing as?

23  A. So, I was acting as a contractor for the Postal Service,

24  and my stated duties were simply to determine whether or not

25  there was anything that she was capable of doing, that we

1   could offer her other employment within the Postal Service.

2   Q. And in the letter, toward the bottom -- let's see.  So --

3   sorry, strike that.

4       Were you going to be posing as a medical doctor?

5   A. No.  I was just a -- as it states in there, it's says a

6   "contract vocational rehabilitation specialist."  I acted

7   under the name of Tonya Wall, so that's me identified in

8   there.

9   Q. Okay.  Thank you.

10       MR. COBELL:  Could we, Agent Boynton, have Exhibit

11   67, please?

12       Oh.  And, Your Honor, the government would move for

13   the admission of 66.

14       MR. ARVANETES:  No objection.

15       THE COURT:  66 admitted.

16

17       **(Exhibit Number 66 was admitted.)**

18

19       MR. COBELL:  Thank you.

20   **BY MR. COBELL:**

21   Q. Are you familiar with this document, Agent Wallace?

22   A. Yes, I am.

23   Q. And what is it?

24   A. It's a background information form that I requested she

25   fill out.  It's basically a questionnaire that had her list

1   all of her current medical conditions, uhm, her hobbies, the

2   -- the things that affected her ability to -- to perform,

3   basically, in life, and just anything that she wanted to

4   identify as an issue.

5   Q. And, so, did Ms. Durand fill this out?

6   A. Yes.

7   Q. Prior to your interview?

8   A. No, she did it at the interview.

9   Q. At the interview.  In your presence?

10  A. Yes.

11  Q. Okay.

12          MR. COBELL:  Now, if we could scroll down to Page 2,

13  Question 11.

14  **BY MR. COBELL:**

15  Q. Can you tell us what Ms. Durand checked in Box Number 11?

16  A. Yeah.  This question is, "How would you describe your

17  overall lifestyle?  Check one entry."  She checked, "Totally

18  sedentary."

19  Q. Okay.  And Question Number 13, uhm, can you tell us what

20  she filled out in that portion and what the question was?

21  A. Sure.  The question, "Do you consider yourself totally

22  disabled and unable to perform any assignment for the Postal

23  Service?  If so, why not?"  She says, "Yes, I've done limited

24  duty and realized my functionality is not," and then it's

25  scribbled out.

1     MR. COBELL:  Okay.  And, then, if we could go to

2  Question Number 20?

3  **BY MR. COBELL:**

4  Q. And the question is -- I guess, if you could go over these

5  -- the question and the answers, as well.

6  A. Sure.  Okay.  So, the question states, "Please indicate the

7  number of hours and/or minutes per day that you can perform

8  the following activities.  If you cannot perform the activity,

9  write 'none' or 'zero.'"  For standing, she wrote "30."  For

10  sitting, she wrote "30."  For walking, "120."  For kneeling,

11  "15."  Squatting, "0."  Climbing, "0."  Bending, "0."

12  Reaching, "10."  And driving, "120."

13  Q. Okay.  And the same thing, if we can go to question Number

14  21.

15  A. "Please check the box in Section A which best describes

16  your average abilities over the past month.  Check the box

17  again in Section B if you usually need help from another

18  person for the activity."  So, for running errands and

19  shopping, she checks, "Significant difficulty," but did not

20  check that she needed help.  Driving a motor vehicle:  Slight

21  difficulty, no help.  Getting in or out of a vehicle:  Slight

22  difficulty, but no help.  Walking outdoors on uneven ground:

23  Significant difficulty, no help.  Climbing stairs:

24  Significant difficulty, no help.  Going out to eat or drink:

25  Slight difficulty, no help.  Getting in or out of bed:  Slight

1    difficulty, no help.  Household chores and yard work:

2    Significant difficulty, no help.  Attending social functions:

3    Slight difficulty, no help.  Bending over to pick up items

4    from the floor:  Significant difficulty, no help.  Standing up

5    from a sitting position:  Significant difficulty, no help.

6    And reaching an object above shoulder:  Significant

7    difficulty, no help.

8    Q. Thank you.

9          MR. COBELL:  If we could go to Page 4, to the

10   signature, false statement line.

11   **BY MR. COBELL:**

12   Q. Agent Wallace, could you read the warning there above the

13   signature line?

14   A. Yes.  "I understand that anyone who fraudulently conceals

15   or fails to report information that would have an effect on

16   any benefits or who makes a false statement or

17   misrepresentation of a material fact in claiming a payment or

18   benefit under the Federal Employee's Compensation Act may be

19   subject to criminal prosecution from which a fine and/or

20   imprisonment may result.  I certify that the information

21   provided above is true and accurate to the best of my

22   knowledge and belief."

23   Q. Thank you.  And did Ms. Durand sign that in your presence,

24   as well?

25   A. She did.

1  Q. Did she date it, as well?

2  A. Yes.

3  Q. Okay.  So, you -- you had stated that you had her fill this

4  out at the beginning of your interview.

5  A. Yes.

6  Q. And that she had come to that interview based on the letter

7  that was sent to her stating that she needed to meet with you

8  as a vocational rehabilitative specialist.

9  A. Yes.

10  Q. Okay.  And do you know how she arrived at that interview?

11  A. Uhm, I was informed by other agents that were monitoring

12  the parking lot that she drove, she arrived in a vehicle as

13  the driver.

14  Q. And was there -- were you aware of a conflict -- a

15  scheduling conflict, uhm, regarding the date of this and Ms.

16  Durand having a trip?

17  A. Uhm, I recall there may have been something.  I don't -- I

18  don't (shakes head negatively) have any details on that,

19  though.

20  Q. Was -- were you ever aware of her going across the country

21  with her daughter?

22  A. Yes.  She did mention, during the interview, that she had

23  to take her daughter to Tennessee, I believe, and that she had

24  done a cross-country trip to do that.  So, that, yeah, I

25  believe that may have conflicted with my interview of her.

1    Q. Okay.

2             MR. COBELL:  Now, if we could go back to Question

3    11.

4    **BY MR. COBELL:**

5    Q. During the interview that you conducted with Ms. Durand

6    that day -- well, first of all, are you famil -- were you able

7    to review the investigation up to that point in time?

8    A. Yes.  Before the interview, I did.

9    Q. And have you viewed the videos of her activities kayaking

10   and prior to that 2000 --

11   A. Just some of the kayaking video.  I hadn't viewed all of

12   it.  But I had gotten briefs from the agents, and I viewed

13   some of the video.

14   Q. So, you were familiar with her activities on that trip.

15   A. I was, yes.

16   Q. Okay.  Now, when she answered "totally sedentary" on

17   Question 11, uhm, did that -- was that in conflict with any of

18   the information you had per the investigation at that time?

19   A. Yes.  And my understanding from the kayaking trip was that

20   she was pretty mobile during the entire trip, that she helped

21   move the kayaks, she paddled, she went running with one of the

22   other agents.  There were a lot of different activities that

23   she was involved in and there were no apparent problems that

24   she had as a result of any of those activities.

25   Q. And during your interview, did you question her about her

1    claim that she was totally sedentary?

2    A. I did.  I asked her numerous different ways about her

3    day-to-day lifestyle and her abilities.  She told me on that

4    day that she felt, on a pain scale of one to ten, that she was

5    an eight, and that almost every other day she was a seven.  So

6    she was consistently a seven on that day.

7         She stated that she has a hard time getting out of bed,

8    or getting out of her recliner chair most days, that some days

9    she has to lay in her recliner because it's more comfortable.

10   That she has a hard time doing household chores, such as

11   dishes.  She can't lift things over her head.

12        Uhm, those are all of the types of statements that she

13   made at her interview.

14   Q. What was her demeanor when she showed up for the

15   interview?

16   A. So, when she walked in, she had a pretty solemn, kind of

17   rundown, tired-looking demeanor.  She walked in, she sat down

18   very slowly, and then, at one point, she actually took her

19   arm, and forcibly with her other arm she forced it up on the

20   table like this (indicating) and acted as if she was

21   struggling a great deal with pain in her arm and in her neck.

22   And that every time she moved, she indicated that there was

23   pain.

24   Q. Do you know approximately how long after the kayaking trip

25   that this interview took place?

1  A. Uhm, I don't remember the date of the kayaking trip.  I

2  know this was in, like, September.  So, it was a few months --

3  at least a few months later.

4  Q. Okay.  Uhm, and you -- you had mentioned that she had gone

5  running with one of the agents when she was on the trip?

6  A. Yes.  I was briefed by one of the agents that she --

7          MR. ARVANETES:  Objection; hearsay, Your Honor.

8          THE COURT:  Sustained.  Rephrase the question,

9  please.

10          MR. COBELL:  Well, if we could go to Question Number

11  3 on the exhibit, please, Agent Boynton?  Oh, I'm sorry,

12  Question Number 21, Page 3.

13  BY MR. COBELL:

14  Q. So, per your review of the investigation to that date, were

15  there any of these claims marked on Question Number 21 that

16  conflicted with the knowledge that you had on that day?

17          MR. ARVANETES:  Your Honor, asked and answered.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes, I would say a few of them.  So,

20  her ability to walk outdoors or -- or on uneven ground based

21  on what's going on during the kayaking trip.  Uh --

22  BY MR. COBELL:

23  Q. How about climbing stairs?

24  A. Climbing stairs.  Yeah, climbing stairs.  Uh --

25  Q. At that time, were you aware that she had, in fact, been

1    running stairs on her trip?

2    A. Yes.

3    Q. How about driving a motor vehicle?

4    A. Uhm, she drove a motor vehicle approximately an hour each

5    way to the interview that day.  I believe it was about 53

6    miles from Fruitland to Boise, where the interview occurred.

7    Q. How about standing up from a sitting position?

8    A. So, she -- she didn't stand during the interview, itself;

9    but during the kayak trip, and numerous times on the video,

10   she was standing, moving around, carrying a kayak, and moving

11   equipment.

12   Q. And the same with bending over and picking up items?

13   A. That's correct, that was on the video, as well.

14   Q. And -- but, during your interview, how does she describe

15   her ability to pick something up from the floor?

16   A. Uh, she said that she basically cannot -- that she can't

17   squat, that she can't bend over, so she can't reach down and

18   pick things up.  Because this -- she can't really kneel or

19   bend.

20   Q. Did she tell you how she would manage to pick something up,

21   then?

22   A. Yeah, I believe she did.  I'm trying to recall specifically

23   what she said.  I think she cased it -- she told me sometimes

24   she just scoots it along the floor with her foot until she can

25   get it to a place that she can either use something else to

 1    pick it up, or just get it to where it needs to be.

 2    Q. Okay.

 3          MR. COBELL:  And, madam clerk, if we could show

 4    Exhibit Number 68 to Agent Wallace?

 5           And, Your Honor, at this time the government would

 6    move to admit Exhibit Number 67.

 7          MR. ARVANETES:  Your Honor, just an objection

 8    pursuant to the pretrial motion.

 9          THE COURT:  67 is admitted, objection overruled.

10

11          **(Exhibit Number 67 was admitted.)**

12

13          MR. ARVANETES:  Is this 68, Your Honor?

14          THE COURT:  67 is the document.

15          MR. ARVANETES:  Oh.  Oh.  67, we don't have an

16    objection to that.

17          THE COURT:  All right.  67 is admitted without any

18    objection.

19       Now, 68 is the -- apparently, the video.

20          MR. COBELL:  Yes.  Yes, Your Honor.

21    **BY MR. COBELL:**

22    Q. And, Agent Wallace, have you seen this CD before?

23    A. Yes, I have.

24    Q. And have you watched the video contained on this

25    particular --

1  A. Yes I have.

2  Q. -- disc?  And is that an accurate representation of the

3  video that you were presented prior to the interview that we

4  just discussed?

5  A. Yes, it was.

6  Q. Okay.  And did you view Ms. Durand in the video?

7  A. Yes.  But it has two parts.  So, it's got my interview in

8  it, and it has the kayaking portions of the kayaking trip, as

9  well, she is viewed in both of those.

10  Q. Okay.  And we've -- I guess, we've gone over how the video

11  was set up.  But if you could briefly describe what you just

12  said regarding the two separate videos that were --

13  A. Okay.  So, during the kayaking trip, a video was taken

14  throughout the trip of her activities, uh, and, then, during

15  her interview with me, that video was also videotaped.

