<pre>
 1   Julie Pesanti DeLong (Sampson)
     Registered Professional Reporter
 2   PO Box 163
     Saint Ignatius, Montana  59865
 3   Phone:  (406) 498-3941
     Email:  fortherecord1103@gmail.com
 4   _____

 5                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MONTANA
 6                       GREAT FALLS DIVISION

 7   UNITED STATES OF AMERICA,       )
                                     )
 8                   Plaintiff,      )
                                     )          CR-16-43-GF-BMM
 9      versus                       )
                                     )
10   DEBORAH JOY DURAND,             )
                                     )
11                   Defendant.      )
     _____
12
                 TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
13
                     DAY 2 OF WITNESS TESTIMONY
14
              BEFORE THE HONORABLE BRIAN M. MORRIS
15             UNITED STATES DISTRICT COURT JUDGE
                   FOR THE DISTRICT OF MONTANA
16
                   Charles N. Pray Courtroom
17             Missouri River Federal Courthouse
             United States District Court Great Falls
18                 125 Central Avenue West
                     Great Falls, MT 59404
19
                        August 22, 2017
20                         8:45 a.m.

21

22

23

24
                 Proceedings recorded by machine shorthand
25       Transcript produced by computer-assisted transcription
</pre>

1                    **APPEARANCE OF COUNSEL:**

2

        **For the Plaintiff:**
3
        Mr. Ryan G. Weldon
4       Assistant United States Attorney
        United States Attorney's Office - Great Falls
5       P.O. Box 3447
        119 First Avenue North, Suite 300
6       Great Falls, MT 59403
        (406) 761-7715 (Phone)
7       (406) 453-9973 (Fax)
        Email: Ryan.Weldon@usdoj.gov
8

9       Mr. Jared Cobell
        Assistant United States Attorney
10      United States Attorney's Office - Great Falls
        P.O. Box 3447
11      119 First Avenue North, Suite 300
        Great Falls, MT 59403
12      (406) 761-7715 (Phone)
        (406) 453-9973 (Fax)
13      Email:  Jared.Cobell@usdoj.gov

14
        **For the Defendant:**
15
        Mr. Evangelo "Vann" Arvanetes
16      Assistant Federal Defender
        Federal Defenders of Montana
17      Office Headquarters, Great Falls
        104 2nd Street South, Suite 301
18      Great Falls, MT 59401-3645
        (406) 727-5328 (Phone)
19      (406) 727-4329 (Fax)
        Email: vann_arvanetes@fd.org
20

21      Ms. Joslyn Hunt
        Assistant Federal Defender
22      Federal Defenders of Montana
        Helena Branch Office
23      15 West 14th Street, Suite 1
        Helena, MT  59601-3332
24      (406) 449-8381 (Phone)
        (406) 449-5651 (Fax)
25      Email: joslyn_hunt@fd.org

1      **INDEX:**

2      **TESTIMONY**

3
       **WITNESS:**                                                    **PAGE:**
4

5      **SONJA ANN DRESCHER:**
       Direct Examination by Mr. Weldon . . . . . . . . . .      10
6      Cross-Examination by Ms. Hunt. . . . . . . . . . . .      28
       Redirect Examination by Mr. Weldon . . . . . . . . .      45
7
       **JOHNATHAN DAVID DRESCHER:**
8      Direct Examination by Mr. Cobell . . . . . . . . . .      48
       Cross-Examination by Ms. Hunt. . . . . . . . . . . .      54
9
       **SAMUEL CRAIG DUNN:**
10     Direct Examination by Mr. Weldon . . . . . . . . . .      61
       Cross-Examination by Mr. Arvanetes . . . . . . . . .     103
11     Redirect Examination by Mr. Weldon . . . . . . . . .     140

12     **CAROLYNE BOWIE:**
       Direct Examination by Mr. Weldon . . . . . . . . . .     149
13     Cross-Examination by Mr. Arvanetes . . . . . . . . .     162
       Redirect Examination by Mr. Weldon . . . . . . . . .     166
14
       **RYAN HAYWOOD:**
15     Direct Examination by Mr. Weldon . . . . . . . . . .     168
       Cross-Examination by Mr. Arvanetes . . . . . . . . .     176
16     Redirect Examination by Mr. Weldon . . . . . . . . .     184

17     **SARA SPANE:**
       Direct Examination by Mr. Weldon . . . . . . . . . .     185
18     Cross-Examination by Mr. Arvanetes . . . . . . . . .     190

19     **JORDAN DAKOTA VANTINE:**
       Direct Examination by Mr. Weldon . . . . . . . . . .     194
20     Cross-Examination by Ms. Hunt. . . . . . . . . . . .     208
       Redirect Examination by Mr. Weldon . . . . . . . . .     212
21
       **KIMBERLY SNYDER:**
22     Direct Examination by Mr. Weldon . . . . . . . . . .     213

23     **JOSEPH FRANCIS BOYNTON:**
       Direct Examination by Mr. Weldon . . . . . . . . . .     218
24     Cross-Examination by Mr. Arvanetes . . . . . . . . .     267
       Redirect Examination by Mr. Weldon . . . . . . . . .     299
25

**EXHIBITS**

| EXHIBIT: | DESCRIPTION: | ADMITTED: |
|---|---|---|
| EXHIBIT 504 | Memo of Interview of Johnathan and Sonja Drescher. . . . . . . . . | 41 |
| EXHIBIT 4 | August 15, 2013 - Department of Labor. . . . . . . . . . . . . . | 76 |
| EXHIBIT 10 | Letter from Department of Labor to Durand July 3, 2007. . . . . | 78 |
| EXHIBIT 20 | Medical Travel Refund Request - (February 2, 2006). . . . . | 97 |
| EXHIBIT 21 | Medical Travel Refund Request - (February 14, 2007) . . . . | 97 |
| EXHIBIT 22 | Medical Travel Refund Request - (February 19, 2007, and February 21, 2007). . . . . . . . | 97 |
| EXHIBIT 23 | Medical Travel Refund Request - (March 2, 2007, and March 5, 2007). . . . . . . . . . | 97 |
| EXHIBIT 24 | Medical Travel Refund Request - (March 16, 2007). . . . . . | 97 |
| EXHIBIT 25 | Medical Travel Refund Request - (June 13, 2007) . . . . . . | 97 |
| EXHIBIT 26 | Medical Travel Refund Request - (July 30, 2007) . . . . . . | 97 |
| EXHIBIT 27 | Medical Travel Refund Request - (September 14, 2007). . . . | 97 |
| EXHIBIT 28 | Medical Travel Refund Request - (January 15, 2008). . . . . | 97 |
| EXHIBIT 29 | Medical Travel Refund Request - (February 25, 2008) . . . . | 97 |
| EXHIBIT 30 | Medical Travel Refund Request - (July 21, 2008) . . . . . . | 97 |

EXHIBIT 31        Medical Travel Refund
                  Request - (July 22, 2008) . . . . . .        97

EXHIBIT 32        Medical Travel Refund
                  Request - (September 25, 2008). . . .        97

EXHIBIT 33        Medical Travel Refund
                  Request - (February 23, 2009) . . . .        97

EXHIBIT 34        Medical Travel Refund
                  Request - (March 25, 2010). . . . . .        97

EXHIBIT 35        Medical Travel Refund
                  Request - (September 15, 2010). . . .        97

EXHIBIT 36        Medical Travel Refund
                  Request - (September 24, 2010, and
                  October 14, 2010) . . . . . . . . . .        97

EXHIBIT 37        Medical Travel Refund
                  Request - (December 21, 2010) . . . .        97

EXHIBIT 38        Medical Travel Refund
                  Request - (April 1, 2011) . . . . . .        97

EXHIBIT 39        Medical Travel Refund
                  Request - (April 5, 2011, and
                  May 6, 2011). . . . . . . . . . . . .        97

EXHIBIT 40        Medical Travel Refund
                  Request - (July 14, 2011) . . . . . .        97

EXHIBIT 41        Medical Travel Refund
                  Request - (August 10, 2011) . . . . .        97

EXHIBIT 42        Medical Travel Refund
                  Request - (October 6, 2011, and
                  October 14, 2011) . . . . . . . . . .        97

EXHIBIT 43        Medical Travel Refund
                  Request - (November 1, 2011). . . . .        97

EXHIBIT 44        Medical Travel Refund
                  Request - (February 12, 2012) . . . .        97

EXHIBIT 45        Medical Travel Refund
                  Request - (March 22, 2012). . . . . .        97

EXHIBIT 46    Medical Travel Refund
              Request - (June 1, 2012). . . . . . .        97

EXHIBIT 47    Medical Travel Refund
              Request - (October 26, 2012, and
              October 29, 2012, and November
              4, 2012). . . . . . . . . . . . . . .        97

EXHIBIT 48    Medical Travel Refund
              Request - (June 22, 2013) . . . . . .        97

EXHIBIT 49    Medical Travel Refund
              Request - (July 8, 2013, and
              July 9, 2013) . . . . . . . . . . . .        97

EXHIBIT 50    Medical Travel Refund
              Request - (March 11, 2014). . . . . .        97

EXHIBIT 71    Denial of PTSD Claim -
              Department of Labor
              (June 15, 2011) . . . . . . . . . . .       103

EXHIBIT 505   Recourse of an Investigation. . . . .       117

EXHIBIT 507   Bricken & Associates, PC,
              Confidential Progress Report
              3/9/2008. . . . . . . . . . . . . . .       126

EXHIBIT 58    Crystal Seas, Inc. Release
              and Assumption of Risk. . . . . . . .       195

EXHIBIT 59    Crystal Seas Kayaking/
              TerraTrek Bicycle Vacations . . . . .       196

EXHIBIT 61    Picture of Durand and
              undercover agents . . . . . . . . . .       198

EXHIBIT 63    Map of Kayaking Trip. . . . . . . . .       200

EXHIBIT 51    Chart Amount of Travel
              Funds . . . . . . . . . . . . . . . .       221

EXHIBIT 55    AQS Case Compensation
              Payment History . . . . . . . . . . .       224

EXHIBIT 70    Life Trend Survey . . . . . . . . . .       228

EXHIBIT 60    Picture of Durand with
              Backpack and Suitcase . . . . . . . .       237

EXHIBIT 62        Picture of Durand and
                  undercover agents . . . . . . . . . .    239

EXHIBIT 57        Snow Bird Recreational
                  Promotions. . . . . . . . . . . . .      241

EXHIBIT 64        Picture of Durand's Journal . . . . .    242

EXHIBIT 65        Snow Bird Recreational Promotions
                  - Customer Experience Survey. . . . .    246

1                           **PROCEEDINGS**

2

3                          **(Open court)**

4                      **(Defendant present)**

5                **(Proceedings began at 8:47 a.m.)**

6

7            THE BAILIFF:  Judge Brian Morris, the United States

8    District Court for the District of Montana.

9            THE COURT:  Please be seated.

10       Good morning, counsel.

11           MR. WELDON:  Good morning, Your Honor.

12           MR. ARVANETES:  Good morning, Your Honor.

13           THE COURT:  I want to take up the issue of

14   punctuality and timeliness.  When I set deadlines to start,

15   those are -- those are firm.  Those aren't, well, I'll see if

16   I can get there 15 minutes later, or I'll see if I can get

17   there.

18       I have a very busy trial schedule.  I set aside three

19   days to try to complete this trial.  I don't need people

20   rolling in 15 minutes late from lunch, 15 minutes late in the

21   morning.  We start right when I set a deadline.

22       You understand that?

23           MR. WELDON:  Yes, Your Honor.

24           MR. ARVANETES:  Yes, sir.

25           THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.  I had half a mind to issue

2     an arrest warrant and have you picked up.  You are released on

3     conditions.  Do you understand?

4          THE DEFENDANT:  Yes.  (Nods head affirmatively)

5          THE COURT:  All right.

6          THE DEFENDANT:  Yes, sir.  Sorry.  I do apologize.

7          THE COURT:  All right.  Well, I'm sorry, too.  I

8     might cut a little slack, but for the fact that yesterday,

9     after lunch, we started 15 minutes late.  This whole trial is

10    slipping.  I've got a busy sched -- I've got a full day of

11    sentencings on Thursday, I've already rescheduled my

12    Wednesday.  Let's get moving.

13        Mr. Weldon, call your next witness, please.

14          MR. WELDON:  Yes, Your Honor.  The United States

15    calls Sonja Drescher.

16

17              **(The witness was duly sworn.)**

18

19          THE WITNESS:  Yes.

20          CLERK OF COURT:  (Indicating)

21          THE COURT:  Good morning, ma'am.

22          THE WITNESS:  Good morning.

23          THE COURT:  Would you please state your full name

24    and spell your last name?

25          THE WITNESS:  My name is Sonja Ann Drescher,

1   D-R-E-S-C-H-E-R.

2         THE COURT:  Could you pull that microphone down a

3   little bit?

4         THE WITNESS:  I'm sorry.

5         THE COURT:  Go ahead, Mr. Weldon.

6         MR. WELDON:  Thanks, Your Honor.

7

8                      **DIRECT EXAMINATION**

9   **BY MR. WELDON:**

10   Q. Good morning, Ms. Drescher.

11   A. Good morning.

12   Q. Will you tell the Court where you're from, ma'am?

13   A. Montgomery, Texas.

14   Q. Did you used to live by a lady whose name was Deborah

15   Durand, or Deborah Simmons?

16   A. Yes.

17   Q. Can you tell the Court when you lived by Ms. Durand?

18   A. Uhm, it was from 2000 -- well, we moved in in 2006, in July

19   of 2006, and we lived there until two years ago.  So, they

20   lived there between 2008, I believe, to 2010.  It was, like,

21   two or three years.  (Nods head affirmatively)

22   Q. Okay.  So, you saw and lived next to Ms. Durand for about

23   two to three years; is that right, ma'am?

24   A. Across the street, yes.

25   Q. Okay.  And you mentioned that that was 2007 to 2010?

1   A. Yes.

2   Q. Approximately?

3   A. 2007 to 2010.  (Nods head affirmatively)

4   Q. All right.  Now, can you describe for the Court where Ms.

5   Durand's property was located, and, then, where your property

6   was located?

7   A. Their property was directly across the street from us.  We

8   were all on five-acre plots.  And we were on the third

9   five-acre plot on our street, and theirs was just -- the front

10  two acres were two-acre plots, and, then, the next one was a

11  five-acre plot, and then theirs.  So, we were, like, just

12  right across the street.

13  Q. Okay.  So, you were, basically, right across the street.

14  Did you have a clear view of Ms. Durand's residence?

15  A. Absolutely.

16  Q. Can you describe the landscape and the area for the

17  Court?

18  A. When we first moved in, it was heavily wooded.  Uhm, there

19  was a driveway.  Uhm, it was just a heavily-wooded area, the

20  whole neighborhood is heavily wooded.  You, basically, had to

21  clear your own land.

22  Q. Were you able to see some of the activities that Ms. Durand

23  engaged in while she was living there during that two- to

24  three-year time period?

25  A. Yes.

1  Q. Can you tell the Court some of the things that you saw Ms.
2  Durand do?
3  A. Sure.  Uhm, I -- I specifically watched her run up and down
4  the street.  She would pass my house in the morning.
5       Uhm, I have watched her ride horses.  Her horses would
6  get loose consistently and come into my yard, and she would
7  have to fight the horse to get the horse to go back to her
8  yard.
9       She would lift barrels of big -- big -- not barrels, but
10  square bales of hay.
11  Q. And can you describe that for the Court?  What did you see
12  Ms. Durand do with the bales of hay?
13  A. She would bend down and grab them, and then hurl them up
14  into these metal (indicating) things that were attached to the
15  fence.
16  Q. Okay.  Were those horse feeders, or what were those,
17  ma'am?
18  A. Uhm, I think they're called a lean -- a lean-to?  I don't
19  know, I'm not -- I don't know anything about horses.
20  Q. You are not a horse lady.
21  A. I don't have horses, never had horses, so...
22  Q. When --
23  A. It's just this big thing that had, like, a lip on it that
24  you fed the horses.
25  Q. How often did you see Ms. Durand lift up those hay -- those

1  hay bales?

2  A. It was -- it was quite often.  It was almost daily.  It

3  was --

4  Q. That you would see her doing that?

5  A. Yeah.  I have five children, and, so, we were outside in

6  the yard a lot, so...

7  Q. Now, did you have a job during that time period, ma'am?

8  A. No.  I was -- I stayed at home.

9  Q. So, that two- to three-year time period, you were at home

10  most of the time.

11  A. I was home, yes, everyday.

12  Q. Now, Ms. Durand was lifting these hay bales you were

13  describing, and how big were these hay bales?

14  A. Oh, they were -- they were, I would say, four feet by two

15  feet.  They were pretty big.  I mean, they had these big

16  straps on both sides to carry it.  It was a big -- hail --

17  bail -- hail -- hay bale.

18  Q. Did it look heavy?

19  A. It did.  I was quite impressed, because I didn't -- I don't

20  do any of that kind of stuff.  And I was, like, yeah, I wish I

21  could do that.

22  Q. And that was through the entire two- to three-year time

23  period.

24  A. Yes.

25  Q. Now, you mentioned that you saw Ms. Durand jogging, as

1    well, right?

2    A. Yes.

3    Q. Could you tell the Court about that, the time frames of

4    when you saw that occur and about how many times?

5    A. Okay.  Uhm, she would get up in the morning around 8:00

6    o'clock.  My son's bus would come around 8:00, 8:15, so we

7    would sit at the bus stop waiting for the bus.  And we would

8    see her come out of her driveway.  She would run down her side

9    of the street to the stop sign, turn, and come back, and pass

10   our house, and then go down -- all the way down until I

11   couldn't see her anymore.

12   Q. So you don't know how far she ran?

13   A. I -- I can only speculate on how far she ran.  There was a

14   cul-de-sac down at the end, and then turned around and come

15   right back.

16   Q. How far was it that you saw her running afterward?

17   A. (Indicating)  Uhm, it was a good distance.  I mean, there

18   was five-acre plots, so that's how I judge it.  It's a good

19   distance.

20   Q.  How many football fields?

21   A. At least, three.

22   Q. At least, three football fields?

23   A. Uh-huh.

24   Q. And that was down and back, then?

25   A. Yes.

1   Q. All right.  So, the total of six football fields?

2   A. Yes.

3   Q. All right.  And, then, she would disappear and you wouldn't

4   see her.

5   A. Right.

6   Q. Now, what was the time frame when you saw Ms. Durand

7   jogging?

8   A. Uhm, she would start around -- right around the time my son

9   and I would go out for the bus, so it was about 8:00 o'clock.

10  She would go down to the stop sign, she would turn, she would

11  come back.  And by 8:15, my son would be on the bus, and she

12  would be passing then where I couldn't see her.

13      Occasionally, when I would have other things to do,

14  outings and stuff, I would see her coming back, and it would

15  be about 8:45, 9:00 by that point.  So, it was a good run.  It

16  wasn't a short five-minute, ten-minute run, it was a run.

17  Q. What was the frequency that you would see Ms. Durand

18  running?

19  A. (Indicating)  Almost every day.

20  Q. And through that two- to three-year time period, how long,

21  during that two- to three-year time period, did you see her

22  running?

23  A. I really didn't notice until my son went to first grade.

24  So, (indicating) it was -- you know, it was -- it was -- it

25  was daily, at that point.  When he was in first grade, it was

1    daily, because we would just see her pass us every day for the

2    bus.  Except for the days that it rained.  Even in the winter,

3    when it was cold, she would run.

4    Q. And, then, was that the 2007 to 2010 time period?

5    A. Yes.

6    Q. All right.  So, it was consistent throughout, then.

7    A. Correct.

8    Q. At least what you saw.

9    A. Correct.

10   Q. All right.  What about any clearing of the land?

11   A. Yes.

12   Q. Can you please describe that for the Court?

13   A. Well, they -- her and her husband would be out there

14   clearing the land almost every day.  We would hear the

15   chainsaws.  My husband and I have witnessed her pick up big

16   stumps and move them.

17       Uhm, I would always complain to my husband that I wished

18   he would do more work, because if they could do it, we could

19   do it.  And, uhm, that never happened for us.

20   Q. Sure.

21   A. But I saw them, you know, cutting down, you know, big

22   trees, clearing the land.  Uhm, they were putting up a fence,

23   and they used the big, uhm --

24   Q. Post hole diggers?

25   A. Post hole diggers.

1   Q. Did you see Ms. Durand using the post hole digger?

2   A. Yes.

3   Q. All right.  Describe that for the Court, please.

4   A. You have to -- a post hole digger, you have to jab it down

5   really hard, and squeeze, and pull up.  And I watched her do

6   that.  They were out there for a whole week doing this to put

7   up posts in the front of their house.  And it's right there,

8   right along the street.

9       Her driveway was in the center, and right along the

10  street she had put these.  Her and her husband were out there

11  doing this.

12  Q. Now, you mentioned that you saw the chainsaw and you heard

13  that running because of clearing the land.

14  A. Yes.

15  Q. Did you ever see Ms. Durand using the chainsaw?

16  A. Yes.

17  Q. Can you explain that, please?

18  A. She would cut down the smaller trees, but she would chop --

19  but they were still -- they weren't, like -- they weren't,

20  like, small, tiny trees, they were, like, maybe, 100 feet

21  tall, versus the other ones.  They were big trees.  They were

22  thick, but they weren't the giant ones.

23  Q. Sure.  And you saw her cutting those down?

24  A. Yes.

25  Q. Did she appear to be injured or was she unable to do those

1    activities?

2    A. I never knew she was ever injured.

3    Q. Now, did you ever see her mowing the lawn, ma'am?

4    A. Yes.

5    Q. Can you explain that to the Court, please?

6    A. I watched her -- the front of their property, there's a

7    ditch, and that's where I saw, most of the time, when she

8    would mow.  Because the ditch has an angle, and you have to,

9    kind of, balance your body on the mower and kind of wiggle

10   side to side to keep from tipping over.

11       Both our property and their property had this ditch that

12   went like this (indicating), and you have to angle your body

13   so you don't fall out of this -- the lawnmower, or the

14   lawnmower getting tipped over.

15       And, so, I -- you know, I would be out there mowing mine

16   and I would see her mowing hers.

17   Q. And she was on the riding lawnmower when she was doing

18   that?

19   A. Absolutely.

20   Q. And she was balancing on the lawnmower?

21   A. She was balancing on the lawnmower.

22   Q. Did she appear to have any problems or any injuries when

23   she was doing that?

24   A. No.

25   Q. How many times per week would you see Ms. Durand mowing the

1   lawn?

2   A. Maybe, once or twice, depending on the rainfall.  Because

3   if we had a sufficient amount of rain, the grass grows faster.

4   But it was about once a week.

5   Q. Once a week you would see that?

6   A. Uh-huh.

7   Q. And that was throughout the 2007 to 2010 time period?

8   A. Yes.

9   Q. What about Ms. Durand's horses?  Lets talk about those for

10   a minute.  Did you see Ms. Durand riding those horses?

11   A. Yes.

12   Q. Okay.  Explain that to the Court, please.

13   A. She would ride up and down the street on the -- just the

14   edge of the street.  She would just go all the way down to the

15   stop sign, turn, come back, go all the way down the road.

16   Q. How many times per week would you see that?

17   A. I believe it was two or three times a week she would go and

18   she would ride her horses.

19   Q. And that was between 2007 --

20   A. '7 to --

21   Q. -- to 2010?  Or, at least, that time period that she was

22   your neighbor, in that time frame.

23   A. Yes.

24   Q. All right.  Now, did you ever see her trotting her horses

25   or going at a faster speed than just a walk?

1    A. Yes.

2    Q. Explain that.

3    A. Sometimes, her horses would get spooked or something and

4    they would run faster.  But most of the time she was trotting.

5    She was -- she was going at a decent speed.  Occasionally,

6    they would, you know, kind of go slower, and just her and her

7    husband did it together.

8        And they would talk, and you can -- I mean, you could

9    hear them talking.  I have no idea what they were saying, but

10   they would pass our house, and, you know, we would see them.

11   Sometimes, the horses would go faster, sometimes it would be

12   slower, it just depended on the day.

13   Q. Did Ms. Durand appear to be in pain or injured at all when

14   you saw her on the horses?

15   A. No.

16   Q. Now, you mentioned that you heard them talking, did they

17   appear to be having fun, or was it distress, or what did you

18   see?

19   A. Oh, no.  It was just, like, general conversations.  It was,

20   you know, just it never sounded -- I never heard them say a

21   cross word to each other, I never heard, you know, voices rise

22   or anything like that.  It wasn't anything like that.

23   Q. Okay.  Now, did you see Ms. Durand moving her plants at

24   all?

25   A. Yes.

1   Q. Please explain that, ma'am.

2   A. She would just pick up the pots and move them.  Uhm, when

3   they built the fence -- uhm, they have a driveway; and when

4   they built their fence, there was a bunch of potted plants

5   there.  And she would move them to build the fence right

6   there.  Uhm, she would also move them along her porch, uhm,

7   and --

8   Q. How would she pick them up?

9   A. She would grab them (indicating) and -- you know, bent down

10  and picked them up, and then move -- twist and turn to move

11  the pots.

12  Q. How big were the pots?

13  A. Some of them were, like, small.  And then there was some of

14  the bigger ones that were, like, a gallon size, and some of

15  them were a little larger than that.

16  Q. And when you mentioned the gallon size, for example, did

17  they appear to have dirt in them?

18  A. Yes, they had dirt and plants.  So...

19  Q. Okay.

20  A. It was a full-sized plant.

21  Q. Now, again, did you see that during the time period of 2007

22  to 2010?

23  A. Yes.

24  Q. And how often did you see her moving plants at the

25  property?

1   A. I don't know, maybe -- once a week, maybe?  I don't know.

2   I'm not 100 percent sure.

3   Q. All right.

4   A. I just know that I've seen -- I've seen them do a lot of

5   things.  They're just, you know, average people, we were

6   average people, we just lived across the street.

7   Q. Did they appear to be active outside?

8   A. All of the time.  They were always outside.

9   Q. Everyday.

10  A. Yes, almost every day.  Unless it rained.  But even when it

11  rained, they were still outside, sometimes.  But they were

12  active.  They were very active outside.

13  Q. What about checking the mail?  Did you see Ms. Durand

14  checking the mail?

15  A. Yes, every day.

16  Q. And was she -- how was she getting to the mail?

17  A. She walked right out there to the mailbox and got her mail.

18  And she would pick up her trash cans during -- twice a week

19  and drag them, along with her mail, to her house.

20  Q. Did she ever appear to be injured when she was checking the

21  mail?

22  A. No.

23  Q. Did she check that mail from the time period of 2007 until

24  2010, or whenever she was your neighbor?

25  A. Yes.

1    Q. Now, were you impressed with Ms. Durand?

2    A. I was.

3    Q. Okay.  Explain that to the Court, please.

4    A. Well, she was very active, and, so, I thought that -- you

5    know, I'm like, oh, I wish I could be more like that.  Because

6    I could not -- I didn't have the stamina to run.  I did not

7    have the strength to hold a chainsaw.

8         I did not have -- I mean, I -- I had five kids, but I

9    just -- I did not have the kind of stamina to do all of the

10   things, and then still get on a horse in the evening and go

11   ride down the street.  I did not have that kind of -- you

12   know, I was just -- I was exhausted watching them.

13        And I just didn't have that.  And I wish I could have

14   been more athletic like that, but I just couldn't.

15   Q. What about the lifting of the hay bales?

16   A. That was very impressive.  Because those things are big,

17   and they're heavy.  And the way that she could swing it, throw

18   it up into the thing, I just was -- I was, like, "Wow!"

19   Q. Now, ma'am, how tall are you?

20   A. I'm six-foot.

21   Q. Okay.  And, so, is it fair to say that you can lift heavy

22   objects, as well?

23   A. I -- I can't.  Not -- (shakes head negatively)

24   Q. Okay.  But you were impressed with Ms. Durand's ability to

25   do that.

1   A. I was very impressed.

2   Q. Okay.  Now, did you ever see anything with a porch?

3   A. Yes.

4   Q. Could you explain that?

5   A. One day, they had a shipment of boards and things that came

6   -- came to their house.  And they took it off the back of the

7   truck, and they were building a porch.  They started building

8   the porch, and I think it was, like, three weeks that it took

9   them to build the porch.

10  Q. And what -- what did you see when they were building the

11  porch, what was Ms. Durand doing?

12  A. Uhm, they would take the boards and take it to the back of

13  the house.  I didn't witness them with hammer and nail, or

14  anything like that, but, uhm, I did see them lifting the

15  boards and taking it to the back of the house.

16       And it wasn't until after they moved that we found out

17  that that's what they were doing, was the porch.  Because

18  there was not a porch, initially, when they moved in.  Because

19  we looked at that property before we purchased our house, and

20  there was no porch.

21  Q. So, what you saw, then, was them lifting the boards.

22  A. Lifting the boards.  And they did build a frame in the

23  driveway.

24  Q. You saw that?

25  A. But I didn't get to see the, you know, laying the boards on

1   top and doing that.  I mean, it was pretty obvious that that's

2   what they were doing.

3   Q. How big were the boards?

4   A. Uhm, I would say four- to six-feet long.  And just regular

5   2x4s, so, four -- four to six feet.

6   Q. How were they picking up the boards?

7   A. They would pick them up in stacks and take them to the

8   back.

9   Q. Multiple --

10  A. Sometimes, they would put it on their shoulder, sometimes

11  they would carry it, you know.

12  Q. And when you say "they," you're referring to Ms. Durand --

13  A. Both of them.

14  Q. -- and her husband.

15  A. Yes.

16  Q. Now, did you see Ms. Durand throughout 2007 and 2010

17  bending while she was doing all of these activities?

18  A. (Nods head affirmatively)  Yes.

19  Q. What about squatting?

20  A. Squatting, yes.

21  Q. Kneeling to do anything?

22  A. Yes.

23  Q. And did she ever appear to show any signs that she was

24  injured at all?

25  A. No.

1  Q. Ma'am, did you have any idea that Ms. Durand had a

2  disability status with the post office?

3  A. I had no idea of any of that at all.

4  Q. Would that have surprised you?

5  A. Yes.  (Nods head affirmatively)

6  Q. Why is that?

7  A. Because of her activity.  She was always moving around, she

8  was always doing things.  And just -- I thought she was very

9  athletic.  I had no idea that she was ever injured, anything.

10  I was very impressed by her athletic build, and running up and

11  down, taking care of the horses.

12      When she would come and get the horse out of our yard,

13  she would, you know, fuss with the horse.  The horse's head

14  would jog around, and she would grab it, and fight with the

15  horse to get it to be under her control to take back across

16  the street.

17  Q. And never showed any signs of pain or injury.

18  A. Huh-uh.

19  Q. Did she ever seem incapable of completing physical work

20  when you saw her?

21  A. Never.

22  Q. Now, was there a time period when Hurricane Ike came

23  through your area?

24  A. Yes.

25  Q. Explain that.

1  A. In September of 2008, we were hit by a hurricane.  And it

2  knocked out the power and everything for two, maybe three

3  weeks.  And I actually spoke with my neighbor to find out when

4  they moved in.  Because I wasn't sure if they were there

5  during that, but they were not.  Uhm, so their two -- the

6  front two pieces of property were vacant.  And, so, it was

7  just her, and then Mark Gilla, who lives two plots down.

8      Uhm, and there was three to four trees go down in our

9  yard.  And I'm not sure how many trees went down in their

10  yard, but I did hear the sound of the chainsaws going.  My

11  husband was scared to use a chainsaw because it caught his

12  pant leg one time, and, so, he never wanted to use it again.

13      But they had theirs going on a consistent basis because

14  of the -- I -- I know they had two trees in the front go down.

15  Because that -- that was right there by the ditch, so we could

16  see that.

17  Q. Now, when was the time frame of Hurricane Ike?

18  A. It was in September of 2008.  It was actually September

19  13th, 2008.

20  Q. September 13th of 2008?

21      MR. WELDON:  Agent Boynton, could we please show the

22  witness Government's Exhibit 18?  And then if I -- if we could

23  scroll down to the dates, please.

24      THE AGENT:  This one here?

25  **BY MR. WELDON:**

1    Q. What's that date that you're seeing there, ma'am?

2    A. September 14th, 2008.

3              MR. WELDON:  May I have just a moment, Your Honor?

4              THE COURT:  You may.

5

6                    **(Discussion off the record.)**

7

8    **BY MR. WELDON:**

9    Q. Very briefly, ma'am.  When you saw Ms. Durand running, what

10   was she wearing?

11   A. She had purple jogging shorts on, and a shirt, just a

12   regular t-shirt.

13   Q. And that was her general garb that she was wearing?

14   A. That was her -- you could see her -- my husband and I would

15   see her on a consistent basis in the purple shorts, and just a

16   t-shirt most of the time, jogging.

17             MR. WELDON:  I have no further questions, Your

18   Honor.

19             THE COURT:  Cross-examination.

20

21                      **CROSS-EXAMINATION**

22   **BY MS. HUNT:**

23   Q. Good morning.

24   A. Good morning.

25   Q. So, I would like to start today with some discussion about

1  an interview that you gave to Special Agent Haywood.

2  A. Okay.  (Nods head affirmatively)

3  Q. So, on January 9th, 2008, isn't it true that Special Agent

4  Haywood showed up at your house?

5  A. He did not show up at my house, he was actually -- he

6  parked in the street (indicating).  And, I, as a mom of five

7  kids, was curious to who that was that was at the --

8  (indicating) you know, the base of my driveway area.

9      I was concerned, because we've had -- we had several vans

10  and stuff come down the road.  And I was nervous about who

11  that was, because I was by myself with my kids.

12  Q. Okay.

13  A. And, so, I went down there and asked him what he was

14  doing.

15  Q. So, you started a conversation with him.

16  A. Yes.  (Nods head affirmatively)  Yes.  I was, like, "What

17  is going on?"  "Why are you at the base of my driveway?"

18  (Smiling)

19  Q. And he explained to you why he was there?

20  A. Uhm, yes.  He said that he was there doing some

21  surveillance.

22  Q. Were you curious about what surveillance?

23  A. He showed me his badge, his postal police badge, at the

24  time.  (Nods head affirmatively)

25  Q. Did he then start talking to you about whether you knew Ms.

1  Durand or Ms. Simmons at that point?

2  A. He asked me if I had a friendship with them, and I said,

3  "Other than just being a neighbor, no.  We never really, you

4  know, been -- visited each other, been in each other's

5  kitchens or anything like that, we just knew, as in passing."

6  Q. So, you never knew Ms. Simmons, never talked to her?

7  A. I talked to her occasionally, like, "Hi, how are you

8  doing?"  "Having a nice day," that kind of stuff.  But it was

9  never indepth conversations.

10  Q. Did -- after he said that he was there looking -- or there

11  to discuss -- or watch Ms. Simmons, is that what you

12  understood --

13  A. Yes.

14  Q. -- him to say?  Okay.  So, he -- then did he start asking

15  you questions about whether you knew her?

16  A. He just asked if I had a relationship with her, if I was a

17  friend of hers or anything.  And I said that I just knew her

18  as the lady across the street, that was pretty much it.  I did

19  not have any type of consistent conversations with her that

20  were long and -- you know, we just said "Hi" and "Goodbye."

21  Q. But, at some point, he asked you if you would provide a

22  statement; is that correct?

23  A. Yes.

24  Q. And, so, did that occur outside on -- in the middle of the

25  street, or did you invite him into your home?

1    A. Oh, I did invite him up to the house.  When my husband came

2    home.  Uhm, I invited him up to, you know, be out of our --

3    you know, be out of the street.  I just didn't feel

4    comfortable with him just right there in the street.

5    (Laughing)

6    Q. So, did you have a long conversation before you did this,

7    or did you just -- with Special Agent Haywood before you

8    invited him in, or --

9    A. No.  I waited for my husband to come home.  (Nods head

10   affirmatively)

11   Q. Okay.  So, you're both in the house with Special Agent

12   Haywood.

13   A. (Indicating)

14   Q. And he asks you if you would like to provide some

15   statements in a formal interview; is that correct?

16   A. Yes.

17   Q. And you did so.

18   A. Yes.

19   Q. And this was back, then, on January 9th, 2008?

20   A. Yes.

21   Q. That's the only interview that you've had with Special

22   Agent Haywood?

23   A. I believe so, yeah.

24   Q. Okay.  Now, would you say that your recollection of what

25   was occurring with regard to Ms. Simmons was more prominent

1   back in 2008 than it is today?

2   A. There were so many things that happened during that time,

3   that -- I remember the horses specifically coming in the yard

4   and her fighting with them because of our broken sprinklers.

5   And our sprinklers would get broken almost weekly.

6       Uhm, it was -- there were so many things that happened

7   during that time that it was just so -- it's just very clear

8   what happened.  I remember the chainsaws going all of the

9   time.  I remember the building.  I remember seeing her go up

10  and down the street.  I remember that very clearly.

11  Q. You remember it very clearly.

12  A. Yes.

13  Q. So, the -- those are clear recollections that you told

14  Special Agent Haywood about?

15  A. I don't remember -- I don't remember exactly what I said to

16  him, --

17  Q. Did you --

18  A. -- but I --

19  Q. Did you have -- sorry, did you have a chance to review the

20  report that he put together after your interview?

21  A. I'm sure I did.  I don't -- I don't remember right at this

22  second.

23          MS. HUNT:  Okay.  Your Honor, if I may -- let me

24  before -- before I do that.

25  **BY MS. HUNT:**

1   Q. With regard to -- just so I'm clear, you said that you and

2   your husband were there with Special Agent Haywood speaking to

3   him together; is that correct?

4   A. At first, I saw him by myself.

5   Q. Right.

6   A. And then my husband also was there.

7   Q. So, when you actually did the interview in your home, you

8   both were together.

9   A. I believe so.  (Nods head affirmatively)

10   Q. Okay.  So, if, maybe, you couldn't recall something, your

11   husband might?

12   A. Yes.

13   Q. And vice-versa.

14   A. Correct.

15          MS. HUNT:  So, if, Your Honor, I may approach the

16   clerk to --

17          THE COURT:  You may.

18          MS. HUNT:  And I would mark and proffer this as

19   Exhibit 504, I think we are at.

20   **BY MS. HUNT:**

21   Q. Ms. Durand -- or, I mean, sorry, Ms. Drescher, --

22   A. Uh-huh.

23   Q. -- does this report look like something you reviewed?

24   A. It's very blurry.

25          THE COURT:  Hold on.  Madam clerk, can you figure

1    out how to -- it looks like my child -- my son has gotten

2    ahold of my phone.

3            MR. ARVANETES:  Your 17-year-old?

4            THE COURT:  Could be any of them.

5        Go ahead, Ms. Hunt.

6    **BY MS. HUNT:**

7    Q. That looks familiar to you?

8    A. Yep.

9            MS. HUNT:  Okay.  So, if I could have you focus

10   on -- actually, I think it might be under the next page, madam

11   clerk.

12   **BY MS. HUNT:**

13   Q. Let's just take the chainsaw.  Where -- you see in that

14   third paragraph where it talks about, "The chainsaw started

15   again"?

16   A. (Viewing document)  Uh-huh.  Yes.

17   Q. You indicated that Ms. Durand walked to the back part of

18   the woods and the chainsaw started again.

19   A. Yes.

20   Q. No statements about Ms. Durand actually using a chainsaw;

21   is that correct?

22   A. Well, I couldn't see the back of her house, I could only

23   see the front of her house.  And there were several trees in

24   the front that I did witness her using a chainsaw cutting

25   down.

1    The back part of the house is heavily wooded, and, so, I
2    don't have eyes in the back.  I can just hear the chainsaw
3    going.  I -- I --
4    Q. Okay.  So, again, your recollecting something very
5    specific, but you did not tell Special Agent Haywood that you
6    actually saw Ms. Durand use a chainsaw in the front of the
7    house; is that correct?
8    A. There was so many things that happened.  And the more that
9    I sit and listened to the chainsaws going and stuff like that,
10   it was just common.  And, so, maybe, at that specific moment
11   in time, I didn't recollect her cutting down a tree in the
12   front, but this was also in, you know, in 2008.  She lived
13   there for another two years, where I know that I've seen her
14   cut down trees, I know that I saw her chasing after a dog, and
15   coming in our yard and getting her horses.

16   And, maybe, at that specific date, maybe I didn't.  I
17   don't remember.  I know that I've seen her numerous times with
18   a chainsaw.  I know that I've seen her numerous times come get
19   her horses out of my yard.  I know that I've seen her fight
20   with her horses.  I know I've seen her hit her dogs.  I know
21   that I saw her chase trash cans down the street when the wind
22   blew them.

23   I've seen her do a lot of things.  And at that specific
24   moment, maybe, I just didn't think about it at that time,
25   because it was so common.  That's the only -- the only thing

1  that I can think of.

2  Q. You didn't think to mention specifically all of that, that

3  laundry list you just specified, to Special Agent Haywood when

4  he was asking you what you knew about Ms. Durand.  It did not

5  occur to you to say that at that moment.

6  A. I tried to give him as much information as I could at that

7  moment.

8  Q. Which was that you had only heard the chainsaws.  Is that

9  correct?

10  A. Yes.

11  Q. Because that's what the statement says.

12  A. Yes.  And that -- and that -- that's the only thing I could

13  think of, I guess, at the time.  I -- I --

14  Q. And you've never provided a further statement to Special

15  Agent Haywood about seeing Ms. Durand with a chainsaw, or

16  hitting dogs, or fighting with horses since then; is that

17  correct?

18  A. When he left, no, I didn't speak to him again.  Until I was

19  subpoenaed to come here.

20  Q. So, were you telling the truth to Mr. -- Special Agent

21  Haywood at that moment?

22  A. Absolutely.  Yes, I did tell him the truth.  But I don't

23  remember every tiny detail of every thing, every day.  I -- I

24  -- looking back, (indicating) I can remember the horses in my

25  yard breaking my sprinklers.  I can remember her coming and

1    getting her horses and fighting with the horses.  I can

2    remember her moving pots and plants.

3        I can remember her -- seeing her pass this -- the house

4    on her jogs.  I can see -- I can remember her going up and

5    down the street on her horses in the evenings.

6    Q. Okay.  Let's go --

7    A. And, maybe, at that moment, I didn't think about that as

8    something that was, you know -- you know (indicating) --

9    Q. At that moment in 2008.

10   A. Correct.

11   Q. When he was asking you about Ms. Durand, you didn't recall

12   it.  That's correct?

13   A. It wasn't that I didn't recall it, it's just that I didn't

14   think it was important, maybe.  Or it was just so common that

15   I didn't even consider it.

16   Q. Let's go back to taking out the trash.

17   A. Uh-huh.

18   Q. You told Ms. -- Special Agent Haywood that you had seen her

19   take out the trash.

20   A. Yes.

21   Q. Nothing more than that.

22   A. That was a common thing that every one of our neighbors did

23   every day.

24   Q. And walk to the mailbox.

25   A. And walk to the mailbox.  I said hello to her numerous

1   times at the mailbox, and she would reply hello back.

2   Q. Even though you indicated to Special Agent Haywood that you

3   -- they were very private people.

4   A. They were very private people.  It was very short

5   conversations any time -- any time we had conversations.  When

6   my kids would go over there to let her know that her horses

7   were in our yard, it was a very quick conversation.  She would

8   get her shoes and come get her horses.

9       She never came to my door and talked to me about her

10  horses.  And when I was outside, it was a very quick

11  conversation.  It was never, "Hey, come sit at my kitchen

12  table and have a cup of coffee with me."  It was never like

13  that.  She was very private.  She did not -- with her

14  demeanor, did not want to have that kind of relationship.

15      They did their thing, we did our thing.  I never saw

16  children in her house, or in her yard, or anything.  I do

17  recall numerous trucks dropping off supplies, but never did I

18  ever see kids.  And I had five children at the time that would

19  play kickball in the front yard, and, you know, we were

20  outside a lot in our front yard.

21  Q. So, let's talk about the fence.  You stated to Special

22  Agent Haywood that there appeared to be a fence, but that you

23  never witnessed Ms. Durand actually put up a fence.

24  A. That was at that time.  The other fence that I'm talking

25  about is not the same fence.  The fence that I'm discussing

1    was the fence that rolled across (indicating).  And then there

2    is the -- after 2008, there was -- they put, all around the

3    front, barbed wire, and they dug in, with the post hole

4    diggers, posts to hold that barbed wire around the front.

5    Because their horses continued to get out.

6    Q. So, this is a different fence that was supposedly put up

7    after -- after 2008.

8    A. Well, there was -- the property is very large, and the

9    rolling fence that they put up was -- the very beginning of it

10   was there, but then they put the gate to -- all the way

11   across.

12   Q. And that -- building that fence occurred after you had

13   provided your statement to Special Agent Haywood.

14   A. No.  I can't -- I -- I -- I -- I think -- I'm not 100

15   percent sure, but I think that -- I think that it happened --

16   I think it did happen afterwards.  I'm not 100 percent sure.

17   Q. But it's safe to say that you did not tell Special Agent

18   Haywood you saw her digging posts, --

19   A. The posts --

20   Q. -- putting in a fence.

21   A. The posts were after.  The posts were way after that she --

22   that he came to our property.  The posts were after.

23   Q. How about the potted plants?

24   A. The potted plants were --

25   Q. When did that happen?  When did she move the potted plants

1  that you said it was such a, you know, frequent occurrence?

2  A. It happened a lot.  She did move her plants around a lot.

3  Q. So, it would have occurred, you know, before 2008, when

4  Special Agent Haywood came to talk to you?

5  A. I don't remember telling him about the plants.  Maybe, it

6  was because it was just so common that I didn't think about it

7  at the time.  I don't know why I didn't tell him.  I just --

8  you know, just like with the horses getting loose in my yard,

9  I just didn't think about it at that time.

10  Q. There were a lot of things that you didn't think about at

11  that time.  It appears.

12  A. I don't know what to say.  I -- I just tried to give him as

13  much information as I could think of at that moment.

14  Q. Which is what you indicated to him, that you could provide

15  no additional information at that time.

16  A. I guess so.  I -- I -- I don't remember thinking about it

17  after that.  I just -- I went on with my life.  I -- I --

18  Q. So, let's talk about the horses.

19          MS. HUNT:  Madam clerk, if you could bring up the

20  first page of Exhibit 504?

21          THE COURT:  Do you want to admit this exhibit, Ms.

22  Hunt?

23          MS. HUNT:  Yes.  I move for the admission of Exhibit

24  504.

25          MR. WELDON:  No objection.

1          THE COURT:  504 is admitted.

2

3              **(Exhibit Number 504 was admitted.)**

4

5          THE COURT:  Madam clerk, could you zoom in a bit,

6    please?  Thank you.

7    **BY MS. HUNT:**

8    Q. It indicates that they owned some horses; is that correct?

9    A. That's correct.

10   Q. And that they sold a horse to somebody next door?

11   A. Yes, they did.

12   Q. That's the extent of the information that you provided to

13   Special Agent Haywood about the horses, would you agree?

14   A. Yes.  At that time, yes.

15   Q. But you had seen, again, her riding her horse at night, you

16   were impressed by her ability to ride horses daily?

17   A. I was.  I was.

18   Q. And this had occurred before you met with Special Agent

19   Haywood?

20   A. Yes.

21   Q. Yet, you did not tell him that.

22   A. I just didn't -- I just didn't think it was valid.  I

23   guess, I didn't -- I guess I really didn't even think about

24   it, because it was such a natural occurrence.  I don't know

25   what else to say.  I just didn't think it was important at

1   that time.

2   Q. And the same with the clearing of the land, you actually

3   saw her clear the land?

4   A. I did.

5   Q. But you did not indicate that to Special Agent Haywood,

6   either.

7   A. You know, I guess -- I guess, I didn't think about it at

8   the time.  I didn't think it was relevant.  I -- I -- I really

9   don't know what I was thinking.  I was just trying --

10          MR. WELDON:  Your Honor, objection.

11          THE WITNESS:  I was trying to give her as much as I

12   could.

13          MR. WELDON:  That's misleading from the statement.

14          THE COURT:  She has already answered it, so I'll

15   overrule it for now.

16      Go ahead, Ms. Hunt.

17   **BY MS. HUNT:**

18   Q. You never indicated to Special Agent Haywood that you were

19   impressed with Ms. Durand, did you?

20   A. Well, he wasn't there in 2010, so, of course, I did not.

21   And, maybe, it was because I had seen a lot more by 2010.

22   Q. You -- but you had seen a lot before that, as well, as

23   you've testified.

24   A. Yes.

25   Q. But you still didn't say that.

1  A. I guess, I didn't think it was important at the time.  I

2  guess, I was just trying to give as much information as I

3  could that I thought was valid.

4  Q. And when did this building of the porch occur?

5  A. I think it was in the summer of 2009.  2008 or 2009.  I

6  can't remember exactly the date.  But I do remember the truck

7  come and drop off the lumber.

8  Q. Okay.  And how about the hurricane?  You indicated that

9  happened in 2008?

10  A. Yes, it happened in 2008.

11  Q. But, again, that's not in Special Agent Haywood's report,

12  either.

13  A. I guess, I didn't think about it at that time.

14          THE COURT:  Ms. Hunt, the hurricane was in September

15  of '08.

16          MS. HUNT:  What?  I'm sorry, Your Honor?

17          THE COURT:  The hurricane was in September of '08,

18  is what she testified.

19          MS. HUNT:  Okay.

20  **BY MS. HUNT:**

21  Q. A few final questions.

22  A. Uh-huh.

23  Q. You indicated that the times that you did see Ms. Durand

24  walk the property or walk to the mailbox, that she didn't

25  appear to be in any pain?

1    A. No.  She didn't appear to be in any pain at all.

2    Q. But you don't know for a fact that she wasn't in any pain.

3    A. Okay.  I had back surgery in 2013, and I had neck surgery

4    in 2013.  I didn't leave my house for six months.  Other than

5    going to the doctor, and that was it.  I never went to my

6    mailbox.

7         And even afterwards, in 2014, in January of 2014, I

8    struggled, and I walked very slow to my mailbox to pick up my

9    mail.  I never saw her struggle to go down the driveway.  I

10   never saw her with any slow movement to pick up the trash

11   cans.  I never saw her do any of those things that I

12   experienced personally after I had back surgery and neck

13   surgery.  I know that I was very, very slow moving for almost

14   a year.

15   Q. You don't know what her surgeries where, do you?

16   A. I have no idea when her surgeries were.

17   Q. Or how much medication she was on.

18   A. I have no idea.  But I never saw her act or move in a way

19   that would even make you think that she had any surgery.

20   Q. And you're moving today.

21   A. Yes, I am.

22   Q. So, you don't know, with time, how much she was able to

23   move.

24   A. I -- I have no idea.  But I do know that in 2000 -- January

25   of 2016, that I worked for the post office, and I delivered

1   mail as a rural route carrier.  And I did -- I did my job

2   perfectly fine.  And I was able to lift and move and turn by

3   2016, and I had my surgery in January -- or July of 2014.

4        And, so, I did move and twist and turn.  And I was able

5   to work.  And I was able to do my job at the post office,

6   delivering and carrying packages and walking up and down the

7   steps.  Uhm, and I did -- I did a good job.

8   Q. But you, again, don't know Ms. Durand's injuries.

9   A. No, I do not have any idea what happened to her.

10  Q. Correct.

11          MS. HUNT:  If I may have a moment?

12          THE COURT:  You may.

13          MS. HUNT:  No further questions, Your Honor.

14          THE COURT:  Redirect, Mr. Weldon?

15          MR. WELDON:  Very briefly, Your Honor.

16

17                    **REDIRECT EXAMINATION**

18  **BY MR. WELDON:**

19  Q. Ma'am, you were asked some questions about your interview

20  that was given on January 9th of 2008.  I just wanted to focus

21  on one section, because defense counsel said you never

22  mentioned that Ms. Durand and her husband were clearing the

23  land.

24        And I'm just going to direct your attention to that

25  interview.  Do you see that, ma'am, on the screen?

1    A. Yes.

2    Q. Can you please explain where you identified where you saw

3    Ms. Durand with her husband clearing the land?

4    A. Uhm, it says, "Sonja stated that she could hear the

5    chainsaw being operated on a daily basis at the Durand's and

6    the Simmons' residence, she stated" --

7    Q. Above that.  I'm sorry, ma'am.

8    A. Oh, I'm sorry.

9    Q. That was my fault.  It's right above that.

10   A. "Sonja added that they had been clearing the land ever

11   since they moved into the residence."

12   Q. Now, this interview, then, you had mentioned that it

13   occurred on January 9th of 2008?

14   A. Correct.

15   Q. Now, you saw activities that occurred after that time

16   period; is that right?

17   A. Correct.

18   Q. Okay.  Now, when you spoke with Mr. Haywood, did you try to

19   give him as much information as you could recall?

20   A. Yes.

21   Q. And, of course, today, are you trying to give the Court as

22   much information as you can recall?

23   A. Yes.  (Nods head affirmatively)

24        MR. WELDON:  I have no further questions, Your

25   Honor.

```
 1           THE COURT:  Is the witness excused?

 2           MR. WELDON:  Yes, please, Your Honor.

 3           THE COURT:  You may step down.  Thank you.

 4           THE WITNESS:  Thank you.

 5           THE COURT:  Mr. Cobell.

 6           MR. COBELL:  Your Honor, the government would call

 7  for its next witness Johnathan Drescher.  And it is his

 8  birthday today, Your Honor.

 9           THE COURT:  Do we have a cake?

10           CLERK OF COURT:  Raise your right hand.

11

12              (The witness was duly sworn)

13

14           THE WITNESS:  Yes.

15           CLERK OF COURT:  (Indicating)

16           THE COURT:  Good morning, sir.

17           THE WITNESS:  Good morning.

18           THE COURT:  Would you please state your full name

19  and spell your last name and give us your date of birth.

20           THE WITNESS:  Johnathan David Drescher,

21  D-R-E-S-C-H-E-R, August 22nd, 1980.

22           THE COURT:  Happy birthday, sir.

23           THE WITNESS:  Thank you.

24           THE COURT:   Go ahead, Mr. Cobell.

25
```

1                        **DIRECT EXAMINATION**

2   **BY MR. COBELL:**

3   Q. Good morning, Mr. Drescher.  Can you -- do you know Ms.

4   Durand, otherwise known to you in the past as Deborah

5   Simmons?

6   A. I know her as my old neighbor.  (Nods head affirmatively)

7   Q. Okay.  And can you describe how long you were neighbors?

8   A. Uhm, probably about three years.  (Nods head affirmatively)

9   Q. Okay.  And do you know approximately what years those were

10   that you lived near her?

11   A. Uhm, I want to say it was 2007, 2008, 2009.  I think so.

12   Maybe, 2010.  I don't remember exactly the years.

13   Q. Okay.  And where did she live in relation to your

14   property?

15   A. Uhm, directly across the street, slightly to the, uhm,

16   right.  (Nods head affirmatively)

17   Q. Okay.  And what did you during -- what did you do for a

18   living during that time period?

19   A. I was a plumber.

20   Q. And how often did you leave your residence to go to work?

21   A. Every day, uhm, Monday through Friday, and sometimes on the

22   weekend, occasionally.

23   Q. Okay.  During that time, did you have an opportunity to

24   speak with Ms. Durand or her husband?

25   A. Uhm, I spoke to them a couple of times, when their horses

1    would get out and come across the street to our house.

2    Q. And what would happen when their horses would come into

3    your property?

4    A. They would come over and get them, and, usually, bring them

5    back to their home in some way, pull them or such.

6    Q. And when you say "them," are you referring to Ms. Durand

7    and her husband, or one, or the both?

8    A. I really only remember her coming across and doing it.

9    Q. And did it look easy?

10   A. No.  No.  The horse was out, it didn't want to go back.

11   (Smiling)

12   Q. And did you ever witness Ms. Durand doing any outdoor

13   activities?

14   A. Yes.  2000 --

15   Q. Can you describe those for the Court, please?

16   A. Uhm, you know, I remember her jogging every morning, or

17   almost every morning.  (Shakes head negatively)  Uhm, I

18   remember her mowing the yard, and doing a lot of yard work.

19   Clearing land.  Dealing with different animals that they had

20   on the property.

21        Uhm, it was a pretty clear shot over there.  I mean, it

22   was directly across the street.  I remember always talking to

23   my wife about how this lady is running every day.  (Laughing)

24   And running is not my thing, so it always seemed to get my

25   attention.

1    Q. Did you ever see her cut down a tree?

2    A. Yes.  Uhm, her and her husband, both, were very active over

3    there clearing the land, putting up fences.  Uhm, a lot more

4    than I was willing to do on my property.  Very busy.

5    Q. Now, do you own a chainsaw?

6    A. Yes.

7    Q. And do you know approximately the size of the chainsaw that

8    you own?

9    A. Uhm, you know, I don't know chainsaw sizes, but I know that

10   mine is just under a professional size, probably three --

11   three-something, 300, 36, sounds familiar.

12   Q. 36 inches, perhaps?

13   A. I don't know.  I have no idea.  It's a full-sized chainsaw.

14   I know that.

15   Q. Did you ever see the chainsaw that Ms. Durand would use?

16   A. Uhm, you know, I'm sure I saw it.  I don't recall theirs.

17   I, for whatever reason, can only picture what mine looks

18   like.

19   Q. Okay.  But did it appear to be, also, a full-sized

20   chainsaw?

21   A. A full-sized chainsaw.  You weren't cutting down anything

22   in our neighborhood without something of size.

23   Q. And do you recall Ms. Durand feeding her horses?

24   A. Yes.

25   Q. Can you describe how she did that?

1  A. Uhm, you know, it was regular square -- square bales of hay

2  that she would lift and put into a horse feeder, which is

3  usually waist high, something you would have to lift up, you

4  know, relatively high above your waist to get it in there.

5  Q. And do you know how the hay that she fed her horses with

6  got to her property?

7  A. Truck.

8  Q. Did you ever see a truck bring the hay there?

9  A. I didn't.

10  Q. Okay.  Did you ever see Ms. Durand doing activities that

11  included -- that required her to bend?

12  A. Yes.

13  Q. Did you ever see her squat during any of her activities

14  outside?

15  A. Did you say "squat"?

16  Q. Yeah.

17  A. Yes.

18  Q. And kneeling?

19  A. Yes.

20  Q. Did you ever see her ride her horses?

21  A. Yes.

22  Q. And how often would you witness that?

23  A. Uhm, I didn't see it very often.  Because, like I said, I

24  wasn't home as much.  But, you know, uhm, just about every

25  weekend they would take them out.

1  Q. And how -- have you ever ridden a horse?

2  A. Once.

3  Q. And how fast would Ms. Durand ride with her horses, if you

4  can recall?

5  A. I remember walking, and, then, whatever it's called when

6  you're going -- not a full run, but just faster than a walk.

7  Q. (Nods head affirmatively)

8  A. I'm sure there is a word for it.

9  Q. If -- do you know a word that we would use if you were

10  describing a human moving at that level of pace, like

11  jogging?

12  A. Probably, jogging, yeah.

13  Q. Okay.  And do you recall the damage that Hurricane Ike had

14  caused in the area?

15  A. It tore trees down on everybody's property.

16  Q. Do you recall the month and the year that hurricane caused

17  that damage?

18  A. I have no idea.  I would say it was -- me and my wife had

19  talked about it.  I think it was 2009.  Maybe, it was --

20  somewhere in there.

21  Q. Would September of 2008 sound approximately correct?

22  A. I mean, that sounds fine.  I'm sure the weather data tells

23  what the date is.  (Chuckles)

24  Q. Well, what happened on your property because of that?

25  A. I lost several trees that came down that had to be chopped

1  up and moved into piles to be burned.

2  Q. And did Ms. Durand have similar trees come down on her

3  property, that you're aware of?

4  A. Yes, we all did.

5  Q. And how did you deal with your trees?

6  A. I'm quite a bit lazier than they were across the street.  I

7  burned mine in place.

8  Q. And how did Ms. Durand and her husband deal with their

9  trees?

10  A. They chopped them up, like you're supposed to, and moved

11  them into piles and, uh --

12  Q. Now, in any of your time, when you saw Ms. Durand doing any

13  of these activities that you've described, did you see or

14  notice her in pain or incapable of doing these activities?

15  A. No.

16  Q. And how would you describe her and her outdoor

17  activities?

18  A. Very active.

19  Q. And, for example, her fitness level?  How would you rate

20  her?

21  A. Uhm, I would -- if -- I mean -- if I hadn't found out there

22  was an issue, I would have never known.  And I had no idea,

23  she was extremely active.  (Nods head affirmatively)

24  Q. Okay.  And do you see Ms. Durand in the courtroom today?

25  A. Not that I'm aware of.

1    Q. Do you know --

2    A. Oh, there she is.  (Laughing)

3    Q. All right.  Can you describe an article of clothing that

4    she is wearing?

5    A. A shirt.  I don't know, green?

6          MR. COBELL:  May the record reflect that the

7    defendant has identified -- or, I'm sorry, that the witness

8    has identified the defendant?

9          THE COURT:  The record will reflect.

10          MR. COBELL:  No further questions, Your Honor.

11          THE COURT:  Cross-examination, Ms. Hunt.

12          MS. HUNT:  Yes, Your Honor.

13

14                    **CROSS-EXAMINATION**

15    **BY MS. HUNT:**

16    Q. Good morning.

17    A. Good morning.  How are you?

18    Q. Pretty good.  So, I'll start with the statement that you

19    just gave about if you hadn't found out there was an issue

20    with Ms. Durand, you wouldn't have known.

21    A. No.

22    Q. What do you mean "an issue"?

23    A. Uhm, so, when I heard that there was a disability that she

24    had -- so, when I heard that she had a disability, uhm, that

25    -- that's how I found out there was an issue.  So...

1    Q. Who did you hear that from?

2    A. An investigator, who was sitting at the edge of my

3    property.

4    Q. So, it was on the day that you gave yours -- your statement

5    --

6    A. Yes.

7    Q. -- (nods head affirmatively) to Special Agent Haywood?

8    A. Yes.

9    Q. Okay.  So, he indicated to you that she had had some

10   injuries?

11   A. Yes.

12   Q. So, let's talk about that date.  Was that the only date

13   that you gave a statement to a federal agent?

14   A. I don't remember giving any other statements.

15   Q. So that was the only one.

16   A. I think so, yeah.

17   Q. So, on January 9th, 2008, you gave that statement.

18   A. Right.

19   Q. And you did so, uh, with your wife present; is that

20   correct?

21   A. Yes.

22   Q. And it was inside of your home?

23   A. Yes.

24   Q. So, if, for example, you couldn't remember something, your

25   wife -- your wife might fill in if he asked a question about

1   what you knew, and vice-versa?  Is that fair to say?

2   A. Not really.  I mean, we both had seen enough that we didn't

3   need to help the other.

4   Q. Okay.  And, so, you gave your statement to Special Agent

5   Haywood about what you had seen.

6   A. Correct.

7   Q. But you never mentioned that you saw Ms. Durand jogging or

8   running in that statement; is that correct?

9   A. That's correct.

10   Q. And you never mentioned that you saw her with any bales of

11   hay; is that correct?

12   A. I suppose, if that's what it says.

13   Q. And with -- with regard to the bales of hay, were they

14   round bales of hay or --

15   A. They were square.

16   Q. They were square?  Do square bales of hay go into a feeder,

17   or do they have to be round?

18   A. The only round ones I've ever seen were gigantic.

19   Q. Okay.  And you mentioned to Special Agent Haywood that you

20   saw her clearing the land; is that right?

21   A. Yes.

22   Q. You actually saw her doing activities to clear the land?

23   A. Yes.

24   Q. But that specificity, that type of statement was not even

25   in your actual interview, that's not what was indicated.

1   A. I guess, at the time, I wasn't trying to be involved.  But,
2   now, I don't have a choice.
3   Q. So, you had information that you didn't provide him?
4   A. It's possible.
5   Q. And the same with putting up the fence, you said you saw
6   Ms. Durand put up the fence?
7   A. Yes.
8   Q. That's what you say today.  But you didn't say that to
9   Special Agent Haywood at that time.
10  A. Truth be told, I didn't remember her even running, until a
11  couple of days ago when I was talking to my wife about it, how
12  she was running and always wearing this purple outfit.
13  Q. Oh, okay.  And, so, you guys had talked about all of the
14  things that you've recalled in the past ten years.
15  A. Yes.
16  Q. Since you gave your statement.
17  A. Correct.  It didn't seem as important at the time because
18  it wasn't my business.
19  Q. But it became your business because you were subpoenaed?
20  A. It is my business because I'm subpoenaed.
21  Q. Same with dealing with the animals, you didn't indicate
22  that to Special Agent Haywood.
23  A. (Shakes head negatively)  I suppose not.
24  Q. So, and your wife works for the Postal Service -- Postal
25  Service; is that correct?

1   A. She did at one point.

2   Q. She did.  Do you work at the Postal Service?

3   A. No.

4   Q. Who was her supervisor?

5   A. Who was her supervisor?

6   Q. Yes.

7   A. (Pause)  Uhm, I don't remember his name.  Mr. -- there was

8   something that he liked to be called.  It was a letter.

9   Mr. -- I never met him, so -- I'm not good with names.

10  Q. Did you and your wife ever discuss Ms. Durand after you

11  gave this statement to Special Agent Haywood?

12  A. Not really.

13  Q. Not until you got the subpoena?

14  A. Yes.

15  Q. Nobody ever mentioned -- your wife never mentioned coming

16  home from working at the Postal Service?

17  A. What do you mean?

18  Q. About Ms. Durand, or nobody had any comments about her?

19  A. In reference?

20  Q. Like, office gossip or anything like that?

21  A. No.

22  Q. Okay.  So, the statement that you actually did provide to

23  Special Agent Haywood, you know, you indicated that about

24  chainsaws, as we've talked about, but you didn't actually see

25  her with one at that time?

1  A. Is that a question?

2  Q. Did you actually -- you had to actually have seen her with

3  a chainsaw; is that correct?

4  A. I assume, at that time, maybe I hadn't; but since the point

5  of him coming to the house, I couldn't help but start looking

6  over there more often.  And their progress didn't change on

7  what they were doing.  I just was more (indicating) observant

8  of what was happening.  (Nods head affirmatively)

9  Q. Were there other people working on the property?

10  A. Her and her husband.

11  Q. There weren't other people living on the property?

12  A. No.

13  Q. Not that you're aware of?

14  A. No.

15  Q. Like her daughter?

16  A. I didn't know them personally, so, maybe, she didn't come

17  outside as much as they did.

18  Q. And you indicated that Ms. Durand didn't appear to be in

19  any pain, but you don't know for sure, do you?

20  A. It's not possible for me to know if someone's in pain.

21          MS. HUNT:  Okay.  Your Honor, if I may have a

22  moment?

23          THE COURT:  You may.

24

25          **(Discussion off the record.)**

**BY MS. HUNT:**

Q. Just a couple more questions.  Regarding your wife, as we've talked about, since you both gave the statement together, when did your wife actually work for the Postal Service?

A. I want to say 2016.  So, it was last year.  Just recently.

Q. And how was it that she injured her back?

A. We were in a car accident together.

Q. Okay.  Thank you.

MS. HUNT:  No further questions.

THE COURT:  Mr. Weldon, redirect -- or Mr. Cobell? I'm sorry.

MR. COBELL:  No -- no redirect, Your Honor.

THE COURT:  Is the witness excused?

MR. COBELL:  Yes.

THE COURT:  You may step down, Mr. Drescher.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Mr. Weldon.

MR. WELDON:  Yes, Your Honor.  Craig Dunn is our next witness, Your Honor.

Your Honor, just to update the Court, I cut two witnesses, so it's almost as if we've had four witnesses

1  testify today.

2          THE COURT:  It seems like it.

3          CLERK OF COURT:  (Indicating)

4

5                **(The witness was duly sworn)**

6

7          THE WITNESS:  I do.

8          CLERK OF COURT:  (Indicating)

9          THE COURT:  Good morning, sir.

10         THE WITNESS:  Good morning.

11         THE COURT:  Would you please state your full name

12  and spell your last name?

13         THE WITNESS:  Samuel Craig Dunn, D-U-N-N.

14         THE COURT:  Go ahead, Mr. Weldon.

15         MR. WELDON:  Thank you, Your Honor.

16

17                  **DIRECT EXAMINATION**

18  **BY MR. WELDON:**

19  Q. Sir, will you please tell the Court what you do for a

20  living?

21  A. I am a Supervisory Claims Examiner for the Office of

22  Workers' Compensation program.

23  Q. And where -- what agency is that for, sir?

24  A. The Department of Labor.

25  Q. How long have you worked in that capacity?

1    A. I've been a Supervisory Claims Examiner for two-and-a-half

2    years.  Prior to that, I was Chief of Operations.  I've been

3    with the OWCP for 16 years.

4    Q. Okay.  And that -- and when we say "OWCP," that means the

5    Department of Labor; is that right?

6    A. Yes.  Yes.

7    Q. Or, at least, it's part of the Department of Labor.

8    A. Correct.

9    Q. Is that an agency of the United States, sir?

10   A. Yes.

11   Q. Now, while we are on that topic, is the United States

12   Postal Service also an agency of the United States?

13   A. Yes.

14   Q. Can you explain the role of the Department of Labor OWCP

15   with Workers' Compensation claims?

16   A. Yes.  So, we manage compensation claims.  My particular

17   division, the Division of Federal Employees' Compensation,

18   handles pretty much all civil employees that are U.S.

19   government employees.

20       So, uhm, if an injured worker, they could be working for

21   the Postal Service or for any of -- the Department of

22   Agriculture, any U.S. government agency, gets hurt, they file

23   a claim.  It goes through their employment agency and then

24   comes to us, the Workers' Compensation program, it comes to

25   the Department of Labor.

1    And then we administer the claim.  We administer

2    benefits.  And look to determine if we can accept or deny the

3    claim.  And, if it's accepted, then we will administer

4    benefits.

5    Q. Now, when you say "administer," can you explain what that

6    means?

7    A. Yeah.  So, initially, when we get a claim, uhm, we -- we're

8    looking for five basics, essentially, to determine if we need

9    to accept a case, or deny the case, or develop the case.

10    Uhm, if a case meets those five basics, then we -- we

11    accept the case.  Uhm, once a case is accepted, we offer

12    medical treatment that -- we will provide medical treatment

13    that can cure or give relief to an injured worker.

14    Uhm, we also offer wage replacement benefits, and

15    vocational rehabilitation, if necessary.

16    Q. And, so, you look at all of those factors, and that's part

17    of your administrating the claim.

18    A. Correct.

19    Q. Now, who, then, Mr. Dunn, decides whether or not to accept

20    or reject a claim?

21    A. A claims examiner.

22    Q. And who has the ultimate authority to do that?  In other

23    words, can the post office do that, sir?

24    A. No.  No.  We -- the Office of Workers' Compensation has

25    that -- that sole responsibility.

1    Q. And, so, that's through the Department of Labor.

2    A. That's through the Department of Labor, yes.

3    Q. All right.  Now, once that claim has been made, and then

4    it's accepted, --

5    A. Uh-huh.

6    Q. -- then that's when you get into the administration of the

7    benefits; is that right, sir?

8    A. Correct.  Correct.

9    Q. Okay.  And, so, then, can you explain what the goal is of

10   the Workers' Comp program?

11   A. The goal, ultimately, is to return an injured worker back

12   to work.

13   Q. And -- and so --

14   A. When they are medically able to do so.

15   Q. Now, is it a retirement program at all, sir?

16   A. It is not.

17   Q. Now, when you're looking to administer the claim, are you

18   looking at the medical evidence that you receive in order to

19   rely on whether and how you are going to administer that

20   claim?

21   A. Yes, sir.

22   Q. Can you explain that process, sir?

23   A. Yeah.  So, like I was saying there -- just kind of

24   background for a minute.  So the five basic elements that we

25   look at to accept a case, we're looking is the claim timely

1  filed?  Is the employee a civil employee?  Has, in fact, an

2  injury occurred?  Did it occur during the performance of the

3  duties, and then a causal relationship, which is does the

4  medical evidence establish that the injury or incident that

5  they claimed caused the accident, is there medical rationale

6  to support that that injury was caused by those factors?

7      So, then, once we have that medical, we can accept the

8  claim.  And, then, going forward, uhm, pretty much how we

9  administer and what we provide is all based on medical

10  evidence.  So, if you file a claim for wage loss, we need to

11  see if the medical evidence supports that you are actually

12  disabled for the period of time that you're being claimed --

13  or that's being claimed.

14      If you're asking for medical treatment for -- I mean, it

15  could be physical therapy or it could be surgery, but we're

16  going to look to see if the medical evidence supports that

17  that's necessary.

18      You know, sometimes you might get something that seems

19  off the wall, and we have to develop that or deny it.  But,

20  for the most part, if the medical supports, kind of, what's

21  being requested, then we would authorize it.

22  Q. So, when you're looking to administer that claim, are the

23  doctors' impressions and conclusions important for what you're

24  relying on?

25  A. Yes, absolutely.

1    Q. In that same vein, then, when the doctors are working with

2    the patient, who are the doctors relying on to provide them

3    information?

4    A. The patient.

5    Q. Now, then, when you're looking for the administration of a

6    claim, do you look for employability at any time?

7    A. Yes.  So, like we said before, kind of the goal of the

8    Department of Labor OWCP is to get them back to work.  So,

9    uhm, a lot of times employment agencies can accommodate

10   limitations.  It doesn't necessarily have to be your released

11   to return to work without restrictions, a lot of times they

12   can accommodate limited duty and things like that.

13       And what OWCP does, when we get those -- so, if we get a

14   form that says there are restrictions, normally we would go

15   back to the employment agency and say, "Can you make a job

16   offer that meets these restrictions?"  And if they can, then

17   they're supposed to write it up and offer it.

18       And, really, we -- we -- OWCP, we get involved with it,

19   if the job offer is denied, then we would need to make a

20   suitability finding on it.  Or if it's accepted, OWCP would

21   really, at that point, just want to reduce compensation.

22       So, you know, when you say you have -- or accepted a job

23   working four hours a day, we wouldn't want to keep paying you

24   for eight hours a day, so we would pay you for the four that

25   you are not working.

Q. Now, Mr. Dunn, can you explain why offering a job to an employee at four hours is beneficial for the government and for this -- for example, for the post office?

A. Yeah. Well, so, the way, I guess, funding works for OWCP is there is something called the Employees' Compensation Fund. So, all benefits that are paid out to injured workers come out of this Employees' Compensation Fund.

At the end of June every year, essentially, there's a bill that is sent to employing agencies, it's called a chargeback. Every agency has a chargeback code. So, in accordance with that code, we send a bill to the agency. And when they go before Congress, part of their budget includes, essentially, paying back that money that's been paid out.

So, by reducing what we are paying out for a job when somebody goes back to work, we are reducing the chargeback that the agency -- federal work -- the agency, essentially, is reducing what they are paying out in benefits.

Q. So, just to make sure we're clear on that, these compensation funds that you were describing, are those federal dollars?

A. Yes.

Q. Then when somebody is working four hours, for example, that actually lightens the amount that has to be paid by the agency. Is that right?

A. Correct.

1    Q. And, so, of course, if it were over a year, or, let's say,

2    a decade, would that be a significant amount, potentially?

3    A. Yes.

4    Q. And, so, that's why, then, the agency is willing to do

5    that, sir?

6    A. Yes.

7    Q. Okay.  Let's talk, then, about the vocational program.

8    A. Okay.

9    Q. So, if there isn't a job that the agency can provide, are

10   there still other avenues that the agency can pursue?

11   A. Yes.  So, like I said, if we were to get medical evidence

12   that had work restrictions, our first step, generally, is to

13   go to the employing agency.  But if they come back and say we

14   cannot accommodate this, we have a vocational rehabilitation

15   program.

16       And, normally, the case would then get referred to our

17   rehab specialist to then assign a rehab counselor.  And the

18   counselor would do an interview, a skills assessment, would

19   look at their -- the injured worker's, kind of, work history

20   and their skill set, and would try to identify some jobs,

21   maybe, in the private sector that they would be able to do,

22   uhm, that was within those restrictions.

23   Q. What about telemarketing?  Is that a job?

24   A. That is a job.

25   Q. And is that something that the post office or that OWCP

1  could ensure an individual was doing for them or for some

2  other --

3  A. Yeah.  I mean, if that's the job that the rehab -- that the

4  rehab counselor identifies, that's definitely one that we

5  would -- I mean, it's not even so much something that we would

6  approve.  We put it into the rehab counselor's, kind of,

7  power, I guess, to identify appropriate jobs.  And if that was

8  one of the jobs that was identified, we would do what was

9  needed to train the person, if necessary, to get them up to

10 speed for being a telemarketer.

11 Q. Now, why would telemarketing be an option that you look to,

12 generally speaking?

13 A. Uhm, I would think it's something that probably could be

14 easily accommodated, if it has -- you know, some of the

15 limitations that prevented you, maybe, from doing something

16 more physical, that, you know, you could answer a phone.

17 Q. Now, you mentioned the chargeback system, and, ultimately,

18 then, that has to be paid by which agency, for example, in

19 this case?

20 A. The chargeback is paid by the agency.  The OWCP doesn't pay

21 that.  So that would be the Postal Service paying that.

22 Q. Now, then, for example, with the Postal Service, those are

23 Postal dollars; is that right?

24 A. Yes.

25 Q. Then are there Offices of Inspector General within each of

1    those agencies?

2    A.  I believe so, yes.

3    Q. Can you explain the relationship between OWCP and the

4    Office of Inspector General?

5    A. It's -- I guess, OWCP is administrative; the Office of

6    Inspector General is criminal.  The -- how do I explain it?

7    The Department of Labor, essentially, receives information.

8        So, we have no relationship with OIG, they are kind of an

9    independent entity, that, I mean, will -- they may ask us for

10   a copy of a file that they might be interested in, which

11   they're entitled to, but there is no -- like, we would not go

12   to the Postal OIG and tell them to look at it.  We're

13   independent of that.  We don't have anything to do with it.

14       But if they had some information that they wanted to

15   provide us, we might look that over and see if there is

16   something administratively we could do with it.

17   Q. Gotcha.  So, criminal versus administrative, not the same.

18   Is that right?

19   A. Not the same, correct.

20   Q. Okay.  Let's talk, then, about the specifics of Ms.

21   Durand's case.

22   A. Okay.

23   Q. If I could show you, please, Government's Exhibit 3.

24       MR. ARVANETES:  Your Honor, at this time, I would

25   object.  I don't know a foundation about what he knows about

1  Ms. Durand's case.  If he has a file, I would ask for a recess

2  to review his file, or, at least, some foundation by the

3  government.

4           MR. WELDON:  I'll ask.  Your Honor, if I could set

5  the foundation, I will.

6           THE COURT:  Go ahead, Mr. Weldon.

7  **BY MR. WELDON:**

8  Q. Mr. Dunn, did you review Ms. Durand's file in preparation

9  for your testimony here today?

10 A. A little bit, yes.

11 Q. Can you explain what you looked at and what you know about

12 her file and the system that warehouses the documents?

13 A. Yeah.  So, all of our claims are imaged.  So, I pulled up

14 her case file and did look at it.  She initially filed a CA-2,

15 which is a claim form to claim injury, so I looked at that.

16 I've looked at a few of the job offers.  Uhm, I didn't go

17 through page-by-page, but I did try to get an overview of the

18 case.

19 Q. And, of course, your explanation is within the documents

20 from OWCP.  Is that right, sir?

21 A. Yes.  Yes.

22 Q. Okay.  Now, one of the documents that you have seen, if I

23 could show you, please, Government's Exhibit 4, do you

24 recognize this document, sir?

25 A. Yes.  Or once you put that up, I do.

1    Q. Excuse me.  I apologize.

2          MR. WELDON:  It's Government's Exhibit 3.

3    **BY MR. WELDON:**

4    Q. Now do you recognize --

5    A. Yes.

6    Q. -- this document, Mr. Dunn?

7    A. Yes.

8    Q. Okay.  And can you explain what this is, sir?

9    A. That's a Form CA-1032.  Those are administered every year

10   on the month of the injured worker's birthday.  And the point

11   of this is to ensure that continued benefits -- or entitlement

12   continues, or is appropriate.

13   Q. And it outlines where they're working, and, then, their

14   responsibilities; is that right, sir?

15   A. Well, it shows -- it asks questions like, "Did you work

16   over the last year?"  "Have your dependents changed?"  Things

17   like that.  So, like, in Ms. Durand's case, she's currently

18   being paid on what is called a Periodic Roll.  So, the

19   Periodic Roll is an automatic compensation payment that goes

20   out every 28 days.

21         Uhm, this is admin -- issued every year, so that we -- at

22   the very least, we can look at the form and see -- if she was

23   being paid at, say, a three-quarters compensation rate, but no

24   longer has a dependent, we would want to reduce that to the

25   basic level of the two-thirds.

1      So, it's just to make sure that what she's being paid is

2   accurate.

3   Q. Now, this, then, is one of those records in the file that

4   you reviewed; is that right, sir?

5   A. Yes.

6   Q. Is the keeping of that record a regular activity of OWCP?

7   A. Yes.

8   Q. And are you a custodian?  Do you have access to these files

9   and can review them?

10  A. Yes.

11          MR. WELDON:  Your Honor, I move for the admission of

12  Government's Exhibit 3.

13          MR. ARVANETES:  No objection.

14          THE COURT:  3 is admitted.

15

16          **(Exhibit Number 3 was previously admitted.)**

17

18  **BY MR. WELDON:**

19  Q. All right, sir, let's focus, then, if we could, on Page 1,

20  the false statement warning.

21          MR. WELDON: If we could scroll down to that, the

22  warning.

23  **BY MR. WELDON:**

24  Q. Could you explain what that is, sir?

25  A. "A false or evasive answer,"  that?

1  Q. Correct.

2  A. Yeah.  Uhm, that -- that's to let the injured worker know

3  that a false or evasive answer to any of the questions can

4  result in forfeiture of compensation.  So, not specific to

5  this case, but we have seen -- I have seen instances where

6  somebody may have worked but didn't report it on this form.

7  But because they didn't report it, if we find out about that,

8  we actually would declare any earnings they received --

9  Because this covers 15 months prior, that would declare a

10  forfeit and an overpayment actually would be declared.

11          MR. WELDON:  Then if we could go to Page 5, please,

12  Agent Boynton?

13  **BY MR. WELDON:**

14  Q. Now, you described, generally, the form, but I want to show

15  you Page 5, please, Mr. Dunn.

16  A. Okay.

17  Q. All right.  Now, do you see who signed this?

18  A. Yes.

19  Q. And who is that?

20  A. Uhm, it says "Debbie Simmons."

21  Q. All right.  And, then, did her name later change, then, to

22  Ms. Durand, in the file, sir?

23  A. Yes.

24  Q. All right.

25  A. Yes, it did.

1    Q. So, then, do you see the second paragraph there, sir?

2    A. Yes.

3    Q. What is that first clause in that paragraph?  And what does

4    that say?  Can you read it?

5    A. "I" -- Yes.  "I understand that I must immediately report

6    to OWCP any improvement in my medical condition, any

7    employment, any change in the status of claimed dependents,

8    any third-party settlement, and any change in income from

9    federally assisted disability or benefit programs."

10          MR. WELDON:  And, Agent Boynton, if we could scroll

11   back up to the top of the page?

12          THE AGENT:  Top of the page?

13          MR. WELDON:  No, the top of the document.  Sorry.

14   **BY MR. WELDON:**

15   Q. And that was mailed on what date, sir?

16   A. July 5th, 2006.

17   Q. Okay.  Let's show you, then, Government's Exhibit 4,

18   please.  Again, sir, do you recognize this document?

19   A. Yes.

20   Q. And what is this, sir?

21   A. It's another 1032.

22   Q. Okay.  And is this a part of the file at OWCP?

23   A. Yes.

24   Q. Is the keeping of that record a regular activity of OWCP?

25   A. Yes.

1    Q. And are you a custodian for this particular document?

2    A. Yes.

3              MR. WELDON:  Your Honor, I move for the admission

4    of Government's Exhibit 4.

5              MR. ARVANETES:  No objection.

6              THE COURT:  4 is admitted.

7

8                 **(Exhibit Number 4 was admitted.)**

9

10   **BY MR. WELDON:**

11   Q. Sir, where was this document mailed?

12   A. Where?

13   Q. Yes.

14   A. It looks like it was sent to Ms. Durand.

15   Q. Okay.  And where -- what --

16   A. In Vaughn, Montana.

17   Q. In Vaughn, Montana?  And what was the date that that was

18   sent, sir?

19   A. August 15th, 2013.

20             MR. WELDON:  Okay.  And if we could go to the bottom

21   of the page -- or the bottom of the document.

22   **BY MR. WELDON:**

23   Q. And who is the individual who signed that, sir?

24   A. Ms. Durand, Debbie Durand.

25   Q. What was the date?

1    A. October 15th, 2013.

2    Q. And where is the location that she provided?

3    A. Vaughn, Montana.

4    Q. Then, if we could show you Government's Exhibit 10, please.

5    Do you recognize this document, --

6    A. Yes.

7    Q. -- Mr. Dunn?

8    A. Yes.

9    Q. Could you explain what this is, sir?

10   A. So, this is a -- it's a letter.  Essentially, it's called a

11   CA-1049.  And I mentioned a little bit before how we can put

12   people on the Periodic Roll.  When someone claims benefits,

13   they need to file a Form CA-7, and they -- on the CA-7, there

14   are different things that they can claim, but, normally, there

15   is a period of time that they would put in to -- to claim

16   time.

17        And when we -- if the medical supports the period that is

18   claimed, the Office of the Workers' Compensation will pay the

19   period of this claim based on the medical evidence.  Once the

20   medical evidence indicates that an injured worker will be out

21   60 days or more, we normally place the claimant on what is

22   called a Periodic Roll, so that those checks go out

23   automatically and there is no longer a need to file the CA-7

24   Form.

25        When we place them on the Periodic Roll, we normally send

1    out this letter, and it shows them, kind of, the benefit

2    breakdown for, maybe -- the way the system works, there is

3    sometimes a lead-in payment, and then what a regular payment

4    will be, and it talks about their, kind of, obligations.

5    Q. And this is one of those documents that outlined it for Ms.

6    Durand?

7    A. Yes.

8    Q. Now, again, is this part of Ms. Durand's file?

9    A. Yes.

10   Q. And is the keeping of that record a regular activity of

11   OWCP?

12   A. Yes.

13   Q. Are you a custodian of that record, sir?

14   A. Yes.

15        MR. WELDON:  Your Honor, I move for the admission of

16   Government's Exhibit 10.

17        MR. ARVANETES:  No objection.

18        THE COURT:  10 is admitted.

19

20        **(Exhibit Number 10 was admitted.)**

21

22        MR. WELDON:  Now, if we could please scroll to Page

23   2, Agent Boynton?  If we could go to the top, sir.

24   **BY MR. WELDON:**

25   Q. Now, this is an explanation of some of those benefits that

1   you outlined; is that right?

2   A. Correct.

3   Q. And explain that for the Court, please.

4   A. So, that first -- the gross amount is, obviously, the --

5   when she fills out -- or when a CA-7 is filled out, the

6   employee agency will provide a pay -- pay rate information.

7   We use that pay rate information to calculate a weekly pay

8   rate.

9        And then based on whether an injured worker has

10   dependents or not, that will determine whether they get paid

11   two-thirds or a three-quarters compensation rate.

12        Uhm, and, then, it's essentially the weekly pay rate

13   times the compensation rate, and then times the days claimed.

14   So, in this case, it would essentially be the physical weekly

15   rate, it would be times four, equals 28 days.  So that gross

16   amount is kind of that raw number.

17        And then the basic life insurance, that's also included

18   on the form, so we deduct that.  Uhm, it didn't appear we

19   deducted health benefits.  And, so, the gross amount, minus

20   the basic life insurance, is the net amount.

21   Q. And, so, then, are taxes required to be paid on that,

22   sir?

23   A. No.

24        MR. WELDON:  Now, then, if I could scroll down to

25   the middle of that page.

**BY MR. WELDON:**

Q. Do you see the second paragraph on the page there, sir?

A. "Compensation benefits"?

Q. Correct.

A. Yes.

Q. Could you read those first two lines?

A. "Compensation benefits for total disability are payable only while you cannot perform the duties of your regular job because of your injury at work.  The Federal Employees Compensation Act is not a retirement program, and you are expected to return to work, including light duty or part-time work, if available, if you are no longer totally disabled because of your injury."

Q. Now, then, if I could show you, please, sir, Government's Exhibit 15.  Now, do you recognize this document, Mr. Dunn?

A. Yes.

Q. What is this?

A. It's a job offer from the employment agency.

Q. And what date was this offered?

A. January 25th, 2008.

          MR. WELDON:  Now, then, if we could scroll to the bottom, Agent Boynton?

**BY MR. WELDON:**

Q. Do you see whether or not this was accepted by Ms. Durand?

1   A. It does not appear it was.

2   Q. All right.  Then if I could show you, please, Government's

3   Exhibit 16, Mr. Dunn?

4   A. Okay.

5   Q. Now, OWCP, on the job offers, gets involved, it seems, is

6   it fair to say if there's a dispute?

7   A. Yeah.  So, kind of the standard way it works would be the

8   employing agency offers the job; if it's accepted, kind of

9   like I was saying before, we might monitor it and reduce,

10  (nods head affirmatively) -- you know, take them off the

11  Periodic Roll and pay, if there's, you know, four hours

12  instead of eight hours, something like that.  But, for the

13  most part, uhm, we -- we are not going to step in if there's

14  not a problem.

15      However, if the job offer is denied, or if no response at

16  all is given to the job offer, which, for our purposes, is

17  considered a denial, uhm, normally, the employment agency

18  would then ask us to make a suitability finding.  And that's

19  where we would look over the job to determine if it -- if

20  everything on there meets criteria and if it corresponds with

21  the work restrictions that have been provided.

22      If it does, then we would send out a letter similar to

23  this, saying it appears to be a suitable job.

24  Q. And do you recognize this document, Mr. Dunn?

25  A. Yes.

1    Q. And was this part of Ms. Durand's file for --

2    A. Yes.

3    Q. -- OWCP?

4    A. Yes.

5    Q. Is the keeping of this record a regular activity in OWCP?

6    A. Yes.

7    Q. And, again, are you the custodian for this particular

8    document, sir?

9    A. Yes.

10          MR. WELDON:  Your Honor, I move for the admission of

11   Government's Exhibit 16.

12          MR. ARVANETES:  No objection.

13          THE COURT:  I thought it was already admitted.

14          MR. WELDON:  Is it, Your Honor?

15          THE COURT:  I believe we admitted it yesterday

16   through Ms. Simmons.

17          MR. WELDON:  Oh, well, I apologize, Your Honor.

18          THE COURT:  It's admitted.

19          MR. WELDON:  Thank you.

20   **BY MR. WELDON:**

21   Q. Now, then, in this case, if we could scroll down, please,

22   Mr. Dunn, do you see what this is explaining to the

23   defendant?

24   A. Uhm, yes.  I mean, it sounds -- it looks like we, OWCP,

25   determined that the job was suitable, and we were saying that

1  she had 30 days to accept it or provide reason for why she

2  could not accept it.

3  Q. Now, then, it mentions that she could lose her compensation

4  benefits; is that right?

5  A. Yes.

6  Q. And that's offered -- or that statement is under the 5

7  U.S.C. Section 8106.

8  A. Yes.

9  Q. Now, is that the same title and general sections that the

10  federal benefits are offered to Ms. Durand?  In other words,

11  the same authority that provides her the opportunity for those

12  benefits?

13  A. 5 -- yes.

14  Q. Okay.  And, then, of course, that's why they could

15  ultimately be taken away --

16  A. Yes.

17  Q. -- under that authority.

18  A. Yes.

19  Q. Is that right, sir?

20  A. Yes.

21  Q. Okay.  Now, then, if I could show you, please, Government's

22  Exhibit 17.  So, you mentioned that there was the January

23  25th, 2008, offer, then we have the March 5th, 2008, letter

24  from the OWCP, and then September of 2008, and this is one of

25  the documents.  Do you recognize this, Mr. Dunn?

1  A. Yes.

2  Q. And explain what this is?

3  A. It's a memo in the file.  It's -- it looks like an internal

4  letter that a claims examiner -- or an internal memo that a

5  claims examiner wrote just explaining the second opinion

6  report that we received from Doctor Hood.  And --

7  Q. Then if we could show you, please, Government's Exhibit

8  18?

9  A. Yes.

10  Q. Because, then, the same date, what happens with Ms.

11  Durand's file?

12  A. She is placed on the -- or her case status has changed.

13  So, we have various codes, kind of they are administrative.

14  And when somebody is on the Periodic Roll, their case,

15  essentially, has a code of PR.

16      And what's significant about that in this -- what this

17  memo is, is it switched -- it shifted her code from PR to PN.

18  And why that matters is because when that 1032 goes out every

19  year with a case that's in a case status of PR, we need

20  medical evidence to support continuing disability every year;

21  once it goes to PN status, we only need it every three years.

22  Q. Okay.  And, then, does it change the movement in the case,

23  as well, Mr. Dunn?

24  A. Yes.

25  Q. Can you explain that?

1    A. It's not as actively looked at.  Uhm, we've -- now we've

2    got medical evidence -- or a claims examiner, at least,

3    determined that we had medical evidence that indicated the

4    injured worker was permanently disabled.  So, for the most

5    part, every three years, when we receive medical evidence from

6    the treating physician, if it's supporting, yes, she's still

7    totally disabled, there isn't a whole lot that we're going to

8    do with it.

9    Q. What about job offers, for example?

10   A. We wouldn't pursue the job offer if they are saying they

11   are permanently disabled.  We're only going to pursue a job

12   offer if we're given something that indicates that there are

13   work limitations.

14   Q. What about vocational programs?

15   A. If it comes back.  We can't refer anything to vocational

16   rehabilitation unless we have work restrictions.

17   Q. And, so, that even includes, for example, telemarketing.

18   A. Yeah.  Any type of work restriction.

19   Q. So, on the OWCP side, then, it ultimately stops.

20   A. For the most part, yeah.

21   Q. What about if somebody moves from one area to another area?

22   Explain that, sir.

23   A. Yeah.  So, OWCP is -- or the division I work for, DFEC, is

24   -- has 12 district offices throughout the country, and each

25   district office covers certain states.  I'm from District 14,

1    the Seattle office, and we cover Alaska, Idaho, Washington,

2    and Oregon, just as an example.

3         So, if -- I believe this is either -- just based on the

4    case number, this started in the Dallas office.  If she then

5    moved to Montana, the case would have been transferred to the

6    Denver office, and, then, when she moved to Idaho, it would

7    transfer to the Seattle office.  So, a lot of different people

8    and a lot of different offices looked at the case.

9    Q. And, so, there wouldn't have been one consistent person,

10   then, who was looking at Ms. Durand's file as she moves

11   throughout the west.

12   A. No.

13   Q. Now, then, let's talk about the doctors and their role in

14   your process --

15   A. Okay.

16   Q. -- for Ms. Durand, sir.  Now, you mentioned that the

17   Department of Labor looks at the medical evidence.

18   A. Yes.

19   Q. So can you explain that process, sir?

20   A. Well, I mean, it -- it -- normally, I guess, like I was

21   saying before, if the medical seems to support what's going

22   on, we just go forward with authorizing and administering

23   benefits.  Where we get into, say, weighing the medical

24   evidence, where we need to kind of compare, maybe, a different

25   report, maybe something from a treating physician and

1    something from a second opinion doctor, is -- when there may

2    be a difference of opinion.

3         So, if we have, say, a general practitioner that is

4    saying this injured worker can't work at all, and we then

5    arrange for a second opinion examination, and if that second

6    opinion doctor were to say he believes the claimant -- or the

7    injured worker can work eight hours, sedentary, we would

8    want -- we would look to see if that creates a conflict,

9    essentially.

10    So, we are going to look at the quality of the report.

11   Is -- was a comprehensive history of both factual and medical

12   provided in both reports?  Was it accurate?  Or was a

13   rationalized opinion provided?  Was it based on objective

14   findings?  What's the specialty of the doctors?  A general

15   practitioner versus a board certified orthopedist, the way it

16   would generally go, you know, we would weigh more heavily

17   toward the board-certified doctor.  And, then, it's -- are the

18   reports firm?  Are they equivocal?  Is there any type of, you

19   know, language, maybe, where, such as this may have been

20   versus probably was, this type language?

21        And we look at all of that, and we would say, if they are

22   of equal weight, uhm, then we would need to go to what is

23   called a referee doctor and see if the referee can resolve the

24   conflict.  If there is no conflict, uhm, we, you know, pretty

25   much would just move forward.  If we've got one doctor saying

1    disabled and a second opinion doctor saying disabled, then

2    there is no conflict, and we kind of would just move forward

3    with the case.

4    Q. Now, would you take any medical evidence that you can

5    receive on the topic --

6    A. Yes.

7    Q. -- that's submitted?

8    A. Yes.

9    Q. So, does it matter, for example, whether it's a treating

10   physician or a second opinion, for example?

11   A. No.  I mean, the second opinion would -- is if it's

12   somebody that we -- we -- OWCP has the authority to actually

13   arrange second opinions within, kind of, whatever we deem

14   necessary, within reason, which is generally considered about

15   every six months.  So, I mean, we certainly are going to

16   accept that, if we've arranged it.

17       But, no.  I mean, if the -- if the injured worker saw a

18   doctor and was referred to somebody else, or wanted to see

19   somebody else, we're -- we are going to take it all.  The

20   only, kind of, issue that would come up is if they are not

21   actually a doctor.

22       So, the medical reports that we receive, in order for

23   them to be probative, do need to be signed or co-signed by a

24   medical doctor, or a doctor of osteopathy, as opposed to a

25   nurse practitioner or a physician's assistant.

1    Q. Now, in this case, Mr. Dunn, would the file for Ms. Durand

2    have been administered differently if she had work

3    restrictions?

4    A. Yes.

5    Q. Explain that, sir.

6    A. Well, if we had gotten medical evidence at any point, say,

7    really, kind of after the PN status, uhm, just because it's in

8    PN status does not mean the case is completely dead.  So, if

9    we were to get medical evidence indicating that she had work

10   restrictions, we would go through the process, like I

11   mentioned earlier, where we would probably go to the agency,

12   the employment agency, first, and see if they could offer a

13   job based on those restrictions.  And if they were not able

14   to, then we would look at vocational rehabilitation.

15   Q. Now, as an example, when we have Doctor Hood's opinion up

16   here for the second opinion, if he would have put her on work

17   restrictions, then there would have been something done

18   differently by OWCP.

19   A. Yes.

20   Q. Now, none of that was done for Ms. Durand's case, though?

21   A. No.

22   Q. She has been in the PN status since that 2008 date.

23   A. Yes.

24   Q. Now, I want to show you, then, as well, Mr. Dunn's (sic)

25   travel vouchers.

1   A. Okay.

2   Q. And you've reviewed Government's Exhibits 20 through 50?

3   Is that right, sir?

4   A. Yes.

5   Q. Are those records part of the file for OWCP?

6   A. Yes.

7   Q. Are those records a regular practice of OWCP to keep?

8   A. Yes.

9   Q. And are you the custodian of those records?

10  A. Yes.

11          MR. WELDON:  Your Honor, the United States moves for

12  the admission of Government's Exhibits 20 through 50.

13          MR. ARVANETES:  Is the government going to go

14  through each one?

15          THE COURT:  I don't know.

16      Mr. Weldon, do you intend to --

17          MR. WELDON:  I can.  I was trying to short-circuit

18  to move quick.  But if we would like to go through each one, I

19  can.

20          THE COURT:  Do you have an objection, Mr. Arvanetes?

21          MR. ARVANETES:  If I may look at what exhibits he's

22  going to show.  I want to double-check that it's what I have,

23  and I may be okay with that.

24          THE COURT:  You want to double-check that the

25  exhibit is the same one that he has?

```
1              MR. ARVANETES:  Yes.  20-whatever.

2              THE COURT:  All right.  Why don't we take a recess

3    and you can do your double-checking.  And when we get back,

4    Mr. Dunn, after the break, if you would please resume your

5    position.

6              THE WITNESS:  Okay.

7              THE COURT:  Thank you.

8

9                        (Recess taken.)

10

11             THE BAILIFF:  The United States District Court is

12   again in session.

13             THE COURT:  Please be seated.

14      Before we proceed, Mr. Weldon, I just wanted to make

15   clear, have you provided Ms. Durand's/Ms. Simmons' entire

16   employment file to the defense?

17             MR. WELDON:  We have provided the entire Workers'

18   Comp file, yes.

19             THE COURT:  Okay.  All right.  So, that's the OWCP

20   file.

21             MR. WELDON:  Correct, Your Honor.

22             THE COURT:  Are there any documents --

23             MR. ARVANETES:  (Nods head affirmatively)

24             THE COURT:  -- that you intend to present to

25   witnesses during this trial that you have not provided to the
```

1     defense?

2             MR. WELDON:  No, Your Honor.  (Shakes head

3     negatively)

4             THE COURT:  Okay.  Mr. Arvanetes?

5             MR. ARVANETES:  (Nods head affirmatively)

6             THE COURT:  Are there any documents that have been

7     produced by any of the witnesses that have not been provided

8     to you before trial?

9             MR. ARVANETES:  No, Your Honor.

10            THE COURT:  I keep hearing your complaint about

11    comparing your file with the files of these witnesses.  What

12    are you talking about?  Are you not -- you're not getting

13    access to these documents?

14            MR. ARVANETES:  Well, it was -- it was this -- I

15    just complained on this occasion, just --

16            THE COURT:  No, it came up yesterday, that you

17    wanted to compare -- you wanted to take a recess to compare --

18    to go through someone's file.  Are there any documents --

19            MR. ARVANETES:  That's a different file.  I wanted

20    to compare it with --

21            THE COURT:  Hold on.  What files are we talking

22    about?

23            MR. ARVANETES:  Okay.

24            THE COURT:  There's Ms. Durand and Washington sent

25    her OWCP file.

1          MR. ARVANETES:  Right.

2          THE COURT:  Do you have access to it?

3          MR. ARVANETES:  Yesterday, what I wanted --

4          THE COURT:  Do you have access to the OWCP file?

5          MR. ARVANETES:  Yes, sir.

6          THE COURT:  The entire file.

7          MR. ARVANETES:  Yes, sir.

8          THE COURT:  Any documents that you've not been

9    provided?

10          MR. ARVANETES:  As far as I know, no.

11          THE COURT:  All right.  What was the dispute

12   yesterday?

13          MR. ARVANETES:  Yesterday was concerning the

14   doctor's file, which I wanted to look at to confirm that the

15   doctor's file, which may have been outside the scope of the

16   OWCP file --

17          THE COURT:  Doctor Strausser's file.

18          MR. ARVANETES:  Correct.

19          THE COURT:  He said -- he claimed that he did not

20   have a file.

21          MR. ARVANETES:  Well, yeah.  I mean, I didn't know

22   that at the time, but...

23          THE COURT:  No, I just -- I'm just -- that's what

24   was -- his testimony was that he did not have a file.

25          MR. ARVANETES:  He did not have a file.  But, you

1  know, when -- like, when this gentleman comes forward, I'm

2  going to ask whether he has the OWCP file, for example,

3  because he is testifying almost as an expert in OWCP without

4  notice or a report.

5          THE COURT:  Mr. Weldon, does the government have in

6  its possession any -- Doctor Strausser's records regarding his

7  treatment of Ms. Simmons/Ms. Durand?

8          MR. WELDON:  Your Honor, the only records that the

9  government has in our possession is the OWCP file, what the

10  doctors submitted, for example, to OWCP.  We then received

11  that file.

12      Every document that we've ever had access to, the defense

13  has access to.  In fact, they probably have access to more

14  documents than we do, because they are actually Ms. Durand's

15  files.

16          THE COURT:  Okay.

17          MR. ARVANETES:  And I wanted to bring up, as an

18  example, Doctor Hood, which I didn't ask for his file, he

19  mentioned a note that he had noticed or he had made on one of

20  the reports.  And it was those kind of things that --

21          THE COURT:  Doctor Hood testified that there was --

22  he had missed a note made by Doctor Strausser on a medical

23  record.

24          MR. ARVANETES:  Right.  And I'm not sure if it was a

25  handwritten note or -- those kind of things are things that

1    the government wouldn't probably have, I assume, and that I

2    obviously don't have.  So, what I'm going -- when I'm asking

3    this, it's for that purpose, Your Honor.

4            THE COURT:  All right.  I just want to be clear that

5    the government has fulfilled its obligations to provide you

6    with all of the documents in its possession.

7            MR. WELDON:  Your Honor, I can tell the Court that

8    of all the cases we've ever tried, in terms of the access that

9    the defense has had, both for the documents and the case

10   agents, that this has been one of the widest ranges that they

11   have had.

12        In fact, even before trial, the government provided a

13   proffer, just generally speaking, of what our witnesses would

14   testify about.  That is unheard of for us to do in these types

15   of trials.

16           THE COURT:  All right.  Is there any other issues

17   with regard to files or documents?

18           MR. ARVANETES:  Well, and I respect -- and

19   Mr. Weldon has -- is correct, he has given me everything I've

20   asked for.  And above and beyond everything I've asked for,

21   Your Honor.

22           THE COURT:  All right.

23           MR. ARVANETES:  And I want to make that record

24   clear.  The U.S. Attorney's Office has been dutiful in that

25   respect.  The only thing I'm interested in is certain kind of

1    things that -- for instance, this note that we didn't really

2    need to get into that Doctor Hood read from Doctor Strausser,

3    (shakes head negatively) I don't really honestly know what

4    that note said, and I don't really care right now, but that is

5    something that would be in his personal file that, maybe, he

6    didn't give to OWCP or give to the government.  Just because

7    he's a doc and they don't -- they don't do this kind of thing.

8              THE COURT:  All right.

9              MR. ARVANETES:  So, I'm not in any way casting --

10   casting aspersions to the government.  They have been amazing

11   in every -- every facit of the discovery process.  To the

12   point that they have even given me a notebook, Your Honor, a

13   red notebook (indicating) that -- I mean, I don't think I've

14   ever gotten this before.

15             THE COURT:  I'm not sure I've ever gotten a red

16   notebook, either.

17             MR. ARVANETES:  It is a red notebook, Your Honor,

18   from the government of every exhibit they have.  And, so, I

19   want to thank Mr. Weldon about that.  The only -- I know, I

20   was -- I was surprised just that they wanted to bring in -- no

21   offense, Ryan, but -- you know, 22 to, whatever it is, 60, or

22   58, or something all at once, because I wanted to make sure

23   that we were on the same page if we're going to go put in that

24   many exhibits.

25             THE COURT:  Have you had a chance to review Exhibits

1    20 through 50?

2            MR. ARVANETES:  Yes, sir, and everything's good.

3            THE COURT:  All right.  Any objections to the

4    admissibility of Exhibits 20 through 50?

5            MR. ARVANETES:  No, sir.

6            THE COURT:  All right.  Then I will admit

7    Government's Exhibits 20 through 50.

8

9            **(Exhibit Numbers 20 through 50 were admitted.)**

10

11           MR. WELDON:  Thank you, Your Honor.

12           THE COURT:   Go ahead, Mr. Weldon.

13           MR. WELDON:  Thank you, Your Honor.

14   **BY MR. WELDON:**

15   Q. Mr. Dunn, let's just speak briefly about the first

16   document.  And are these all the same forms that -- Mr. Dunn,

17   in terms of the form, itself, not necessarily the information

18   on it?

19   A. I'm not seeing anything here, but I think you are talking

20   about the 957?

21   Q. Correct.

22   A. Yes.

23   Q. Those are all the same?

24   A. Yes.  Those are all the same.  Yes.  Yes.

25   Q. Could you explain what those are, sir?

```
 1              THE COURT:  Hold on.  Could we avoid -- when we talk
 2   about acronyms, can we avoid numbers, as well?
 3              THE WITNESS:  Oh, I'm sorry.
 4              MR. WELDON:  Yes, Your Honor.
 5              THE COURT:  Call it by what it is, as opposed to the
 6   definition.
 7   BY MR. WELDON:
 8   Q. Mr. Dunn, this form, sir?
 9   A. Yes.  It's a medical travel refund request.
10   Q. Sure.  And it has the name that you described, but,
11   essentially, this is the travel for the medical --
12   A. Yes.  An injured worker can file this to claim
13   reimbursement for travel to, like, a doctor.  (Nods head
14   affirmatively)
15   Q. Sure.  So, in Ms. Durand's case, for example, not only does
16   she get wage compensation and the treatment paid for, she also
17   receives mileage to various appointments.  Is that right?
18   A. Yes.
19   Q. Okay.  And in order to do that, what does Ms. Durand have
20   to do?
21   A. What she would need to file this claim?  And, for the most
22   part, uhm, normally you would want to submit, like, a medical
23   report or a slip or something showing -- certainly, if you
24   went to the doctor, if that's what you were claiming, that you
25   actually attended an appointment on that day.
```

1  Q. Now, when you are looking at this information, that's what

2  OWCP relies on when they are paying these claims; is that

3  right, sir?

4  A. Yes.

5  Q. Now, does it explain in the bottom of the form, then, the

6  importance of being accurate on the information?

7  A. Yes.

8  Q. Okay.  Can you read that, then, for the Court, that

9  Paragraph 6, please?

10 A. "Payee Certification.  I hereby certify that the

11 information given by me on and in connection with this form is

12 true and correct to the best of my knowledge and belief.  I am

13 aware that any person who knowingly makes any false statements

14 or misrepresentations to obtain reimbursement from OWCP is

15 subject to civil penalties and/or criminal prosecution."

16 Q. And that's the same on every form, then, Mr. Dunn?

17 A. I believe so.

18 Q. Now, can you explain the process for how these claims are

19 paid?

20 A. Yeah.  So, in about 2003, OWCP moved from having individual

21 bill payers in each office to having a central bill pay

22 process.  Uhm, the company at the time was called ACS, it's

23 now called Condor.  But the forms are submitted to a kind of

24 central warehouse in Loving, Kentucky, and central bill pay,

25 then -- I honestly don't know what all they do, but they

1    process the forms.  And for, like, mileage claims, if it's

2    under -- under $100 for the most part -- or, I'm sorry, 100

3    miles, uhm, they process it.  If it's over 100 miles, they

4    will send us through a web portal, they'll send us claim

5    examiners, it's called Thread, it's kind of like an e-mail,

6    asking if -- whether, it's travel, or surgery, or anything, if

7    it can be approved.

8    Q. Okay.  And then that approval process occurs prior to any

9    payment out to the claimant.

10   A. Yes.

11   Q. Is that right, sir?

12   A. Yes.

13   Q. Now, are these Workers' Compensation benefits, as well?

14   A. Uhm, yes.

15   Q. All right.  So, it's provided under the same authority and

16   the same federal dollars.

17   A. Yes.

18   Q.  All right.  Now, Mr. Dunn, I wanted to talk to you, then,

19   about Government's Exhibit 71.

20         MR. WELDON:  If we could show the witness that?

21   **BY MR. WELDON:**

22   Q. Sir, again, can you explain what this form is?

23   A. (Viewing document)  It looks like a claim for benefits

24   that -- or a claim for compensation benefits that was denied.

25   Q. Now, do you recognize this form, Mr. Dunn?

1    A. It's a letter from our --

2    Q. Do you --

3    A. We have a library, and it's from that, yes.

4    Q. Do you want to see the original document, sir?

5    A. I was kind of wanting to see the second page.

6              MR. WELDON:  Can we scroll to the second page,

7    please?

8              THE WITNESS:  Oh, that's it.  Is this more than two

9    pages?

10             MR. WELDON:  Yes.

11        Your Honor, may I just short-circuit this and approach

12   with the original document?

13             THE COURT:  You may.  Give it to the clerk,

14   please.

15             THE WITNESS:  Thanks.

16             THE COURT:  Do you have a copy, Mr. Arvanetes?

17             MR. ARVANETES:  What exhibit is this?

18             MR. WELDON:  71.

19             THE COURT:  71.

20             MR. ARVANETES:  71?  Yes.

21             THE WITNESS:  Oh, okay.  Yes.

22   **BY MR. WELDON:**

23   Q. All right.  And you're familiar with that document,

24   Mr. Dunn?

25   A. Yes.  Yes.

1    Q. Now, can you explain what this is, sir?

2    A. Yes.  So, this kind of goes back to the earlier

3    questioning.  When we receive a claim, and we look to see if

4    the claim meets the five benefits, uhm, if it does, we accept

5    it; if we don't -- if it does not, though, we would deny it,

6    and something like this is what would be issued when we deny a

7    claim.

8    Q. And what was that claim for, sir?

9    A. This one appears to be for an emotional condition.

10   Q. And what was the OWCP's determination on that issue, sir?

11   A. That it was not a work-related.

12   Q. And, so, that claim, was that denied?

13   A. It was denied, yes.

14           MR. WELDON:  Your Honor, I move for the admission of

15   Government's Exhibit 71.

16           MR. ARVANETES:  No objection, Your Honor.

17           THE COURT:  71 is admitted.

18

19             **(Exhibit Number 71 was admitted.)**

20

21           MR. WELDON:  May I have a moment, Your Honor?

22           THE COURT:  You may.

23

24             **(Discussion off the record)**

25

1         MR. WELDON:  I have no further questions, Your

2  Honor.  Thank you.

3         THE COURT:  Cross-examine?

4         MR. ARVANETES:  Yes.

5         THE COURT:  Mr. Weldon, do you want to get your

6  exhibit back?

7         MR. WELDON:  May I approach?

8         THE COURT:  You may.

9         MR. WELDON:  Thank you, Your Honor.

10    Thank you, sir.

11

12               **CROSS-EXAMINATION**

13  **BY MR. ARVANETES:**

14  Q. Good morning, sir.

15  A. Good morning.

16  Q. How are you today?

17  A. I'm okay.

18  Q. You are -- let's see.  You are an analyst with OWCP?

19  A. I'm a Supervisory Claims Examiner.  So I oversee seven

20  claim examiners who adjudicate Workers' Comp claims.

21  Q. Okay.  So, your, like, the supervisor or a --

22  A. Yeah.

23  Q. Where's your office at?

24  A. Seattle.

25  Q. Seattle.  Okay.  All right.  And you've been doing this 16

1    years?

2    A. Yes.

3    Q. And have you been in Seattle all 16 years or have you moved

4    around or --

5    A. I was in the New York office for six years, and I've been

6    in the Seattle office for ten years.

7    Q. When you went to Seattle, was it an upgrade?  Did you go to

8    become a supervisor, or did you --

9    A. No.  I actually had a break in service.  I had been a

10   stay-at-home dad for awhile, and then, essentially, when it

11   was time for me to go back to work, I was looking for jobs and

12   Seattle had an opening.

13        So, in New York, I had been a claims examiner and a

14   senior claims examiner, and then I was a senior -- or when I

15   came to Seattle, I was a claims examiner and a senior claims

16   examiner.  And, actually, a technical assistant, and the chief

17   of ops, and then the supervisor.

18   Q. And, so, the claims examiner with the OWCP is a -- is part

19   of the Department of Labor?

20   A. Yes.

21   Q. All right.  And government agencies, as you testified, has

22   -- each has an OIG arm, if you will.

23   A. I believe they do, yes.

24   Q. You believe they do.

25   A. (Nods head affirmatively)

1  Q. Okay.  And that's the criminal arm versus the civil arm.

2  A. Yes.

3  Q. All right.  And are you aware that the OIG is trained to

4  try to file criminal prosecutions to circumvent the

5  administrative position or the administrative arm, the civil

6  arm, of OWCP?  Are you aware of that?

7  A. I'm aware they are, I guess, trained to be investigators.

8  Q. Okay.

9         MR. ARVANETES:  May I approach, Your Honor?

10        THE COURT:  You may.

11        MR. ARVANETES:  Thank you.

12        THE COURT:  Approach the clerk, please.

13 **BY MR. ARVANETES:**

14 Q. What I'm showing you is Defense Exhibit 505.  It's from a

15 training manual of the OIG.

16 A. Okay.

17 Q. And it says "recourse of an investigation."  Can you read

18 the first sentence?

19 A. "The first recourse of an investigation should be the

20 pursuit of a criminal remedy.  Advantages" --

21 Q. Yeah.  I'm sorry.

22 A. Okay.

23 Q. And then it says -- I'm sorry to interrupt.

24 A. "Advantages to criminal prosecution include:  Permanent

25 removal from the DOL-OWCP rolls.  Termination of wage loss

1  compensation and medical benefits.  Deterrent effect.  Takes

2  the DOL-OWCP out of the decision-making process in whether to

3  terminate benefits.  Provides a strong case for the Postal

4  Service in their administrative process."

5          MR. ARVANETES:  All right.  Thank you.  Can I have

6  that part?

7  **BY MR. ARVANETES:**

8  Q. So, I want to focus on the fourth bullet point, "Takes

9  DOL-OWCP," that's you, essentially, right?

10 A. Uh-huh.  Yes.

11 Q. Takes you out of the decision-making process in whether to

12 terminate benefits.

13 A. Yes.

14 Q. Is that what we are doing here?  By the OIG filing a

15 (indicating) complaint against my client?

16 A. I believe so.

17 Q. And because, prior to that, or, at least, prior to today,

18 she has been on what's called the Periodic Rolls.

19 A. Correct.

20 Q. Right?  And the Periodic Rolls means that she is -- gets

21 full benefits.

22 A. Yes.

23 Q. And that she is -- and I -- and correct me on the

24 phraseology, but is it called tempor --

25 A. Temporary total disability.

1  Q. Is that it, temporary total disability?

2  A. Yes.

3  Q. And, so, the only way administratively for you-all to take

4  her off of those permanent rolls is based upon the objective

5  medical evidence that you get every three years with this form

6  you get every three years.

7  A. Correct.

8  Q. And that's what you've testified to.  Now, --

9  A. I mean -- yeah.  Yes.

10  Q. All right.  All right.  So, the forms that you get every

11  three years, uhm, let me backtrack a little bit before I get

12  into that.  You testified that you're here, not only to

13  provide information on OWCP-DOL information like you are,

14  right?

15  A. Yes.

16  Q. But you also are here because you are testifying for the

17  government in a case that they have against Ms. Durand.

18  A. Yes.

19  Q. And, therefore, in order to do that, you had to review her

20  OWCP file.

21  A. Yes.

22  Q. Now, her OWCP file has over 5,000 documents, you probably

23  are aware.

24  A. Yes.

25  Q. (Laughing)  And, unfortunately I -- strike that.

1            But, uhm, and, so, I want to kind of get an idea.  I

2    mean, that's a lot of documents, so did you get to review all

3    5,000 documents?

4    A. No.

5    Q. All right.  You interviewed -- well, how do you go about

6    deciding what to review in this 5,000-plus doc file?

7    A. I had a conference call with Mr. Weldon, and he kind of

8    advised some things that I would be talking about, so I looked

9    at some of those particulars.

10   Q. All right.  So, you know about the fact that even back in

11   '03 she initially filed a request for Workers' Compensation.

12   A. Yes.

13   Q. And know that it was denied and she appealed.

14   A. (Pause)  Uhm, no.  I thought it was accepted.  But I didn't

15   realize it had been initially denied.

16   Q. It was initially denied, and -- but then it was appealed.

17   Who --

18   A. Okay.

19   Q. Who -- what's the body that reviews the appeal?

20   A. There -- well, there are three options, and I'm not sure

21   which option she chose.  Uhm, there is an option for

22   reconsideration, and that would have been -- the

23   reconsideration would have been performed by a senior claims

24   examiner.

25   Q. Okay.

1   A. There's the --

2   Q. Is that you, or is that -- I guess, a senior claims

3   examiner versus a claims examiner, or --

4   A. I'm a Supervisor Claims Examiner.  So, we have claims

5   examiners that, uhm, adjudicate claims, we have senior claims

6   examiners that look at appeals and handle other aspects and do

7   venturing.

8   Q. Sure.

9   A. And then a supervisor oversees them all.  So, a

10  reconsideration is performed by a senior claims examiner.

11  There's the branch of hearings and review, and then there is

12  the Employees' Compensation Appeals Board.

13  Q. All right.  But you're not sure which one they appealed to.

14  A. I'm not.

15  Q. But you know that -- well --

16  A. The case was accepted.  (Nods head affirmatively)

17  Q. Yeah, it was accepted.  All right.

18  A. Yeah.

19  Q. All right.  And, then, she had issues that occurred during

20  her limited duty that wasn't on her original claim, her CA-2

21  claim.

22  A. Okay.  Yes.

23  Q. Right?

24  A. Yes.

25  Q. And, so, in 2005, she filed a new CA-2 claim --

1    A. Correct.

2    Q. -- to add whatever other parts --

3    A. Some additional conditions, yeah.

4    Q. All right.  And those special conditions could be even --

5    well, physical, as well as psychological.

6    A. I believe she filed a separate -- a third claim for a

7    psychological, and that --

8    Q. But I'm just saying, in general, it could generally be

9    physical and psychological.

10   A. Oh, yes.  Yes.

11   Q. All right.  And, so, then -- and, so, then, you understand

12   that she got two back surgeries from Doctor Strausser.

13   A. Yes.

14   Q. And the first one didn't take, correct?

15   A. Yes.

16   Q. So she had a second one, correct?

17   A. Yes.

18   Q. And those were both paid by the OWCP?

19   A. Yes.

20   Q. And OWCP, by the way, charges a 7 percent interest or

21   something to the organizations that are administrating the

22   claims?

23   A. I've never heard of that.

24   Q. We talked about it earlier, but --

25   A. I've never heard of that.

1  Q. You guys charge the agencies with a certain amount of money

2  to administrate?

3  A. We charge -- so, if a surgery is performed, the provider

4  will submit a bill.  We pay that bill on a fee schedule, uhm,

5  so we might not even pay the 100 percent that they are

6  billing.  Uhm, and, then, that's included in the bill, the

7  chargeback money that goes to the employing agency at the end

8  of the -- end of June.

9  Q. All right.  And, so -- and you also are aware that -- with

10  UPS (sic), they --

11          THE COURT:  U.S. Postal Service.

12          MR. ARVANETES:  U.S. -- Sorry.

13  **BY MR. ARVANETES:**

14  Q. The USPS has a -- they got a -- they are a unique agency in

15  the context that they have to sell stamps to make their

16  budget?

17  A. Yes.

18  Q. Is that right?

19  A. Yes.

20  Q. All right.  And that's so when they go to Washington for

21  money, they also got to (indicating) show that they are trying

22  to balance their budget or trying to do the best they can.

23  A. (Shakes head negatively)  Yes.

24  Q. And part of the money that they spend every year goes

25  toward these Workers' Compensation benefits that they pay to

1   people like Debbie Durand.

2   A. Yes.

3   Q. All right.  So -- so, you know about the surgeries, you

4   know that the second one didn't take and she had to have a

5   box, an electronic stimulator put in.

6   A. Yes.

7   Q. All right.  And OWCP pays directly to these doctors.

8   A. Yes.

9   Q. Correct?  And OIG, any OIG, but especially with USPS/OIG,

10  most of their work focuses on actual healthcare fraud by

11  doctors, not fraud by the employees.  Are you aware of that?

12  A. Uh, no.

13  Q. Okay.  All right.  So -- so, then -- so, then, in 2007,

14  there's an investigation started by Agent Haywood at OIG.

15  A. Yes.

16  Q. Do you recall that?

17  A. Yes.

18  Q. And during this time, and it's in the -- it should be in

19  the OWCP file, as well, during the spring and summer of 2007,

20  uhm, Ms. Durand filed a complaint, an EEO complaint.  What is

21  an EEO complaint?

22  A. An Equal Employment Opportunity.

23  Q. Right.

24  A. Yeah.

25  Q. Right.  And she filed an EEO complaint against her boss,

1  Carolyne Bowi.

2  A. Okay.

3  Q. All right?  Did you review that when you read the OWCP

4  file?

5  A. No, I did not.

6  Q. All right.  Well, that happened.  So, now, October 19th,

7  2007 -- 2007, Carolyne Bowi calls Agent Haywood to complain

8  that maybe Ms. Durand is going beyond her work restrictions.

9  A. Okay.

10  Q. Now, is that normal for a boss who's under an EEO complaint

11  to go to a -- an OIG agent to complain about, perhaps -- about

12  her employee about work restrictions or whatever?

13  A. (Shakes head negatively)  I don't know.  We're --

14  Q. Have you ever heard of that?

15  A. OWCP is separate from that, so that would be internal

16  agency --

17  Q. All right.  All right.  That's fine.

18  A. -- administration.

19  Q. Okay.  So, you're aware, though, that starting on or about

20  October 19th, 2007, Agent Haywood started the investigation.

21  A. Yes.

22  Q. All right.  And part of the investigation was to do these

23  videos.

24  A. Okay.

25  Q. These films.

1    A. Okay.

2    Q. Were you able to read the reports of his films?

3    A. I saw them there.  I didn't read them.

4    Q. Okay.  You saw them there.

5    A. Yes.

6    Q. Did you see the video?

7    A. No.

8    Q. All right.  All right.  So, then, January 18th, 2008,

9    Haywood, Agent Haywood visits Doctor Strausser.  Do you

10   remember that?

11   A. Okay.  Yes.

12   Q. And he shows him these vid -- these videos that he took.

13   A. Okay.

14   Q. Okay?  Now, as part of OWCP's examiner, is that -- is that

15   normal?

16   A. He -- that's fine.  That's independent from us.

17   Q. That's independent.  What about, is -- is it independent

18   the fact that, you know, the doc didn't -- or is it -- do you

19   get into whether the fact that there could have been HIPAA

20   issues there, that he didn't sign off on HIPAA before the

21   video was shown?

22   A. From an OWCP standpoint, HIPAA does not apply to the claims

23   examiner.

24   Q. All right.

25   A. I don't --

1    Q. All right.  Fine.  And, then, what about -- are you aware,

2    under your -- under your rules and regs, that if you're going

3    to show the video to the doc in an investigation, that you

4    should show that video first to the employee?

5    A. Yes.  We are supposed to make the employee aware that we

6    have a tape, if we're going to use it.

7    Q. All right.  And are you aware that prior to showing the

8    video to Doc Strausser on the 18th of January, that that video

9    was not shown to my client?

10   A. Uhm, I think you had said the agent showed that?

11   Q. The agent showed it to Doc Strausser on the 18th, --

12   A. Right.

13   Q. -- but never showed it to Durand prior to that.

14   A. Right.  But from OWCP, if we had the tape and we're going

15   to use it, we're required to show -- we're required to advise

16   Ms. Durand, or any injured employee, that we have one and

17   we're going to use it.  But OIG had that separate from us,

18   so...

19   Q. So, when do you get it from OIG?

20   A. That's really up to them.

21   Q. Up to who, OIG?

22   A. OIG.

23   Q. So, when did you get this video from OIG, from Haywood,

24   after --

25   A. I'm not sure.

1   Q. You don't know?

2   A. I don't know.

3   Q. All right.  So, do you know what the term "primary care

4   physician" is?

5   A. Yeah.  Yes.

6   Q. And a determination of work restrictions by a doc.

7   A. Yes.

8   Q. Or a change of work restrictions by a doc on a patient,

9   i.e., an employee of USPS, would that be done by the primary

10   care physician?

11   A. It can be.

12   Q. Is that required in -- in your rules?

13   A. I mean, we like to -- kind of the easiest way for things to

14   happen, to work, is for the primary care physician to, uhm,

15   say, as it relates to return to work, to provide us with work

16   restrictions, and then for the agency to accommodate those

17   work restrictions.

18       If we are not getting good medical evidence, uhm, say,

19   we're getting reports that don't contain complete histories or

20   aren't well rationalized, or, you know, we're just not

21   getting, kind of, comprehensive reports, we can then go to a

22   second opinion doctor, and the second opinion doctor can also

23   provide work restrictions.

24   Q. Okay.  All right.  So -- and you already testified that

25   your decisions are based on medical evidence.

```
 1    A. Correct.
 2            MR. ARVANETES:  So, if the clerk could put up
 3    Government's Exhibit 16.
 4            THE COURT:  Do you want to introduce 505 before you
 5    do that?
 6            MR. ARVANETES:  Yes, sir.  I want to -- I'd like to
 7    introduce 505.
 8            THE COURT:  What is it, Mr. Arvanetes?
 9            MR. ARVANETES:  It is from a training manual from
10    our subpoena duces tecum.
11            THE COURT:  A training manual for who?
12            MR. ARVANETES:  From OIG.  That I got under the
13    subpoena.
14            THE COURT:  Mr. Weldon, any objection?
15            MR. WELDON:  May I have just a moment, Your Honor?
16
17                   (Discussion off the record.)
18
19            MR. WELDON:  I have no objection, Your Honor.  Thank
20    you.
21            THE COURT:  505 is admitted.
22
23                   (Exhibit Number 505 was admitted.)
24
25            THE COURT:  Go ahead, Mr. Arvanetes.
```

1          MR. ARVANETES:  All right.  So, before we go to 16,

2     let me ask the clerk or the agent to put up -- sorry, we'll

3     put up 14, first.

4     **BY MR. ARVANETES:**

5     Q. Okay.  So, this -- this is -- this is a report from Doctor

6     Strausser after he seen the video.

7     A. Okay.

8     Q. And this is on U.S. Department paperwork, right?  That's --

9     A. Correct.

10    Q. -- one of your forms?

11    A. Yes.

12    Q. All right.  And -- and he changes the work restrictions.

13    A. Okay.

14    Q. Okay?

15          MR. ARVANETES:  And, so, if Mr. Boynton could put up

16    -- put up 15?

17    **BY MR. ARVANETES:**

18    Q. So, he changes the work restrictions.  Now, tell me the

19    process in your exam -- in your experience, this is a -- first

20    of all, 15 is an offer for modified assignment/limited duty,

21    and it's based upon the previous exhibit, it's based upon the

22    change in work restrictions by Strausser.

23    A. I believe so.

24    Q. Exhibit 14.  Okay?

25    A. Okay.

1    Q. Now, this is a -- how does -- and this is on USPS. -- this

2    is a USPS form, so how does this form get from -- from

3    Strausser's office to -- to --

4              MR. ARVANETES:  Can you scroll down, sir?

5    **BY MR. ARVANETES:**

6    Q. -- to the lady here, Carolyne Bowi?   Or Carolyne Bowi, I

7    guess, is right here.  I apologize.  How does -- how does it

8    get from the doc to the OIG to her boss?

9    A. I don't know.

10   Q. You don't know.

11   A. No.

12   Q. Does this form -- it's part of the OWCP file, so how does

13   this form get to the OWCP file?

14   A. Somebody submits it.

15   Q. And do you know when this was submitted to OWCP?

16   A. Uhm, can you scroll down to the very bottom?

17   Q. Sure.

18   A. It looks like it was received by the OWCP on February 27th

19   of 2008.

20   Q. Okay.  And, so, it's fair to say that, at this point,

21   uhm -- well, strike that.

22             MR. ARVANETES:  Can the agent put up 16,

23   Government's Exhibit 16, now?

24   **BY MR. ARVANETES:**

25   Q. Okay.  Now, this is Department of Labor?

1    A. Yes.

2          MR. ARVANETES:  And can you scroll down to the

3    signature, please?

4    **BY MR. ARVANETES:**

5    Q. And this is Claims Examiner Jim Hulsey.

6    A. Yes.

7    Q. Is that right?

8    A. Yes.

9    Q. All right.

10         MR. ARVANETES:  And can you scroll back up?  To the

11   date.  Let's get a date in here.

12   **BY MR. ARVANETES:**

13   Q. All right.  So, this was March 6th, 2008.

14   A. Correct.

15   Q. And that's -- this is one of your forms, claims examiner,

16   and he -- he says that -- right here, that "The duties and

17   physical requirements of the position are described in the

18   enclosed offer.  We have reviewed the offer and find it

19   suitable in accordance with your medical limitations provided

20   by Strausser."

21   A. Correct.

22   Q. All right.  Now, we already testified about the fact that

23   15, which was the limited duty job offer signed by Carolyne

24   Bowi, wasn't signed.

25   A. Correct.

1   Q. All right.  It wasn't signed by the employee, Ms. Durand.

2   A. Correct.

3   Q. And, so, what does that -- what does that tell you?  What

4   does that mean in your -- in -- well, what does it mean?

5   A. She didn't accept the job.

6   Q. She didn't accept -- accept the job.  Okay.

7          MR. ARVANETES:  Thank you.  You can take that

8   down.

9   **BY MR. ARVANETES:**

10  Q. All right.  So -- so, do you recall -- do you recall that

11  she objected to this, because -- in the OWCP file because she

12  claimed that Doctor Strausser was not her primary care

13  physician?

14  A. I didn't -- I don't recall her -- with those words, I do

15  remember seeing something in the file saying that she was

16  trying to see a different doctor to get medical evidence.

17  Q. Okay.

18  A. Yeah.

19  Q. All right.  And that would be her primary care physician.

20  Why would -- in your mind, why would it be important that a

21  person object because Doctor Strausser, she claimed, wasn't

22  her primary care physician?

23  A. I'm not sure I understand.

24  Q. Well, let me go back to the form that we just saw by your

25  claim -- fellow claims examiner, --

A. Right.

Q. -- Hulsey.  He signed off on this work restriction

modification --

A. Correct.

Q. -- based upon Doctor Strausser, assuming that Doctor

Strausser was her primary care physician.  Would that be an

accurate statement?  Or an accurate assumption?

A. Uhm, it's not -- I don't know if he -- I don't know what he

was assuming, but we accept medical from any doctor.  So, if

we have medical evidence that shows restrictions, and a job

offer is made, that letter that we were just looking at is a

suitability letter.

     So, we reviewed the job offer, cross-referenced it

against the work restrictions that are on file and determined

that it was a suitable job offer.  Now, it was not accepted,

but we also did not finalize that decision.

Q. Exactly.

A. So, I think, we ended up doing the second opinion report

with Doctor Hood, and that's when we then switched the case

from PR to PN and put that memo in the file saying it appears

she had a permanent.

Q. All right.  So, and we will get to that.  But what I just

want -- I just wanted to make clear that as part of your job,

do you know what a primary care physician is supposed to be

doing as part of taking care of this whole -- whole situation

1  with the patient?

2  A. The primary care physician --

3  Q. Yeah.

4  A. -- provides care.

5  Q. Right.  But doesn't the primary care physician also consult

6  with other doctors?

7  A. I guess they do.  I mean, they certainly can, uhm, refer

8  out to specialists, and then a report can come back.  The

9  primary care physician, I guess, would see that.  Uhm, like I

10  said, though, if the primary care physician referred the

11  injured worker to a different specialist, we would accept that

12  report from the specialist, too.

13  Q. And, in fact, one of the specialists was her -- a

14  psychiatrist named Doctor Bricken?

15  A. Okay.

16  Q. Do you recall that -- reading it in the OWCP file?

17  A. Was that the other file that it was claimed, or was that --

18  Q. Well, no.  No.  That's --

19  A. Okay.

20  Q. That's part of -- here, let me find -- here.

21           MR. ARVANETES:  May I approach, Your Honor?

22           THE COURT:  You may.

23           MR. ARVANETES:  I want to put this as 506.

24  **BY MR. ARVANETES:**

25  Q. All right.  This is 506.  And this is a -- a -- something

1   written by Debbie Durand, she signs it here.  It's dated 6 --

2   I believe, 6/6 of '08, and she says, "I'll be filing a formal

3   complaint.  I have not submitted the forms yet due to

4   inability to complete them without assistance, the

5   representative that assists me with this has been

6   unavailable."

7        This is a form where she is saying I'm filing a complaint

8   about the fact that Strausser was not her primary care, that

9   Doctor Martin was, actually, her primary care, --

10             MR. WELDON:  Objection; foundation.

11   **BY MR. ARVANETES:**

12   Q. -- as well as Doctor Bricken.

13             THE COURT:  Hold on.  Hold on.  What's the

14   objection?

15             MR. WELDON:  Foundation.

16             THE COURT:  What's the foundation for this document?

17   **BY MR. ARVANETES:**

18   Q. Are you aware of this document in her OWCP file?

19   A. If it's in the file -- I mean, I have not seen it.  But if

20   it's in the file, it's there.

21   Q. All right.  And do you know why she was filing this formal

22   complaint on 6/6 of '08?

23   A. No.

24             MR. ARVANETES:  All right.  I won't submit it at

25   this time, Your Honor.

1          May I approach --

2          THE COURT:  You may.

3          MR. ARVANETES:  -- the clerk with Exhibit 507?

4          THE COURT:  You may.

5   **BY MR. ARVANETES:**

6   Q. All right.  This is a report from Doctor Bricken &

7   Associates, PC, and it's dated March 9th, 2008.

8   A. Okay.

9          MR. ARVANETES:  Can you scroll down so we can

10  show -- oh.  Oh, can you scroll down for the -- just so we can

11  get the OWCP number, the page number?

12  **BY MR. ARVANETES:**

13  Q. This is OWCP Page Number 3127.

14  A. Okay.

15  Q. Okay?  Were you able, in preparing for your testimony

16  today, to review this document?

17  A. I have not reviewed this document.

18  Q. All right.  Can you take a moment and review this

19  document?

20  A. (Witness complies.)  Okay.

21          MR. ARVANETES:  All right.  And can you go to the

22  next page, please?

23  **BY MR. ARVANETES:**

24  Q. And tell me when you're done.

25  A. (Witness complies.)

1   Q. And we'll go to the final page after you are done.

2   A. Yep, go ahead.

3   Q. All right.

4   A. (Reading document)  Okay.

5          MR. ARVANETES:  All right.  And is there a last

6   page, or not?  I'm not sure if there is a final page or --

7   **BY MR. ARVANETES:**

8   Q. Yes, please -- recommendations, please read that.

9   A. (Reading document)  Okay.

10  Q. All right.  So, this -- this is happening during your

11  appeal, or during the time she was objecting to Doctor

12  Strausser changing her work restrictions.

13  A. Okay.  (Nods head affirmatively)

14  Q. All right?  And, uhm, for the record, this is one of the

15  documents in your file, correct?

16  A. Correct.

17  Q. All right.

18         MR. ARVANETES:  I move for the exhibit (sic) of this

19  document.

20         MR. WELDON:  No objection, Your Honor.

21         THE COURT:  The document will be admitted.

22

23         **(Exhibit Number 507 was admitted.)**

24

25         MR. ARVANETES:  All right.

1           THE COURT:  507.

2           MR. ARVANETES:  Okay.  You can take it down,

3    please.

4    **BY MR. ARVANETES:**

5    Q. So -- so, she was sent to Doctor Hood for a second opinion

6    on -- on or about June-something in 2008.

7    A. Correct.

8    Q. Uhm, and who is Doctor Hood?  Do you know Doctor Hood?

9    A. No.  We don't -- we have a  -- typically, offices contract

10   with medical schedulers; and if we need a second opinion, such

11   as that from Doctor Hood, we send a referral to the medical

12   scheduler, and they have a fleet of doctors and they figure

13   out the scheduling.

14   Q. Okay.  So, why -- why did the claims examiner -- and were

15   you aware that the claims examiner actually bumped it up to

16   the senior claims examiner about the decision on what to do

17   with Ms. Durand after she was objecting to Doctor Strausser

18   being claimed as her primary care physician?  Were you aware

19   of that in the OWCP file?

20   A. No.

21   Q. All right.  As part of your testimony today, when were you

22   contacted by the government to testify today?

23   A. About three weeks ago.

24   Q. Three weeks ago.  So, as part of your preparation for today

25   -- with that -- besides talking to Mr. Weldon, besides looking

1    at the OWCP file, did you actually look at, uhm, our expert's

2    file, Brad Harris, his -- his report on -- and the exhibits in

3    his report?

4    A. No.

5    Q. Okay.  All right.  So -- so -- okay.  So, let me get back

6    to, so the senior examiner -- do you know why -- all right.

7    So, there was a conflict, and that's why the claims examiner

8    sent her to Doctor Hood; is that right?

9    A. I don't even know if there -- well, it may not have

10   necessarily been a conflict, it was -- we needed additional

11   information.  So...

12   Q. Why -- why additional information?  I mean, what was -- in

13   other words, what was wrong with Strausser's report that

14   peaked the interest of the claims examiner to have to go to

15   that next step?

16   A. Uhm, she -- I don't think it was Doctor Strausser's report.

17   We had the job offer, I guess, based on Doctor Strausser's

18   report.

19   Q. Right.  Right.

20   A. She didn't accept it, but I believe she then supplied some

21   evidence indicating that she was going to see another doctor.

22   I think there was still some issues, maybe, with the

23   (Indicating) stimulator, uhm, in her back.  And, so, to get a

24   comprehensive, essentially, assessment of her ability to work,

25   we went to Doctor Hood.

1          MR. ARVANETES:  Okay.  And if -- if Agent Boynton

2    could put up 18.

3    **BY MR. ARVANETES:**

4    Q. Now, you've already seen this.  This is part of the

5    government's exhibits?

6    A. Yes.

7    Q. And I want you to read what this says here into the record.

8    A. "The work-related disability is too severe for employment

9    and is unlikely to improve.  See medical report(s) dated:

10   7/31/08 and SECOP-Doctor James Hood."

11   Q. All right.  And, so -- and what about this?  What does this

12   mean down here?  We haven't really talked about this, but read

13   that into the record and explain what that means.

14   A. "Some work-related disability continues, and chronic

15   concurrent disabilities together with work-related disability

16   prevent employment.  Conditions causing disability are:

17   Failed back syndrome - SECOP - total disabled - refused FCE -

18   may result in injury."

19   Q. Okay.  "Refused FCE," that's the functional capacity --

20   A. Capacity exam, yes.

21   Q. -- exam.

22   A. I believe Doctor Hood's report gave some indication that,

23   uhm, he didn't want to do or perform a functional capacity

24   examination, because he thought it would bring about an

25   injury.

1   Q. Further injury.

2   A. Further injury.

3   Q. All right.  Thank you.  And this is -- is this one of your

4   docs?

5   A. This is an internal document that's attached.

6   Q. All right.  And, so, this is a -- who is -- this is another

7   claims manager.

8   A. Yes.

9   Q. Now, it's not a claims analyst, so where on the totem pole

10  is she compared to --

11  A. That's -- that's just different terminology.  It's the same

12  job that I have.  So, that's a supervisory claims examiner.

13  Q. All right.  All right.  So -- and that's part of your --

14  your area in OWCP.

15  A. Yes.

16  Q. Okay.  Thank you.  And then we have -- all right.

17        MR. ARVANETES:  And, then, 17.  Can you put up 17,

18  Agent, please?

19  **BY MR. ARVANETES:**

20  Q. So, and this is from Hulsey, again, the original claims

21  examiner from March who initially said, hey, you know,

22  everything's okay, uhm, and he -- what does he write here?

23        MR. ARVANETES:  Can you scroll up so the gentleman

24  can read this?

25  **BY MR. ARVANETES:**

1  A. "As a result of agency investigator reports and an offer of

2  employment made to the claimant, an independent medical

3  examination was performed on 7/23/08 by James Hood, MD.

4  Doctor Hood indicates in his report that the claimant cannot

5  work in any capacity.  Doctor Hood indicates a functional

6  capacity evaluation was not warranted due to a high

7  probability of injury.  Doctor Hood indicates the claimant is

8  totally disabled; may require surgery in the future; is

9  deconditioned; and indicates the claimant has failed back

10  syndrome as a result of surgery on 8/11/05 and 02/27/06."

11  Q. All right.  Thank you.

12        MR. ARVANETES:  Thank you, Agent.

13  **BY MR. ARVANETES:**

14  Q. And, so, this is some of the objective stuff, objective

15  medical evidence that you are referring to when you're trying

16  to decide as OWCP whether to place someone on the Periodic

17  Rolls or not, or on limited duty or not.

18  A. Correct.

19  Q. Right?  Objective stuff, here.

20  A. Correct.

21  Q. All right.  Thank you.  So -- so, that was in 2008.

22  A. Uh-huh.  Yes.

23  Q. Now, you testified that every three years there's a medical

24  document that -- or what happens every three years?  I want to

25  get it -- I don't want to put words in your mouth.

1    A. So -- yeah.  So, every year that CA Form 1032 is sent out

2    and needs to be completed, but every three years we need to

3    receive medical evidence supporting continued disability.

4    Q. All right.  So, every year a CA-2 form is filled out by the

5    employee.

6    A. The -- No, the CA-1032.

7    Q. Okay.  Every year?

8    A. Every year, the CA-1032 is filled out by the employee.

9    Q. All right.  And, then, every three years, what's the

10   form?

11   A. Just medical evidence.  So, in addition to receiving that

12   CA-1032, we would also need a medical report supporting

13   continued disability.

14   Q. And, so --

15   A. Or whatever.

16   Q. How many medical -- in preparing for this testimony today,

17   how many medical reports did you see since 2008, September or

18   October, to today, (indicating) every three years medical

19   reports telling whatever it says?  I don't -- I don't -- I

20   mean, let me ask you, how many forms --

21   A. I don't know how many I saw.  I mean, there -- there were

22   several that were in there.

23   Q. And they were signed by -- who signs those forms?

24   A. A doctor.

25   Q. Okay.  All right.  So, every three years, in the OWCP file,

1   there are medical forms signed by a doctor.

2   A. Correct.

3   Q. And do you require those doctors to actually have contact

4   with the employee?

5   A. They need to perform an examination.

6   Q. All right.  And that's a face-to-face examination.

7   A. Yes.

8   Q. Otherwise, you wouldn't accept that.

9   A. Correct.

10  Q. And --

11  A. I -- I mean, it's -- it would be put in the file.

12  Q. Right.

13  A. We would not consider it probative value, because it was

14  not based on anything.  So, we would either go back to the

15  plaintiff saying that we need something based on an actual

16  examination, or we would arrange to have, like, another second

17  opinion.

18  Q. All right.  So, every three years, then, since -- I mean,

19  she has been on the Periodic Roll since 2008.

20  A. Probably, prior.  But, yes.

21  Q. But -- okay, probably prior?

22  A. Yes.

23  Q. But after Hood's report and your Claims Examiner Hulsey

24  accepts it, she -- he -- she is put on Periodic Rolls,

25  permanent rolls, since now?

1   A. Yes.

2   Q. And, so, there have been medical reports every three years

3   since then saying that she had been seen and physically, what?

4   That she's not --

5   A. Incapable of working.  So, we would not pursue a job offer

6   or look to change her case status.

7   Q. And, again, you required this.  This is called the

8   objective evidence --

9   A. Medical evidence, yes.

10  Q. -- that you're looking at.

11  A. Yes.

12  Q. All right.  And, then, as far as if she's on Periodic

13  Rolls, you couldn't offer her a job.

14  A. Correct.  If the medical continues to show that she is

15  totally disabled, we can't pursue a job, because there are no

16  restrictions.

17  Q. Okay.  And if she's on Periodic Rolls you couldn't offer

18  her any vocational training that -- you know, you talked --

19  A. Correct.

20  Q. -- about vocational training earlier with Mr. Weldon.

21  A. Correct.

22  Q. You couldn't offer her any vocational training.

23  A. No.

24  Q. And, so, have you -- and I may have asked you this, but I

25  forgot.  Did you see the video of -- Haywood's video?

1    A. No.

2    Q. No.  Did you see the video of this undercover investigation

3    in 2015 of the kayak trip?

4    A. No.

5    Q. All right.  Okay.

6          MR. ARVANETES:  May I have a moment, Your Honor?

7          THE COURT:  You may.

8          MR. ARVANETES:  (Viewing documents)

9    **BY MR. ARVANETES:**

10    Q. Does your -- does OWCP follow regulations, such as ECAP,

11    for example?

12          THE COURT:  I don't know what that is, Mr.

13    Arvanetes.

14    **BY MR. ARVANETES:**

15    Q. Do you know what ECAP is?

16    A. ECAP is the Employees' Compensation Appeals Board.  So, I

17    mean, I guess they do set precedence and --

18    Q. For OWCP.

19    A. They -- yes.  Yes.

20    Q. Okay.

21    A. They're the appeals board.

22    Q. All right.

23    A. In terms of following them, I don't --

24    Q. Well, they set precedence.

25    A. They can set precedence.

1    Q. That's fine.  And, then -- and, then, a statement of

2    accepted facts --

3    A. Yes.

4    Q. -- is a document, it's -- the acronym is SOAF, --

5    A. Correct.

6    Q. -- S-O-A-F.

7    A. Correct.

8    Q. What is that?

9    A. So, it's -- it's a document that is created by a claims

10   examiner, and it's a summary of the facts that are accepted in

11   a case.

12   Q. Okay.  And is it true that in a SOAF they cannot -- the

13   OWCP claims examiner cannot accept subjective opinions within

14   the SOAF?

15   A. Correct.  It's really just supposed to be a summary of,

16   kind of, this is how the injury occurred, this is what's been

17   accepted.  Maybe, these are some surgeries that occurred, or

18   something like that, but it's --

19   Q. All right.

20   A. -- not anything subjective.

21   Q. Again, objective, objective, objective, right?

22   A. Correct.

23   Q. All right.  All right.  In your regulations, is it true

24   that the claimant, i.e., the employee, Ms. Durand, has an

25   initial choice of physicians.

1    A. Yes.

2    Q. That is true.

3    A. That is true.

4    Q. Okay.  And you understand -- what is FECA?

5    A. The Federal Employees' Compensation Act.  That's the law

6    that we administer, that OWCP administers.

7    Q. So, you've got to follow that, right?

8    A. Yes.

9    Q. And that's not just precedence, case law, that's

10   actually --

11   A. That's the law.

12   Q. -- a law passed by Congress.

13   A. Yes.

14   Q. All right.  And would you agree with the statement that

15   basic FECA law is that an injured worker must be taken as a

16   whole person --

17         MR. WELDON:  Objection; legal conclusion, Your

18   Honor.

19         THE COURT:  You want to read the statute?  What's

20   the cite, and I can take notice of it.

21         MR. ARVANETES:  All right.  FECA Procedure Manual,

22   Chapter 2-0814.4(c)(7).  May I read it?

23         THE COURT:  You may.

24   **BY MR. ARVANETES:**

25   Q. "Basic" -- do you agree with this statement under the FECA

1    Procedure Manual, Chapter 2, "Basic FECA law is that an

2    injured worker must be taken as a whole person when returning

3    them to work.  This means if a non-work-related condition

4    results in work restrictions, those non-work-related

5    conditions must be considered in creating an acceptable job

6    offer to the worker"?

7    A. Yes.

8    Q. Thank you.

9            MR. ARVANETES:  May I have a moment, Your Honor?

10           THE COURT:  You may.

11

12              **(Discussion off the record.)**

13

14           MR. ARVANETES:  That was all, Your Honor.

15           THE COURT:  Okay.

16           MR. ARVANETES:  Just briefly.

17   **BY MR. ARVANETES:**

18   Q. So, would you agree that a face-to-face examination, and

19   we've already said that that's important, but if it's not a

20   face-to-face examination, it's not probative?

21   A. Correct.

22   Q. Okay.  And would you agree that even in Government's

23   Exhibit 18, that the OWCP, in deciding her claim, was looking

24   at other -- other health issues that she was having?

25   A. I don't remember what 18 is.  But we would be looking at

1    the whole person.

2    Q. Okay.  All right.  Thank you.  And, then, would you agree

3    that the OIG, that it's -- that it's against this -- the ECAP

4    precedent that we talked about?

5            MR. WELDON:  Objection; legal conclusion.

6            MR. ARVANETES:  I haven't gotten my question out.

7            THE COURT:  Well, let's hear the question, then.

8            MR. ARVANETES:  All right.

9    **BY MR. ARVANETES:**

10   Q. Would you agree that -- that it's against -- well, would

11   you agree that there was a problem with the fact that OIG

12   Investigator Haywood didn't show the claims examiner the video

13   that was shown --

14           THE COURT:  Mr. Arvanetes, I'm going to stop you

15   now.  How is this witness supposed to testify about OIG

16   procedure?  What's -- what's the --

17           MR. ARVANETES:  All right.  All right.  I'll strike

18   that.  I'll strike that.  (Nods head affirmatively)

19           THE COURT:  I'm not following.  I mean, we have an

20   OIG investigation, this witness is an OWCP claims manager.

21   Are you trying to say that the investigation is invalid

22   because OIG didn't follow OWCP's requirements?

23           MR. ARVANETES:  Well, let me ask this question.

24           THE COURT:  Okay.

25   **BY MR. ARVANETES:**

1    Q. Why didn't, if you know, based upon the OWCP file, or based

2    upon your experience as a senior claims examiner, why didn't

3    -- the video that Haywood showed Strausser, why wasn't that

4    shown to Doctor Hood, the secondary?

5    A. I don't know.  (Shakes head negatively)

6    Q. Do you know, based upon your experience, in general, why it

7    wouldn't be shown?

8    A. (Pause)  Uhm, sometimes, we'll get videos from OIG that

9    don't really show anything that the claims examiner thinks

10    would make any difference in the claim.

11    Q. (Nods head affirmatively)

12    A. Uhm, so, I mean, it could have been something like that.

13    Uhm, I -- you know, it could have fallen through the cracks.

14    I really don't know.

15          MR. ARVANETES:  All right.  All right.  Thank you.

16          THE WITNESS:  Okay.

17          MR. ARVANETES:  Thank you for your time, Your

18    Honor.

19          THE COURT:  Mr. Weldon, redirect?

20          MR. WELDON:  Very briefly, Your Honor.

21

22                  **REDIRECT EXAMINATION**

23    **BY MR. WELDON:**

24    Q. Mr. Dunn, you were asked about the medical restrictions and

25    the evaluations that were done of Ms. Durand after she went to

1    the PN status.

2    A. Yes.

3    Q. And, so, just briefly, then, it went from one year; but,

4    then, once she went to the PN status, it went to the

5    three-year time period.  Is that right, sir?

6    A. Correct.

7    Q. Now, those doctors who were evaluating Ms. Durand, who was

8    in the room with those doctors?

9    A. Uhm, I don't know.  I wouldn't think anybody, other than --

10   Q. Ms. Durand?

11   A. -- Ms. Durand.

12   Q. All right.  Were these videos shown to the doctors or did

13   they have the ability to talk to the neighbors of Ms.

14   Durand?

15          MR. ARVANETES:  I would object, it's speculation,

16   this witness doesn't know.

17          THE COURT:  How do you know?  We'll find out what he

18   knows.  Overruled.

19          MR. ARVANETES:  All right.

20          THE WITNESS:  I don't know.

21   **BY MR. WELDON:**

22   Q. Now, in the file, though, did you see that there was a

23   provision of those videos to the doctors who provided medical

24   restrictions for Ms. Durand?

25   A. No.

1  Q. All right.  So, at least, according to your file, then, you

2  don't see any provision of those videos to the doctors after

3  Doctor Strausser.

4  A. No.  (Shakes head negatively)

5  Q. Now, Mr. Dunn, you were asked about the process and the

6  Office of Inspector General showing the video.

7  A. Yes.

8  Q. Now, that doesn't change the fact that you have to rely on

9  and you expect the claimant to provide truthful answers to the

10  responses for OWCP; is that right, sir?

11  A. Correct.

12  Q. So, no matter what happens in the process, you're relying

13  on the claimant to provide accurate information.  Is that

14  right, sir?

15  A. Correct.

16  Q. So, no matter what, it doesn't change the process that that

17  claimant has to engage in?

18          MR. ARVANETES:  Objection; leading, Your Honor.

19          THE COURT:  Overruled.

20          MR. ARVANETES:  That's --

21          THE COURT:  Overruled.

22  **BY MR. WELDON:**

23  Q. Does it change it?

24  A. It does not change it.

25  Q. All right.  If I could show you defendant's Exhibit 507,

1     please.

2              THE COURT:  507, madam clerk, is one that we -- you

3     have a hardcopy.

4              CLERK OF COURT:  Oh.  Sorry.

5              THE COURT:  It's the letter from Dr. Bricken.

6     **BY MR. WELDON:**

7     Q. Now, when you reviewed this, Mr. Dunn, --

8     A. Yes.

9     Q. -- this was in the file; is that right, sir?

10    A. Yes.

11    Q. Now, did you notice anywhere in there where Ms. Durand

12    identified that she was clearing a five-acre parcel of land?

13    A. No, I didn't notice that.

14    Q. Okay.  What about jogging?  Does she say anything or was

15    that documented in this particular area?

16    A. I did not see that.

17             MR. ARVANETES:  Your Honor, outside the scope.

18             THE COURT:  Overruled.

19    **BY MR. WELDON:**

20    Q. What about building fences?

21             THE COURT:  You didn't discuss this on your direct

22    -- or your cross-examination, Mr. Arvanetes?

23             MR. ARVANETES:  Uhm, not about the --

24             THE COURT:  You discussed this exhibit, what it

25    contained, correct?

```
 1              MR. ARVANETES:  Yeah.

 2              THE COURT:  So, he gets to inquire about what it

 3    doesn't contain.

 4              MR. ARVANETES:  I agree.  Thank you.

 5              THE COURT:  Go ahead, Mr. Weldon.

 6              MR. WELDON:  Thank you, Your Honor.

 7              THE COURT:  All right.  Let's keep objections on --

 8    on point here.

 9              MR. ARVANETES:  All right.

10              THE WITNESS:  I'm sorry, I -- what was --

11              THE COURT:  Re-ask your question, Mr. Weldon.

12              MR. WELDON:  Thank you, Your Honor.

13    BY MR. WELDON:

14    Q. What about building a fence, sir?

15    A. No.

16    Q. None of that information?

17    A. No.

18    Q. In fact, did it identify whether or not it impacted her

19    ability to engage in physical activities?

20    A. Did -- did the report talk about her abilities?

21    Q. Correct.

22    A. Uhm --

23    Q. That it had been impacted.

24    A. No.  No, it just talked about her emotional state.

25    Q. Okay.  Now, then, I want to ask you briefly, Mr. Dunn,
```

1    about the vocational rehab and the whole person.

2    A. Okay.

3    Q. Can you explain that to the Court, please?

4    A. Yeah.  So, if -- when we are looking at a job offer, uhm,

5    we do have to take it to the whole person.  And we look at

6    preexisting conditions, conditions that were accepted, as well

7    as conditions that may have arisen post-injury.

8         Uhm, now, when we go to the employing agency, we do have

9    to take all of that into account and see if they can

10   accommodate it.  If there is -- if the weight of the medical

11   evidence, though, in the file shows that, based on the

12   accepted work injury, the claimant can work at least sedentary

13   duties, but there is a post -- post-injury condition that has

14   developed that is not work-related, we can document the file,

15   and then request that a vocational rehabilitation specialist

16   look for -- essentially, determine the claimant's wage earning

17   capabilities in the open labor market.

18         And, then, we would do -- if there is something viable

19   within the labor market, uhm, we could do something called a

20   constructed WEC.  A WEC, sorry, stands for a wage earning

21   capacity.  And what that means is while you are not performing

22   that job, you are capable of performing that job.  And we

23   would then issue a decision, essentially reducing compensation

24   that's being paid, based on the job that you were capable of

25   doing.

1  Q. And, so, can you give us an example of numbers, Mr. Dunn?

2  A. Oh, yeah, I could just -- I could make something up.  So,

3  you know, if you are on the Periodic Roll, and you're

4  receiving $1,000 every 28 days, and then we, uhm, issue a wage

5  earning capacity decision that says you're capable of working

6  four hours a day doing this job, and this job earns so much

7  money, we would reduce that $1,000 by -- it's kind of a

8  complicated formula, it's called the Shadrick Formula.  But

9  it's -- you know, say, it might reduce it by half, something

10  like that.

11  Q. Sure.  And, so, then, the point, then, Mr. Dunn, is that

12  would reduce the amount of federal dollars that would be paid

13  to the claimant.

14  A. Correct.

15  Q. Is that right?

16  A. Correct.

17  Q. So, even though, then, you consider the whole person in the

18  vocational context, is it different?

19  A. Uhm, a little bit.  We can -- if a -- if a -- if a

20  injured -- if a non-work-related injury has arisen that is

21  essentially causing more severe restrictions, we -- we would

22  look at it different, because we could then say, well, what

23  work restrictions, what job is available based on the

24  work-related injury.

25  Q. Sure.  So, and, then, in this case, then, with Ms. Durand,

1    was there any vocational component that was considered after

2    September of 2008?

3    A. There was not.  We never had any work restrictions, so we

4    never went to vocational rehabilitation.

5    Q. Now, sir, do you help and work with people in finding jobs

6    with other agencies, then?

7    A. Yes.  So, when we assign a vocational rehabilitation

8    specialist, in addition to doing a skills assessment, we can

9    also pay for training for an injured worker, if we determine

10   that their -- their skills may match something in the private

11   sector but they need a little training in it.

12        So, you know, maybe, it's a computer class or something

13   like that.  And we will pay for that training, and then we

14   will actually work with the injured worker, following that

15   training, for up to 90 days to try to help them get a job.

16   Q. Now, in your experience, working with OWCP, do you have any

17   jobs that you could obtain and work with people where they

18   could sit for three hours and 14 minutes?

19   A. (Laughing)  I would imagine a customer service

20   representative or something like that.  (Nods head

21   affirmatively)

22   Q. Telemarketing.

23   A. Telemarketer, yeah.

24   Q. That we discussed earlier.

25   A. Yes.

1          MR. WELDON:  All right.  Your Honor, I have no

2   further questions.

3          THE COURT:  Is the witness excused?

4          MR. WELDON:  Yes, please, Your Honor.

5          THE COURT:  You may step down, Mr. Dunn.

6          THE WITNESS:  Thank you.

7          THE COURT:  All right.  We are going to break for

8   lunch.  We will return here at 1:30.

9

10              **(The lunch recess was taken.)**

11

12          THE BAILIFF:  The United States District Court is

13   again in session.

14          THE COURT:  Please be seated.  Good afternoon.

15          MR. WELDON:  Good afternoon, Your Honor.

16          MR. ARVANETES:  Good afternoon, Your Honor.

17          THE COURT:  Ready to proceed?

18          MR. WELDON:  Yes, Your Honor.

19          THE COURT:  All right.  Mr. Weldon, call your next

20   witness.

21          MR. WELDON:  Your Honor, the United States calls

22   Carolyne Bowi.

23          CLERK OF COURT:  (Indicating)

24

25              **(Discussion off the record.)**

1

2          CLERK OF COURT:  Raise your right hand.

3

4                **(The witness was duly sworn.)**

5

6          THE WITNESS:  Yes.

7          CLERK OF COURT:  (Indicating)

8          THE COURT:  Good afternoon, ma'am.

9          THE WITNESS:  Hi.

10         THE COURT:  Would you please state your full name

11  and spell your last name?

12         THE WITNESS:  My name is Carolyne Bowi.  I'm

13  sorry --

14         THE COURT:  How do you spell your last name?

15         THE WITNESS:  B-O-W-I.

16         THE COURT:  Would you slide the microphone up in

17  front of you?  Thank you.

18      Go ahead, Mr. Weldon.

19         MR. WELDON:  Thank you, Your Honor.

20

21                **DIRECT EXAMINATION**

22  **BY MR. WELDON:**

23  Q. Good afternoon, ma'am.

24  A. Hi.

25  Q. Could you please explain to the Court what you do for a

1   living, Ms. Bowi?

2   A. I am a -- at this moment, I am a station manager at the

3   Tomball Post Office.

4   Q. And how long have you worked in that capacity, ma'am?

5   A. As a postal worker, or at that particular --

6   Q. In your current position right now.

7   A. Uhm, three-and-a-half years.

8   Q. And how many employees do you oversee?

9   A. Let's see.  Either 100, or approximately 100 employees.

10  Q. Now, how long have you worked for the post office?

11  A. 34 years.  I'm sorry, 32 years.

12  Q. 32 years?

13  A. Yes, sir.

14  Q. And what were some of your job duties at that time?

15  A. My job duties at the time, at the beginning I was a city

16  carrier.  In 2003, I was promoted as a supervisor.  I

17  supervised the employees at the Tomball Post Office, the clerk

18  -- clerks, custodians, or carriers.  And my job was to ensure

19  that every mail -- every piece was delivered on a daily

20  basis.

21  Q. And how many employees did you supervise at that time?

22  A. Around about the same, pretty much almost 100.

23  Q. About 100 employees?

24  A. Uh-huh.

25  Q. Do you know a lady by the name of Deborah Simmons, who also

1    goes by the name Deborah Durand now?

2    A. Yes.

3    Q. Can you explain how you know her?

4    A. I know her from working at the Tomball Post Office, she was

5    an RCA at the Tomball Post Office.

6    Q. When you say "RCA," what does that mean?

7    A. That's a rural letter carrier.

8    Q. Okay.  What are the job duties of a rural letter carrier?

9    A. The duties of a rural letter carrier is to come in in the

10   morning, based on their hours, if they come in the morning,

11   they come in to sort out the mail, to case it up, and get it

12   ready for delivery to the customers.

13   Q. When you say "case," what does "case" mean?

14   A. "Case" means when they get in, they're going to gather all

15   of that mail together, and what they are going to do is --

16   rural carriers, what they do, they put it in delivery order,

17   say, 1202 parcel or 1203 parcel, and put the mail in order.

18   And with the DPS mail, which is delivery point sequence, it's

19   already in delivery order, so you don't have to go

20   (indicating) and search.  It's already in order.

21       Now the only thing they would have to search is, maybe,

22   the flats, which they have to go and do this, you know, to

23   search.  But, as far as that, they case -- they put the mail

24   in delivery order.  So, when they do pull the mail down, load

25   up their vehicle, they begin to deliver the mail.

1  Q. So, is casing, then, Ms. Bowi, another way to say that they

2  sort it?

3  A. Yes.

4  Q. For example?

5  A. Yes.

6  Q. All right.  Now, Ms. Durand ultimately was on -- had an

7  injury; is that right?

8  A. Correct.

9  Q. And you were her supervisor at that time; is that --

10  A. I was not.  I was the supervisor of Tomball.

11          MR. WELDON:  Okay.  Now, then, if I could show you

12  Government's Exhibit 9, please.

13  **BY MR. WELDON:**

14  Q. Do you see the date on that document, Ms. Bowi?

15  A. Yes, sir.

16  Q. What is that date?

17  A. 3//7/07.

18          MR. WELDON:  And if we could scroll down, please,

19  Agent?

20  **BY MR. WELDON:**

21  Q. Now, do you recognize your name on that document?

22  A. Yes.

23  Q. Okay.  And where do you see it?

24  A. Here (indicating).

25  Q. Okay.  Now, Ms. Bowi, can you explain what was done with

1    this document as it relates to Ms. Durand?

2    A. It's what you call a job offer, and a job offer is,

3    according to their job, their medical restriction, in order to

4    -- in order to -- in order to give them a job within their

5    capacity is according to the restriction that the doc has

6    given us.  And we, in turn, have to identify what he or she

7    can do at that time with their restriction that was given to

8    us.

9    Q. Now, then, did Ms. Durand accept that job?

10   A. Yes.  (Indicating)

11   Q. Okay.  And can you explain to the Court whether or not you

12   are going to have Ms. Durand work outside of those

13   restrictions, or within those restrictions?

14   A. Within those restrictions that's given to us.

15   Q. Okay.  Now, then, if I could show you --

16           MR. WELDON:  If we could scroll back up, please,

17   Agent Boynton?  Okay.

18   **BY MR. WELDON:**

19   Q. Now, on this, could you walk through some of those job

20   duties that were provided for Ms. Durand?

21   A. The first one is the case rural, which is they work a case

22   route for two to four hours.  The next would be processing,

23   boxing, by section, mail for the customers.  Working

24   undeliverable mail -- undeliverable mail.  Answer the side

25   door, which is the side door is when a customer picks up

1  certifieds or parcels.  The next one is answering the phone,

2  which they would be answering the phone for any customer that

3  need -- anybody needing any assistance as far as the phone.

4      "Second notice" will be the certifieds -- certifieds

5  express mail, which she is going to send out a second notice

6  to the customers to let them know that they still have

7  certified mail to pick up.  "Lobby director," which her duty

8  would be to go into the lobby and assist the customers to move

9  the line a little bit faster, so when they get to the counter

10  they're already prepared for whatever transaction they are

11  going to occur on at that time.

12  Q. Now, then, you can see the work hours, how -- what were her

13  work hours, based on this job?

14  A. Based on this, it's eight hours.

15  Q. All right.  Then I'll show you, if we could, Government's

16  Exhibit --

17          MR. WELDON:  Can we have 60, please?  Or, excuse me,

18  Government's Exhibit -- can I have one moment, Your Honor?

19          THE COURT:  You may.

20

21          **(Discussion off the record.)**

22

23          MR. WELDON:  All right.  If we could have

24  Government's Exhibit 15, please?  And if we could scroll to

25  the bottom.

**BY MR. WELDON:**

Q. Now, Ms. Bowi, could you explain Government's Exhibit 15?

A. That's also a job offer.

Q. Okay.  And, then, if we could scroll back up to the job duties.  What were some of the job duties that were going to be provided in this particular document?

A. In this one, particularly, it would be UMMB, which is what we call waste mail, what the customer calls junk mail.  It's sorted through it and get it prepared to go down to the plant to have it shredded.  Deliver express mail.  Case route -- again, case a route.  Do second notice.  A second notice of parcels and any kind of accountables.

Q. All right.  Let's talk about the delivery of express mail.  Can you tell the Court what that means?

A. Delivering express mail, we get express mail through, maybe, in the A mail, and most of the time we get -- the majority in our express mail, in the, uhm, ten o'clock, and has to be delivered by noon.  In order for us to meet the service of the customer, we have to have it delivered by noon.  And so, what we do is we identify and have carriers or whomever to deliver that express mail piece.

Q. Now, did you ever -- when you were working with Ms. Durand about her restrictions, did you ever have an issue with her delivering express mail, where you had to modify her conditions?

1    A. Yes.

2    Q. Can you tell the Court about that, please?

3    A. Yes.  On one particular day I asked her to deliver the

4    express mail, she, in turn, told me she couldn't do it because

5    she couldn't drive.

6    Q. And, then, did you ultimately end up changing her

7    conditions based on that?

8    A. Correct.

9    Q. So, tell the Court about that, please.

10   A. What I had to do is in order to -- if she said she couldn't

11   drive, I had to notify someone, or get her documentation

12   showing that she can no longer drive.  If she's not able to

13   drive, I have to modify this job offer in order to coincide

14   with her restrictions and to take away the driving part of

15   it.

16   Q. So, when these job offers came out, for example, there's

17   one job offer in there where you actually had to modify to

18   take out the express mail delivery.  Is that right, ma'am?

19   A. Yes.

20   Q. Now, did that ever cause you any concern after that was

21   modified?

22   A. Yes.

23   Q. Explain that to the Court.

24   A. Uhm, one day it so happened, I, you know, walked outside

25   and saw her driving her vehicle and picking up her -- picking

1    up her husband/boyfriend.

2    Q. Okay.  And do you know what type of vehicle or transmission

3    she was driving?

4    A. It was -- I really can't remember if it was a stick shift

5    or an automatic, but I do know she was driving.

6    Q. And why did that cause you concern, Ms. Bowi?

7    A. Well, because if you can't drive to deliver mail, an

8    express mail piece, why are you driving right now?  And when

9    you have the restrictions that you have, why are we driving

10   right now?

11   Q. Now, did you ultimately learn about Ms. Durand going on a

12   vacation?

13   A. (Pause)  I've heard of one, where she was getting married

14   and going out of town.

15   Q. And, of course, you didn't know where she was at that

16   point; is that right, Ms. Bowi?

17   A. No, sir.

18   Q. All right.  And, then, what about when she was with her

19   boyfriend, did you have any concerns at the post office when

20   she was there with him?

21   A. The only concern -- the -- one of the concerns that I had,

22   because, in management, you try to keep people away from

23   touchie-touchie, and one of the things that I had an issue

24   with is the kissing one another.  Because that creates --

25   creates a -- what you call a zero tolerance or a, uhm -- how

1    can I say this?  If anyone can see that and are offended by,

2    then they can report that, then we have to address that.

3    Q. Sure.  And, so, that bothered you, and that was something

4    that you had to --

5    A. Well, it wasn't a bother to me, it was a bother to keep

6    anyone --

7    Q. To the work place.

8    A. Correct, to keep anyone from saying anything to stop it.

9    Q. Now, then, what was the goal with Ms. Durand when you were

10   her supervisor?  What were you trying to do with her?

11   A. My goal with Ms. Durand is to abide by the restriction that

12   was set before me, to keep her gainfully employed, to ensure

13   that anything that we can do as the Postal Service to keep you

14   gainfully employed, to keep you working instead of sitting at

15   home.

16        There is -- there was -- this here was something that we

17   were able to give her in order to keep her gainfully

18   employed.

19   Q. Now, Ms. Bowi, are there jobs in the post office there that

20   you could give people that include answering phones, for

21   example?

22   A. Yes.

23   Q. All right.  And would it be jobs that are sedentary?  In

24   other words, they don't have to, you know, do physical manual

25   labor?

1    A. Correct.  Correct.

2    Q. Could you explain some of those job duties to the Court,

3    please?

4    A. Some of the duties that we have is, like, we have right

5    now, uhm, where we take our limited duty people and send them

6    to the office -- the passport office to make appointments,

7    take appointments for passports.  And that's something that

8    they can do, as well, because all they are doing is answering

9    the phone and making appointments for them throughout the

10   district area.

11        You know, and, also, like, as a director, and as I said

12   earlier, answering the phones, uhm, returning certifieds, uhm,

13   clearing the carriers.  Which clearing carriers, you know,

14   carriers come in the afternoon with their equipment, their

15   scanners, their certifieds, we can do that, they can clear

16   carriers like that.

17        The other one is answering the side door, what we call a

18   side door, is servicing the customers.  When they come in to

19   pick up parcels or certified, or whatever the case may be, or

20   answering things.  We also have what we call impasse and we

21   are trying to do this on limited duties on restriction how to

22   use the impasse.

23        And what that is, is when a customer has got into the

24   line, instead of them going straight up to the counter, they

25   -- we can also -- if they have a critical or difficult, we can

1    use that to cut down the line.  We also have what you call a

2    SSK machine, where we can utilize that.  So we can use light

3    duty -- limited duty to use that, as well.

4    Q. So, there are many jobs that you can provide limited duty

5    to individuals.

6    A. Correct.  Within their restrictions, yes.

7    Q. Is there any shortage of work at the post office, ma'am?

8    A. No, sir.

9    Q. Could you use all of the help you could get?

10   A. Right now, I have five in my building.

11   Q. Now, do you have other individuals who are working and that

12   you're working with even though they have injuries, Ms.

13   Bowi?

14   A. Yes.

15   Q. Can you explain how you work with those people and some of

16   them that you currently have under your supervision right

17   now?

18   A. I do the same thing I'm doing -- I did with her.  I went by

19   their restrictions; and if they said, well, Ms. Bowi, you

20   can't do that, then we have to go back.  And what we do is --

21   and I'm sorry to say this.  When we start this process, we

22   have to send it to injured comp, along with their medical, to

23   make sure that we're in compliance with their restrictions.

24        And I did it with each and every one of my five people

25   that I have right now, that I have to make sure that I do not

1    violate their restrictions, as well as ensure and let them

2    know, "Please don't violate your restriction, as well."

3    Because you never know who's watching.  It's not just

4    management watching, your co-workers are watching.

5         "So, with that being said, make sure you're in compliance

6    with the restrictions, because you're the one who said that

7    you're not able to do this."  But, at the same time, we've got

8    to make sure.  And that's what I do with the five I have.  I

9    have given them pretty much the same jobs that has taken place

10   right here.

11   Q. Now, ma'am, you then had this job offer, this last one that

12   was given to Ms. Durand in January of 2008; is that right?

13   A. Yes.

14   Q. Okay.  Now, did you ever, then, have any job offers or

15   contact with Ms. Durand after that point?

16   A. To my recollection, I don't think I did.

17   Q. All right.  In other words, you don't remember her coming

18   back to work for the post office.

19   A. No, I don't think she did, if I remember correctly.

20            MR. WELDON:  May I have just a moment, Your Honor?

21            THE COURT:  You may.

22

23            **(Discussion off the record.)**

24

25            MR. WELDON:  I have no further questions, Your

1   Honor.  Thank you.

2               THE COURT:  Cross-examination?

3               MR. ARVANETES:  Can the clerk please take down this

4   exhibit?  Thank you.

5

6                        **CROSS-EXAMINATION**

7   **BY MR. ARVANETES:**

8   Q. Good afternoon, Ms. Bowi.

9   A. Hi.

10  Q. Your position in 2002 through 2003 with the USPS was an

11  OIC?

12  A. 2003?  OIC?

13  Q. Yes.

14  A. (Indicating)  where?

15  Q. In Tomball.

16  A. No, sir.

17  Q. Okay.  What about in 2004?

18  A. No, sir.

19  Q. What about in 2006, when Debbie Simmons Durand --

20  A. I was there in 2006.

21  Q. Okay.  2006.  Were you an OIC then?

22  A. Yes.

23  Q. And what does OIC stand for?

24  A. That's the officer in charge.

25  Q. And that's with the USPS?

1    A. Correct.

2    Q. All right.  And this was in Tomball?

3    A. Tomball, correct.

4    Q. All right.  And how many years did you supervise Ms. Durand

5    -- or Ms. Simmons Durand from '06?

6    A. (Pause)  I was there, maybe, two years?  I'm not for sure.

7    Q. Okay.  All right.  And during this time, when you were the

8    OIC, she was a rural letter carrier?

9    A. Correct.

10   Q. And was she contracted, or was she full-time?

11   A. She was a sub.

12   Q. Can you explain that?

13   A. A sub is a person that relieves a person, that comes in to

14   replace a regular.

15   Q. Okay.

16   A. If I'm not mistaken.

17   Q. So, is that contracted -- do you have any idea --

18   A. Is that contracted?  What do you mean "contracted"?

19   Q. Was it contracted with the USPS, or is it part of the

20   USPS --

21   A. That's part of the U -- the post office.

22   Q. All right.  Now, is it fair to say, when you were her

23   supervisor, that, uhm, you and her had issues?

24   A. (Pause)  No, I don't think that's fair to say.  (Shakes

25   head negatively)

1    Q. Okay.  You guys got along?

2    A. (Shakes head negatively)  I'm fine.  I was fine.

3    Q. Okay.  Were you aware, in May of 2007, that she filed an

4    EEO complaint against you?

5    A. Yes.

6    Q. And that, during that time, after that, there were

7    hearings, actual hearings with you and Ms. Durand, and, I

8    guess, others?

9    A. And when was this?  I don't remember a hearing.

10   Q. 2007.

11   A. I remember sitting down with her.

12   Q. Were there any meetings then?

13   A. I remember sitting down with her.

14   Q. Do you remember sitting down with the EEO person?

15   A. No.  I remember sitting down with her.

16   Q. With her being in the -- do you remember sitting down with

17   anyone about the EEO complaint?

18   A. One person, but she wasn't there.  And it didn't go

19   anywhere.

20   Q. Do you know -- when did you find out about the EEO

21   complaint?

22   A. Whenever they sent it to us.  I don't -- I don't remember

23   the date.

24   Q. Okay.  All right.  So, you were aware of the complaint.

25   A. Correct.

1   Q. That's fair to say?  And, later that year, do you recall

2   contacting a USPS/OIG agent, Haywood?

3   A. Yes.

4   Q. And that was on or about October 19th, 2007?

5   A. Right now, I can't remember what time of year it was, but I

6   do remember contacting him.

7   Q. Okay.  It was in 2007, fair to say?

8   A. Well, I'm not going to answer that, because I'm not for

9   sure.  But I do know I contacted him.

10   Q. Okay.  And this was -- was it during the time the EEO

11   complaint was going on?

12   A. Not in my -- no, not that I'm aware of.

13   Q. And did your call have anything to do with any

14   retaliation?

15   A. I'm sorry, say it again?

16   Q. Did your call to the agent have anything to do with

17   retaliating against Debbie for filing the EEO complaint?

18   A. No.

19   Q. And besides that conversation on October 19, 2007, on or

20   about, with officer -- or Agent Haywood, did you have any

21   other communication with Mr. Haywood?

22   A. I'm pretty sure I did, but I can't remember what about.

23   Q. Do you remember what it was about?

24   A. It was about this case, if it was anything.  I had two

25   cases going on, so pretty much all it was.  I just can't

1    remember which one it was.

2              MR. ARVANETES:  Okay.  May I have a moment, Your

3    Honor?

4              THE COURT:  You may.

5              MR. ARVANETES:  Nothing further.

6              THE COURT:  Redirect?

7              MR. WELDON:  Very briefly, Your Honor.  Your Honor,

8    may I approach madam clerk?

9              THE COURT:  You may.

10

11                     **REDIRECT EXAMINATION**

12   **BY MR. WELDON:**

13   Q. Ms. Bowi, you were asked about the EEO complaint by Ms.

14   Durand, do you remember that?

15   A. Yes.  I just heard it, yes, sir.

16   Q. All right.  And was that complaint ultimately dismissed?

17   A. Yes.

18   Q. Now, what did you expect Ms. Durand to do when she was at

19   work?

20   A. To do her job as required, what she could do within her

21   restrictions.

22   Q. Did you ask anything more of her?

23   A. No, sir.

24   Q. Now, when you contacted Ryan Haywood, you were asked about

25   that contact, why did you do it?

1  A. I did that because of the restriction that was given, that

2  you -- that she said she couldn't drive, so why are you

3  driving now?  So, that was my issue.

4  Q. And, so, you wanted to make sure that, then, they were

5  looking into whether Ms. Durand was providing accurate

6  information?

7  A. Correct.

8        MR. WELDON:  Your Honor, I have no further

9  questions.

10        THE COURT:  This document that you put up, is that

11  in the record?

12        MR. WELDON:  It is not, Your Honor.  I just wanted

13  to make sure for her answer.

14        THE COURT:  Okay.  Is the witness excused?

15        MR. WELDON:  Yes.  Please, Your Honor.

16        THE COURT:  You may step down, Ms. Bowi.  Thank you.

17     Mr. Weldon.

18        MR. WELDON:  Yes, Your Honor.  The United States

19  calls Ryan Haywood.

20

21              **(The witness was duly sworn.)**

22

23        THE WITNESS:  I do.

24        THE COURT:  Good afternoon, sir.

25        THE WITNESS:  Good afternoon, Judge.

1    THE COURT:  Would you please state your full name

2    and spell your last name, please?

3    THE WITNESS:  Ryan Haywood, H-A-Y-W-O-O-D.

4    THE COURT:  Could you sit up closer to the

5    microphone?

6    THE WITNESS:  Okay.

7    THE COURT:  Go ahead, Mr. Weldon.

8    MR. WELDON:  Thank you, Your Honor.

9

10   **DIRECT EXAMINATION**

11   **BY MR. WELDON:**

12   Q. Sir, will you please tell the Court what you do for a

13   living?

14   A. I'm a Special Agent with the Postal Service, Office of

15   Inspector General.

16   Q. How long have you worked in that capacity, sir?

17   A. Approximately, 11 years.

18   Q. Can you explain some of the training that you have received

19   as part of your job duties?

20   A. Uhm, being assigned to the Workers' Compensation team, uhm,

21   training in Workers' Compensation fraud and things like that

22   dealing with that program, for the past 11 years.

23   Q. Now, can you tell the Court when you became involved in the

24   investigation of Ms. Durand?

25   A. It would have been the latter half of 2007, I think the

1    beginning of October.

2    Q. How did that process start, sir?

3    A. Usually, it will come in as some type of a referral from an

4    external source or postal management.  This one came in as a

5    referral from postal management.

6    Q. Okay.  And what did you do in response to that?

7    A. Started to initiate an allegation (sic) of the case.

8    Q. Did you then conduct surveillance, sir?

9    A. Yes, sir.

10   Q. Can you explain what you did and what sort of surveillance

11   you conducted with respect to Ms. Durand?

12   A. When the allegation came in, I then went through the

13   process of finding out where she lived and I started doing

14   surveillance at her residence.

15   Q. When did that process begin?

16   A. It began in the second half of 2007, I believe in

17   November.

18   Q. Okay.  And, then, when did it continue until?

19   A. It continued through January of '08 or February of '08.

20           MR. WELDON:  Madam clerk, could we please show the

21   witness Government's Exhibit 69?  Actually, excuse me, I

22   believe it's 68.  I apologize.

23   **BY MR. WELDON:**

24   Q. All right.

25           THE COURT:  69.

1            MR. WELDON:  It's 69.  Thank you.

2    **BY MR. WELDON:**

3    Q. Musical chairs, Agent Haywood.  Now, do you recognize

4    Government's Exhibit 69?

5    A. Yes.

6    Q. All right.  And is that a true and accurate depiction as

7    some of the things that you saw Ms. Durand doing?

8    A. Yes, sir.

9    Q. All right.  Now, can you explain what you saw Ms. Durand

10   doing throughout your surveillance of her?

11   A. Throughout the surveillance, it included video surveillance

12   and my observations, uhm, everyday activities of driving,

13   walking to the trash, to the mailbox, uhm, types of yard work

14   with branches, riding a lawnmower, carrying branches, uhm,

15   doing activities that looked to be associated with horse

16   maintenance, uhm, feeding small animals, dogs, animal-type of

17   work.

18   Q. Now, did you see her carrying trash cans, you said?

19   A. Yes.

20   Q. What about burn piles?  Did you see any of that?

21   A. Dragging debris to a burn pile.

22   Q. All right.  And then she -- so, it was physical labor,

23   then, that you saw.

24   A. Yes, sir.

25   Q. All right.  Now, how long would those time periods -- or

1    those -- those physical activities take place?

2    A. It was over days, from the November to the January.  And I

3    don't remember the exact number of days, but it was over

4    several days.

5    Q.  And, then, you, of course, recorded and documented some of

6    the relevant dates that are in Government's Exhibit 69; is

7    that right?

8    A. Yes, sir.

9    Q. Now, then, you had the opportunity to interview Ms. Durand,

10   did you not, sir?

11   A. Yes, sir.

12   Q. Tell us about that.

13   A. That occurred in, I think, 2008.  Uhm, we met at a

14   McDonald's.  Myself and another agent, uhm, spoke.  I think

15   that her husband or somebody was present, and I spoke to her

16   about her injury.  And she walked me through how it had

17   occurred, uhm, what was -- you know, what the ailment was or

18   the injury was, the process of the type of treatment that she

19   had, uhm, what she could and could not do, her pain levels.

20   And then, I believe -- and I discussed what was videoed and

21   the things that I had seen her doing.

22   Q. Now, then, did she talk to you about Doctor Strausser, at

23   all?

24   A. Yes, sir.

25   Q. What did she say, sir?

1    A. That Doctor Strausser, I believe, was not her treating

2    physician at the time, or the physician on record, and that he

3    had kept her off of work or on the limited duty type of

4    restrictions.

5    Q. Okay.  And did she talk about anything with respect to her

6    pain about Doctor Strausser?

7    A. I think she had told him on a scale the number of the pain

8    that she was in.

9    Q. Okay.  Did she identify about -- what Doctor Strausser told

10   her about the pain, for example?

11   A. That it might be in her head?

12   Q. Correct.  Yeah.  So, she -- that it was just in her head?

13   A. Correct.  Yes, sir.

14   Q. All right.  Now, then you talked to her about certain

15   activities that she could do; is that right?

16   A. Yes, sir.

17   Q. And what were some of those activities she told you she

18   could do?

19   A. I think, during the interview, it was walking to the

20   mailbox.  She could do some housework, or mopping, or

21   something like that, with breaks in between.  Uhm, she could

22   drive a certain amount of time, as long as it wasn't too long

23   of a distance.

24   Q. Okay.  Now, then, did you discuss the surveillance with Ms.

25   Durand?

1    A. Yes, sir.

2    Q. Okay.  And how do you use that in your interview, sir?

3    A. I just -- after she went through what she could and

4    couldn't do, I just presented her with the video of

5    observations that I saw her doing over that span of time, and

6    just advised her of what all I had seen.

7    Q. Now, when Ms. Durand was initially talking to you about

8    what she could or could not do, was she minimizing it when she

9    first spoke to you?

10            MR. ARVANETES:  Objection; subjective.

11            THE COURT:  Rephrase the question.

12   **BY MR. WELDON:**

13   Q. Sir, you had conducted surveillance of Ms. Durand, had you

14   not?

15   A. Yes, sir.

16   Q. So you had seen what she could and could not do; is that

17   right, sir?

18   A. Yes, sir.

19   Q. Now, did Ms. Durand identify all of the activities that she

20   could do when she spoke with you?

21   A. Not in the videos.

22   Q. All right.  So, then, at that point, did you use the video

23   evidence to confront her?

24   A. Yes, sir.

25   Q. So, explain what happened after you did that, sir.

1  A. After -- she -- after I told her about the video and the

2  activities that I had seen her do, she just said that, uhm --

3  I'm trying to remember the latter part of the interview.

4      She said that she was required to do all of that as part

5  of, I think, the maintenance of the horses and stuff, and,

6  uhm, that she was afraid that if the Postal Service -- if she

7  went back in some type of limited capacity, they might make

8  her do more than what was on the limited duty restrictions.

9  Q. Then did you talk to her about what the post office

10 wouldn't have her do, for example?

11 A. Yes, sir.

12 Q. So, let's, for example, talk about you mentioned shoveling

13 manure.

14 A. Yes, sir.

15 Q. What about pushing hay bales?

16 A. Yes, sir.

17 Q. By the way, did Ms. Durand explain, when she was pushing

18 some of the hay bales, the weight of those hay bales?

19 A. She informed me that a round hay bale was about 400 pounds.

20 Like this (indicating), you know, a big round one.

21 Q. And that she was pushing?

22 A. Yes.

23 Q. Then you talked about the yard work with her, as well?

24 A. Yes, sir.

25 Q. Okay.  And you explained all of those activities that the

1  post office wouldn't make her do; is that right, sir?

2  A. Yes, sir.

3  Q. Then did you ultimately show her the job restrictions that

4  was the most recent job that was offered to her?

5  A. (Pause)  Yes, sir.  (Nods head affirmatively)

6  Q. Okay.  And if we could show you Government's Exhibit 15,

7  please.

8           MR. WELDON:  And if we could scroll down, Agent

9  Boynton?

10 **BY MR. WELDON:**

11 Q. And did you mention that those activities that she was

12 doing in her yard weren't included in those activities for the

13 post office, sir?

14 A. Yes, sir.

15 Q. Okay.  Now, then, ultimately, did you ask Ms. Durand why

16 she wasn't working for the post office?

17 A. Yes, sir.

18 Q. What did she tell you?

19 A. She told me that she was -- did not want to come back, for

20 90 percent of the reason being her injury, and the other 10

21 percent being, I guess, some type of conflict with postal

22 management.

23 Q. Now, then, when you talked to her about the activities that

24 she was doing, and did you ask her why -- about what she could

25 do with all of those activities, why she couldn't answer

1    phones?

2    A. Yes, I recall asking her that.

3    Q. Okay.  What was her response?

4    A. That she was afraid that the Postal Service would make her

5    do more than what was on the restrictions.

6              MR. WELDON:  May I have just a moment, Your Honor?

7              THE COURT:  You may.

8

9              **(Discussion off the record.)**

10

11             MR. WELDON:  I have no further questions, Your

12   Honor.  Thank you.

13             THE COURT:  Cross-examine?

14             MR. ARVANETES:  Yes, sir.

15

16             **CROSS-EXAMINATION**

17   **BY MR. ARVANETES:**

18   Q. Good afternoon.

19   A. Good afternoon.

20   Q. When you found out about this -- or you started the

21   investigation on Ms. Durand based upon her supervisor's call,

22   Ms. Bowi -- from Ms. Bowi, correct?

23   A. Yes, sir.

24   Q. That was on or about October 19th, 2007?

25   A. That sounds correct, yes, sir.

1   Q. Do you -- did you bring with you your file or any records

2   or interview or anything like that?  With you today?

3   A. (Shakes head negatively)  No, sir.

4   Q. And why is that?

5   A. I just -- it's out in the car.

6   Q. It's what?

7   A. It's out in the car.

8   Q. You understand -- all right.  (Shakes head negatively)  You

9   opened up an investigation; is that right?

10  A. Yes, sir.

11  Q. Uhm, you got video surveillance?

12  A. Yes, sir.

13  Q. Is that right?  You visited with a Doctor Strausser?

14  A. Yes, sir.

15  Q. January 18th, 2008.  Do you recall that?

16  A. That sounds about the time, yes.

17  Q. At the time, were you -- was it your impression that Mr.

18  Strausser -- Doctor Strausser was her primary care

19  physician?

20  A. Yes, sir.

21  Q. When you visited him, did you submit to him a HIPAA

22  letter?

23  A. I believe so.

24  Q. Are you sure of that?

25  A. I'm sure, (nods head affirmatively) yes, sir.  I believe I

1    did.

2    Q. All right.  I want to -- for the record, I want to approach

3    -- I want to go over this HIPAA letter with you, okay?

4            MR. ARVANETES:  May I approach, Your Honor?

5            THE COURT:  You may.

6    **BY MR. ARVANETES:**

7    Q. Can you identify this first page?

8    A. That looks -- that looks like the cover page to a HIPAA --

9    the HIPAA letter.

10   Q. And that is put out by the OIG?

11   A. Yes, sir.

12           MR. ARVANETES:  Can the clerk turn to the second

13   page?

14   **BY MR. ARVANETES:**

15   Q. So, this HIPAA letter, essentially, is given to a doctor or

16   to a medical person?

17   A. Yes, sir.

18   Q. Now, there's been testimony from Doctor Strausser that he

19   didn't recall whether a letter was given, and in your -- and I

20   want to get your testimony right.  Is it your testimony that

21   you think you did it but you don't -- do you have a record of

22   it in your file?

23   A. I'd have to --

24   Q. The HIPAA letter?

25   A. I'd have to check, but I think I provided it to the --

1    Q. The OWCP file?

2    A. -- the office manager of the practice.

3    Q. The office manager of?

4    A. I believe so, but I could check my file.  I think it was

5    the office manager.

6            MR. ARVANETES:  All right.  Your Honor, this is a

7    very important issue.  I would ask that after this testimony,

8    that he be allowed to check the file and see if he has it in

9    the file.

10           THE COURT:  The file from the car?

11           MR. ARVANETES:  Correct.

12           THE COURT:  Get -- get the file?

13           MR. ARVANETES:  Well --

14           THE COURT:  We'll take a recess and get the file,

15   and you can look at it.

16           MR. ARVANETES:  Is that -- okay.

17           THE COURT:  Any problems, Mr. Weldon?

18           MR. WELDON:  No, Your Honor.

19           THE COURT:  All right.  Let me know when you've had

20   a chance to review the file.  We will be in recess.

21           MR. ARVANETES:  Okay.

22

23                    **(Recess taken.)**

24

25           THE BAILIFF:  The United States District Court is

1     again in session.

2              THE COURT:  Please be seated.

3         Mr. Arvanetes, did you get a chance to review

4     Mr. Haywood's file?

5              MR. ARVANETES:  It was an electronic version, but I

6     was told that -- I got the answer I needed, so I'm prepared to

7     go ahead with the questioning.

8              THE COURT:  All right.  Let me determine, though,

9     are there any other witness files to which you have not had

10    access?

11             MR. ARVANETES:  No, Your Honor.

12             THE COURT:  Mr. Weldon, again, have you provided the

13    defense with all of the relevant discovery material and files?

14             MR. WELDON:  Yes, Your Honor.  (Nods head

15    affirmatively)

16             THE COURT:  Okay.  All right, Mr. Arvanetes, go

17    ahead, if your ready.

18             MR. ARVANETES:  Thank you.

19        Madam clerk, please put up the exhibit, or at least --

20    **BY MR. ARVANETES:**

21    Q. This is where we ended off, Agent.  This is the HIPAA form

22    that is usually given to -- to doctors before agents talk to

23    doctors, it's a form furnished by OIG.  Is that right?

24    A. Yes, sir.

25    Q. And before we paused, we -- well, during the recess, you

1    were able to review your file?

2    A. Yes, sir.  (Nods head affirmatively)

3    Q. And that file is an electronic file?

4    A. Correct.  Yes, sir.  (Nods head affirmatively)

5    Q. Okay.  And were you able to find one of these HIPAA forms

6    signed by either Doctor Strausser or one of his aides?

7    A. No, sir.

8    Q. Okay.  Thank you.

9         MR. ARVANETES:  And I'm not -- I don't -- I don't

10   intend to move that into an exhibit, Your Honor.

11   **BY MR. ARVANETES:**

12   Q. And, so, when you met with Doctor Strausser on January 18th

13   of 2008, he was pretty busy that day, wasn't he?

14   A. Yes, sir.  (Nods head affirmatively)

15   Q. And he said he had "a little time between patients to see

16   me."

17   A. Yes, sir.

18   Q. Or to see you.

19   A. Yes, sir.  (Nods head affirmatively)

20   Q. And, uhm -- and you showed him a video that you made of --

21   a surveillance video that you made of Ms. Durand?

22   A. Yes, sir.

23   Q. And do you recall how many minutes he was able to spend

24   watching the video?

25   A. I do not recall.

1    Q. Okay.  Uhm, did you show -- before showing the video to

2    Doctor Strausser, did you show the video to Ms. Durand?

3    A. I'm sorry, I didn't hear.  To who?

4    Q. I'm sorry, to Ms. Durand?

5    A. No.  No, sir.  (Shakes head negatively)

6    Q. And you testified that -- or I think you testified, did you

7    ever show the video to Ms. Durand?

8    A. No, sir.  (Shakes head negatively)

9    Q. You never did.  Okay.  And during the interview you had at

10   McDonald's with Ms. Durand, you said you were -- you weren't

11   alone, there was another agent?

12   A. Yes, sir.

13   Q. Do you recall that agent's name?

14   A. Uhm, Nora Moa, I believe.

15   Q. Who?

16   A. Nora Moa.

17   Q. And do you -- for the record, do you know the spelling of

18   that, by any chance?

19   A. N-O-R-A, M-O-A.  M-O-A.  Nora Moa.

20   Q. All right.  And was this conversation recorded?

21   A. No, sir.

22   Q. Any reason why it wasn't recorded at that time?

23   A. No.

24   Q. Uhm, when -- when did you pass your recommendations on to

25   OWCP?

1   A. I didn't pass any recommendations on to OWCP.

2   Q. How did your -- how did -- who did you pass the

3   recommendations on to, then?

4   A. I passed a Report of Investigation to the Department of

5   Labor and the Postal Service.

6   Q. And you're aware that OWCP is a part of the Department of

7   Labor?

8   A. Yes, sir.

9   Q. Okay.  (Nods head affirmatively)  And are you aware that in

10  the summer of 2008, they sent -- well, the Department of

11  Labor/OWCP sent Ms. Durand -- ordered her to go to a secondary

12  -- for a second opinion to Doctor Hood?

13  A. No, sir.

14  Q. You are not aware of that?

15  A. Now.  But, then, no.

16  Q. Not then?  All right.  Were you aware -- are you aware now

17  that he, back then, said that she was 100 percent disabled?

18  A. Sorry, say that --

19  Q. Are you aware now that back in 2008, after he saw her, that

20  he recommended that she was 100 percent disabled?

21  A. Yes, sir.

22         MR. ARVANETES:  All right.  May I have a moment,

23  Your Honor?

24         THE COURT:  You may.

25

```
 1              (Discussion off the record.)

 2

 3              MR. ARVANETES:  I have nothing further.  Thank

 4     you.

 5              THE COURT:  Redirect, Mr. Weldon?

 6              MR. WELDON:  Briefly, Your Honor.

 7

 8                    REDIRECT EXAMINATION

 9     BY MR. WELDON:

10     Q. Sir, let me ask you just some questions about a criminal

11     investigation.  You were asked about your surveillance of Ms.

12     Durand; is that right?

13     A. Yes, sir.

14     Q. Now, you were asked a question of why you didn't show the

15     video to Ms. Durand.

16     A. Yes, sir.

17     Q. And -- and why, in criminal investigations, might you not

18     show the defendant the video before you ask questions?

19     A. Because the -- uhm, I'm sorry, what was that again?

20     Q. Why would there be reasons that you wouldn't show somebody

21     a video before you asked them questions?

22     A. To tell if they're being truthful or not.

23              MR. WELDON:  Your Honor, I have no further

24     questions.

25              THE COURT:  Is the witness excused?
```

1    MR. WELDON:  Yes, please, Your Honor.

2    THE COURT:  You may step down, Mr. Haywood.  Thank

3  you.

4    Mr. Weldon.

5    MR. WELDON:  Yes, Your Honor.  The United States

6  calls Sara Spane.

7    CLERK OF COURT:  (Indicating)  Raise your right

8  hand.

9

10    **(The witness was duly sworn.)**

11

12    THE WITNESS:  I do.

13    CLERK OF COURT:  (Indicating)

14    THE COURT:  Good afternoon, ma'am.

15    THE WITNESS:  Good afternoon.

16    THE COURT:  Would you please state your full name

17  and spell your last name?

18    THE WITNESS:  Sara Spane.  And my first name is

19  spelled S-A-R-A, and then my last name, S-P-A-N-E.

20    THE COURT:   Go ahead, Mr. Weldon.

21    MR. WELDON:  Thank you, Your Honor.

22

23    **DIRECT EXAMINATION**

24  **BY MR. WELDON:**

25  Q. Ma'am, what do you do for a living?

1    A. I am a Federal Agent for the Postal Service, Office of

2    Inspector General.

3    Q. How long have you worked in that capacity?

4    A. Since 2006.

5    Q. Can you explain some of your job duties?

6    A. Uhm, yes.  So, currently, I am the Subject Matter Expert

7    for claimant fraud for the Western Area Field Office, and for

8    about ten years I have conducted claimant fraud

9    investigations, and I currently do provider fraud

10   investigations.

11   Q. Where is your current duty station?

12   A. Denver.

13   Q. Did you become involved in the Durand case, ma'am?

14   A. I did.

15   Q. Can you explain how that occurred, and then what,

16   ultimately, your role was?

17   A. Uhm, I was contacted by the Case Agent, Joseph Boynton, and

18   he consulted with me on the investigation, uhm, I -- I

19   assisted with the undercover portion of the case.

20   Q. I'm going to show you Government's Exhibit 57.  Do you

21   recognize Government's Exhibit 57, ma'am?

22   A. Yes, I do.

23   Q. Can you explain what this is?

24   A. It's a letter that Agent Boynton actually sent out, but him

25   and I had consulted and put this together.

1  Q. And can you read this, just the front page?

2  A. Sure.  It is addressed to Mrs. Debbie Durand at an address

3  in Fruitland, Idaho, and it is dated May 6th of 2015.  And it

4  says, "Dear Debbie Durand:  Congratulations, again, on winning

5  the adventure package for two as a result of completing our

6  survey.  Snowbird Recreational Promotions is pleased that you

7  and your guest are officially booked for a three day and two

8  night guided kayak tour of the San Juan Islands with Crystal

9  Seas!  We sincerely appreciate your assistance with furthering

10  our consumer research, and this is just our way of showing our

11  gratitude.  As promised, your detailed adventure travel

12  package is enclosed.  All we ask is that at the conclusion of

13  the trip you complete and return an evaluation survey

14  regarding your experiences with CCrystal Seas.  While we

15  sincerely hope that you enjoy your travels and tour, it is

16  imperative that you do not disclose your affiliation or role

17  with our company, it is important to customer service, the

18  quality of amenities, and value of products you experience

19  during your tour.

20      By maintaining confidentiality about your participation

21  in the Snowbird Recreational Promotions evaluation program,

22  this will ensure the service and treatment that you receive

23  during your tour are as authentic as possible.  The companies

24  we represent rely heavily on your experience and feedback to

25  increase the quality of service and products they provide,

1  you're honest opinion will greatly aid Snowbird Recreational

2  Promotions and our contract companies with these efforts.

3  Your evaluation survey will take no longer than 15 minutes to

4  complete, and will be provided via mail with a postage paid

5  return envelope by August 7 of 2015.  Once your completed

6  survey is received, you will receive additional complimentary

7  offers to travel and shop at other great locations near you.

8       We appreciate you becoming an active participant in this

9  process.  I'd like to thank you in advance for your

10  cooperation and willingness to evaluate Crystal Seas Should

11  you have any questions regarding your travel package or the

12  evaluation process, please do not hesitate to contact myself

13  via e-mail, or our office.  It is our pleasure to facilitate

14  your outdoor adventure, and we are here to personally guide

15  you through the process.  Let the fun begin, and we hope you

16  have an enjoyable trip.  Sincerely, Sandy Black."

17  Q. And who is Sandy Black?

18  A. Sandy Black is my undercover name.

19  Q. Okay.  Now, then, there were two things that I wanted to

20  talk with you about, ma'am, and the first is the evaluation.

21  Can you explain why that's identified and why that's something

22  that your office is pursuing for Ms. Durand?

23  A. Uhm, the outfit -- you're speaking about the evaluation at

24  the end of the trip?

25  Q. Correct.

1    A. Uhm, so, we put the evaluation in there, because the ruse

2    is that the person is then going to be evaluating a company,

3    and their services that are being provided on whatever the

4    trip is that is being provided.

5    Q. And, so, then you're trying to obtain accurate information

6    after the fact; is that right?

7    A. Yes.  We are trying to get details from that individual as

8    to the service that was provided on the trip that they

9    attended.

10   Q. And that's a part of the reason that, then, they get the

11   free trip.  Is that right, ma'am?

12   A. That's correct.  That's all that they have to do is

13   complete the survey.

14   Q. Now, then, the second component, that is no disclosing the

15   mystery shopper.  Is that right?

16   A. That's correct.

17   Q. Explain that please, ma'am.

18   A. So, this also helps keep the undercover covert, by putting

19   the nondisclosure in there.

20   Q. So, in other words, you don't want the defendant explaining

21   that she won a free trip when she's on a kayaking trip, for

22   example.

23   A. That's correct.

24   Q. All right.  Now, then, was there ever any document or

25   discussion that this was as a result of Ms. Durand's medical

1  conditions?

2  A. No, there was not.

3      MR. WELDON:  All right.  May I have a moment, Your

4  Honor?

5      THE COURT:  You may.

6

7          **(Discussion off the record.)**

8

9  **BY MR. WELDON:**

10  Q. One thing just real briefly, ma'am.  Was there, working

11  with Ms. Durand, anything about who else was going to attend

12  the kayaking trip with her?

13  A. Uhm, yes.  It was offered as a trip, where you would get to

14  bring one guest.  And, so, I had discussions with Ms. Durand

15  about that, and she was unable to bring a guest on the trip.

16  Q. And, now, was there somebody who she was initially going to

17  bring but didn't bring?

18  A. Yes.  She discussed possibly bringing her husband, and then

19  she also discussed bringing her daughter.

20      MR. WELDON:  I have no further questions, Your

21  Honor.

22      THE COURT:  Cross-examination?

23

24          **CROSS-EXAMINATION**

25  **BY MR. ARVANETES:**

1    Q. Good morning -- or good afternoon.  What was your name

2    again?  Your real name?

3    A. Agent Spane.

4    Q. What?

5    A. Agent Spane.

6    Q. Spane -- Spane?

7    A. Spane.  Good afternoon.

8    Q. Agent Spane, in your -- what --

9              MR. ARVANETES:  May I approach, Your Honor, --

10             THE COURT:  You may.

11             MR. ARVANETES:  -- with a page?

12   **BY MR. ARVANETES:**

13   Q. This is part of the promotion, I believe, that you and your

14   agency created; is that right?

15   A. (Viewing document)

16   Q. It's a -- it's on the second page of this congratulatory,

17   your travel awaits you?

18   A. Yes, that's correct.

19   Q. And the -- as far as dist -- distance and timing,

20   (indicating) it says eight to ten miles a day; is that

21   correct?

22   A. Correct.

23   Q. And as far as time in the water, four to five hours a day,

24   correct?

25   A. Correct.  That's what it says on there.

1    Q. All right.  Thank you.  And, then, also, you -- under your

2    Sandy Black pseudonym, you had several e-mails, correspondence

3    with her, with Debbie Durand to prepare for the trip?

4    A. I believe that I sent her a -- or that we did send her the

5    information for the trip, but then she preferred it to be sent

6    through the mail, --

7    Q. Through the --

8    A. -- as well.

9    Q. Through -- through the snail mail, or e-mail?

10   A. Through the U.S. Postal Service.

11   Q. The U.S. Postal Service?  And, so, you did communicate with

12   her in preparation for the trip by e-mail, as well?

13   A. Yes, that's correct.

14   Q. Okay.

15          MR. ARVANETES:  Nothing further.  Thank you.

16          THE COURT:  Redirect?

17          MR. WELDON:  No, Your Honor.

18          THE COURT:  Is the witness excused?

19          MR. WELDON:  Yes, please, Your Honor.

20          THE COURT:  You may step down.  Thank you.

21          THE WITNESS:  Thank you.

22          THE COURT:  Mr. Weldon.

23          MR. WELDON:  Yes, Your Honor.  The United States

24   calls Kimberly Snyder.

25          THE COURT:  We might have time for all of your

1   witnesses, Mr. Weldon.

2            MR. WELDON:  Pardon me, Your Honor?

3            THE COURT:  Go ahead.  Go ahead.  Get who you want.

4   I said you might have time for all of your witnesses at this

5   pace, Mr. Weldon.

6            MR. WELDON:  Yes, Your Honor, we're moving fast now.

7            THE COURT:  Who are you calling?

8            MR. WELDON:  Pardon?

9            THE COURT:  Who are you calling now?

10           MR. WELDON:  Jordan Dakota Vantine, Your Honor.

11           CLERK OF COURT:  (Indicating)  Raise your right

12  hand.

13

14                  **(The witness was duly sworn.)**

15

16           THE WITNESS:  (Nods head affirmatively)  Yes.

17           CLERK OF COURT:  (Indicating)

18           THE COURT:  Good afternoon.

19           THE WITNESS:  Hello.

20           THE COURT:  Would you please state your full name

21  and spell your last name?

22           THE WITNESS:  Jordan Dakota Vantine, V-A-N-T-I-N-E.

23           THE COURT:  Mr. Weldon.

24           MR. WELDON:  Thank you, Your Honor.

25

1    **DIRECT EXAMINATION**

2    BY MR. WELDON:

3    Q. Ma'am, where are you currently living?

4    A. Bellingham, Washington.

5    Q. And during the year of 2015, the summer, what were you

6    doing?

7    A. I was a sea kayak guide for a company called Crystal Seas

8    Kayaking based in Friday Harbor, Washington.

9    Q. And were you the sea kayak guide for Ms. Durand, ma'am?

10   A. I was.

11   Q. Can you explain for the Court what the itinerary was for

12   that particular trip and how far you were paddling for that

13   kayaking adventure?

14   A. Sure.  Ms. Durand was on a three-day sea kayaking trip.

15   Those trips leave off the west side of San Juan Island.  We

16   typically paddle ten to twelve miles per day, six to eight

17   hours per day to an island on the north side of San Juan.

18   And, on the second day, we circumnavigate that island

19   (indicating) and camp in the same spot.  On day three, we

20   paddle back.  (Nods head affirmatively)

21   Q. Now, when individuals are obtaining kayaking adventures

22   with your company, do they have to fill out certain forms,

23   ma'am?

24   A. They do.

25   Q. Okay.  Now, let's show you, then, Government's Exhibit 58,

1    please.  And you'll see that on your left-hand side.

2        Do you recognize this document?

3    A. I do.

4    Q. And what is this, ma'am?

5    A. This is a standard form that we receive from all guests

6    that come on our trips, it's a release and acknowledgement of

7    risk, that's very standard.

8    Q. Okay.  For example, that kayaking is dangerous; is that

9    right?

10   A. Yes.

11          MR. WELDON:  Your Honor, I move for the admission of

12   Government's Exhibit 58.

13          MS. HUNT:  Oh, sorry.  No objection.

14          THE COURT:  58 is admitted.

15

16          **(Exhibit Number 58 was admitted.)**

17

18   **BY MR. WELDON:**

19   Q. All right.  Then, are there any other documents that

20   individuals have to fill out, ma'am?

21   A. Uh, yes.  They fill out another form that describes their

22   experience, uhm, dietary needs, and then anything else that

23   they think that us, as a guide, would find relevant to their

24   experience on the trip.

25   Q. Now, are those forms important for you as a sea kayak

1    guide, ma'am?

2    A. They are very important.

3    Q. And why is that?

4    A. It talks about medical history, any impairments the person

5    might have.  Also, I pack all of the food for the trip, so

6    dietary needs.  And it also just gives me a better idea of the

7    fitness level of the person, their abilities, uhm, and where

8    our trip might go or might not be able to go.  (Nods head

9    affirmatively)

10   Q. If I could show you, then, Government's Exhibit 59.  Do you

11   recognize this document, ma'am?

12   A. Yes.

13   Q. What is it?

14   A. Uhm, this is our pre-vacation questionnaire, uhm, that

15   guests fill out, kind of giving us, like, their height, their

16   weight, medical history, and dietary restrictions.  (Nods head

17   affirmatively)

18   Q. And do you recognize this document, ma'am?

19   A. Yes.

20          MR. WELDON:  Your Honor, I move for the admission of

21   Government's Exhibit 59.

22          MS. HUNT:  No objection, Your Honor.

23          THE COURT:  59 is admitted.

24

25          **(Exhibit Number 59 was admitted.)**

1

2          MR. WELDON:  Now, if we could please scroll down,

3    Agent Boynton.

4    **BY MR. WELDON:**

5    Q. So, the first you mentioned is the height and the weight

6    that you're looking for; is that right, ma'am?

7    A. That's correct.

8    Q. Okay.  And, then, if we could go to the second page.

9    Explain this.

10   A. Sure.  So, we asked for dietary concerns, we provide all

11   three meals and snacks throughout the day.  So, you know, we

12   pack wine and that sort of thing per guest.  So, I just read

13   through this form.

14          Uhm, medical concerns, uhm, or requirements, had back

15   surgery and take several different meds for the pain.  So,

16   that raises a concern to me, but over twelve years tells me

17   that, you know, this person has a grip on what their abilities

18   are, but I would be sure to check for that whenever we are on

19   the water paddling.  (Nods head affirmatively)  Potentially,

20   not verbally in front of a lot of people, but I would just

21   look for signs in a guest, if they look like they are fatigued

22   or in pain.

23   Q. And did you see Ms. Durand in pain at all throughout the

24   sea kayaking adventure?

25   A. I did not.

1    Q. Now, then, you mentioned that you were on the kayaking

2    adventure, and I'll show you, then, Government's Exhibit 61,

3    if we could.

4         Do you recognize this document, ma'am?

5    A. Yes.

6    Q. What is this?

7    A. This is a picture that I took at the beginning or the end

8    of our trip, I can't recall.  But --

9    Q. But it's a true and accurate depiction?

10   A. Yes.  I took it.

11            MR. WELDON:  Your Honor, I move for the admission of

12   Government's Exhibit 61.

13            MS. HUNT:  No objection, Your Honor.

14            THE COURT:  61 is admitted.

15

16            **(Exhibit Number 61 was admitted.)**

17

18   **BY MR. WELDON:**

19   Q. Now, Ms. Vantine, you're the kayaking guide.

20   A. Correct.

21   Q. Did you know that this was an undercover operation that

22   occurred at CCrystal Seas?

23   A. I had no idea.  (Smiling)

24   Q. All right.  Did you know that everybody in that picture,

25   except for Ms. Durand, was a federal agent?

1    A. No.   (Shakes head negatively)

2    Q. What were you -- what was your impression when you were

3    conducting the tour?

4    A. It was a standard trip, uhm, with a random group of people,

5    uhm, two folks were related.  I knew Ms. Durand was there

6    singly.  And, yeah, (shrugs shoulders) it was just a -- it was

7    a normal trip.  That's how -- kind of a hodgepodge of

8    different folks.

9    Q. Can you explain the physical demands that are involved in

10   kayaking?

11   A. Uhm, sure.  Sea kayaking, in particular, is a -- it's an

12   endurance-based sport, and it's rigorous at times.  The area

13   that we were paddling in is in the San Juan Islands.  We spend

14   a lot of time contouring the coast, but for the three-day

15   itinerary we make long crossings, where you take into account

16   the current and tides and wind.

17        There are a lot of times where you'll be in the boat for

18   up to four hours, you know, sitting, twisting.  Yeah, it's a

19   -- it's a difficult -- I wouldn't call it a light sport.

20   Q. Right.  Now, are there times when you just can't stop on

21   the kayaking adventure?

22   A. Yes.  So, for this crossing that I was telling you about,

23   we do one major crossing through Spieden Channel, and it's a

24   ferry -- a Washington State Ferry lane, it's also just a

25   high-traffic area.

1    So, whenever we're paddling through that, I like to tell

2    people, you know, kind of brief them, like, you know, while

3    we're on shore that you can't really stop paddling here, we

4    need to keep going, you know, there's a potential to really

5    get swept out into the Strait of Juan de Fuca if you're not

6    paddling hard and keeping up the pace.  (Nods head

7    affirmatively)

8    Q. All right.  And, then, also, to get across, so that you are

9    not in boat traffic, as well; is that right, ma'am?

10   A. Correct.

11   Q. Okay.  Now, then, we talked a little bit about the trip, so

12   I'm going to show you, if I could, Government's Exhibit 63.

13       Do you recognize Government's Exhibit 63?

14   A. I do.  This is a chart of the west side of San Juan

15   County.

16       MR. WELDON:  Your Honor, I move for the admission of

17   Government's Exhibit 63.

18       MS. HUNT:  No objection, Your Honor.

19       THE COURT:  63 is admitted.

20

21       **(Exhibit Number 63 was admitted.)**

22

23   **BY MR. WELDON:**

24   Q. Now, ma'am, can you explain to the Court where the tour

25   started and where you progressed through for the rest of the

1  kayaking trip?

2  A. Sure.  So, you'll need to scroll down just a little bit.

3  Uhm, so you can kind of see where it says "San Juan Islands,"

4  just above the "S" that's Smallpox Bay, that's San Juan County

5  Park where the --

6  Q. You can touch it, Ms. Vantine.

7  A. I can touch it?

8  Q. You can.

9  A. Uhm, oh great.  I'll just make the little map here.  Yeah.

10  So, we -- we contour the coast up San Juan Island.  And then,

11  from here, you do a crossing to the south point of Henry

12  Island.  Which is about a mile, and that's just south of Roche

13  Harbor, so there is quite a bit of boat traffic there, as

14  well.  We paddle up the west side of Henry.  We normally stop

15  right here for lunch.  Uhm, and then if you can scroll up a

16  little bit?  Oh, sorry.

17  Q. Oops.  I'll take care of that for you.

18  A. Cool.  And then this is the long crossing I was telling you

19  about, from Posey Island, typically, over to the north end of

20  Spieden, the south end of Stuart.  This is Spieden Channel

21  that -- there is that crossing.  There's the reef right there,

22  as well as ferry traffic, boat traffic.  But you cross that,

23  Stuart Island, paddle right up through here into Reid Harbor.

24  And that's where we camp at the end of day one.

25  Q. So, that's the first day, then.

1    A. Yes.

2    Q. Okay.  And, then, it's, approximately, between, every day,

3    eight to ten miles that you're traveling?

4    A. Yeah.  Eight to ten.  (Nods head affirmatively)

5    Q. All right.  Now, then, what do you do for the second day?

6    A. The second day -- well, the second day, we have options.

7    Uhm, we can either have a layover day, if folks are worn out

8    and tired of kayaking or sore, anything like that.

9        And on a layover day you're allowed to just stay at camp.

10   You can go for a hike, I normally make a map of a trail, but

11   just kind of relaxing on the beach.  If you want to paddle

12   more, and you are not too fatigued, we do a circumnavigation

13   of Stuart Island, which is what we did on Ms. Durand's trip.

14       So, for this day, we paddle out Reid Harbor, around south

15   side (indicating) up to Turn Point, then have lunch at a beach

16   in this area, and then paddle back around into Reid Harbor.

17   Q. Now, just to make sure we are clear on this, Ms. Vantine,

18   there was the option to simply stay at the beach.

19   A. Yes, that's correct.

20   Q. And Ms. Durand chose not to stay at the beach.

21   A. She chose to paddle.  (Nods head affirmatively)

22   Q. And then, again, we're talking between eight to ten miles

23   per day.

24   A. Yes.  It's six to eight hours.

25   Q. All right.  Then, ultimately, we have day three, can you

1  explain what happened on day three?

2  A. Sure.  Day three is, essentially, the same route out as it

3  is back.  You do -- we did a fairly long crossing that day

4  down to Henry from Stuart -- or back around Henry Island,

5  across the same route over, uhm, back to Smallpox Bay, and

6  then we take out there.

7  Q. Now, then, can you explain the tides and paddling and how

8  that can be difficult when you're in a kayak?

9  A. Sure.  So, for sea kayaking, you can do it anywhere from,

10  you know -- you can do some pretty sizable crossings.  And San

11  Juan Islands actually has a very large tidal exchange, which

12  means that the water can be moving anywhere from -- you know,

13  from still to ten knots.  (Indicating)  So, you have to

14  compensate for that by setting a point and tracking to

15  navigate across the water.

16      So, for long crossings, whenever there's a lot of tide

17  movement, it's really important to keep paddling, or you can

18  get swept out in either direction, and those oftentimes turn

19  into calls to the Coast Guard.  So...

20  Q. Now, did Ms. Durand have any problem in paddling in the

21  kayak?

22  A. She did not.

23  Q. And, of course, you had seen the form, so you were watching

24  her; is that right, ma'am?

25  A. Correct.

1    Q. Did she indicate that she had any problems at all while

2    kayaking?

3    A. She did not.

4    Q. All right.  Then, now, when you're camping, explain that to

5    the Court.  What -- what does that entail?  What's the

6    campsite like?

7    A. Sure.  So, we camp in Reid Harbor.  Uhm, we pull the boats

8    up to the shore and then un -- we unpack the boats of all of

9    our gear, boat hatches, we've got group gear and then personal

10   hatches.  So, we take all of the items out, move them to the

11   campsite.

12        I let people set up their own tents, blow up their

13   sleeping pads, help me move kitchen items to the picnic table,

14   and then you button the boats back up and move them up above

15   the high tide line over driftwood and --

16   Q. How heavy are the boats?

17   A. Fully loaded, the boats are over 100 pounds.  Uhm, slightly

18   less than that, I mean, 60 or so when unloaded or empty.

19   Q. Now, the kayaks, are they heavier because of the equipment,

20   ma'am?

21   A. Yes.

22   Q. All right.  Then, the campsites, explain the campsites.

23   A. Sure.  So, we were camping on the east side of Reid Harbor.

24   It's -- it's a flat campsite, a grassy area, uhm, treed.

25   (Laughing)  A classic campsite.

1  Q. Sure.  And what about are there any places that people can

2  go walking?

3  A. Yeah, definitely.  So, Stuart -- we go to Stuart Island,

4  because of the extensive hiking trails, uhm, and there is a

5  hiking trail that goes up six miles to -- round-trip, to a

6  lighthouse.  And, also, half -- at the halfway point is a

7  school house that --

8  Q. Are those uphill?  Do you have to walk uphill?

9  A. Yeah, it's -- it's uphill.  People get winded pretty

10 quickly, but I like to recommend that -- that folks, you know,

11 take a walk to stretch out their legs.  Which we did on our

12 trip, as well.

13 Q. And Ms. Durand did that, as well, then?

14 A. Yes.

15 Q. Now, then, let's talk about did Ms. Durand ever complain

16 about being unable to lift the kayaks or do anything that --

17 try to have you do it instead of her, for example?

18 A. No.

19 Q. Okay.  Did she pack her own gear?

20 A. Yes.

21 Q. Did she have any difficulty getting in and out of the

22 kayak?

23 A. No.

24 Q. Is it easy to get in and out of a kayak?

25 A. Uhm, you know, it takes a lot -- it takes quite a bit of

1    balance.  You know, you have to have someone stabilizing the

2    boat for the first few times.  But, yeah, it's -- you -- to

3    get into the boat, you sit down on the back, brace both your

4    hands, twist, and then kind of scoot in.

5        And then do the opposite to get back out, but you have to

6    be able to push your whole body weight up, scoot up on the

7    back of the boat while keeping your balance, swing your legs

8    over the side and not capsize.  Which we didn't have any

9    capsizes on our trip.

10   Q. And Ms. Durand didn't capsize, either, then.

11   A. She did not.

12   Q. All right.  Now, did Ms. Durand ever ask for breaks?

13   A. Uh, she never asked for a break.

14   Q. And, of course, you, as the guide, you're monitoring to

15   make sure that people aren't tiring out.

16   A. Right.  Yeah, I like to stop every 45 minutes or so and

17   hang out, talk, drink some water, and then keep paddling.

18   Q. Did Ms. Durand at all seem to be unable to keep up?

19   A. No.

20   Q. Now, when the trip ended, what was the last thing that you

21   saw Ms. Durand doing?

22   A. We were running late for the ferry.  We got off the water a

23   little bit late and she was catching the ferry from San Juan

24   Islands back to Anacortes.  So, we kind of rushed into town,

25   to the top of the ferry landing, and she jumped out of the

1  van, grabbed her bags and ran down to the ferry to not miss

2  her boat.

3  Q. And when you say "ran," you mean physically ran?

4  A. She ran.

5  Q. Now, then, you were able to see the kayaking video in this

6  case, were you not, ma'am?

7  A. I was.

8  Q. All right.  And were you able to, then, see Ms. Durand at

9  the medical interview?

10  A. Yes.

11  Q. Now, what -- can you compare and contrast what you saw on

12  the kayaking trip versus what you saw of Ms. Durand when she

13  was at the medical interview?

14  A. Completely different person.  Uhm, yeah, pretty

15  indescribable.  One person was very -- very depressed and

16  talking about, you know, very painful movements, and I had --

17  that was not my impression of her at all on our trip.

18      Uhm, she kept up with the group just fine, seemed like an

19  active -- active lady (nods head affirmatively) that really

20  enjoyed her time.

21          MR. WELDON:  May I have just a moment, Your Honor?

22          THE COURT:  You may.

23

24          **(Discussion off the record.)**

25

1    MR. WELDON:  I have no further questions, Your

2    Honor.  Thank you.

3    THE COURT:  Cross-examination.

4

5                      **CROSS-EXAMINATION**

6    **BY MS. HUNT:**

7    Q. Hello, Ms. Vantine.

8    A. Hi there.

9    Q. So, forgive me, I have never been kayaking, so I know

10   nothing about kayaking.

11        So, are these kayaks two-person kayaks?

12   A. They are tandem kayaks, correct.

13   Q. So, Ms. Durand was in a two-person kayak, she was with

14   somebody else; is that correct?

15   A. Yes.

16   Q. Was she on the front of the kayak or in the back?  Does it

17   matter where you are on the kayak?

18   A. Uhm, it doesn't -- it doesn't matter where you are on -- in

19   the boat.  And I can't really answer if she was in the front

20   the whole time or the back the whole time.

21   Q. So, it's not like a two-person bicycle, where the heavier

22   person has to be in the back, anything like that?

23   A. The policy that we have is that folks have to be over 16 in

24   order to sit in the back of the kayak.

25   Q. Gotcha.

1   A. It's interchangeable.

2   Q. So, she was with somebody paddling within the waters

3   everyday.

4   A. Correct.  She was in a tandem kayak for the entirety of the

5   trip.

6   Q. Did she have different partners each day, or --

7   A. I do not know.

8   Q. Did that vary?

9   A. I do not know.  I just -- I would assume she had different

10  partners, but I don't know.

11  Q. Okay.  You indicated that she didn't show that she was

12  having any problems --

13  A. Correct.

14  Q. -- throughout the trip?

15  A. Correct.

16  Q. What about the getting out of the kayak the first or second

17  day, didn't you have to assist her at some point?

18  A. I assist people by sitting on the front of the boat, uhm,

19  and stabilizing the boat while they get in or out.  (Nods head

20  affirmatively)

21  Q. So, that was the assistance that you provided?

22  A. Was making -- yeah, was stabilizing the boat.

23  Q. But you didn't actually pull her out of the boat?

24  A. I did not physically put her in or pull her out of the

25  boat.

1    Q. Okay.  How about -- isn't it true that you -- that she had

2    to have a back brace while she was on the kayak, like a

3    bubble-something to stabilize her back?

4    A. I'm unsure, but we do not provide back braces or

5    stabilizers for the boats.

6    Q. So she could have brought her own.

7    A. Potentially.

8    Q. And you just didn't see it.

9    A. True.

10   Q. And, then, at the -- the last bit of what you indicated to

11   Mr. Weldon, that you saw the different videos, one of the trip

12   and one of her interview, that it seemed like there were two

13   different people.

14   A. Yes.

15   Q. But she was on the trip and enjoying herself?

16   A. Yes.

17   Q. And she could have been in pain, but you didn't know that,

18   because you didn't know if she was on any medication?

19   A. Uhm, I knew that she took medication for pain.  So, I

20   monitored that while we were on the trip, just visually making

21   sure that -- you know, I ask -- I check in with people to see,

22   "How are your arms feeling?", you know, "Are we good to keep

23   -- to stay in the boats?"  Uhm, "Should we continue paddling?"

24   "Should we get out here for a break?"

25        I check in with people, and I never had any complaints

1   for her.  I didn't administer anything from the first aid kit

2   or anything like that, so...

3   Q. But you indicated that you stop every 45 minutes or so to

4   kind of take a break.  (Nods head affirmatively)

5   A. Uhm, yeah, like, every 45 minutes we will stop, drink some

6   water.  We don't just continuously paddle for four hours

7   straight.  We stop for lunches while we get out, get out and

8   walk around the beach.

9   Q. And it's possible, then, when you saw what you termed "two

10  different views" of Ms. Durand that she might have been having

11  a bad day at that time when she was being interviewed.  You

12  don't know what the circumstances were when she was being

13  interviewed, would you say that's fair?

14  A. I don't know the circ -- well, I would say that her

15  description of pain that she felt moving and lifting things,

16  uhm, was not at all what I witnessed on the trip.

17      I did not witness a person in pain or with a handicap or

18  that was unable to keep up with anyone else that was

19  able-bodied on the trip.

20  Q. But you would agree that you wouldn't be able to know for a

21  fact that she was in pain or not.

22  A. Correct.

23          MS. HUNT:  May I have a moment, Your Honor?

24          THE COURT:  You may.

25

```
 1              (Discussion off the record.)

 2

 3    BY MS. HUNT:

 4    Q. So, you indicated -- I'm sorry, one further question.  You

 5    indicated that you were aware that she was on some

 6    medications, that was in her form.

 7    A. Yes.

 8    Q. Did you know that she was taking morphine on the trip?

 9    A. (Pause)  No.

10              MS. HUNT:  Thank you.  No further questions.

11              THE COURT:  Redirect, Mr. Weldon?

12              MR. WELDON:  Very briefly.

13

14                    REDIRECT EXAMINATION

15    BY MR. WELDON:

16    Q. Ms. Vantine, you were asked questions about whether

17    somebody else was paddling or if it was a tandem kayak?

18    A. Correct.

19    Q. Was Ms. Durand paddling the whole time that you were on the

20    trip?

21    A. Yes.

22              MR. WELDON:  I have no further questions, Your

23    Honor.

24              THE COURT:  Is the witness excused?

25              MR. WELDON:  Yes, please, Your Honor.
```

1    THE COURT:  You may step down, Ms. Vantine.  Thank

2  you.

3       Mr. Weldon.

4    MR. WELDON:  Yes, Your Honor.  The United States

5  calls Kimberly Snyder.

6    THE WITNESS:  Hello.

7    MR. WELDON:  (Indicating)

8    THE WITNESS:  Okay.

9    CLERK OF COURT:  Raise your right hand.

10

11           **(The witness was duly sworn.)**

12

13    THE WITNESS:  (Nods head affirmatively)  Yes.

14    CLERK OF COURT:  (Indicating)

15    THE COURT:  Good afternoon.

16    THE WITNESS:  Good afternoon.

17    THE COURT:  Would you please state your full name

18  and spell your last name?

19    THE WITNESS:  Sure.  Kimberly Snyder, S-N-Y-D-E-R.

20    THE COURT:  Mr. Weldon.

21    MR. WELDON:  Thank you, Your Honor.

22

23           **DIRECT EXAMINATION**

24  **BY MR. WELDON:**

25  Q. Ma'am, what do you do for a living?

1  A. I'm a Nurse Practitioner.

2  Q. How long have you worked in that capacity?

3  A. About 14 or 15 years.

4  Q. Do you have any education or training that you've received,

5  ma'am?

6  A. Yes.

7  Q. Can you explain some of that to the Court?

8  A. (Nods head affirmatively)  Sure.  I have an Associate's

9  degree that I got at -- in Elko at UTMV in Galveston.  I

10  received a Bachelor's Degree in UT Houston in Health Sciences,

11  and I've received a Master's Degree.

12  Q. And where do you currently work now, ma'am?

13  A. I work for the Veterans Administration.

14  Q. Was there a time that you worked in Great Falls, Montana?

15  A. Sure.  (Nods head affirmatively)

16  Q. All right.  And do you currently work in Great Falls,

17  Montana?

18  A. No, I do not.

19  Q. Where do you work now?

20  A. I work in Tri-Cities, Washington.

21  Q. I'm going to direct your attention to May 28th of 2013, in

22  Great Falls, Montana.

23  A. Okay.

24  Q. Do you remember that time period, ma'am?

25  A. I remember where I worked.

1    Q. All right.  And where was that?

2    A. I worked at Benefis Hospital in the emergency department.

3    Q. Was there a time when you saw a Deborah Durand?

4    A. I saw a chart that says, yes, indeed, I did do that.

5    Q. Now let me ask you this, ma'am.  When you're reviewing your

6    records -- or writing your records, do you make them as

7    accurate as you possibly can?

8    A. Absolutely.

9    Q. Why is that?

10   A. Well, not to be glib, but for things like this.  And --

11   Q. Right.  To make sure that you can remember?

12   A. And when -- if a patient were to come back and say I have X

13   problem, then I can look at the record and say, okay, we do

14   this, this, and this, and I understand what you're asking me,

15   and go from there.  (Nods head affirmatively)

16   Q. Now, what did you see Ms. Durand for?

17   A. She had fallen off of a horse.  Or --

18   Q. Can you --

19   A. -- was thrown off of a horse.

20   Q. Okay.  Can you explain what she told you and what the

21   treatment was for Ms. Durand?

22   A. Sure.  She said that she had been riding a horse and that

23   it had bucked and thrown her off.  She hit the ground, hit her

24   face, was unconscious for an -- I don't remember the period of

25   time, she didn't know how long.

1  Q. Okay.  And, then, did you provide any treatment at that

2  point, ma'am?

3  A. Correct.  She had a CAT scan of her face and head, that

4  kind of thing.  She had multiple lacerations, I believe there

5  were five separate lacerations to her face, and, uhm, she

6  fractured her cheekbone.

7          MR. WELDON:  May I have just a moment, Your Honor?

8          THE COURT:  You may.

9

10         **(Discussion off the record.)**

11

12         MR. WELDON:  I have no further questions, Your

13  Honor.

14         THE COURT:  Cross-examine?

15         MS. HUNT:  No.  No, Your Honor.

16         THE COURT:  Is the witness excused, Mr. Weldon?

17         MR. WELDON:  Yes, please, Your Honor.

18         THE WITNESS:  I'm all done?

19         THE COURT:  You may step down.

20         THE WITNESS:  Thank you so much.

21         MR. ARVANETES:  May it please the Court, Your Honor?

22  May we have a break?

23         THE COURT:  Uh, we may.  Let's take a 15-minute

24  break.

25      Mr. Weldon, how many witnesses do you have left today?

1        MR. WELDON:  I have one witness, Your Honor.

2        THE COURT:  That's it?

3        MR. WELDON:  That's it, Your Honor.

4        THE COURT:  All right.  We're making good time.  If

5    you want to call others, you're welcome.

6         MR. WELDON:  No, no, Your Honor.  We are slimming

7    as we speak.  We are good.

8        THE COURT:  All right.  Well, we'll take a -- speak

9    for yourself, Mr. Weldon.  We'll take a 15-minute break.

10       MR. WELDON:  Thank you, Your Honor.

11

12                    **(Recess taken.)**

13

14       THE BAILIFF:  The United States District Court is

15   again in session.

16       THE COURT:  Please be seated.

17      Mr. Weldon, call your next witness.

18       MR. WELDON:  Yes, Your Honor.  The United States

19   calls Joe Boynton.

20

21                **(The witness was duly sworn.)**

22

23       THE WITNESS:  I do.

24       CLERK OF COURT:  (Indicating)

25       THE COURT:  Good afternoon, sir.

1   THE WITNESS:  Good afternoon, Your Honor.

2   THE COURT:  Please state your full name and spell

3   your last name.

4   THE WITNESS:  It's Joseph Francis Boynton, the last

5   name is B-O-Y-N-T-O-N.

6   THE COURT:  Mr. Weldon.

7   MR. WELDON:  Thank you, Your Honor.

8

9   **DIRECT EXAMINATION**

10  **BY MR. WELDON:**

11  Q. Sir, how are you currently employed?

12  A. I work with the Postal Service, Office of Inspector

13  General.

14  Q. How long have you worked for the Office of Inspector

15  General?

16  A. This September will be five years.

17  Q. And do you have any other training and experience and --

18  work experience that you had prior to working for the post

19  office?

20  A. Yes, I did.  I reserved with the Air Force, Office of

21  Special Investigations as a Criminal Investigator for the Air

22  Force.  And, prior to that, I worked with the Bremerton Police

23  Department, I was a parole office for about four years before

24  being picked up as a detective, where I worked primarily as a

25  crime scene detective.

1  Q. How did you become involved in the Durand investigation,

2  sir?

3  A. During a proactive initiative to review payments for travel

4  claims by injured postal employees.

5  Q. Let's talk, then, about the travel fraud, sir.  Did you

6  look at the travel fraud documents and do some analysis of

7  those documents?

8  A. I did.  I first saw the amount of money that was actually

9  being sent to Ms. Durand, and then I requested an analysis to

10  be conducted by my agency to review when the travel payments

11  were made and if there were medical appointments corresponding

12  on those same dates.

13  Q. Now, then, did you review and have you seen Government's

14  Exhibits 20 through 50?

15  A. Yes, I have.

16  Q. Now, can you explain what you found on each one of those

17  documents for various visits, sir?

18  A. I found that there were claims for travel reimbursement

19  that did not correspond with any medical billing or provider

20  billing.

21  Q. Now, how did you go about that process, sir?

22  A. Well, after looking at which days were paid to Ms. Durand

23  for travel reimbursement and no medical evaluation, I looked

24  at the OWCP file.  Because, sometimes, doctors aren't always

25  great about getting the medical billing in on the proper date,

1    such as physical therapy.

2         Oftentimes, physical therapists will conduct a bunch of

3    physical therapy throughout a week, or maybe even two weeks,

4    and only bill on one day.  So then that billing shows up on

5    one day, whereas, the patient did actually go there all those

6    days.

7         So, I wanted to ensure that that wasn't happening.  So, I

8    reviewed the medical file and eliminated those potential

9    instances.

10   Q. And then, for example, from 20 to 50, you ensured that

11   there were no medical appointments or contact with pharmacy on

12   that day; is that right, sir?

13   A. That's correct.  So, once I eliminated those instances from

14   the file, I then sent out HIPAA letters for requested

15   information to those providers where Ms. Durand claimed on her

16   travel voucher, the reimbursement billing, that she went to.

17   And then they responded saying that they did not have any

18   record of any appointments.

19              MR. WELDON:  If we could, please, Mr. Cobell, could

20   we show the witness Government's Exhibit 20?  And if we could

21   scroll down, please?  A little farther, please.

22   **BY MR. WELDON:**

23   Q. Agent Boynton, can you explain what particular date on

24   Government's Exhibit 20 there wasn't an appointment?

25   A. February 2nd, 2006.

1  Q. And who was that for?

2  A. It was filed by Ms. Durand, and she claimed to go to the

3  Martin Diagnostics at 710 Lawrence, Tomball, Texas  77375.  It

4  was 104 miles.  And on here it also states that it was a

5  round-trip.  She had also checked that it was from home to

6  office/clinic.

7  Q. And was Ms. Durand paid for that particular trip, then?

8  A. Yes, she was.

9  Q. All right.  Now, then, you did that for each analysis

10  through each exhibit; is that right, sir?

11  A. Yes, I did.

12          MR. WELDON:  And, then, if we could please turn to

13  Government's Exhibit 51.

14  **BY MR. WELDON:**

15  Q. Now, then, Agent Boynton, do you recognize Government's

16  Exhibit 51?

17  A. Yes I do.  It's an Excel spreadsheet that I put together of

18  the instances where I found there was no billing for travel

19  reimbursement.

20          MR. WELDON:  Your Honor, I move for the admission of

21  Government's Exhibit 51.

22          MR. ARVANETES:  No objection.

23          THE COURT:  51 is admitted.

24

25          **(Exhibit Number 51 was admitted.)**

**BY MR. WELDON:**

Q. Now, Agent Boynton, can you explain the amounts and the total ultimate amount that Ms. Durand received as a result of these vouchers?

A. Sure.  Uhm, the amount is calculated by how many miles that she had claimed, like on the previous form it assessed 104 miles round-trip, the Department of Labor, Office of Workers' Compensation program calculates mileage.  It can change from year to year, but it's approximately .50 cents a mile.

Q. (Nods head affirmatively)

A. Pretty close to that.  Uhm, and, then, so, whatever the mileage is, they put it to that -- they multiply it by whatever they get, .55 cents or .50 cents per mile, and then that's what they pay for the claim.

MR. WELDON:  And if we could show the second page, please, Mr. Cobell?

**BY MR. WELDON:**

Q.  Then, what was the total amount that Ms. Durand received as a result of these vouchers, 20 through 50, sir?

A. $1,828.39.

Q. And that was for all times when medical appointments did not exist on those dates when they were claimed.

A. That's correct.

Q. Let's scroll back up, then, to Page 1 and talk about

1    Montana.  Do you see any areas in there where Ms. Durand was

2    in Montana claiming that she was traveling, sir?

3    A. Yes.  There is three for Osco Pharmacy.

4    Q. And those are the amounts that are identified in the

5    right-hand column; is that right, sir?

6    A. That's correct.

7    Q. All right.  Now, then, there were also other amounts that

8    Ms. Durand received as a result of her Workers' Compensation

9    fund; is that right, sir?

10   A. That's correct.

11         MR. WELDON:  If we could please show the witness

12   Government's Exhibit 55?

13   **BY MR. WELDON:**

14   Q. Agent Boynton, do you recognize Government's Exhibit 55?

15   A. I do.

16   Q. What is this, sir?

17   A. It is an AQS Case Compensation Payment History.  So, this

18   is a Department of Labor, Office of Workers' Compensation,

19   kind of a summary form for a claim, and it is filed by claim

20   number.

21   Q. And is this one of the documents that you use when you're

22   looking at the amounts that Ms. Durand received?

23   A. Absolutely.  It has a compensation history on it.

24         MR. WELDON:  Your Honor, I move for admission of

25   Government's 55.

1      MR. ARVANETES:  No objection.

2      THE COURT:  55 is admitted.

3

4          **(Exhibit Number 55 was admitted.)**

5

6   **BY MR. WELDON:**

7   Q. Now, if we could, please, Agent Boynton, let's talk about

8   the time frames and the amounts that Ms. Durand received.

9      Can you explain how much Ms. Durand received from

10  February 25th of 2013, until July 26th of 2014?

11  A. For wage compensation, she received $43,953.54; and in

12  medical compensation, she received $63,324.39.

13  Q. All right.  And, then, what was the total, sir, with the

14  wages and the compensation for that time period?

15  A. $107,000 -- $107,277.93.

16  Q. Now, Mr. Boynton --

17      THE COURT:  Hold on.  Hold on.  What do you mean by

18  "medical compensation" as opposed to "wage compensation"?

19  **BY MR. WELDON:**

20  Q. Agent Boynton, could you explain the difference between the

21  two, sir?

22  A. Absolutely.  So, an injured postal employee, they get their

23  wage compensation calculated at 75 percent of what their

24  earnings were at the time of being injured, so that ends up

25  being tabulated out of their wage compensation, and, then, the

1    medical compensation is whatever medical treatments that they

2    receive in connection to their work-related injury during that

3    time period.

4            THE COURT:  So, payment to the provider.

5            THE WITNESS:  Payment to the provider.

6    **BY MR. WELDON:**

7    Q. And, Agent Boynton, when we just went through the travel,

8    that's also a third component that the individual receives, as

9    well; is that right?

10   A. Absolutely.  Yes.

11   Q. So, then, when we talked about the $107,000, total, of

12   that, Ms. Durand received $43,000 from February of '13 to July

13   of 2014.

14   A. That's correct.

15   Q. Now, that's while she was in Montana; is that right, sir?

16   A. Absolutely.  Yes.

17   Q. Then let's talk about the total.  So, from February of 2006

18   until May of 2016, can you explain the breakdown of the

19   numbers there, sir?

20   A. Absolutely.  For wage compensation, she received

21   $268,892.18, for medical compensation, she received

22   $424,511.45, for a total of $900 -- or, correction, $693 or --

23   $693,403.63.

24   Q. Now, that's just during the time period of February of 2006

25   to May of 2016; is that right, sir?

1  A. That's correct.

2  Q. Now, is Ms. Durand still continuing to receive benefits?

3  A. Yes, she is.

4  Q. All right.  And what's the total, just generally speaking,

5  at this point, sir?

6  A. Uhm, I believe it's over $800,000.

7  Q. And Ms. Durand is still getting those compensation

8  benefits.

9  A. Yes.  I --

10  Q. Now, then, let's talk about the undercover operation, sir.

11      Can you explain how that process began with Ms. Durand

12  and the documents that you were sending to her.

13  A. Absolutely.  So, under a ruse business called Snowbird

14  Recreational Promotions I had sent her an opportunity to win a

15  trip.  It was a horseback riding trip to Arizona.

16      And I sent her that specific offer because on her

17  Facebook page it showed that she had recently put in to win a

18  blanket for her horse, and she liked horses.  So, I wanted to

19  make sure that it was something that would be of interest,

20  because we all tend to get junk in the mail, something that

21  will, at least, you know, have her look into it a little bit

22  further.

23  Q. She has to be interested in it.

24  A. Exactly.  Right.  So, along with that, to win the trip, I

25  sent the survey, just covering a lengthy number of questions,

1    such as age, hobbies, activities, and those types of things.

2    Q. Is part of that, then, also to determine her level of

3    activity?

4    A. Yes.

5    Q. And then to compare that with what she is saying to other

6    medical professionals.

7    A. Absolutely.  It's to gauge her ability, in her own words,

8    to see what she says she's doing and what she is capable of

9    doing.  Not only that, it helps us put together these

10   operations, so we're at least doing something that they're

11   interested in.  And capable of doing, because they said that

12   they have done them before.

13            MR. WELDON:  Let's start, then, with Government's

14   Exhibit 70, please.

15            MR. COBELL:  70?

16            MR. WELDON:  Yes.

17   **BY MR. WELDON:**

18   Q. Do you recognize this, sir?

19   A. I do.  It's a Life Trend Survey.

20   Q. And it's from the Postal Service?

21   A. It was, yes.  The Postal Service, Office of Inspector

22   General.

23   Q. Sure.  And mailed to Ms. Durand?

24   A. That's correct.

25   Q. All right.  And do you recognize this document?

1    A. I do.

2          MR. WELDON:  Your Honor, I move for the admission of

3    Government's Exhibit 70.

4          MR. ARVANETES:  7, you said?

5          THE COURT:  7-0.

6          MR. ARVANETES:  70.  No objection.

7          THE COURT:  70 is admitted.

8

9          **(Exhibit Number 70 was admitted.)**

10

11   **BY MR. WELDON:**

12   Q. All right, Agent Boynton, let's walk the Court, then,

13   through some of the answers that Ms. Durand provided.  Let's

14   first talk about the leisure activities.

15   A. Okay.

16          MR. WELDON:  And if we could scroll down, please?

17   Back up, please.

18   **BY MR. WELDON:**

19   Q. Let's just talk first, then, about the sporting interests.

20   A. Okay.

21   Q. Explain some of Ms. Durand's sporting interests.

22   A. So the question asked, "Which of the following sports do

23   you personally participate in?"  For

24   "Bicycling/Mountainbiking" she checked "Often."  For

25   "Camping/Hiking" she checked "Often."  For "Fishing" she

1    checked "Sometimes."  For "Bowling" she checked "Sometimes."

2    For "Hunting/Shooting" she checked "Often."  For "Ziplining,"

3    she checked "Sometimes."  For "Physical Fitness/Exercise" she

4    checked "Often."  For "Walking" she checked "Often," and for

5    "Other" she checked "Sometimes," and then wrote in

6    "kayaking/canoeing."

7    Q. All right.  And, then, if we could look, did she identify

8    how much time she engaged in leisure activities, sir?

9            MR. WELDON:  If we could go down to Number 9?

10   **BY MR. WELDON:**

11   A. So, "How many hours do you spend on leisure/sports

12   activities?"  "Ten or more hours per week."

13   Q. Now, then, does she identify in that section, the next

14   section, over in Section 12, whether or not she travels?

15   A. Yes, she did.

16   Q. And what does she say, sir?

17   A. Uhm, for "Personal Trips" she checked "Once per month" or

18   "Once every two or three months, less than once every three

19   months."

20   Q. And, of course, it says, "Please X the type of travel that

21   you do, X all that applies."  Is that right, sir?

22   A. That's correct.

23   Q. Now, where is her favorite destination?

24   A. Montana.

25           MR. WELDON:  And, then, if we can go to the second

1    page, please?

2    **BY MR. WELDON:**

3    Q. Now, she identifies some of the portions that she thinks

4    she already knows, and what are those?

5    A. (Viewing document)

6         MR. WELDON:  Can we go down please, Mr. Cobell?

7    **BY MR. WELDON:**

8    Q. Do you see the recreation activities?

9    A. Oh, yes.  Uhm, already own a horse.  Already own an

10   all-terrain vehicle.  Plan to buy a recreational vehicle.

11   Plan to buy a swimming pool.

12   Q. And, then, who is the individual who signed that

13   document?

14   A. It says "Debbie Durand."

15   Q. What was the date that was provided on that document by Ms.

16   Durand?

17   A. July 3rd, 2015.

18   Q. Let's then show you the Snowbird RP Consumer Application.

19        MR. WELDON:  If we could go to Government's Exhibit

20   66, please?

21   **BY MR. WELDON:**

22   Q. Explain this, Agent Boynton.

23   A. So, this was the consumer application that was attached to

24   the chance to win a horseback riding trip to Arizona that Ms.

25   Durand was requested to fill out in order to win the trip.

1        These are questions that are -- well, crafted by me.

2   There are other ones that we use throughout our agency, and I

3   just kind of tailored it to kind of what I was looking for.

4   Q. And what was the purpose behind this application?

5   A. Well, for one, to see if she would answer, and, also, to

6   see what her responses were, and to get a general idea of what

7   her capabilities truly are.

8        MR. WELDON:  If we could show the witness, please,

9   Page 2 of that document?

10  **BY MR. WELDON:**

11  Q. What does --

12       MR. WELDON:  If we could scroll up?

13  **BY MR. WELDON:**

14  Q. What does Ms. Durand identify as her current type of

15  employment?

16  A. "Retired."

17       MR. WELDON:  If we could go to the third page.

18  **BY MR. WELDON:**

19  Q. Now, does she identify her hobbies, sir?

20  A. (Viewing document)  Yes, she does.  Are you talking about

21  Number 30?

22  Q. 25.

23  A. Oh, I apologize.  Yes, she does.

24  Q. And what does she say?

25  A. "Horses," "horseback riding," "husband - TV - baseball."

1   Q. And what about how often does she do that?

2   A. Every day.

3   Q. And then does she go to a gym, sir?

4   A. Yes, she does.

5   Q. How often does she do that, according to this survey?

6   A. Two to three times per week.

7   Q. Does she lift weights?

8   A. Yes, she checked "free weights."

9   Q. And then does she talk about the sports that she does

10  seasonally?

11  A. Yes.

12          MR. WELDON:  If we could scroll down, please,

13  Mr. Cobell?

14  **BY MR. WELDON:**

15  Q. What were the five summer activities that Ms. Durand

16  engages in?

17  A. Camping, fishing, discovering historic places.  Oh, rock

18  hunting and -- oh, boating, kayaking, and canoeing.

19          MR. WELDON:  And then if we could go to the next

20  page?

21  **BY MR. WELDON:**

22  Q. What about the winter activities?

23  A. Sledding, sleighing, watching old movies, and snow

24  machining.

25  Q. Then, let's talk about Paragraph 37.  Did Ms. Durand

1    identify any other activities that she engages in?

2    A. Hunting, tracking, pack-in camping.

3    Q. What is pack-in camping?

4    A. It's not something that I have done, because I do state

5    park camping.  But, from what I understand, it's where you

6    pack everything on your back and you head out into the

7    wilderness.

8    Q. And you go camping.

9    A. And you go camping, yes.

10   Q. Now, Ms. Durand was the one that provided this information,

11   sir?

12   A. Yes, she did.

13   Q. And did she sign this document?

14   A. Yes.

15   Q. Okay.  And, then, now, you have seen the original document;

16   is that right, sir?

17   A. Yes, I have.

18   Q. Where was this document sent to?

19   A. This doc --

20   Q. To Ms. Durand?

21   A. Yes, it was mailed to Ms. Durand, and it was returned to

22   me.

23   Q. And it was originally sent in to Montana, as well; is that

24   right, sir?

25   A. Yes.

1    Q. Then let's talk about Government's Exhibit 57, please.

2    Explain to the Court the relationship between the application

3    we just looked at and then this document.

4    A. Well, this one, she won.  She just didn't win a horseback

5    riding a trip, she won a kayaking trip.

6        So, from the survey, I put together what I thought would

7    be the most efficient, practical undercover operation for

8    agent time, government expense, because horseback riding in

9    Tucson, Arizona, was $5,000 per person, which would be

10   significantly expensive.

11       So, using her information that she provided and the

12   interests that she had, we put together a kayaking adventure,

13   and then this was to let her know that she had won.  This was

14   also accompanied with two other documents, one of them was

15   just a congratulations page, followed by this document, and

16   then followed by an itinerary.

17            MR. WELDON:  And if we could show the witness Page

18   2, please?

19   **BY MR. WELDON:**

20   Q. You mentioned there was a travel itinerary, is this the

21   travel itinerary that you were referencing?

22   A. It is.  And I put this all together.

23   Q. Okay.  Now, then, that was provided to Ms. Durand.  Was

24   there any requests that was made for special accommodations

25   for her?

1    A. Not that I recall.  We included a $50 gift card for any

2    random expenses that may came up.

3              MR. WELDON:  All right.  Then let's go to the third

4    page, please.

5    **BY MR. WELDON:**

6    Q. And those are the shuttle accommodations; is that right?

7    A. That's correct.

8    Q. And, then, if we could go to the next page, please?

9        Now this was referenced earlier, --

10   A. Okay.

11   Q. -- but let's talk about this, Agent Boynton.

12   A. Yeah.

13   Q. Can you explain what this particular page is showing?

14   A. For the particular kayaking trip that we were going on, I

15   took this straight from the Crystal Seas website what the trip

16   entailed.

17   Q. Okay.  And, so, you included that within the paperwork.

18   A. Absolutely.

19             MR. WELDON:  All right.  And, then, the fourth page,

20   if we could show that, as well?

21             THE WITNESS:  Also from the Crystal Seas website.

22   **BY MR. WELDON:**

23   Q. All right.  And was that to outline --

24   A. Yes.  I wanted to make sure that all of the information

25   about the trip was available to her before going on the

1    trip.

2    Q. Why did you do that?

3    A. Uhm, so she can make an assessment -- or I would hope make

4    an assessment on whether or not that's something that she's

5    capable of.

6    Q. Now, then, you also went on the trip.

7    A. I did.  (Nods head affirmatively)

8    Q. And explain how that process occurred.

9    A. So, I booked the trip through Crystal Seas for myself, two

10   other agents with the Postal Service, Office of Inspector

11   General, and for Ms. Durand.  And, then, after making our

12   reservations, we made our way to Friday Harbor, and met the

13   kayaking guide, and went kayaking.

14   Q. All right.  I'm going to show you Government's Exhibit 60,

15   Agent Boynton.

16   A. Okay.

17           THE COURT:  You think you are.

18           MR. WELDON:  Mr. Cobell is better than Mr. Rostad at

19   that, Your Honor.

20   **BY MR. WELDON:**

21   Q. Agent Boynton, can you tell the Court what you're seeing in

22   Exhibit 60?

23   A. Yes.  That's Ms. Durand leaving the ferry from Anacortes to

24   Friday Harbor.

25   Q. Is that a true and accurate depiction of what you saw,

1  sir?

2  A. Yes.

3        MR. WELDON:  Your Honor, I move for the admission of

4  Government's Exhibit 60.

5        MR. ARVANETES:  No objection.

6        THE COURT:  60 is admitted.

7

8        **(Exhibit Number 60 was admitted.)**

9

10  **BY MR. WELDON:**

11  Q. Agent Boynton, why did you take this picture?

12  A. Well, she's got a backpack on, she is walking down an

13  incline to get off the ferry, and she is rolling a backpack --

14  or luggage of some kind.

15  Q. Did she appear to be struggling to do that at all, sir?

16  A. No.  No.  And this was the purpose of the trip, was to

17  document her capabilities.

18  Q. Did she appear to have any problems moving in that

19  particular exhibit -- or at that time, when you saw her?

20  A. No, not at all.

21  Q. Did -- okay.  And then, I'll show you Government's Exhibit

22  61.

23        MR. WELDON:  And this was previously admitted, Your

24  Honor?

25        THE COURT:  Yes.

1   **BY MR. WELDON:**

2   Q. Agent Boynton, would you explain what we see in

3   Government's Exhibit 61?

4   A. So, this is the beginning of the kayaking trip.  We just

5   kind of loaded up our bags into the van, and this was a group

6   photo that we asked the kayaking guide to take of the four of

7   us.

8   Q. Can you identify the individuals who are in the

9   photograph?

10  A. Absolutely.  Uhm, all the way to the right in the picture

11  is Ms. Durand.  Directly in front of her in a green jacket is

12  Special Agent Casey Snyder, with the Postal Service, Office of

13  Inspector General.  To the left of Agent Snyder is -- she

14  changed her last name.  She's -- at the time, she was Special

15  Agent Kristy Cathers (phonetic), but she goes by Special Agent

16  Kristy Levenough (phonetic), with the Postal Service, Office

17  of Inspector General, and all the way to the left is myself.

18  Q. Okay.  So, three undercover agents and Ms. Durand; is that

19  right, sir?

20  A. That's correct.

21  Q. So, if I could show you Government's Exhibit 62.

22  A. Oh, and behind us were the kayaks that we were actually

23  on.

24  Q. Sure.  And explain what you're seeing in Government's

25  Exhibit 62, Agent Boynton.

1    A. On the left is Ms. Durand and what looks like a bluish-type

2    long-sleeved shirt.  Dead center is Agent Cathers, and to the

3    right is myself.

4    Q. Is this a true and accurate depiction of the scene as you

5    remember it?

6    A. It is.

7          MR. WELDON:  Your Honor, I move for the admission of

8    Government's Exhibit 62.

9          MR. ARVANETES:  No objection.

10         THE COURT:  62 is admitted.

11

12          **(Exhibit Number 62 was admitted.)**

13

14    **BY MR. WELDON:**

15    Q. Now, where was this located, Agent Boynton?

16    A. So, this was actually at the campsite.  Uhm, and I believe

17    it was our first day.  We just had gotten off the -- unpacked

18    the kayaks.

19    Q. Now, can you explain the level of exercise that you had to

20    engage in while kayaking, sir?

21    A. Yes.  Uhm, I had never kayaked before, uhm, which, looking

22    back on it, I should have made sure that I had done a little

23    bit of kayaking prior to this, because it was -- it was

24    physically demanding.

25         By the end of it, my left shoulder was sore.  And all

1    of the -- I have bad skin as it is, but all of the skin on my

2    finger was all dried up.  And, I think, in some of the videos

3    you can actually see that I had tape all wrapped around on it.

4    Anyway, it was the salt water.  But it was -- it was a lot of

5    kayaking from start to finish.

6    Q. Was it more than you expected, sir?

7    A. Yes, it was.

8    Q. Okay.  And -- and were you tired at the end of the day?

9    A. Yes, I was.

10   Q. Now, did you go on some of walks in the evening?

11   A. Yes.  After the first day, we unpacked, set up our camps

12   and tents and sleeping arrangements and things like that, and

13   Agent Cathers was going to go on a run.  And we went around

14   the camp and then up this really somewhat steep road that went

15   up to a school, and then finally down to a lighthouse, and on

16   that we passed Ms. Durand on a walk up the steep incline

17   towards the schoolhouse.  Shortly after that, I stopped

18   running, because I was exhausted, and Agent Cathers kept on

19   running.

20   Q. Now, did Ms. Durand appear to be struggling at all during

21   the nighttime --

22   A. No.

23   Q. -- or appear to be unable to do anything?

24   A. No.  No.

25   Q. Did you ever see her, during the kayak trip, unable to

1    complete any of the tasks?

2    A. No.

3              THE COURT:  Mr. Weldon, before we go on, you didn't

4    admit Exhibit 57.  Did you want to do that?

5              MR. WELDON:  I do, Your Honor, yes.  Thank you.

6    Your Honor, I move for the admission of Government's Exhibit

7    57.

8              THE COURT:  That's the promotional information.

9              MR. WELDON:  (Nods head affirmatively)  Correct.

10             MR. ARVANETES:  No objection.

11             THE COURT:  57 is admitted.

12

13             **(Exhibit Number 57 was admitted.)**

14

15             MR. WELDON:  Thank you, Your Honor.

16   **BY MR. WELDON:**

17   Q. Now, then, Agent Boynton, let's talk about Ms. Durand's

18   journal.

19   A. Okay.

20   Q. Did you have the opportunity to see Ms. Durand's journal?

21   A. I did.

22   Q. Explain that, sir.

23   A. So, after the kayaking trip was over and we had boarded the

24   ferry from Friday Harbor to Anacortes, uhm, we were up in the

25   -- I guess it would be the cafeteria area, or galley, since

1   it's a boat, and we were sitting down.  And when I say "We,"

2   that prior photo of the other two agents and myself were

3   sitting down.

4        And Ms. Durand came by.  And Agent Cathers asked if she

5   had written a journal, and asked if she could take pictures of

6   it.  And Ms. Durand said, "Yes, absolutely."  So, she had

7   actually left the journal with Agent Cathers and went off to

8   take photos, and, hopefully, catch some whales.  Photos of

9   some.  Not actually to catch some whales, but photo --

10  photographs of some whales.

11  Q. Sure.  You would need a big net for that.

12  A. Yes.

13       MR. WELDON:  Could we show the witness Government's

14  Exhibit 64?

15  BY MR. WELDON:

16  Q. Do you recognize Government's Exhibit 64, Agent Boynton?

17  A. Yes.

18  Q. What is it?

19  A. It's a picture of Ms. Durand's journal.

20       MR. WELDON:  Your Honor, I would move for the

21  admission of Government's Exhibit 64.

22       MR. ARVANETES:  No objection.

23       THE COURT:  Exhibit 64 is admitted.

24

25            **(Exhibit Number 64 was admitted.)**

**BY MR. WELDON:**

Q. Agent Boynton, can you identify some of the things that Ms. Durand described in the journal?

A. Yes.  She talked about Posey Island, which is where we stopped for lunch on the very first day.  After we departed from the bay area that we were -- a park that we are at, we went and kind of skirted the island and stopped at Posey Island for lunch.

     She talked about going through Spid -- or Spieden Channel.  Sorry, I want to get it right.  Which is a very busy channel.  This was, for me, the most concerning, because I wasn't a great paddler, that it is nonstop paddling.  You've got to go, because, according to our guide, you could get washed out into the ocean -- well, not the ocean, but into a larger shipping area and into the Puget Sound area, which that was not what I wanted to do.

Q. Sure.

A. Especially in a tandem kayak.  And, then, past Roche Harbor, and then Reid Harbor.  And Reid Harbor is where the campsite was.

Q. And, so, she outlined all of those activities, then.

A. Yeah, very well.

Q. Did you find anything in the survey, or, at least, the journal where Ms. Durand was identifying her inability to

1   complete any task or her level of pain was too much?

2   A. Not that I saw.  Most of it was very positive reviews of

3   the kayaking trip.

4   Q. Now, you completed that trip, and we'll get to the video

5   here in a moment, --

6   A. Okay.

7   Q. -- but I want to compare that.  Because, then, you

8   ultimately have a second stage of the undercover operation; is

9   that right, sir?

10  A. Yes.

11  Q. Talk about that for us, please.

12  A. So, the second part of it is the undercover interview with

13  the claimant.  And the purpose of that is to speak with the

14  claimant to get statements as close to the event that we have

15  already observed as we can so they are relevant statements.

16  Because you don't want it to go a long time and become really

17  stale and things like that.  And it's really just to get, what

18  we would believe, statements similar to those that she would

19  be sharing with her medical provider.

20  Q. And is part of that, then, because you're not in the room

21  when the medical provider is asking her the questions?

22  A. That's correct.

23  Q. All right.  So, you're looking to the realtime

24  information --

25  A. Right.

1   Q. -- with the video.

2   A. In their words, as well.

3   Q. Sure.  So, let's show you, then, Government's Exhibit 65.

4   A. Okay.

5   Q. Because you have the follow-up survey, first, right?

6   A. Yes.  The follow-up survey will come in first, and then

7   it's the undercover video.

8   Q. And, so, I'll show you Government's Exhibit 65.

9       Do you see that, sir?

10  A. I do.

11  Q. And do you recognize that?

12  A. Yes.

13  Q. What is that?

14  A. It is a Customer Experience Survey that I created and sent

15  to Ms. Durand.

16  Q. Okay.  And is this one of the documents that you ultimately

17  use, as well, when you do the interview with the medical --

18  the undercover medical provider?

19  A. That's correct.  So, as you can see, these are put together

20  on purpose to have stages to them, so we can get, not just one

21  collection of statements, but a multiple collection of

22  statements from the claimant.  So we can get a really good

23  idea of what their capabilities are, because, maybe, if you

24  ask a question one way, you may get one answer; but if you ask

25  it a different way, you might get a different answer.  So,

1    that's why we sent out just more than one thing.

2    Q. And is this the survey response that you received from Ms.

3    Durand, sir?

4    A. Yes, it is.

5           MR. WELDON:  All right.  Your Honor, I move for the

6    admission of Government's Exhibit 65.

7           MR. ARVANETES:  No objection.

8           THE COURT:  65 is admitted.

9

10           **(Exhibit Number 65 was admitted.)**

11

12   **BY MR. WELDON:**

13   Q. Can you explain the question, and then the answer that Ms.

14   Durand provided for Question Number 1, sir?

15   A. So, Number 1 says, "How much kayaking experience do you

16   have and how would you categorize your skill before and after

17   this trip?"  And her written response was, I call myself a

18   little past beginner," only because -- oh, I only kayak on

19   lakes and smooth rivers on a -- sit-on a kayak.  After this

20   trip, I think of myself as a beginner/intermediate.  What's

21   that say?  Something experienced a lot of different styles of

22   kayaking, along with safety guidelines which I didn't have

23   before, but I know there is a lot more I don't know.

24   Q. All right.  And then you have some other questions that you

25   ask.  Let's go, then, to question Number 5.

1    A. Okay.

2    Q. In that question, it outlines the experience with Crystal

3    Seas --

4    A. Uh-huh.

5    Q. -- and whether or not the travel instructions were helpful.

6    Is that right?

7    A. That's correct.

8    Q. What was Ms. Durand's answer to that question?

9    A. "Sandy Black did very well with travel arrangements to

10   Crystal Seas, flight and hotel, shuttle, ferry were all in

11   sync, except for hotel -- or hotel's confirmation/charge.

12   Coming home was total opposite.  My" -- discrepancy?

13            THE COURT:  Shuttle.  It's on the left.

14            THE WITNESS:  Oh.  "My shuttle was late, so I missed

15   my flight.  I couldn't get a hotel room and walked the streets

16   of Seattle for almost two hours, from hotel to hotel asking

17   for a room.  Sandy called hotels to find rooms; but by the

18   time I got there, they were booked.  I finally found a

19   hospitality room at the Coast Hotel and" out-of-pocket -- oh,

20   I'm sorry, "a pull-out couch, which I paid for myself.  The

21   airlines had changed my ticket, no fee, I left in the a.m."

22   **BY MR. WELDON:**

23   Q. All right.  Now, are you from the Seattle area, sir?

24   A. I live there now.

25   Q. All right.

1   A. I originally grew up in Maine.

2   Q. Is it a flat area when you're walking around the streets

3   there, sir?

4   A. No.  And that area she was in was actually SeaTac,

5   Washington, which is next to the airport.

6   Q. Now, then, Sandy Black was the identified individual; is

7   that right, sir?

8   A. That's correct.

9   Q. And who is Sandy Black?

10  A. Special Agent Sara Spane with the Postal Service, Office of

11  Inspector General.

12  Q. Now, then, let's turn, if we could, to Question Number 10.

13  A. Okay.

14  Q. Ms. Durand was asked a question of, "What kayak did you

15  use, single, or tandem?  Would you have preferred a different

16  type of kayak?"  What did Ms. Durand say?

17  A. "Tandem.  At first, I wanted a single, more mobility, go

18  where I wanted quickly, didn't have to make up for other

19  person's lack of enthusiasm at times, but the stability and

20  capability of the tandem, because I am not a seasoned kayaker,

21  was the best choice."

22  Q. Now, did Ms. Durand say that it was because somebody else

23  would paddle for her?

24  A. No.

25  Q. Let's show you, then, government's -- or the Question 12,

1    please.

2    A. Okay.

3    Q. Explain that answer, and question.

4    A. Okay.  "This trip included two nights of camping, how would

5    you rate the equipment provided for camping?"  "Say, one to

6    ten, a nine.  Only complaint was the mattress wouldn't stay

7    aired up, couldn't configure for my old bones.  The tent was

8    just big enough for two people, new equipment or personals,

9    the sleeping bag was comfortable and the pillow was a

10   surprise, like mini My Pillows.  Tent was very easy to set

11   up."

12   Q. Now, did you see Ms. Durand setting up her tent?

13   A. Yes, I did.

14   Q. Did she have any difficulty setting up that tent?

15   A. No.

16   Q. Let's talk, then, about Question 15, the campground.

17   Explain that question and answer, sir.

18   A. Sure.  "Was it uncomfortable sleeping at the campsite?

19   What was your experience?"  "Our campsite was comfortable.  I

20   think because the site was so well-used, the ground was level,

21   in main spots for tents.  There was hiking to keep you busy if

22   you wanted and/or just hang around."

23   Q. Then what about Question 16?

24   A. "Would you have preferred different sleeping arrangements?

25   If so, what?  N to N."  "No.  Since I was by myself, I had my

1    tent to myself.  The ones who had two to a tent complained of

2    closeness.  I know I was going to be camping, I enjoyed it."

3    Q. Then let's show you Question 21.

4    A. Okay.  "Did you see any wildlife or scenic landscape?  If

5    so, what did you get to see?"  "Quite a few things, seals,

6    orcas, starfish, Vancouver Island, dolphins and seagulls

7    feeding on a bait ball, sailboat, regatta, beautiful sea

8    shores with sea moss and driftwood, sea cliffs, smooth to the

9    shape of a lounge chair, tide pools full of starfish, sea

10   anemones" -- is that right?  -- "sea anemones, and little

11   crabs and/or fish, yachts, cruise ships, freighters that make

12   waves so high when you kayak over it you lose sight of the

13   kayak in front of you, so much more."

14   Q. Agent Boynton, explain that, the waves, and not being able

15   to see people in front of you.

16   A. Sure.  So, towards the ends of our three-day kayaking trip,

17   there was a barge ship that went by, or a large ship.  And

18   just as we were getting close to where we were going to end

19   our journey, uhm, there were very large swells that came by.

20        So, in order to successfully navigate those, the guide

21   told us to paddle into them as quickly as you can, and to

22   continue to paddle all the way through it, so you don't

23   capsize.  So, right at the end of our trip, we had to do that.

24   And the swells were so high, when one kayak went over the

25   other end of it, if you were on the other side, you didn't see

1    the other kayak, you just saw a wave in front of you for a

2    couple of them.  (Nods head affirmatively)

3    Q. Now, in the summary video that we're going to show in a

4    minute, was that actually -- did Ms. Vantine talk about that

5    on the video?

6    A. She did, yes.  It was at the very end.

7    Q. Let's show you, then, Question Number 23.  And, again,

8    Agent Boynton, these are questions that you are creating in

9    order to identify the level of physical activity that Ms.

10   Durand did.

11   A. Correct.  And I think that they were reasonable questions

12   for a trip of this type, as well.

13   Q. Sure.  Now, then, let's talk about 23.

14   A. Okay.

15   Q. What was the question, and then the answer?

16   A. "Was there adequate time to rest and take breaks, or did

17   you feel rushed?"  "We did rest or take breaks when we got to

18   a certain point or when a kayak needed to catch up."

19   Q. Who was that person who always needed to catch up?

20   A. That would have been my tandem kayak.

21   Q. So, Ms. Durand was doing better than you were; is that

22   right, Agent Boynton?

23   A. Yes.

24   Q. And you are under oath, sir.

25   A. Yes.  (Nods head affirmatively)  I was not a good

1    kayaker.

2    Q. All right.  Now, then, let's talk about Government's

3    Exhibit -- or Question 25.  What was the question, and then

4    the answer?

5    A. Sure.  "Did you feel rushed by the guides or have a hard

6    time keeping up?"  "Not really felt rushed."  Or -- yeah.

7    "Would have liked to have spent more time taking photos on the

8    water.  It wasn't very hard keeping up.  Others had GoPros, I

9    didn't, so might have made a difference.  Our return ferry was

10   scheduled early, because my flight was booked the same day

11   (which I missed.)  (Indicating)  Which was underlined and in

12   parentheses.

13   Q. Now, the GoPros, who had the GoPros, sir?

14   A. Myself and Special Agent Casey Snyder.

15   Q. Let's talk, then, about Question 26.

16   A. Okay.  "If tandem kayaks were used, did the other tour

17   members slow you down or go too fast paddling?  Did their

18   experience level seem to match your own?"  And the answer was,

19   "When I was paired with someone - we seemed to paddle fine.

20   Our experience level definitely matched.  We had one

21   slow/non-paddler that I didn't get paired with."

22   Q. Who was that, Agent Boynton?

23   A. That was me.

24   Q. All right.

25   A. I was the only person not paired with Ms. Durand.

1    Q. Let's go, then, to Question 27.

2    A. Okay.  Crystal Seas prides itself on accommodating all

3    kayaking levels, how would you rate the physical demands of

4    the kayaking portion of this tour?"  The written response was,

5    "It is, of course, the major portion of the tour.  However" --

6    do you want me to read the next line now --

7    Q. Sure.

8    A. Okay.  "Kayaking can be adaptive.  I found that it wasn't

9    difficult keeping up kayaking, but I am fairly strong.  I know

10   that we stopped when we needed, and Dakota asked us if we

11   needed to rest.  We paddled APX," which I'm assuming is

12   approximately, "ten to twelve miles all together.  It didn't

13   seem like it."

14   Q. Now, Agent Boynton, just to clarify one thing, the

15   reference here is to "Dakota," who is that?

16   A. Uhm, uh, Jordan Dakota Vantine.

17   Q. All right.  So, that was the --

18   A. She was the kayaking guide.

19   Q. The kayaking guide.

20   A. Uh-huh.

21   Q. And we heard from her earlier; is that right, sir?

22   A. Yes, we did.

23   Q. All right.  Then, on 28, what was the response by Ms.

24   Durand to that question?

25   A. "Did the physical demands of this trip cause you to be

1  uncomfortable in any way?"  The answer was, "I thought I might

2  have trouble, but I was really surprised by the different ways

3  of paddling, sitting and placing your legs to be more

4  comfortable.  The only problem I had was about the last hour I

5  developed a chronic pain in my left elbow, which I found,"

6  something -- oh, "found out later it was just an

7  inflammation."

8  Q. All right.  And, then, let's talk about 35, if we could.

9  A. Okay.

10  Q. Did Ms. Durand have any negative comments or would she

11  recommend this to other individuals?

12  A. "Yes!"  "Incredible experience!"  Amazing scenery,

13  wildlife, and food.  More than I expected and still can't

14  believe how all-inclusive it was.  So many different things to

15  see and do in an area so few get to see and experience.  Would

16  only go out with Crystal Seas again."

17  Q. Now, then, there was the final portion of any additional

18  comments, let's talk about that.  Can you explain what Ms.

19  Durand said in those comments, sir?

20  A. Sure.  "I had a wonderful time with Crystal Seas.  They had

21  very sturdy, high-quality equipment, that I, even as a client,

22  took pride in.  We quickly learned how to use sea skirts and

23  rudders.  At first, going into 500-foot-plus deep water was

24  scary, but put it out of your mind and enjoy the scenery,

25  which you can't help doing.  Then you relax and realize what a

 1   unique area of Washington this is.  We stopped on a couple of

 2   islands, hike around, camp out, see sea life, especially the

 3   endangered orcas, even know exactly which ones we saw.  This

 4   was a very unique adventure --

 5           MR. WELDON:  And then, the next page, please,

 6   Mr. Cobell?

 7           THE WITNESS:  -- experience.  Top quality in almost

 8   everything I saw, even the sleeping bags and tents.  No going

 9   less than the best for comfort, as allowed to fit within the

10   constraints of a kayaks inside and leave room for food.  The

11   biggest problem I had was with the itinerary planning.  My

12   shuttle returning was late, so I missed my flight.  Couldn't

13   find a hotel, walked a couple of hours from hotel to hotel

14   trying to find an empty/available room.  About 2:00 a.m., I

15   finally found a hospitality room, no bed, just a fold-out

16   couch till my flight left the next morning.  I paid for the

17   hotel from my own cash reserves, have not been reimbursed as

18   of yet.  I hope I get to participate in more of these

19   recreational or nonrecreational customer experiences, whatever

20   is available.  Please include the" -- oh, "please include me.

21   I truly enjoyed it and hope my survey notes help.  I received

22   this survey on the 16th.  Thanks, Debbie Durand.  Loved the

23   Washington, Alaska areas."

24   Q. Now, Agent Boynton, when you were proposing these options

25   for Ms. Durand, --

1  A. Uh-huh.

2  Q. -- was she under the impression that she might have other

3  opportunities out there?

4  A. Yes.

5  Q. And explain that, sir.

6  A. Uhm, well, I -- it's part of the ruse unto itself.  If you

7  do -- you know, if you're successful in providing surveys and

8  feedback and information, which is our business, you could

9  potentially win other trips, as well.

10 Q. Sure.  So, then, in this example, she is looking for other

11 trips that might be available.  Is that right, sir?

12 A. That's correct.

13 Q. Now, then, ultimately the video and the setup of the exam

14 occurs for Ms. Durand.

15 A. Correct.

16 Q. And just give the Court a time frame for when the trip

17 occurred versus when the interview occurred.

18 A. Sure.  The trip occurred in late July of 2015, and then the

19 undercover interview occurred in mid-September of the same

20 year.

21 Q. And do you -- do you -- have you seen Government's Exhibit

22 68, Agent Boynton?

23 A. (Viewing document)  Yes, I've seen them all.

24 Q. All right.  And that's a true and accurate depiction of

25 both the undercover interview, as well as the kayaking trip?

1    A. Correct.

2         MR. WELDON:  Your Honor, at this time the United

3    States would publish Government's Exhibit 68.

4         THE COURT:  Are you going to move to admit it?

5         MR. WELDON:  I believe it's admitted, Your Honor.

6         THE COURT:  Madam clerk, is it admitted?

7         CLERK OF COURT:  Yes.  Yesterday.

8         THE COURT:  Go ahead.

9         MR. WELDON:  Thank you, Your Honor.

10

11                    **(Video played.)**

12

13   **BY MR. WELDON:**

14   Q. Agent Boynton, was Ms. Durand a different person in the

15   interview than she was on the kayaking trip?

16   A. Yes, she was.

17   Q. Let's talk, then, to make sure we are clearing up the

18   record on it, who was the individual who was judo chopping and

19   karate kicking that item?

20   A. That was Ms. Durand.

21   Q. Can you explain what happened there, sir?

22   A. So, that item that she was judo chopping and karate

23   kicking, I think it was like a buoy float thing that you put

24   in between boats and, maybe, a pier, so that your boat doesn't

25   rub up against it.

1    And, for whatever reason, it was just on the outskirts of

2  our camping area, and I had stepped over it a couple of times

3  because the agent that I was with was in the Army and wanted

4  to, apparently, camp -- camp in a field.  So, we went to a

5  field area where there was a bunch of grass that we laid down,

6  and to get back and forth I stepped on this thing numerous

7  times.

8    And I thought it was a rock, and one time I stepped on

9  it, it kind of popped up, and that's when I noticed that it

10  was mostly Styrofoam and really light.  So, it was Agent

11  Cathers that thought it would be funny to just have -- have

12  fun, really.  And it was just a game, and that was it.

13  Q. Right.  Now, then, did you ever see Ms. Durand lifting,

14  bending, and twisting?

15  A. Oh, yes.

16  Q. And how often would that occur in the kayaking trip?

17  A. Every day.  (Nods head affirmatively)

18  Q. Now, then, one of Ms. Durand's claims in the interview was

19  that it was for her medical condition.

20  A. Uh-huh.

21  Q. Was she ever informed that the kayaking trip was for her

22  medical condition?

23  A. Oh, not at all.

24  Q. Now, she also said that everybody else, except for Agent

25  Cathers, had a medical condition.

1    A. Right.  She said there was one runner, which was named

2    Cathers, that liked to run, so, that left myself and Agent

3    Snyder as the other participants, and we were not there

4    because we had injuries.

5    Q. And, of course, did you say that at all, or was that ever

6    mentioned, that you had --

7    A. No.

8    Q. -- injuries?  Now, Ms. Durand claimed that the trip was a

9    total of seven miles in the medical interview?

10   A. Correct.

11   Q. And that was not accurate, according to how far you had to

12   travel; is that right, sir?

13   A. That's correct.  (Nods head affirmatively)

14   Q. Okay.  And, then, only a few hours in the kayak per day,

15   was that accurate?

16   A. No.  No.

17   Q. What was -- what did you do for the kayaking trip?

18   A. So, for the first day, it was six to eight, and the second

19   day it was four to five hours.  And the third day was about

20   six to eight hours.

21   Q. And, then, that doesn't even include the walking and the

22   hiking that was done afterwards.

23   A. That's correct.

24   Q. All right.  Now, Ms. Durand also claimed that her left arm

25   gave out.

1    A. Correct.

2    Q. And did that occur on the kayaking trip?

3    A. No.  No.  That was not observed by the agents or by the

4    surveillance video.

5    Q. Now, one of the things that was in the video was Ms. Durand

6    getting into the kayak.

7    A. Correct.

8    Q. Can you explain that, and whether or not that took some

9    physical ability in order to do that?

10   A. It does.  Uhm, so, to get in and out, you're seated pretty

11   low to get in and out of the kayak.  So, when you take your

12   sea skirt off, if you're to get out, you have to put your hand

13   behind you and essentially lift your whole body up and get

14   your butt on the back -- or on the top of the kayak itself,

15   and then get your legs out.

16       And you can't throw the weight too quickly or you'll roll

17   (indicating), you have to slowly get your legs up, out, and

18   then over, and then stabilize yourself on the side.

19   Q. Did Ms. Durand appear to have any difficulty doing that,

20   sir?

21   A. Not at all.  So, to get in, it's essentially the opposite.

22   Uhm, you have to kind of stabilize yourself, and then get your

23   butt on the center of the kayak, and then get your legs in and

24   then scoot yourself.  And, then, lower your -- all your body

25   weight down up on your shoulders and arms.

1   Q. Now, how physical was the trip, sir?

2   A. It was pretty physical, actually.  Uhm, there was quite a

3   bit of kayaking, a lot of upper-body work, lots of sitting in

4   the kayak, getting in and out of the kayak, a lot of bending.

5        Uhm, every time we stopped, we would have to get food,

6   water, cameras, other things in and out of the kayak.  Because

7   you had to put everything in a seabag or a waterproof bag,

8   which is a -- is a really rigid, plastic bag, toss everything

9   in there, roll it up, snap it together, and throw it in the

10  kayak.

11  Q. Was Ms. Durand not able to do any of the activities?

12  A. It appeared she did them just fine.

13  Q. Now, did you see her paddling the entire trip, sir?

14  A. Yes.

15  Q. Now, did she set up her whole tent the whole time?

16  A. Yes, she did.

17  Q. Did she pack her gear from the ferry?

18  A. Yes.  Which actually was quite lengthy.  Because, as you

19  saw in the photo, she had the backpack and a rolling suitcase.

20  Well, you don't put a rolling suitcase and that backpack in a

21  kayak.  You have to take everything out of that and then put

22  it into these waterproof bags, and make sure that it all fits

23  into the kayak.

24  Q. Ms. Durand did that all on her own?

25  A. Yes.

1   Q. All right, then, let's show you, if we could, Government's

2   Exhibit 67.

3           MR. WELDON:  Now, if we could go to Page 3, please,

4   Mr. Cobell.  Scroll down, please.  Excuse me, it would be Page

5   2.  There we go.

6   **BY MR. WELDON:**

7   Q. All right.  Agent Boynton, do you see this form here,

8   Government's Exhibit 67?

9   A. I do.

10  Q. And what was the point of this particular assessment?

11  A. So, this form is actually a Postal Service form, and I took

12  the word "medical" off of it.  Because it's a current

13  capabilities form.  Because it's with a contractor, so it's

14  not a medical provider.  But I wanted to make sure that the

15  questions were going to be similar that were to be asked by

16  the medical providers, because, as we talked about before,

17  this is to determine what type of statements that the claimant

18  is making to their provider without us being there.  So, this

19  is --

20  Q. And let's talk, then, about the standing for 30 minutes.

21  A. Okay.

22  Q. That -- that that's the most that she can -- that's the

23  minutes that she can do per day --

24  A. Sure.

25  Q. -- for those activities.

1    A. Correct, 30 minutes.

2    Q. Was that accurate, according to what you saw on the

3    kayaking trip?

4    A. No.  Because I watched her walk to the school, which was

5    more than 30 minutes.

6    Q. All right.  What about the sitting for 30 minutes per

7    day?

8    A. No.  We were in the kayak for hours at a time, and that was

9    all seated.

10   Q. What about the walking, sir?  Did she have any inability to

11   walk, or a limit on that, that you saw?

12   A. No.

13   Q. All right.  Now, kneeling for 15 minutes per day?

14   A. I didn't see up to 15 minutes, but I did see her

15   kneeling.

16   Q. And did she have any problems doing that at all, sir?

17   A. Huh-uh.  (Shakes head negatively)

18   Q. All right.  Squatting, what about squatting?

19   A. Yeah, she squatted down to set up her tent.

20   Q. And that's --

21   A. And put the stakes in and things like that.

22   Q. And any problems when she was doing that, sir?

23   A. Huh-uh.

24   Q. Okay.  What about bending and climbing?

25   A. There was quite a bit of bending.  You've got to bend to

1  get in and to get things in and out of on the kayak, to

2  stabilize the kayak, or other people getting in and out of the

3  kayak, to get things out of your kayak, that was a routine

4  throughout the three days.

5  Q. Okay.  What about reaching, sir?

6  A. Uhm, above her head, or just reaching out, in general?

7  Q. Reaching, in general.  Did you see her reaching?

8  A. Yeah.

9  Q. Did she have any apparent problems when doing that?

10  A. No.

11          MR. WELDON:  Then, if we could go to the next page,

12  please, Mr. Cobell?

13  **BY MR. WELDON:**

14  Q. Let's talk about the significant difficulty portions.

15  A. Okay.

16  Q. So, for example, walking outdoors on uneven ground, she

17  explained that as a significant difficulty.

18  A. Correct.

19  Q. Did you observe that when you were on the kayaking trip?

20  A. Yes, the whole thing was on uneven ground.

21  Q. Did she have any difficulty at all, that you saw, Agent

22  Boynton?

23  A. No.

24  Q. No?

25  A. No.  Not at all.

1    Q. All right.  What about climbing stairs?

2    A. So, she went with Agent Cathers and climbed quite a few

3    stairs on one of the trails on the island.

4    Q. Okay.  And didn't have any problems doing that.

5    A. No.

6    Q. What about household chores or yard work?

7    A. Uhm, she -- she didn't do any yard work on the kayaking

8    trip, but she did talk about some of the things that she did

9    at home, such as having a large garden, uhm, I think it was,

10   like, a 40 by 60, is the way she described it, taking care of

11   horses and things like that.

12   Q. All right.  What about standing up from a sitting

13   position?

14   A. Uhm, I watched that on a regular basis every time we got in

15   and out of the kayak.  And I'd actually say that there were

16   more complicated positions to get up from, because you're not

17   sitting.  Most people think of sitting as sitting in a chair,

18   a kayak is, essentially, you sit on a board when you sit in a

19   specific kayak.

20   Q. Bending over, for -- over to pick up an item from the

21   floor, did she appear to have any problems with that?

22   A. No, not at all.

23        MR. WELDON:  Okay.  And, then, if we could go to

24   page -- the second page?  Third.  If we could scroll down,

25   please.

**BY MR. WELDON:**

Q. Now, Ms. Durand identified her level of activity as what, Agent Boynton?

A. Oh, totally sedentary.

Q. Now, did that appear to be the case when you saw her on the kayaking trip?

A. Not at all.  She was very active.

Q. Now, Agent Boynton, all of these occurred -- you know, the investigation that you began occurred in Montana for some of those funds that Ms. Durand had received; is that right?

A. That's correct.

Q. And you've provided those numbers.  And that included multiple states; is that right, sir?

A. That's correct.  (Nods head affirmatively)

Q. So, what where those states where Ms. Durand lived?

A. Texas, Idaho, Montana, and then she saw some medical providers in Utah.

Q. And all of those are provided under the authority of the Workers' Compensation benefits?

A. That's correct.

Q. Do you see the individual in the courtroom here today who was on the kayaking trip, Agent Boynton?

A. Yes, I do.

Q. Could you please point to her and describe what she's wearing?

1   A. She's right there at the end of the table, a gray-and-white

2   t-shirt, glasses.

3          MR. WELDON:  Your Honor, I would ask that the record

4   reflect that the witness has identified the defendant.

5          THE COURT:  The record will reflect.

6          MR. WELDON:  May I have a moment, Your Honor?

7          THE COURT:  You may.

8

9             **(Discussion off the record.)**

10

11   **BY MR. WELDON:**

12   Q. Agent Boynton, did Ms. Durand appear to be like a zombie

13   when you saw her on the kayaking trip?

14   A. Not at all.

15          MR. WELDON:  All right.  No further questions, Your

16   Honor.  Thank you.

17          THE COURT:  Mr. Arvanetes, cross examine?

18          MR. ARVANETES:  Yes, sir.

19

20             **CROSS-EXAMINATION**

21   **BY MR. ARVANETES:**

22   Q. Good afternoon, --

23   A. Good afternoon.

24   Q. -- Agent Boynton.  How did you become familiarized with

25   Agent Haywood's investigation?

1   A. So, in our database for report writing, she is a postal

2   employee, so the postal employee records are pulled from them.

3   Just for information purposes, like, where they work and their

4   information such as that.  So, when I put in her Social

5   Security number, the other cases popped up as relevant

6   information.

7   Q. (Nods head affirmatively)  And that case actually went

8   nowhere.

9   A. (Pause)  I wouldn't necessarily categorize it as "nowhere."

10  Q. Was it a successful investigation?

11  A. She was terminated from the Postal Service.

12  Q. Was she still getting benefits?

13  A. Uhm, yes, she was still getting benefits.

14  Q. Was she still declared, uhm, on the Periodic Rolls?

15  A. She was Periodic Rolls, PN status, yes.

16  Q. Okay.  So, uhm, but you don't know why she was terminated

17  from her USPS job.

18  A. Uh, no, I'm not -- I'm not exactly sure of why.

19  Q. All right.  And, so, how did you end up finding out or, at

20  least, being interested in Ms. Durand in 2014?

21  A. Because, as I said, we looked into her -- so, the Postal

22  Service pays for injured worker compensation payments that

23  include travel vouchers.

24       So, the Postal Service pays that to the Department of

25  Labor to facilitate that program, but the Postal Service also

1    tracks all of those payments.  And the Postal Service, Office

2    of Inspector General is very -- I wouldn't say cutting edge,

3    but very on top of data analytics, especially for postal

4    payments, and they tracked travel expenses.

5        So, I looked at the travel expenses for claimants in my

6    area and saw that she had a significant amount of travel

7    reimbursement.

8    Q. From what dates did you look at to conclude that it was

9    significant?

10   A. Sure.  It goes back five years.  And, at this time, so 2014

11   to five years prior, 2000.

12   Q. 2009.  And, so, how do you get to 2006, then?

13   A. Oh.

14   Q. In your --

15   A. Yeah.

16   Q. -- dynamic?

17   A. So, I requested an analysis of all payments through the

18   Postal Injury Claimant System, which we call PICS.  It's just

19   a postal database where we warehouse all of those payments

20   that we send to the Department of Labor, and, obviously, the

21   Workers' Compensation program for injured employees.

22       So, they pulled all of that data together, and, so, I was

23   able to look at the totality of the entire claim.

24   Q. And, so, you assessed that between February 2nd of 2006,

25   and March 11th of 2014, she had 60 requests for

1    reimbursement?

2    A. Yes.  There was actually more prior to that.  But what

3    limited that was the Department of Labor, Office of Workers'

4    Compensation program, their travel voucher forms, they only

5    keep them so long.  So, they only went back to 2006.

6    Q. And, so, it was 60, total.

7    A. Approximately, yes.

8    Q. Okay.  Well, I want to know the exact -- do you have the

9    exact number?

10   A. I don't have my report directly in front of me.

11   Q. You have -- you did, during your investigation, requests

12   for approval, for approval to conduct the undercover

13   operation.  Do you recall that?

14   A. I do.

15   Q. Okay.  And do you recall, in this approval request, that

16   you estimated that it was 60 total mileage reimbursements

17   between 2006 and 2014?  And if you give me a minute, I will

18   find that exact --

19   A. Sure.  Well, I --

20   Q. Yeah, I'm sorry?

21   A. No.  I can say that when we request approval for undercover

22   operations, we put a summary of the investigation as conducted

23   thus far up to that point, and then what we hope the

24   undercover operation will then uncover.

25   Q. Okay.  So -- so, my question, then, again, is how many

1   total between these dates, between February 2nd and March

2   11th, do you recall?

3   A. I don't recall off the top of my head, but it -- it should

4   be in that report, if you have it.  And those, of course, were

5   all.

6   Q. Okay.  So, you said approximately 60 travel dates?  Is that

7   your approximation?

8   A. If it was in my report, then, yes.

9   Q. Well, let me show you your report to refresh your

10  recollection.

11  A. Sure.  No problem.

12  Q. Would it help?

13  A. Yes, it would.

14          CLERK OF COURT:  Do you want it on the document

15  camera?

16  **BY MR. ARVANETES:**

17  Q. That is a report --

18  A. Thank you.

19  Q. If you can review that?  And you're welcome to review the

20  whole report, but the question pertains to Page 3, the top

21  paragraph.

22  A. (Reading document)  (Nods head affirmatively)  Yes, that's

23  correct.

24  Q. 60 total.

25  A. Uh-huh.

1        MR. ARVANETES:  May I approach?

2        THE WITNESS:  Oh, you want it back.

3   **BY MR. ARVANETES:**

4   Q. And out of these 60, you had a question of approximately --

5   or you had a question of 34 --

6   A. Uh-huh.

7   Q. -- that you did not find approval for.

8   A. That's correct.

9   Q. And you obtained -- you sent out HIPAA requests --

10  A. Uh-huh.

11  Q. -- to doctors.

12  A. Medical.

13  Q. And pharmacies.

14  A. Yes.  Absolutely.

15  Q. And fair to say that the billing records at times, between

16  doctors and pharmacies, are not always accurate?

17  A. Uhm, (indicating) I don't work for a medical provider, so I

18  don't know if I can necessarily answer that.

19  Q. Did you make a statement to that effect during your grand

20  jury testimony?

21  A. I believe I did.  And sometimes they can be, and sometimes

22  (shakes head negatively) they are not.

23  Q. Okay.  Fair enough.  And, then, out of -- out of those, you

24  received -- out of those 60, --

25  A. Uh-huh.

1    Q. -- there were 34, like I said, question marks.

2    A. Correct.

3    Q. And, so, you sent out HIPAA requests.  And these HIPAA

4    forms, uhm, do they also accompany subpoenas with them?

5    A. No.

6    Q. How do you obtain -- do you obtain that information through

7    a subpoena, through --

8    A. No.

9    Q. -- process?

10   A. Huh-uh.

11   Q. How do the doctors, then, give you that information?  Or

12   the pharmacies?

13   A. Through the HIPAA letter, just advising them that --

14   essentially, the HIPAA letter is letting them know that it's

15   okay to provide this information to us because we are the

16   Office of Inspector General, and under the Inspector General

17   Act of 1978, we're entitled to that information.

18   Q. And any -- any one of those doctors or pharmacies, did you

19   have to subpoena them?

20   A. No.

21   Q. And is your testimony today that 34 of those, from Exhibit

22   51, the chart, can be --

23          MR. ARVANETES:  I guess, Mr. Cobell, can you please

24   put up 51?  Exhibit 51.

25   **BY MR. ARVANETES:**

1    Q. This is the chart you made up?

2    A. Yes.

3    Q. And these are the times where you could not correspond

4    visits or anything else.

5    A. Correct.  And, as I stated before, sometimes medical

6    billing isn't always accurate, and that was in reference to

7    sending bills to the Department of Labor, Office of Workers'

8    Compensation for payment for claimants.

9    Q. What about attendance?  Is it always accurate?

10   A. A don't know.  I don't know if I can speak to that.

11   Q. Well, in your experience, have you ever gone to a pharmacy

12   to pick up medicine and it wasn't there?

13   A. Not that I can recall.  I mean, unless --

14   Q. Have you ever been to a doctor and -- maybe, for medical

15   records or for x-rays, and you picked them up and do you ask

16   whether it's noted that you were there if it's not for an

17   appointment?

18   A. I don't think I've ever asked that question specifically.

19   Q. Okay.  Well, something general to that effect?

20   A. No.

21   Q. No?  All right.  Would you say that it happens?

22   A. I don't know if I can say that.

23   Q. Just in general would you say that it happens in the real

24   world?

25   A. I don't know.

1    Q. Could you guesstimate?

2          MR. WELDON:  Objection; asked and answered, Your

3    Honor.

4          MR. ARVANETES:  Withdrawn.

5    **BY MR. ARVANETES:**

6    Q. So, the total amount that you stated that was -- I guess,

7    that there weren't records for, the total amount of mileage

8    ended up being $1,823 -- 1,823.39.

9    A. That sounds right.

10   Q. Is that accurate?

11   A. Yeah, that sounds right.

12   Q. And on -- on October 7th, 2014, you presented this

13   information to the prosecutor.

14   A. That sounds right.

15   Q. And that prosecutor was Mr. Weldon.

16   A. Yes, it was.

17   Q. And what was his response to this -- this investigation for

18   $1,800 -- 1828.39.

19          MR. WELDON:  Objection; relevance.

20          THE COURT:  Overruled.

21   **BY MR. ARVANETES:**

22   Q. What was his response?

23   A. He said he liked the case.

24   Q. He said he liked the case?

25   A. Yeah.  I gave him a summary of the case, he said he liked

1  the case, that we could either prosecute it at this level, or

2  at the State -- Montana State insurance level.

3  Q. He said what?  I missed that last part.

4  A. Montana State, I guess, has an insurance commission, that

5  it could be prosecuted there, as well.

6  Q. So, at this time, was it accepted or not accepted for

7  prosecution?

8  A. You know, I don't recall.  I would have to look back on my

9  record to see if it was accepted or not.  I don't believe it

10  was, but I would have to double-check to be certain.

11  Q. Did he ask you to conduct further surveillance?

12  A. He asked if it was possible, and I said, "Yes, we can try."

13  Q. We can try.  And that's when you created or you hatched the

14  idea of this ruse kayak trip.

15  A. Yes.

16  Q. And from 1,828, what is the current amount that you're

17  claiming, both in what was paid to her, and, also, a medical

18  bills total?

19  A. In total, I think it's over $800,000.

20  Q. And did that peak the government's interest?

21  A. Uhm, are you talking -- because we both work for the

22  government.  Are you referencing me?

23  Q. The prosecutor, I'm talking about.

24  A. Uhm...

25          MR. WELDON:  Objection, Your Honor, relevance.

1          THE COURT:  I'll allow it.  I'm always curious to

2     see your reaction, Mr. Weldon.

3          THE WITNESS:  Uhm, are you saying -- or can you

4     please clarify the question?

5     **BY MR. ARVANETES:**

6     Q. Did you end up in a grand  -- did you end up testifying to

7     a grand jury about it?

8     A. I did.  Yes, I did.

9     Q. Not on the 1,828 -- or 1,828, only, but on an amount much

10    larger than that.

11    A. That's correct.

12    Q. Based upon the ruse kayak trip?

13    A. Based upon her statements and the observations of the

14    undercover operations.  (Nods head affirmatively)

15    Q. Based upon the ruse kayak trip.

16    A. That, and to include the undercover interview, as well.

17    Q. And, so, based upon the ruse kayak trip for -- that

18    occurred for three days (indicating) --

19    A. Uh-huh.

20    Q. -- in 2015, this amount doesn't include -- this amount

21    isn't included or this amount does not include those three

22    days, it includes all the way back to 2006.  Is that correct?

23    A. That's correct.  That's just wages and medical

24    compensation.

25    Q. Right.  But you are using the kayak trip to try to base a

1   fraud from ten -- almost ten years before -- or seven years

2   before.  Is that correct?

3   A. (Indicating)

4   Q. From -- no, nine years before.

5   A. We are using the evidence obtained during the undercover

6   operation --

7   Q. Right.

8   A. -- to prove false statements to obtain healthcare

9   benefits.

10  Q. Going all the way back to 2006.

11  A. It's -- that's the totality of the Indictment, yes.  (Nods

12  head affirmatively)

13  Q. All right.  And, at the time that you testified to the

14  grand jury, you said that you had been an OIG agent for four

15  years, I believe.

16  A. That's correct.

17  Q. And, before that, you were in the Navy, I think?

18  A. I was in the Navy for nine years, yes.

19  Q. All right.  In those four years prior to this ruse

20  operation, did you create a ruse in cost and magnitude similar

21  to this?

22  A. I don't believe so.  I have.  When I was a police officer I

23  had used ruses before.

24  Q. I'm talking about just being an OIG agent, though.

25  A. Not in that magnitude, no.

1    Q. No.  So, let's talk about the magnitude.

2    A. Okay.

3    Q. How much did it cost -- just in the ruse, itself, how much

4    did it cost your -- or the government to pay for your

5    agents?

6              MR. WELDON:  Objection; relevance, Your Honor.

7              THE COURT:  I'll allow some latitude.  Let's get to

8    the point.

9              MR. ARVANETES:  It does go to my Rule 29 motion, as

10   well, Your Honor.

11             THE COURT:  All right. --

12             MR. ARVANETES:  For outrageous government conduct.

13   **BY MR. ARVANETES:**

14   Q. How much?

15   A. So, are you asking for the cost of the wages for the

16   employees --

17   Q. That's my first question, yes.

18   A. -- of the OIG?

19   Q. You got it.

20   A. I think we estimated around $10,000 for --

21   Q. Per agents?

22   A. For -- no, for the three agents, for three days.  Most of

23   the agents were fairly new to government service.  I think

24   they were all GS-13s, uhm, so the cost of their wages for

25   three days.

1   Q. Now Cathers.  Cathers had -- how long has Cathers been with

2   the OIG?  Cathers has been on with OIG for over 10 years.

3   A. No, she hasn't.  She got -- her and I went through new

4   agent training together.  I think she did other stuff.  But if

5   you have --

6   Q. All right.

7   A. I don't have her resume or CV in front of me now.

8   Q. I'll strike the question for now.  What about airline

9   tickets?

10  A. Paid out of the postal OIG budget --

11  Q. You got it.  How much?

12  A. -- for agents.  I think hers was approximately 300 or 350,

13  for Agent Cathers to fly from Arizona to Seattle, or SeaTac,

14  Washington.

15  Q. Okay.  And what about for you?  How much did it cost for --

16  you didn't have to fly.

17  A. I didn't have to fly.

18  Q. And neither did the other agent.

19  A. No.

20  Q. And -- all right.  So, let's, then, talk about Ms. Durand.

21  A. Okay.

22  Q. Okay?  Now, we're just talking about the three-day ruse.

23  How much was her flight?

24  A. I don't have the number in front of me, but it was pretty

25  close to 300-ish dollars, 300, 350.  I did submit an --

1    Q. An approval for that?

2    A. -- approval for the funds --

3    Q. I know.

4    A. -- and that is detailed.

5    Q. I know.  And I have that.

6    A. Okay.

7    Q. And I appreciate that.  You reminded me.  But -- and that

8    was paid by the government.  That wasn't paid by her, was

9    it?

10   A. No, it was all paid by the government.

11   Q. All right.  And, then, let's talk about the kayak trip,

12   itself.

13   A. Okay.

14   Q. The kayak trip in San Juan Islands.

15   A. Uh-huh.

16   Q. Do you live near -- I mean, do you live in that area?

17   A. Uhm, I live, I think, about three hours south of there.

18   Q. Three hours south?

19   A. Uh-huh.

20   Q. Is that a pretty popular spot?

21   A. In the summertime, it sure is.

22   Q. And you were kayaking in the summertime, were you not?

23   A. Yes.

24   Q. All right.  So, how much was the kayak trip per person?

25   A. Per person?  I think the total trip was only a little over

1   $3,000.  But, as I said, it's detailed in the funds request.

2   Q. 3,000 per person, or --

3   A. In total.

4   Q. For the agents and Ms. Durand?

5   A. Correct.

6   Q. Okay.  And hotels obviously added more money to it.

7   A. Uh-huh.

8   Q. Is that a yes or no?

9   A. Yes, it is.

10   Q. Just for the record.  I'm sorry.

11   A. Absolutely.

12   Q. All right.

13   A. There were hotel expenses, yes.

14   Q. Now, you also put in time (nods head affirmatively) to

15   investigate, to, I guess, talk about this ruse and create the

16   dynamics of the ruse, the surveys, the letter promising her

17   future free trips and things like that.

18   A. Uh-huh.

19   Q. Right?

20   A. Yes.

21   Q. And just so you -- for the record, "huh-uh" isn't --

22   A. Oh, yes.

23   Q. I'm sorry.

24   A. That's quite all right.

25   Q. All right.  And, so, how many hours did you spend on

1    that?

2    A. You know, I'm not sure of the exact amount of hours that I

3    worked on just creating the ruse.

4    Q. Uh-huh.

5    A. I -- I mean, of course, we put hours towards cases and

6    things like that, but it would take me some time to figure out

7    exactly the number of hours.

8    Q. Well, you're a smart guy, I think, so can you estimate?

9    A. To draft everything up and to talk about things?

10   Q. Uh-huh.

11   A. Uhm, probably, a couple of weeks.

12   Q. So, let's say, maybe, 80 hours?

13   A. Okay.

14   Q. All right.  And with -- you said you're a G-13?

15   A. A GS-13.

16   Q. A G -- whatever, a GS-13, so what would that be?  How

17   much?

18   A. What do I make a year?

19   Q. No, I don't care what you make.  Just for 80 hours, can you

20   estimate -- you can divide it by two, if you want, to make it

21   easier for you, but --

22   A. Sure.

23   Q. -- what would it -- what would it -- what was that cost?

24   A. Well, I can tell you -- maybe, this is the easiest way to

25   do it.  Postal pay periods are every two weeks, so, in a

1    postal pay period, I would make, at that time, about 3,200

2    after taxes.  So, that's after you take out healthcare

3    expenses and everything else, so about 3,200 per two weeks.

4    Q. 3,200 net, but probably five, gross.

5    A. I -- I would have to take a look at it.

6    Q. Okay.  And that's just you.

7    A. That's just me.

8    Q. I mean, you weren't just working alone, were you?

9    A. Huh-uh.

10   Q. We had agents that talked already about working with you on

11   this.

12   A. Yes, that's correct.

13   Q. So -- so, 5,000 just for you.

14              THE COURT:  Mr. Arvanetes, does the government get

15   credit for the taxes he pays?

16              MR. ARVANETES:  Does the what?  Does the government

17   get any credit?

18              THE COURT:  You're talking about how much it's cost

19   the government, but they pay taxes on the salary that they get

20   paid.  Do we have to back that out of your calculation?

21              MR. ARVANETES:  Uh, I don't know, Judge.

22              THE COURT:  Seems fair, doesn't it?

23              MR. ARVANETES:  Well, that's -- well, we'll take it

24   out, then.

25              THE COURT:  Okay.  Well, if it would make it easier

1    with five.

2              MR. ARVANETES:  We will do 35, Your Honor.

3    BY MR. ARVANETES:

4    Q. Uhm, so we are getting close to 20,000, aren't we?

5    Already.  And this isn't even talking about bringing the gal

6    from -- the agent from Alaska to do the ruse interview.

7    Right?

8    A. That sounds about right, yeah.

9    Q. So, we are getting close to 20,000.  All right.  And the

10   mystery shopper, that letter that you sent to her saying she

11   won a trip initially said it was a horseback riding trip?

12   A. To Arizona, yes.  (Nods head affirmatively)

13   Q. And that was unsolicited, wasn't it?

14   A. That's correct.

15   Q. In fact, to get the idea, you used, which is public record,

16   Facebook.

17   A. Open-source media, yes.

18   Q. Right.  What did you call it?

19   A. Open source.

20   Q. Open-source media.  All right.  And, so, you use Facebook

21   to actually figure out what her interests are before you sent

22   her that letter.

23   A. Yes.

24   Q. (Nods head affirmatively)  And just to be clear, from the

25   beginning to the end she didn't pay for anything.

1    A. That's correct.

2    Q. In fact, I believe she had to pay for a hotel one night,

3    but I assume she got reimbursed.

4    A. Yes.  It wasn't part of the adventure, for her to pay her

5    own hotel.

6    Q. And like you said in direct, there was even promises for --

7    later on, for possibly more free stuff.

8    A. Uh-huh.  Yes.

9    Q. Yes.  Thank you.  Uhm,  and you even included a $50 gift

10   card, is that --

11   A. That's correct.

12   Q. -- my understanding?  When did that occur?  When was the

13   card sent?

14   A. I would have to double-check my notes.  But with the

15   paperwork and everything else for Crystal Seas, for her to be

16   prepared and get ready.  And the gift card was really to cover

17   some other expenses that were difficult for me to cover,

18   essentially, from my office.  Because you can pay for things

19   like kayaking trips, hotels, airfare shuttle costs and all of

20   that stuff from your computer, but there were some expenses

21   that I just couldn't cover, so I didn't want there to be any

22   uncovered expenses.

23   Q. So, why just $50?  What does that even get you these

24   days?

25   A. It's just an estimate.  It's 50 bucks (indicating).

1    Q. For what?

2    A. Possible expenses.  (Shakes head negatively)

3    Q. So, you sent that to her -- I didn't quite get your answer.

4    Was it before?

5    A. Yes.  Before she left for her trip, yes.

6    Q. All right.  And that was unsolicited.  That was her free

7    gift.

8    A. Yes.

9    Q. She didn't ask for that money?

10   A. She didn't.

11   Q. She didn't ask for -- she didn't even ask to make money off

12   this trip.

13   A. That's correct.

14   Q. Now, you wrote a report called "Boynton's Report on

15   Kayaking and Interview."  Do you remember that report?

16   A. I don't have it in front of me.

17   Q. Okay.  Well, I can get it to you.

18   A. Okay.

19   Q. Well, before I do that, I guess I should ask a question.

20   Perhaps, if you remember it, you may not need the report.  But

21   if you don't, I'll refresh your recollection with the report.

22        Okay.  So, during the second day, do you recall asking

23   Debbie how she was feeling, after the second day of kayaking?

24   A. Yes, I do.

25   Q. And do you recall Debbie telling you that she was in

1    pain?

2    A. Yes, because she had missed her scheduled medication

3    time.

4    Q. And that -- do you recall her saying that she would be

5    fine --

6    A. Yep.

7    Q. -- after she took her medication?

8    A. That's correct.

9    Q. And you congratulated her on kayaking while in pain.

10   A. She said she was in pain and she was kayaking.  I was not

11   in pain, and having a difficult time kayaking because it was

12   physically strenuous.

13   Q. You were in pain, too?  Or you weren't in pain?

14   A. No, I said I was not in pain and I was having a difficult

15   time kayaking.  She said she was in pain and she was kayaking

16   very well.

17   Q. Do you recall in a survey -- and I'll find it, if you don't

18   recall -- that she stated the last time she kayaked was

19   2003?

20   A. I believe I read that in there.

21   Q. Uh-huh.  2003, is that your recollection, too?

22   A. That's when I recall from the form.

23   Q. Okay.  And do you recall her saying, in this conversation

24   you're having with Debbie while you were congratulating her

25   for kayaking in pain before she took her medication, that she

1    said how she -- she -- how she could -- uh, "Durand said how
2    could she not kayak, she just wanted to keep going."
3         Do you recall her saying that?
4    A. I think so, if it's in there, yes.
5    Q. All right.  And that evening, Durand and Cathers went for a
6    walk together at -- on Stuart Island?
7    A. Uh-huh.  Yes.
8    Q. Okay.  And Cathers actually tracked the length and extent
9    of the walk.
10   A. Yes.
11   Q. And you testified on direct that -- was it at Stuart Island
12   where you and Agent Cathers went jogging?
13   A. On the first day.
14   Q. On the first day?  Was it at this island, Stuart Island?
15   A. Yes.  We camped at the same island twice.
16   Q. Uhm, and that was it uphill or something, or where -- how
17   -- what was the trajectory to the --
18   A. The grade of the incline?
19   Q. Yeah.  Yeah.
20   A. It was steep.  It wasn't a simple incline.  It wasn't
21   gradual, it was a simple incline.  To leave the area that we
22   were camped in, it was, like, a very short, kind of,
23   horseshoe-ish trail, that was fairly level through the woods,
24   and then you get to the road that actually goes uphill to
25   where this old school was that she --

1    Q. To the old school.

2    A. Uh-huh.

3    Q. And it was a road, you said, a paved road?

4    A. I don't believe it was paved.  (Shakes head negatively)

5    Uhm, I think it was a well-packed dirt road, if I recall

6    correctly.  (Nods head affirmatively)

7    Q. Okay.  And that you testified that, at one point, Agent

8    Cathers -- or that you stopped and Agent Cathers kept running.

9    A. Yes.

10   Q. Did you ever make it to the school?

11   A. I went past the school.

12   Q. You went past the school?

13   A. I didn't make it to the lighthouse.  Cathers kept going to

14   the lighthouse.  I stopped in this open area.  It was really

15   nice.

16   Q. And I believe you said that was it coming back down that

17   you, I guess, ran into, not physically, but --

18   A. It was on the way up.

19   Q. -- metaphorically --

20   A. It was on the way up.

21   Q. Was it on the way up?

22   A. Uh-huh.

23   Q. That you ran into Debbie.

24   A. That's correct.  (Nods head affirmatively)

25   Q. And was Debbie --

1    A. We passed her.

2    Q. Right.  But was she running?

3    A. No, she wasn't running.

4    Q. She was walking, wasn't she?

5    A. She was walking up the hill.

6    Q. But she was walking, not running.

7    A. Correct.

8    Q. All right.  In your same report, on the same page, do you

9    recall stating, At no time during the kayaking tour did Debbie

10   -- did Durand complain of hand, neck, shoulder, or back

11   pain?

12   A. That's correct.

13   Q. Does that not conflict with what you stated earlier about

14   her complaining of pain?

15   A. That was more of a specific categorization, that she

16   didn't -- she just said, "I have pain."

17   Q. Did you ask her where that pain was?

18   A. I did not ask her.

19   Q. Who did -- who wrote the post-kayak interview between the

20   undercover agent and Debbie on the 22nd of September of 2015

21   in Boise, Idaho?

22   A. Who -- who wrote it?  What do you mean.

23   Q. Yeah, who wrote the questionnaire?

24   A. Oh.  I -- as I said in direct, that's a postal form.  I

25   just took the word "medical" off of it, and it's just a

1    current capabilities form.  So, it stated just "Current

2    Capabilities Form."

3    Q. And you took the "medical" out.

4    A. Correct.

5    Q. And you took that out on purpose.

6    A. That's right, it's not a medical interview.  It's a

7    contractor interview.

8    Q. And would you agree that the questions stated by the agent

9    conflates days concerning the kayak trip with an average day

10   for Debbie Durand?

11   A. What do you mean by "conflates"?

12   Q. Conflates?  I mean combined.

13   A. I think the questions are up to the claimant to answer how

14   they read the question and how they see it, uhm, as what --

15   how the question is worded and stated.

16   Q. You've seen the interview, I assume.

17   A. Yes, I have.

18   Q. Would you agree that the line is blurred between questions

19   about her average day and answers about her average day versus

20   questions about the kayak trip and the days about the kayak

21   trip?

22   A. Well, I don't think there is any kayak trip specific

23   questions on the form.

24   Q. No, but I'm -- during the interview, I mean.

25   A. During the interview, there was discussions -- or the

1  questions were of the frequency of activities, without

2  specificity of whether you're kayaking or if it's a

3  day-to-day.  But the form was also used as a discussion point

4  with the claimant and the undercover agent, that they went

5  into for more detail.  Which is, essentially, the purpose of

6  the form, is to talk about it and --

7  Q. So, would you agree, then, with what you just said, that

8  the discussion, itself, conflated the two terms?  In other

9  words, they did not distinguish between days that she was

10 kayaking versus her regular days?

11 A. The discussion is designed to allow the claimant an

12 opportunity to tell the truth about their capabilities and

13 their conditions.

14 Q. So, is that a yes or a no?

15         MR. WELDON:  Objection; Your Honor, he's answered

16 the question.

17         MR. ARVANETES:  I --

18         THE COURT:  He can try to clarify, if he can.

19 **BY MR. ARVANETES:**

20 Q. Would you agree that the discussion, itself, blurred

21 between her regular days of laying around being sedentary

22 versus days -- the days that she was kayaking?  I mean, that's

23 a simple "yes" or "no."  And it's okay, whatever answer, I

24 don't --

25 A. The questions are what the questions are.  I mean, so the

1  words, as they are written, are --

2  Q. No, I'm talking about the discussion, not the

3  questionnaire.

4  A. The discussion --

5  Q. Yes.

6  A. The discussion is designed to speak with the claimant and

7  get the claimant's own words about activities, hobbies,

8  anything that they could have been involved in that could

9  result in a potential job offer.  Whether that be hobbies,

10  outside activities, jobs that they might be working,

11  volunteering opportunities, any of those types of things.  The

12  questionnaire is merely just a -- essentially, a jumping-off

13  point, if you will, to have a discussion about these things.

14  (Nods head affirmatively)

15  Q. I'll move on.  When you were doing the pre-kayak survey,

16  writing it up, creating it, you were aware of not only Ms.

17  Durand's pathology; i.e., physical injuries?

18  A. Yes.

19  Q. Correct?

20  A. We were aware of her accepted medical condition through the

21  Department of Labor, Office of Workers' Compensation

22  program.

23  Q. But you were also aware that she was on antidepressants.

24  A. I did review her medical file.  (Nods head affirmatively)

25  Q. And you were -- so, you were aware that she was on

1  antidepressants, correct?

2  A. I believe I read her medications.

3  Q. All right.  And you were aware, therefore, that she

4  suffered from depression; is that correct?

5  A. I do recall that she did have the other claim that was

6  ultimately denied by the Department of Labor --

7  Q. Yes or no?

8  A. -- that have mental health aspects to it.

9  Q. All right.  And based upon your knowledge, if you have

10  knowledge about this, is one -- does being outside, being in

11  the sunshine assist with one's depression?

12  A. I don't think I'm medically qualified to answer that.

13  Q. Well, do you know in general?  By personal experience?

14  A. I know that people that live in Alaska suffer from SAD,

15  seasonal affectiveness (sic) disorder, because they don't get

16  a lot of sunshine.

17  Q. So, would it make a difference to you that her actions on

18  this free kayak trip out in the sunshine perhaps made her less

19  depressed?

20  A. I wouldn't know.  I don't know what's going on in there.

21  Q. Well, did she appear depressed?

22  A. No, she did not.  She appeared very active, jovial, she was

23  very upbeat.

24  Q. Exactly.  And that contradicted from what her medical and

25  psychological pathology was.

1    A. That's correct.

2    Q. Is that correct?

3    A. Because when I reviewed her file, she appeared to be

4    sedentary and immobile --

5    Q. Okay.

6    A. -- as she displayed her capabilities to her medical

7    provider.  But on the kayaking trip, that wasn't evident.

8    Q. Exactly.  Thank you.  I appreciate an honest answer.  And

9    this Life Survey, what -- when was that sent, this Life

10   Survey?

11   A. I think it was sent in the spring of 2015.

12   Q. And what was -- I mean, was that also unsolicited to her?

13   A. Yes.

14   Q. And was that the first communication you had with her?

15   A. No.  My communication began in December, where -- well, I'd

16   have to look at the exhibit, again, when I sent her the first

17   survey.  But it was in December.  And it -- no, it was, it was

18   before that.  Because the Life Trend Survey was returned and

19   signed and dated, I believe, July 3rd, 2015, and our kayaking

20   trip was July -- late in July of 2015.  And I had sent her the

21   survey in December of the year prior.

22   Q. So, that was another survey that was sent to her, --

23   A. By my agency, --

24   Q. -- as well.

25   A. -- yes.

1    Q. And who created that survey?

2    A. Uhm, I believe that survey was sent out through our ITU,

3    Integrity Testing Unit, with the Postal Service, Office of

4    Inspector General.

5              MR. ARVANETES:  Okay.  May I have a moment, Your

6    Honor?

7              THE COURT:  You may.

8

9              **(Discussion off the record.)**

10

11             MR. ARVANETES:  May I have a moment, Your Honor?

12   Another moment?

13             THE COURT:  I'm giving you a moment.

14   **BY MR. ARVANETES:**

15   Q. During your investigation, did you have a medical doctor

16   try to meet or set up an appointment with Debbie?

17   A. No.  (Shakes head negatively)

18   Q. You agree that you got her to go to San Juan Islands on a

19   ruse, right?  You got her to go to Boise for a post-interview

20   on a ruse.

21   A. Correct.

22   Q. You could have set up a doctor's appointment, a ruse

23   doctor's appointment with a real doctor from -- perhaps,

24   contracted with OIG to get her medical attention, or to, at

25   least, evaluate her medically.

1  A. I'm not an attorney, but I'm pretty sure you start getting

2  into some legal area about doctor/patient confidentiality.

3  That's the point of all of these other things, that we can get

4  those honest statements from the claimant so we don't have to

5  be in that doctor/patient room to infringe upon that

6  information.  But we still get those statements.

7       And during this whole process, it's an opportunity for

8  the claimant to be honest about what's really going on.  Uhm,

9  and, I think, getting a doctor involved, that would -- if I

10  had --

11 Q. You didn't want a doctor involved, is that fair to say?

12 A. Not a ruse doctor.

13 Q. Well, I don't mean a ruse doctor, I mean a ruse with a real

14 doctor, not a fake doctor.

15 A. Are you asking if we brought a doctor along for, like, a

16 kayaking trip?  Is that what you're saying?

17 Q. No, I'm saying during the investigation did you ever try to

18 get her to see a doctor?

19 A. I did not, no.

20          MR. ARVANETES:  All right.  I have nothing

21 further.

22          THE COURT:  Mr. Weldon, redirect?

23          MR. WELDON:  Very briefly, Your Honor.

24

25                    **REDIRECT EXAMINATION**

1  BY MR. WELDON:

2  Q. Agent Boynton, let's talk about the agent hours that

3  Mr. Arvanetes discussed with you.  Do you get paid whether you

4  do an undercover operation or not?

5  A. That's correct, I'm salary.

6  Q. So, you could literally sit at your desk and you would

7  still be paid those hours.

8  A. That's correct.  (Nods head affirmatively)

9  Q. All right.  And, so, instead, what did you do?

10  A. I conducted a claimant fraud investigation for the Postal

11  Service, Office of Inspector General.

12  Q. You were also discussing the basic amount of money that was

13  paid for this trip; when you identify fraud within the system,

14  does that actually save the Postal Service money?

15  A. Absolutely.

16  Q. Why is that, sir?

17  A. Well, so, claimants on the Periodic Rolls or PN status,

18  they obtain wages -- wage compensation and medical

19  compensation until they are no longer eligible, which could be

20  until death.  So, the Postal Service will calculate, you know,

21  how much they are going to save, because they no longer have

22  to pay those any more after the claimant has been criminally

23  charged.

24  Q. Now, then, you were also discussing with Mr. Arvanetes the

25  comments that Ms. Durand made about her pain, and just

1  describe how that occurred and what she said.

2  A. It was just a casual conversation, most of the interactions

3  during the trip were casual, and I just asked how she was

4  doing.  And she just said, "I was in pain, and I missed my

5  scheduled medication time, but I'll take it and I should be

6  fine."

7  Q. And, then, did she ever mention any more comments

8  throughout that entire trip about pain?

9  A. Not at all.

10  Q. Now, then, Agent Boynton, you -- I know you don't work for

11  the post office specifically, but you work with the post

12  office; is that right?

13  A. That's correct.

14  Q. Are there any jobs that you see there, where somebody can

15  sit for 16 hours and 28 minutes that would be available?

16  A. Yes.

17          MR. WELDON:  I have no further questions, Your

18  Honor.

19          THE COURT:  Is the witness excused?

20          MR. WELDON:  Yes, please, Your Honor.

21          THE COURT:  You may step down, Mr. Boynton.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Mr. Weldon, do you have any other

24  witnesses that you wish to call?

25          MR. WELDON:  Your Honor, I do not.  But can I

1    confirm the exhibits with madam clerk, please?

2          THE COURT:  Yeah.  Before we do that, I want to talk

3    about our schedule for tomorrow.

4          MR. WELDON:  Yes, Your Honor.

5          THE COURT:  I assume, after the government rests,

6    you will have a Rule 29 motion?

7          MR. ARVANETES:  (Nods head affirmatively)

8          MS. HUNT:  Yes.  Yes, that's correct, Your Honor.

9          THE COURT:  All right.  Then -- so that will be

10   tomorrow morning.  Once we get -- if we go past that, then you

11   have a case to present; is that correct?

12         MS. HUNT:  Yes, Your Honor.

13         THE COURT:  And how long do you anticipate for it to

14   get there?

15         MR. ARVANETES:  May I speak?

16         THE COURT:  You may.

17         MR. ARVANETES:  Uhm, Your Honor, we had a -- and I

18   wanted to ask about this.  We have a Doctor Ellis appearing by

19   video.

20         THE COURT:  Yes.

21         MR. ARVANETES:  The time is -- it was nine to

22   twelve, but I didn't realize the time change, so it actually

23   is eight to eleven.  But we can -- I have my IT guy, who can

24   talk to the people down in Oklahoma and switch it to nine.

25         THE COURT:  How long do you anticipate Mr. Ellis

1   appearing?

2              MR. ARVANETES:  Uhm --

3              MS. HUNT:  I don't think it would be longer than 45

4   minutes for direct.

5              THE COURT:  All right.  Well, why don't we have him

6   as the first witness tomorrow.

7              MR. ARVANETES:  At what -- what time would you like

8   that?

9              THE COURT:  Well, I'd like to start at 8:45.

10             MR. ARVANETES:  (Nods head affirmatively)  All

11  right.

12             THE COURT:  So, that's our first hurdle to get over.

13  Okay.

14             MR. ARVANETES:  Okay.

15             THE COURT:  And, then, why don't we say about 9:30,

16  have him available, depending on how the Rule 29 motion

17  goes.

18             MR. ARVANETES:  Okay.  9:30?  I can make that

19  happen, Your Honor.

20             THE COURT:  Between 9:30 and 9:45 Mountain Time.

21             MR. ARVANETES:  (Nods head affirmatively)  Yeah.

22             THE COURT:  All right.  Now, and, then, you have

23  five witnesses on your list, I assume that you will go until

24  after lunch?

25             MR. ARVANETES:  Uhm, let me see.  Let's see.  We've

1    got that one, we've got Debbie.  I would say yes.  To be

2    conservative, --

3              THE COURT:  Okay.

4              MR. ARVANETES:  -- after lunch, sir.

5              THE COURT:  All right.  And, Mr. Weldon, you have a

6    forfeiture allegation.

7              MR. WELDON:  That's correct, Your Honor.

8              THE COURT:  Do you have additional evidence that you

9    wish to present?  Have we got to that point?

10             MR. WELDON:  Your Honor, just so the Court's aware,

11   I think you have all of the evidence that you would need to

12   hear for that forfeiture allegation.

13             THE COURT:  Okay.  Then I don't -- do I have a --

14   I've seen evidence of the wage payments, is there a summary of

15   -- is there evidence of the medical payments somewhere in the

16   record?

17             MR. WELDON:  There is the -- by the agent's

18   testimony, Your Honor.

19             THE COURT:  All right.  And then you want to confirm

20   the exhibits?

21             MR. WELDON:  Yes, please, if that's acceptable.

22             THE COURT:  All right.  Why don't you do that now,

23   and then I'll ask in the morning if you wish to call other

24   witnesses.

25             MR. WELDON:  Yes, Your Honor.

```
 1         THE COURT:  So, we are going to break now, clean up
 2   any housekeeping matters with the clerk, and we will reconvene
 3   tomorrow at 8:45 to accept the government's resting its case,
 4   and then proceed to the Rule 29 arguments.
 5         MR. ARVANETES:  Yes, sir.
 6         THE COURT:  All right.  Anything else to address?
 7         MR. WELDON:  No, Your Honor.  Thank you.
 8         THE COURT:  All right.  And, then, I -- I still
 9   haven't come to a final decision yet on whether we will have
10   the parties submit findings, or whether I'll rule after the
11   trial.  We will discuss that further in the morning, after
12   I've had a chance to think it over.
13         MR. WELDON:  Yes, Your Honor.
14         THE COURT:  All right.  We will be in recess until
15   8:45.
16         MR. ARVANETES:  Yes, sir.
17         MS. HUNT:  Thank you.
18
19         (The evening recess was taken at 5:33 p.m.)
20
21
22
23
24
25
```

**<u>CERTIFICATE</u>**


     I, Julie L. DeLong, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter to the best of my knowledge, skill, and
ability.


 /s/ Julie L. DeLong                    02/05/2018
Julie L. DeLong                         Date