16      And then the case agent took both of those videos and did

17  a screen-in-screen when she was making statements during my

18  interview that conflicted with the activities that she was

19  engaged in on the kayak trip, and so they overlap.

20  Q. Okay.  And do you recall how long your video-recorded

21  interview was with Ms. Durand?

22  A. Yeah.  I believe I was -- I interviewed her for about an

23  hour-and-a-half, I think.

24  Q. Okay.  And do you recall approximately how many hours of

25  video there were of her from the kayaking trip?

1    A. I don't -- I don't recall.

2    Q. Is it fair to say that the -- this video on Exhibit 68 is

3    just a short -- a much shorter and condensed version of both

4    videos?

5    A. Yes.

6    Q. Okay.

7           MR. COBELL:  All right.  At this time, the

8    government would move to admit Exhibit Number 68.

9           MR. ARVANETES:  Objection, pursuant to pretrial

10    motions.

11           THE COURT:  All right.  Objection overruled.

12    Exhibit 68 will be admitted.

13

14           **(Exhibit Number 68 was admitted.)**

15

16           MR. COBELL:  Thank you, Your Honor.

17    **BY MR. COBELL:**

18    Q. During your interview time with Ms. Durand, did she tell

19    you that she could put up a fence?

20    A. No.

21    Q. Did she tell you that she could dig a post hole?

22    A. No.

23    Q. Did she tell you that she had cleared land with a

24    chainsaw?

25    A. No.

1    Q. Did she tell you that she could ride on a riding

2    lawnmower --

3    A. No.

4    Q. -- for 30 minutes to an hour at a time?

5    A. No.

6    Q. Did she tell you that she --

7             MR. ARVANETES:  Objection; facts not in evidence, as

8    far as the lawnmower.

9             THE COURT:  As far as what?

10            MR. ARVANETES:  Well, he said 30 to 60 minutes.

11            THE COURT:  Well, he asked her whether she told her

12   that.

13            MR. ARVANETES:  Oh.  Withdrawn.

14   **BY MR. COBELL:**

15   Q. Did she tell you that she hand fed her horses?

16   A. No.

17   Q. Did she tell you that she carried bales of hay up to 100

18   feet, lifting them onto a horse feeder by herself?

19   A. No.

20   Q. Did she tell you that she picked up trash cans?

21   A. No.

22   Q. Did she tell you that she moved stumps from pine trees?

23   A. No.

24   Q. Did she tell you that she rode horses up and down the

25   street where she lived two to three times a week?

1   A. No.

2   Q. Did she tell you that she walked on a regular basis?

3   A. No.

4   Q. Did she tell you that she moved plants?

5   A. No.

6   Q. Did she tell you that she was very active outside?

7   A. No.

8   Q. Did she tell you that she was a member of a local gym and

9   liked to lift free weights?

10   A. No.

11   Q. Did she tell you that she went jogging in the mornings?

12   A. No.

13        MR. COBELL:  Let's see.  If we could have Exhibit

14   Number 56?

15   **BY MR. COBELL:**

16   Q. Are you familiar with this document, Agent Wallace?

17   A. I've seen it, yes.

18   Q. And what is it?

19   A. It's a -- it's a survey that was sent out from my agency to

20   get her -- as part of -- it was part of how she won the kayak

21   trip.  So, it was a survey that went out that she had to fill

22   out a whole bunch of information to be considered to win the

23   kayak trip.

24   Q. So, is it fair to say that this document was designed by

25   the case agents for the specific purpose of getting the

1    defendant to demonstrate what she was capable of doing?

2    A. Yes, that's the purpose.

3           MR. COBELL:  Okay.  If we could go to Page 2 of this

4    document, please?  And if you could keep scrolling.  I'm

5    looking for the questions -- oh, starting on Line 25.

6    **BY MR. COBELL:**

7    Q. What did Ms. Durand put down for Number 25, her favorite

8    hobby or activity?

9    A. She wrote "horses, horseback riding," and then it says,

10   "husband - TV" and "baseball."

11   Q. Okay.  And how often did she say, in 26, that she engaged

12   in those activities?

13   A. Everyday.

14   Q. Okay.  And on Number 27, can you tell us what she put on

15   that?

16   A. "Do you visit an exercise facility regularly?  And she

17   answered, "Yes."

18   Q. And did she even put to which facility she belonged to?

19   A. Oh, yeah, the next part.  "If so, which gym do you belong

20   to?"  She wrote, "Idaho Athletic Club."

21   Q. And how often did she say she worked out there?

22   A. Two to three times per week.

23          MR. COBELL:  Okay.  If you could keep scrolling down

24   to 29.

25   **BY MR. COBELL:**

1  Q. If you could tell us what she said she did at the exercise

2  facility.

3  A. She checked "Free Weights."

4  Q. And for the type of sports that she participates in, Number

5  30, what did she say?

6  A. She checked, "Walking," "Hiking," "Fishing," "Bicycling,"

7  and other she wrote, "Horseback riding."  And "Kayaking."

8  Q. And how often did she say she engaged in those

9  activities?

10  A. She wrote "Seasonally to daily."

11  Q. Okay.  And for Number 32, it says, the last two pieces of

12  sporting equipment that she purchased, what did she put there?

13  A. She wrote a "saddle" and a "bicycle."

14  Q. Okay.

15        MR. COBELL:  If we could continue scrolling down.

16  **BY MR. COBELL:**

17  Q. For Number 33, if you could tell us what her favorite

18  summer activities are.

19  A. She wrote, "camping," "fishing," "discovering historic

20  places," "rock hunting," and "boating/kayaking/canoeing."

21  Q. And continued, then, to 34, her favorite winter

22  activities?

23  A. She wrote, "sledding," "sleighing," "watching old movies,"

24  and "snow machining."

25  Q. Okay.  And in Number 36, when she checked the activities

1    that she had participated in the last three years, what does

2    she check?

3    A. She wrote, "Musical Concert," "Museum," "Parade," "Outdoor

4    Show," "Rodeo," "State Fair," and "Air Show."

5    Q. Okay.  And for 37, can you tell us what that question is

6    and the answers she gave?

7    A. "Please indicate any other activities that you participate

8    in that are not listed above that you would like to receive

9    marketing information on or participate in product testing,"

10   and she wrote, "hunting, tracking, pack-in camping."

11   Q. And are you familiar with what "pack-in camping" is?

12   A. My understanding is it's where you put in a backpack

13   everything that you're going to take with you to camp, and

14   then you pack out into the woods and set up camp.

15   Q. Okay.  Now, during your interview with Ms. Durand, did the

16   kayaking trip come up that she had just been on in the last

17   few months?

18   A. Yes, it did.

19   Q. And what did she say about that trip?

20   A. So, she told me that she had won a trip, and that she had

21   gotten to go on this kayaking adventure in Washington.  And

22   she explained to me that she really enjoyed it, it was very

23   beautiful, but that on numerous occasions she wasn't actually

24   able to do a whole lot.  She, at times, couldn't help paddle,

25   so, her partner in the kayak would have to paddle for her.

1  And that by the end of day she was totally wiped out and

2  couldn't do anything and had to go lay in her tent.  She also

3  stated that she had won the kayak trip because of her medical

4  condition, that that was the purpose of the trip.

5  Q. Can you expound on that a little?  What was her claim about

6  the purpose for the trip regarding handicapped people?

7  A. Sure. So, she told me during the interview that the trip,

8  itself, was specifically designed for people who had physical

9  disability issues to, kind of, get out in nature and see what

10  they could do, what they could do within their capabilities.

11  And that she had filled out a survey specifying what her

12  issues were, and that that was why she got -- she won the

13  trip.

14  Q. Now, in your review of all of the documentation, all of the

15  investigations up to that point, was there any indication, in

16  what you were familiar with, that would show that the trip was

17  presented to her as a trip for those who had specific

18  handicaps like hers?

19  A. No, it's not.  It was not -- it was not set up that way,

20  and none of the questions were designed specifically to try

21  and only find people who had disabilities.  She did have the

22  opportunity to fill the form out in such a way that it states,

23  you know, I can't do any of these things or I don't do any of

24  these things because -- whether or not it's performed.  But

25  the forms are designed specifically so that she can identify

1    what she is capable of doing.  (Nods head affirmatively)

2    Q. Now, when she described the kayaking trip to you, did she

3    minimize the distances traveled?

4    A. Yes.  I think she stated that she maybe did seven -- seven

5    or eight miles a day, something like that, and I think the

6    kayak trip was in the teens somewhere in terms of miles, I

7    think almost twice -- being almost twice as far as she stated

8    they actually did.

9             MR. COBELL:  Okay.  The government would move at

10   this time for admission of Exhibit 56, Your Honor.

11            MR. ARVANETES:  No objection.

12            THE COURT:  Exhibit 56 is admitted.

13

14            **(Exhibit Number 56 was admitted.)**

15

16   **BY MR. COBELL:**

17   Q. And, Agent Wallace, one more question.  On the screen here

18   we have, basically, the final page of the -- or close to the

19   final page of that questionnaire.

20   A. Uh-huh.

21   Q. And can you read the certification there at the top?

22   A. It says, "I certify that the information provided in this

23   survey/questionnaire is correct," and then she identifies

24   herself as Ms. Debbie Durand, her mailing address.  Do you

25   want me to read the mailing address?

1  Q. No.  No.  Did she sign and date that?

2  A. Yes, she signs and dates it, as well.

3

4  **(Discussion off the record.)**

5

6  **BY MR. COBELL:**

7  Q. Ma'am, can you explain to the Court the purpose of setting

8  up that type of an interview, posing as the occupational

9  therapist?

10  A. So, our purpose in doing that is to -- to basically get

11  kind of a snapshot of what she would be telling her doctor and

12  what type of demeanor she would likely present to her doctor.

13  Because we're obviously not in the room with the doctor when

14  she is presenting the information.  But the assumption is that

15  she would present herself in likely the same manner to us that

16  she would to a doctor.  And it gives her the opportunity to

17  provide us those details about her physical condition.  (Nods

18  head affirmatively)

19  Q. So, would it be fair to say that that basically is about as

20  close as an agent like yourself gets to seeing what would be

21  said to the doctor --

22       MR. ARVANETES:  Objection; leading, Your Honor.

23       THE COURT:  Rephrase it, please.

24  **BY MR. COBELL:**

25  Q. What -- I guess, what type of information do you get out of

1  the defendants in that type of an interview?

2  A. So, the interview is actually -- the questions are designed

3  specifically to ask questions that the doctor would ask to try

4  and make a determination as to whether or not she is

5  physically capable of working in some respect.

6  And, so, for us, we can capture that data independently

7  of the doctor's notes, because, you know, all we get back from

8  those interviews is whatever the doctor writes up in their

9  notes.

10  So, it gives us the opportunity to ask similar questions,

11  and then determine whether or not she -- that she is capable

12  of particular things, whether she can answer phones, whether

13  she can case mail, whether she can do all of the various

14  different things that she might be offered in a position

15  within the Postal Service.

16  Q. And did what Ms. Durand tell you, was that similar to what

17  she had told her doctor in the past?

18  A. Yes.   (Nods head affirmatively)

19  MR. COBELL:  No further questions for the witness,

20  Your Honor.

21  THE COURT:  Cross-examination, Mr. Arvanetes?

22  MR. ARVANETES:  Yes, Your Honor.

23  Can the government just put up the letter from Ms.

24  Wallace -- or from the USPS?

25  And that is -- and if the Court can -- I don't see the

1   Exhibit Number.  What exhibit is this?

2           THE COURT:  66.

3           MR. ARVANETES:  66.

4

5                   **CROSS-EXAMINATION**

6   **BY MR. ARVANETES:**

7   Q. So, is it Ms. Wallace?

8   A. Yes.

9   Q. Okay.  So, this letter, Exhibit 66 -- let's see -- was not

10  written by you.

11  A. That's --

12  Q. Correct?

13  A. Correct.

14  Q. It's on USPS stationary, correct?

15  A. Correct.

16  Q. And who is this "Haidee Schouten"?  Is that a real person,

17  or is that a --

18  A. Not that I'm aware.

19  Q. Okay.  And, uh -- and, so, you were -- she -- Ms. Durand

20  was sent this letter after the kayak trip to report on the

21  22nd of September to meet with you in Boise.  Is that fair to

22  say?

23  A. That's correct.

24  Q. All right.  And it concerns reducing the numbers of

25  employees who are on Periodic Rolls and Daily Rolls, is that

1    your understanding?

2    A. Yes, that's correct.

3    Q. Now, we've heard some testimony that the way the system

4    works is that every three years there has to be a medical form

5    put in, as well as a questionnaire by the client, and I was

6    wondering is this a part of the procedure, to have a meeting

7    like this with the person on Periodic Rolls, a face-to-face

8    like this?

9    A. I don't -- I don't do that line of work, so I can't answer

10   that question.

11   Q. You're not aware of that?  Okay.  All right.  And you were

12   posing as a vocational rehab specialist?

13   A. Correct.

14   Q. Do you have any training in any type of rehabilitation or

15   vocational rehab?

16   A. I do not.

17   Q. What about in -- well, strike that.

18       Let's go to Government's Exhibit 67.  This was -- this

19   was sent to her -- or did she fill this out during the

20   interview?  Is that --

21   A. Correct.

22   Q. Okay.  And did she fill it out in front of you, or --

23   A. Yes.

24   Q. Okay.  And can you read where it says -- Number 4, the

25   medications she was currently on?

1  A. Uhm, Morphine Sulphate, 20 milligrams, two times a day,

2  Topamax, 50 milligrams, two times a day.  And I don't know

3  what that is, Levothyroxine, 25 milligrams, one time a day.

4  Gabapentin, 600 milligrams, three times a day.  I don't know

5  what that says, Phenelzine HCC, I think, one time a day.

6  Meloxicam, as needed, 50 milligrams.  Buspirone HCL, 10

7  milligrams, three times per day.  Vitamin D, 2000 milligrams,

8  one time per day, and Atarax HCL, 25 milligrams, as needed.

9  Q. Okay.  And is that -- apparently, she takes that, not just

10  once a day, but sometimes two or three times a day, some of

11  these medicines.

12  A. That's what's stated, yes.

13  Q. In your experience, is that a lot of medication to take?

14  Do you have any ex -- you don't have any experience.

15  A. I don't have that experience.  (Shakes head negatively)

16  Q. Uhm, you talked about some of the background about the

17  kayak trip, and you talked a little bit about, I guess,

18  watching a video, and do you know how many hours that video --

19  video total was?

20  A. For the kayak trip?

21  Q. Yes.

22  A. No, I don't know the total number of hours of video.  I

23  know it was over a period of three days.

24  Q. Okay.  Did you watch every hour, every minute of the

25  video?

1    A. I did not.

2    Q. So, to help with your background, you consulted with the

3    agents to get a state of mind as to how to approach this

4    interview, is that fair to say?

5    A. That's correct.

6    Q. And one of the things I would assume was told to you was

7    that during the trip, the kayak trip, Ms. Durand was taking

8    her medication everyday, especially the Morphine and some of

9    the other pain relievers.

10   A. I was not told that.

11   Q. You were not told that at all?

12   A. No.

13   Q. You weren't told that Ms. Durand told Ms. Caters -- do you

14   know who Ms. Caters is?

15   A. I do not.

16   Q. All right.  And she was on the trip, too, right?

17   A. She was.

18   Q. Fair to say?  All right.  And were you told that Ms. Durand

19   told her that, "I was on Morphine during the trip"?

20   A. No, I don't recall being told that.

21   Q. You weren't told that at all?

22   A. No.

23   Q. All right.  But at least you know, you're aware that she

24   takes this daily.  Is that fair to say?

25   A. Yeah, that's what she was saying --

1   Q. Do you have any reason to believe that she wasn't taking

2   her medication during an arduous trip like a kayak trip?  Any

3   reason to believe that she wasn't on any medication?

4   A. Well, I don't -- I don't know what her actual prescriptions

5   by the doctor are, so I didn't realize --

6   Q. Well, these are them right here, what you just read.

7   A. Sure.

8   Q. So, I'm just asking you, is there any reason to believe

9   that -- in your mind, that she wasn't taking this medicine?

10  A. No, I don't -- I don't know whether she was or not.

11  Q. All right.  You're not -- are you looking at me, or are you

12  looking at -- I don't know who you're looking at.

13  A.  I'm looking at you.

14  Q. You're looking at me?  Okay.  All right.  So, she mentioned

15  about a cross-country trip, right?

16  A. Yes.

17  Q. She didn't hold back on that, she talked about it, where it

18  was to Kentucky or Tennessee.

19  A. Tennessee, I believe, yes.

20  Q. All right.  All right.  And she also talked about the kayak

21  trip.

22  A. Yes.

23  Q. Right?  She didn't -- she didn't hide that at all, she

24  talked about taking the kayak trip.  Is that fair to say?

25  A. She did tell -- yes, she did tell me that.

1   Q. All right.  Thank you.  She mentioned -- she talked about,

2   in Paragraph 1, her medical conditions.  Right?  (Nods head

3   affirmatively)  Is there --

4   A. (Viewing document)  Are you talking about on this form?

5   Q. Yeah, on the form, Government's Exhibit 67.

6   A. Yeah.  I can't see Number 1.

7   Q. Okay.

8   A. (Viewing document)  Okay.  Yes.

9   Q. And did she talk about -- well, she writes that she's got

10  chronic pain, right?

11  A. She does.  (Nods head affirmatively)

12  Q. She writes about an IPG implant.

13  A. Yes.

14  Q. Do you know what that is?

15  A. Uh, no.  I understand that it's an implant in her lower

16  back.

17  Q. Okay.  Like a pain stimulator or something like that?

18  A. Something along those lines.  I don't know what it does.

19  Q. She talked -- or did she tell you or did you know, to

20  prepare for this, that she had numerous operations on her

21  back?

22  A. I was told that, yes.

23  Q. And that she also had an operation for Thoracic Outlet

24  Syndrome.  Do you know what that is?

25  A. I -- I'm not familiar with what it is.

1    Q. But you're aware of --

2    A. I did read her medical background before her interview,

3    yes.

4    Q. All right.  Good.  And were you aware that the last time

5    she mentioned that she went kayaking was 2003?

6    A. (Pause)  During my interview?  Is that what you're asking?

7    Q. Well, just on the -- yeah.  I mean, on the forms that you

8    talked about today, did she mention that the last time she

9    kayaked was 2003?

10   A. I would have to review the form to see if she disclosed it

11   on there.  I don't recall that.

12   Q. Okay.  We will get to that.  Did she mention that she had

13   elbow problems after her kayak trip?

14   A. I do believe that I recall her saying something about her

15   elbow was bothering her at some point during the interview,

16   yes.

17   Q. Okay.  Now -- now, on Page 2 of Government's Exhibit 67,

18   she -- Paragraph 12.  Uhm, what does she write there in

19   Paragraph 12?

20   A. Uh, the question is, "Has your accepted medical condition

21   prevented you from enjoying any hobbies or recreational

22   activities or social activities that you were able to

23   participate in prior to your injury?  If so, please describe."

24   And she wrote, "Yes, I love gardening, hiking, roadtrips."

25   Q. Okay.  Do you think she was being in any way devious of

1  that -- in that response?

2  A. That she loves those things?  No.

3  Q. Yeah?

4  A. I don't believe she was being devious, no.

5  Q. All right.  And going back to that kayak trip video, you

6  saw most of the video?  Or how much -- can you estimate how

7  many hours you saw of the video?

8  A. Yeah, I probably watched -- well, I mean, I watched clips

9  of it that were given to me from the case agents.  So, it was

10 probably an hour or so worth of the video that I watched.

11 Q. Did you ever see her running?

12 A. I did not see her running.

13 Q. Okay.  Good.  Paragraph 13, you weren't able to -- do you

14 understand what she was saying in Paragraph 13?

15 A. She left it -- it looks like she left it incomplete in

16 terms of her actual written response.

17 Q. And the question is, Do you consider yourself totally

18 disabled and unable to perform any assessment (sic) for the

19 Postal Service, meaning the USPS, and why didn't you ask her

20 what she meant?

21 A. Well, this was -- this is just on the forms.  So, I

22 believe, during the interview, we did go back through exactly

23 what she could or couldn't do.  And during the course of that

24 interview, she told me that she basically could not get out of

25 her chair most days.

1  Q. All right.  But as far as -- that question is pretty

2  important, isn't it?

3  A. Yes.  And we did discuss in -- throughout the interview

4  that information related --

5  Q. That's a simple question.

6  A. -- related to this question, yes.

7  Q. Did you ask her that specific question?

8  A. I don't recall whether I specifically asked her what her

9  answer was.  I would have to go back and review the video.

10  Q. Fair to say that you did not?  Or you just don't recall.

11  A. I don't recall.

12  Q. Okay.  That's fair.  Did she talk about, not only her

13  physical injuries, but, also, her psychological injuries?

14  A. She did.  She did tell me at one point that some of her --

15  some of her issues are due to just the fact that she can't get

16  out and do the things that she used to do and has been in a

17  slightly depressed state as a result of that.

18  Q. And, in fact, Paragraph 4, some of the medications may, or,

19  at least, go toward the depression issue.

20  A. I don't -- I don't know, I'm not familiar with those

21  medications.

22  Q. All right.  Paragraph -- let's go to Page 3, I believe.

23  Read -- can you read that question, Number 19?

24  A. "What is the maximum amount you can lift (Check One)?"

25  Q. And what did she check?

1   A. She checked "21-30 pounds," and then wrote, "heavily

2   medicated - 50lbs not smart."

3   Q. "Not smart."  "Heavily medicated," meaning she -- with

4   being heavily medicated she could probably lift more weight.

5   A. Okay.

6   Q. Is that how you took that?  Or how do you take that?

7   A. As I read it, it says that she can lift 21 to 30 pounds,

8   and, then, if she is heavily medicated, so 50 pounds isn't

9   smart.

10  Q. Okay.  So, she may be able to do more when she's medicated.

11  Do you agree with that?

12  A. I don't know, I'm not a doctor.

13  Q. Do you know how -- how much the kayaks weigh?

14  A. I don't.

15  Q. You don't.  Do you have a kayak, yourself?

16  A. No.

17  Q. Do you kayak?

18  A. I have been kayaking.

19  Q. When was the last time you went?

20  A. Probably, two years.  (Nods head affirmatively)

21  Q. Do you know how much that kayak weighed?

22  A. It was -- it was too heavy for me to -- it was too heavy

23  and bulky -- it was a one-person kayak -- for me to carry

24  without struggling a little bit.  I mean, I could drag it -- I

25  could drag it across the ground, but...

Q. Drag it.  But you couldn't pick it up over your head or

something like that.  I mean, she --

A. Yeah, it would take me some work to be able to pick that

one up.

Q. But you never saw --

A. It was a pretty big kayak.

Q. I'm sorry.  But you never saw Debbie pick up the kayak over

her head in the video where --

A. In the video I saw -- just saw her hold it under her arm

and pull it.

Q. Kind of drag it along?

A. I believe there was somebody else actually carrying --

Q. Someone helping her.

A. -- it with her.  On the back -- on the back end.  It was a

two-person kayak.

Q. Okay.  All right.  So, someone was helping her.

Now, Question Number 21 on Page 3.  It says, "Please

check the box in Section A which best describes your average

abilities over the past month."  Now, stopping for a moment,

who writes up these questions?

A. On these forms?

Q. Yeah?

A. We do.

Q. Yeah, you guys do.  Right?

A. Our agents do, yes, sir.

1   Q. And you testified that these -- a lot of these questions

2   are designed similar to what a doctor's questions would be,

3   fair to say?

4   A. Correct.

5   Q. In fact, you testified to that, so...  There is nothing in

6   that question about the context of doing these kind of things

7   either medicated or not medicated.  Is that fair to say?

8   A. It's -- specific to whether there is medication involved in

9   these activities?

10  Q. Well, I'm asking you.  The contents of this --

11  A. That's what I'm asking.  I don't understand.

12  Q. The question does not mention anything about the difference

13  between being medicated or not medicated.

14  A. That's correct.

15  Q. Well, wouldn't you think that, if it was a doctor's form,

16  that would be very important?

17  A. I've seen doctors' forms that look exactly like this for

18  Workers' Compensation.  Some of these questions come directly

19  out of the type that I saw on some of those forms.

20  Q. Okay.  But can you testify today that this specific

21  question came directly out of a doctor's form?

22  A. No, I cannot.

23  Q. And would you agree that it would be important, if you're a

24  doctor, to know about the context of doing these activities

25  when you're medicated versus when you're not medicated?

1    A. It depends on the context of the question, and I'm not a

2    doctor.

3    Q. Good enough.  Mr. Cobell asked you about whether she could

4    put in a fence, put in a post, chainsaw, hand-feed horses,

5    pick up trash, right?

6    A. Yes.

7    Q. Did you ask whether she could do those specific items?

8    A. No.  I didn't ask specifically on all of those items, no.

9    Q. No.  You didn't ask whether she could build a fence, did

10   you?

11   A. No.

12   Q. You didn't ask whether she could put in a post.

13   A. No.

14   Q. You didn't ask whether she could run a chainsaw.

15   A. No.

16   Q. You didn't ask whether she could pick up trash cans.

17   A. No.

18   Q. No.  Now, let me get to -- now, let's talk about the Snow

19   Bird Recreation.  I think it's 60 -- let's go to 65.

20            THE AGENT:  56.

21            MR. ARVANETES:  56.

22   **BY MR. ARVANETES:**

23   Q. So, before I get to -- let's see.  Before I get to 56 --

24   this is bizarre.  Let's talk about 57, first.

25            MR. ARVANETES:  Can the gentleman kindly give me 57?

**BY MR. ARVANETES:**

Q. Now, we talked a little bit about this.  Are you Sandy

Black, too?

A. No.

Q. So do you know who Sandy Black is?

A. Yes.  She is another agent.

Q. Now, let's talk a little bit about this form.  This was

part of your undercover operation, is that fair to say?

A. It was part of the, yeah, undercover operation.  It was not

mine.

Q. All right.

A. This is -- but I didn't play a role in this specific

letter.

Q. Well, it was brought up in your direct, so --

A. Sure.

Q. -- I'm going to ask you about it.  So, was this -- I mean,

did Debbie search out Snow Bird Promotions in order to get a

free kayak trip?

A. No.

Q. How did she become aware of Snow Bird Recreational

Promotions?

A. My agency sent her the survey.

Q. You guys, your agency sent her the survey.  Unsolicited, is

that fair to say?

A. That's correct.

1   Q. And, as an unsolicited letter, you -- it starts out by

2   saying, "Congratulations again on winning the adventure

3   package for two as a result of completing our survey."  What

4   do they mean by "again"?  Was there a previous promotion, that

5   you know of?

6   A. I don't.

7   Q. That was unsolicitedly given to her?

8   A. I don't know, I didn't send this letter.

9   Q. Okay.  It says, "Snow Bird Recreational" the next sentence,

10  "is pleased that you and your guest are officially booked for

11  a  three day and two nights guided kayaking tour of the San

12  Juan Islands with Crystal Seas!"  With an exclamation point.

13  Was that something that she had a choice of declining?

14          MR. COBELL:  Objection, Your Honor.  This is outside

15  of the scope of direct and not the proper witness to be

16  addressing this exhibit with.

17          THE COURT:  Well, I'll give him some latitude.  But

18  it was discussed during Ms. Wallace's direct examination.

19       Go ahead, Mr. Arvanetes, if she knows it.

20          MR. ARVANETES:  Thank you.

21  **BY MR. ARVANETES:**

22  Q. Do you want me to ask the question again?

23  A. Yes, can you repeat the question for me, again, please?

24  Q. Sure.  Of course.  So, the second sentence says, "Snow Bird

25  Recreational Promotions is pleased that you and your guest are

1    officially booked for a three day and two nights guided

2    kayaking tour of the San Juan Islands with Crystal Seas!," and

3    my question is was she given an opportunity to back out of

4    that?

5    A. I don't know, I didn't make that coordination with her.

6    Q. Because it looks like it's a past tense, "booked."

7    A. I would --

8    Q. Like it's already been --

9    A. I would assume that she didn't have to go on the trip if

10   she didn't want to.

11        MR. COBELL:  Your Honor, just my objection is that

12   Agent Wallace clearly wasn't the one who participated in this

13   portion of the investigation.

14        THE COURT:  All right.  Your objection is overruled.

15   We'll see where he is -- I guess we wouldn't get much

16   information, if that's the case.

17        Go ahead, Mr. Arvanetes.

18        MR. ARVANETES:  Thank you.

19   **BY MR. ARVANETES:**

20   Q. And at the -- the penultimate sentence, the second to the

21   last sentence of the first paragraph, it says, "...and this is

22   just our way of showing our gratitude!"  "Gratitude," what

23   gratitude are you talking about?

24   A. Her filling out the Consumer Research Survey.

25   Q. And that Consumer Research Survey, is that -- was that

1  something that -- how should I say?  Uhm, was that in the

2  context to her knowledge of her OWCP claim overall?  Do you

3  know?

4  A. I don't know why -- I don't know.  (Shakes head negatively)

5  Q. Okay.  Was it in any way -- was she told that it was

6  connected to her OWCP claim?

7  A. No.

8  Q. What about the evaluation survey that we're going to talk

9  about next after we talk about this letter, that was something

10 that was asked for her to complete; is that correct?

11 A. Yes, it was mailed to her.

12 Q. The Snow Bird Recreation Promotions Evaluation Survey --

13 A. Yes.

14 Q. -- that we discussed.

15 A. Yes.

16 Q. That we discussed on direct.  That was also something that

17 was also mailed to her by your agency.

18 A. Correct.

19 Q. And then it says in the next sentence, "It is imperative"

20 -- imperative -- "that you do not disclose your affiliation or

21 role with our company."  What affiliation and role?  Is she

22 buying into this company or -- what is her affiliation and

23 role with this company?

24 A. I can't speak to that, I didn't write this letter.

25 Q. Then a couple of sentences later, "By maintaining

1  confidentiality about your participation in the Snow Bird

2  Recreational tour -- Snow Bird Recreational Promotions

3  evaluation program, this will ensure the services and

4  treatment that you receive during your tour are as authentic

5  as possible."  Is that a -- was it authentic or -- it was a

6  sham, it was a ruse, was it not?

7  A. It was a ruse, yes.

8  Q. So, this sentence is -- is basically lying to her.

9  A. Yes.

10  Q. And why would she have to maintain confidentiality?

11  A. Because the ruse is that it's a mystery shopper-type

12  promotion.

13  Q. And I have never had the fortune -- I've never been a

14  mystery shopper, so what does that mean?

15  A. So, a company will have you, for example, go on a promotion

16  of some sort, they will pay for you to go on it, and then rate

17  on your experience for them so they can evaluate it through

18  whatever their purpose is.

19  Q. So, why -- I don't understand -- I mean, why would it have

20  to be confidential?  Confidential to whom?

21  A. So that you don't disclose it to the person that you're

22  acting as mystery shopper for or to.

23  Q. So, the -- what?  The people on the trip, as well, I guess?

24  So that they don't know that you're getting it for free or --

25  A. Yes.

1   Q. I mean, what do you mean?

2   A. That would be my assumption, by the way that's written.

3   Q. And, then, again, it goes back to this evaluation.  We

4   represent -- "We rely heavily upon your experiences and

5   feedback to increase the quality of services and product they

6   provide."

7        Again, that's -- you're wanting her to write the

8   evaluation.

9   A. That's correct.

10  Q. And you say in the next paragraph, "It will only take 15

11  minutes."  Right?

12  A. Yes, that's what it says.

13  Q. And you even go to the added -- you actually pay for her

14  postage with a return envelope.

15  A. Correct.

16  Q. That's your agency, right?

17  A. Yes.

18  Q. And you even give a deadline.

19  A. Yes.

20  Q. And, then, it even says, if you com -- "Once your completed

21  survey," you will not -- you may -- "you will receive

22  additional complimentary offers to travel and shop at other

23  great locations."  Again, trying to get her hooked in, fair to

24  say?

25  A. Yes.

1   Q. All right.  So, it's fair to say, from the beginning of

2   this ruse, sending that -- well, you won this letter -- or you

3   won this trip, you're a mystery shopper, you got -- your

4   agency, which is a government agency, am I -- fair to say?

5   A. That's correct.

6   Q. OIG?

7   A. Yes.

8   Q. The USPS/OIG was involved in the beginning, right?

9   A. Correct.

10  Q. And, then, they paid for her airplane.

11  A. Yes.

12  Q. Correct?  Right?  And they pay for her kayak trip.

13  A. Yes.

14  Q. So, they're involved, your agency, the government, during

15  this ruse?

16  A. Yes.

17  Q. Fair to say?  And they're even involved at the conclusion

18  of the ruse, which is your fake interview in Boise on

19  September 27th.

20  A. Correct.

21  Q. Okay.  Thank you.  So, it's fair to say that your agency

22  had a very large role, if not the ultimate role, in this ruse.

23  A. It was our undercover operation.  We developed it and put

24  it into play, yes.

25  Q. Okay.  Great.  Thank you.

1    MR. ARVANETES:  May I have a moment, Your Honor?

2    THE COURT:  You may.

3

4            **(Discussion off the record.)**

5

6    **BY MR. ARVANETES:**

7    Q. Did they get -- did they -- did your agency also award her

8    a coupon card for $50?

9    A. That, I'm not aware of.  (Shakes head negatively)  I don't

10   know if that happened or not.

11   Q. All right.  Fair enough.  Thank you very much.

12            THE COURT:  Mr. Cobell, any redirect?

13            MR. COBELL:  Briefly, Your Honor.

14

15            **REDIRECT EXAMINATION**

16   **BY MR. COBELL:**

17   Q. Agent Wallace, during this interview that you had with Ms.

18   Durand, is that type of interview designed to give the

19   recipient of Workers' Comp the opportunity to come clean and

20   speak the truth?

21   A. Yes, she has the opportunity to answer those questions

22   however she sees fit.  So, whatever her truth is, that's the

23   purpose of it.  (Nods head affirmatively)

24   Q. In addition to the bottom of her questionnaire that she

25   filled out during that interview that she certified that she

1  was going to tell the truth, did you encourage her verbally to

2  be truthful during that interview?

3  A. Uhm, I think we briefly discussed it, and I discussed with

4  her that statement before she signed it.  (Nods head

5  affirmatively)

6  Q. Okay.  Now --

7          MR. COBELL:  No further questions, Your Honor.

8

9              **(Discussion off the record.)**

10

11         THE COURT:  Is the witness excused?

12         MR. COBELL:  Yes, Your Honor.

13         THE COURT:  You may step down.  Thank you, Ms.

14  Wallace.

15     We are going to take a ten-minute recess.

16

17              **(Recess taken.)**

18

19         THE BAILIFF:  The United States District Court is

20  again in session.

21         THE COURT:  Please be seated.  Mr. Weldon, what do

22  you have planned for the rest of the day?

23         MR. WELDON:  Well, I'm moving ahead at a slower

24  pace, Your Honor, than this morning, but we're getting there.

25         THE COURT:  All right.  And how many witnesses

 1    before we break?

 2              MR. WELDON:  Depending on cross, Your Honor, I was

 3    hoping for at least one.

 4              THE COURT:  I was, too.

 5              MR. WELDON:  (Nods head affirmatively)

 6              THE COURT:  I'm hoping two, maybe.

 7              MR. WELDON:  Yes, Your Honor.

 8              THE COURT:  All right.  Go ahead.  Call your next

 9    witness, please.

10              MR. WELDON:  Yes.  Yes, Your Honor.  Just so the

11    Court is aware, I do have two witnesses waiting.

12              THE COURT:  Great.

13              MR. WELDON:  The United States calls Doctor Hood.

14

15                   **(The witness was duly sworn.)**

16

17              THE WITNESS:  I do.

18              CLERK OF COURT:  (Indicating)

19              THE COURT:  Good afternoon, sir.

20              THE WITNESS:  Good afternoon.

21              THE COURT:  Would you please state your full name

22    and spell your last name.

23              THE WITNESS:  It is James Furniss, F-U-R-N-I-S-S,

24    Hood.  (Nods head affirmatively)

25              THE COURT:  Go ahead, Mr. Weldon.

1    MR. WELDON:  Thank you, Your Honor.

2

3                    **DIRECT EXAMINATION**

4    **BY MR. WELDON:**

5    Q. Sir, what do you do for a living?

6    A. I'm a physician.

7    Q. And how long have you worked in that capacity, sir?

8    A. I've been an Orthopedic Surgeon for 40-some-odd years.

9    Q. Can you tell the Court about some of your educational

10   background?

11   A. Yes.  I went to the University of Texas, in Austin.  I was

12   accepted to medical school after three years.  I went to the

13   University of Texas Medical Branch at Galveston, and I

14   received my M.D. Degree in 1966.  From there, I went to

15   Memphis, Tennessee, at the City of Memphis Hospitals and did a

16   straight medicine internship.

17       At that time, I was drafted into the United States Army.

18   I spent 1967 and 1968 in Vietnam as a General Medical Officer.

19   I returned to the states and did a second year in the Army at

20   Fort Gay, Virginia.  I then returned to Memphis and did a

21   four-year orthopedic residency at the Camel Clinic, associated

22   with the University of Tennessee, at Memphis.

23       I went into orthopedic practice in Austin, Texas, in

24   1974.  I did general orthopedics; but because of my fondness

25   for children, I sort of gravitated into pediatric orthopedics.

1    I retired from orthopedic surgery in 1995.  That was hard,

2    frankly.  The emergency room and the children's orthopedics

3    took a big toll emotionally.

4        I then went into the Workers' Comp arena as a physician.

5    I spent nearly two years, two-and-a-half years as a physician

6    with an occupational medicine clinic called Concentra.  I was

7    their orthopedic consultant in Houston.  I went from clinic to

8    clinic and saw difficult cases.

9        It was then that I started additional peer reviews and

10   the examination of individuals in the work comp system, and

11   that's been my main focus since 2001.

12   Q. Since you retired from surgery, sir?

13   A. Yes.

14   Q. Now, did you have the opportunity, then, to see Ms.

15   Durand?

16   A. Yes, I did.

17   Q. Can you explain, first of all, the process, and then what

18   it is that you saw when Ms. Durand stopped by your office?

19   A. Well, in this system, you're asked a series of questions,

20   and the first part of any exam is the history.  And it's what

21   you expect someone to give you as to their injury, how it

22   happened, what treatment they've had, and how they're doing,

23   along with past history.  And then you take that down in a

24   written form, first, and then we ask questions.

25       And then the second part is a physical examination, in

1    which we look for objective findings.

2    Q. When you say "objective," what do you mean, Doctor?

3    A. Objective -- subjective is what someone tells you, "I have

4    back pain," "I have a headache."  Objective are physical

5    findings, palpable tenderness, palpable muscle spasm,

6    decreased range of motion, range of motion, muscle strength

7    testing, reflexes, sensory.

8        Now, in truth, though, there are only three things in the

9    lumbar spine that are considered objective:  Palpation

10   (indicating) --

11   Q. When you say "palpation," what do you mean, sir?

12   A. I mean, where you touch the person and determine if they

13   have muscle spasm.  The same way a chef would touch a steak

14   and see if it's rare or well done, a trained orthopedic

15   surgeon can tell.

16       The next objective would be reflexes.  And then the final

17   is atrophy, whether or not there is any decrease in

18   circumference of one leg or one arm versus the other.  All the

19   rest can be under subjective, voluntary control.

20   Q. And, so, when you're going through that process, Doctor,

21   you're looking for both the objective, as well as the

22   subjective; is that right, sir?

23   A. Yes.  The other objective findings happen to be imaging

24   studies, other evidence that might come under the form of

25   surveillance and so forth, and that's it.

1    Q. Now, in this case, then, did you have the opportunity to

2    look at the objective findings for Ms. Durand?

3    A. Yes.

4    Q. Can you explain to the Court what it is that you found that

5    was objective about Ms. Durand's condition?

6    A. She had subjective complaints of back and neck pain.  From

7    a standpoint of a cervical and upper extremities, I found that

8    she had a normal range of motion.  She had complaints

9    subjectively of pain in her left arm and had what we call

10   global giveaway weakness.

11   Q. What is that, sir?

12   A. That means that in every single muscle that was tested,

13   that includes biceps, triceps, deltoid, wrist extensors,

14   fingers, they will all giveaway, the same weakness.  But the

15   reflexes were normal, there was no atrophy.

16        Because there was a little conflict between her

17   subjective and what I found objectively, I then requested

18   another objective test called an EMG Nerve Conduction Study.

19   Q. Could you explain that process and what it means, sir?

20   A. Consider an EKG, where they put electrodes on your chest

21   and look at a machine and it gives out a reading, an EMG is

22   similar, in that a physician will put a little needle directly

23   into a certain muscle, and he will look at the machine and see

24   if that muscle has the right nerve supply or is there any

25   muscle damage.  And that test was normal.

1    There had been several other tests that had been

2    normal.

3    Q. For Ms. Durand.

4    A. For her.  So, from the standpoint of the cervical spine and

5    the diagnosis of cervical radiculopathy or thoracic outlet

6    syndrome, I found nothing objectively to support that.

7    Q. Now, Doctor, while we have those terms, could you break

8    down those terms for us so that I can follow you, sir?  The

9    two diagnoses that you said she did not have.

10   A. Cervical radiculopathy would be when there's a certain

11   level of a disc in the neck that would press upon a nerve

12   root.  For instance, if it's the disc between C-4 and C-5, you

13   would expect weakness only in the deltoid or biceps, and a

14   decreased reflex at the biceps.

15       A thoracic outlet is a vague term in which the nerves

16   that come in a bundle from the neck beneath the collarbone,

17   it's called a brachial plexus, there are three nerves, radial,

18   medium, and ulna, they form a branch under the collarbone.

19       A thoracic outlet has to do with some impact on the

20   brachial plexus at that level.  It can be vascular, related to

21   arterial, or it can be neurological.  That diagnosis had been,

22   quote, "made" in the medical records, but I found absolutely

23   no evidence objectively of that.

24       Cervical radiculopathy, again, is where there's a piece

25   of the disc that presses on a specific nerve root and produces

1   muscle weakness, reflex changes, sensory loss.

2   Q. Now, Doctor, were you aware of some of the injuries that

3   Ms. Durand had as part of your examination for her?

4   A. I don't recall that she had an injury.

5   Q. Now, let me ask you this, then.  Were you aware of some of

6   the surgeries that she had for -- for example, her fusions?

7   A. Yes.

8   Q. Can you explain that to the Court and whether or not you

9   expected her to recover from those surgeries?

10  A. She had an initial surgical procedure called a discectomy,

11  where the physician felt that there was evidence of a disc

12  pressing on the exiting nerve root.  That's a small procedure

13  called a laminectomy.  It can be done with a very small

14  incision.  And the purpose is to remove the disc materials

15  from the nerve root.  And when done for the appropriate

16  reasons, and done correctly, it's curative.

17      She continued to complain.  They did additional

18  diagnostic studies called discograms, which a discogram is

19  where a physician will inject a med -- a dye directly into a

20  disc.  There are two parts of it, one is -- wants to know,

21  does that hurt?  Is the pain the same pain as you're having?

22  And then they will do a CT scan and look at what happens to

23  that dye after it has been injected into the disc.

24      As a result of that discogram, she had a two-level fusion

25  between the last two vertebrae.  There are five vertebrae in

1    the lumbar spine, the last two are L-4-5 and L-5-S-1.  A

2    fusion is a procedure in which the movement of those vertebrae

3    are just taken away, they are fused, so that there is no --

4    they think it's painful motion, and that's the purpose of the

5    fusion.

6    Q. Now, sir, are you aware of anybody who has had that

7    procedure besides Ms. Durand?

8    A. I've had a two-level fusion, from L-4 to the sacral.

9    Q. So, you've had, essentially, the same fusion.

10   A. Yes.  I had it for a congenital abnormality known as

11   spondylolisthesis.  I was born with it.

12   Q. How many hours do you work per week, sir?

13   A. Sixty.

14   Q. How old are you?

15   A. 76.

16   Q. When did you have your procedure?

17   A. 1990.

18   Q. So you've been working that entire time, that amount of

19   hours.

20   A. I have to say that I missed two months earlier this year

21   because of open heart surgery.

22   Q. All right.  But other than that, you've been working.

23   A. Yes.  I have not missed a day in 16 years, other than the

24   surgery.

25   Q. Now, then, you ultimately reached a conclusion with Ms.

1  Durand; is that right, --

2  A. Yes.

3  Q. -- Doctor Hood?

4  A. Yes.

5  Q. Now, what was your conclusion based on?  Because you didn't

6  have the objective evidence that we just went through, so what

7  were you relying on when you spoke with Ms. Durand?

8  A. I -- looking back on it, to be honest, I don't know.  I

9  must have felt sorry for her.  Which is very unusual for me,

10  because I'm usually extremely objective.  And from that point

11  on or ever before I cannot ever recall, honestly, under oath,

12  saying that someone is totally incapable of doing anything.

13  Q. And what do you mean by that, Doctor Hood?

14  A. I mean that unless you are a paraplegic, I think everybody

15  can do something.  I think it is beneficial, psychologically,

16  to work.  I think to tell someone that you cannot work and

17  you're totally disabled is a slow death sentence.

18  Q. Now, in this case, Doctor Hood, you relied on the

19  statements of Ms. Durand; is that right?

20  A. Yes.

21  Q. And your conclusion was that her subjective statements were

22  disingenuous; is that right, sir?

23  A. I'm sorry?

24  Q. Her statements to you about her pain and her abilities were

25  disingenuous when she spoke to you at the exam; is that right,

1    sir?

2    A. Not at that time.

3    Q. And, at that time, they were not accurate statements that

4    she provided.

5             MR. ARVANETES:  Objection; leading, Your Honor.

6             THE COURT:  Rephrase it.

7             MR. WELDON:  Well, I want to make sure I get this

8    straight, Your Honor.

9             MR. ARVANETES:  Yeah.

10   **BY MR. WELDON:**

11   Q. Doctor Hood, when you had the interview with Ms. Durand,

12   did you rely on her statements about her level of pain?

13   A. Yes.

14   Q. Okay.  And did those statements turn out to be accurate

15   according to -- according to what you later learned?

16   A. No.

17   Q. Okay.  And let's talk about that.  Were you, then,

18   ultimately showed a video of Government's Exhibit 69, which is

19   her at her house?

20   A. Yes.  (Shakes head negatively)

21   Q. Okay.  And did you see some of the activities that she was

22   involved in there, Doctor Hood?

23   A. Yes.

24   Q. Okay.  Can you explain just generally what stuck out and

25   caught your attention about Ms. Durand?

1    A. I saw a video of her at a horse farm, or with horses.  She

2    was walking normally, no evidence of a limp or any external

3    support.

4        I then saw a video of her in a kayak, in rapids or rough

5    water.

6    Q. And that was open ocean water?

7    A. I don't know whether it was open ocean or lake or a

8    river.

9    Q. But you, at least, saw the kayak.

10   A. Yes.

11   Q. Now, let's talk, then, about bending.  Did you see her

12   bending at all, --

13   A. Yes.

14   Q. -- Doctor Hood?

15   A. Yes.

16   Q. Why did that matter for you, sir?

17   A. Well, if you can bend, that means that there is an ability

18   to bend, to do activities of daily living, tie your shoes,

19   pick up stuff, to put on your clothes.

20   Q. To go to work?

21   A. Yes.

22   Q. Now, when you go through the process of a medical

23   examination, do you ask your patients, or the people your

24   evaluating, whether or not they can bend and twist and do all

25   of these sorts of activities?

1    A. Yes.

2    Q. Okay.  And did Ms. Durand ever tell you that she could do

3    those sorts of activities that you saw in the videos, sir?

4    A. No.

5    Q. Did she ever tell you that she could use a chainsaw?

6    A. Uh, no.

7    Q. What about did she ever talk to you about clearing a

8    five-acre plot of land?

9    A. No.

10   Q. Would that have changed your mind, if you knew she was

11   doing that?

12   A. Yes.

13   Q. While we are on that topic, Doctor Hood, did you ever see

14   the video of -- the 2008 video when you did your initial

15   evaluation?

16   A. No.  And I have her records here, and in that record is a

17   small note, January 2008, in which her treating physician

18   apparently was shown a video.  And he opined at that time,

19   because of that, that she could work.

20       I never saw that (indicating) until I requested these

21   medical records for this thing.  So, he did -- he had seen it,

22   but I did not see that at the time of my exam.

23   Q. And, certainly, Ms. Durand didn't tell you about those

24   activities, did she?

25   A. No.

1   Q. Now, did she tell you about her ability to dig post

2   holes?

3   A. No.

4   Q. What about riding horses?

5   A. No.  (Shakes head negatively)

6   Q. Would -- would that be something important for you to know

7   as a doctor with the spinal injury?

8   A. Yes.

9   Q. Why, sir?

10  A. Well, if you really have severe problems related to a spine

11  injury, one of the worst possible things would be the

12  up-and-down movement of a horse, riding a horse.

13  Q. What about two or three times a week riding a horse?

14  A. That would be bad.

15  Q. Now, what about mowing the lawn?  Did Ms. Durand talk to

16  you about mowing the lawn at all at her place?

17  A. No.

18  Q. Did she tell you that she would pick up and take out the

19  trash?

20  A. No.

21  Q. Did she tell you that she was active outside?

22  A. No.

23  Q. Did she ever tell you that she could bend, squat, walk, and

24  kneel?

25  A. No.

1    Q. In fact, did she tell you the opposite, sir?

2    A. She just said that she was in severe pain, and she was on

3    three medications and not working.

4    Q. And she couldn't --

5    A. Not able to work.

6    Q. And she couldn't work.

7    A. That's right.

8    Q. All right.  Now, after you've seen the videos, Doctor Hood,

9    do you feel like you were tricked by Ms. Durand?

10   A. I was distressed and, to put it mildly, a little

11   embarrassed, because that -- looking back on it, that was

12   something that -- I can't explain it (shakes head

13   negatively), but I was angry, as well.  (Nods head

14   affirmatively)

15   Q. And why were you angry?

16   A. I was angry both at myself and her.  And, as well, that I

17   did not have access to the same video that her treating

18   physician had had six months before my exam.

19   Q. Would that have changed your mind?

20   A. Absolutely.

21   Q. Had you seen that and known about it?

22   A. Yes.

23   Q. Now, let's talk, then, Doctor Hood, I want to show you

24   Government's Exhibit 18, please, sir.  And I'm going to point

25   you to the middle here on the medical section.

1      And do you see that, sir, where it states, "On July 30 of

2   2008"?

3   A. Yes.

4   Q. And what is that, sir?

5   A. It's a memorandum for a file of her -- about her medical,

6   and it has a totally erroneous statement.

7   Q. And, of course, that's based on your opinion; is that

8   right, Doctor Hood?

9   A. Yes.

10   Q. Okay.

11   A. Of course, I didn't -- I didn't say that.

12   Q. Well, now, but, then, let's make sure we're clear here.

13   So, for Government's Exhibit 18, you're the Doctor Hood

14   they're talking about.  Is that right, sir?

15   A. Yes.

16   Q. All right.  So, then -- and, then, of course, your report

17   is attached to that.  Is that right, Doctor Hood?

18   A. That's right.

19   Q. All right.  And, then, Doctor Hood, I want to show you, if

20   we could, Government's Exhibit 14, please.

21      Now, Doctor Hood, this is a January 18th of 2008,

22   restriction for work, and I just want to show you some of

23   those restrictions.

24          MR. WELDON:  If we could scroll down, please?

25   **BY MR. WELDON:**

1    Q. Would you have allowed Ms. Durand, at the time when you did

2    the second medical opinion, to engage in these activities, as

3    well?

4    A. Absolutely.

5    Q. And, so, she would have been cleared for work, from you,

6    had you had all of that information.

7    A. Yes.

8    Q. That includes the statements from Ms. Durand, if you would

9    have had straight answers.

10   A. Yes.

11   Q. Then I will show you, if we could, Government's Exhibit 15.

12          MR. WELDON:  And if we could scroll down, please?

13   **BY MR. WELDON:**

14   Q. Now, Doctor Hood, this is, ultimately, the job offer that

15   came out based on those restrictions, do you see there the

16   physical requirements of this modified assignment?

17   A. Yes.

18   Q. Can you take a moment to look at those, sir, and tell the

19   Court whether or not you would have authorized those for Ms.

20   Durand based on all of the information that you have now.

21   A. Yes.

22   Q. Now, you also reviewed the kayaking video and the video at

23   her house; is that right, sir?

24   A. That's correct.

25   Q. Okay.  Did that provide further proof for you that she was

1    capable of working?

2    A. Yes.

3    Q. Okay.  Now, would Ms. Durand have been able to work, from

4    that 2008 time period until 2015, based on your review of the

5    videos in this case?

6    A. Yes.

7              MR. WELDON:  May I have just a moment, Your Honor?

8              THE COURT:  You may.

9

10                   **(Discussion off the record.)**

11

12             MR. WELDON:  I have no further questions, Your

13   Honor.  Thank you.

14             THE COURT:  Cross-examine?

15

16                   **(Discussion off the record.)**

17

18                     **CROSS-EXAMINATION**

19   **BY MR. ARVANETES:**

20   Q. Good afternoon, Doctor Hood.

21   A. Good afternoon.

22   Q. How -- how did you get here today?

23   A. Plane.

24   Q. Who paid for the plane?

25   A. I did, so far.

1    Q. Are you going to get reimbursed by the federal

2    government?

3    A. That's up to my billing and scheduling company.

4    Q. Would you like to?

5    A. I don't care.

6    Q. What about your time today?  Do you have a -- do you have

7    an active practice right now, sir?

8    A. No.

9    Q. So --

10   A. You mean do I see patients?  No.

11   Q. Yeah.

12   A. I'm sort of like a lawyer who became a judge.

13              THE COURT:  (Laughing)

14              MR. ARVANETES:  (Laughing)

15              THE WITNESS:  Or like Billy Martin who was a great

16   baseball player who became a coach.  That's what I meant, yes.

17              MR. ARVANETES:  Yeah, I'll remember that.

18              THE COURT:  That's right up my alley.

19              MR. ARVANETES:  (Laughing)

20              THE COURT:  (Laughing)

21   **BY MR. ARVANETES:**

22   Q. So, do you have a physical office, though, at all, or

23   not?

24   A. I have several physical offices, yes.

25   Q. So, is your percentage -- from zero to 100, what is your

1    percentage of patients you see through the OWCP, the Federal

2    Workers' Comp program?

3    A. I'd say they're around 20 percent.  The rest are --

4    Q. The rest are what?

5    A. Texas Workers' Comp, Workers' Comp from other states,

6    Philadelphia, New York.  (Nods head affirmatively)

7    Q. So, besides Workers' Comp cases from Philly; New York;

8    Texas; Austin; College Station, maybe; federal, do you see any

9    other patients?

10   A. If anybody's lucky enough to get me, they can get a

11   consultation and treatment.  But that's very infrequent now.

12   Q. All right.  So, easy, maybe 99 percent of your cases are

13   Workers' Comp cases.

14   A. That is correct.  (Nods head affirmatively)

15   Q. And, so, you're here today to testify about a patient, what

16   would -- did you have an actual doctor/patient relationship

17   when you saw Debbie Durand in 2008?

18   A. No.  We make it very clear that there's no doctor/patient

19   relationship.

20   Q. With a -- with all of these Workers' Comp type of cases,

21   you're there to kind of see them, kind of a one-shot see -- a

22   one-shot deal like you did with Debbie.

23   A. I sometimes see patients many times over throughout the

24   years with chronic problems, yes.

25   Q. Okay.  With Debbie, though, you saw her one time.

1    A. One time.

2    Q. One time.  And that was in 2008?

3    A. That's correct.

4    Q. July.

5    A. That's correct.

6    Q. Now, you've been asked to come here today to talk about

7    Debbie Durand, she goes by Durand now, almost 10 -- 10 years

8    later.

9    A. That's correct.  (Nods head affirmatively)

10   Q. And your testimony is based upon seeing a couple of videos.

11   A. A couple videos, and that letter from her own treating

12   physician of January of 2008, which I --

13   Q. From January of 2008.

14   A. Yes.

15   Q. That's a person by the name of Doctor Strausser.

16   A. Yes.

17   Q. Is that right?

18   A. Yes.

19   Q. And, to your knowledge, was he her primary care

20   physician?

21   A. In the system we have, he was probably not her primary care

22   physician.

23   Q. Because he's a -- he's a cutter, basically.  He's a

24   spine -- he's a surgeon.

25   A. That's correct.

1    Q. All right.  So, we know -- you established that you don't

2    have a relationship -- you didn't have a doctor/patient

3    relationship with Debbie.

4    A. That's correct.

5    Q. And you only saw her once.

6    A. That's correct.

7    Q. And you're here today saying that back in 2008 she wasn't

8    honest with you.

9    A. Seems to be the case, sir.

10   Q. Seems to.  And who approached you to show you these

11   videos?

12   A. The United States attorney.

13   Q. What about OIG agents, as well?

14   A. No.

15   Q. No?

16   A. Not that I re -- just the attorneys.  And to the best of my

17   memory, it was the attorney.

18   Q. It was an attorney.  And --

19   A. I think so.

20   Q. In Texas?

21   A. Yes, Houston.

22   Q. But a U.S. attorney, right?  A government lawyer.

23   A. I think so.

24   Q. And these videos he showed you, one of them was from an

25   investigation that the OIG did back in 2007; is that right?

1    A. I don't recall a date.

2    Q. Uhm, well, the video that was shown to Strausser that you

3    talked about, that video I'm talking about, that was based

4    upon an investigation.

5    A. It must have been in 2008, because his report was January

6    of 2008.

7    Q. Fair enough.  Fair enough.  No problem.  And were you aware

8    of that video at the time that you saw Debbie in July of

9    2008?

10   A. No.  No, I did not have his response to seeing the video.

11   Q. Okay.  And you understand what he decided after seeing that

12   video, he changed his mind about her being able to work; is

13   that right?

14   A. That's what the letter said, yes.

15   Q. Right.  And a week later she was offered, with certain

16   restrictions -- like was talked about in direct examination,

17   with certain restrictions she was offered a job.

18   A. I guess.

19   Q. Okay.  And, at that time, the claims examiner for OWCP

20   believed that Doctor Strausser was her primary.

21   A. I can see how.  And from an ethical, moral standpoint,

22   after he did the surgery, he sure should have been her primary

23   care.  And not for any pain management or family doctor or

24   chiropractic.  Once a surgeon does -- in my humble opinion,

25   after 45 years, once a surgeon does something of that

1    magnitude, that person, it should be his responsibility for

2    the remainder of his or her life.

3    Q. But you understand the definition of -- and you work in

4    Workers' Comp, so you understand the definition of what a

5    primary care physician is, right?

6    A. I don't know what they do.

7    Q. But you understand, though, that they are usually the

8    family doctor, the GP.

9    A. Yeah.  Right.

10   Q. As we call them, right?

11   A. Right.

12   Q. In our parlance.

13   A. But I don't know what they do.

14   Q. All right.  It's usually not a surgeon.  Surgeons have a

15   lot of surgeries, and they don't really establish a lot of

16   personal relationships like your GP would.

17   A. Not these days, no, sir, they do not.

18   Q. But, back in the day, would a surgeon do a house call?

19   Back in your day?

20   A. No.  But I would have seen them for the remainder of their

21   life, in my office.

22   Q. But a GP -- but a GP would have done a house call.

23   A. Would have done a house call?

24   Q. Back in your day.

25   A. Not in my day.  I'm not that old.  We were using cars then.

1    (Laughing)

2    Q. No.  But a house call, you know, going with your car to

3    visit -- to visit a patient.

4    A. Maybe, a friend.  But I don't know of any of my friends who

5    are family doctors that would have made a house call, from

6    1974 on.

7    Q. Well, my dad did, and he was a GP.

8    A. Well, I admire him.

9    Q. Before he died.

10   A. That's correct, I admire him.  Thank you.

11   Q. Thank you.  Now, so, your primary payment, let's establish,

12   is from the government, state or federal government, for

13   Workers' Comp.

14   A. I suppose so.

15   Q. All right.  Now, she visited you, do you know why she

16   visited you?

17   A. She was told to.

18   Q. She was ordered -- she was ordered by the OWCP to visit

19   you.

20   A. Yes.

21   Q. And -- and you did what any occupational person would do,

22   you looked at her history.

23   A. Yes.

24   Q. And you recognized in her history that in August of 2005,

25   she underwent a laminectomy of the L-4-L-5.

1    A. Yes.

2    Q. And that was a failure.

3    A. Yes.

4    Q. And she had another surgery, L-4-L-5, and L-5 decompression

5    and fusion surgery back in '06, February of '06.

6    A. Yes.

7    Q. And I'm reading your report.  You've reviewed your report,

8    haven't you, from --

9    A. Yes.

10   Q. Okay.  And, then, that didn't take, either, because she had

11   to get a stimulator.

12   A. That's not correct.

13   Q. Okay.

14   A. The fusion was successful.  It created a two-level bony

15   arthrodesis.  Now, she had subjective complaints of leg pain.

16   And they immediately jumped to the option of a spinal cord

17   stimulator, which, in my opinion, was not necessarily the

18   correct step.

19   Q. Spinal cord stimulators are fairly rare, aren't they?

20   A. They're rare, and they're about 50 percent effective.

21   Q. All right.  Well, and no disrespect to your opinion, but

22   the objective fact is she had a stimulator put in.

23   A. That is correct.

24   Q. All right.  And that was in May of 2007.

25   A. Yes.

1  Q. And, then, there's something -- according to your report, a

2  revision of a spinal cord stimulator was performed a year

3  later in May of '08.

4  A. Yes.

5  Q. All right.  Now, you also reviewed some pictures, MRIs, a

6  Doppler, right?

7  A. Yes.

8  Q. And the cervical imaging revealed degenerative disc changes

9  in the midportion of the cervical.

10  A. Yes.

11  Q. And she also had an issue with -- or, at least, there was a

12  tentative diagnosis of thoracic outlet syndrome.

13  A. That's correct.

14  Q. And she later -- I don't know if you realize this, she

15  later had surgery on that, for that?

16  A. I didn't know.

17  Q. All right.  But the pictures or MRIs indicate a no vascular

18  compliment producing any brachial plexopathy.

19  A. Yes.

20  Q. Right?  And you also knew the history, that she had some

21  steroid injections in this area and they were of no benefit.

22  A. Yes.

23  Q. Okay.  Now, you didn't order -- you did notice, in C-6 and

24  C-7, some abnormal morphology.  Is that --

25  A. Yes.

1    Q. -- fair to say?  And, so, when we're talking about

2    objective -- obtaining objective data in order to diagnose

3    someone -- we're not talking subjective yet, but just

4    objective -- fair to say that's the objective data you're

5    talking about?

6    A. It's part of it.

7    Q. Part of it.  Other objective data, as you talked about, is

8    your own palpitation, reflexive atrophy issues of the spine,

9    your own hands-on -- hands-on diagnosis.

10   A. Yes.

11   Q. Right?  Or not diagnosis, but --

12   A. Findings.

13   Q. Findings, right.  And, then, of course, the subjective, her

14   own -- what she talks about.

15   A. Yeah.

16   Q. As far as the pain.  Now, you looked at -- when that U.S.

17   attorney visited you in Houston this year, you looked at the

18   kayak -- did you look at those videos of the kayak trip?

19   A. Yes, I did.

20   Q. All right.  Now, I don't want to --

21   A. I didn't have any choice.

22   Q. All right.  And how long did you look at those videos?  I

23   mean --

24   A. As long as they had them up there.

25   Q. All right.  How long -- how long was it, do you remember?

1  A. They were in my office about an hour.

2  Q. Now, you say -- and, again, I just want to make it clear,

3  I'm not trying to trip you up or anything, but you say, the

4  kayak, there were rapids and the water was rough?  Do you

5  remember saying that, or did I just write that --

6  A. Yes, that's true.  It looked like that to me.

7  Q. It looked like it?  Okay.  Fair enough.  So, you saw one

8  hour of this kayak video, but --

9  A. No, I did not say that.

10  Q. Okay.  What --

11  A. I said they were in my office about an hour.  I looked at

12  the video as long as it was on per the attorney.  And I don't

13  recall the exact minutes.  I'm not like a lawyer with a clock.

14  Q. (Smiling)  All right.  Uhm, can you estimate how many

15  hours, or no?

16  A. I would say it was ten minutes.

17  Q. Ten minutes.

18  A. It was not a long period of time.

19  Q. All right, ten minutes.  Now, you were asked about whether

20  you would, back in 2008, have made your conclusion that she

21  was totally disabled if you knew that she was kayaking, for

22  example.

23  A. That is correct.

24  Q. In 2008, did you ever ask her whether she was kayaking?

25  A. No.  I don't believe I've ever asked anybody if they were

1    kayaking.

2    Q. Okay.  What about using a chainsaw?  Did you ask her

3    whether she was -- she used a chainsaw?

4    A. No.

5    Q. What about clearing land?  Did you ask her about clearing

6    land, whether she did it or not?

7    A. No.

8    Q. Did you ask her whether she rode horses back in, I guess,

9    '08?

10   A. No.

11   Q. Or riding on a lawnmower?

12   A. No, I did not.

13   Q. Now, the kayak trip, the video that you saw didn't occur in

14   void, did you know or were you told by the attorney that

15   showed you the video whether she was on any medication?

16   A. No.  (Shakes head negatively)

17   Q. All right.  Did you know or were you eventually told what

18   kind of medication she was on around the time of that kayak

19   trip?

20   A. No.  I only knew what medicine she told me she was on at

21   the time of the visit.

22   Q. All right.  Well, I'm going to read them to you.  And you

23   tell me what they are.  And you tell me, since we are not

24   talking about a void here, we are talking about putting this

25   kayak trip in context with the medicine she was on, I'm going

1   to talk to you about this.

2        Uhm, Buspirone, 10 milligrams.  What is the use of

3   Buspirone?

4   A. It's an antianxiety medicine that would make you very

5   drowsy.

6   Q. Okay.  And she takes that, one tablet three times a day.

7   A. Yes.

8   Q. Gabapentin.  What's Gabapentin for?

9   A.  Gabapentin is an epileptic medication with a known use for

10  a decreased perception of neuropathic pain.

11  Q. Exactly.  And 600 milligrams, is that a high or low

12  dosage?

13  A. That's pretty high.  Usually, it's about 300.

14  Q. All right.  She takes that three times a day, as well.

15  A. That would increase her sedation.

16  Q. Levothyroxine.

17  A. That's just a thyroid medicine.

18  Q. All right.  Melo -- or Meloxicam?

19  A. That's a non-steroidal anti-inflammatory medication.

20  Q. All right.

21  A. It's similar to Advil or Celebrex.

22  Q. And she takes 15 milligrams once a day.

23  A. That's good.

24  Q. And then Meta -- Metaxalone.

25  A. Metaxalone, I'm not familiar with it.  (Shakes head

1  negatively)

2  Q. All right.  That's 800 milligrams.

3  A. Oh, it must have been a muscle relaxant.  I'm sorry,

4  yeah.

5  Q. And she takes that three times a day.  Morphine.  She takes

6  Morphine.

7  A. Morphine.

8  Q. She takes Morphine, too.

9  A. I'm not surprised.

10  Q. And --

11  A. (Nods head affirmatively)

12  Q. Well, we can get into that.  But during this time of the

13  kayak trip she was prescribed Morphine, 20 milligram capsules,

14  time release, twice a day, one tablet twice a day, along with

15  all of that other medicine.

16  A. Yeah.

17  Q. And then Topamax.

18  A. Oh, my gosh.

19  Q. 50 milligrams.  What's that?

20  A. (Shakes head negatively)  That's a benzodiazepine, and

21  she's the -- along with Gabapentin, it's unbelievable.  I

22  don't know why she would take both of those, or who would give

23  both Topamax and Gabapentin.  But we're bordering into

24  polypharmacy now, but go ahead with your --

25  Q. Well, that's -- that's the last one.  One, twice a day.

```
 1   A. Yeah.
 2   Q. And, so, you know, we can talk about her kayak trip, we can
 3   talk about all that, but we have to place this in context of,
 4   also, that's a lot of medicine.  When you used that fancy
 5   word, I liked that, "poly" --
 6   A. Polypharmacy.  It's a ridiculous amount of medicine.
 7   Q. Polypharmacy.  Lawyers like fancy words, too.  Uhm, so,
 8   that makes someone not feel, like, much pain.
 9   A. That would make somebody feel like nothing, like you're in
10   la la land.  Like, I don't know how she managed to walk, and
11   get into the kayak, or remember the trip.
12   Q. Well, that's a good -- that's a good analogy.
13        Now, you did a -- you did a report.
14   A. Yes, I did.
15   Q. For this -- for today.  Okay?
16   A. No, I did not do a report for today.
17   Q. Okay.
18   A. Oh, yes, I'm sorry, I did a (indicating) sort of summary of
19   what --
20   Q. Yeah.  And did -- did you write this report, or did someone
21   write it for you and you reviewed it and you signed it?  How
22   did it work?
23   A. Are you kidding?  Did someone write it for me?  I have
24   never in my whole life had anybody do anything for me.   In
25   fact, my office has been notified that if they ever change one
```

1  word of my report, they will be fired.

2  Q. So, it's pretty unusual, wouldn't you say?  It's almost

3  malpractice if someone wrote a report for a federal court

4  hearing for you to testify about on something like --

5  important like this?

6  A.  I would -- I would -- if -- if someone else did it, I

7  would have told them exactly what to say.  And I sometimes

8  dictate, I sometimes tell my office what to say, but no one

9  ever puts words in my mouth.

10  Q. So, you wouldn't just -- so nobody would put a report in

11  front of you, you would review it, it looks fine, and sign

12  it?

13  A. (Shakes head negatively)

14  Q. And in your report you write, "I then provided my initial

15  opinion which lacked evidence of outside activities by

16  Durand."  And you wrote, "It is my opinion that her current

17  medical condition renders her totally disabled" -- this is

18  from your report -- "at this time from any gainful

19  employment."

20  A. Well, my original report.

21  Q. Yeah.

22  A. Oh, yes.

23  Q. "It was" --

24  A. Exactly.

25  Q. -- "my clinical assessment."

 1   A. And I said -- but -- but --

 2   Q. But -- I mean, but it's in your report --

 3   A. At this time.  At this time.

 4   Q. Correct.

 5   A. At this time.

 6   Q. Exactly.  I understand.  Let me -- let me finish.

 7   A. Yeah.

 8   Q. Understood.  "It was my clinical assessment that the

 9   functional capacity evaluation was not in the best interest."

10   A. That is very correct.

11   Q. And the functional capacity evaluation, actually, in your

12   opinion, could have created further damage.

13   A. Uhm...

14   Q. You wrote at that time.

15   A. Perceived, alleged damage.

16   Q. And you write, "A functional capacity evaluation in/on this

17   lady would be a snapshot in time, and, in my opinion, should

18   not be utilized in determining work abilities.  In addition to

19   this, it is my clinical opinion, as an orthopedic" -- as a

20   ortho -- it says here, "orthopedic surgeon of 40 years'

21   experience, a functional capacity evaluation examination could

22   lead to increased complaints, and, possibly, further injury."

23   A. Yep.

24   Q. "As a result" -- and this is, again, is in your report that

25   we have here today, your report for your testimony, "As a

1    result, I concluded that Deborah Durand was totally disabled."

2    A. At that time.

3    Q. So, I just -- "at that time."  So, I want to make sure that

4    what I just read came from your report from 2008.

5    A. Yes.

6    Q. But it's in your report for this examination today.

7    A. (Pause)

8    Q. That was filed by the U.S. Attorney's Office.

9    A. The date of that report?

10   Q. No, I'm saying --

11   A. The date of that report that you're referring to?

12           MR. WELDON:  Your Honor, objection.  Can we show the

13   witness the report?

14           THE COURT:  Mr. Arvanetes, show him the report.

15   You're taking quotes from an earlier --

16           MR. ARVANETES:  Okay.  Let's --

17           THE COURT:  Put it on the screen, madam clerk.

18           MR. ARVANETES:  I don't want to -- I'll try not to

19   confuse him.

20           THE COURT:  Go to Page 2, madam clerk, to where he's

21   quoting.

22           MR. ARVANETES:  And for identification purposes, it

23   would be Exhibit 503.  Let's say that.

24   **BY MR. ARVANETES:**

25   Q. So, they -- I don't want to confuse you, Doc.  This is what

1    I was talking about.

2    A. Okay.

3    Q. All right.  Now --

4    A. That's not my original report of July of 2008.

5    Q. Yeah.  In your original report, this part here (indicating)

6    -- and I'll -- and do you have your original report with

7    you?

8    A. Yes.  (Nods head affirmatively)

9    Q. Okay.  Would it help to review that report, for you?

10   A. No, that's true.

11   Q. Okay.

12   A. Yes.  At the time of my exam in July, that was my opinion.

13   Q. Now, you believe in work, right?  A work ethic?

14   A. Yes.

15   Q. You talked about that.  And you even said that it was

16   unusual for you to conclude for someone to be totally

17   disabled.

18   A. Yes.

19   Q. Right?  Back in 2008, was it also unusual for you to decide

20   that someone's totally disabled?

21   A. Yes.  And I said, "At this time."  But no one asked me

22   why.

23   Q. Why you thought she was totally disabled.

24   A. At that time.

25   Q. Nobody asked you why at that time.

1   A. That was not part of the questions.  They didn't ask me

2   that.  (Shakes head negatively)  And I never said she was

3   totally disabled forever or indefinite or could never work

4   again in any capacity, I said, "At this time."

5   Q. And I respect that.  I understand that, sir.  I understand

6   that.  But it's your opinion, I guess, that having never seen

7   Debbie again and not knowing the pathology of her from 2008 to

8   today, how can you make a decision at this time (indicating)

9   that contradicts that decision?

10  A. They asked me whether or not, at that time, she could work

11  in any capacity, in 2008.  Based upon what she told me, and

12  the information that I had, and the lack of information that I

13  had, --

14  Q. Which you're talking about the video.

15  A. -- and the fact that she had not had additional treatment

16  that could have been very helpful, I said, at that time, she

17  was disabled.

18  Q. So, at that time, based upon all -- all of the above.

19  A. That's all I said, sir.

20  Q. Okay.

21  A. I was not asked to project the future, and I don't know

22  what happened to her after 2008.

23          MR. ARVANETES:  Can the government put up

24  Government's Exhibit 18?

25          THE COURT:  Did you want to admit 503?

1    MR. ARVANETES:  Yes, we will admit 503.

2    THE COURT:  Any objection, Mr. Weldon?

3    MR. WELDON:  No objection, Your Honor.

4    THE COURT:  503, Doctor Hood's report, is admitted.

5

6    **(Exhibit Number 503 was admitted.)**

7

8    THE COURT:  Can you touch the screen, Mr. Arvanetes,

9    and clear it?

10    MR. ARVANETES:  Oh, yes, sir.

11    THE AGENT:  Is this the exhibit you want?

12    MR. ARVANETES:  18.

13    THE AGENT:  18.

14    **BY MR. ARVANETES:**

15    Q. Based upon your report from 2008, the government showed you

16    the same document earlier, there is an "X" by "The

17    work-related disability is too severe for employment and is

18    unlikely to improve."

19    A. I did not ever say that.  That word -- that wording can

20    never be found in any report.  That is totally false.

21    (Indicating)  Whoever put that in is erroneous and did not

22    look at my report.

23    I said that she could not work at that time, and I have

24    never, ever, put "unlikely to improve."  That is a false

25    thing.  I don't believe it.

```
 1   Q. And I --
 2   A. I don't believe it to this day.
 3   Q. I'm just saying it's a government exhibit.
 4   A. I don't care.  It's wrong.
 5   Q. All right.  Fair enough.
 6   A. And to put my name to it, and to think that those were my
 7   statements, whoever put that in there has done -- and that's
 8   (indicating) -- what can I say?
 9   Q. I'm sorry --
10   A. It's as wrong as it can be.
11   Q. All right.  I'm sorry.  My apol -- all I can say is I'm
12   sorry.
13   A. I don't know whoever would say it, that a condition is
14   unlikely to improve.  I don't know how they would come up with
15   something like that.
16            MR. ARVANETES:  May I have a moment, Your Honor?
17            THE COURT:  You may.
18
19                 (Discussion off the record.)
20
21            MR. ARVANETES:  And Ms. -- I was going to say "Ms.
22   Clerk."  You can take that down.  Sorry.
23   BY MR. ARVANETES:
24   Q. So, do you prescribe medicine?
25   A. No.
```

1  Q. All right.

2  A. Not to her.

3  Q. And one thing I forgot to ask is when the -- when the U.S.

4  attorney came down to visit you in Houston and you saw the

5  kayak video for about ten minutes, how long did you see the

6  other video from 2008?

7  A. Probably, about the same, five or ten minutes.

8  Q. All right.  Fine.

9       MR. ARVANETES:  All right.  Thank you.  (Nods head

10  affirmatively)

11       THE COURT:  Do you wish to redirect, Mr. Weldon?

12       MR. WELDON:  Very briefly, Your Honor.

13

14                  **REDIRECT EXAMINATION**

15  **BY MR. WELDON:**

16  Q. Doctor Hood, I Just wanted to clarify a few things, if we

17  could, sir.

18      All of the injuries that you knew about of Ms. Durand,

19  were those all injuries that were recoverable, sir?

20  A. Yes.

21  Q. Okay.  And, now, you had your report at the time, but was

22  this something where Ms. Durand, ultimately, from the injuries

23  that you knew about, could work at a later date?

24  A. Yes.

25  Q. Okay.  Now, you had spoken with Mr. Arvanetes about

1  thoracic outlet syndrome, did you hear that term, sir?

2  A. Yes.

3  Q. And can you explain what that was?

4  A. There are three major nerves that come from the cervical

5  spine; radial, ulnar, median.  They come together in a group

6  underneath the collarbone.  As they go down, they normally

7  separate into the various muscles than they innervate.

8      Thoracic outlet syndrome is a condition in which it is

9  either a vascular artery or vein that presses on that, or when

10  it's a neurological.  But, for instance, you've heard of a

11  stinger in football, that's a transient irritation of the

12  brachial plexus.  You can have a severe crush injury and get

13  an injury to those nerves.

14      Now, if it's vascular, they can diagnose this with an

15  MRI, or a Doppler, or arteriopathy.  If it's neurological,

16  it's an EMG Nerve Conduction Study.  And the one that I

17  obtained from our state expert was normal.  Plus, they would

18  have physical findings of weakness, usually in the finger

19  (indicating).  It's called intrinsic --

20  Q. And when you are referring to --

21  A. They did not find any of that.

22  Q. And that is as it relates to Ms. Durand; is that right,

23  Doctor Hood?

24  A. Yes.

25  Q. Okay.  So, you didn't have any objective findings to

1    support that at all.

2    A. No.

3    Q. Now, then, you saw the trip in the video, and you've been

4    asked a few questions about those.  Now, you were able to, if

5    you wanted to see any other videos, then that was made

6    available; is that right, Doctor Hood?

7    A. That is correct.

8    Q. Now, then, you were asked about questions that you didn't

9    ask Ms. Durand.  Like, for example, the chainsaws and jogging

10   and all of those sort of ideas, did you ask her whether or not

11   she could bend or squat?

12   A. No.  You know, honestly, over the past 25 years I have

13   tended to rely on medical records and more on objective --

14   Q. Sure.

15   A. -- findings, clinical, radiographic, and EMGs.

16   Surveillance, if I have them.  For instance, we do auto

17   liability.

18   Q. Sure.

19   A. I like to see the photographs of the vehicles.  I like to

20   see the police report.  I like to see the first emergency room

21   visit.  Those are all objective things.  And, in fact, that

22   gives me, sometimes, a great deal more information than

23   subjective.

24   Q. Now, in this case, though, with Ms. Durand, you had to rely

25   on the subjective statements; is that right, Doctor Hood?

1    A. She told me she was in a lot of pain, taking medicine, the

2    spinal cord stimulator wasn't able to work.

3    Q. Okay.  And that included the bending and climbing and

4    squatting, for example; is that right, sir?

5    A. That's right.

6    Q. Okay.  Now, you were asked questions about the drugs that

7    Ms. Durand was taking?

8    A. Yes.

9    Q. Could you just explain, if she was taking that many drugs,

10   what she would be like?

11   A. A zombie.

12   Q. Now, you were also asked questions about your report, and

13   you explained to the Court that nobody changes your reports.

14   Is that right, sir?

15   A. That's right.

16   Q. So, you had your first initial 2008 report, and then,

17   ultimately, the document that you gave to the U.S. Attorney's

18   Office to file.  Is that right, sir?

19   A. That's correct.

20   Q. Now, although you were working with the U.S. Attorney's

21   Office with that document, did you review it and make sure

22   that everything was accurate?

23   A. Absolutely.

24   Q. Now, you were also asked about the functional capacity

25   test?

1    A. Yeah.

2    Q. Why didn't you give Ms. Durand --

3    A. I think it's a scam.  To be honest with you.

4    Q. Sure.  Explain that, please, sir.

5    A. A functional capacity evaluation is a physical exam that is

6    -- shows a snapshot in time.  It asks a person to do bending,

7    how much can they lift.  And I can guarantee you that over 20

8    years I have never seen a work comp patient give a valid

9    effort that gives any information.

10        What I have seen is people complaining that their

11   condition is worse after a functional capacity evaluation.

12   And, therefore, unless I'm ordered to have one done, I simply

13   don't do it.

14   Q. And when they say --

15   A. Because it gives no valid information.

16   Q. Sure.  And, of course, in addition to them completing that,

17   when you say that they are injured after it, is that also a

18   liability for your office?  (Nods head affirmatively)

19   A. Yes.

20   Q. Now, Doctor Hood, all of the information that you've seen

21   about Ms. Durand, is she disabled and can she not work?

22   A. No.  (Nods head affirmatively)  She is able to do

23   something.

24   Q. Answer phones?

25   A. Yes.

1   Q. And the restrictions that you just identified when we

2   previously spoke on direct examination.

3   A. Yes.

4           MR. WELDON:  Your Honor, I have no further

5   questions.

6           THE COURT:  Is the witness excused?

7           MR. WELDON:  Yes, please, Your Honor.

8           THE COURT:  Thank you for your time, sir, you may

9   step down.

10      Well, Mr. Weldon, you've given the only accurate

11  prediction of the day.

12          MR. WELDON:  It would be, Your Honor.

13          THE COURT:  All right.  We are going to break for

14  the night.

15      Mr. Weldon, how are we doing on time for tomorrow?

16          MR. WELDON:  Terrible.  But we will pick up, Your

17  Honor.

18          THE COURT:  All right.  Given our -- given where we

19  are, we've heard five witnesses, do you have 11 to call?

20          MR. WELDON:  That's correct.  I cut one, and, so, we

21  are condensing as we speak, Your Honor.

22          THE COURT:  So, will you finish your case tomorrow,

23  do you anticipate, or go into Wednesday?

24          MR. WELDON:  With 11 witnesses, at our rate, I do

25  not believe so.

1           THE COURT:  They'll all be at this pace.

2           MR. WELDON:  Yes.

3           THE COURT:  All right.  Noon Wednesday?

4           MR. WELDON:  I would certainly -- of course,

5   depending on cross --

6           THE COURT:  I'm trying -- I'm trying -- I have a

7   number of items scheduled Wednesday, and I need to know if I

8   need to reschedule those.

9       And, Mr. Arvanetes, you expect a half-a-day for your

10  case?

11          MR. ARVANETES:  Yes, sir.  I just wanted to say,

12  just, if I can -- can I talk?

13          THE COURT:  I'm asking you.  You may talk, yes.

14          MR. ARVANETES:  Okay.  Can Mr. Weldon and I, kind

15  of, discuss what witnesses he has left, and I would have a

16  better --

17          THE COURT:  All right.  That would be helpful, too.

18  Well, tomorrow -- if you can discuss that after I leave, I

19  need to go home.

20          MR. ARVANETES:  Yes, sir.

21          THE COURT:  Mr. Weldon, we'll start tomorrow at

22  8:45.

23          MR. WELDON:  8:45.

24          THE COURT:  We'll try to start the session on time.

25          MR. WELDON:  Yes, Your Honor.

1          THE COURT:  Okay.  Anything else before we break for

2    the evening?

3          MR. WELDON:  No, Your Honor.

4          MR. ARVANETES:  No, Your Honor.

5          THE COURT:  All right.  We will see you at 8:45

6    tomorrow.

7          MR. WELDON:  Thank you, Your Honor.

8          MR. ARVANETES:  Thank you, Your Honor.

9

10          **(The evening recess was taken at 5:14 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

    I, Julie L. DeLong, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my knowledge, skill, and ability.


  /s/ Julie L. DeLong               02/05/2018
Julie L. DeLong                     Date