1    Julie Pesanti DeLong (Sampson)
     Registered Professional Reporter
2    PO Box 163
     Saint Ignatius, Montana  59865
3    Phone:  (406) 498-3941
     Email:  fortherecord1103@gmail.com
4    _____

5                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MONTANA
6                      GREAT FALLS DIVISION

7    UNITED STATES OF AMERICA,      )
                                    )
8                   Plaintiff,      )
                                    )           CR-16-43-GF-BMM
9      versus                       )
                                    )
10   DEBORAH JOY DURAND,            )
                                    )
11                  Defendant.      )
     _____

12
               TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
13
                  DAY 3 OF WITNESS TESTIMONY
14               CLOSING ARGUMENTS BY COUNSEL

15         BEFORE THE HONORABLE BRIAN M. MORRIS
              UNITED STATES DISTRICT COURT JUDGE
16               FOR THE DISTRICT OF MONTANA

17               Charles N. Pray Courtroom
                Missouri River Federal Courthouse
18         United States District Court Great Falls
                  125 Central Avenue West
19                Great Falls, MT 59404

20                  August 23, 2017
                      8:30 a.m.

21

22

23

24
               Proceedings recorded by machine shorthand
25      Transcript produced by computer-assisted transcription

1     **<u>APPEARANCE OF COUNSEL:</u>**

2

   **For the Plaintiff:**
3
   Mr. Ryan G. Weldon
4  Assistant United States Attorney
   United States Attorney's Office - Great Falls
5  P.O. Box 3447
   119 First Avenue North, Suite 300
6  Great Falls, MT 59403
   (406) 761-7715 (Phone)
7  (406) 453-9973 (Fax)
   Email:  Ryan.Weldon@usdoj.gov
8
   Mr. Jared Cobell
9  Assistant United States Attorney
   United States Attorney's Office - Great Falls
10 P.O. Box 3447
   119 First Avenue North, Suite 300
11 Great Falls, MT 59403
   (406) 761-7715 (Phone)
12 (406) 453-9973 (Fax)
   Email:  Jared.Cobell@usdoj.gov
13

14    **For the Defendant:**

15 Mr. Evangelo "Venn" Arvanetes
   Assistant Federal Defender
16 Federal Defenders of Montana
   Office Headquarters, Great Falls
17 104 2nd Street South, Suite 301
   Great Falls, MT 59401-3645
18 (406) 727-5328 (Phone)
   (406) 727-4329 (Fax)
19 Email:  annectants

20 Ms. Joslyn Hunt
   Assistant Federal Defender
21 Federal Defenders of Montana
   Helena Branch Office
22 50 West 14th Street, Suite 1
   Helena, MT 59601-3332
23 (406) 449-8381 (Phone)
   (406) 449-5651 (Fax)
24 Email:  joslyn_hunt@fd.org

25

<u>**INDEX:**</u>

Plaintiff Rests. . . . . . . . . . . . . . . . . .        4
Rule 29 Motion. . . . . . . . . . . . . . . . . .        5
Defense Rests. . . . . . . . . . . . . . . . . .       242
Renewed Rule 29 Motion . . . . . . . . . . . . .      243
Closing Argument by Mr. Weldon . . . . . . . . .      243
Closing Argument by Mr. Arvanetes  . . . . . . .      267

<u>**TESTIMONY**</u>

<u>**WITNESS:**</u>                                              <u>**PAGE:**</u>

<u>**JOHN WESLEY ELLIS, M.D. (Via Video)**</u>:
Direct Examination by Ms. Hunt . . . . . . . . .       55
Cross-Examination by Mr. Arvanetes . . . . . . .       74
Redirect Examination by Ms. Hunt . . . . . . . .       85

<u>**JAMIE GIPE:**</u>
Direct Examination by Mr. Arvanetes. . . . . . . .       89
Cross-Examination by Mr. Weldon. . . . . . . . .       94

<u>**DEBORAH JOY DURAND:**</u>
Direct Examination by Mr. Arvanetes. . . . . . . .      102
Cross-Examination by Mr. Weldon. . . . . . . . .      175
Redirect Examination by Mr. Arvanetes. . . . . . .      208

<u>**HARVEY BRADFORD HARRIS:**</u>
Direct Examination by Mr. Arvanetes. . . . . . . .      209

<u>**EXHIBITS**</u>

<u>**EXHIBIT:**</u>        <u>**DESCRIPTION:**</u>                    <u>**ADMITTED:**</u>

EXHIBIT 508     Excel Spreadsheet of Travel. . . . . . .       91

EXHIBIT 514     Doctor Bricken's Report. . . . . . . .      125

EXHIBIT 511     Social Security Administration . . . . .      128

EXHIBIT 515     Psychiatric Review Technique . . . . . .      130

EXHIBIT 516     Mental Residual Functional Capacity. . .      133

1

2                    **PROCEEDINGS**

3

4                    **(Open court)**

5                 **(Defendant present)**

6          **(Proceedings began at 8:42 a.m.)**

7

8          THE BAILIFF:  Judge Brian Morris, the United States

9  District Court for the District of Montana.

10         THE COURT:  Please be seated.

11     Good morning, counsel.

12         MR. WELDON:  Good morning, Your Honor.

13         THE COURT:  Good morning, Ms. Durand.

14         THE DEFENDANT:  Good morning.

15         THE COURT:  Before we left last evening, Mr. Weldon,

16  you were going to confirm with the clerk that you admitted all

17  of the exhibits that you wished to admit.

18         MR. WELDON:  And I have made that confirmation, Your

19  Honor.

20         THE COURT:  All right.  That's good news.  Do you

21  have any other witnesses that you wish to call?

22         MR. WELDON:  Your Honor, the United States rests.

23         THE COURT:  Thank you, Mr. Weldon.

24     Mr. Arvanetes, do you have a motion?

25         MR. ARVANETES:  Yes, sir.  May I approach the

1    podium?

2            THE COURT:  Approach what?

3            MR. ARVANETES:  The podium.

4            THE COURT:  Of course.

5            MR. ARVANETES:  May it please the Court, Your Honor.

6    (Nods head affirmatively)  Uhm, Your Honor, my Rule 29 motion

7    talks about -- first, I'll be talking about my entrapment,

8    outrageous government conduct arguments, and then, as far as

9    the substance, the Rule 29, as opposed to the elements.

10       Your Honor, it's our position that Ms. Durand was

11   entrapped based upon the case law that I've cited in my brief.

12   Uhm, there are certain factors that the Ninth Circuit and the

13   Supreme Court have looked at for entrapment, and, at times,

14   they do rise to the level of constitutional due process

15   violations of outrageous conduct.

16           For example, the Ninth Circuit, in United States

17   versus Bacerra, 92 F.2d 960, raises five factors:  The

18   character or reputation of Ms. Durand.  In this context, as

19   opposed to Bacerra, which was, I believe, a drug case, I don't

20   know if there was an issue of that, or a previous, you know,

21   criminal act.

22           Number two, whether the government made the initial

23   suggestion of criminal activity.  As the Court's aware, and

24   has heard evidence that this -- this -- especially the

25   entrapment, within the context of the kayak operation, which

1   they are using to go all the way back to '06 to claim fraud,

2   they initiated everything about this.

3       And the second factor says, "Whether the government made

4   the initial suggestion of criminal activity."  To allege that

5   this fraud, that this kayak trip was fraud, uhm, they looked

6   on her Facebook page, they reached out to her, they wrote a

7   letter which promised a lot of different things, promised

8   future free trips, uhm, to get her to bite.

9       She did that.  They paid for everything.  They worked her

10   through in the middle of the operation.  They continued

11   providing her with all of the resources to entrap her into

12   this ruse.  They even called it a ruse.  Uhm, you know,

13   airplane tickets, e-mails, uhm.  You've got to get your -- get

14   a survey in by this time.  Uhm, and, then, of course, they

15   even concluded where they had a post-interview, a post-kayak

16   interview with a survey and -- and it's the main reason why we

17   are here.

18       Without the kayak trip, uhm, before that, she had been on

19   the Rolls for -- since 2008, the Periodic Rolls, which meant

20   that she was, by USP -- U -- by OIG standards, was permanently

21   disabled.  And as the DOL guy said, they needed objective

22   medical findings to take her off of those Rolls.

23       So, which obviously they didn't do.  I mean, the -- just

24   a footnote, uhm, that if they wanted to do a ruse by getting a

25   real doctor to check her out, uhm, and that doctor came

1   forward today and alleged fraud, then we would have, perhaps,

2   a different argument.  But the real -- the real question is

3   who did -- I'm getting into my other argument, and I

4   apologize, I'm conflating the two.  But I'll get into that

5   later, I don't want to mix the Court up with my arguments.

6       So, I'll get to point 3, whether the defendant engaged in

7   activity for profit.  Obviously, (shakes head negatively) that

8   wasn't the case.

9       Whether the defendant showed any reluctance.  We really

10  don't know.  We know that by the time the hook was set, she

11  was engaged and wanted to go on this trip.  (Nods head

12  affirmatively)  She wanted to go on this kayak trip, so...

13      And, then, the nature of the government's inducement.

14  Obviously, the nature of the government's inducement goes to

15  what I earlier talked about, as far as all of the factors that

16  they did to entrap her into this kayak trip.

17          THE COURT:  Mr. Arvanetes, let's go through those

18  five factors.  First, before I get to those, as a general

19  matter, how does this ruse differ from other undercover ruses

20  used by the government routinely?  We have -- every day, I've

21  got cases involving controlled buys of illegal drugs, where

22  the government gives someone cash to go buy drugs from an

23  unaware defendant, who sells the drugs to the --

24          MR. ARVANETES:  (Nods head affirmatively)

25          THE COURT:  -- informant or the undercover agent and

1   commits the crime.  How does that differ from what happened

2   here?

3          MR. ARVANETES:  Well, I think -- and I think it was

4   addressed in Bacerra, maybe it was addressed, also, in

5   Black -- and if I may look at my brief for a moment?

6          THE COURT:  You may.

7          MR. ARVANETES:  In -- on Page 5, it's a Ninth

8   Circuit opinion, United States versus Skarie, I believe?  Or,

9   no.  I apologize.  It's a Third Circuit case, United States

10  versus Twigg, 588 F.2d 373.

11      In that case, the law enforcement set him up, encouraged

12  him, provided the essential supplies and technical expertise.

13  Which, again, I think you can parallel to the trip.  And when

14  he and Kubica, the informant, encountered difficulties in

15  consummating the crimes, they assisted in finding solutions.

16      You know, they -- in a lot of entrapment cases that I've

17  -- I've had, they'll do an undercover buy, for example, and

18  they'll record it.  And, I mean, that's -- that's the

19  operation.  They don't -- you know, in the cases I read for

20  this, they -- you know, like in drug cases, they induced her.

21      They also, in some cases, took advantage of the person's

22  addiction.  They also supplied the -- if the person was, say,

23  making a meth lab, they were -- they made -- they offered --

24  they provided the supplies for the meth lab to be built, so

25  that he can, then, make meth, and then entrapped him into

1    making meth.

2         And, so, that's --

3              THE COURT:  There is a distinction, though, between

4    giving someone equipment to go commit a crime versus the

5    controlled buy.

6              MR. ARVANETES:  Right.

7              THE COURT:  All right.  So, where does this case

8    fall?  I mean, as I understand the government's theory, the

9    crime isn't the kayak trip, they allege that the crime --

10   that's just further evidence.  The crime is the fact that they

11   claim Ms. Durand falsely filed claims that she was totally

12   disabled, falsely reported to the doctors that she could not

13   engage in any physical activity.

14             MR. ARVANETES:  Back --

15             THE COURT:  She is committing the crime by receiving

16   these benefits for the period of time from '07 or '08,

17   forward.

18             MR. ARVANETES:  (Nods head affirmatively)

19             THE COURT:  And that's ongoing.

20             MR. ARVANETES:  (Nods head affirmatively)

21             THE COURT:  And they come along and simply say,

22   well, let's test that theory.  Is this giving the equipment

23   for the meth lab, or is this giving the money for the buy of

24   the drugs that are already being produced?

25             MR. ARVANETES:  Your Honor, in this case, we have a

1    situation where we allowed Doctor Strausser, for example, to

2    -- on the video that he saw back in 2008, to offer him an

3    opportunity to raise his hand when he felt that Debbie had

4    lied to him.  He never did.

5        I mean, if we want to get down to the brass knuckles of

6    it, the fraud, like the Court correctly notes, is committed --

7    was she committing fraud against these doctors?  And the only

8    evidence we heard was from 2008 -- or from today, but from the

9    examination or from a viewing of the video from 2008 that

10   Doctor Strausser saw to change his mind, where he never raised

11   his hand (shakes head negatively) to anything that he felt she

12   lied about.

13       And, Doctor Hood, uh, he saw her in 2008 and said it was

14   a (shakes head negatively) one in -- one in 40 years, uhm, he

15   said that I told her she was permanently disabled.

16           THE COURT:  But he also said that he felt sorry for

17   her, he thought, and that that -- that he had -- he testified

18   that with regard to the cervical pain, there were no objective

19   indicators or problems of her subjective complaints.  Don't we

20   have a conflict in the evidence?

21           MR. ARVANETES:  Well, I think Doctor Hood also

22   testified that -- I mean, and -- well, let me finish my first

23   thought.  Doctor Hood testified, as well, that he viewed the

24   pathology of her, the history, and whatever records he had

25   available to him about her pathology, and that was the

1   surgeries, the stimulator, and, also, the -- I don't know what

2   he called it.  The touch test (indicating).

3        So, he also relied on the objective evidence.  And he

4   said that he is someone who never -- and, I mean, and it was

5   quite fascinating to hear him, he was a firm believer in work.

6   And he said he had -- I don't want to misquote him, but it was

7   something like one in 40 years.

8             THE COURT:  But he -- I understand that.  But he

9   also said that the stimulator was probably not necessary, that

10  the fusion surgery is pretty routine and that people recover.

11  You know, I --

12            MR. ARVANETES:  Uh-huh.

13            THE COURT:  How do we avoid a conflict in the

14  evidence that I have to resolve versus -- Rule 29 is a low

15  standard, the government hasn't even made a case.  I mean,

16  when the doctors -- I mean, they each testified that they

17  believe that Ms. Durand misled them, and you cross-examined

18  them and then cut into that.

19       You know, Doctor Strausser did not raise his hand.  I'm

20  not sure he understood specifically what he was supposed to

21  do, but he did not raise his hand, I agree with you on that.

22  And that potentially undermines his testimony on direct.  But

23  I think it creates a conflict, at best.  It doesn't completely

24  wipe out what he testified on direct.

25            MR. ARVANETES:  Well, and that's where the -- you

1  know, the OWCP, as the Court is aware, you know, sent forms

2  and -- every three years, and they were fine with that.

3      They also could have (shakes head negatively) --

4          THE COURT:  Sent forms to whom?  I mean, I haven't

5  seen these forms.

6          MR. ARVANETES:  Well, I haven't seen them, either,

7  frankly.  But according to him, forms are sent.  We -- (shakes

8  head negatively) I haven't seen the forms.  And if the

9  government had the forms, I assume they would have presented

10  them.

11          THE COURT:  Well, yeah.  But all I have is the

12  testimony from Agent Boynton that the forms were sent.  I

13  haven't seen the forms, I don't know what medical providers --

14          MR. ARVANETES:  No, exactly.

15          THE COURT:  -- examined -- examined Ms. Durand

16  between 2008 and 2015.

17          MR. ARVANETES:  And I haven't seen the forms, and I

18  don't know -- you know, and that's the government's burden

19  here.  And, so, --

20          THE COURT:  All right.

21          MR. ARVANETES:  -- I want to get into --

22          THE COURT:  But before we do, let's get back to the

23  five factors here.  The character of the defendant.  Now, I

24  assume what the court and -- and -- Judge Moon, in his

25  dissent, is worried about was because upstanding members of

1  the community are potentially going to be encouraged or

2  enticed to engage in criminal activity that they, otherwise,

3  would not.

4          MR. ARVANETES:  Correct.

5          THE COURT:  Okay.  So, I'm not impugning Ms. Durand

6  at all.  But the government -- the evidence shows that she was

7  on disability.  And there was a dispute back in '07 and '08,

8  and Doctor Strausser and Doctor Hood got involved when we had

9  Agent Harwood's (sic) surveillance.

10         MR. ARVANETES:  (Nods head affirmatively)

11         THE COURT:  So, doesn't that -- doesn't that

12 activity, the surveillance of Ms. -- I think it's Exhibit 69,

13 I believe, of Ms. Durand at home raise some question in the

14 government's mind about her capabilities?

15         MR. ARVANETES:  Well, and that's where I think they

16 could have -- well, yeah, either, A, the OWCP, between 2008

17 and 2017, or the Indictment time period, had the power to send

18 her to a doctor, just like they did to get a second opinion

19 after Doctor Strausser changed her work restrictions and sent

20 her to Doctor Hood.

21     Number two, --

22         THE COURT:  Well, wait.  Why do they have to do

23 that?  If they think it's incriminating -- I mean, if they

24 wanted to terminate her, maybe.  But this -- they think this

25 is criminal activity.

1    MR. ARVANETES:  No.  I'm saying within the

2    administrative process, the OWCP has the authority --

3    THE COURT:  Oh, I understand that.  But why -- why

4    is this -- what you're suggesting is that if someone works for

5    the post office, and they are a member of the union and they

6    have a grievance process and -- the post office believes that

7    the person is stealing stamps or something, your theory would

8    require them to go through the grievance process to discharge

9    them before they could refer the case for potential criminal

10   prosecution.  Isn't that what your argument is, that -- that

11   there was this administrative process for OWCP, the OWCP

12   failed to follow this administrative process, the OIG can't

13   get involved until that's done?

14   MR. ARVANETES:  I don't think they failed to follow

15   the administrative process.  Once she is on the Periodic

16   Rolls, after the claims examiner took the opinion of Doctor

17   Hood, she's on the Periodic Rolls and is considered totally

18   disabled.

19   THE COURT:  Well, yes.  But the government's theory

20   in this case is that she achieved that placement on the

21   Periodic Rolls through fraud or deceit or false statements,

22   and that she continued to make these false claims based -- in

23   Count III, based on those false statements in Count I.

24   MR. ARVANETES:  And my question is, is either the

25   OWCP, or in the ruse, the OIG, between -- I mean, we are

1    talking eight years (indicating) -- or a nine years
2    difference.  They could have either one -- there is no --
3    either one could have taken -- ordered her to a doc, and
4    neither of them did.
5              THE COURT:  They could have, but --
6              MR. ARVANETES:  So -- so, all we're using are these
7    videos that we, as lay people, are looking at and saying, "Oh,
8    my gosh, you know, she can pick up a canoe, or she can walk up
9    a hill."
10             THE COURT:  Right.  But, again, this is Rule 29.
11   And we have evidence that she is helping carry kayaks, and we
12   have testimony of witnesses that she paddled for six hours
13   without complaint.  I mean, doesn't that, at least, raise a --
14   make out at prima facie case -- that can be rebutted,
15   perhaps -- that she was not being forthcoming about the nature
16   of her impairments?
17             MR. ARVANETES:  (Shakes head negatively)  Your
18   Honor, that's very -- I mean, I respect the Court's question,
19   but I think when we -- we're not doctors, and we don't know
20   her pain tolerance.  Especially with the amount of
21   medication --
22             THE COURT:  No, we don't.  But I have to figure that
23   out as the finder of fact.  And this is a Rule 29.
24       Now, I want to get back to these five factors.  We were
25   talking about the character of the defendant.  And, to me, the

1    meth lab analogy, where the government provides the tools to

2    create the meth, you know, here's precursor chemicals, here's

3    your beaker, here's all of the stuff you need, the government

4    didn't go to Ms. Durand and say, hey, why don't you claim

5    permanent disability, go ahead and fake a back injury and

6    claim permanent disability.  She already was on disability.

7    Right?

8                    MR. ARVANETES:  (Nods head affirmatively)

9                    THE COURT:  You agree?  You're shaking your head.

10                   MR. ARVANETES:  She was on the Periodic Rolls, yes,

11   sir.

12                   THE COURT:  Yeah.  Right.  So, she's in now -- and,

13   again, not to cast dispersions on people on the Periodic

14   Rolls, but she's in this universe of people who are under the

15   microscope because they're on disability, isn't this more

16   analogous to the controlled buy of the drugs than the -- the

17   supply of the goods to create the drugs in the first place?

18                   MR. ARVANETES:  Well, and I go back to -- I -- I go

19   to Rule -- Page 9 of my brief, where I quote Black, United

20   States versus Black, which is a more recent opinion.  And it's

21   -- the cite is 733 F.3d 294.  It's the Ninth Circuit opinion.

22        And it says even though the Black court held no

23   outrageous government conduct occurred concerning the lab

24   factor, it still stated something significant to Ms. Durand's

25   claim -- case quoting United States v Emmert, "Law enforcement

1    conduct becomes constitutionally unacceptable where government

2    agents engineer and direct the criminal enterprise from start

3    to finish.  Generation of new crimes merely for the sake of

4    pressing criminal charges against the defendant also

5    constitutes outrageous government, at least where the

6    government essentially manufactured the crime."

7         And --

8              THE COURT:  Well, Mr. Arvanetes, the crime here --

9    the crime is not the kayak trip.

10             MR. ARVANETES:  But that's what the government, I

11   believe --

12             THE COURT:  No, that's evidence of the crime.  The

13   crime they allege is false statements.

14             MR. ARVANETES:  And I don't -- and we heard evidence

15   from the doctors.  If we want to get down to it, what did the

16   doctors say?

17        Doctor Strausser, first of all, you know, he didn't even

18   consider himself an expert; but, for the sake of the filings,

19   he was an expert.  And all he saw was a video, probably five

20   or ten minutes in between patients.  And when he saw the video

21   again, he could not say in any way that she lied.

22        Doctor Hood saw the videos 10 years later, or nine years

23   later, and said -- (shakes head negatively) you know, he said,

24   well, I only did it one in 40 -- one in 40 years, or

25   something, back in 2008.

1     And I don't know where it's relevant where he felt sorry

2     for her, because he's a doctor.  I don't think the Court can

3     rest the evidence on Doctor Hood's testimony that he simply

4     put her on permanent disability because he felt sorry for her.

5     I don't know where -- what basis he had for that.

6     But he saw the evidence, and he -- he was someone who was

7     not for putting people on total disability, and, yet, he did

8     at that time.

9     THE COURT:  Right.  But he also testified contrary

10    to that, that he did not see objective evidence in the imaging

11    or in his palpi -- he said there is a palpitation test that he

12    does where the muscles contract upon touch, he didn't see any

13    of that, he said.

14    He looks at reflexes, and he looks at atrophy, and that's

15    the lumbar region.  This is the objective criteria for the

16    lumbar region.  He said he saw none of that, that the imaging

17    studies didn't show anything.  It was the subjective

18    complaints of Ms. Durand, and he was persuaded by those

19    subjective complaints.

20    And he testified on direct that he felt sorry -- that he

21    must have felt sorry for her, and, therefore, came up with his

22    one in 40 year diagnosis of permanent disability at that

23    time.

24    MR. ARVANETES:  I don't -- but I would respectfully

25    submit to the Court that he -- he didn't only put her on

1    permanent disability, which he had never done, basically,

2    before in 40 years, on simply her statements, he did it --

3    yes, a lot of his examination, objective examination was

4    negative within the context of how pathology goes.

5         But, certainly, he did look at her history and her

6    injuries, which were severe, and he also testified that,

7    objectively, there existed certain pathology.

8              THE COURT:  What?  What?  What pathology?

9              MR. ARVANETES:  Well, uhm, the --

10             THE COURT:  With regard to the cervical, he explains

11   -- he said there is a normal range of motion.  That Ms. Durand

12   had a global give-way weakness for all muscles, which he found

13   unusual.  That typically someone who suffers from problems,

14   some muscles are stronger than others, he said that she

15   indicated that all muscles were weak.

16        The EMG, he conducted that study, normal results.  The

17   subjective complaints conflicted with the objective criteria.

18   And that was the cervical issue.  And he talked about the

19   fusion surgery.  He said -- he diagnosed Ms. Durand as

20   disabled.  Not sure why or what criteria, must have felt sorry

21   for Ms. Durand.

22        That's the testimony on direct.  Now, you cross-examined

23   him and undermined some of that.  But, again, this is a Rule

24   29, is there no case that the government has made out here?  I

25   mean, I think it's -- I think we are in the area of factual

1   disputes for me to resolve.

2       All the government has to do is make out a prima facie

3   case that Ms. Durand, with regard to the false statements, was

4   not forthcoming with her medical providers about her

5   activities.  And it showed that -- and I -- we have the video

6   from '08.  Now, Doctor Strausser testified that Ms. Durand's

7   conduct in the video conflicted with what she told him about

8   her abilities, and Mr. -- Doctor Hood testified that he did

9   not know about that video when he offered the second opinion

10  on Ms. Durand.

11          MR. ARVANETES:  And that was --

12          THE COURT:  That had he known, he didn't think he

13  would have found her disabled.  I think we have a conflict

14  with the evidence.

15          MR. ARVANETES:  Well, that was up to the claims

16  examiner.  And I don't know why he wasn't shown the video,

17  except for the fact that --

18          THE COURT:  Right.  Well --

19          MR. ARVANETES:  -- he didn't feel that that was

20  objective evidence, because the claims examiner only can go by

21  the medical claim -- medical objective evidence.

22          THE COURT:  Right.  Let's get back to the five

23  elements of entrapment here.  Your entrapment argument we are

24  talking about now.

25      So, the character of the defendant.  So, Ms. Durand had

1  filed a claim for disability, and there was some concern by

2  Agent Hayworth -- Agent Haywood --

3          MR. WELDON:  Your Honor, it's Haywood.

4          THE COURT:  Haywood.

5          MR. WELDON:  Yes.

6          THE COURT:  As to the voracity of that complaint.

7  Now, the government's role -- did the government make an

8  initial suggestion of criminal activity?  Again, you're trying

9  to focus the criminal activity on the kayak trip.  I don't

10  think that's the criminal activity.  I think that's potential

11  evidence.

12      The alleged criminal activity are the false claims for

13  her disability and the false statements to the medical

14  providers.  Right?

15          MR. ARVANETES:  Back in 2007 --

16          THE COURT:  Right.

17          MR. ARVANETES:  -- and 2008.

18          THE COURT:  Right.  The government didn't induce her

19  to file false claims, did they?

20          MR. ARVANETES:  No.  I would -- I would -- I would

21  submit that they weren't false claims.

22          THE COURT:  I know you do.  But the government

23  didn't induce her to make false statements to her medical

24  providers, and you don't think they were false statements --

25          MR. ARVANETES:  But I think the medical providers

1    were utilizing objective evidence.

2           THE COURT:  Well.  Okay, but --

3           MR. ARVANETES:  To come to their conclusion.

4           THE COURT:  But you -- you're claiming outrageous

5    government conduct, entrapment, and that's the kayak trip.

6    But the kayak trip isn't the crime.  The kayak trip is

7    potential evidence relating to the voracity of her statements

8    to the medical providers and the validity of her claims filed

9    for continued disability.

10          MR. ARVANETES:  Well, I go -- I mean, and the Court

11   is aware, in my brief, that I discuss, and starting on Page

12   11, A, B, C, D, E, concerning the entrapment and outrageous

13   government conduct.

14       "A" concerns what we would submit is retaliation.  And I

15   know it's in the light most favorable to the government.

16          THE COURT:  Right.  Ms. Bowi testified that she --

17   Ms. Durand claimed that she could not drive, so she couldn't

18   do the -- perform work as an RCA, because she could not drive,

19   Ms. Bowi testified that she saw Ms. Durand driving her husband

20   to work.  So, she was concerned about that.

21       Now, I -- there is a conflict in the evidence.  That's

22   not -- the government didn't induce Ms. Durand into driving

23   back in '07, did they?

24          MR. ARVANETES:  No.

25          THE COURT:  And, now, let's go to these other

1    factors on entrapment.  "The defendant engaged in activity for

2    profit."  You said, "No."  But she wasn't running a criminal

3    -- she wasn't running a drug operation, where she is making

4    money, but isn't she getting disability payments?  There's a

5    financial incentive for her to file these claims, right?

6          MR. ARVANETES:  Well, the entrapment, the government

7    -- the government's outrageous conduct concerns the five

8    factors from 11 to 14, but the entrapment, itself, argument

9    focuses on the kayak trip.  So, those are two separate legal

10   arguments.  So, she was not getting profit --

11         THE COURT:  Well, you have to entrap someone into

12   comitting their crime.  Why is the kayak trip a crime?

13   There's nothing illegal about going on a kayak trip.  She

14   wasn't, like --

15         MR. ARVANETES:  Because they are using it to go all

16   the way back to 2008 without any other medical evidence --

17         THE COURT:  They are using it as evidence to counter

18   her claims that she was disabled.

19         MR. ARVANETES:  Without any medical evidence, Your

20   Honor.  I mean, their -- how could it -- how can you go back

21   10 years -- how can you have a trip from 2015 and go back to

22   8, 9 -- or 7, 8 years and say she was committing fraud back

23   then, because of a video that, really, (shakes head

24   negatively) uhm, we don't know anything about it, we don't

25   know the context of anything, except that it was a video and

 1  that --

 2          THE COURT:  Which video?  The kayak trip?

 3          MR. ARVANETES:  The kayak trip.

 4          THE COURT:  What do you mean we don't know anything

 5  about it?  It's at the San Juan Islands, they traveled 6, 8

 6  hours a day.  We had the guide tell us about the trip.  What

 7  do you mean we don't know anything about it?

 8          MR. ARVANETES:  I'm talking about medical -- medical

 9  opinions about that kayak trip, about, uhm --

10          THE COURT:  I need a medical opinion about the kayak

11  trip?

12          MR. ARVANETES:  I think it's better than having us

13  look at the kayak trip and say, "Wow, she's great."

14          THE COURT:  Well, it's not nothing.

15          MR. ARVANETES:  I know.

16          THE COURT:  It's something.  But isn't it a conflict

17  of the evidence?

18          MR. ARVANETES:  It is.

19          THE COURT:  This is a Rule 29, again.

20          MR. ARVANETES:  I know.  I know.  (Nods head

21  affirmatively)

22          THE COURT:  So, I have to have a doctor that says we

23  looked at that kayak trip and said, "Well, someone who is

24  disabled shouldn't be able to carry that kayak, shouldn't be

25  able to engage in that activity"?  I can't look at that as a

1    lay person and say, "Huh, that doesn't sound like the same

2    person who is saying that she can't lift her arms."

3        I mean, it --

4            MR. ARVANETES:  I understand.

5            THE COURT:  Whether it's persuasive or not, I mean,

6    it's evidence that contradicts Ms. Durand's claims.  This is,

7    again, Rule 29.

8            MR. ARVANETES:  I respect -- I know.

9            THE COURT:  All right.  So, finish up on the

10   entrapment.  I -- Ms. Durand didn't engage in activity for

11   profit, but she was filing these claims to get money from the

12   government.  Right?  That's why you file a disability claim.

13           MR. ARVANETES:  She filed it in '03 and '05, yes.

14           THE COURT:  Yeah.  Well, and she kept filing and

15   getting money up through '16, through to the present.  And

16   you're telling me --

17           MR. ARVANETES:  And -- but she was put on the

18   Periodic Rolls.

19           THE COURT:  But, Mr. Arvanetes, you brought up these

20   five factors for entrapment, and you said Ms. Durand didn't

21   engage in activity for profit.  She's getting money for this,

22   right?

23           MR. ARVANETES:  I was focused on the kayak trip,

24   but, yes, that's --

25           THE COURT:  No, you laid out these five elements,

1    and I'm going to go through them.  The last one -- fourth is

2    "Whether the defendant showed reluctance to engage in the

3    activity."  Now, did Ms. Durand show any reluctance in filing

4    disability claims?

5              MR. ARVANETES:  Uhm, not that I know of, Your Honor,

6    no.

7              THE COURT:  Did she show any reluctance about going

8    on the kayak trip?

9              MR. ARVANETES:  Uhm, not that we've seen evidence

10   of, no.

11             THE COURT:  All right.  I mean, she might -- you

12   might have -- you might have evidence in your case, I haven't

13   seen it in the government's case.

14             MR. ARVANETES:  (Nods head affirmatively)

15             THE COURT:  "The nature of government's inducement."

16   Now, you were outraged about the $25,000 or so that they spent

17   on that trip, what do we spend -- what does the government

18   spend typically on investigations?  On these undercover

19   operations?

20             MR. ARVANETES:  Certainly, not that much, Your

21   Honor.  And, in fact --

22             THE COURT:  Well, wait a minute.  What do you mean

23   not that much?  I mean, I've had drug cases where they have

24   helicopter surveillance for hundreds of miles, they have got

25   video surveillance, they have got 10, 12 agents on the job,

 1    they have got -- you factored in the cost of the agents'

 2    salaries.  I mean --

 3             MR. ARVANETES:  He said that he never spent that

 4    much.

 5             THE COURT:  I don't -- we get some, you know, where

 6    some knucklehead up on the reservation gets charged with

 7    sexual assault and we send the evidence off to a crime lab, we

 8    fly people out to testify.  I mean, we spend thousands of

 9    dollars on prosecutions.  Routinely.  I mean, how is this

10    different?

11             MR. ARVANETES:  Uhm, just because they -- well, at

12    least, concerning the kayak trip, they, basically, from the

13    beginning, the middle, to the end, uhm, furnished her with

14    everything.  Even beyond that, with promises of future

15    opportunities.

16             THE COURT:  All right.  Let's go on, then, to your

17    -- 11 through 14, is that the -- is that the outrageous

18    conduct?

19             MR. ARVANETES:  Yes, Your Honor.

20             THE COURT:  Okay.  Let's go through those, as

21    well.

22             MR. ARVANETES:  We talked about A with supervisor

23    Bowi.

24             THE COURT:  All right.  And you think that was

25    retaliation.

1         MR. ARVANETES:  That's correct, Your Honor.

2         THE COURT:  Okay.

3         MR. ARVANETES:  But --

4         THE COURT:  And what -- on what do you base that

5    claim for retaliation?  What's it -- what's in --

6         MR. ARVANETES:  There is no evidence that that was

7    presented.  I mean, there is no evidence.

8         THE COURT:  I haven't seen any evidence.  You asked

9    Ms. Bowi if she had a problem with Ms. Durand, and Ms. Bowi

10   said no.

11        MR. ARVANETES:  I understand that.

12        THE COURT:  So, and if you wanted to present it in

13   your case, that's fine; but, up to this point, I can only rely

14   on what's been presented in the government's case and your

15   cross-examination.

16      All right.  What about the Haywood investigation?

17        MR. ARVANETES:  The Haywood investigation, uhm, we

18   would submit that he violated his own OIG investigative

19   techniques to get Doctor Strausser to change his opinion with

20   the video from the undercover investigation.

21      We know that --

22        THE COURT:  All right.  Well, hold on.  That he

23   violated his investigative technique.  He may have violated

24   the administrative process for removing Ms. Durand from the

25   Rolls of the permanently disabled, but did he really cross

1   some line in terms of the improper criminal investigation?

2         MR. ARVANETES:  Well, he didn't have a HIPAA form,

3   Your Honor.  I mean, that's -- I mean, if -- I mean, if we are

4   to look at outrageous conduct, we should be allowed to look at

5   the fact that if they are ignoring their own administrative

6   policies, just simply ignoring them.  (Shakes head negatively)

7         I mean, there is no -- there was no HIPAA.  At least the

8   evidence showed that he could not produce a HIPAA form, for

9   example.  He did not show this video to the client ahead of

10  time.  And, basically, whatever way, at that time had Doctor

11  Strausser change his opinion.

12        But as we saw Doctor Strausser a few days ago, uhm,

13  (shakes head negatively) we gave him a chance to say where is

14  the lie?  He didn't do it.

15        THE COURT:  All right.  Now, the third thing, you

16  talk about the "Interim Period," that the --

17        MR. ARVANETES:  Right.

18        THE COURT:  -- DOL ignored Agent Harwood's (sic)

19  attempts and sent Ms. Durand to see Doctor Hood.

20        MR. ARVANETES:  Right.

21        THE COURT:  Why is that outrageous?

22        MR. ARVANETES:  Well, the part -- well, it is

23  foundation to where I get to the outrageous, in the interim

24  period, DOL, for whatever reason, didn't feel that they were

25  going to go with Doctor Strausser's opinion.  We heard

 1    evidence that the employee has a right to choose her own

 2    doctor, which she -- without any lawyer, as the Court is

 3    aware, this is -- they don't have lawyers, they have to

 4    rely -- I mean, they have to rely on themselves, because they

 5    consider it a nonadversarial system.  Which, you know, is --

 6    is -- I would question.  But, nevertheless --

 7              THE COURT:  You would question what?

 8              MR. ARVANETES:  That it's a nonadversarial system,

 9    when, in fact, we have people videotaping and doing things

10    like that to try and catch them up on things.

11              THE COURT:  What does that have to do -- it's a

12    no-fault system.  There are, certainly --

13              MR. ARVANETES:  Well, a lot of people -- a lot of

14    people don't have lawyers, and a lot of people, when they

15    don't have lawyers, and we know in our Native American cases,

16    you know, the absurdity of Bryant, for example, when people

17    are pleading just to get out of jail --

18              THE COURT:  Well, wait --

19              MR. ARVANETES:  -- without --

20              THE COURT:  Wait a minute.

21              MR. ARVANETES:  -- lawyers.

22              THE COURT:  Wait a minute.  Ms. Durand did not have

23    a lawyer, was she precluded from having a lawyer throughout

24    this process in the work comp system?

25              MR. ARVANETES:  No.  She had to buy or she had to

1    pay for her own lawyer.

2              THE COURT:  Okay.  I'm not aware of any civil system

3    that has the Gideon requirement, are you?

4              MR. ARVANETES:  No.

5              THE COURT:  So, what's out -- what's so outrageous

6    about it?  I mean, she has -- if she -- if she wants a lawyer

7    and can afford one, she can hire one.  And they work on a

8    contingency fee, typically, I understand, but didn't she have

9    the ability to hire a lawyer?

10             MR. ARVANETES:  As the Court is aware, in Federal

11   Workers' Comp it's not a -- it's totally different than State

12   Workers' Comp.  They don't get a contingency fee, they don't

13   do any of that.

14        But, yeah, she can hire, she can pay 10, $50,000, get a

15   lawyer.  But she didn't.  She was able to just somehow say,

16   "Wait a second, I have a right to my own doctor to review

17   this."  They didn't believe -- or at least they felt it

18   important to get a second opinion.  They used Doctor Hood, who

19   was the one-shot doctor, and, of course, put her on the

20   Periodic Rolls, for which she's on.

21        And, then, D, mileage investigation.  Uhm, we have a

22   situation where, you know, there is an alleged $1,800 fraud

23   claim.  Uhm, and whether it was accepted or not by the U.S.

24   Attorney's Office --

25             THE COURT:  What's wrong with investigating the

1   mileage fraud that Mr. -- or Agent Boynton --

2          MR. ARVANETES:  It's what came after.  I would argue

3   that it's what came after.  The fact that we are sitting here

4   talking about, with forfeiture, a potential 1.21 -- $1.25

5   million fee, compared to $1,800 is --

6          THE COURT:  Well, wait.  As I understand Agent

7   Boynton's testimony, he had -- one of his jobs was to look

8   at -- try to reduce the Postal Service's liability for these

9   payments to the Department of Labor for people who are on

10  Workers' Compensation, and so he would look at -- for unusual

11  cases.

12      And Ms. Durand, as he testified, had about 60 claims for

13  mileage over a long period of time, and he thought that

14  unusual, so he dug in further and determined that he could not

15  verify 34 of the 60 claims.

16          MR. ARVANETES:  Correct.

17          THE COURT:  That's what got him started on the

18  investigation.

19          MR. ARVANETES:  And he approached the U.S. Attorney

20  with that.  (Nods head affirmatively)

21          THE COURT:  So?  He approached the U.S. Attorney,

22  who said we will investigate further.  What's wrong with that?

23  Why is that -- I don't -- I don't see the outrage there.

24          MR. ARVANETES:  It wasn't just investigating

25  further, it was to see if we can do some surveillance.

1  THE COURT:  Well, wait a minute.  They have --

2  they're -- they think they have got the tip of the iceberg,

3  why can't they surveil?

4  MR. ARVANETES:  That's -- that's fine.  But we get

5  to the -- I don't know, the -- almost a Kafkaeesque situation,

6  where -- where --

7  THE COURT:  Wait -- wait a second.

8  MR. ARVANETES:  Because of one -- because of one

9  three-day trip, they are now going all the way back to 2006

10 and claiming $1.2 million in damages.  It just is --

11 THE COURT:  One three-day trip that the government

12 believes provides the evidence that Ms. Durand wasn't truthful

13 back in 2000-whatever, and that she wasn't truthful after the

14 fact when she spoke to the undercover agent and said that she

15 couldn't move, that the kayak trip was fun but it was too

16 hard, and minimized the activities involved.

17 MR. ARVANETES:  (Pause)

18 THE COURT:  I mean, I --

19 MR. ARVANETES:  And -- but -- and it's okay.  If she

20 wasn't truthful for three days, and she was committing fraud

21 for, maybe, that month, if they want to allege that.  I mean,

22 I still wouldn't agree with that, but at least I would find it

23 more rational than somehow going back to 2006.

24 THE COURT:  Well -- okay.  Your argument is that

25 the -- as I understand it, that the kayak trip may cast doubt

1   upon her disability in 2016, but it should not be used to cast

2   doubt on her disability in 2006.

3            MR. ARVANETES:  And -- and beyond.  I mean, how can

4   that -- how can -- who, here, in the government case, said

5   that somehow her -- uhm, her body adjusted, got better,

6   adjusted to the medication in ten years -- or nine years

7   between '06 and 2015?  Nobody.

8       They are taking three days and saying -- that picture of

9   three days and saying, well, heck, she was lying way back in

10  -- nine years ago.  That's --

11           THE COURT:  Hold on.  What about Exhibit 69, the

12  video of Ms. Durand walking around her property?

13           MR. ARVANETES:  And what about it?  I mean, Doctor

14  Strausser didn't find anything wrong with it.

15           THE COURT:  Doctor Strausser testified on direct

16  that Ms. Durand said that she couldn't do anything, that she

17  couldn't bend over, she couldn't squat down.  I mean, I

18  thought the sheer venality of Exhibit 69 was its most powerful

19  fact.  That Ms. Durand is walking and getting the mail, she is

20  bending over picking up her dogs, she is doing things that

21  people do all of the time.

22      It wasn't nothing dramatic, she wasn't skydiving or

23  kayaking or doing some crazy activities, but she was just

24  walking around doing things that people do in their daily

25  lives.  And the government's witnesses testified and we have

 1   forms showing -- that she filed and signed -- that she

 2   couldn't do those things.

 3        Now, that's a snapshot in time, I agree, but --

 4             MR. ARVANETES:  Well, I --

 5             THE COURT:  -- it's further evidence that ties

 6   together the kayak trip in '08.  I mean, and you can try to

 7   undermine it in your case.  This is Rule 29.  Again, the

 8   government --

 9             MR. ARVANETES:  Well, and --

10             THE COURT:  -- has put their evidence on, and they

11   have to provide evidence to support each element of the

12   offenses.

13             MR. ARVANETES:  I asked Doctor Strausser this

14   question, "Did you say that she couldn't lift a bucket?"  "Did

15   you say she couldn't do whatever the banality was?"  He said,

16   "No."  So, we can conflate her report -- or Strausser's report

17   of what she said, or what he said she -- she could do.  But

18   we're conflating now what she did in the video, which was not

19   in his report.  (Indicating)  We're conflating the two, and I

20   think that's dangerous.

21             THE COURT:  Conflating which two?

22             MR. ARVANETES:  The 2007 videos and his report.  I

23   asked him, "Did you ever say that -- did you ever ask her was

24   she lifting buckets?"  "Did you ever ask her was she riding a

25   mower to carry -- or whatever it is, to carry something on the

1    back?"  "Did you ever ask her whether she was doing X, Y, or

2    Z?"  He said, "No."  (Shakes head negatively)

3                THE COURT:  Well.  Yeah, those specific things.

4                MR. ARVANETES:  Yeah.

5                THE COURT:  But he testified that she said that she

6    couldn't -- that she couldn't do anything.

7                MR. ARVANETES:  Well.  But, you know, she is not

8    going to -- again, I think we're -- my argument is that we are

9    conflating the two.  She's not going to just sit in a chair.

10   I mean, that's not what total disability is under the OWCP.

11   It's not like she can't --

12               THE COURT:  Well --

13               MR. ARVANETES:  -- just live.

14               THE COURT:  Well, Mr. Arvanetes, that's what Ms.

15   Durand testified -- or told the undercover agents, "I sit in a

16   recliner most of the day."  This is 2016.

17               MR. ARVANETES:  I'm talking -- right.  But we're

18   talking about 2008, Strausser's report versus the video.

19   That's what I'm talking about.

20               THE COURT:  Okay.  So, but we're trying to -- the

21   government has this -- has this evidence now.  You can argue

22   that it's tenuous that her condition in 2016 should be applied

23   back to her condition in '08, but it is evidence, and that --

24   that -- that's their case.

25               MR. ARVANETES:  I agree.  I agree.  I agree.

1          THE COURT:  All right.  What else do you have,

2     besides the outrageous conduct and the entrapment?

3          MR. ARVANETES:  Well, Sub (e) on Page 12, the kayak

4     trip ruse.  Uhm, and we argued a little -- or we argued --

5          THE COURT:  We discussed that.

6          MR. ARVANETES:  We discussed the -- and that went --

7     I mean, we've already discussed it, basically, under the

8     entrapment factors, that they pretty much controlled the

9     whole -- the whole thing.

10       I mean, they controlled -- they controlled, obviously,

11    what she did, but calling her a "mystery shopper," for

12    example, her comments may be used later on.  You know, I mean,

13    you can get free trips.  Encouraging her to be --

14         THE COURT:  Well, Mr. -- Mr. Arvanetes, --

15         MR. ARVANETES:  I know.

16         THE COURT:  -- we have evidence.  You saw the

17    questions from the undercover agent directly to Ms. Durand,

18    and test -- she was on the video saying, "I'm in a recliner

19    most of the day, I've got terrible pain, it's very

20    discouraging to me."  That was what she said when asked

21    direct.  So, the government thinks that's not truthful, so

22    they use surreptitious means to try to -- to try to challenge

23    those things.  What's wrong?

24         MR. ARVANETES:  And there's -- and I understand it's

25    in the light most favorable to the jury --

1      THE COURT:  The government.

2      MR. ARVANETES:  -- or to the government, uhm, but

3  that was getting into my question of actual conflating

4  (indicating) a regular day versus this opportunity to be

5  outside, to be on her medication, but at the same time --

6      THE COURT:  Well, Mr. Arvanetes, if sunshine had

7  that kind of effect on people, we would bottle -- someone

8  would have patented it by now and made a fortune.  I mean, if

9  that's your claim, is that she was outside enjoying the sun?

10      MR. ARVANETES:  On medication, too.  And we had Mr.

11  Boynton --

12      THE COURT:  Well, and had the doctor testified that

13  -- Doctor Hood testified that someone on that kind of

14  medication would be a "zombie," in his words.

15      MR. ARVANETES:  Sure.  Sure.  If I took that

16  medication right now, I probably would be.  But after -- who

17  knows.  After the years that she's taken it, tolerance --

18      THE COURT:  Well, there was some --

19      MR. ARVANETES:  I don't know.

20      THE COURT:  I think, Agent Boynton, on

21  cross-examination, you asked him about the statement that Ms.

22  Durand said, "I'm in some pain, I didn't take my second dose

23  of medication," --

24      MR. ARVANETES:  Right.

25      THE COURT:  -- and that she was okay after that.

1      MR. ARVANETES:  Right.

2      THE COURT:  And Ms. -- the kayak instructor said

3  that she didn't seem impaired in any way.

4      MR. ARVANETES:  Yeah.  I mean, so, I agree.  The

5  Court can't take it in a bubble.  I mean, we have to take it

6  in reality.

7      THE COURT:  There's a conflict in the evidence that

8  I have to resolve.

9      MR. ARVANETES:  And we're not in a bubble.  So, she

10  was on medication, and she was -- the sunshine was a factor.

11      THE COURT:  Well, how do we know?  I haven't heard

12  any evidence that she was on medication.  The only thing I

13  have is -- on the record is --

14      MR. ARVANETES:  Well, Boynton's testimony.

15      THE COURT:  Right.  I mean, that she took -- needed

16  to take her meds.  It wasn't the whole regimen.  We don't know

17  what it was.

18      MR. ARVANETES:  I understand.

19      THE COURT:  If you want to put on evidence to that,

20  we can -- I'll consider it.  But, right now, all I have is one

21  statement about that she needed to take her meds and she felt

22  better afterwards.

23      MR. ARVANETES:  May I have a moment, Your Honor?

24      THE COURT:  You may.

25      MR. ARVANETES:  (Viewing documents)  I do have a

1    note, and, maybe, I got Doctor Hood's testimony wrong, uhm,

2    but he said something like one in 40 years I don't think I've

3    -- have ever said that someone was totally disabled.

4    Something to that effect.  Uhm...

5            THE COURT:  But he also said it was at that time.

6    And --

7            MR. ARVANETES:  Right.

8            THE COURT:  -- that, in his view, that she would

9    improve.  And he also said that he relied upon her subjective

10   statements.

11           MR. ARVANETES:  Although, Exhibit -- remember

12   Government's Exhibit 18, which I know that he didn't like, but

13   Government Exhibit 18 said -- quoted him saying he didn't --

14   she wasn't going to improve.

15           THE COURT:  Well, he said that Government's Exhibit

16   18 quoted him -- or disregarded his statement and his

17   diagnosis, and said "at that time."

18           MR. ARVANETES:  Yeah.  And I don't understand what

19   that even means.  I mean, "at that time" --

20           THE COURT:  It means people's conditions can

21   improve.  He said, recovery periods, in his experience, people

22   get better over time, and he thought that Ms. Durand might be

23   in that group of people who get better over time.

24           MR. ARVANETES:  And it would have been -- again,

25   this is the government's evidence, (shakes head negatively) we

1  don't have any medical evidence whether she improved over

2  time.

3  　　　　　THE COURT:  Well, we have the evidence that she's

4  kayaking, don't we?

5  　　　　　MR. ARVANETES:  Yeah, but that's not medical

6  evidence.

7  　　　　　THE COURT:  Yeah.  But, I mean, that's evidence.

8  What do you mean "medical evidence"?  I mean, Ms. Durand says

9  I can't get out of the recliner, and here she is kayaking

10  across the San Juan Islands.  That's evid -- it's evidence.

11  　　　Now, you -- you can argue that it isn't sufficient to

12  meet beyond a reasonable doubt --

13  　　　　　MR. ARVANETES:  I understand.

14  　　　　　THE COURT:  -- because of these criteria, but I

15  think it makes out a prima facie case on a Rule 29.

16  　　　　　MR. ARVANETES:  All right.  Okay.

17  　　　　　THE COURT:  Anything else?

18  　　　　　MR. ARVANETES:  No, sir.  Thank you.

19  　　　　　THE COURT:  All right.  I'll hear from Mr. Weldon.

20  　　　Mr. Weldon, where do I find anything in the record about

21  these -- I mean, you're claiming hundreds of thousands of

22  dollars in false medical payments, where do I find any record

23  about that?

24  　　　　　MR. WELDON:  For the false medical payments, Your

25  Honor?

1          THE COURT:  Yes.

2          MR. WELDON:  So, Ms. Durand, for example, when she

3   was claiming that she was unable to work, those were the

4   payments that she was receiving from OWCP.

5          THE COURT:  No, I'm not talking about the --

6          MR. WELDON:  For the wages.

7          THE COURT:  -- wages, I'm talking about the medical.

8   You've got $300,000 in wages, and $300,000 in false medical

9   payments, wasn't it?

10          MR. WELDON:  That is correct, Your Honor.  And

11   you'll see --

12          THE COURT:  Where in the record is there evidence of

13   the false medical payments?

14          MR. WELDON:  That is only for the component of the

15   forfeiture allegation, Your Honor.

16          THE COURT:  I know.  But -- okay, but where is it?

17          MR. WELDON:  Well, the medical record -- for the

18   amounts that she's claimed?

19          THE COURT:  Yeah.

20          MR. WELDON:  Oh.  That was from Agent Boynton, Your

21   Honor, the amount.  Now --

22          THE COURT:  But he said -- he gave a ballpark figure

23   of -- a total of $800,000.

24          MR. WELDON:  Correct.

25          THE COURT:  But 424 for false medical.

1    MR. WELDON:  (Nods head affirmatively)

2    THE COURT:  Where is the documentation for that?  To

3    whom were these paid?

4    MR. WELDON:  Well, that was paid to the doctors,

5    Your Honor.

6    THE COURT:  Right.  But where is that -- is that

7    evidence in the record?  Beyond the testimony of Agent

8    Boynton?

9    MR. WELDON:  No, it is not, Your Honor.  So, you

10   have the testimony as to the amount that was paid.

11   THE COURT:  Right.  But how -- how can I evaluate

12   it?  I mean, we're all -- your view is that all of these

13   visits were fraudulent?

14   MR. WELDON:  Well, I think that goes more to the

15   forfeiture allegation, Your Honor.  So, those were based on

16   the initial claim and the amounts that she was receiving.

17   THE COURT:  All right.  Well, we can wait -- or I

18   can talk to you about it in closing arguments.

19   MR. WELDON:  Correct, Your Honor.

20   THE COURT:  But I have some concern about looking at

21   those individual claims and the amounts involved.

22   MR. WELDON:  And, Your Honor, I think that that is

23   completely a valid claim, when we're talking about the wire

24   frauds, for example, but that's not the thrust of the

25   government's claim.

1           THE COURT:  The wire frauds are the wage payments.

2           MR. WELDON:  Correct.  And, so, when we talk about

3    forfeiture, then, that's when we get into the total amount.

4           THE COURT:  Okay.  So, let's talk about the wire

5    fraud.  Did -- is this for each payment Ms. Durand received,

6    or was she having to file claims the whole time?

7           MR. WELDON:  She was having to file claims the

8    entire time.

9           THE COURT:  How often?

10          MR. WELDON:  It would be on a regular basis

11   throughout the time period, Your Honor.

12          THE COURT:  What does that mean?  Every month?

13   Every week?  Every year?

14          MR. WELDON:  It would be throughout the allegation.

15   So, yes, it could be up to every week, but it varied each

16   time.  You have the ECFs, for example, that's Government's

17   Exhibit 51.

18          THE COURT:  And what's "ECF"?

19          MR. WELDON:  Or it's 55.  Those are the payments

20   that she was receiving based on her compensation, Your

21   Honor.

22          THE COURT:  All right.  Oh, that's the -- that's the

23   summary.

24          MR. WELDON:  Correct.  And, so, what we have in the

25   records, just so the Court's aware, is we have a stipulation

1    for the wire fraud, that the wires were created.

2              THE COURT:  Right.

3              MR. WELDON:  So, really, what we're talking -- they

4    don't stipulate to fraud, obviously.  So, the question is

5    whether or not it was fraud, not whether or not there were

6    wires in furtherance, because the defense has already

7    stipulated to that.

8              THE COURT:  All right.  So, let's go ahead to Mr.

9    Arvanetes's argument.  How do you tie in activity from 2016

10   back to 2008?  I mean, I understand your theory is that Ms.

11   Durand's claim got lost in the shuffle here, that she moved

12   from Texas to Montana to Idaho.

13             MR. WELDON:  (Nods head affirmatively)

14             THE COURT:  And that, after she went on PN status,

15   no one followed up --

16             MR. WELDON:  Correct.

17             THE COURT:  -- until Agent Boynton started going

18   through the list of people on disability.

19             MR. WELDON:  Yes, Your Honor.

20             THE COURT:  So, if I were to believe your theory, in

21   2016 she is out kayaking, she's in great shape, she clearly is

22   not disabled.

23             MR. WELDON:  Yes, Your Honor.

24             THE COURT:  How does that relate back to her

25   condition in '09 and '10 and '11?  You know, maybe -- Doctor

1   Hood said that she got better over time, and that, then,

2   somewhere along the line, having been fully disabled at that

3   point, as Doctor Hood testified, that she healed sufficiently

4   to move beyond that.

5       I mean, why should I -- why should I say -- instead of

6   going back to '06, say that the kayak trip invalidates

7   everything back to '08?

8           MR. WELDON:  Well, the reason for that, Your Honor,

9   is, really, we're talking about bookends.  So, we have

10  evidence on both sides.  We have Doctor Hood's testimony.  And

11  I know that the Court has and will have a transcript, but, as

12  I recall Doctor Hood's testimony, he did make statements that

13  Ms. Durand was disingenuous about whether or not she could

14  stand, walk, squat, those types of activities.  And he said

15  that had he known that she could do those things, he would

16  have put her on work restrictions.  Also, had he known that

17  she was out jogging and doing various activities, he certainly

18  would have put her on work restrictions.

19          THE COURT:  Well, let's look at this from Mr.

20  Arvanetes's viewpoint.  She goes, she files a claim, and it's

21  initially accepted by Doctor Strausser.  And there's a

22  concern, it gets denied, and she's sent for a second

23  opinion.

24          MR. WELDON:  Correct.

25          THE COURT:  Okay.  She goes to see Doctor Hood, and

1  he says, "You're disabled at this point."

2         MR. WELDON:  Yes.

3         THE COURT:  She doesn't know that Doctor Hood didn't

4  see the video of her walking around her property.

5         MR. WELDON:  That's correct.

6         THE COURT:  He says --

7         MR. WELDON:  Walking --

8         THE COURT:  Hold on.  He says -- Doctor Hood says,

9  "You're disabled," and she says, "Okay, I'm disabled."  And

10  then she goes on with her life, and figures, well, I'm

11  disabled, I'm not going to work anymore.

12         MR. WELDON:  (Nods head affirmatively)

13         THE COURT:  I'm going to do all I can, though, to

14  improve my quality of life, and she improves over time.  Where

15  is the crime?

16         MR. WELDON:  Why did Doctor Hood have his second

17  opinion saying that she was totally disabled?  It was based on

18  her subjective complaints about her level of pain and her

19  inability to do certain activities.

20      And, really, Your Honor, the important point of this case

21  for Workers' Comp is you have to trick the docs.  That's where

22  it all begins.  Because you heard numerous questions with the

23  Department of Labor and with the U.S. Postal Service about

24  that they are going to weigh the medical evidence, but they

25  are not doctors.

1    So, once you trick the doctors, and you make them feel

2    bad for you and they say that you're totally disabled, now you

3    are on the Periodic Rolls, you're going to be put into the PN

4    status.  You move around a little bit, that way your file is

5    lost in the shuffle, and you're essentially hitting the

6    lottery of Workers' Comp.

7    THE COURT:  All right.  How do you respond to Mr.

8    Arvanetes's claims about the outrageous conduct?  You know,

9    that she was entrapped here, and the kayak trip is a ruse,

10   that she was just minding her own business before then?

11   MR. WELDON:  The interesting point about this case

12   is that it's one of those situations where if the government

13   turns left, it's wrong; if the government turns right, it's

14   wrong; if we go forward, it's wrong; if we go backwards, it's

15   wrong.

16   The reason that I say that, had there not been the

17   kayaking trip, for example, then they would just simply be

18   saying that you can't prove the case, and this is purely just

19   evidence of the crime.

20   And I do want just to address some of these factors,

21   because I think they're important.  And Mr. Arvanetes's brief

22   outlined those factors, I don't have any dispute with those,

23   but I can see right now that the character reputation of Ms.

24   Durand, that's why we went back to 2006.  The government is

25   not saying that the kayaking trip is the crime, it is evidence

1 of the crime that was continuing.

2        So, the character reputation, she was lying to her

3 doctors right from the very beginning in 2006; and that

4 continued all the way up until 2015, when she had the kayaking

5 trip.

6        Whether the government made the initial suggestion of the

7 criminal activity.  Nobody from the federal government told

8 her that it was acceptable or that she could lie to the

9 doctors in order to obtain benefits.  That was something that

10 Ms. Durand did entirely on her own.

11        Whether the defendant engaged in the activity for profit.

12 She received over $600,000 in benefits.  And, in fact, she

13 didn't even have to pay taxes on any of that.

14            THE COURT:  Okay.  Wait a second.  How did she

15 receive a benefit from the government paying a doctor?

16            MR. WELDON:  Well, how did she receive a benefit for

17 the -- she doesn't have to pay that, then, Your Honor.

18            THE COURT:  No.  I know.  But, I mean, it's more

19 like she -- the payment to the doctors justifies the continued

20 payment to her.

21            MR. WELDON:  Correct.

22            THE COURT:  Maybe there is a total loss to the

23 government of the $600,000.

24            MR. WELDON:  Correct.

25            THE COURT:  But her benefit is 300-and-whatever

1  thousand.

2          MR. WELDON:  Correct.  I agree with that.  I believe

3  that that's accurate, Your Honor.

4          THE COURT:  Okay.

5          MR. WELDON:  So, but, certainly, $300,000, if you

6  told a general American within the United States that they

7  were going to receive $300,000 and they didn't need to show up

8  for work, I expect they would consider that a profit.

9      Whether the defendant showed any reluctance.  There was

10  no reluctance, that's in the record, of any kind.  Ms. Durand,

11  in fact, if you will recall, in one of the exhibits stated,

12  "Please consider me for any and all other areas, I

13  particularly like Washington and Alaska."

14      And then the nature of the government's inducement.  This

15  was simply at the end where we were proving the crime.  We

16  have the bookend, where we had the initial lies told to the

17  doctors, and then we have the follow-up interview where it

18  confirms that Ms. Durand is making those same claims to her

19  doctor.

20      Now, the statement was made that the government could

21  have brought in other doctors.  And, sure, we could have

22  probably marched in a million different doctors.  But the

23  Court has evidence from 2008, where Doctor Hood was lied to,

24  and then you have in 2015, the undercover interview, where Ms.

25  Durand is making those same lies.

1    And, of course, then you have between the time period,

2  her neighbors, for example, explaining that almost over a

3  three-year period that she was very active, and Ms. Drescher

4  told the Court that she was a little jealous and impressed

5  with Ms. Durand and how active she was.

6    I do think it's also important, Your Honor, to just

7  address the -- what entrapment is not.  And I found the

8  elements, and I agree with these, again, that Mr. Arvanetes

9  cited, and why the government's conduct is not outrageous.

10    And the first one proves it, I think, the clearest, "The

11  defendant was already involved in a continuing series of

12  similar crimes or the charged criminal enterprise was already

13  in progress at the time that the government agents became

14  involved."  At the time that the kayaking trip occurred, this

15  had been going on since 2006, as alleged by the United States.

16    And, then, finally, Your Honor, the -- I think the real

17  problem with the defense and why this is something I just want

18  to address now, we're in a totally different realm.  When

19  we're talking about the administrative side, and OWCP and how

20  they administer their claims on that administrative side, we

21  can talk about the Code of Federal Regulations all day long.

22  That's not what we are talking about here.  We are in a

23  federal criminal trial.  We have the Office of Inspector

24  General investigating fraud claims.  So, how OWCP deals with

25  those claims in the administrative side does not deal with the

1  criminal side of the fraud scheme that the United States has

2  alleged.

3          THE COURT:  All right.  Okay.  Thank you,

4  Mr. Weldon.

5          MR. WELDON:  Thank you, Your Honor.

6          THE COURT:  This is a Rule 29 motion, I must view

7  the evidence in the light most favorable to the government.

8      With that standard, I believe the government has

9  presented a prima facie case with regard to Count I, the false

10  statements.

11      The doctors testified about what Ms. Durand told them.  I

12  think the neighbors testified as to Ms. Durand's activities.

13  These were undermined by the defense on cross-examination,

14  which creates an issue of fact for me to resolve at the

15  conclusion of the case.

16      With regard to Count II, we have stipulations that

17  payments were made, if they were made based -- if the wire

18  transfers were made, if those were made upon false statements

19  and false claims filed, I think the government meets its

20  burden under Rule 29.

21      Count III are the false claims.  Again, these are claims

22  filed based upon what the government alleges were false

23  statements to doctors about her medical condition.  I think we

24  have an issue of fact to resolve there.

25      And, finally, the theft of government property.  That's

1    the same issue, whether Ms. Durand provided false statements

2    to her medical providers.

3        I think we have issues of fact for me to resolve at the

4    conclusion of the case, so the government survives the low

5    hurdle of a Rule 29 motion.

6        I'm going to deny the motion at this time, as well, as to

7    the motions under Rule 29 based upon outrageous government

8    conduct or entrapment.  I don't believe that the government

9    induced Ms. Durand into filing false claims.  The government

10   induced Ms. Durand into taking the kayak trip, which the

11   government contends represented evidence to show that her

12   claims to her medical providers were not accurate.

13       So, I'm going to deny the Rule 29 motion and proceed to

14   the defense's case.

15       Anything else, Mr. Weldon?

16           MR. WELDON:  No, Your Honor.  Thank you.

17           THE COURT:  Mr. Arvanetes?

18           MR. ARVANETES:  No, sir.

19           THE COURT:  All right.  Do we have Doctor Ellis

20   available?

21           CLERK OF COURT:  We do, yes, Your Honor.

22           MS. HUNT:  Yes, Your Honor.

23           THE COURT:  Okay.  Why don't we take a break and get

24   Doctor Ellis hooked up, and let me know when you're ready to

25   continue.  Thank you.

 1      MS. HUNT:  (Nods head affirmatively)

 2

 3                    **(Recess taken.)**

 4

 5      THE BAILIFF:  The United States District Court is

 6  again in session.

 7      THE COURT:  Please be seated.

 8    Mr. Arvanetes, are you ready to proceed with the

 9  defense's case?

10      MR. ARVANETES:  Yes, sir.

11      THE COURT:  All right.  Call your first witness,

12  please.

13      MS. HUNT:  We call Doctor John Ellis.

14      CLERK OF COURT:  Please raise your right hand.

15

16              **(The witness was duly sworn.)**

17

18      THE WITNESS:  I prefer to affirm, and I do so

19  affirm.

20      THE COURT:  Good morning, Doctor Ellis.  Would you

21  please state your full name and spell your last name?

22      THE WITNESS:  John Wesley Ellis, E-L-L-I-S.

23      THE COURT:  Go ahead, Ms. Hunt.

24      MS. HUNT:  Thank you.

25

1 **DIRECT EXAMINATION**

2 **BY MS. HUNT:**

3 Q. Good morning, Doctor Ellis.  So, before, just a bit of

4 logistics, if at any point you have trouble hearing me or we

5 have trouble hearing you, we might just have to adjust

6 accordingly.  But (nods head affirmatively) Could you begin by

7 telling us how you're employed?

8 A. I work in Occupational and Legal Medicine stationed in

9 Oklahoma City.

10             MR. ARVANETES:  Your Honor, I can't --

11             THE WITNESS:  I work -- (audio interruption)

12             MR. ARVANETES:  Can you turn it up?  I'm having

13 trouble hearing.

14             THE COURT:  Hold on, Doctor Ellis.

15        Madam clerk, could you turn up the volume?

16             CLERK OF COURT:  We are maxed.

17             THE COURT:  Okay.  Doctor Ellis, I'm sorry.  Could

18 you make sure that you speak clearly and close to the

19 microphone?

20             THE WITNESS:  Yes.  The microphone is above my

21 monitor.  Can you hear me now?

22             THE COURT:  That's much better.  Thank you, sir.

23        Go ahead, Ms. Hunt.

24             MS. HUNT:  Thank you.

25 **BY MS. HUNT:**

1    Q. So you said you we're employed in occu -- occupational

2    medicine; is that correct?

3    A. Occupational and Legal Medicine in Oklahoma City, yes.

4    Q. Okay.  And what licenses do you hold?

5    A. I have a license for Medicine in the state of Oklahoma.

6    Q. And how about your certifications?

7    A. I am board certified under the American Board of

8    Environmental Medicine, the American Board of Family Medicine,

9    I have fellowships in the American Academy of Family

10   Physicians, the American Board of Stability Analysts, the

11   American Board of Forensic Examiners, the American College of

12   Forensic Examiners and the American College of Occupational

13   Environmental Medicine.

14       I have professional certifications in the American Board

15   of Disability Analysis, the American Board of Forensic

16   Medicine Examiners, the American Board of Forensic Medicine,

17   the American Board of Independent Medical Examiners, and the

18   American College of Legal Medicine.  And I'm a certified

19   Forensic Consultant for the American College of Forensic

20   Examiners Institute.

21   Q. Thank you, Doctor Ellis.

22       Now, did you have occasion to meet with Ms. Durand?

23   A. Yes.  I saw her on July 14th, 2017.

24   Q. How long did you meet with her?

25   A. Uhm, from 9:15 a.m. to 11:29 a.m.

1   Q. (Nods head affirmatively)  And before you actually met with

2   her, did you review any documents before that meeting?

3   A. Yes.  She had sent me two large folders of documents

4   (indicating), and I had gone through those very carefully

5   before I saw her.

6   Q. And what did those include?

7   A. Uhm, everything you sent me.

8   Q. Were they medical records?

9   A. All of the medical records -- medical records.  There's

10  legal documents, and I have all of the medical records that we

11  have of her extensive amount of treatment over the years.

12  Q. Okay.  And how about any videos?

13  A. Yes.  I've reviewed the videos.  You sent me five

14  surveillance videos -- surveillance videos, so I reviewed

15  those before I saw her.

16  Q. Thank you.  So --

17  A. Oh, by the way, the (inaudible) was 7.1 centimeters high.

18  Q. Okay.  From your review of the documents, what did you

19  understand Ms. Durand's history of injuries to be?

20  A. She was a rural carrier outside of Houston.  She had an

21  accumulative trauma injury to her back and her left shoulder.

22  She was accepted.  She had a back surgery; and then she had a

23  back fusion, a second surgery, where the bottom two discs had

24  spacers put in them, and then pins.  So, she got a fusion to

25  the bottom two discs in her back.

1          She had surgeries on the muscles in her left shoulder.

2     Not like most shoulder joints, but in the shoulder -- because

3     they were pinching the nerves that go down the arm.  And,

4     then, -- so, subsequently she's had a dorsal column

5     stimulator, which is a -- electrical wires that go in the

6     back, and there's a battery, and it stimulates and tries to

7     trick the brain to not pay any attention to the pain fibers,

8     that pain sensation that she has.

9     Q. And, so, you said --

10    A. And she had steroid injections and digital therapy and

11    things like that.

12    Q. Okay.

13    A. Randomly.

14    Q. Did you actually, then, conduct a medical examination of

15    Ms. Durand?

16    A. Yes, I did.

17    Q. And was this a physical examination?

18    A. Yes.  A physical exam, yes.

19    Q. Did you do any palpitations, any examinations --

20    A. Yes.

21    Q. -- as regarding palpitations?

22    A. Yes.  The left trapezius, which is the muscle in the

23    shoulder, when I put pressure on that, I could cause the

24    tingling down her arm.  And in the back, she has tenderness

25    over the lumbar paraspinal muscles.  And there's also

1    tightness, the muscles are tight in the lower neck, the whole

2    thoracic lumbar paraspinal muscles.

3        So, the objective findings are, basically, tightness in

4    the muscles that go to the bottom of her cervical spine and

5    down to the lower spine.  The other findings, like the

6    tingling down the arm, that's a subjective finding.

7    Q. And how about --

8    A. Then I also did --

9    Q. Oh, go ahead.

10   A. I did testing of the nerves.

11   Q. I'm sorry, what did you say?

12   A. I did testing of the nerves.  Would you like detail on

13   that?

14   Q. Yes, please.

15   A. Okay.  Now, the way you test the nerve from the neck down

16   the arm or the shoulder down an arm, or, in her case, the back

17   down the left leg, there -- you test for light touch, you

18   barely touch it.  Then you test for a pin prick.  And all I

19   have up here is a bunch of little pins.  Sometimes I have

20   patients say, "You only touched me with a paperclip," that is

21   a good test, they are doing the right thing.

22       All right.  And, then, you can test for vibrations,

23   seeing if they have diabetes causing it.  And, then, I tested

24   with pressure.  This is a -- this is a fishing line; and when

25   you put pressure on it, and once it bends, this would never

1  get over 6.65 grams.  And, so, you can test from a small

2  amount of pressure to a whole lot of pressure (indicating).

3      And she had findings consistent with loss of pressure

4  sense, not completely, in the left L-4-5 and S-1 nerves.

5  That's the calf, the big toe, and the side of the foot.

6  Q. Okay.  So --

7  A. Then she had -- yes.

8  Q. If I could just --

9  A. Then she had -- yeah.

10 Q. If I could stop you there --

11 A. That's okay.

12 Q. -- and back you up just a little bit, just so that we

13 capture all that you're saying.

14     So, when you're talking about this testing that you did,

15 uhm, is this reflex testing?  You said, it's nerve testing; is

16 that right?

17 A. The reflex testing is when you hit the -- hit the -- hit

18 the knee and the ankle, the elbows, the wrists.

19 Q. Did you do that, as well?

20 A. And those were normal, except for the butt.

21 Q. Did you do --

22 A. I did that, yes.

23 Q. You did that, as well.  Okay.

24 A. Yes.

25 Q. So, let's go through, you noted that you did these various

1   exams with the medical equipment that you have there.

2   A. Right.  That's testing the sensory fibers of the spinal

3   nerves.  Then you test the motor fibers strength.  She has

4   atrophy in her left calf.  Uhm, she has some weakness in her

5   left arm.  That's a subjective finding.  The atrophy is an

6   objective finding.  And has weakness in her major big toe.

7   Her left big toe will go up and down, the left foot will go up

8   and down, and the knee flexion extension.

9       So, she has some motor loss of the spinal nerves down the

10  left leg, not complete, but incomplete down her left leg, and

11  some brachial plexus impingement of the nerves down her left

12  arm.

13  Q. What does that brachial plexus mean?

14  A. Okay.  If you go to sleep on your arm, and your arm goes to

15  sleep and tingles, that's the brachial plexus, that's the

16  nerves outside of the spine that you can pinch.  And, then, if

17  you get normal, then goes back to normal.  That's why she had

18  her surgery.  It wasn't for a shoulder joint, it was for the

19  muscles pinching those nerves.  That's why her EMG for that

20  extremity was always normal.

21  Q. Did you test anything with regard to her thumbs and fingers

22  and her left forearm?

23  A. Uhm, it says, The big pulse in her left wrist, with her

24  hand in her lap and hand at shoulder height, I did not find

25  any carpal tunnel in her wrist, cubital tunnel in her elbow.

1  Those are pinching of nerves.  Uhm, I didn't find anything

2  that's called complex regional pain syndrome, we usually call

3  it reflex syndrome dystrophy or RSD.  She has nerves on her

4  left arm that are weak, it makes the left arm weak, and the

5  nerves down her left leg makes it painful and numb and,

6  somewhat, weak.

7  Q. Okay.

8  A. Always on the left side.

9  Q. So, from what you -- then, all of the testing that you did,

10  did you come up with a diagnosis for Ms. Durand?

11  A. Yes.  I agree with the diagnosis that has been assigned to

12  her by the Office of Workers' Compensation programs.  She had

13  a strain of her neck.  She had a lumbar disc displacement.

14  She had brachial plexus, brachial level sacral and left

15  shoulder, but I also would diagnose that she's got a left

16  L-4-5 and S-1 spinal nerve impingement.  Which is part of the

17  lumbar disc displacement, the disc in the region that she had

18  the surgeries.

19  Q. So, and, then, from your diagnosis, then, can you tell us

20  what your medical opinion is regarding the injuries that she

21  suffered while at work?

22  A. Uhm, clarify that a little bit.  You mean her whole life?

23  Yeah.  Or what her restrictions would be?

24  Q. That she suffered while at the post office that you said

25  that you do agree with those diagnoses that she had, those

1   injuries.

2   A. Yes.  She met the criteria for acceptance of an

3   accumulative trauma injury working for the post office, it

4   would be called a Form CA-2, occupational disease.  And, I

5   believe, with those diagnoses, I would add the nerves down her

6   left arm and -- not the outlet, but the nerves in her left arm

7   were perceptive.  But the nerves are just consequential to the

8   accepted lumbar disc disease.

9   Q. So, do you believe in your medical opinion, based on

10   diagnoses and your examination, if -- with regard to her

11   disability, that she is temporary totally disabled?

12   A. At this time, she is temporary totally disabled to perform

13   her duties as a rural carrier.  I think she could work in a

14   modified job position, if the agency -- in this case, the post

15   office -- would offer a modified job, and offer it to -- and

16   present that to her treating doctor.  Then the treating

17   doctor, who is the sole person who makes the determination on

18   temporary total disability, could then let her return to work

19   for sedentary work.

20   Q. Okay.  So, let's back up just a bit.  When you say that you

21   believe that she is temporary totally disabled from her

22   position as a rural carrier, why is that?

23   A. Okay.  She -- under the Federal Employment Compensation

24   Act, the Office of Workers' Compensation Program, that's

25   occupational medicine are -- she is not --

1        MR. WELDON:  Objection, Your Honor, a legal

2   conclusion.

3        THE COURT:  Hold on, sir.  I'm sorry?

4        THE WITNESS:  Yes.

5        MR. WELDON:  Legal conclusion, Your Honor.

6        THE COURT:  Overruled.

7      Go ahead, sir.

8        THE WITNESS:  She cannot perform the duties of a

9   rural carrier, which requires a rotation of the lower lumbar

10  spine to one side, picking up magazines and rotating to the

11  other side.  Even if she was asymptomatic, that would hurt

12  those two bottom vertebrae.   But she can do other things.

13  **BY MS. HUNT:**

14  Q. And you actually did -- you indicated that she can do other

15  activities, then, is that what you're saying?

16  A. Why, sure.  Yeah.  I think the video showed that.  I think

17  she tells us that she can do that.  Even in the video, she

18  said that she has a -- usually, a 7 out of 10 with narcotics,

19  but under the -- with the outdoors and the exercise and out in

20  the sun, it went down to six.  And you can work with a 7, it

21  just hurts.  (Nods head affirmatively)

22  Q. You saw the videos in this case.  Is that right?

23  A. Yes.

24  Q. Okay.  And what's --

25  A. Yes, I did.

1   Q. What can you tell us that you actually reviewed in those

2   videos?  What did you see her doing?

3   A. Well, I saw her walking, bending over.  She was carrying

4   two trash bags, probably 13-gallon kitchen trash bags.  I saw

5   her in a wide kayak that had to be jerry-rigged with a back

6   brace for her back.

7        And then she -- may I show this paddle?

8   Q. I'm sorry, what did you say?

9   A. May I show this paddle?  This is a -- this is a

10  (indicating) kayak paddle.  And then she was paddling

11  (indicating), which would be good exercise for her shoulder.

12  Her shoulder is not the reason she's off work, but it's good

13  exercise.

14       And if you look at her video, she's doing all upper back.

15  She's not doing much low back.  But she can do some low back,

16  that would be good for her back.  So, that means she's not,

17  like, in a wheelchair and can't do anything.  And this is not

18  the criteria for Social Security, she's not -- yeah, it's

19  Federal Workers' Comp.

20  Q. So, was Ms. Durand on daily living restrictions?

21  A. No.  She's never been -- they -- they -- I hear them say

22  "medical restrictions," there have been no medical

23  restrictions.  All restrictions are addressed to the

24  supervisor, to the agency.  I don't see anywhere in the

25  records where any doctors told her what she can't do at

1    home.

2    Q. And how long can someone actually be temporary totally

3    disabled?

4    A. In Federal Workers' Comp, until they die.  And, like you

5    say, all others can have a back fusion and get off twelve

6    weeks; in Federal Workers' Comp, you can be on Workers' Comp

7    until the agency provides you another modified offer.  And the

8    employee doesn't have any choice in it.

9    Q. And in -- and can you elaborate on that?  Is it the

10   patient's responsibility to get off of -- after having that

11   designation of a temporary totally disabled and being on

12   Periodic Rolls -- let me back up.

13        Are you familiar with the Periodic Rolls?

14   A. Yes.

15   Q. The term "Periodic Rolls"?

16   A. Yes.

17   Q. Is it the patient's responsibility to get off of the

18   Periodic Rolls, once they are on the Periodic Rolls?

19   A. No.

20            MR. WELDON:  Objection, Your Honor, legal

21   conclusion.

22            THE COURT:  It certainly is, but I'm going to allow

23   it.  Go ahead.

24            THE WITNESS:  Okay.  Yeah.  No, the patient,

25   unfortunately, doesn't have anything to do with temporary

1    total disability and Periodic Rolls in, unfortunately, Federal

2    Workers' Comp, nor does the supervisor.

3         In State Workers' Comp, I can talk to the boss and say,

4    "Let's try this." But the board supervisor doesn't even get

5    to know what the diagnosis is. All they get are restrictions.

6    And the only way they can talk to the doctor is to send a

7    nurse case manager. Which really helps, because if you keep

8    somebody off of work for two weeks, it hurts them. All right?

9         Uhm, so, she -- the attending physician -- which she has

10   the sole right to pick that doctor, no one else can -- is the

11   sole determinant of temporary total disability. I've had

12   patients say, "I want to go back to work." I said, "No, I'm

13   going to send you with restrictions." "No, I don't want any

14   restrictions." "I can't do that."

15        Or I've had patients say, "I don't want to go to work."

16   "Well, yeah, but you can, you're going back to work, this is

17   not a vacation."

18   **BY MS. HUNT:**

19   Q. So, from what I'm gathering from what you're saying, can a

20   patient go back to work if the patient wants to but the doctor

21   doesn't want to release him?

22   A. No. Not unless they have a Form CA-17, or OWCP, or a note

23   from the attending physician, or, at least -- returning them

24   back to work. Because the supervisor cannot let them return

25   back to work unless they have the paperwork.

1   Q. So, can you explain to us, because you've indicated that

2   you reviewed the videos, how doing those daily activities and

3   actually paddling on the kayak is not evidence of a lack of

4   disability?

5   A. Well, it shows that she can do some things, but it doesn't

6   show that she can be a rural carrier.  Even if she was

7   asymptomatic she can't be a rural carrier.  Because she has

8   mechanical spacers between the bottom two vertebrae, she has

9   pins, and she's going to be liable to hurt herself.

10      It's not whether she can work, it's whether the work will

11  cause harm.  So, she can do a lot of stuff.  And the videos

12  are helpful for the attending doctor, and anybody making

13  suggestions to the attending doctor, saying, look, she can do

14  this, she can do that, let's put her back to work.

15      But until that happens, because neither I or Doctor Hood

16  or Doctor Strausser can put her back to work.  We're not the

17  attending physician.  The video needs to be seen, and we need

18  to get the information from her current attending physician.

19  Q. I just have a few more questions for you, Doctor Ellis.

20      Can a doctor make a new determination about a person's

21  disability status just based on seeing a video?

22  A. Oh, I think so, yes.  (Nods head affirmatively)  I don't --

23  it's all -- it's like any law, everything has got a certain

24  amount of probative value.  And that's why we are in front of

25  a Judge for him to decide.  But if -- I testified against a

1  person and put him in jail based on the video.  Because,

2  obviously, he was lying to me.

3  Q. So, what -- does a doctor determine work restrictions in

4  hindsight, or is it just at the present time when you're

5  reviewing the patient?

6  A. Restrictions and impairment ratings are based on the day

7  you see them.  You can't -- you can't go forward.  You can't

8  say, she'll get better, and, therefore, I'm going to rate

9  lower, or you can't say it has to be done.  You can't go --

10  only Superman and God can go backwards.  We can't go

11  backwards.  Unless it's egregious.

12      Now, that means that, at first, when someone says, "I'm

13  always in a wheelchair 24/7," and you've got videos of them

14  not in a wheelchair.  Obviously, then we can go back in time.

15      But on hers, after she has her second back surgery, at

16  what time can you go back and say that she was no longer

17  temporary totally disabled?

18      At no time in this case can you say she has ever returned

19  to rotating her low back.  But she can do other things, but no

20  one ever made her the offer.

21  Q. Okay.

22  A. And, in addition, her -- Doctor Martin took her off on her

23  psychological factors, which counts in Federal Workers' Comp.

24  Because you can't see the psychological factors on the

25  video.

1      MS. HUNT:  Okay.  If I may have a moment, Your

2  Honor?

3      THE COURT:  You may.

4

5              **(Discussion off the record.)**

6

7  **BY MS. HUNT:**

8  Q. I just have a few more questions for you.  So, were you

9  aware that Ms. Durand was taking medication?

10 A. Yes.  (Nods head affirmatively)

11 Q. Do you know what she was taking?

12 A. She was taking narcotic medications.  The chart, her

13 medical records, she has been taking narcotic medications for

14 a long time.  On the video, she was on narcotic medications.

15 That's why the Employees' Compensation Appeal Board said

16 videos might not be beneficial.

17 Q. So, you're aware of how many different medications she is

18 taking?

19 A. Oh, yeah.  We've tried all kinds of things for pain.

20 Pain's hard to treat.  Excuse me, I'm thinking of medical

21 conditions, yeah.

22 Q. So, if I go through a list of what she was taking, could

23 you tell me -- you know, we'll go through whether that's a

24 large amount, a small amount, uhm, for each one.

25     The first --

1   A. Sure.

2   Q. The first is Buspirone.  Of course, I'm going to

3   mispronounce these -- 10 milligrams, three times a day.

4   What's that for?

5   A. At what times did she take those?  Okay, that's -- that's

6   for depression, it sometimes helps pain.

7   Q. Okay.  Is that a high dosage?

8   A. No, that's a reasonable dose.

9   Q. Okay.

10  A. Based on her body size and her condition, yes.

11  Q. How about Gabapentin, 600 milligrams, three times a day.

12  A. Right.  That is a seizure medication that sometimes

13  modulates pain.  You'll see it advertised, like Lyrica, on TV

14  for diabetic neuropathy.  That's reasonable.

15  Q. Okay.  Levothyroxine, 25 mcg capsule every day.

16  A. Micrograms.  That's thyroid medication.  That's what she

17  takes, that's not due to her injury.

18  Q. Okay.  Meloxicam, 15 milligrams.

19  A. Yes, that's reasonable.  And that's a nonsteroidal

20  anti-inflammatory, like Motrin.  Okay.

21  Q. Metaxalone.

22  A. What?  What?

23  Q. Metaxalone, 800 milligrams, one tablet three times a day.

24  A. That may -- I may not be aware of that one.  That may be a

25  muscle relaxer.

1    Q. Okay.

2    A. So, I can't say for certain.  I just can't say.

3    Q. How about Morphine, a 20 milligram capsule?  Is that a

4    lot?

5    A. Not for this lady.  It would be for a virgin.  I mean, a

6    virgin who has never taken that medicine.  You wouldn't start

7    off on that dose.  It would be reasonable for a person with

8    her kind of condition, a failed back like she had.

9         And, again, I'm not disparaging Doctor Strausser's

10   surgery.  She needed surgery, and she's had the best results

11   you can get from a surgery.  He did a great job.  But, anyway,

12   if you have to be on that kind of pain medication, she's got

13   real pain.  It's pinching the spinal nerve and the spinal

14   column, and so it's central nervous system pain, not just

15   peripheral.  You got to -- you got to get enough.

16   Q. And Topamax, 50 milligrams, twice a day.

17   A. Yeah.  That's a -- that's an anti-depressant, and it helps

18   pain.

19   Q. Okay.

20   A. And that's a reasonable dose.

21   Q. Okay.  So, she is taking all --

22   A. And I'm sure there's been all kinds of things tried over

23   the years.  This is what happens with -- yeah.

24   Q. Sorry.  She is taking all of these medications, is that

25   reasonable, given your -- for her type of injuries, her type

1   -- through your examination, --

2   A. For her --

3   Q. -- would you find that to be a reasonable dosage?

4   A. I find that's very common, that most pain doctors will do

5   that.  That's a reasonable amount of medicine for the kind of

6   pain that she has.  Uhm, she has got a fusion of her lower

7   back.  And back pain is the worst pain that occurs.  Shoulders

8   hurt, but they don't need that much pain medicine.  And these

9   injuries to the spinal cord and the arthritis in the lumbar

10  spine requires that kind of medications.

11  Q. (Viewing documents)  So, if somebody is taking that many

12  medications, she would not be a zombie.  You wouldn't --

13  A. No.  No.  No.

14  Q. -- qualify it that way?

15  A. After -- after the first few months, the buzz, the

16  psychological part of the narcotic kind of goes away, but you

17  still get about 85 percent of the pain until that's gone.  For

18  her kind of injury, she should be on enough medication that if

19  she ran out on the weekend that she'd throw up from physical

20  withdrawal.  That's the normal thing we have to do.  We don't

21  have anything else to manage the pain.

22  Q. So, we talked -- I just need to go back to the videos, just

23  briefly, uhm, because I think you mentioned that if

24  somebody -- if there is a video shown to a doctor, that it --

25  depending on what it is, --

1    A. (Nods head affirmatively)

2    Q. -- could assist that doctor.  Is that correct?

3    A. Yes.  Yes.  Doctors get to use everything, what the family

4    says, what the video says, what the investigator says.  And,

5    of course all of her medical records, in a criminal court,

6    would be hearsay.  But we get to put all of that together,

7    take our education, training, and experience, and then put it

8    together.  And, so, a video is helpful.

9    Q. What about medical opinions that are developed based on

10   covert surveillance videos?

11   A. Well, they are medical opinions, and the trier of fact can

12   decide the appropriate value.  In this case, I -- with what's

13   at stake, I would not -- if you asked me to just review the

14   video or the records, I'd say, "No, I want to see her."

15              MS. HUNT:  Okay.  If I may have one more moment?

16              THE COURT:  You may.

17              MS. HUNT:  No further questions at this time.

18              THE COURT:  Mr. Weldon, cross examine.

19              MR. WELDON:  Thank you, Your Honor.

20

21                     **CROSS-EXAMINATION**

22   **BY MR. WELDON:**

23   Q. Good morning, Doctor Ellis.

24   A. Yes.  Are you Ryan Weldon?

25   Q. I am, sir.

1    A. Okay.  Good to meet you, sir.

2    Q. Good to meet you.  I wanted to ask you a few questions.

3         Now, you had mentioned that Ms. Durand can go back to

4    work?

5    A. Yes.  (Nods head affirmatively)  In a sedentary position

6    without a lot of rotation.

7    Q. And, so, let's just describe some of those job duties, if

8    we could, Doctor.  Could she answer phones?

9    A. Sure.

10   Q. All right.  And could she do that during an eight-hour time

11   period?

12   A. (Pause)  Maybe, not a full eight hours sitting with her

13   back.  But I -- if I were her treating doctor, I'd try a

14   four-hour day of a sedentary job.

15   Q. All right.  So, you would put --

16   A. Move up to eight hours.

17   Q. All right.  You would put Ms. Durand, or authorize her to

18   go back to work in a sedentary position, and, say, for

19   example, answer phones for a four-hour period.

20   A. Yes.  And in the post office, she could do express mail.

21   If I were her treating doctor, I would put her back to work

22   with these restrictions:  Start with four-hours a day.  Not --

23   she's got -- she's got to be able to get up from that chair

24   frequently, because sitting puts a lot of pressure on those

25   bottom discs.

1    And she could do express mail.  She could answer the

2  phones.  She couldn't do front desk clerking, unless she was

3  able to sit and stand at different times.  And I'd start her

4  off on a four-day, five days a week, and see how she did.

5  Q. All right.  And, then, how long would you have that happen,

6  sir?

7  A. Oh, maybe, two weeks, and then go up to eight hours.  Some

8  patients really just can do four hours a day, so they get four

9  hours of salary and four hours of Workers' Comp each day.

10  Q. Sure.  And, so, that would, essentially, be saving the

11  federal government for that four-hour time period.  Is that

12  right, sir?

13  A. Yeah.  They'll be getting -- they'll be getting work out of

14  the four hours they're paying, sure.

15  Q. Sure.  All right.  And then what else --

16  A. (Audio interruption)  Go ahead.

17  Q. What else could she do, sir?

18  A. I mentioned the post office.  Uh, well, express mail, she

19  could do.  She could do sedentary work.  She can do work even

20  on the computer.  Because it's not her shoulder joint, it's

21  the shoulder muscle, so she can do some computer work.  I'd

22  recommend that she have a split keyboard and be able to set

23  things -- sit, and sometimes have the keyboard go up so she

24  can stand and work.  She's a hard worker, she'd do well.

25  Q. Sure.  And that requires hard working; is that right, sir?

1    A. No, that wouldn't be hard work.  That's sedentary, that's

2    light duty.

3    Q. All right.  Then let's talk -- I have just a few more.  I

4    want to make sure I walk through these with you.  So, she can

5    sit, you are saying, for about four hours to start with, what

6    about walking?

7    A. Yes.  I would start her out four hours a day, yes.

8    Q. Okay.  Could she walk?

9    A. Yes, uhm, she can walk.  And now she has got to be careful,

10   because that left leg sometimes will give away.  Not bad.  Her

11   motor fibers aren't completely shot.  But even in the video,

12   the first video, there's just a little slap of the foot.  It

13   goes along with it, everyone sort of has a left foot drag.

14   But not bad, so she could walk.

15   Q. All right.  So, she'd be able to walk, then.  And would you

16   put a restriction on her ability to walk, Doctor?

17   A. Yes.  That, I would have to do clinically, and say, show me

18   what you can do and let's build up to it.  But it's good for

19   her.

20   Q. All right.  And, so, would you allow her to do four hours

21   of walking, then?  Up to four hours?

22   A. Not continuously.  She would have to have rest periods, at

23   least, probably, in the first week or two, probably every 30

24   minutes she'd have to sit down for five minutes.  And, maybe,

25   she can build up to walking.  And maybe she can work four

1    hours -- walk four hours a day.

2    Q. All right.  Then let's talk about would you allow her to

3    twist at all, sir?

4    A. Oh, yeah, she can twist.  She just can't do -- she can

5    twist.  I mean, she can sit at a desk and do a little bit of

6    about 45 degrees to the right, and 45 to the left.  But she

7    can't do -- she can't be a LLV or the postal carrier, but that

8    twist, because there's -- there's just too much stuff, the

9    tray grabbing.  Now we are carrying Amazon.  The magazines,

10   the catalogs.

11   Q. All right.  Would you allow her to operate a motor

12   vehicle?

13   A. Yes.

14   Q. All right.  And how many hours could she operate the motor

15   vehicle?

16   A. She could probably -- she could do eight hours a day,

17   probably, in a motor vehicle.  Now, she's going to have to

18   have frequent stops, and you will get up and stand up and walk

19   around.

20   Q. Sure.  All right.  Then what about pushing?  Could she

21   push?

22   A. Oh, yeah, she can push a little bit.  She can push a cart,

23   and push a grocery cart.  She should be careful.  It's not

24   going to hurt her shoulder to do a lot of pushing.  It's not

25   like it's a shoulder joint, which I would do restrictions of

1    the amount of weight.  She -- it's different.  She's going to

2    have a restriction, a weight restriction with her arm because

3    it's weak.  But it's not going to hurt her.  It's like the

4    kayak (indicating), it's good for her.  I mean, that's what

5    she did in physical therapy, that maneuver (indicating).

6    Q. And, so, you want her being active, then, to make sure that

7    she's maintaining her physical abilities.

8    A. Right.  If I were giving instructions to a -- that person,

9    I would say, "You stay as active as you can and go to the

10   point of discomfort, and then you can go back."  But, then,

11   the restrictions to the employer, they want more, because he's

12   not aware of all the things that are going on.

13   Q. Right.  Then what about pulling?  Could she pull?

14   A. Yeah.  Except -- she can pull.  Now, pulling, it's a little

15   bit harder on the back.  And I would put a 35 pounds

16   occasional, and 25 pounds continuous pulling.

17   Q. Then, what about lifting?  Would you let her lift?

18   A. Sure.  Again -- in almost the same way.  It's got to be

19   occasional.  She can't do it repetitively, but she can

20   certainly reach down and pick up a dog or a, you know, a box.

21   Or up to 35 pounds, occasionally, and 20 to 25 pounds

22   frequently --

23   Q. What about --

24   A. Less frequently.

25   Q. Go ahead.

1    A. No, that's it.  Go ahead.

2    Q. All right.  Then, what about squatting?  Could she squat?

3    A. (Pause)  That, I would restrict, and kneeling, I would

4    restrict, because it's going to be hard for her to get up.

5    But she can do a little squatting.  In other words, if she

6    drops a pencil, she can reach down and get it, but it

7    shouldn't be a continuous thing.

8    Q. Sure.  You don't want her clean and jerking, for example.

9    A. What?  What?

10   Q. You don't want her doing a clean and jerk physical

11   exercise, for example.

12   A. No.  No.  But she can bend and squat and tie her shoes

13   and --

14   Q. Okay.  What about kneeling?  Can she kneel?

15   A. She can kneel, but it's going to be harder to get up.  And

16   I would restrict that.  Because of her back, not because of

17   her knees.

18   Q. All right.  What about climbing?

19   A. No.  (Shakes head negatively)  She's at risk.  I wouldn't

20   let her get on one stool, because that left leg can give-way

21   and she could fall.

22   Q.  All right.  Now --

23   A. Not that she can't do it, it's just that she's at risk.

24   Q. Now, Doctor Ellis, you were involved in this case, did you

25   see Doctor Strausser's restrictions that he put on Ms. Durand

1 on January 18th of 2008?

2 A. I may have but don't remember.

3 Q. Well, those were the restrictions that we, essentially,

4 went through that you would allow Ms. Durand to do.  Is that

5 right, sir?

6 A. No.  Whatever he said at that time, it applies.  Because he

7 was there, and he saw her, and he did the surgeries.  So,

8 whatever he said, being the attending physician at that time,

9 that's it.

10 Q. Okay.

11 A. That's what it is.

12 Q. And so you --

13 A. I can't argue with that.

14 Q. You wouldn't disagree with those restrictions that were

15 placed on Ms. Durand at that time, then.

16 A. No, I would not.

17 Q. All right.

18 A. Because that's the -- at that time, he's there, and he saw

19 them, I can't go back in time and second guess anybody.

20 Q. Now, Doctor Ellis, were you -- so you conducted an

21 interview of Ms. Durand as part of your exam; is that right,

22 sir?

23 A. Yes.  (Nods head affirmatively)

24 Q. Now, did you have the benefit of also knowing about the

25 videos that were taken, as well, when you conducted your

1  exam?

2  A. Well, I saw the videos, did all the medical -- flipped

3  through all of the records long before I saw her.

4  Q. Okay.  So, were those law enforcement records helpful for

5  you in making your evaluation and your ultimate determination

6  that Ms. Durand could go do work restrictions?

7  A. Oh, yeah.  They're great.  They're very beneficial, as far

8  as returning to work, restrictions and -- yeah, very

9  helpful.

10  Q. Now, if you didn't see those, would that have put you at a

11  disadvantage?  Or, at least, you would have been relying on

12  different materials?

13  A. Well, I would, obviously, be relying on different

14  materials.  It would be an advantage to see the video, than

15  not, but my restrictions, based on her physical exam, which I

16  usually have, those restrictions would be the same, based on

17  the exam, the physical findings, the obvious nerve damage to

18  the left leg, and the nerve damage to the right -- in her left

19  arm.

20  Q. And, now, were those outside videos surveillance videos and

21  the law enforcement investigation, would that also be helpful

22  for you to review whether or not Ms. Durand was being truthful

23  with you?

24  A. (Pause)  If she was lying, if she ever said that she

25  couldn't do anything, that would be helpful.  But she never

1    said that to me, or to anybody else, it looks like.

2    Q. Now, well, let's just talk about with you.  Did she tell

3    you certain things about the activities that she had been

4    involved in?

5    A. No.  We discussed it.  Uh, she just had some restriction of

6    her left arm, she has to be careful with her back, and

7    weakness down her left leg.  But she can do stuff.

8    Q. Did she --

9    A. She can probably ride a horse.

10   Q. Did she tell you -- oh, she told you -- did she tell you

11   that she could ride horses?

12   A. No.  No.  But I think she could.

13   Q. All right.  Did she tell you that she was fairly strong?

14   A. No.  I can tell she's strong.  She is a big girl.

15   Q. All right.  Did she tell you that she jogs?

16   A. (Audio interruption)  Huh?

17   Q. Did she tell you that she jogs?

18   A. I don't remember that.

19   Q. Okay.  Did she tell you that she lifts hay bales?

20   A. No, I don't remember that.

21   Q. What about chainsaw cutting?

22   A. She can do that.

23   Q. Sure, she could clear five acres of land?

24   A. (Pause)  Yeah.  Probably not like she could when she was

25   20.

1    Q. Okay.  And did she tell you that she was very active

2    outside?

3    A. She didn't say that.  But I assumed she was, based on the

4    videos and what she talked about.  She's not one of those

5    people that just complains about everything, she was rather

6    stoic.

7    Q. So, she didn't provide a lot of information with you, then.

8    A. She may have.  But if I didn't put it in my report, then I

9    can't say I -- I mean, I can't go back yesterday and remember

10   what someone said, much less when I saw her on July 14th.

11   So...

12   Q. Sure.

13   A. If it's in my report.  And that's a summary, not -- unless

14   it's in quotes, it's a summary of the interview.

15   Q. Can she dig post holes?

16   A. Doctors are not lawyers, they don't put folks -- they don't

17   do transcripts.  Okay.  I'm sorry.

18   Q. Sure.  The question was can she dig post holes?

19   A. Sure.  (Nods head affirmatively)

20   Q. Okay.  Can she mow the lawn?

21   A. Yes.

22   Q. And can she trot with her horse, then?  We talked about

23   riding, but let's talk about trotting.

24   A. (Indicating)  Yeah.  She can trot a horse.  She's going to

25   hurt, but she can trot with a horse.  It's the rotation that's

1    bad.  The vertical is not so bad, the vertical up and down.

2              MR. WELDON:  May I have just a moment, Your Honor?

3              THE COURT:  You may.

4

5                        **(Discussion off the record)**

6

7              MR. WELDON:  I have no further questions, Your

8    Honor.  Thank you.

9              THE COURT:  Redirect, Ms. Hunt?

10             MS. HUNT:  Yes briefly.

11

12                       **REDIRECT EXAMINATION**

13   **BY MS. HUNT:**

14   Q. So, Dr. Ellis, you mentioned that she can go back to work,

15   uhm, but was she offered that?

16   A. Not that I'm aware of.  I don't think -- the agency has not

17   had her periodically reviewed, and it should be every 180

18   days.  Some people once a year.  And, like, I do that all of

19   the time.  And then you go through, and you've got the same

20   restrictions or we modify them, or put them back to work.

21        But it's the attending physician that makes that

22   decision, and no attending physicians are here now.  Doctor

23   Strausser was no longer the attending.  I'm not the attending.

24   Q. You're not the attending.  So, the work restrictions that

25   you went through with Mr. Weldon, it would be something that

1    you would impose on somebody, if you were the attending

2    physician, but you are not her attending physician.

3    A. No.  No.  On this specific person, based on my examination,

4    everything, my education, training, and I have a lot of

5    experience, if I were -- if she picked -- appointed me as her

6    attending physician, which is her sole right, those would be

7    my decisions, I would put her back to work.  As a clinical

8    finding.  And, then, if she can't work, then I'd take her back

9    off work, and we'd adjust, adjust, adjust.

10   Q. Okay.

11   A. But, now, the only person that can do that is her attending

12   physician.  So, I would recommend that the agency take all of

13   this information to her attending physician and say, "Do you

14   think she is still temporary totally disabled or could she

15   return to work with modified light duty?"

16   Q. And are you aware of, back in 2008, what Doctor Hood's

17   assessment of her was?

18   A. Yes.  (Nods head affirmatively)

19   Q. And what was that?

20   A. Uhm, he said, "No sign of symptom magnification, global

21   weakness, all muscle groups, the left arm has pain, one

22   centimeter of atrophy in the left forearm and upper arm, that

23   there is the same in the right arm."

24   Q. And did he indicate whether she was temporary totally

25   disabled?

1    A. Yeah.  At that time, he said, "Durand cannot work in any

2    capacity."  And that a functional capacity evaluation was not

3    warranted due to the high probability of injury, and, which,

4    you know, still later, she had all of these procedures, all of

5    this medicine, the surgeries, the epidurals, so he was

6    correct.

7    Q. And from your review and understanding of the process, and

8    your examination of Ms. Durand, uhm, that's the determination

9    that's remained.  Is that -- would you agree with that?

10   A. Well, no.  Because Doctor Hood doesn't determine temporary

11   total disability.  That was his opinion.  Doctor Martin was

12   the one that determined temporary total disability, and it was

13   for her physical injuries and her psychological injuries.

14   Q. And you indicate about the videos that that can, again,

15   assist you, but that -- what is it that you rely on heavily?

16   Was that the physical exam?

17   A. No, I rely --

18   Q. When you were interviewing the patient?

19   A. No.  I rely on 49 years of practicing medicine, 40 years of

20   legal medicine, and the examination of the patient, and her

21   whole examination, seeing the patient, being with the patient.

22       Uhm, it's, basically, a thing, as a practitioner, we do a

23   lot of psychological stuff.  Then you determine what someone

24   can do.  You know, some people, I have to make them go back to

25   work.  "I don't want to go back."  "You've got to go back to

 1   work.  I'm the doctor.  But, I mean, you should go back to

 2   work, and be happy to."

 3            MS. HUNT:  May I have a moment?

 4            THE COURT:  You may.

 5            MS. HUNT:  No further questions.

 6            THE COURT:  Is the witness excused?

 7            MS. HUNT:  Yes, he is.

 8            THE COURT:  Thank you for your time, Doctor Ellis.

 9   You're excused.

10            THE WITNESS:  Thank you, sir.

11            MS. HUNT:  Oh, I'm --

12            THE COURT:  Ms. Hunt, your next witness.

13            MS. HUNT:  Yes.  The defense calls --

14            MR. ARVANETES:  Jamie Gipe.

15            MS. HUNT:  -- Jamie Gipe.

16

17                 **(The witness was duly sworn.)**

18

19            THE WITNESS:  I do.

20            THE COURT:  Good morning, Ms. Gipe.

21            THE WITNESS:  Good morning.

22            THE COURT:  Would you please state your full name

23   and spell your last name?

24            THE WITNESS:  Jamie Gipe, G-I-P-E.

25            THE COURT:  Go ahead, Mr. Arvanetes.

1    MR. ARVANETES:  Thank you, Your Honor.

2

3                      **DIRECT EXAMINATION**

4    **BY MR. ARVANETES:**

5    Q. Ms. Gipe, good morning.

6    A. Good morning.

7    Q. What do you -- what do you do for a living?

8    A. I'm the Investigator at the Federal Defenders of Montana

9    here in Great Falls.

10   Q. And as part of your duties as an investigator, do you

11   assist attorneys to investigate their cases?

12   A. Yes, I do.

13   Q. And as part of those duties, in assisting attorneys to

14   investigate cases, did you assist in investigating a case

15   concerning Deborah Durand?

16   A. Yes, I did.

17   Q. And in your duties assisting attorneys, and, specifically,

18   assisting in the case of Ms. Durand, did you review her

19   files?

20   A. Yes, I did.

21   Q. And in your duty of assisting attorneys and Ms. Durand in

22   reviewing the files, did you review the files concerning the

23   mileage fraud?

24   A. I did.

25   Q. And in your duties assisting attorneys and reviewing the

1   case for Ms. Durand and reviewing specifically mileage fraud,

2   did you produce an Excel sheet about the mileage fraud?

3   A. I did.

4          MR. ARVANETES:  May I approach, Your Honor?

5          THE COURT:  You may.

6          MR. ARVANETES:  And are we at Exhibit --

7          CLERK OF COURT:  The last one was 507.

8          THE COURT:  You're at 508.

9          MR. ARVANETES:  508.

10         THE COURT:  You already have a 509, so I hope this

11  is.  It's a jump to 514 after this, if you have more.

12  **BY MR. ARVANETES:**

13  Q. Ms. Gipe, is this familiar to you?

14  A. It is.

15  Q. Is this the Excel sheet that you helped create based upon

16  reviewing the file for Ms. Durand, specifically in the context

17  of mileage fraud?

18  A. Yes, it is.

19  Q. Is this a fair and accurate depiction of that sheet?

20  A. Yes, it is.

21         MR. ARVANETES:  Your Honor, at this time, I move for

22  Exhibit 509.

23         THE COURT:  508.

24         MR. ARVANETES:  508.  Sorry.

25         MR. WELDON:  I have no objection, Your Honor.

1        THE COURT:  508 is admitted.

2

3              **(Exhibit Number 508 was admitted.)**

4

5    **BY MR. ARVANETES:**

6    Q. Now, Ms. Gipe, can you explain to the Court what you did to

7    create this document?

8    A. I can.  We had gotten a couple of different Excel

9    spreadsheets in discovery from the government, and, basically,

10   I combined two of the spreadsheets to make this one chart for

11   Ms. Durand to look at, to give her an idea of the time frame

12   of the travel reimbursement vouchers.

13   Q. Okay.  And, in your review of the spreadsheet and the

14   information that you just discussed, can you explain what the

15   different colors are, and the columns, as well, for the Court

16   to understand?

17   A. I can.  The brown columns that you see --

18   Q. And you can mark on there, if you'd like.

19   A. These ones (indicating) were actually taken from -- I

20   believe, it's Government's Exhibit Number 51.  Uhm, so, I

21   separated that Excel spreadsheet.

22       And then the blue and the yellow columns are actually

23   from a different spreadsheet that we got from discovery, it

24   was called "Durand's PICS," P-I-C-S, Excel workbook, and it

25   was Tab Number 2 that I used to get those breakdowns.  And,

1    basically those are the payments and the dates of service for

2    medical transportation and pharmacy for her services.

3    Q. And did you find any discrepancies in -- in -- between the

4    two?

5    A. (Viewing document)  Between the vouchers and between the --

6    Q. Yes?

7    A. -- charts?  On a few of them, I did.

8    Q. Okay.

9    A. Basically, I made it out so that it would give her kind of

10   a snapshot in time to, maybe, recollect -- refresh her memory,

11   so that, maybe, she could recollect what was going on in those

12   time periods of the submissions.

13   Q. So we can understand this, the yellow or orange here is

14   from Government's Exhibit 51.

15   A. Correct.

16   Q. And those are, approximately, 34 instances where the

17   investigation could not find any proof of an actual visit.

18   Is --

19   A. Correct.

20   Q. -- that fair to say?

21   A. Correct.

22   Q. Okay.  And, then, the colors in blue are the -- well, what

23   are those?  Explain those.

24   A. I believe that those are -- it's provider information that

25   the government supplied for us, basically, all of her doctor

1  visits, transportation, pharmacy.  It appeared to me that that

2  was kind of a spreadsheet of every medical transportation or

3  pharmacy record that they could find on her.

4  Q. And, so, what you did was you compared dates within

5  proximity to the alleged times that she -- there was no proof

6  that she visited.

7  A. Yes.  Exactly.  I pulled out of the other document the time

8  frame of about when the time in question was.

9  Q. And, so, the columns, then, this column would essentially

10  be hospital paid?

11  A. Correct.

12  Q. Fair to say?  And this column would be what?

13  A. That's the medical that was paid.

14  Q. Okay.  And then explain this column, if you can?

15  A. It's the sum of units.  It looks like that was just one of

16  their columns in their spreadsheet.

17  Q. Administrative columns, perhaps?

18  A. Yes.

19  Q. Fair enough.  And then this column here?

20  A. That's the transportation that was paid.  So, you can

21  correlate that with the yellow.  If I can do it.  Here

22  (indicating).  And I'm not a very good drawer.

23  Q. Okay.  And, so, that's a correlation to the transportation

24  paid to Ms. Durand?

25  A. Correct.

1   Q. And, then, again, we have sum of units?

2   A. That's the miles that she drove.

3   Q. Oh, that's the miles.  Okay.  And, then, finally, what is

4   this here?

5   A. Pharmacy paid.

6   Q. Okay.  Thank you.

7         MR. ARVANETES:  I have no further questions.

8         THE COURT:  Mr. Weldon?

9         MR. WELDON:  Very briefly, Your Honor.

10

11                     **CROSS-EXAMINATION**

12  **BY MR. WELDON:**

13  Q. Good morning, Ms. Gipe.

14  A. Good morning.

15  Q. I just want to walk through your chart.  Now, the gray

16  portions, or the tan portions, we'll call them, I guess, those

17  are ones where you didn't find any corresponding payments.  Is

18  that right?

19  A. Those were pulled from the chart that you guys provided us,

20  that the government provided us that there were no

21  corresponding ones found.

22  Q. And you didn't contact the medical providers to verify

23  anything with respect to this chart, then; is that right,

24  ma'am?

25  A. This chart was provided just to Ms. Durand so that she

1    could look at it for her memory jogging.

2    Q. So, then, I just want to make sure we're clear.

3         MR. WELDON:  If we could show the witness

4    Government's Exhibit 22.

5    **BY MR. WELDON:**

6    Q. Now, this is one of the components that you identified; is

7    that right, ma'am?

8    A. I've seen this, but I didn't -- none of this information I

9    copied onto the chart, but, obviously, some of it correlates,

10   just because these are her travel reimbursement vouchers.

11   Q. And, so, when you have on your -- Defense Exhibit 508, you

12   have "Martin Diagnostics," and that's consistent with

13   Government's Exhibit 22; is that right?

14   A. Correct.  But the columns that I actually copied were from

15   -- I believe it's 51.

16   Q. Sure.  And, of course, then, when you talk about Martin

17   Diagnostics, and there is no blue material underneath that,

18   that means there's no -- you are not providing any information

19   about that exhibit.  Is that right, ma'am?

20   A. Correct.

21   Q. So, you couldn't find anything that would justify payment

22   for that particular exhibit.

23   A. There was nothing -- uhm, there was nothing in that other

24   Excel workbook that I used that I got those blue and yellow

25   portions from that had those dates of service, but when I

1    spoke with Ms. Durand, and I believe that's what she is going

2    to testify about, uhm, (indicating) there could be an

3    explanation for it.

4    Q. Now, then, let's just ask it this way.  So, for the tan

5    portion, there's nothing in this chart --

6              THE COURT:  Hold on, Mr. Weldon.  Can you go back to

7    the chart?

8              MR. WELDON:  Yes.

9              THE COURT:  The colors are a little ambiguous.

10             MR. WELDON:  They are.  I apologize, Your Honor.

11             THE COURT:  They are all pastels.

12             MR. WELDON:  Yes.

13             THE COURT:  Clarify.  Touch the screen on what you

14   mean by the tan portions, please.

15             MR. WELDON:  Yes.

16   **BY MR. WELDON:**

17   Q. Ms. Gipe, so I'm talking about these portions right here

18   (indicating), which are, for example, "Martin Diagnostics,"

19   and then it says on "2/19 of 2007," and that is actually

20   Government's Exhibit 22.  Would you agree with that?

21             THE COURT:  It's included in Government's Exhibit

22   22.

23             MR. WELDON:  Correct.  It's the summary chart of

24   that.  Maybe, we can do it this way.

25        Your Honor, may I approach Ms. Gipe and show her?

1          THE COURT:  Approach the clerk.

2          THE WITNESS:  (Viewing documents)

3     **BY MR. WELDON:**

4     Q. Now that you are looking at Government's Exhibit 22, Ms.

5     Gipe, is that consistent, then, with this tan portion of the

6     4656?

7     A. Yes.  But it's not -- that's not what I used to get those

8     columns.

9     Q. I understand.

10    A. Yes.

11    Q. But the information is from that document.

12    A. Yes.

13    Q. And Government's Exhibit 22 is the document that your

14    client completed; is that right?

15    A. To the best of my knowledge.

16    Q. Sure.  So, then, this is really just a summary chart that

17    you've provided.

18    A. Yes.

19    Q. Okay.  And, then, just to make sure I'm clear, the blue

20    portions are the combination of another chart.

21    A. Correct.

22    Q. All right.  Let me do this one thing.  With Government's

23    Exhibit -- or with the top portion here on Martin

24    Diagnostics, --

25          THE COURT:  Which document?  508?

1        MR. WELDON:  508, Your Honor.

2        THE COURT:  All right.

3   **BY MR. WELDON:**

4   Q. Do you see the top portion there, ma'am?

5   A. Yes.

6   Q. And, so, explain what the Court is looking at with Martin

7   Diagnostics for this particular portion of the chart.

8   A. So, with the tan portion there, that's what is in question

9   as to whether she submitted a travel voucher for that date of

10  service and the government wasn't able to verify that.

11       So, what I did was I pulled the dates of service around

12  those time frames.  So, you can see on February 1st, it looks

13  like she was paid $16.47 for transportation, and a pharmacy

14  was paid out for $317.14.  On February 2nd, she was paid

15  $46.28, but there was no corresponding date of service, but

16  then on February 7th, a pharmacy was paid out for $143.19,

17  uhm, however, there was no mileage then reimbursed for

18  February 7th.

19  Q. Then let's talk about that.  So, just using these numbers

20  (indicating), do you know what was paid on February 1st of

21  2006?

22  A. $16.47.

23  Q. And do you know where that was paid to?

24  A. Uh, Ms. Durand.

25  Q. Okay.  But then what was the -- was it Walmart, do you

1  know?

2  A. I don't know what pharmacy that was.

3  Q. Okay.

4  A. Off of the top of my head.

5  Q. Now, Third-Party Solutions, though, that is for payment to

6  a pharmacy, correct?

7  A. Correct.

8  Q. All right.  Then, if you look, would you disagree that it

9  was paid to Walmart?

10  A. (Indicating)  I don't know that I can agree or disagree

11  that it was paid to Walmart, but...  (Nods head affirmatively)

12          MR. WELDON:  Your Honor, may I approach madam clerk?

13          THE COURT:  You may.

14  **BY MR. WELDON:**

15  Q. And I'll get to my point here in a minute, Ms. Gipe.  Now,

16  is this the portion for the first line that we were talking

17  about?

18  A. It appears that it is.

19  Q. So, that would be the February 1st, 2006, line; is that

20  right?

21  A. Yes.

22  Q. And how many miles were identified as being traveled?

23  A. 37.

24          MR. WELDON:  Okay.  And, then, if we could please go

25  back to Government's Exhibit 508?

1          THE COURT:  It's not a government's Exhibit.

2          MR. WELDON:  Or Defense Exhibit 508.

3    **BY MR. WELDON:**

4    Q. Now, then, what's the suggestion?  So, you have the payment

5    on the top there on February 1st of 2006, in the amount of

6    $16.47, based on the 37-mile claim; is that right?

7    A. That's my -- that's my assumption of the sum of the units

8    right next to where your -- the chart said "Transportation

9    paid was 37."

10   Q. And, then, the next payment is the February 2nd, 2006,

11   payment; is that right, ma'am?

12   A. Yes.

13   Q. And, again, that was based on 104 miles.

14   A. Yes.

15   Q. All right.  So, really, Ms. Durand was able to travel 37

16   miles for one prescription, the next claimed prescription was

17   104 miles.  Is that right?

18   A. According to what the information was, yes.

19          MR. WELDON:  All right.  Your Honor, I have no

20   further questions.

21          THE COURT:  Redirect?

22          MR. ARVANETES:  No redirect, Your Honor.

23          THE COURT:  Is the witness excused?

24          MR. ARVANETES:  Yes.

25          THE COURT:  You may step down.  Thank you, Ms.

1   Gipe.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Mr. Arvanetes?

4          MR. ARVANETES:  Your Honor, we call Ms. Durand.

5          THE COURT:  Ms. Durand?

6          MR. ARVANETES:  Yes.

7          THE COURT:  Okay.

8

9                 **(The witness was duly sworn.)**

10

11         THE DEFENDANT:  I do.

12         THE COURT:  Good morning, Ms. Durand.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  We know who you are.

15     Go ahead, Mr. Arvanetes.

16         MR. ARVANETES:  Thank you.  May I have a moment to

17  prepare?

18         THE COURT:  Mr. Arvanetes, I was going to take a

19  lunch break about 12:30, how long do you think for Ms. Durand?

20         MR. ARVANETES:  I think direct's going to be an hour

21  or --

22         THE COURT:  Okay.

23         MR. ARVANETES:  -- so.

24         THE COURT:  All right.  Well, we'll see where we

25  are.  Go ahead.

1

2                        **DIRECT EXAMINATION**

3      **BY MR. ARVANETES:**

4      Q. Good morning, Debbie.

5      A. Good morning.

6      Q. How are you doing today?

7      A. (Smiling)  Could be better.  (Shakes head negatively)

8      Q. Uhm, I'm going to ask you some questions, and I just want

9      you to -- if you remember, uhm, do the best you can to answer

10     them.  And if I need to repeat anything, uhm, then please ask

11     me to repeat something.  Okay?

12     A. Okay.

13     Q. If you don't understand it.

14     A. All right.

15     Q. I want to talk a little bit about chronology, a little bit

16     about your history, your pathology, if you will, since it's,

17     obviously, one of the big points of this case.

18     A. Okay.

19     Q. When did you start working for the USPS?

20     A. I believe it was in 2001.  (Nods head affirmatively)

21     Q. And what was your position there?

22     A. I was called a TRC, is what I started at.

23     Q. What does that "TRC" mean?

24     A. Temporary rural carrier.

25     Q. And where was that?

1    A. That's in Tomball, Texas.

2    Q. And, then, in 2003, were you injured?

3    A. Yes.

4    Q. And did you file a CA-2 form with Workers' -- with the USPS

5    or the OWCP?

6    A. Yes.

7    Q. And was it initially rejected?

8    A. Yes.

9    Q. And did you appeal?

10   A. Yes.

11   Q. And when was it (indicating) not objected to, what year?

12   A. When it was accepted?

13   Q. When it was accepted.

14   A. It was in 2004.  I think it was April of 2004.

15   Q. And that was for a work-related injury?

16   A. Yes.

17   Q. Can you explain what that injury was and how that injury

18   occurred?

19   A. Uhm, I carried mail on -- well, I started as a TRC, which

20   is not guaranteeing you any days; usually, one day to however

21   many days, five days a week, six days a week, often, and I was

22   the sub for a route.  And the rural carrier on that route was

23   injured, and she went out of work, injured on duty, so I was

24   her sub of record, so I took over that route.

25        So, I was working eight hours a day, five days a week,

1  uhm, on that route, plus I was doing extra work for the post

2  office, whatever the supervisor needed me to do, carry another

3  route, case a route, deliver express, do coll -- well, not

4  collections then.  Pretty much anything.  I was carrying C

5  carrier mail.  I was doing a lot of different stuff.  And --

6  and I was -- I was working hard, I was doing everything they

7  asked me to do.

8       And in the first part of April, I think it was, the post

9  office contracted with Southwestern Bell or AT&T, it was a

10  phone book company.  And along with my regular mail, which was

11  over 400-and-something people, uhm -- it was 4 to 600 people,

12  I can't remember exactly the number of people that I carried

13  mail for, they wanted me to also carry along out, uhm, these

14  bundles, 15-pound bundles of phone books that were cellophane

15  wrapped all together.

16       And each person on that route was getting those phone

17  books.  And they'd come in, like, on pallets, and you just had

18  them out there, you'd just pull them off what you could take.

19  They came in -- the clerks would bring them, I guess, off of

20  pallets and throw them in our hampers, along with our regular

21  packages and mail.

22       And we would have to go in there and pull out our

23  packages, pull out everything else, and then wrestle the

24  15-pound bundles out of there.  And that was, like, almost two

25  weeks' worth of doing that every day.   And then I would stack

1   the phone books someplace, and they would not be happy there,

2   so the supervisor or administrator would complain.  So, I

3   would have to move these huge stacks of these phone books from

4   one place to another, and it was just a constant, uhm,

5   bending, squatting, you know, having to lift these up and

6   place them somewhere else.

7        And, then, I carried out, usually, about five of those

8   bundles a day, because that's all I could fit inside of my

9   vehicle.  And, so, I would deliver my regular mail, plus these

10  phone books.  And I carried pretty much everything on my left

11  arm; and when I case mail, I case holding it with my left

12  hand, and chuck it in the case, and case it out.

13       Well, I started having some really severe problems

14  holding things in my hand.  I kept -- started dropping them,

15  couldn't hold onto them, and so, it was taking longer to case

16  the mail.  And when I had to squat down and pick things up, I

17  was having a hard time getting back up.

18       And, uhm, eventually it got to where I couldn't hold

19  anything in my left arm.  I couldn't pick it above -- or pick

20  it up over my shoulder, and, so, I was having to case

21  everything with my right hand.  So, it was just taking really

22  long, and then I still had to deal with these -- the bundles.

23  And, so, I started to squat down, and I just couldn't get back

24  up anymore, I just -- I was there -- I was just there for a

25  while just crying, because I couldn't get up.

1    And, so, I had -- another person came over and asked me

2    what was wrong, and I said, "I just can't get up." And, so,

3    well, obviously, I eventually got up. And I was doing my job

4    there, and trying to make due with what's going on. And I was

5    in severe pain, I was hurting so bad.

6    And I had no insurance, because I was a TRC, had no

7    insurance of any kind. And I was seeing a primary care

8    doctor, Doctor Martin, I had been seeing him off and on when I

9    could for whatever I had to. And on the 23rd, when I left

10   work, I was -- I was just really seriously thinking about

11   committing suicide, because I just -- you know, I had no

12   insurance, I couldn't pay for anything.

13   I got back on the road, I thought I was having a heart

14   attack because my chest was so tight and hurting, and I just

15   decided right then and there that, you know, if I didn't die

16   tonight, I could go to the doctor tomorrow, I told myself.

17   So, I went to the doctor the next morning, and he just --

18   he, uhm -- I don't remember if he did an x-ray then -- right

19   then, he did an exam, and came up with the diagnosis that he

20   did.

21   Q. And, so, with that information, you submitted this CA-2

22   form in 2003.

23   A. Yes.

24   Q. Which was eventually accepted in 2004.

25   A. Right.

1   Q. Which -- did it place you on certain restrictions?

2   A. Uhm, I did have restrictions.  I don't remember exactly

3   what they were back then, but I had a lot of restrictions.

4   Q. So, you could work, but with restrictions.

5   A. Uhm...

6   Q. How did that work?  Explain -- explain the proc -- that

7   process?

8   A. Yeah, I can't remember that long back.  I don't remember if

9   I went to work right then, right away.  I know I was on

10  restrictions.  And, I think, he had me off, because he was

11  trying to find out what was going on with my back.  I was

12  still having problems with my -- (indicating) this part of my

13  neck, and my arms and stuff.

14        And I think we worked with the back part, getting the

15  surgeries done -- well, going through that, and we got the

16  neck later accepted.  Because the original claim, I don't know

17  how they dropped the ball on that one, but they did.  And,

18  uhm --

19  Q. All right.  Well, let me -- let's move forward to -- you

20  put in another CA-2 claim in 2005.

21  A. Yeah, that was for the neck.

22  Q. And that was because the initial CA-2 in 2003 didn't have

23  the neck.

24  A. Right.

25  Q. And was that accepted?

1   A. Yes.

2   Q. Okay.  And, then -- and, so, in 2006, you eventually went

3   back to work in Tomball with restrictions?

4   A. Yes.

5   Q. And who was your supervisor then?

6   A. Hmm...  I'm -- I remember the postmaster, I believe it was

7   John Turknik (phonetic), but the supervisor -- I'm not sure

8   who the supervisor was then.

9   Q. Okay.  And, so, when you went back to work, you had

10   restrictions -- work restrictions?

11   A. Yes.

12   Q. And what were those work restrictions, do you recall?

13   A. Uhm...

14   Q. Just in a general --

15   A. Yeah.  I couldn't lift a certain amount.  Uhm, there was --

16   I think there was no pushing, no pulling, or something like

17   that on that one.  Uhm --

18   Q. And how does -- what was your -- in your experience as a

19   postal worker with the USPS, how was someone on temporary duty

20   treated?

21   A. Like dirt.

22   Q. Explain that.

23   A. Uhm, you're not -- well, when you're on limited duty,

24   you've got the work restrictions, and this is what the post

25   office, the supervisors, are supposed to go with.  Uhm, they

1    are supposed to be within your craft, which I was a rural

2    carrier, uhm, but they had me, uhm, doing supervisor duties,

3    doing administrative duties.  I was, uhm, doing things that a

4    city carrier -- well, not just a city carrier, anybody inside

5    the post office is -- you know, you're just -- I was just

6    treated like crap.

7        I wrote down a memo to somebody that a supervisor told

8    me to write down and hand to another rural carrier, and she

9    brought it -- she wrote a nasty comment on it and came back

10   and threw it at me and said, "You're not the supervisor,

11   don't -- you know, don't ever hand me these things again,

12   don't ever bring anything to me again."  Uhm --

13   Q. Where was your desk at?

14   A. It was right by the men's bathroom.  Uhm, it was against a

15   wall.  And my back was towards the rest of the office, the

16   entire office.  And, then, to the right of my desk was the

17   men's restroom.

18   Q. And, so, when did Carolyne Bowi become your supervisor?

19   A. Uhm, I believe it was the next time I went back to work on

20   limited duty, a limited duty offer.  I believe she was in the

21   office then as a supervisor -- or an OIC, or a supervisor.

22   Q. And how did she treat you as a temporary worker?

23   A. Yeah.  Yeah. (Shakes head negatively)  Not good.  She was

24   unbelievable.  I just can't believe there was somebody like

25   her.

1    Q. Explain.

2    A. Uhm, (sigh) well, she's -- she had me -- and I -- okay.

3    One of my assignments was to answer the side door.  And I did

4    it.  It was a clerk duty, but that's okay, that's what they

5    told me to do, so I did it.

6         And one of the ladies that was at the side door, she had

7    been waiting in line for a really long time, and she was --

8    kept buzzing the side door.  And I answered it, and I -- she

9    told me what she needed, she was there to pick up a package

10   and to talk to a supervisor.

11        And I told her -- I don't remember what was wrong with

12   the package, I think it had actually been returned or

13   something like that.  It wasn't available, it wasn't there in

14   the office, and, so, she said -- kept insisting that she

15   wanted to talk to a supervisor.

16        So, I went and told the supervisor, Ms. Bowi, that this

17   lady was waiting at the side door, and she just kind of didn't

18   say anything.  And, so -- she heard me.  She looked at me, she

19   heard me.  And, so, she didn't say anything.  The lady was out

20   there.  Of course, I shut the side door.

21        And the lady still is out there for awhile, so she was

22   ringing the doorbell again, and, you know, I answered again.

23   She says, "You know, I really -- I want to talk to a

24   supervisor."  She was very adamant about it.  And I was, like,

25   "Okay."  So I went back and told her again.  You know, this

1    lady is still at the side door, she is waiting to speak to a

2    supervisor, she is not going to leave until she talks to a

3    supervisor.

4         And, so, she didn't (shakes head negatively) -- she

5    didn't go to the side door.  She didn't say anything about it.

6    Uhm, finally, this lady, she's just at the side door, and she

7    is just in tears and totally upset and, "My husband's a

8    lawyer, you're going to hear about it," you know, and on and

9    on and on.

10        And I was just in tears, because I did everything I could

11   to help her.  And, you know, I was -- that's what I -- I was

12   doing everything I could.  I couldn't do anything else.  I was

13   -- I'm not a supervisor, I couldn't help her in that position.

14   So, she just finally -- she walked away.  And she left and

15   shut the door, and I just sat down.  I mean, I was so shaken

16   and so upset.

17        And there was another time that somebody called on the

18   phone --

19   Q. So, let's -- so let's just stick to that one.

20   A. Uh-huh.

21   Q. Because we don't want to go into each time.  But were you

22   written up for that?

23   A. Oh, yeah.

24   Q. Like, why?

25   A. This was -- I can't even remember the reason that she wrote

1   me up for this one was.  Uhm, I don't know if it was an

2   actual, like, a letter that they put in your file, kind of

3   thing, or if it was just, like, you know -- I don't know, but

4   she says, you know, "You're getting written up."  I know that

5   there was a time that I was written up for.  I believe this is

6   the time.

7   Q. And then you heard testimony, Ms. Bowi said you were

8   written up for driving the wrong way.  Explain that.

9   A. Yeah.  Yeah.  Our post office is, like, here, and then

10  you've got an entrance gate on this side, and then the exit

11  gate on the other side.  And we are on a back street.  Uhm,

12  the traffic that comes through is occasional.  During school,

13  it's more often, when school let's out.

14      And I had come down that road, and I -- I don't think --

15  I think I -- well, the exit gate was locked.  And, so,

16  usually, we'll come up the road -- and I wasn't the only one

17  who did this every day, they go in the exit gate, because it's

18  before hours, it's before the post office is open, go in the

19  exit gate and go to the back and park.

20      And, so, I was coming up the same drive, where -- the

21  same end of the road where I normally did, and look there, and

22  the exit gate is closed.  So, I was already in the parking --

23  already in the driveway going in the back gate, the exit gate,

24  but it was closed, so I cut through the front parking lot to

25  go in the end gate.  And that's where she wrote me up for

1   going through the parking lot -- the front, empty parking lot

2   before hours, going the wrong way in the drive -- in the

3   parking lot.

4   Q. And other people -- you saw other people do that, too?

5   A. Oh, yeah.  Yeah.  It was pretty common.

6   Q. Do you know if -- I mean, just to your knowledge, if they

7   ever got written up?

8   A. Nobody.  No.

9   Q. You did file an EEO complaint, did you not?

10  A. Yes.

11  Q. Against Carolyne Bowi?

12  A. Uh-huh.

13  Q. And what was -- it was based upon what?

14  A. Uhm, I think there was two EEO complaints against her.  One

15  was because there were probably three -- uhm, three or four

16  limited duty people in the office, and it was kind of worked

17  out where we would come in at different times, I guess, to

18  kind of cover the day, or whatever, and -- because we didn't

19  all work eight hours, or a certain number of hours, the exact

20  same hours, or whatever, during the day.

21       And she usually had me come in in the early morning.

22  But this other lady that would come in -- and I had asked Ms.

23  Bowi before, because the phone was right by the men's

24  bathroom, you know, "Can I use the phone anywhere else?"  And

25  she'd said, "No."  And there is a phone in the back that the

1  clerks used when they needed to -- there's a clerk usually

2  back there, and she said no on that phone.  There's a phone in

3  the supervisor's office, and it was no on that phone, that I

4  had to sit at this phone and answer all the calls and do the

5  other work at that desk.

6      And, so, one day, one of the other limited duty people

7  came in, and there was other -- she had pretty much the same

8  restrictions that I did, uhm, and she was in the supervisor's

9  office answering the phone.  And I asked Ms. Bowi, you know,

10  "How come she's in there answering the phone?"  And she says,

11  "Oh," she says, "I needed her in there."  You know, "So she's

12  just in there answering the phone."  So, it was -- it wasn't

13  the first day, it happened multiple days that this lady was in

14  there in the supervisor's office answering the phone.

15      And even when I wasn't at the desk answering the phone or

16  on the phone there and I would be doing other things, that

17  lady would still be in the supervisor's office there at the

18  desk answering the phone.  And that's all -- basically, all

19  she did in there, she didn't do the other work.

20      And, so, you know, I asked Ms. Bowi, you know, "Can I go

21  in there and use the phone?"  You know, "Instead of sitting

22  here with the men's room, I'm disrupted every time the men go

23  in, the smells are not the best, you know, there's a lot of

24  thing's going on right there," and she kept refusing -- you

25  know, refusing me.

1      And I had been in the supervisor's office doing

2  administrative duties and everything else, so it's not a

3  problem -- there's not a problem with security or anything

4  like that, or, you know, me getting into the files or

5  anything.  Because I had already been in there doing what she

6  told me to do.  So, I filed the EEO.  And it wasn't just that,

7  it was this lady is an African American.  She had done this

8  multiple times, not just with this lady, but this same -- you

9  know, it's the same situation with the same lady.

10      Uhm, we only delivered expresses, or had to go out and

11  take stuff out to a carrier that we had -- we have a LLV,

12  which is a post office vehicle, and then we have our personal

13  vehicles.  And I would always ask for an LLV when I had to do

14  it, because I didn't want to use my personal vehicle.  Uhm, if

15  I remember right, it wasn't a very dependable one, so I didn't

16  want to get out there and have something break down or happen

17  to it.

18      And, uhm, so I asked for an LLV, and I was always

19  refused.  And when this same lady, when she had to go do the

20  expresses or go out on the routes, she was given an LLV just

21  right off the bat.  You know?  She would actually take an LLV

22  from other carriers that were -- that usually used it.  They

23  weren't assigned to it, but they usually used it, she would

24  take it from them and give it to this lady.

25      And the same lady, I figure -- I was doing administrative

duties, so I would pull down the 4240s and timesheets that you

write down your, basically, time in, your lunch hour, your

time out, and everything else, and you would also put on there

your mileage, if you drove your personal vehicle, or you would

write "LLV" if you used a LLV.

And the same lady, uhm, she was using the LLV, so I was

pulling down the 4240, so I knew everything that was going on

within the post office with these -- with this, and she had a

LLV this one day but she wrote down the mileage on that day,

so she actually got paid.

I think it's called an EMA, which was a mileage

reimbursement, that day while she was using a post office

vehicle.  And I pointed this out, and it was just never --

like, it was, brushed it off, don't worry about it.

Q. You put in a what?

A. I told the supervisor what happened on there, you know,

that she had done this, and she just brushed it off.

Q. All right.

A. It was just, yeah, a total different treatment.  And not

between just this lady, but others.

Q. So, during this time, you sought EAP.

A. Yes.

Q. Explain what "EAP" means within the USPS --

A. Uhm, employee --

Q. US postal products?

1    A. Yeah.  I think it's employee -- I can't remember what the A

2    is.  It's assistant -- I can't remember what the A is.  But

3    what it is, it's, like, a counseling service that the post

4    office provides, and I had made an appointment to talk to the

5    EAP lady, uhm, about the treatment and the problems that I was

6    having with Ms. Bowi at work.

7         And, uhm, I talked with -- seen her -- saw her a few

8    times, and pretty much thought it was going nowhere.  You

9    know, it's just sit here, you know, give us your grievances,

10   and, then, you know, we'll just talk it out (indicating) kind

11   of thing.

12   Q. Uh-huh.

13   A. I don't know if they are supposed to mediate or whatever.

14   But as soon as I heard the word "mediate," I'm just like, you

15   know, me and the post -- or the supervisor, together, it's

16   just -- I'm not going to go there.

17   Q. So, the -- so, the EEO complaint eventually was dismissed.

18   A. It was dropped, yeah.

19   Q. It was dropped.  And did you have recourse to appeal?

20   A. I did.

21   Q. And did you appeal?

22   A. No.

23   Q. Why not?

24   A. Because when I filed the EEO and I told them just as

25   honestly as I could, you know, what was going on and

1    everything, and they told me that -- well, I don't know what

2    the word is, but they would go back, and they would talk to

3    the supervisor.  And as soon as I found out that, then I just

4    knew it was going nowhere.

5    Q. Okay.  Now, during -- while you were working as -- what do

6    we call it?  Temporary duty?

7    A. Yeah.

8    Q. A temporary duty assignment.

9    A. Oh, limited duty?

10   Q. Limited duty.  That's it.

11   A. Yeah.

12   Q. You also had a first back surgery by Doctor Strausser.

13   A. I -- I had -- I believe so, yeah.  Right in between them

14   times, I believe I had.

15   Q. And -- and you had back surgery, I believe, for the L-4 and

16   L-5?

17   A. L-4-L-5 and S-1.

18   Q. I'm sorry?

19   A. L-4-L-5 and S-1.

20   Q. Oh, and S-1.

21   A. Uh-huh.

22   Q. And that was done by Doctor Strausser?

23   A. Right.

24   Q. And this was the time when you were still using Doctor

25   Martin as your primary care physician?

1    A. He was my primary care physician, yeah.

2    Q. And how did that first surgery take?  (Nods head

3    affirmatively)

4    A. It didn't.  (Shakes head negatively)  Uhm, it was a

5    laminectomy.  And, I guess, they go in there and

6    (indicating) -- well, the first surgery -- the first back

7    surgery that Strausser did is a laminectomy to the L-4-L-5,

8    you're right.

9    Q. Uh-huh.

10   A. And they go in there and scrape out something or drill out

11   something, where it's supposed to take the pressure off the

12   disc, I think --

13   Q. The nerve?

14   A. -- or the nerve, yeah.  And that didn't work, I didn't

15   receive any relief from that at all.

16   Q. And where was the pain coming from?

17   A. This --

18   Q. Back?  Legs?  What?

19   A. The lower back is where it starts from, and then it goes

20   down the left leg, all the way.  Just, like, the sciatic nerve

21   pain goes all the way down to the toes.  It's just all the way

22   down.

23   Q. And about a year later you had a second surgery?

24   A. Yes.

25   Q. With Doctor Strausser?

1    A. Yes.

2    Q. And what was that for?

3    A. That was the back surgery, the lumbar fusion, (nods head

4    affirmatively) another back surgery.

5    Q. But it was a fusion this time.

6    A. It was a fusion, yeah.

7    Q. Explain that.

8    A. This is the L-4-L-5 and S-1.  So, they take out -- well,

9    they went through the front, and they make an incision in the

10   lower abdomen, in the front, and they go to the side and take

11   out the disc material.  And they replace those with, I think,

12   they were rings that have, like, chips of bone in them,

13   cadaver bone, I think it is.

14        And then they take -- he took rods, and there are screws

15   in there and pins to hold the -- to hold it all rigid, L-4-L-5

16   and S-1 rigid, and they are still in there.

17   Q. And tell me about the success of that surgery.

18   A. I received a little bit of relief from it, but it was still

19   -- I had the pain, I had the numbness and weakness in the leg.

20   It was all still there.  (Shakes head negatively)

21   Q. And then -- let's see.  And, then, during this time, one of

22   Doctor Strausser's office partners was a guy named Doctor

23   Heiman.

24   A. Yeah.

25   Q. Do you remember Doctor Heiman?

1    A. He's in the office - in the same building, yes.

2    Q. The same building?  And what was going on with Doctor

3    Heiman?

4    A. Uhm, I believe this is right after my neck had been

5    accepted with the second CA-2 that he had done some imaging in

6    my neck and had found some -- irregularities or he found, I

7    think, a protruding disc or a tear in my neck, in my cervical.

8         And he found -- he knew that I had this thing going on in

9    my neck right here (indicating), it was -- it was really,

10   really tight and sometimes I couldn't talk, so the whole

11   answering the phones thing before this was done was very

12   difficult and hard.

13        But he did some testing, uhm, with my left arm and my

14   hands, and he had -- he suggested that I might have thoracic

15   out load -- outlet syndrome.

16   Q. And, so, did he do a surgery on that, eventually?

17   A. He did not.  Somebody else did.

18   Q. And that was Doctor Ali -- Ali Gaza?

19   A. Ali Azizzadeh.

20   Q. Ali Azizzadeh.

21   A. Azizzadeh.

22   Q. And let me go back.  As far as -- who paid for the surgery

23   for your first back operation with Strausser?

24   A. Workers' Comp.

25   Q. And, then, who paid for the second?

1  A. Workers' Comp.

2  Q. Who paid for your thoracic outlet syndrome surgery?

3  A. Workers' Comp.

4  Q. Okay.  So, at -- so, after the second surgery didn't take

5  from Doctor Strausser, he sent you over to Doctor Jue.

6  A. Yep.

7  Q. J-U-E, correct?

8  A. That's right, yeah.

9  Q. And what was his specialty, and what was he looking at

10  doing?

11  A. His specialty is a pain -- uhm, I don't know exactly what

12  he calls it.  But what he does is he puts in implants -- uhm,

13  an implant pulse generator or pain generator.  It's,

14  basically, a pulse generator.  And that's what he was looking

15  to do to relieve some of the pain in my left leg and in my

16  back, so that I could kind of get back to where I was on that

17  part of my body.

18  Q. And tell me about what -- I mean, (shakes head

19  negatively) I don't know what -- what is the implant?  Like,

20  tell me --

21  A. Uhm, well, he -- there is a (indicating) little motor, it's

22  about this big (indicating), and he put that in a pocket in my

23  left hiney.

24  Q. In your left what?

25  A. Hiney.  (Laughing)

1    Q. Okay.  All right.

2    A. And it has leads, wires that go up to, uhm, this little --

3    what do they call them?  They are not paddles, I guess they're

4    called leads.  But there are little metal bars in them, and

5    they go along your spine, and they are attached to something

6    down in there to keep them in place.

7         But that's especially what it is.  And what it does is it

8    has -- it -- the pulse from the generator sends out signals,

9    and they go through -- they go to your brain, because the pain

10   signals goes from your spot to your brain, so this is sending

11   the same -- well, the pain -- okay.

12        The pain signal is, like, kind of, a constant one, it's

13   constantly going to your brain, and the pulse generator is

14   sending the brain more signals, so it confuses the brain to

15   what the pain signals are.  So, it's -- it just -- I don't

16   know if it's by electricity or what, but it helps to relieve

17   the pain in the back and down the leg.

18   Q. Okay.  And before he sent you -- or before you decided to

19   put in an implant, did he send you to a psychologist?

20   A. Yes.  I had to go see a psychologist, to make sure that

21   when I woke up from surgery that I didn't think I had, like,

22   an alien attached to me, or, you know, somebody had done

23   something that I didn't know while I was out.

24   Q. All right.  And was that psychologist Doctor Bricken?

25   A. Yes.

1    Q. And, as far as -- and let me go back, if I didn't say it.

2    Doctor Heiman's surgery for thoracic, that was paid for by the

3    government?

4    A. Yes.

5    Q. Or by Workers' Comp, I mean?

6    A. Yes.

7    Q. And the consultation and future surgery by Doctor Jue, also

8    paid for by the Federal Workers' Comp?

9    A. Yes.

10   Q. And, also, the psychologist, Doctor Bricken, that was also

11   paid for by Workers' Comp?

12   A. Yes.

13          MR. ARVANETES:  Your Honor, may I approach?

14          THE COURT:  You may.

15          MR. WELDON:  (Viewing document)

16          MR. ARVANETES:  Is it 514?

17          THE COURT:  Is it a new one?  Yes, 514.

18

19               **(Discussion off the record.)**

20

21   **BY MR. ARVANETES:**

22   Q. Ms. Durand, what I'm showing you here is a report from

23   2007, May, from Doctor Bricken.  Okay.  And it says that

24   you're the patient here for this.

25   A. Yes.

1   Q. Okay.  Is Doctor Bricken the person that you saw for your

2   psychological services?

3   A. Yes.

4   Q. And was -- did you go to Woodlands to see him at his office

5   (indicating)?

6   A. Yes.

7   Q. And if you can read a little bit of it to yourself to make

8   sure that it's you he's talking about.

9   A. Yeah.

10   Q. So we can establish a little -- a little foundation or

11   something.  (Nods head affirmatively)

12   A. (Reading document)

13   Q. Were you going by "Ms. Simmons" then?

14   A. Yes.  That was before I was married.

15   Q. A 44-year-old Caucasian female at the time?

16   A. At that time, yep.

17         MR. ARVANETES:  Your Honor, I move this Exhibit

18   514.

19         MR. WELDON:  No objection, Your Honor.

20         THE COURT:  514 is admitted.

21

22             **(Exhibit Number 514 was admitted.)**

23

24         MR. ARVANETES:  Can the -- can the -- can you scroll

25   down?

**BY MR. ARVANETES:**

Q. So, at the time, in 2007, was this your current medication?

A. It looks like it, yes.

Q. And that included Paxil?  What is that?  What is that?

A. An antidepressant.

Q. Okay.  And Voltaren?

A. I think that's an anti-inflammatory.

Q. Sonata, that's for what?  Sleep?

A. That's one of the uses for it.  Uhm, that's not what he was using it for.  And I can't remember exactly what -- there is different uses for that.

Q. Okay.

A. I can't remember which one he was using it for.

Q. And, also, Hydrocodone?

A. Yep.

Q. Okay.  It's fair to say that your -- you rated the pain as a seven to eight on a scale of zero to ten?

A. Yes.

Q. All right.  And, at this time, in 2007 of May, what was your status, your work status?

A. Uhm.  I think it was unemployed then.  I was off limited duty.  I can't remember if -- it was either at the tail end of it, of a limited duty assignment.

Q. Okay.

1    A. Uhm, I'm not sure.

2    Q. And was he recommending that you go and work?

3    A. No.  He -- he was trying to get me to work.

4    Q. Get you back to where you could work.

5    A. Uh-huh.  (Nods head affirmatively)

6          MR. ARVANETES:  Thank you, madam clerk.

7    **BY MR. ARVANETES:**

8    Q. Now, in April of 2008, were you also given Social Security

9    disability payments?

10   A. Yes.  Uhm, 2008?  I believe so.

11   Q. And do you recall what that was for?

12   A. Uhm --

13   Q. What was it?

14   A. Psychological.

15   Q. What?

16   A. Psychological.

17   Q. Okay.  All right.

18         MR. ARVANETES:  And, this, Your Honor, from a

19   previous filing of my trial exhibits, was Government -- or

20   Defense Exhibit 511.

21      So, have you seen this?

22         MR. WELDON:  (Nods head affirmatively)

23         MR. ARVANETES:  I don't want to confuse the Court

24   with these exhibits.  So, this would be 515, I believe.

25         THE COURT:  Wait a minute.  What happened to 511?

1          MR. ARVANETES:  Well, that's the trial exhibit.  We

2     can stick with 511 on it.

3          THE COURT:  Why don't we do that.

4          MR. ARVANETES:  Okay.

5          THE COURT:  This is the Social Security disability?

6          MR. ARVANETES:  Yes, sir.

7          THE COURT:  Okay.  Any objection, Mr. Weldon?

8          MR. WELDON:  No, Your Honor.

9          CLERK OF COURT:  Do you want this exhibit --

10         THE COURT:  511 is admitted.

11

12              **(Exhibit Number 511 was admitted.)**

13

14              **(Discussion off the record.)**

15

16     **BY MR. ARVANETES:**

17     Q. And can -- so, in 2008 of -- April, you're -- you were

18     given Social Security benefits for your mental health.

19     A. Right.

20          MR. ARVANETES:  And if the clerk can scroll down?

21     **BY MR. ARVANETES:**

22     Q. You were initially given a one-time payment of $352.

23     A. Yes.

24     Q. In '09?  And, then, how much -- how much were you getting

25     initially per -- I don't know what the payment cycle is on

1  that.

2  A. Every third week of the month, or something like that.

3  They pay once a month every -- I think it's every -- it's the

4  same day every month.

5  Q. Okay.  And how much were you getting at -- at --

6  initially?

7  A. $44 a month.

8  Q. And how much -- are you currently getting money for Social

9  Security disability for mental health?

10  A. Yes.

11  Q. How much do you get for that per month?

12  A. Right now it's 115.

13  Q. 115?

14  A. Uh-huh.

15  Q. A month?

16        MR. ARVANETES:  May I approach the clerk, Your

17  Honor?

18        THE COURT:  You may.

19        MR. ARVANETES:  All right.  Let's go with -- what

20  are we on next?

21        THE COURT:  Is this a new one?  Do you have a new

22  exhibit or something you listed in the trial exhibits?

23        MR. ARVANETES:  It's a new exhibit, Your Honor.

24        THE COURT:  All right.  515.

25        MR. ARVANETES:  515.  Okay.

**BY MR. ARVANETES:**

Q. Okay.  This is Exhibit -- Defense Exhibit 515.  Can you explain what this is?

A. Uhm...

Q. What's it say here (indicating)?

A. "Psychiatric Review Technique."

Q. Okay.  And is this your name?

A. Yes.  (Indicating)

Q. And your -- it doesn't matter, but --

        MR. ARVANETES:  Can the clerk scroll down to the bottom?

**BY MR. ARVANETES:**

Q. And who performed this -- this test?

A. Doctor Lankford.

Q. And this is someone that you saw on behalf of Social Security with regard to your mental health benefits?

A. Yes.

        MR. ARVANETES:  And if the clerk could go to Page 7?

    Well, first of all, I would like to admit it as an exhibit.

        MR. WELDON:  No objection, Your Honor.

        THE COURT:  515 is admitted.


              **(Exhibit Number 515 was admitted.)**

1   **BY MR. ARVANETES:**

2   Q. Can you please read where there's an "X" to the Court?

3   A. "Medically determinative" -- oh, uhm -- "impairment is

4   present, it does not precisely satisfy the diagnostic criteria

5   above."

6   Q. And then what does it say with "Disorder"?

7   A. "Pain disorder with psychological features, chronic."

8           MR. ARVANETES:  And can the clerk please go to Page

9   11?  And, uhm, can you -- could the clerk scroll --

10  **BY MR. ARVANETES:**

11  Q. And, so, as far as functional limitation under "Restriction

12  of Activities of Daily Living," what does it say?

13  A. Uhm, "Moderate."

14  Q. What does it say on the "X"?

15  A. Oh, "Moderate."

16  Q. "Moderate."  And "Difficulties in Maintaining Social

17  Functioning"?

18  A. "Moderate."

19  Q. "Difficulties in Maintaining Concentration, Persistence" --

20  I can't read that -- "or Pace"?

21  A. "Moderate."

22  Q. And then "Episodes of Decompensation, Each of Extended

23  Duration"?

24  A. "None."

25          MR. ARVANETES:  And can the clerk please go --

1  please go to Page 13.

2  **BY MR. ARVANETES:**

3  Q. And these are his consultation notes.  Can you please read

4  this into the record?

5  A. Uhm, "46 yr old female with allegations of depression.

6  Clmt" -- or, I don't know -- "Clmt has chronic pain, and as a

7  result has become depressed, with pretty significant

8  limitations bec of the depression.  Clmt was hurt on an on the

9  job injury in 2003.  Clmt tried to return to work without

10  success, and has not worked since 2007. Clmt has had

11  repetitive injury to her lspine.  Clmt has been treated with

12  PT, surgery, injections, medication pain management, psych

13  treatment, spinal cord stimulator to no avail.  Clmt was

14  recently seen for MSE on 3/13/09 (Dr. Bricken)-clmt still

15  suffering from depression and anxiety due to pain.  Clmt's

16  ALDs are affected, as well as social interactions.  Clmt

17  endorses depressive symptoms such as inability to concentrate,

18  memory loss, fear of pain/re-injures self, loss of

19  sleep/appetite/enjoyment of prior hobbies/interests.  Clmt

20  continues to date with psych therapy to decrease mental

21  illness"

22       MR. ARVANETES:  Okay.  The clerk can put it down.

23    May I approach, Your Honor?  Defense Exhibit 516.  I know

24  it says "Government's Exhibit."  Oh, what --

25

1          **(Discussion off the record.)**

2

3          MR. ARVANETES:  Is this -- is 511 admitted, Your

4     Honor?

5          THE COURT:  511 has been admitted.

6          MR. ARVANETES:  Okay.  All right.

7     **BY MR. ARVANETES:**

8     Q. And what is this, Ms. Durand?  What does this say?

9     A. "Mental Residual Functional Capacity Assessment."

10    Q. All right.  Is this what you did, yourself?

11    A. No.  (Shakes head negatively)

12    Q. Do you recall?

13    A. I did something similar, but I -- I didn't fill this out.

14    Q. Okay.  And is this your name, as well (indicating)?

15    A. Yes, it is.

16    Q. All right.

17         MR. ARVANETES:  Your Honor, I would move this as

18    Exhibit 516, I believe.

19         MR. WELDON:  No objection, Your Honor.

20         THE COURT:  516 is admitted.

21

22         **(Exhibit Number 516 was admitted.)**

23

24         MR. ARVANETES:  And the clerk -- can the clerk go to

25    Page 3?

**BY MR. ARVANETES:**

Q. And can you read --

        THE COURT:  Hold on, Mr. Arvanetes.  What is this?
Who filled this out?

        MR. ARVANETES:  This is a doc -- the same doctor,
this Social Security doctor --

        THE COURT:  Doctor Lankford?

        MR. ARVANETES:  Yes.

        THE COURT:  Okay.

**BY MR. ARVANETES:**

Q. And can you please, for the record, read his functional
capacity assessment?

A. Uhm, okay.  Uhm, "Record the elaborations on the preceding
capacities in this section."  Oh, underneath that.  "Clmt
would be unable to sustain a 40 hour work week due to
psychological symptoms."

Q. Thank you.

        MR. ARVANETES:  The clerk can take it down.

**BY MR. ARVANETES:**

Q. So -- so, Doctor Jue wanted you to see Doctor Bricken for
psychological issues --

A. Yes.

Q. -- before the operation.

A. Yes.

Q. And a stimulator was put in your back.  Or your buttock.

1    A. Yes.

2    Q. Left buttock.

3    A. Yes.

4    Q. And, then, was it ever changed or moved?

5    A. Yes.  It was moved.  When I had it in, it was catching on

6    everything, and it was sitting right on top of the sciatic

7    nerve, so I -- it was moved to the front.  Or the little

8    battery pack.

9    Q. And do you still have that in your body?

10   A. Yes.

11   Q. Okay.  Now, back in 2007, you heard testimony that around

12   October, Carolyne Bowi contacted Agent Haywood from OIG.

13   A. Yes.

14   Q. Were you aware that she contacted Agent Haywood?

15   A. No.  Not -- no.

16   Q. Were you aware that he conducted an investigation and you

17   were put under surveillance?

18   A. No.

19   Q. So, you -- on or about 9/14 of 2007, you try to see Agent

20   -- or Doctor Strausser for your back issues.

21   A. I'm not sure on that.

22   Q. Okay.  What about on January 18th, 2008, the date that

23   Agent Haywood visited Doctor Strausser, did you happen to have

24   -- to visit Doctor Strausser's office?

25   A. Yes.

1   Q. Who told you to visit Doctor Strausser's office on that

2   day?

3   A. Uhm, I had a phone call, uhm, I believe it was the day

4   before.  And they told me that I had an appointment the next

5   day that I didn't know about, so I went to the appointment at

6   Doctor Straussers'.

7   Q. And what -- I mean, tell me what happened.  Did you -- did

8   you see Doctor Strausser that day?

9   A. No.

10   Q. Did you wait in the waiting room?

11   A. Yes.

12   Q. For how long?

13   A. It was a long time.

14   Q. Did you ask what the issue was?

15   A. Yes.  Uhm, after -- we sat there for quite awhile with

16   another gentleman, he'd got up and gone in, and we were

17   sitting there for a long time watching the TV.  And I was,

18   like, gosh, it's, like, forever, and it seems like -- you

19   know, we should have been back there by now.

20      And, so, I went up to the front reception and asked them,

21   you know, is there -- "Is everything okay?"  You know, "Any

22   idea how much longer it's going to be?"  And they said, "Well,

23   you don't have an appointment."

24   Q. You don't have an appointment?

25   A. I didn't have an appointment, huh-uh.

1   Q. But -- okay.  So, you never got to see Doctor Strausser

2   that day?

3   A. No.  (Shakes head negatively)

4   Q. When you visited Doctor Strausser for your back surgeries,

5   throughout the history of visiting him, did you ever lie to

6   him at all?

7   A. No.

8   Q. Or did you ever, uhm, I don't know, mischaracterize your

9   symptoms?

10  A. No.  I just want him to fix it.  (Chuckles)

11  Q. Fix what?

12  A. Fix my back.

13  Q. Fix pain, maybe, too?

14  A. Uh-huh.  Yeah.

15  Q. So, on July -- or January 25th of 2008, did you receive a

16  modified job offer signed by Carolyne Bowi?

17  A. Yes.

18  Q. And what did you do about that?

19  A. Uhm, I told her that, uhm, I wouldn't accept it until my

20  primary care -- my doctor got to look at it.

21  Q. Are you saying that Doctor Strausser wasn't your primary

22  care physician?

23  A. No.

24  Q. Who was your primary --

25  A. He never was.

1   Q. Who was?

2   A. Doctor Martin.

3   Q. The person that you talked about seeing even before you

4   started working at the post office.

5   A. When I first started, yep, before my entry.

6   Q. When you first started.  Okay.  And that was your primary

7   care physician?

8   A. Yes.

9   Q. And you understood your rights under FECA that you had a

10  choice of physicians?

11  A. Yeah.  Yes.  They told me that.

12  Q. Okay.  And, so -- so, where did they order you to go in

13  July of 2008?

14  A. Uhm...

15  Q. What doctor did they tell you to go see?

16  A. Oh, yeah.  Doctor Hood.

17  Q. Doctor Hood.

18  A. Uh-huh.

19  Q. You have to say it for the record --

20  A. I'm sorry.

21  Q. -- for the court reporter "yes" or "no."

22  A. Yes.

23  Q. All right.  And how long was that appointment?  How long

24  did he look at you for?

25  A. It wasn't very long.  He didn't -- in my mind, it's, like

1    -- it was, like, 15 minutes.  Uhm, it might have been a little

2    bit longer, but it wasn't very long at all.

3    Q. All right.

4    A. He did -- yeah, he --

5    Q. Was he professional?

6    A. Uh-huh.

7    Q. You have to say "yes" or "no."

8    A. Yes, sir.  Yeah.

9    Q. And we've already heard his testimony that he had already

10   reviewed your pathology, did he ask you questions about, I

11   don't know, your pain, or whatever?

12   A. Yes.

13   Q. When did he ask?

14   A. Yes.  He asked me about my pain.  Uhm, I'm trying to think

15   what else was all going on.  Uhm, I know that we sat and

16   talked for just a -- well, I was on the little table with the

17   paper on it.  But we talked for a little bit, and then he did

18   a few tests.  He went over my x-rays and CAT scans and

19   reports.

20   Q. With you?  With you?

21   A. Uhm...

22   Q. Did he show you the pictures --

23   A. No.

24   Q. -- while in the office?

25   A. I don't remember that.  But I remember him just saying that

1  he had reviewed --

2  Q. Fair enough.  Do you remember specifically what questions

3  he asked you?

4  A. No.

5  Q. Did he tell you anything about not being able to walk

6  around outside?

7  A. No.

8  Q. Did he tell you anything about not being able to clear

9  brush in your front yard?

10  A. No.

11  Q. Or use a tractor or a mower to pull things?

12  A. No.

13  Q. Or what about even to ride a horse?

14  A. No.  (Shakes head negatively)

15  Q. He didn't tell you any of that.

16  A. Huh-uh.

17  Q. That you can't do that?

18  A. Huh-uh.

19  Q. You have to say the word.

20  A. No.  No, he didn't.

21  Q. All right.  When you -- what did you tell him about what

22  was going on with you?

23  A. (Sigh)  About everything?

24  Q. Well, I mean, how -- why you're there?

25  A. Everything that was going on?

1   Q. Yeah.

2   A. Uhm, that the -- well, I kind of -- I believe I told him a

3   little bit about -- I'm trying to remember exactly when.  The

4   -- well, I received a letter to see him that -- to see him.  I

5   had never even heard of him before.

6   Q. But that letter was from the OWCP.

7   A. I believe so, yeah.  It was -- they had told me that I

8   would have to see, uhm, basically what they call one of their

9   doctors, or another doctor.  They said one of their doctors.

10  And, so, I -- I got a letter in the mail saying you're going

11  to go see this Doctor Hood.  Which, between the time they told

12  me this and I got the letter, it was -- you know, I was, like,

13  I don't know if they're going to -- I figured somebody there

14  in town or something.  But...

15  Q. In town, where?

16  A. In town, in Tomball.

17  Q. Were you still living in Tomball?

18  A. I was living in the area, yeah.

19  Q. In the area?  All right.  And where was Hood at?

20  A. Uhm, he was in Houston.

21  Q. Houston.  All right.  So, maybe, about 60 miles away.

22  A. It was a ways, yeah.

23  Q. A ways.  All right.

24  A. Yes.

25  Q. All right.  So, anyway, did you tell him -- let's get back

1  to our question.  Did you tell him about what was going on

2  with you, about your pain?

3  A. Yes.  Yeah.  Yes.

4  Q. All right.  And did you ever lie to him in any way?

5  A. No.

6  Q. Did you ever embellish anything?

7  A. No.

8  Q. "Embellish," meaning -- do you know what embellish means?

9  A. Yes.

10 Q. All right.  Did you embellish?

11 A. No.

12 Q. Did you, I don't know, say anything dishonest to him?

13 A. No.  I didn't say much of anything at all.  I answered his

14 questions and let him do his thing.

15 Q. Okay.  And what ended up happening based upon that -- uhm,

16 that --

17 A. Uh, that visit?

18 Q. Yeah, that visit?

19 A. Uhm, well, I left -- my husband was with me, so we left,

20 and --

21 Q. No, I mean, what happened, though, as far as --

22 A. Oh, as the result?

23 Q. Yeah.

24 A. Okay.  I got a letter in the mail.  And I was reading

25 through it, and, at the bottom it said, uhm, that he was

1   diagnosing me with disability, permanent disability, total

2   disability.

3   Q. And that meant you were going to be placed on Periodic

4   Rolls.

5   A. Uhm...

6   Q. The Periodic Rolls.

7   A. Yes.  It's my understanding.

8   Q. The -- is that PN status?

9   A. PN, yeah, not -- yeah.  Yes.

10  Q. Okay.  And after that, you would have to sign in -- sign

11  something every year.

12  A. Oh, I didn't know that at the time, but, yeah.

13  Q. All right.  Eventually.  Okay.  And between then and now,

14  did -- did the OI -- OWCP -- or DOL/OWCP ever tell you to go

15  visit another doctor --

16  A. No.

17  Q. -- after the Hood appointment?

18  A. No.

19  Q. But you have been seeing people.

20  A. Yes.  Yes.

21  Q. For -- for what?

22  A. Uhm, well, I was -- even after I saw -- I believe, after I

23  saw Doctor Hood, I was still seeing a psychologist, Doctor

24  Bricken, and I seen --

25  Q. Did you remember seeing Doctor Strausser, at all?

1    A. No.

2    Q. Did you see him --

3    A. I saw him, I think, before that about my neck, and, I

4    think, he just looked at images and --

5    Q. And that was about 2010?

6    A. Uhm, I'm not sure of the date.  Somewhere in there.

7    Q. Okay.  All right.

8    A. But it was -- yeah, I've seen a lot of different doctors

9    since then.

10   Q. All right.  And you're still suffering pain?

11   A. Yes.

12   Q. And, so, tell me the -- tell me right now what medicines

13   you're on to deal with the pain and the depression?

14   A. Uhm, depression is Venlafaxine.  I think it's Effexor, is

15   it's, like, brand name, Venlafaxine is its generic.  And I've

16   been bumped up on that.

17        Uhm, I take Buspirone, which is an antianxiety medicine.

18   That's what it was prescribed for.  It keeps my chest

19   palpations down and everything else.

20        Uhm, I get Gabapentin, which is a pain medicine, a nerve

21   pain medicine.  It's either Gabapentin or Lyrica; and I'm

22   allergic to Lyrica, so it's Gabapentin.  And then I take

23   Morphine for pain.

24   Q. Morphine?

25   A. Yeah.

1   Q. Quite a bit, according to what we've heard.

2   A. Yeah.  It's 20 milligrams, twice a day.

3   Q. What about during the kayak trip, were you taking any

4   medicine during the kayak trip?

5   A. I was taking all of that.

6   Q. Were you in pain during the kayak trip?

7   A. I was.  (Nods head affirmatively)

8   Q. Did you take medicine to alleviate the pain?

9   A. Yes.

10  Q. Did it help alleviate --

11  A. Uhm...

12  Q. -- the pain?  Tell me.  Tell me.

13  A. It did.  (Smiling)  It did to a good -- well, it doesn't.

14  (Shakes head negatively)  It doesn't.  That's why my pain --

15  my pain scale is so high.  And (shakes head negatively) it

16  doesn't take it away, it just kind of --

17  Q. What about your depression?

18  A.  -- puts a numb edge on it.

19  Q. All right.  What about your depression?  Did it -- did that

20  trip help?

21  A. Oh, gosh, yes, it did.  (Nods head affirmatively)

22  Q. Tell me about it.

23  A. Uhm, the trip, itself, was, just to me, like, the best

24  thing ever.  Just in my mind, before this, I was -- uhm, well,

25  I was in bed from December to, almost, May, just because I --

1    emotionally, and physically didn't -- just couldn't get a

2    handle on things.

3         And, in May, I had been to some physical therapy

4    appointments around that time, and then back home, and, so,

5    this trip was -- it seemed like a really good thing.  But it

6    was just, you know, it's an almost too good to be true thing,

7    you know.  In fact, I got --

8    Q. Almost -- almost too good to be true.

9    A. Yeah.

10   Q. Uhm, what about when you first got the letter or the -- I

11   don't know, the thing that said you won a free trip, that was

12   either late 2014 or early 2015; is that right?

13   A. Yeah, somewhere in there, I think.

14   Q. And what do you feel like about going on a kayak trip in

15   the San Juans?

16   A. Uhm, I didn't really think it was going to be doable.

17   Q. Why is that?

18   A. I just didn't think I could do it.  I didn't think that --

19   you know, it's -- I knew nothing about it.  And I kayaked way

20   back in 2003.  (Shakes head negatively)  Uhm, I love watching

21   it.  It seemed like a really great thing to do, but (shakes

22   head negatively) I just -- I knew that my physical limitations

23   would be really, really hard to get over, to get through.  And

24   the mental part of it, I was -- like, I just didn't even want

25   to go out and do anything.

1   Q. Did you do any prep before the trip, physical prep or

2   psychological prep or anything to get ready for it?

3   A. Well, basically, just a lot of psychological, just, it was

4   back and forth, back and forth.  I will, like, you know, I

5   want to, but I don't know if I can.  Uhm, and physical, I --

6   it -- I had started therapy, my doctor prescribed therapy for

7   me.  Uhm, because --

8   Q. What do you mean "therapy"?  Therapy, what kind?  Psych

9   therapy?

10   A. Physical therapy.

11   Q. Oh, physical therapy.

12   A. Physical therapy.

13   Q. All right.

14   A. Yeah.  And, so, I started physical therapy, I think, about

15   -- around about the same time as the letter, or before it.

16   But, I think, after I decided that I was potentially --

17   because it was -- potentially decided that I might go on it, I

18   wasn't still 100 percent sure, and, so, I mentioned this to

19   the physical therapist.  You know, I said, you know, "I'm

20   thinking about this," you know, "what do you think?"  And he

21   says, "Well, you know, it's a good thing."  You know, it's

22   something -- I've been in pool therapy, and so I had done some

23   kind of similar exercises and stuff in there.  And he said

24   that, uhm, you know, "We'll just keep up with the therapy and

25   see how it goes," so...

1  Q. Were you seeing a psych -- a psychiatrist at the time,

2  too?

3  A. No.

4  Q. During the kayak trip, there has been evidence that you

5  believed -- or, at least, in an interview with Boise on

6  September 22nd, 2015, the undercover interview, that you

7  thought this trip was something about disability or --

8  A. Yes.

9  Q. Tell me what --

10 A. Yes.  Uhm --

11 Q. Tell me what -- what made you think about that.

12 A. Well, and that was kind of the decision -- part of the

13 decision why I decided to do it.  Uhm, when I first -- I can't

14 remember if it was a phone call first or a letter first, but

15 in the phone calls that I had with Sandy Black, we had talked

16 about --

17 Q. And this is -- and this conversation is just your state of

18 mind, not -- we're not trying to say this is the truth of the

19 matter asserted, it's for your state of mind.

20 A. Yeah.

21 Q. So, tell me about that.

22 A. Yeah.  I had --

23 Q. What was your state of mind?

24 A. I had told her, you know, these different limitations, and,

25 that, you know, I really don't know if I can do it.  She said,

1  "Well, you know, this is what they said, this is a company

2  that is a short excursion, for, like, when the cruise ships

3  come in, and they are -- they have to accommodate, you know,

4  all peoples.  They can't, you know, discriminate again them."

5      And, so, she -- you know, I told her my -- what my issues

6  were, and she says, "Well, that's kind of why we are reaching

7  out to you, because we need to make sure that they are, you

8  know, accommodating, making accommodations for people that

9  have limitations."

10     And, uhm, so, I thought, well, you know, I can fit that

11 bill.  (Laughing)  You know?  And, so, uhm...

12 Q. So, that helped your state of mind --

13 A. It helped.

14 Q. -- in deciding --

15 A. Yeah.

16 Q. -- to do it?

17 A. Yeah.  And that's why -- I mean, you know, even -- yeah.

18 Q. All right.  When you were kayaking, did you ever need help,

19 physical help out of the kayak?

20 A. Uhm, I did need help out.  Uhm...

21 Q. Or --

22 A. But it wasn't actually --

23 Q. In or out?

24 A. Yeah.  It wasn't actually, like, lifting me out.  I think

25 it was the first or second time we got out of the kayaks, I

1  was in the back.  I was in the back.  I was in the back.  And

2  I was -- you're supposed to put the paddle behind you, which I

3  didn't -- I never did -- I didn't -- I missed that part of the

4  training or something, or instruction, the first couple times

5  I didn't.

6  Q. What do you mean "put the paddle behind you"?  Like a --

7  like a --

8  A. The kayak paddle.

9  Q. Like a rudder?

10 A. The kayak paddle.

11 Q. Yeah.

12 A. You're supposed to put it behind you, and then lift

13 yourself up onto the back of the kayak above the seat right

14 there.  And --

15 Q. Was that to get in?

16 A. To get out.

17 Q. To get out.

18 A. Yep.

19 Q. All right.

20 A. And, like I said, I missed the instruction, the first

21 couple -- the first time or so.  And, but, anyway, we had

22 pulled up onto this -- right now I can't think of where it

23 was.  But I was down in the kayak, and I was trying to lift

24 myself up and I couldn't.  And it just -- my arms had, like,

25 no strength.  I had no strength in the upper body, at all.

1    And I couldn't get my legs to move to help push myself up and

2    out.

3         So, I was sitting there for a little bit.  And Dakota

4    kind of came over there next to me, and she was, like, you

5    know, do I help her or not help her?  And, so, she was just

6    kind of there just -- just kind of like support, and, if I

7    needed help, she was going to help me.  But she just let me

8    take a few minutes and, kind of, I guess, I don't know what

9    happened, but --

10   Q. Kind of like she testified yesterday.

11   A. Yeah.  Yes.

12   Q. Kind of hoped that she would, maybe, stabilize the kayak

13   for you?

14   A. Well she was -- yeah, she stabilized -- she was helping me

15   get out.  I think she was holding the kayak and not -- she

16   wasn't actually -- didn't have her hands on me.

17   Q. She was being very helpful.

18   A. She had.  She was wonderful.

19   Q. And you were never jogging on this kayak trip, were you?

20   A. No.  I've never been jogging.  I couldn't -- I can't jog.

21   (Laughing)

22   Q. Well, back when you were, I guess, living in Texas, you

23   heard a neighbor testify.

24   A. Yeah.

25   Q. Uhm, did you know this neighbor?

1   A. I had seen her a few times.  Uhm --

2   Q. Were you guys close?

3   A. No.  (Shakes head negatively)

4   Q. How -- I mean --

5   A. It's housing.

6   Q. Yeah.  I mean, --

7   A. Yeah.

8   Q. -- how close were you guys?

9   A. Uhm...

10  Q. How does that all work?

11  A. Well, our house sit's back off -- sat back off the road,

12  uhm, I think -- I don't know.  My husband would know better.

13  100 feet, maybe?

14  Q. And what about hers?

15  A. Hers sat back off the road the same.

16  Q. Next to each other, or across the street?  I can't remember

17  what it was.

18  A. Our driveways were almost like this (indicating) across the

19  street, because the houses were about the same.

20  Q. Across -- just across the street?

21  A. Yep.

22  Q. And did you ever -- I mean, I don't know, what kind of

23  jogging were you doing?

24  A. I don't jog.  I did not jog.  The only jog I might have

25  ever done was when I went after the dogs, the puppies, when

1   they went into the horse pen, to keep them from getting

2   stomped.  And that was, like, the only jogging I ever did.

3   Q. It was your Pomeranians?

4   A. Yes.

5   Q. All right.  Were you walking, though, for exercise on the

6   street?

7   A. Uhm, no.  I had walked down one time leading a horse that

8   had colic, and that was the only time.

9   Q. What?  Who?

10  A. I had a horse that had colic.

11  Q. Okay.

12  A. And, I think, that was the only time that I ever walked

13  down the street.

14  Q. Were you ever told not to own horses?

15  A. No.  No.

16  Q. All right.  Okay.  I want to talk to you about Defense

17  Exhibit -- I thinks it's 508.  It's what we entered in today

18  with Ms. Gipe.  It's concerning the mileage fraud -- alleged

19  mileage fraud.

20          THE COURT:  It's 508.

21          MR. ARVANETES:  Thank you, madam clerk, for trying

22  to get that.  I appreciate it.

23  **BY MR. ARVANETES:**

24  Q. All right.  And I want to go over this with you, because --

25  just because I want to -- I want to -- I want the Court -- I

1    want the evidence to know about it, about what this is and

2    what was going on here.

3         So, we have here "Martin Diagnostics" right here

4    (indicating).  Okay?

5    A. Yes.

6    Q. All right.  And the date says 2/2/06, right?

7    A. Yes.

8    Q. All right.  Now, the government says -- and, for all we

9    know, they are right, that there is no record of -- and this

10   is a reimbursement.  Is that fair to say?

11   A. Yes.  It's a mileage reimbursement for travel.

12   Q. Okay.  So, there is no record of you visiting Martin

13   Diagnostics.  Now, let me ask you, so I know what the heck

14   that is, what is Martin Diagnostics?

15   A. That was my primary care doctor.

16   Q. That's Doctor Martin.

17   A. It's his -- yes.

18   Q. Okay.  All right.  So, then tell me about these dates here

19   (indicating).

20   A. Uhm, it's my understanding that February 1st was travel for

21   it looked -- a prescription.  Uhm, February 2nd is the

22   disputed one.  February 7th is a prescription charge.

23   Q. Okay.  So, now, slow down, because -- so I don't lose you.

24   A. Okay.

25   Q. All right.  So, February 1st here (indicating) let's --

1    February 1st, it says that you did 37 miles, is that right,

2    and you got paid $16.47?

3    A. Yes.

4    Q. All right.  And, then, February 2nd is the disputed one

5    here (indicating)?

6    A. Yes.

7    Q. Trying to get my color -- I lost my color.  It's just not

8    working.  All right.

9         MR. ARVANETES:  Now it's not working, Your Honor.  I

10   don't know what the deal is, but this isn't good.

11        THE COURT:  Why don't you clear the screen and start

12   over.

13        MR. ARVANETES:  I'm trying to.  I'm trying to.  I

14   hate computers.  All right.

15   **BY MR. ARVANETES:**

16   Q. What about this Tuesday, February 7th?  That says,

17   "Pharmacy paid," "343"?

18   A. Uhm, yes.  (Nods head affirmatively)

19   Q. Were you paid for mileage on that day?

20   A. No.

21   Q. Okay.  So, in that sense, there's a payment that you went

22   to Third-Party Solutions, the pharmacy, but you never put in

23   for mileage on that.

24   A. No.

25   Q. You never got paid for mileage on that.

1    A. Correct.

2    Q. So explain your reasoning why that is.

3    A. Uhm, my handwriting is pretty good.  Uhm, some days it's

4    not as good as others.  But this is -- to me, is what it looks

5    like is that where I put 2/2 -- or 2/7/06, they transcribed it

6    as 2/2/06.

7    Q. Okay.  All right.  Let's go to the next one here, the next

8    orange one, Martin Diagnostics, 2/14/2007.

9    A. Yes.

10   Q. The record shows that you put in mileage, but you didn't

11   get payment for it.

12   A. Yes.

13   Q. And then there's 2/14, which is a disputed one right below

14   it in purple, and then Thursday, February 15th -- 2/15.  And

15   it looks like there is several different places you went to

16   that day?

17   A. Yes.

18   Q. Is that fair to say?

19   A. Uhm...

20   Q. And "Medical paid," $82 in Conroe, $800 in Houston, and

21   $299 in Woodlands, right?

22   A. Yes.  Well -- yep.  That's -- yep.

23   Q. And does this say that you were ever paid for

24   transportation?

25   A. No.

1    Q. All right.  Any explanation for that?

2    A. Uhm, it could be --

3    Q. Except for the fact that you weren't paid.

4    A. Yeah.  On 2/14, I am almost a hundred percent positive that

5    that's the day that I had to pick up, uhm, what records that

6    Doctor Martin had for the surgery the next day -- or for the

7    procedure the next day.

8    Q. Okay.  All right.  Now, let's go to the next several.

9    There is one, two, three, four on this page, "Martin

10   Diagnostics."  It says there is no record for 2/19/2007,

11   2/21/2007, 3/2/2007, 3/5/2007, and 3/1/2007.  Correct?

12   A. Yes.

13            MR. ARVANETES:  Can the clerk please go to the next

14   page?

15   **BY MR. ARVANETES:**

16   Q. Then there is also -- all right.  All right.  Can you

17   explain any -- any of those, why -- why there's no record from

18   Martin Diagnostics that you were ever there on 2/19, 2/21, and

19   the dates that I just said?

20   A. Yes.  Uhm, those dates is actually Martin Diagnostics

21   Physical Therapy, uhm, which was there in his new building,

22   and --

23   Q. Okay.

24   A. (Nods head affirmatively)  Oh, go ahead?  On those days, I

25   know that because on limited duty assignments and what was

1   going on with Ms. Bowi, there was not a certain time or a set

2   time that I would get off, and I had appointments that were

3   made for physical therapy, so, and get to them on time.

4        And a lot of times, the gentleman would just let me in

5   there and do 15 or 30 minutes of some type of physical therapy

6   there.

7   Q. Okay.  So, why wasn't it recorded, then?

8   A. Because it wasn't a full hour.

9   Q. All right.

10       MR. ARVANETES:  All right.  Page 2.  We are on Page

11  2 already?  Thank you, madam clerk, we're already there.

12  **BY MR. ARVANETES:**

13  Q. Let's go to 7/13 and 7/30.  It looks like Woodlands -- in

14  Woodlands Pain Consultants, 46 and 65 with change.  It says

15  that we don't have a record of that.

16  A. Okay.  Yes.

17  Q. Tell me about -- you know, it says Thursday, 26 -- July

18  26th, Third Party Solutions.  There is a payment of 191, but

19  no travel, no travel reimbursement.  Explain it.

20  A. Uhm, and I know -- I'm pretty sure, because I write mostly

21  what's on the calendar or try to do it off memory, that there

22  are days that I didn't get mileage reimbursement for, it was

23  never submitted.  Uhm, just because I forgot about them.  I

24  don't write it down as soon as it happens, or whatever.

25       But on the 7 -- on 7/13/2007, I don't have anything for

1   Woodlands Pain Consultants, but I did have something for

2   Martin Diagnostics for that same day.

3   Q. Okay.  All right.  What about 7/30?

4   A. Uhm, 7/30?  And, also, the -- on 7/13, the amount that was

5   charged, I believe, was the same amount as my mileage to

6   Martin Diagnostics.  But on 7/30 -- uhm, 7/30?

7            MR. ARVANETES:  Well, let's go back to Page 1, madam

8   clerk.  I want to set that -- I want to look at that.

9   **BY MR. ARVANETES:**

10  Q. So let's look at the first one.  "Martin Diagnostics"?

11  A. Yes.

12  Q. How much is that reimbursement?

13  A. That one is 46.28.

14           MR. ARVANETES:  All right.  Then let's go to the

15  one, madam clerk.

16           THE WITNESS:  And then next one is 46.56.

17  **BY MR. ARVANETES:**

18  Q. And then 46.56.  Any reason why the change is different?

19  A. Uhm, it could be an increase in the amount -- the dollars

20  or cents per mile.

21  Q. Okay.  And, then, sorry to interrupt you, but you were

22  explaining 7/30.

23  A. 7/30?  Uhm, this one, I'm -- Woodlands Pain Consultants was

24  where I had the implant put in.  And I had to go back for

25  reprogramming with the ANS representative, that's the

1    manufacturer of my implant.  And if -- Jason would meet -- he

2    had to meet in a physician's office, because he didn't have an

3    office.

4    Q. What was he doing with the implant?

5    A. He programs it.  He, like, puts in --

6    Q. Like, a new battery or something?

7    A. No.  Uhm, he has a remote that he can, uhm, like, adjust

8    the locations of the, uhm, tingle in my back, the pain

9    generator -- pain -- on the leads, the little metal contacts.

10   Q. All right.

11   A. He can program that.  That's what he was, is a programmer,

12   and he was also there during the surgery.

13   Q. All right.  So, tell me about July 26th.

14   A. Uhm, July 26th, I just didn't charge mileage reimbursement

15   for it.  That was the day I picked up prescriptions.

16   Q. And Third-Party Solutions is a --

17   A. It's some pharmacy.

18   Q. What is that?  That's a pharmacy.

19   A. Yeah, I don't know.

20   Q. Where?  In Texas?

21   A. I don't know.  I -- I assume it would be, because that's

22   where I was living.

23   Q. Okay.  Let's go to the next one.  9/14, CVS Pharmacy, $45,

24   no record.  We got 9/4, Third-Party Solutions.  We got a

25   payment of 210 but no reimbursement.  Tell me about that?

1    A. Right.  And this is a clerical error.  Uhm --

2    Q. Explain that.

3    A. It should be -- on the CVS Pharmacy where it says "9/14,"

4    it should be "9/4."

5    Q. Now, why does this -- why is -- tell me why does one say

6    "Third-Party Solutions" and one says "CVS Pharmacy"?

7    A. Uhm, I don't know how they paid through it.  I don't know.

8    Q. Is that a company, like, --

9    A. I don't know.

10   Q. "Third-Party Solutions"?

11   A. Yeah, I don't know.

12   Q. Like, Walgreens or something?

13   A. I don't know.  (Chuckles).

14   Q. All right.  That's fine.

15   A. And they seemed to pay a lot of pharmacy things.

16   Q. Okay.  All right.  All right.  Let's move on.  Let's go to

17   Northlakes Pain, 1/15, and Woodlands, 2/25/2008, uhm, records

18   that put in for -- put in for mileage, but no payment.

19   A. And 1/15 to Northlakes Pain, that's when I had my revision

20   done, and --

21   Q. Revision of what?

22   A. My IPG, a revision of my implant.

23   Q. Okay.

24   A. And, with that, I'm not sure if it was paperwork for DOL,

25   uhm, a work release.

1  Q. You're talking about -- which one are you talking about?

2  A. 1/15/08.

3  Q. Okay.

4  A. It would be where I just went into the office to pick up

5  something, uhm, that they didn't charge -- make a charge for.

6  Q. Right.

7  A. And when I did that, it was usually for paperwork or

8  x-rays.

9  Q. All right.  What about 2/25?

10 A. 2/25 is Woodlands Sports Medicine, and that's where I had a

11 lot of my imaging done --

12 Q. Correct.

13 A. -- when I had my back surgery.  And this would be right

14 before I saw Doctor Speller on my cervical neck.  So, I had

15 been picking up x-rays and CT scans and reports from Woodlands

16 Pain.

17 Q. Okay.  And -- all right.  So, tell me about the purple

18 February 19th, 20th, 21st, 25th, 26th, 27th, and 28th.

19 A. Yeah.  The 19th, First Script is the Workers' Comp

20 pharmacy.  They pay the -- their prescriptions.

21     Martin Diagnostics, it looks like I had to go in there.

22 That one, I couldn't tell you what the appointment was for.

23 American Institute of Toxicology --

24 Q. Did you get reimbursed for that?

25 A. Yes.

Q. On 2/19?

A. Yes.

Q. Okay.

A. Uhm, American Institute of Toxicology, I don't know what

that was.  And, then, Doctor Steven Sims, he's Northlakes Pain

Consultants.  So, that --

Q. I don't see a reimbursement there for the American

Institute of Toxicology.  Is that there, --

A. No.

Q. -- or what is that?

A. Uhm, I'm not sure why there isn't.  Again, it could be, I

just -- I didn't send one in.  I didn't have the date written

down or --

Q. Okay.

A. Well, we've got the date there.

         MR. ARVANETES:  All right.  All right.  Let's go to

the next page, madam clerk.

**BY MR. ARVANETES:**

Q. All right.  So, we've got Memorial Hermann-Woodlands,

23.23, no record, 7/21, and we have a couple of visits, July 1

and July 23rd of the same year.

A. Yes.

Q. Tell us about that.

A. Uhm, I had a procedure done in the Woodlands, and that

was -- I can't remember exactly which one that was, either.

1    And, then, on the 23rd is when I had Doctor Hood's

2    appointment, so I would have been picking up paperwork for

3    Doctor Hood's apartment (sic), as was required by me, --

4    Q. From?

5    A. -- from a letter.

6    Q. From Memorial Hermann?

7    A. Uhm, it could be Memorial Hermann.  Yeah, it would be

8    Memorial Hermann.  Yeah.

9    Q. You could have been picking up paperwork?

10   A. Or x-rays from the previous procedure.

11   Q. All right.  And, then, uh -- and, then, of course, two days

12   later, QTC Medical Services, that's Doctor Hood.

13   A. Yep.

14   Q. All right.  What about the next two, Northlakes Pain, 22

15   and 9/25?

16   A. Uhm, 7/22 is the same thing, picking up paperwork for

17   Doctor Hood.  Uhm, 9/25, Northlakes Pain Consultants, uhm --

18   let's see.  Doctor Bricken.  Oh, I'm pretty sure this one's --

19   yeah, staples.  I'm pretty sure I was getting the staples out

20   from the surgery, or, uhm, just basically running in there and

21   have him pull them out, or check to see if they could be taken

22   out.

23   Q. Did you say "Speller" or "Sims"?

24   A. No, this is for -- Northlakes Pain Consultants is Sims.

25   Q. Okay.  Makes sense.

1    A. Yeah.

2    Q. And what about -- what about the dates in proximity to that

3    date?

4    A. Uhm, 9 --

5    Q. 9/9, 9/11, 9 --

6    A. Yeah.  9/11, Doctor Bricken's office, uhm, I was paid for

7    mileage.  9/11, Doctor Sims and the Huntsville Surgery Center,

8    that was -- okay.  Paid for with mileage.  Doctor Bricken, my

9    psychologist, that was paid for with mileage.  First Script

10   Pharmacy, and then my doctor, Martin, that was paid for

11   mileage.  And on the 24th, was, again, Doctor Bricken and

12   Doctor Sims, and I was paid for mileage.

13   Q. Okay.  So, how do you explain why there is no record from

14   Northlakes Pain on 9/25?

15   A. Because it was -- it was an in quick office, just let me

16   check you over.  It wasn't an actual --

17   Q. From who, now?  From Sims?

18   A. From Sims, Doctor Sims.

19          MR. ARVANETES:  All right.  Can we go to the next

20   page?

21   **BY MR. ARVANETES:**

22   Q. Okay.  Tell me about the purple.

23   A. Uhm, 9/25 is the day that's disputed, and, then, 9/30, uhm,

24   September 30th, it says just "getting ready for something,"

25   and I don't know what it is.  Some kind of procedure coming

1   up.  But I don't know, I couldn't explain what the other ones

2   are for.  It would be picking stuff up, dropping it -- you

3   know, scripts.  I'm not sure what other ones are right now.

4   Q. All right.

5        MR. ARVANETES:  Let's go to the next couple.

6   **BY MR. ARVANETES:**

7   Q. Chronic Pain Recovery and CVS?

8   A. Yeah.  Chronic Pain Recovery is where I did about five or

9   six months of mental/physical rehabilitation, and, uhm, that

10  was right around the time that there was paperwork that had to

11  be done, uhm, in order to, basically, get in there.  And I

12  also had a TENS unit that had leads on it.

13  Q. A what?

14  A. A TENS unit.

15  Q. What is that?

16  A. It's got little electrode things that you put on your body,

17  and you hook it up to a --

18  Q. And it was leaking?

19  A. No.  It needed leads.  I needed the leads.

20  Q. It needed leads.

21  A. Yeah.  (Laughing)

22  Q. All right.  And, then, CVS Pharmacy, 3/25?

23  A. CVS Pharmacy.

24  Q. 19, no record?  But, then, you have the purple 324,

25  Stoneriver Pharmacy Solutions, paid 674, but no record that

1   you got reimbursed.

2   A. And that's prob -- that could just be a day that I was

3   trying to go off mental or put it wrong on the calendar.

4   Q. What about for opioids?  Can they -- docs fax it at that

5   time?

6   A. No.  That's a hand deliver -- a hand pick-up, hand

7   deliver.

8   Q. Hand pick-up, hand deliver?  All right.  Let's go to

9   Smith's in Utah, 9/25 --

10  A. Uhm, 9/15 and 9/16.  I -- this is a drop-off script.  I had

11  an appointment at Utah Pain and Rehab on the 14th, and because

12  it was so far away we didn't get back until sometimes after

13  the pharmacy was closed so we would have to drop it off the

14  next day.

15  Q. -- okay -- all right.  And that's when, in fact, it says --

16  did you get paid for that drop off the next day?

17  A. Not on the 15th, no.  Well, I did get paid for it, sorry,

18  but there's nothing to show.  When I went and picked it up on

19  the 16th, I didn't get paid for that.

20  Q. You didn't get paid.  So, even if you were late, what, it

21  was closed or something?

22  A. Yeah.  They're closed and you can't leave a script, an

23  opioid script.

24  Q. So, you still felt that you could put mileage in, because

25  you actually made a good faith effort to go --

1    A. Uh-huh.

2    Q. -- and try to drop the script off?

3    A. Well, I did -- I did drop the script off on the 15th, the

4    next day.

5    Q. Right.

6    A. Yeah.  Yeah, I dropped it off, and it was --

7    Q. You put mileage in for it.

8    A. Yes.

9    Q. All right.  And then you picked it up on the 16th?

10   A. It looks like it, yeah.  It was paid for.

11   Q. But you didn't get reimbursed for it.

12   A. No.

13   Q. All right.  What about the next one, Smith's, 10/14?

14   A. Yes.  Smith Food and Drug.  It's exactly almost a month

15   later, so it's probably about the same thing -- that's the

16   same thing, probably.

17       10/12, a prescription -- or an appointment at Utah Pain

18   and Rehab.  Again, it's a long ways away, so it's --

19   Q. Is that because the county you lived in didn't prescribe

20   opioids?

21   A. That's right.  The county I was in, and the next county.

22   So I had to go two counties away before I could get a

23   prescription for opioids.

24   Q. And then we've got 9/16, a script, 222.94, but no

25   reimbursement.

1  A. Right.

2  Q. All right.  What about the next one?  Smith's, Thursday,

3  10/14, 210 -- 2010?

4  A. Uhm, 2/14/2010, that's the same thing.  The same thing --

5  same visit that I had to go down to Utah Pain and Rehab, it

6  was a month later.

7  Q. All right.  All right.  Let's go to the -- let's go to the

8  next page.  All right.  12/10/2010, tell us about that one.

9  A. Okay.  Uhm, because we live so far away, we would -- we had

10  to drive that way, and it's through mountains, through

11  canyons.  I mean, it's, probably, 75 miles of no service.

12  But, I had an appointment at Utah Pain and Rehab; and when we

13  had gotten there, my husband and I, we found out that she was

14  at -- that she had to leave, and so we didn't get to see her

15  at that time.

16  Q. Okay.  And what about the purple, Wednesday?

17  A. Uhm...

18  Q. Anything -- anything related, or not?

19  A. On Wednesday?  Oh, that's -- that's when we drove down

20  there, so -- and there's -- we drove down to Utah Pain and

21  Rehab, but couldn't get into the appointment because she had

22  left and we weren't notified.

23  Q. All right.  And what about the next one, 4/1/11?

24  A. Uhm, April 1st.  3/28, script, that was paid for mileage.

25  3/29, a script with no mileage.  3/30, a prescription and

1    visit to Utah Pain and Rehab with mileage.  I think there is

2    more.  Is that it?

3    Q. No.

4    A. 4/1.

5              MR. ARVANETES:  If we could go to the next page.

6              THE WITNESS:  Oh.  If it's not, then that's going to

7    be a pick-up, or a drop-off.

8              THE COURT:  Mr. Arvanetes, are you going to go

9    through every one?  I get the point.

10             MR. ARVANETES:  Well, don't they -- and what -- as

11   the Court knows, even one of these or two of these could be an

12   offense that could prevent her from getting all -- losing all

13   payments.

14             THE COURT:  All right.  Go ahead.

15             MR. ARVANETES:  So, that's -- that's why I'm taking

16   the time for her to explain each one, because that's why.  And

17   I'm trying to make this -- I'm trying to go as fast as I can.

18   **BY MR. ARVANETES:**

19   Q. All right.  So, let's go to the next two, Utah Pain,

20   4/5/2011, and Smith's, 5/6/2011.

21   A. Uhm, on Utah Pain and Rehab, 4/5/11, we had weather

22   conditions and traffic trying to get to the -- trying to get

23   to Utah Pain and Rehab, and, so, we were 15 minutes late and

24   they wouldn't see me.

25   Q. But you still (nods head affirmatively) put in mileage for

1    it.

2    A. Yes.  Uh-huh, put in mileage for it.

3    Q. Because you went there.

4    A. Yes, I was there.

5    Q. All right.

6    A. Yep.

7    Q. And, then, what about 5/6, and then the dates within

8    proximity to 5/6, 5/4 and 5/6?  What were they for?

9    A. Yeah.  5/4, uhm, a pharmacy prescription.  I was paid

10   mileage and, also, a trip to Utah Pain and Rehab that day.  On

11   5/6 -- let's see.  Figure out my thing.  That one, we came

12   back for a prescription from Smith's, because they didn't

13   have -- uhm, they probably didn't have a script ready, or they

14   didn't have my prescrip -- my opioid prescription in stock.

15   Q. What day are you on?

16   A. This is 5/6.

17   Q. 5/6?  Okay.  All right.  So, okay, they didn't have the

18   prescription in stock, the opioid?

19   A. That happens.  Well, sometimes, I go to the pharmacy and

20   they say, "Well, we don't normally carry this, so we have to

21   order it."  And if they didn't have enough to fill a script,

22   they would sometimes have me come back.  Sometimes, they would

23   give me a partial, a little bit of it, or whatever they had,

24   and then I would have to come back and pick up the rest of it.

25   Sometimes, I had to come back, because they didn't even have

1   it until they ordered it.

2   Q. All right.  What about 7/14/2011?

3   A. 7/14, pharmacy, mileage paid.  Pharmacy, mileage paid.

4   Utah Pain and Rehab.  And that's going to be the same thing.

5   Uhm, it's going to be a prescription that wasn't, uhm,

6   available or they didn't -- they didn't have it in stock.

7   Q. Okay.  All right.  What about 8/10/2011?

8   A. 8/10 is a --

9   Q. Let's tie that into the proximity.

10  A. Yeah.  8/9 -- okay.  8/9, I had a prescription, uhm,

11  filled, and that would be what -- normally, that's what the --

12  Utah Pain and Rehab would fax in or call in, and, then, on

13  8/10, it's probably when I went and picked it up.

14  Q. Okay.  (Nods head affirmatively)  All right.  Uhm, and what

15  about the purple -- or the orange 10/14/2011?

16  A. It's the same thing, picking up a script from 10/14.

17  Q. Okay.  All right.  Let's go -- I think, we are almost

18  there.  We've got one page, and then we have one other thing

19  on the last page.  So, let's go to this.

20       Orange, Utah Pain, 11/1/2011?

21  A. Uhm --

22  Q. Can you explain the purple?

23  A. This is a day, uhm -- on the purple.  11/2, a prescription

24  and a trip to Utah Pain and Rehab.  And --

25  Q. Okay.  Were you reimbursed for both of those, for the

1  script and the pain?  I can't tell.

2  A. No, I wasn't on 11/2.

3  Q. All right.

4  A. But what I think I had done is that I had put it down on

5  the wrong day, so it was 11/1 instead of 11/2.

6  Q. Okay.  Because 11/2, you didn't get reimbursed, but 11/1,

7  they don't have a record and you were reimbursed.

8  A. Right.  So, I didn't put anything on for 11/2.

9  Q. Let's go to the next one, 2/12.

10  A. Uhm, 2/12.

11  Q. February of 2012.

12  A. That's going to be a prescription pick-up.  And this 1/25,

13  Utah Pain and Rehab.  2/12 is some kind of prescription

14  pick-up.

15  Q. All right.  The next one, 3/22?

16  A. And 3/22 is the same thing, a prescription pick-up.

17  Q. Okay.  6/1?

18  A. A prescription pick-up.

19  Q. 10/29?

20  A. Uhm, that's going to be a prescription pick-up.

21  Q. Let's see.  I see Great Falls Osco, 6/22/13?

22  A. Okay.  On the 6/22/13, that actually shouldn't have been

23  filed by me.  Because that was for a different -- that was for

24  an injury that was not Workers' Comp related.

25  Q. Okay.  So, what does that mean?

1    A. That means that I picked up the prescription, but I just

2    wrote it on my calendar, "Pharmacy," and, so, I just --

3    Q. So that was a mistake on your part?

4    A. Yeah, that was a mistake.

5    Q. Okay. And, then, the last page. 7/8, 2/13, and 3/11/14?

6    A. Uhm, I -- on the 9th, I had an appointment with another

7    doctor, and so I -- this would have to be some kind of a

8    prescription pick-up.

9    Q. Okay.

10   A. And the same with the 3/11.

11           MR. ARVANETES:  Okay.  May I have a moment, Your

12   Honor?

13           THE COURT:  You may.

14

15                **(Discussion off the record.)**

16

17           MR. ARVANETES:  All right.  No further questions.

18   Thank you.

19           THE COURT:  Thank you, Mr. Arvanetes.

20      We are going to take our lunch break.  Be back here at

21   2:00.

22      Mr. Arvanetes, do you have other witnesses to present?

23           MR. ARVANETES:  Brad Harris is our last one.

24           THE COURT:  And how long do you expect him to take?

25           MR. ARVANETES:  Uh, with Mr. Harris, uhm, I'd say we

1    can get direct done in probably an hour.

2            THE COURT:  Okay.  All right.  We will see you after

3    lunch.

4        Ms. Durand, you'll be back on the stand after lunch.

5            MR. ARVANETES:  What time, Your Honor?

6            THE COURT:  2:00 o'clock.

7            MR. ARVANETES:  2:00 o'clock.  Thank you.

8

9                    **(The lunch recess was taken.)**

10

11           THE BAILIFF:  The United States District Court is

12   again in session.

13           THE COURT:  Please be seated.  Good afternoon.

14       Are you ready to proceed, Mr. Weldon?

15           MR. WELDON:  Yes, Your Honor.

16           THE COURT:  All right.  Go ahead with your cross,

17   please.

18           MR. WELDON:  Thank you, Your Honor.

19

20                    **CROSS-EXAMINATION**

21   **BY MR. WELDON:**

22   Q. Good afternoon, Ms. Durand.

23   A. Good afternoon.

24   Q. Ma'am, can you work?

25   A. (Pause)  At what?  I don't under -- I don't understand what

1  you're asking.

2  Q. Can you perform a job?

3  A. (Shakes head negatively)  What kind of job?  I don't

4  know.

5  Q. Well, let's talk.

6  A. I don't understand what you're meaning.

7  Q. All right.  Can you do the job that you were offered all

8  the way back in January of 2008?

9  A. No.

10  Q. So, those restrictions you can't comply with.

11  A. Those are restrictions that my primary care said I could

12  not do.

13  Q. I'm talking about right now.

14  A. He said in 2008.  For the restrictions from him.

15  Q. Ms. --

16  A. I would have to talk to my primary care physician.

17  Q. Ms. Durand, let me ask you this.  Right now, do you think

18  you can perform the activities that are outlined in the

19  January of 2008 job offer?

20  A. I don't remember what's actually in the offer anymore.

21          MR. WELDON:  Madam clerk, could we please show the

22  witness Government's Exhibit 15?

23  **BY MR. WELDON:**

24  Q. This was the last job offer that you ever received; is that

25  right, Ms. Durand?

1    A. In 2008?  Yes.

2    Q. All right.  Then, let's look at the restrictions.  Right

3    now, can you sit?

4    A. For an amount of time (nods head affirmatively), if --

5    depending on --

6    Q. Sure.

7    A. -- several things, yeah.

8    Q. Ma'am, can you sit for four hours?

9    A. Not in one place, no.

10   Q. All right.  Now, you've done that for the last three days;

11   is that right, ma'am?

12   A. I have not sat in the same place sitting straight

13   (indicating), no.

14   Q. But for four hours a day.  And you can take breaks, can't

15   you?

16   A. If I'm allowed to take breaks, I probably could.

17   Q. All right.  Then let's look at the walking.  Can you

18   walk?

19   A. For a certain distance.

20   Q. All right.  How far?

21   A. I don't know.

22   Q. Well, give us -- do you walk in a day?

23   A. Uhm, a little bit, yeah.

24   Q. How many hours do you walk?

25   A. I don't walk hours.

1    Q. All right.  Do you walk around the house?

2    A. Yep, a little bit.  (Nods head affirmatively)

3    Q. Do you walk outside?

4    A. A little bit.

5    Q. All right.  Do you garden?

6    A. Uhm, a very little bit.  (Laughing)

7    Q. Now, that's not what you told the agents, is it?

8    A. Two years ago, no.  We live in a different house.  And,

9    even then, I had people come help me to garden.

10   Q. What about --

11   A. And I had my husband.

12   Q. -- can you stand?

13   A. I stand.

14   Q. And, yet, again, you can do all of those things for about

15   four hours in a work day; is that right?

16   A. I don't know.

17   Q. Well, what do you do in a normal day?  Do you do those

18   activities in a normal day?

19   A. Off and on, yes, throughout a -- however long, from morning

20   to night.

21   Q. All right.  So, then, based on your general schedule that

22   you have now, --

23   A. Uh-huh.

24   Q. -- can you sit, walk, and stand for four hours?

25   A. Not four hours at a time, no.

1   Q. Okay.  But throughout the day?

2   A. Throughout a morning-to-night day, probably.

3   Q. What about, then, pushing, pulling, and lifting?  Can you

4   do any of that?

5   A. I don't know.  It depends on what I'm lifting, I guess.

6   Uhm, I can very carefully do some of those others, and I do

7   some of the others.

8   Q. All right.  Now, can you read the next one?  Is it reading?

9   The second column?

10  A. I don't know what that is.

11  Q. Okay.

12  A. I can read, yes.  (Chuckles).

13  Q. All right.  And you can look at documents?

14  A. Yeah.

15  Q. All right.  You can answer the phone?

16  A. Uhm, (shakes head negatively) I don't know if I could say I

17  can answer the phone.

18  Q. You can talk, can't you?

19  A. I can speak.  (Nods head affirmatively)

20  Q. All right.  And you can listen.

21  A. I can listen.

22  Q. All right.  And you can answer people's questions, like you

23  are with me right now.

24  A. Uhm, maybe.  I get very agitated.

25  Q. You can --

1   A. -- when I talk to some people, just on the phone and

2   (indicating) --

3   Q. Sure.

4   A. -- everything.

5   Q. And you can provide detailed information, can't you?

6   A. Depending, yes.

7   Q. Well, in fact, with Mr. Arvanetes right here in open court

8   you walked through all of the travel vouchers, didn't you?

9   A. Uh-huh.

10   Q. Is that a yes?

11   A. Yes.

12   Q. And, then, when you were walking through that, you provided

13   very specific information that was detailed about those

14   transactions; is that right?

15   A. Yes.

16   Q. And you --

17   A. Because I had a part of those.

18   Q. And you didn't have any problem doing that, did you?

19   A. No.

20   Q. All right.  And you were answering Mr. Arvanetes's

21   questions, weren't you?

22   A. Yes.

23   Q. That would be a similar process on the phone, wouldn't

24   it?

25   A. Uhm, no.

1    Q. The only difference would be that you would have to hit a

2    button.

3    A. No, it's not true.

4    Q. What's the difference?

5    A. Dealing with agitated clients -- customers that are

6    calling, trying to work between them and the supervisor.  It's

7    not just answering the phone.  I can sit and answer a phone,

8    or answer the house phone, occasionally.

9    Q. And you can sit here and answer my questions, --

10   A. Yes, I can.

11   Q. -- as well, can't you?

12   A. Uh-huh.

13   Q. Now, then, these restrictions, is there anything on this

14   exhibit here that you can't do today?

15   A. (Viewing document)  (Shrugs shoulders)  It's not up to

16   me.

17   Q. All right.  Do you disagree with Doctor Ellis's opinion?

18   A. About?

19   Q. About your ability to work?

20   A. No, I'm not disagreeing.  He's not my primary care

21   doctor.

22   Q. I understand that, ma'am.  But you don't have any problem

23   with him saying that you can do certain activities.

24   A. No.  That's what his job is (nods head affirmatively), is

25   to give his opinion.

1    Q. Now, he had access to all of the information that was in

2    this case; is that right?

3    A. I would -- you would have to talk to Mr. Arvan --

4    Arvanetes.

5    Q. Was he allowed to see the 2008 video?

6    A. I -- it sounds like he was.

7    Q. Was he able to see the kayaking video?

8    A. Yeah, it sounds like he was.

9    Q. And then you were here when Doctor Strausser and Doctor

10   Hood testified; is that right?

11   A. Yes.

12   Q. Okay.  And they were able to see that.

13   A. Yes.

14   Q. Did you show those videos to any of your other doctors that

15   you visited?

16   A. I don't show the videos.

17   Q. All right.  Did you show the investigation that the Postal

18   Service had?

19   A. I didn't have that until just recently, so, no.

20   Q. So, the only thing that you discussed or spoke with your

21   doctors about were things that you told them; is that right?

22   A. Uhm, no.  Talking about their findings of my x-rays, my

23   medical that they performed.

24   Q. And, then, when they asked you questions, they were relying

25   on your answers; is that right?

1  A. No.

2  Q. Did they ask you questions?

3  A. Yes.

4  Q. All right.  And you provided the answers.

5  A. Yes.

6  Q. Are those answers consistent with what you were providing

7  in the undercover operation in Boise?

8  A. No.  There's -- it depends on different times, so it has --

9  there is no comparison.

10  Q. Let's talk about that, ma'am.  Because when you're not

11  talking to doctors you provide different answers; is that

12  right?

13  A. No.

14  Q. Okay.  Well, let's focus, then, on the kayaking trip.  You

15  had mentioned that you didn't know if you could perform the

16  activities, on your direct testimony.  Do you remember that?

17  A. Yes.

18  Q. All right.  And, in fact, you were told about the level of

19  physical activity in some of the documents; is that right?

20  A. Those were in there, yes.

21  Q. All right.  So, do you remember, then, receiving the

22  statement with the frequently asked questions, where it

23  stated, "Sea kayaking is a physical activity, and the better

24  shape you're in the more enjoyable your trip will be.

25  Therefore, it is a good idea to condition yourself before this

1    trip.  We recommend moderate upper body conditioning for at

2    least a few weeks before your trip.  We will be kayaking an

3    average of five to six hours each day, with breaks, floating,

4    and landing, in between."

5    A. Yes.

6    Q. And you saw that.

7    A. Yes.  (Nods head affirmatively)

8    Q. And, again, you went on that sea kayaking trip.

9    A. Yes.

10   Q. Now, then, you also were paddling in open ocean water; is

11   that right, ma'am?

12   A. Yes.

13   Q. You slept on the ground?

14   A. On a mattress in a sleeping bag on the ground.

15   Q. Sure.  But that was at a camping place; is that right?

16   A. Uh-huh.  Yes.

17   Q. All right.  Now, then, you also went for hikes after you

18   went through the kayak paddling.

19   A. We were encouraged to stretch our legs (nods head

20   affirmatively), yes.

21   Q. Did you do that?

22   A. Yes, I did.

23   Q. All right.  And you would have to walk uphill.

24   A. Yes.

25   Q. And you did that for about two-and-a-half miles.

1   A. Uhm, no.

2   Q. Well, how far was it?

3   A. Uhm, I don't know exactly.  It's in my journal.

4   Q. All right.  So, it's consistent, then, with what you said

5   in your journal.

6   A. Yes.

7   Q. All right.  And, then, that was after you had kayaked

8   throughout the day.

9   A. Yes.

10  Q. So, you were --

11  A. And after we had eaten, if I remember right.

12  Q. Sure.

13  A. So, it wasn't right after, it was definitely --

14  Q. So, you kayaked throughout the day, and then you were able

15  to walk after that.

16  A. Uh-huh.  Yes.

17  Q. All right.  Then, after, on day two, you actually had the

18  option of not continuing on; is that right?  You could have

19  stayed --

20  A. Uhm, yes.

21  Q. And you chose to continue to paddle.

22  A. Yes.

23  Q. Again, for another ten to twelve miles.

24  A. No.

25  Q. You paddled that day.

1    A. Yes.

2    Q. And you didn't have any problems doing that.

3    A. I'm not saying I didn't have problems.

4    Q. Okay.  You had no problem keeping up.

5    A. Uhm, the two of us, no, we did good.

6    Q. All right.  And you were paddling that entire time.

7    A. No.  We rested.

8    Q. Yes.

9    A. When I took pictures, I didn't paddle.  Sometimes I just

10   put my paddle down.  Uhm...

11   Q. Now, then, you also hiked to a local school; is that right?

12   A. That is the school that we took the walk to.

13   Q. And, then, also, to the light house?

14   A. No, I didn't go to the light house.

15   Q. Now, you mentioned to agents that you enjoyed elk hunting;

16   is that right, Ms. Durand?

17   A. I love it.

18   Q. Okay.  And you've --

19   A. I just can't do it.

20   Q. And you've done that.

21   A. Uhm, back a long time ago, yes.

22   Q. When?

23   A. Uhm, (shakes head negatively) I don't even know.  We went

24   camping, (shrugs shoulders) and then my husband went elk

25   hunting.  So, it's -- that's elk hunting.

1    Q. All right.  And when was that?

2    A. Uhm, I can't remember.

3    Q. Was it during 2000 -- from 2006 until 2015?

4    A. Uhm, yes, it would be in there somewhere.

5    Q. All right.  Where did you go?

6    A. Uhm, Elk Valley, I think.

7    Q. Elk Valley?  In Idaho?

8    A. Uh-huh.  Yes.

9    Q. And you obtained licenses, I'm assuming.

10   A. No.  I didn't.

11   Q. All right.  Your husband did?

12   A. Yes.

13   Q. And you were with him.

14   A. Yes, I camped with him.

15   Q. Okay.  Now, how many days would you elk hunt, ma'am?

16   A. Uhm, two -- two days, I think.

17   Q. Two days, total?

18   A. I believe so.

19   Q. So, two days --

20   A. It wasn't very long.

21   Q. -- from 2006 until 2015.

22   A. Yes.

23   Q. Only two days.

24   A. It was one time.

25   Q. One time for two days.  Now, you rode horses, as well; is

1    that right?

2    A. Yes.

3    Q. What -- how many times would you ride horses?

4    A. Uhm, less than 20 times the whole entire time since -- you

5    want time?  I keep horses, because they relax me and (shrugs

6    shoulders) they are calming, and that's something that I can

7    (nods head affirmatively) do.

8    Q. I want to make sure I understand your testimony.  You are

9    saying that from 2006 until 2015, you only rode horses 20 --

10   less than 20 times.

11   A. Less than 20 times.

12   Q. All right.  Now, you were next to the Dreschers, you lived

13   next door; is that right?

14   A. Yes -- no, across the street.

15   Q. Across the street.  You were neighbors.

16   A. Well, yeah.

17   Q. Now, you helped move your daughter across the country?

18   A. Uhm, no.  (Shakes head negatively)

19   Q. Did you help her move?

20   A. No.  (Shakes head negatively)

21   Q. You mentioned that you wanted to travel more and meet more

22   people when you were speaking with agents on the undercover

23   trip?

24   A. Yes.

25   Q. Now, you never declined to participate in anything or claim

1  that it was because of injury that you couldn't do something

2  on the kayaking trip?

3  A. I'm not -- I don't understand quite what you're asking.

4  Q. You never said that you could not complete something on the

5  kayaking trip because of your pain or your injuries, did

6  you?

7  A. I -- I don't make it a habit of telling people what's going

8  on.  I just do what I can do, and then go --

9  Q. Ma'am, is that a yes or a no?

10  A. No.

11  Q. Now, when you were leaving the kayaking trip, you actually

12  ran away to catch the ferry; is that right?

13  A. No, I don't call it running.

14  Q. So --

15  A. I hurried.

16  Q. Were you jogging?

17  A. No.

18  Q. You were in a hurry?

19  A. I was in a hurry.

20  Q. Now, you walked the streets of Seattle, or, at least, the

21  SeaTac area, until 2:00 a.m.

22  A. Yes, I did.

23  Q. And you were able do that.

24  A. Well, I walked and sat on the luggage until I got a phone

25  call.  So, yeah, for two hours that's what I did.

1  Q. Let's talk about your other claimed activities when you're

2  not talking to doctors.

3            MR. WELDON:  If we could show the witness

4  Government's Exhibit 70.

5  **BY MR. WELDON:**

6  Q. Do you recognize this, Ms. Durand?

7  A. Yes.

8  Q. And you filled this out, didn't you?

9  A. Yes.

10  Q. All right.  Now, let's just show some of the activities.

11            MR. WELDON:  On Number 9, if we could scroll down.

12  **BY MR. WELDON:**

13  Q. It's says, "How many hours do you spend on leisure sports

14  activities?"  And you say, "Ten hours or more per week."

15  A. Yes.

16  Q. All right.  And then you state that you bicycle and

17  mountain bike often?

18  A. (Viewing document)  Uhm, bicycle, I don't know how often.

19  I've done it a few times.  But I've done it more than --

20  (shakes head negatively) more than any of the others.  So, of

21  the options, that was it.

22  Q. Ma'am, the answer that you marked was "often."

23  A. Yes.

24  Q. All right.  Then, for camping and hiking, you mentioned

25  that you do that often.

1   A. Yes.

2   Q. Okay.  Then you also stated that you hunt and shoot often.

3   A. Yes.

4   Q. All right.  Then you do physical fitness and exercise

5   often?

6   A. Well, I was in a physical therapy program, so, yes.  (Nods

7   head affirmatively)

8   Q. And then you walk often; is that right?

9   A. Walking, yes.

10  Q. Okay.  Then you also mention that sometimes you do kayaking

11  and canoeing.  Is that right, ma'am?

12  A. I have kayaked now twice, so yes.  (Nods head

13  affirmatively)

14  Q. Twice in your entire life?

15  A. Yes.  (Nods head affirmatively)

16  Q. Now, then, on the next page, if we could show you the

17  recreation that you have, that you own.  You own an RV -- or,

18  excuse me, you own a horse and an ATV.  Is that right?

19  A. Uhm, I own a horse.  My husband has an ATV.

20  Q. All right.  And then you want an RV and a swimming pool.

21  A. Yes.

22  Q. Okay.  And, then, at the bottom there, that is your

23  writing, and then we have the date of 7/13 -- or 7/3 of '15.

24  Is that right, ma'am?

25  A. Yes.

1  Q. Okay.  Then you also had some other documents where you

2  outlined how strong you were.  Do you remember that?

3  A. Uhm, no.

4  Q. Okay.  Let me show it to you.  If we could show you

5  Government's Exhibit 65, Question 27, on Page 6.  Can you read

6  that out loud, your response, Ms. Durand?

7  A. I'm sorry, which one?

8  Q. On Question 27.

9  A. On the question part of it, or the --

10  Q. No, your response.

11  A. Oh, the answer?  Sure.

12  Q. What you wrote.

13  A. Uhm, "It is, of course, the major portion of the tour,

14  however, I found that it wasn't difficult keeping up kayaking

15  but I'm fairly strong.  I know that we stopped when needed and

16  Dakota asked us if we needed to rest.  We kayaked

17  approximately 10 to 12 miles all together, it didn't seem like

18  it."

19  Q. And you wrote that answer; is that right, Ms. Durand?

20  A. Yes.

21  Q. Now, that -- you didn't know that -- or didn't think that

22  would go to a doctor at any point, did you?

23  A. (Pause)  I had no idea where it was going.  It was

24  supposedly going to where this survey went.  Or wherever it

25  went, I don't know.

1    Q. Now, let's talk, then, about when you do talk to doctors,

2    what you say to them.  Okay?

3    A. Yes.

4    Q. Let's show you Government's Exhibit 67.

5        Now, this was the contract specialist; is that right,

6    ma'am?  Do you remember this?

7    A. (Viewing document)  No, sir.  I don't know who this -- I

8    don't know -- I don't know where this went.

9    Q. Well, do you remember going to Boise and meeting with

10   somebody to help you potentially look for employment?

11   A. Oh, yes.

12   Q. Do you remember filling out a form?

13   A. Yes.

14   Q. Does this look to be the form that you filled out?

15   A. Uhm, it -- I'm not sure.  It could be.

16   Q. Okay.  Do you recognize the writing on that?

17   A. Yes.

18   Q. Whose writing is that?

19   A. It's mine.

20   Q. All right.  Then let's talk about your assessment of your

21   medical condition in Number 7.

22   A. (Viewing document)  Yes.

23   Q. And what do you say when you believe that the Postal

24   Service is looking at whether or not they can get you a job?

25   A. I don't understand your question.

1    Q. What does Number 7 -- what did you say in Number 7,

2    ma'am?

3    A. What I checked, or what I said?

4    Q. Both.

5    A. I checked, "Getting somewhat worse over last year or so

6    sciatic nerve pain and pain in shoulder, trapezoid area has

7    become worse."

8    Q. Okay.  And then you explain, in Question 11 on Page 2.  Now

9    different than the surveys, you actually say what about your

10   overall lifestyle?

11   A. It's totality sedentary -- that, sedentary.

12   Q. It's sedentary?

13   A. Yeah.

14   Q. All right.  Now, then, you're asked whether or not you can

15   get a job.  In Number 13.

16   A. (Viewing document)  Yes, I see it.

17   Q. What do you say?

18   A. "Yes, I've" -- "I've done limited duty and realized my

19   functionality is not" -- I don't know what I put there.

20   Q. All right.  And that was in the response to the question,

21   "Do you consider yourself totally disabled and unable to

22   perform any assignment for the Postal Service?"

23   A. Yes.

24   Q. And your response is, then, you can't do that.

25   A. (Pause)  Okay.  (Nods head affirmatively)

1    Q. Is that true?

2    A. Uhm, that's what it says here, yes.

3    Q. All right.

4    A. I guess, it's what -- I don't know what you're implying out

5    of it, but --

6    Q. Ma'am, did you fill out this form?

7    A. Yes.

8    Q. All right.  And, so, are these your answers?

9    A. Yes.

10   Q. Now, when you were answering this, were you explaining to

11   the contract specialist that you could not work for the post

12   office?

13   A. (Shrugs shoulders)  (Shakes head negatively)  I was

14   answering a question, so (shrugs shoulders) that's what's on

15   there.

16   Q. Let's show you, then, Question 20.  Now, we just went

17   through the ones in -- that Doctor Ellis agreed with, but you

18   provide a different amount; is that right?

19   A. I don't know if it's different or not.

20   Q. Well, let's go through that, then.  So, you say that in a

21   day you can only stand for 30 minutes.

22   A. (Nods head affirmatively)  Okay.

23   Q. And that's not accurate, is it?

24   A. I don't stand.  I try -- I can't -- I don't understand

25   where you're -- (shrugs shoulders)

1    Q. Ms. Durand, let me make it easy.  So, in Number 20 it says,

2    "Please indicate the number of hours and/or minutes per day

3    that you can perform the following activities."

4    A. Yes.

5    Q. "If you cannot perform the activity, write none or zero."

6    What was your response for the -- standing?

7    A. 30.

8    Q. For the whole day?  (Shakes head negatively)

9    A. Yes, sir.  (Nods head affirmatively)

10   Q. And that's not accurate, is it?

11   A. Yes, it is.

12   Q. Now, on the sitting, you say that for the whole day you can

13   only sit for 30 minutes.  And that's not accurate, is it?

14   A. Yes, it is.

15   Q. For the walking, you say it's only 120 minutes.  And that's

16   not accurate, is it?

17   A. Yes, it is.

18   Q. In fact, you have no problems walking, do you?

19   A. Yes, I do.  (Nods head affirmatively)

20   Q. What about kneeling, 15 minutes?

21   A. (Nods head affirmatively)

22   Q. That's not accurate, is it?

23   A. Yes, prayers.

24   Q. Squatting, you said you couldn't squat at all.  And that's

25   not accurate, is it?

1   A. (Pause)  I would say no on that one.  There's no minutes to

2   that one that I could put a minute down.  So, zero to one.

3   Q. Zero to one minute.  And, of course, you've seen the video,

4   where you were seen pounding stakes in for the tent; is that

5   right?

6   A. Uhm, yes.  (Nods head affirmatively)

7   Q. Okay.  And, so, you didn't have any problems squatting

8   then, did you?

9   A. Yes, I did.  (Nods head affirmatively)

10  Q. Bending, zero minutes.

11  A. Okay.

12  Q. That's not accurate, either, is it?

13  A. Yes, it is.

14  Q. All right.  Well, in the kayaking trip you were seen

15  bending; isn't that right?

16  A. Yes.  (Nods head affirmatively)

17  Q. Okay.  And, so, you can bend for more than zero minutes.

18  A. Zero to one.

19  Q. All right.  Reaching, ten minutes.  Is that right?

20  A. Yes.

21  Q. And, then, of course, you had to put 120 minutes for

22  driving because you drove yourself to the appointment; is that

23  right?

24  A. (Shakes head negatively)  That's not the reason that's on

25  there.

1    Q. Ma'am, you drove yourself to the appointment?

2    A. Yes.

3    Q. And how far was the appointment?

4    A. About an hour.

5    Q. So, that requires back and forth, two hours.

6    A. Yes.

7    Q. What's 120 minutes?

8    A. That's two hours.

9    Q. Okay.  Now, then, let's talk about Section 21.  You state

10   that you have a significant difficulty walking outdoors on

11   uneven ground.

12   A. Yes.

13   Q. And that's not accurate, is it?

14   A. Yes, it is.  (Nods head affirmatively)

15   Q. Okay.  On the kayaking trip you had no problems doing that

16   at all, did you?

17   A. Yes.  (Nods head affirmatively)

18   Q. You have no problem climbing stairs.  Did you?

19   A. Yes, I do.

20   Q. All right.  Now, you climbed stairs with agents, didn't

21   you, ma'am?

22   A. I climbed steps.

23   Q. And --

24   A. And they were very short steps.

25   Q. What's the distinction between the steps and the stairs?

1   A. I don't know.  I believe it's height.

2   Q. All right.  You say that you can't -- you have significant

3   difficulties doing household chores or yard work.

4   A. (Nods head affirmatively)  Yes.

5   Q. That's not accurate, is it?  (Shakes head negatively)

6   A. Yes.

7   Q. In fact, in 2008, from 2010, you were seen clearing your

8   property, which is five acres.  Isn't that right, ma'am?

9   A. Back then, yes.

10  Q. So, you were clearing your property at that time.

11  A. I didn't -- (shakes head negatively)  The horses cleared

12  the property, I just cleaned it up, yes.

13  Q. All right.  So you would help clean it up.

14  A. Yes.

15  Q. Would you use chainsaws?

16  A. I did.

17  Q. All right.  You would cut down trees.

18  A. Uhm, I don't think I was cutting trees, but I did cut down

19  some wood.

20  Q. All right.  And that took significant effort, didn't it?

21  A. (Pause)

22  Q. Ms. Durand, that took significant effort, didn't it?

23  A. Cutting down the trees?

24  Q. Yes.

25  A. With a chainsaw?  Uhm, I'm sure it did.  I couldn't tell

1    you right now.  That's -- (shakes head negatively)

2    Q. Ms. Durand, you were there.

3    A. I was physical -- yes, I was there.  Years ago.

4    Q. Standing up from a sitting position.

5    A. (Nods head affirmatively)

6    Q. You can do that.

7    A. With significant difficulty.

8    Q. All right.  And you can even do it out of a kayak, can't

9    you?

10   A. With significant difficulty.

11   Q. All right.  And it doesn't appear on the video to look like

12   significant difficulty, does it?

13   A. I believe it does.

14   Q. Reaching over -- or reaching an object -- excuse me,

15   bending over to pick up an item from the floor.  Remember this

16   in the video where you told the undercover agent that you had

17   to scoot it along the floor?

18   A. Yes.

19   Q. All right.  That's not true, is it?

20   A. Yes, it is.

21   Q. All right.  Well, you're seen on the video picking up items

22   throughout the kayaking video.

23   A. (Pause)

24   Q. In fact, you can do it with weight, can't you?

25   A. I don't know what you're meaning.

1   Q. In other words, you can lift the kayak.

2   A. Yes, I did lift it.

3   Q. And you had to take that from the beach all the way down to

4   the water.

5   A. (Pause)  Yes, with four people.  (Nods head affirmatively)

6   Q. And you were able to do that.

7   A. Not by myself.

8   Q. Sure.  But that's because it's really heavy.

9   A. No, because there is four people.  (Nods head

10  affirmatively)

11  Q. All right.  And you were able to carry the load, as well.

12  A. I carried -- I was in the front.

13  Q. And you carried a portion.

14  A. I carried a portion.

15  Q. And you did that, not only in your right arm, but you did

16  it in your left arm, as well.

17  A. It was both arms, both times.

18  Q. Right.  Now, then, Ms. Durand, on the bottom, the

19  certification --

20          MR. WELDON:  If we could go to the final page?

21  **BY MR. WELDON:**

22  Q. -- you signed that, as well; is that right?

23  A. Yes.

24  Q. And you signed that knowing that you couldn't make any

25  false statements to obtain benefits?

1    A. Yes.

2    Q. All right.  Now, at that time, were you capable of

3    working?

4    A. Uhm, I -- no.

5    Q. So you've gotten better, then; is that right?

6    A. No.

7    Q. Well, you mentioned that you could do some of the

8    activities now, and that's different than what you said on

9    Form 67 -- on Exhibit 67, isn't it?

10   A. No, sir, you're telling me I can do things now.

11   Q. Ms. Durand, is it fair to say that you didn't like your job

12   at the post office?

13   A. I loved my job at the post office.

14   Q. You just spent about the first 15 minutes talking about all

15   the problems that you had at your job; is that right?

16   A. With my supervisor.

17   Q. Right.  And when you spoke to Agent Haywood, did you

18   explain to him, after he told you that you had been videoed,

19   that it was 90 percent your injury and 10 percent your boss?

20   A. Yes.

21   Q. So, it was only 90 percent correct, 10 percent inaccurate,

22   what you were saying.

23   A. No.

24   Q. Now, when you spoke with Agent Haywood, he asked if you

25   could answer phones?

1    A. (Shrugs shoulders)

2    Q. And you said that they would require you to do more.

3    A. I don't know what I said back then.

4    Q. Now, could you do telemarketing?

5    A. (Shakes head negatively)  I've never done it.

6    Q. If you were trained, could you do that?

7    A. I don't see how.

8    Q. Why?

9    A. (Shakes head negatively)  I can't tell you why, I just see

10   how I -- I don't see how I could.  Between the physical and --

11   (shakes head negatively)  I don't know, I can't answer that.

12   Q. Could you do secretarial work?

13   A. I don't know, I've never done it.

14   Q. If you were trained?

15   A. I don't know.

16   Q. Would you be willing to be trained?

17   A. It would be up to my doctor.

18   Q. And, of course, your doctor obtains information from you;

19   is that right, ma'am?

20   A. Uhm, partly.

21   Q. Now, let's talk, then, about the money that you received.

22   Those were all federal funds; is that right, Ms. Durand?

23   A. I bel -- yes.

24   Q. All right.  And you're not disputing that at all.

25   A. No.

1  Q. Those were from the Department of Labor/Office of Workers'

2  Compensation?

3  A. Yes.

4  Q. And it was based on some of your statements that you were

5  able to ultimately obtain those benefits; is that right?

6  A. Which -- I'm not sure what you're talking about.

7  Q. Well, what you claimed.  What you told doctors.  That was

8  one of the reasons why you obtained those benefits.

9  A. I'm not sure what benefits.  What are you talking about

10  exactly, so I understand?

11  Q. The money that -- when you didn't have to go to work, that

12  was, in part, based on what you told your doctors.

13  A. (Shakes head negatively)  I don't know how they judge that,

14  how they decide that.

15  Q. Now, you lived in Montana; is that right, Ms. Durand?

16  A. Yes.

17  Q. When did you live in Montana?

18  A. Uhm, a couple years ago, for a couple of years.

19  Q. All right.  You actually lived here in -- it would have

20  been for about a year-and-a-half; is that right, ma'am?

21  A. That could be.

22  Q. All right.  And you wouldn't dispute that, though.

23  A. No.

24  Q. Now, during that time period that you were in Montana, you

25  received well over $1,000 in federal wages; is that right?

1    A. Uhm, yes.

2    Q. All right.

3    A. I believe.

4    Q. And you're still receiving wages as we speak; is that

5    right?

6    A. Wages, I -- what do you mean, "wages"?

7    Q. Wage compensation from Workers' Comp, you are still

8    receiving that today.

9    A. Are you talking about the Periodical Rolls (sic)?

10   Q. What I'm saying is you are still receiving federal funds

11   today as we speak from OWCP --

12   A. Yes.

13   Q. -- for wages.

14   A. Okay.  (Nods head affirmatively)

15   Q. Is that right?

16   A. If that's what you're saying they are.  I don't know -- is

17   that -- is this the Periodical Roll?  I don't understand what

18   you're asking.

19   Q. Sure.  Under the Workers' Compensation Program, you are

20   receiving benefits for wage -- for wages; is that right?

21   A. (Pause)  (Shakes head negatively)  Okay.  The Periodical

22   Roll, yes.  (Nods head affirmatively)

23   Q. Okay.  Now, you also mentioned that you had a PTSD -- or,

24   at least, you had some psychological issues; is that right,

25   Ms. Durand?

1    A. Yes.

2    Q. Now, you submitted that to OWCP, and that claim was denied;

3    is that right?

4    A. Uhm, I submitted it.

5    Q. And it was denied.

6    A. I found that out.  (Nods head affirmatively)  Yes.

7    Q. Okay.  I want to just talk with you briefly about

8    Government's Exhibit -- or Defense Exhibit 508.

9        Ms. Durand, that's the chart that you spoke about; is

10   that right?

11   A. I'm sorry, what is it?

12   Q. That's the chart that you discussed with Ms. -- Mr.

13   Arvanetes, about the travel fraud?

14   A. Oh.

15   Q. Do you remember that?

16   A. Yes, the colored chart.

17   Q. Right.  Now, when you have those travel documents, did you

18   bring any receipts with you?

19   A. Uhm, no, I just have the original vouchers, or the -- no.

20   Q. The vouchers that OWCP has.

21   A. The reimbursement, yes.

22   Q. But you don't have any receipts that show any of these

23   things that you're doing; is that right?

24   A. Not for that time period, but I have recent ones, yes.

25   Q. Sure.  But the ones that we're talking about through the

1   government's exhibits, do you have any receipts with you that

2   show and verify what you're saying?

3   A. Not with me.

4   Q. And -- and do you have any?

5   A. I believe I do have a few.

6   Q. Okay.  Now, trial has been pending for awhile.  Did you

7   know that?

8   A. Yes.

9   Q. All right.  And did you bring them with you?

10  A. No.  I have the actual documents.

11  Q. You have the receipts.

12  A. I have the actual travel reimbursement documents.

13  Q. But do you have the receipts that verify what you testified

14  to on direct?

15  A. No.

16  Q. So, it's clear, then, that, on those dates, there are no

17  medical records to document that you attended those sessions

18  or went for those prescriptions; is that right?

19  A. There would be none.

20  Q. All right.

21  A. On a lot of them.

22  Q. And you don't have any receipts to, then, justify some of

23  those vouchers, as well; is that right?

24  A. That's right.

25  Q. Now, ma'am, do you understand that Workers' Comp is not a

1    retirement program?

2    A. Yes.

3            MR. WELDON:  Your Honor, I have no further

4    questions.

5            THE COURT:  Redirect, Mr. Arvanetes?

6

7                    **REDIRECT EXAMINATION**

8    **BY MR. ARVANETES:**

9    Q. Debbie, besides -- before the kayak trip, the last time you

10   kayaked was 2003?

11   A. Yes.

12   Q. As far as cleaning property, did anyone help?

13   A. Yes.  (Nods head affirmatively)

14   Q. Who?

15   A. My husband, his daughter, his son, my daughter.  Uhm, I

16   know there was a couple other people, but I can't remember who

17   they were, that were there.

18   Q. Okay.  You were asked if you could work, I think that was

19   the first question.

20   A. Yes.

21   Q. Since 2008, have you been released to work?

22   A. No.

23            MR. ARVANETES:  No further questions.

24            THE COURT:  Is the witness excused?

25            MR. ARVANETES:  Yes.

1          THE COURT:  You may step down, Ms. Durand.

2          THE WITNESS:  Thank you, sir.

3          MR. ARVANETES:  Your Honor, we call Brad Harris.

4

5              **(The witness was duly sworn.)**

6

7          THE WITNESS:  Yes, I do.  Get my materials.

8          THE COURT:  Good afternoon, Mr. Harris.

9          THE WITNESS:  Hello.

10         THE COURT:  Will you please state your full name and

11   spell your last name?

12         THE WITNESS:  My full name is Harvey Bradford

13   Harris, H-A-R-R-I-S.

14         THE COURT:  And speak into the microphone, please.

15         THE WITNESS:  Okay.

16         THE COURT:  Go ahead, Mr. Arvanetes.

17         MR. ARVANETES:  Thank you.

18

19                    **DIRECT EXAMINATION**

20   **BY MR. ARVANETES:**

21   Q. Mr. Harris, the parties have already stipulated to the

22   foundation of our experts, but can you, at least, give a

23   little introduction to your knowledge and experience of

24   Federal Workers' Comp law?

25   A. I think it was about ten years ago, maybe a little longer,

 1   when I started doing Federal Employee Workers' Compensation.

 2   As the years kind of drug on, I became more and more involved

 3   in it, and more involved in groups of lawyers that dealt with

 4   that subject, speaking at various group functions and writing

 5   for our groups, our specialty groups.

 6       I, uhm -- our group decided to join an organization, a

 7   national organization of Workers' Compensation claimant

 8   attorneys, this organization is referred to as, WILG, W-I-L-G,

 9   and it stands for worker injury advocacy, or something, I

10   don't know.

11       And, so, I have gotten more and more involved in that.

12   And I'm on the board of that organization, and now we've got a

13   thousand -- nearly a thousand attorneys across the nation who

14   are claimant representatives.

15       And, as I said, I typically speak at our annual -- we

16   have an annual convention every year; so we are a little bit

17   more formalized, because we've kind of glommed onto that

18   existing organization.

19   Q. But, uhm, with that organization, how many other people are

20   like you who do Federal Workers' Comp law?

21   A. Well, there is not very many lawyers who do.  We have a

22   Federal Employee Compensation Act, Federal Employee Workers'

23   Compensation practices, maybe -- I think our group only has

24   about 40 people, and only about 20 of them are very active.

25   (Nods head affirmatively)

1   Q. That's -- and that's in the nation?

2   A. In the whole nation, yes.

3   Q. All right.  For this case, you've been hired as an

4   expert?

5   A. Yes, sir.  Thank you.

6   Q. And, for this case, you've been hired as an expert and

7   you've done an expert report?

8   A. Oh, yes, sir.  I've examined all kinds of files.  I,

9   unfortunately, don't have the actual 5,000-page OWCP file with

10   me.  I sure wish I had it here.  I hope you-all have access to

11   it.  But I've summarized different subjects of different -- I

12   mention that in my report --

13   Q. Uh-huh.

14   A. -- that I've created.  I guess, a Haywood investigation

15   report, a Boynton investigation report.  I was provided, as

16   the Court knows, with some USPS/OIG policies and procedures,

17   and I have a notebook.

18   Q. By special order of the Court.

19   A. Yes, sir.  Yeah.  And I don't know to what extent I'm

20   allowed to testify about that; so, if you ask me, I might kind

21   of warn you I don't know what I can say about that.

22   Q. Well, you could ask the Court for permission to answer that

23   question.  I would say, after the trial, uhm, pursuant to that

24   order, I will have to get those copies, or whatever you have,

25   back.  As I have to do, as well, return it to the Court.

1  A. Okay.  So, I just didn't know if I can testify about it or

2  not.  And while we are talking about that, I have also been

3  instructed by you that I don't get to testify about anything

4  I've learned during this trial.

5  Q. Right.  Exactly.  You cannot.

6  A. My report (indicating) was completed back in mid-July, or

7  something like that, (shakes head negatively) and I think I

8  have enough information in that to testify about those things

9  that I knew then.  Of course, I know a few -- I know a few

10  things more now, because of this trial in here, uhm, and, I

11  think, there is one specific piece of evidence that came in

12  that I knew about, but I hadn't seen.  (Shakes head

13  negatively)

14      I knew that the -- Ms. Durand had received Social

15  Security disability, but I hadn't actually seen the file, any

16  part of that file.  (Shakes head negatively)  Until recently.

17  And then I sent that to you, and I think you filed that as an

18  exhibit or something.

19  Q. Yes.  And it is actually Exhibit -- I believe -- 509.  I'm

20  not sure which 509, but 509 for trial.

21  A. So, the reason why I'm pointing that out is that --

22          THE COURT:  It's 511, Mr. Arvanetes.

23          MR. ARVANETES:  511.

24  BY MR. ARVANETES:

25  A. The reason why I'm pointing it out is I'm not for sure

1    about how that relates to my testimony.  Because I knew about

2    it, but didn't know that specif -- I hadn't seen those

3    specific documents.  I knew she had it, because, of course, it

4    was in her 1032s.

5        Every year, you have to fill out a 1032 and reveal your

6    sources of income, and, of course, that was in the file, the

7    OWCP file.  And --

8    Q. Well, it's an exhibit, now, so, --

9    A. Okay.

10   Q. -- I can show you it as an exhibit.

11   A. I was just explaining how I knew about it.

12   Q. All right.  All right.  Well, I appreciate that.  Is there

13   anything else, as far as that question, that you want to talk

14   about before we move on?

15   A. No, sir.  I just -- if I accidentally started testifying, I

16   might not be able to differentiate.  Just stop me and I

17   will --

18   Q. I will stop you.

19   A. Okay.

20   Q. I will stop you.

21   A. I'm talking about stuff that I've learned in the past three

22   days.

23   Q. Exactly.  You know, I'm an officer of the Court, and --

24   well, so are you, actually, but you're a witness.  But, yeah,

25   I'm an officer of the Court, and I take that seriously, sir.

1    A. Okay.

2    Q. I want to ask you a similar question to what Mr. Weldon

3    asked Ms. -- well, I guess I -- can Deborah Durand work right

4    now?

5    A. Well, I -- I wouldn't know -- I wouldn't say I have a

6    professional opinion about someone's ability to work.  It's my

7    understanding that she has never been offered a job which is

8    suitable.  So, if she was offered a job that was suitable, I

9    think she could do what we call partial work or partial

10   disability in a job that had the restrictions that were

11   properly created.

12   Q. Now, that's hard to grasp, so can you elaborate why --

13   who -- well, let me back up.

14        She's on Periodic Rolls.

15   A. Yes, sir.

16   Q. What does that mean?

17   A. Well, uh, she -- during the normal Workers' Compensation

18   claims processing, she arrived at a point where the claims

19   examiner, the OWCP, determined that they would move her to a

20   different status.  And that status, as you may know, is the

21   permanent rolls, the PN.

22        So, I think your question had do with that.  What --

23   she -- no.  What I would really like to do is talk just a

24   little bit about the Workers' Compensation process for just a

25   second, because it will help you understand what I'm getting

1  at.   (Nods head affirmatively)

2  Q. If  -- and, yes.  And you do it based upon your report, and

3  based upon your review of the file, and you've covered that.

4  So, in the context of the Workers' Compensation process, can

5  she work right now?

6  A. No.  Because she hasn't been offered a job that's suitable.

7  (Shakes head negatively)

8  Q. And, so, tell me the process -- tell me, are there good

9  things about Workers' Comp, Federal Workers' Comp?

10  A. That's why I wanted to talk about it.  It's amazing.  Most

11  people don't practice -- of course, very few people practice

12  Federal Workers' Compensation.  But I wanted to talk about it

13  for a second, because it's just got some amazing attributes;

14  some positive, some negative.

15       As in any regular Workers' Compensation claim -- and when

16  I say "regular," I'm talking about regular state law

17  controlled Workers' Comp.  There's a social contract that a

18  person gives up any right to pain and suffering in exchange

19  for only wage loss reimbursement and medical bills paid.  And

20  they don't have to, but the other part of that combination is

21  that they don't have to prove negligence on their life -- on

22  their employer, just the fact that it happened at work.

23       So, you don't get to claim pain and suffering, you don't

24  have any compensation for that.

25  Q. In Federal Workers' Comp?

1    A. No, I'm talking about all state law Workers' Compensation

2    systems.

3    Q. Okay.

4    A. That's the general social contract.  But it's been changed

5    slightly with regard to federal employees, and in federal

6    employees there are no such thing as a right to future wage

7    loss reimbursement benefits, nor future medical bills.

8         So, therefore, an attorney cannot commute that to a net

9    present value and settle the case.  There is no settlement.

10   This is an important point that I want to make.  There is no

11   settlement of a Federal Employee Workers' Compensation case.

12        You're not entitled to wage loss reimbursement until that

13   week or two, or a month, whatever time period, that month has

14   actually occurred and you have not been paid.  The same thing

15   as medical care.

16        Whereas, you know, in state law, lawyers all over the

17   United States, 50 states, what they primarily do is estimate

18   those benefits and commute them to a net present value and

19   settle the case for that amount.  And they typically receive a

20   fee for doing that, a fee on top of those benefits.

21        Whereas, the Office of Workers' Compensation programs is

22   specifically a non-adversarial process, which, to their minds,

23   justifies not ever awarding anything (shakes head negatively)

24   for attorney fees, and, therefore, there is so few attorneys

25   who represent these people.  We're talking about money that

1   must come out of the pocket of the injured worker who is off

2   work.

3   Q. Okay.

4   A. There is no such thing as a contingency fee.  Like, for

5   example, in a car wreck, a third, something like that, --

6   Q. Right.

7   A. -- that's illegal in the Office of Workers' Compensation.

8   You must do time billing, and your time billing must be

9   approved by your client, and then it must be sent to the

10  claims examiner and approved before you're actually allowed to

11  have your money, the money for doing the work.

12  Q. Okay.

13  A. So, secondly, because of our system, there is no what we

14  would call a control of that money.  If you were to get your

15  client, say, $30,000 in back pay, the lawyer doesn't receive

16  that $30,000 with his name on it and his client's name on it,

17  as if it was a tort claim against State Farm Insurance for a

18  car wreck, that $30,000 is deposited directly into the

19  client's file.  Into the client's checking account, is what

20  I'm trying to say.

21       So, you see, there is no way the attorney gets to

22  exercise control over that money to collect his fee, if he was

23  extending credit to the client.  So that's another reason why

24  it's very difficult.  But -- and why there's so few lawyers

25  involved in that business.

1    But I want to move on about some very unusual things,

2    extraordinary things about the --

3    Q. Good things, you mean?

4    A. Some are good, some are bad.

5    Q. Okay.

6    A. It kind of depends on how you look at it.  One great thing

7    is that some causation, S-O-M-E, some causation is required to

8    prove your claim.  Not an overwhelming amount of causation,

9    just some.

10    So, for example, you know that the federal government

11    gives preference to veterans; if a veteran has a job with the

12    federal government, he might already have a VAD, he might

13    already have a Veterans' Administration Disability on his

14    knee.  But if he worsens it as a result of work activity, that

15    becomes a full-fledged Workers' Compensation claim.

16    There is no apportionment between how much of his injury

17    was pre-existing or due to some other thing, he's entitled to

18    100 percent of his Workers' Compensation benefits.  So, that's

19    fantastic.

20    Relative -- comparatively speaking to, you know, that's

21    what lawyers do all day long in state law Workers'

22    Compensation is argue about the apportionment.  There's not

23    apportionment issue.  Which is favorable to the employee.

24    The other thing is after the claim is approved, there are

25    no credibility determinations for the claims examination --

1    examiner as far as the claimant.  When the claim is approved,

2    it's approved.  From there on, all we're going to be talking

3    about is medical evidence.  That's all that is required from

4    there on.

5    Q. Is that objective medical evidence?

6    A. Well, you know, I've been -- I was an injury lawyer for

7    20-something years, so I learned -- you know, the concepts of

8    what is objective and what is subjective sometimes is quite

9    over -- underwelming, so, I don't know exactly how to answer

10   that question.

11        But what I'm saying is there is no more questioning the

12   credibility of the claimant after the claim has been approved.

13   In fact, this is very odd.  It's really odd.  Extraordinary.

14   The burden is on the claims examiner to terminate the

15   benefits.  The burden is on the claims examiner to terminate

16   the benefits.  And he does that by way of -- his primary

17   function is what we call medical development.

18        So, the claims examiner develops the file medically.  He

19   sends out letters, Is this person still this?  How about this?

20   What do you say, doc?  You know, he medically develops the

21   file.  And he has three primary, I guess you would say, tools

22   --

23   Q. The claims examiner?

24   A. The claims examiner has three primary tools.  He has an

25   individual that works inside his district -- like, there is 16

1  districts, I believe, but, anyway, works inside of his

2  district, who is a doctor, who is what I would call a paper

3  reader.  He's a district medical advisor but he doesn't see

4  anyone, he simply looks at medical reports for the claims

5  examiner and gives him suggestions.

6  Q. Was that done in this case?

7  A. Well, yes.  We had a -- we had a DMA, a district medical

8  advisor look into her -- she had repeatedly, for years,

9  claimed that she had TOS, and, eventually --

10 Q. Thoracic Outlet Syndrome.

11 A. Yes.  I'm  sorry, I should have said that.  And,

12 eventually, they submitted that to one of their district

13 medical advisors, and he said, "Well, sure, of course."  And

14 right after -- and his name is Doctor Blum, B-L-U-M.  And

15 after he came -- he agreed, and then immediately approved the

16 surgery, which happened in the end of 2008.

17       That's an important thing, the time that that happened,

18 2008.  She had been trying to get that approved for, like,

19 five years.  But that's one of --

20 Q. Who paid for that?

21 A. Who is that?

22 Q. Who paid for that surgery?

23 A. Oh, the Workers' Compensation, OWCP.

24 Q. All right.  Thank you.

25 A. The second tool, I talked about the district medical

1   advisor, the internal paper reader doctor, the second tool is

2   what they refer to as the second opinion doctor.  Not the

3   doctor that's the patient's doctor, the injured person's

4   doctor --

5   Q. Such as Doctor Martin in our case.

6   A. Yes.  Not like Doctor Martin, but a doctor who has no

7   relationship, whatsoever.

8   Q. No patient/client -- or no doctor/patient relationship.

9   A. That's exactly true.  In fact, their -- they are told that

10  you don't develop, you know, you're not supposed to develop a

11  doctor/patient relationship with this person.

12       They have a process by which they assign these -- what

13  they call second opinion examiners.  And Doctor Hood has been

14  on that list for, I don't know, 30 years -- or, I don't know,

15  at least 20 years.  And I think that's what he testified to.

16       I've dealt with Doctor Hood on cases twelve years ago.

17  Q. Okay.  So, Doctor Hood --

18  A. Yeah.

19  Q. As far as this case goes, Doctor Hood was the second

20  opinion examiner after Doctor Strausser had denied -- or had

21  changed his opinion as far as restrictions on Debbie.

22  A. Yes.  Now, I want to talk about that, but let me just

23  finish what I'm saying here.

24            MR. WELDON:  Your Honor, objection, nonresponsive.

25            THE COURT:  Yeah.  Let's move it along, Mr.

1  Arvanetes.

2  **BY MR. ARVANETES:**

3  Q. Okay.  What is the final -- what is the final?

4  A. The umpire doctor.  The claims that -- the umpire doctor.

5  If the claims examiner is still uncertain after he's sent a

6  person SCOP, a second opinion examiner, he gets to send her to

7  another non-related doctor, a one-shot doctor, which we refer

8  to at that time as an umpire, because there's already been a

9  SCOP.

10       Now, what I want to tell you, which is really important,

11  is in normal Workers' Compensation context that is what your

12  lawyer does, is he challenges the bias and prejudice of the

13  doctors that are being -- that the persons are being sent to,

14  but we don't have that right under Workers' Compensation.

15       So, this would be a very harsh thing to the claimant.

16  That even if he has a lawyer, we can't send a letter to Doctor

17  Hood, we can't take a deposition of Doctor Hood.  Nor the

18  district medical advisor, nor the umpire.

19       We don't get to send letters or suggestions of things we

20  would like for them to consider when they do their

21  examinations.  Not allowed, hands off.

22  Q. So, we're -- we're stuck with that opinion.

23  A. That's what I'm trying to tell you.  The claims examiners

24  use of A, B or C, that is the DNA, the second opinion, or

25  umpire, is not something you can challenge.

1   Q. So, in --

2   A. Not unless you have re -- I guess you would say rebuttal

3   medicine -- medical evidence from your own physician.

4   Q. Right.  All right.  So, the first -- so, in our case,

5   Doctor Blum was involved in advising the claims examiner.

6   A. Uh-huh.

7   Q. Is that right?

8   A. Yes.  I'm sorry.  Yes.

9   Q. That's all right.  And then -- and the claims examiner --

10  reviewing the records, why did the claims examiner go to

11  Doctor Hood?

12  A. Well, what happened was Officer Haywood -- or Special Agent

13  had presented a video to Doctor Strausser, and Doctor

14  Strausser already, although there already were work

15  restrictions in place from him, changed his work restrictions

16  slightly.  And Officer Haywood submitted that new information

17  to Carolyne Bowi, and Ms. Bowi wrote up a new job offer based

18  upon the January 18th report of Doctor Strausser.

19          And when that offer was submitted, Ms. Durand said, Wait

20  a minute, that's not the correct doctor, and that's not a

21  valid job offer.  So, she objected to that.  And what

22  happened --

23  Q. She objected by not -- by not signing the form.

24  A. Yeah.  So, the claims examiner prematurely, in my opinion,

25  immediately said the job was suitable, and that --

1   Q. Doctor Strausser --

2   A. -- Doctor Strausser was the correct physician.  But then

3   she brought evidence to his attention, she sent him the report

4   from Doctor Bricken.  Remember, there is a big part of this

5   case which the OIG just never understood, and that is you have

6   to consider all of their conditions, whether or not they are

7   work related.

8          And the reports are in from -- she sent -- she sent

9   reports from Martin and from Doctor Bricken that showed there

10  was all kinds of other things that needed to be taken into

11  consideration, as far as creating a job offer for this woman.

12         Unfortunately, you know, there is a -- it's pretty

13  embarrassing, I suppose, to the claims examiner, he had to

14  change his position.  And that's what I'm saying about the

15  file, it's in the file where the claims examiner changes,

16  whoop, whoop, you know, that Doctor Martin is the right

17  doctor, that's not a suitable job offer, let's send it out to

18  a SCOP -- I'm sorry, a second opinion doctor and find out what

19  his verdict will be.

20         And, of course, then we get this once in 40 years opinion

21  from Doctor Hood.  I've never seen an opinion like that from

22  Doctor Hood.

23  Q. And you've read -- you've read his reports.

24  A. Oh, yes.  I've had other clients who were seeing Doctor

25  Hood.

1  Q. But you've read his report?

2  A. Or sent to Doctor Hood, I should say.

3  Q. From this case, as well.

4  A. Oh, no.  In this case, of course, yes.

5  Q. Yes,  And it was a one in 40 years.

6  A. Yeah.  What happened was it jumped it to a different

7  stratosphere, it jumped the case to a PN.  And when the case

8  gets jumped to PN, there's no more use of an A, or a B, or a

9  C, as I was describing, to fend off the claim.

10      In fact, there's not even this vocational rehabilitation

11  concept.  Which I find to be total baloney.  It's not like

12  they're going to get a person a job.  What -- they just simply

13  have to identify a job that exists, and then they get to

14  reduce their Workers' Compensation benefits by what that job

15  would pay.

16      So, very few people actually get a job from a vocational

17  rehabilitation counselor, what they do is they get an idea of

18  a job that person could do, and then they reduce they're pay

19  by -- I like to talk about, for example, sitting in the dark

20  in the parking lot in your car all night long, you're a

21  security guard, so we're going to be able to reduce your

22  Workers' Compensation pay by $600 a month, because that's what

23  that person would make.

24      That's basically what LWEC means, loss of wage earning

25  capacity.  It simply a determination.  But that opportunity

1   was lost when she was jumped up to a PN status.

2   Q. By Doctor Hood's report.

3   A. By Doctor Hood's report.

4   Q. Until -- and the PN status put her on the Periodic Rolls.

5   A. That's what I'm talking about, permanent -- she became

6   permanent.  So, all they get to do then is require medicine

7   evidence like once every three years and send her out the 1032

8   every year.

9   Q. And, in your file, in the OWCP file, you talked about this

10  report every three years, did you see any reports every three

11  years in this file?

12  A. Actually, I didn't see any.  But, I mean, they have a right

13  to do that, though.  They have the right to, every three

14  years, make you re-prove your case with medical evidence

15  indicating that you can't do any work.

16  Q. And, then, you said there was a 1030 -- what is it, a 1032

17  or a --

18  A. Yeah.  A 1032 is kind of like a -- it's like fishing.  What

19  we want you to do is send us back this report, swear to it of

20  what all your income has been and all of your work activity.

21  And, then, of course, they have the right to check that with

22  the IRS.  So if they find, you know, a deviation, then that's

23  a potential fraud.

24  Q. Uh-huh.

25  A. But, as I said a little bit earlier, uhm, I don't think

1    that was ever charged.  When I -- that's how I actually

2    learned that she was on Social Security disability.  Which, of

3    course, you don't get the full benefit, you only get a little

4    bit of if you're drawing Workers' Comp.

5    Q. And what's the importance of her -- Doctor Bricken being

6    her psychiatrist and the fact that she is on disability for

7    her mental health, with regard to this case, with regard to

8    the issue of, uhm, our entrapment defense, with regard to the

9    psychiatry, for example?

10   A. The psychological condition is this woman was determined to

11   be totally disabled due to her psychological condition, but

12   what -- in Social Security disability you have to prove that

13   you can't do any work, anywhere.

14        She met that burden, according to the Social Security

15   Administration, for her psychological condition.  I think it

16   was granted in 2009, but it was a back pay up to what they

17   found to be an onset date somewhere in 2008.  I think, maybe,

18   even April of 2008.  I can't remember.

19   Q. And you noticed that the OWCP denied her psychological

20   benefits work restrictions based upon her psychology or her

21   mental health, why was that?

22   A. Well, to begin with, it's totally irrelevant.  If she had

23   the condition, she had the condition.  When you're talking

24   about the OWCP, can she --

25   Q. Because -- because why?  Because you have to take the

1  person as a whole.

2  A. Yes, they have to consider everything.  They have to

3  consider hemorrhoids, they have to consider anything a person

4  has.  Any kind of medical condition a person has -- has to be

5  taken into consideration in a suitable job offer.

6  Q. So, --

7  A. There's really no doubt about that.  The first witness of

8  the --

9  Q. Who?

10 A. Never mind.  There's no doubt about that.

11 Q. All right.  So -- so, is it relevant, you've read Haywood's

12 interview to -- when he had an interview with Debbie Durand

13 at -- in 2008.

14 A. Yes, sir.

15 Q. February.

16 A. I did.

17 Q. You read that interview.

18 A. I have it here, too, yes.

19 Q. All right.  Debbie said that it's 90 percent disability, 10

20 percent Bowi, does that make any difference with regard to

21 whether she can -- whether she can work or not once she is on

22 the Periodic Rolls (indicating)?

23 A. After PN, no, of course it wouldn't make any difference.

24 (Shakes head negatively)  After a person gets to PN, and I

25 don't mean to be light about this, but they are pretty much

1   untouchable.  And that's the problem with the OIG and with the

2   agency, it's what they have.  They have that problem.

3       And they have a way of dealing with it, that -- when I

4   said that 1032.  It might detect some sort of a report there

5   that's inconsistent with the IRS and they can go after them on

6   fraud on that.  But as far as Workers' Compensation fraud,

7   which is what we are here about, Workers' Compensation fraud,

8   the Workers' Compensation laws need to be respected.  Those

9   are called FECA rights, Federal Employee Compensation Act.

10          MR. WELDON:  Your Honor, objection, nonresponsive,

11  legal conclusion, 403.

12          THE COURT:  Let's stick to the this case, Mr.

13  Arvanetes.

14          MR. ARVANETES:  So, can the clerk please put up

15  Exhibit 511?  That is the wrong one.  Hold on.

16          THE COURT:  511 is the Social Security --

17          MR. ARVANETES:  I want to -- I would like the

18  exhibit that was entered into, and we referred to it a little

19  bit earlier before his testimony, is a training man -- from

20  the training manual.

21      Do you have that Joslyn?  What number is that?

22          THE COURT:  505.

23          MR. ARVANETES:  505?  Please put up 505, madam

24  clerk.

25  **BY MR. ARVANETES:**

1    Q. So, you received this by special order of the Court.

2    A. Yes, sir.  I have seen it, read it, and it's mentioned in

3    my report.

4    Q. Recourse of an investigation.  This is OIG training

5    materials.

6    A. Yes, sir.  It's how it was represented to me, and it

7    appears to be so.

8    Q. All right.  And I want -- I want to read.  "The first

9    recourse of an investigation should be the pursuit of a

10   criminal remedy.  Advantages include," and read the -- doesn't

11   work still.  The third box, starting with "PICS."

12   A. Yes.  Apparently, they're training their special agents to

13   ignore a person's OWCP rights, to take away their rights from

14   the Department of Labor/Office of Workers' Compensation.  Get

15   out of that, avoid those rights, take the OWCP out of

16   decision-making process.

17        Now, remember, they tried to use the OWCP decision-making

18   process and lost.

19   Q. And that's the Haywood --

20   A. That's the Haywood --

21   Q. -- investigation.

22   A. Uh-huh.

23   Q. Let's talk about that.  So, you -- that was an unsuccessful

24   investigation.

25   A. Yes, it was unsuccessful, if the goal was to take her off

1    -- is to return her to work, yes, uh-huh.

2    Q. Because the claims examiner didn't -- chose not to follow

3    it and chose to send Ms. Durand to Doctor Hood, right?

4    A. Yes.  The -- what happened was Ms. Durand complained, and

5    had to teach the claims examiner that's not how you do it.

6    You have to use your own doctor, and you have to take all of

7    your matters into consideration.

8         So, he was -- unfortunately, as I said, it's in the file

9    where he changes his mind and sends her to Doctor Hood, his --

10   his -- B in my example of the things that he could do for

11   second opinion examinations.

12   Q. So, why didn't Doctor Hood get to see the video, in your

13   expert opinion?

14   A. Well --

15   Q. Why didn't  -- in other words, why didn't the Department of

16   Labor/OWCP send the video to Doctor Hood?

17        MR. WELDON:  Your Honor, objection, speculation,

18   legal conclusion.

19        THE COURT:  Can you lay any foundation for it as to

20   why he would know that?

21   **BY MR. ARVANETES:**

22   Q. You're an expert in this area, uhm, are there

23   administrative rules with regard to showing videos to

24   doctors?

25   A. Correct.  Yes.

1    MR. WELDON:  Objection, Your Honor, leading the

2    witness.

3    **BY MR. ARVANETES:**

4    Q. What are they?

5    THE COURT:  Hold on.

6    **BY MR. ARVANETES:**

7    Q. What are those?

8    THE COURT:  Hold on.  Wait until I rule, okay?

9    MR. ARVANETES:  I'm sorry.  I thought you waved him

10   off.

11   THE COURT:  I've been sitting here listening to a

12   lecture on Workers' Compensation law.  This is supposed to be

13   testimony about this case.  I'm giving you a lot of latitude.

14   Mr. Weldon, I'm going to allow it to go for now.

15   Go ahead, Mr. Arvanetes.

16   **BY MR. ARVANETES:**

17   Q. Please answer the question.

18   A. They have -- under Workers' Compensation rules and FECA,

19   the law, the Federal Employee Compensation Act, people have

20   various rights, and one of those rights -- they typically

21   determined, by way of appeals up to the highest court under

22   the Workers' Compensation system, which is called ECAB, and

23   ECAB has ruled that you are not allowed to make -- to get a

24   decision from a doctor on a surveillance video unless you

25   honor the rights of the employee, to allow them to be familiar

1    with it and provide their response to it.  An actual case was

2    decided by one of my friends who brought --

3    Q. So, that -- that is your opinion, based upon your

4    knowledge, of why Doctor Hood may not have been able to see

5    the video.

6    A. Well, actually, I didn't see that they sent this video to

7    the OWCP.

8    Q. Exactly.

9    A. And --

10   Q. All right.  Now, in your report -- in your report, you

11   write an executive summary.

12   A. Yes, sir.

13   Q. It is on the second page of your report.

14   A. Yes, sir.

15   Q. Because I want to tighten this up.  Number one, you write,

16   "A supposed fraud that Durand created in 2008 when USPS

17   Inspector Haywood showed covert video of some activities at --

18   to her treating physician, Doctor Strausser, which supposedly

19   caused him to change his opinion of work restrictions."

20        Have we gone over that or do you have anything to add to

21   that?

22   A. Well, there's a lot of steps involved in that, but that's,

23   basically, the -- as the people know here, it's the -- it's

24   the Haywood investigation, which we just -- I just testified

25   to was unsuccessful because it didn't follow the correct

1    procedures.

2    Q. And, number two, The supposed fraud that Durand created

3    when the USPS Inspector General -- or Inspector General's

4    Special Agent Boynton surreptitiously invited her to a kayak

5    trip, during which he covertly videoed her activities on the

6    trip was supposedly, blah, blah, that was defrauding the

7    government in her contemporaneous receipt of Workers'

8    Compensation benefits, what do you mean by that in your

9    executive summary?  Please explain that.

10   A. What I mean is, of course, Mr. Boynton -- officer Boynton

11   conducted his -- I'll call it kayaking investigation, and in

12   that kayaking investigation, uhm, appears to have come to a

13   number of medical conclusions about the abilities of this

14   individual at work without getting any medical evidence on

15   that.  And I was using that, of course, here today.  And --

16   Q. Did they --

17   A. -- that's something I read about and stated about, is

18   whether the --

19   Q. Did the USPS, in review of your reports, the -- not the

20   USPS, the OIG -- the USPS/OWCP, did they -- after Doctor

21   Hood's report putting her on PN, the Periodic Rolls, did they

22   ask Debbie Durand to go see a doctor?

23   A. Oh, no.  Don't know why, but they didn't.  (Shakes head

24   negatively)

25   Q. Could they have done that?

1   A. Certainly.  (Nods head affirmatively)  The employing agency

2   all -- not just the OIG, but the employing agency always had

3   the right to use their own doctors on -- for Ms. Durand.

4   Q. All right.  So, the OWCP --

5   A. Even -- even parallel with the processing of the claim.

6   Q. What's that?  I'm sorry.

7   A. I'm saying even parallel with the processing of the claim.

8   Quite often, an employing agency will use one of their own

9   doctors -- not like Doctor Hood, a SCOP, but their own doctor,

10  and ask them to go see this doctor for an examination, and

11  then try to supplement the OWCP file with that information.

12      The employing agency, the United States Postal Service,

13  never did that in this case, nor did the OIG try to get any

14  medical evidence on her.

15  Q. So, you are saying that not only -- not only the DOL/OWCP

16  didn't tell her to go see a doctor between 2008 and the

17  present, but you are saying, also, that USPS/OIG could have

18  done the same thing.

19  A. Yes.  If they had been -- I don't know what the word is,

20  but -- I don't want to be derogatory.  But if they would have

21  been able to ruse out -- that's it.  If they would have been

22  able to ruse her into that, yes.  Say, for example, her

23  fitness examination for her to go kayaking.

24  Q. And none of that was done.

25  A. No, sir.

1   Q. So, if one of the ways to address whether she could get off

2   Periodic Rolls is to send her to a doctor, which wasn't done

3   since Doctor Hood in 2008, is there another way to try to get

4   her off Periodic Rolls?

5   A. Well, actually, they become, as I said earlier, pretty much

6   untouchable when they get into that PN status.  Remember that

7   the claims examiner no longer has his A, B, or C powers like I

8   was describing earlier.

9   Q. Okay.

10  A. The claims examiner no longer has the power to send her to

11  vocational rehabilitation in order to reduce her benefits,

12  that doesn't exist anymore.  But they do have a right to ask

13  them for medical evidence every three years that continues to

14  substantiate their disability.

15        And, as I said, they also have a right every year to send

16  out the 1032 form, which makes you turn in a financial report

17  on yourself about your earnings and your working and your

18  capabilities.

19  Q. All right.

20  A. And that, quite often, can be used as an instigator of a

21  fraud investigation.

22  Q. And how important is, for instance, whether someone can --

23  you know, like in the video, that part of the file from

24  Haywood, riding a tractor or taking care of dogs, or whatever,

25  is that important to a claims examiner?

A. Well, as I said, a claims examiner is not allowed to

consider that type of evidence, unless he's followed the

correct procedure according to ECAB, the Employee Compensation

Appeals Board.

Q. But he could have looked at that video and sent it to a

doctor.

A. If he would have done it correctly, yes, he could have,

uh-huh.  Actually, he did it, and did not advise the claims

examiner that the opinion was based upon this covert

surveillance video, as I recall.

    I don't remember -- I don't remember Haywood -- I don't

-- wait a minute.  Haywood did submit a report to the OWCP

eventually, but I'm talking about during the time period in

January when this job offer was made.  I don't believe the

claims examiner had a copy of that video.

    OIG Haywood did, in fact, send his entire report into the

OWCP, as I recall now, but my point is it was subsequent to

this objection that Ms. Durand made, which resulted in this

SCOP evaluation by Doctor Hood.

Q. All right.  And do USPS/OIG policies and procedures --

based upon your review of the file, including their training

manuals received on your order of the Court, did USPS/OIG

policies and procedures, do they allow ruse vacations?

A. I think that there has to be an approval to do that, and

there are certain steps that have to be followed.  Now, I

1    don't think I have been provided (nods head affirmatively) the

2    entire --

3    Q. You haven't been.

4    A. -- policy and procedures manual.

5    Q. You haven't been.

6    A. So, I don't know if there was compliance with it.  But I

7    know the parts that I have look like it's very -- it's very

8    well-detailed about you have to go through different steps of

9    approvals and techniques.

10   Q. And on the last page of your report, on Page 7, you write

11   "Conclusions," can you go to that, please.

12   A. (Witness complies.)  Oh, found it.  Yes, uh-huh.

13   Q. Can you read the first one?  Because you're an expert, I

14   want -- I want, for the record, and the Court to hear your

15   conclusions.

16        The first one, please read that.

17   A. Well, one of the deviations was the personally engaging

18   Durand's specialist physician, Doctor Strausser.  You know

19   that the employing agency is only supposed to contact treating

20   physicians by way of written correspondence.  They are not

21   even supposed to call them.

22        Now, they do have the right, and they did, hire a

23   field -- what I call a field nurse.  Actually, the field nurse

24   on this case for both, for the OWCP, and a separate field

25   nurse by the employing agency.  But as far as personally

1    engaging this -- the specialist, Strausser, they violated

2    their own rules with regards to that.

3    Q. All right.  What about the second paragraph, sir?

4            THE COURT:  Well, hold on.  Where -- what rule did

5    they violate?  You keep talking about these rules.  I don't

6    know -- where are we getting these rules?

7            MR. ARVANETES:  Uhm...  (Indicating)

8            THE COURT:  You're the one asking the questions

9    about it.  I don't know what the rules are, you're not making

10   any headway here.

11           MR. ARVANETES:  Okay.  I'm sorry.  Because I'm

12   trying to wrap this up.

13           THE COURT:  No, I mean, tell me what the rules --

14   show me what the rule is that you think they are violating.

15   **BY MR. ARVANETES:**

16   Q. Now, Mr. Harris, what rule are they violating?

17           MR. ARVANETES:  Can I ask that question?

18           THE COURT:  You may.

19           MR. ARVANETES:  Thank you.

20   **BY MR. ARVANETES:**

21   A. Well, it would probably take me a long time to actually

22   find the cite of that rule, but there's -- there's --

23   there's --

24   Q. Well, based upon your knowledge, what is the rule?

25   A. The rule --

1    Q. Provide it.

2    A. The rule is, as I just said, they don't contact the

3    treating physician except by a letter or through a nurse

4    physician.

5    Q. And that is in -- in --

6    A. I'm talking about rules for the employing agencies.  I'm

7    not talking about the Office of Inspector General.  I don't

8    know what rules they have, other than this incomplete thing

9    that I've been sent.

10             MR. ARVANETES:  Okay.  All right.  Is that --

11             THE COURT:  You are talking about the rules of the

12   Office of Workers' Compensation Board and the Department of

13   Labor and the post office.

14             MR. ARVANETES:  Yes, sir.  Yes, sir.

15   **BY MR. ARVANETES:**

16   Q. Is that correct?

17   A. That is correct, yes.  (Nods head affirmatively)

18             THE COURT:  All right.  Go ahead.

19             MR. ARVANETES:  Thank you.

20   **BY MR. ARVANETES:**

21   Q. The second paragraph.

22   A. It's the same concept here, personally engaging with Doctor

23   Hood, who was a second opinion, the employing agency is not

24   allowed to do that.

25        Now, the OIG, as I said, I'm not for sure if they can or

1    they can't.  That's what a lot of this case is about, is whose

2    rules apply?  Do the Workers' Compensation rules actually

3    apply to a Workers' Compensation fraud case, or not?  I think

4    they have to.

5              MR. ARVANETES:  May I have a moment, Your Honor?

6              THE COURT:  You may.

7

8              **(Discussion off the record.)**

9

10             MR. ARVANETES:  Thank you very much, Mr. Harris.  I

11   don't have any more questions at this time.

12             THE COURT:  Mr. Weldon?

13             MR. ARVANETES:  You've been helpful.  There will be

14   some cross-examination, so please stay seated.

15             THE WITNESS:  (Smiling)

16             MR. ARVANETES:  And if I have any redirect, we'll go

17   from there.

18             THE WITNESS:  Okay.

19             MR. ARVANETES:  All right.

20             THE COURT:  Mr. Weldon?

21             MR. WELDON:  Your Honor, I have no questions.

22             THE COURT:  Okay.  Is the witness excused?

23             MR. ARVANETES:  Yes, sir.

24             THE COURT:  You may step down.  Thank you,

25   Mr. Harris.

1    Mr. Arvanetes, any other witnesses?

2    MR. ARVANETES:  Your Honor, we rest.

3    THE COURT:  All right.  Mr. Weldon, any rebuttal?

4    MR. WELDON:  No, Your Honor.

5    THE COURT:  We are going to take a break until 4:00

6    o'clock, at which time I'm going to allow the parties to

7    present closing arguments, to last no more than 30 minutes per

8    side.  And, in the meantime, please make sure all of your

9    exhibits have been admitted and that they are in order.

10    Anything else, Mr. Weldon?

11    MR. WELDON:  No, Your Honor.  Thank you.

12    THE COURT:  Mr. Arvanetes?

13    MR. ARVANETES:  No, Your Honor.

14    THE COURT:  All right.  And we will talk more at

15    four.  Thank you.

16

17                    **(Recess taken.)**

18

19    THE BAILIFF:  The United States District Court is

20    again in session.

21    THE COURT:  Please be seated.

22    We've straightened out all of the exhibits, Mr. Weldon?

23    MR. WELDON:  Yes, we have, Your Honor.

24    THE COURT:  Mr. Arvanetes?

25    MR. ARVANETES:  Yes, sir.

1          THE COURT:  Okay.  All that needed to be admitted

2     have been admitted?

3          MR. ARVANETES:  Yes, sir.

4          THE COURT:  All right.  Then why don't we start with

5     the government's closing statements.

6        Mr. Weldon.

7          MR. ARVANETES:  Just for the record, Your Honor, I

8     need to renew my motion for a judgment of acquittal.

9          THE COURT:  All right.  And as I articulated

10    previously when I denied that, I believe we have issues of

11    fact for me to resolve, as the factfinder in this case.  The

12    government has made out a prima facie case, according to the

13    elements of the four counts, and you've attempted, through

14    cross-examination and your case-in-chief, to rebut those and

15    undermine the evidence supporting those elements, and I think

16    it's one that I need to resolve and I'm denying your renewed

17    Rule 29 motion.

18         MR. ARVANETES:  Thank you, Your Honor.

19         THE COURT:  All right.  Mr. Weldon.

20         MR. WELDON:  Yes sir.

21       Thank you, Your Honor.  I know that the Court listened

22    very carefully to most of the facts, so I don't need to go

23    through many of the details, but there were a few things that

24    I wanted to address.

25       And the first is what this case is not about.  We are not

1    arguing that Ms. Durand was not injured.  We are arguing about

2    that she was embellishing her level of injury so that she

3    didn't have to work at all.  And the reason for that is that

4    working even part-time for Ms. Durand, she didn't want to have

5    to do.

6                THE COURT:  When do you -- when do you think that

7    she embellished or exaggerated her injuries?

8                MR. WELDON:  I think the clearest proof for the

9    Court was Doctor Hood's testimony.

10               THE COURT:  And that was in 2008.

11               MR. WELDON:  Correct, Your Honor.

12               THE COURT:  Is that when it started?

13               MR. WELDON:  Well, I think it started right from the

14   very beginning, even with Doctor Strausser, Your Honor.  And

15   you have --

16               THE COURT:  All right.  So, I have to decide whether

17   she made a false statement.

18               MR. WELDON:  Correct.

19               THE COURT:  And when she made a false statement.  If

20   she made a false statement, that's the basis for a false

21   claim.

22               MR. WELDON:  Correct.

23               THE COURT:  And, then, when did she first file a

24   false claim, and for what period of time that she filed the

25   false claims, right?

1          MR. WELDON:  Yes, Your Honor.

2          THE COURT:  Okay.  So, tell me when -- go through

3     the chronology.  I know she started -- she had her CA-2 in

4     2003.

5          MR. WELDON:  That is correct.

6          THE COURT:  That was denied.  It was reviewed and

7     approved and then withdrawn, when do you think she made the

8     first false statement?

9          MR. WELDON:  I think that the first false statement

10    that we have in the exhibits, Your Honor, starts with the

11    travel vouchers, which is in February of 2006.

12         THE COURT:  And that's, uh --

13         MR. WELDON:  Government's Exhibit 20.

14         THE COURT:  Exhibit 20.  Okay.

15         MR. WELDON:  Yes, Your Honor.  And, so, what the

16    United States --

17         THE COURT:  What was her -- what was her disability

18    status in February of 2006?

19         MR. WELDON:  In February of 2006, Your Honor, her

20    disability status -- if you would give me one moment -- was

21    she was paid temporary total disability.  And the cite for

22    that would be Kathy Simmons' testimony, Your Honor.

23         And she could have either been working for the post

24    office or not, it's the fact that she was making that false

25    claim on a travel voucher.

1      THE COURT:  And, so, the false claim was that she

2 went for medical care.

3      MR. WELDON:  (Nods head affirmatively)

4      THE COURT:  Did she -- let me back up.  Travel

5 voucher and later reimbursement for travel for medical care.

6      MR. WELDON:  Correct.

7      THE COURT:  Did she travel for medical care in

8 February of 2006?

9      MR. WELDON:  No.

10      THE COURT:  She did not.

11      MR. WELDON:  That's correct.  And --

12      THE COURT:  Okay.  I want to try to distinguish

13 between what -- you think there are times where she submitted

14 a voucher and didn't go anywhere, is that your theory?

15      MR. WELDON:  That's correct.

16      THE COURT:  That sometimes she submitted vouchers

17 and didn't go anywhere.

18      MR. WELDON:  That's correct.

19      THE COURT:  All right.  Were there other times that

20 she submitted vouchers and went for medical care?

21      MR. WELDON:  Correct.

22      THE COURT:  Are you challenging the validity of the

23 need for that medical care?

24      MR. WELDON:  No, Your Honor.

25      THE COURT:  You're not.

 1              MR. WELDON:  We're simply saying it did not exist.

 2              THE COURT:  So, for 34 of the 60 travel vouchers --

 3              MR. WELDON:  (Nods head affirmatively)

 4              THE COURT:  -- she did not receive any medical care,

 5    or pharmacy care, or whatever it might have been.

 6              MR. WELDON:  That's correct.

 7              THE COURT:  Okay.

 8              MR. WELDON:  So, the United States' position, Your

 9    Honor, is that from Government's Exhibit 20 --

10              THE COURT:  Right.

11              MR. WELDON:  -- until Government's Exhibit 50, there

12    was no appointment or care that was provided.

13         And then --

14              THE COURT:  For all of them.

15              MR. WELDON:  Correct.

16              THE COURT:  For 20 through 50.

17              MR. WELDON:  Correct.

18              THE COURT:  Okay.

19              MR. WELDON:  Now, then, you have the stipulation,

20    where the parties stipulate and agree that on the following

21    dates there was no medical record of a medical appointment or

22    a pick-up of a prescription, and then it outlines the dates

23    with the respective government exhibit numbers.

24              THE COURT:  All right.  And that's in the

25    stipulations.

 1             MR. WELDON:  It is, Your Honor.

 2             THE COURT:  All right.  Now, how does Ms. Durand's

 3     testimony regarding Exhibit 20 -- all right.  Well -- well,

 4     what is it?

 5             MR. ARVANETES:  508.

 6             THE COURT:  508.  Sorry.  508.

 7             MR. WELDON:  Yes, Your Honor.

 8             THE COURT:  How does that comport with your claims

 9     about Exhibits 20 through 50?

10             MR. WELDON:  Well, I think she would have receipts

11     for some --

12             THE COURT:  Okay.  So, that's an issue of fact that

13     I have to resolve.

14             MR. WELDON:  Correct.

15             THE COURT:  She has testified here's what I did, but

16     for some reason it doesn't quite sync up.  That was her

17     testimony.

18             MR. WELDON:  That's exactly right.

19             THE COURT:  All right.

20             MR. WELDON:  And, Your Honor, if I could show you

21     Government's Exhibit 508, please?

22             THE COURT:  You may.

23             MR. ARVANETES:  It's a defense exhibit.

24             MR. WELDON:  Excuse me, Defense Exhibit 508.

25         I think the easiest position for the Court is if you look

1   at the tan portions, or whatever you want to call those

2   colors, those correspond to the exhibits.

3       Now, if you look, and you compare them to the government

4   exhibit --

5               THE COURT:  The mauve color here?

6               MR. WELDON:  Sure, let's go mauve.

7               THE COURT:  That corresponds with Exhibits 20

8   through 50.

9               MR. WELDON:  Correct.

10              THE COURT:  Okay.

11              MR. WELDON:  Now, one thing, if you really want to

12  get into the weeds and look through the details, then some of

13  these are not addressed.  So, there is some mauve colored

14  portions that simply are not addressed that are in the

15  exhibits.

16      So, in other words, there might be --

17              THE COURT:  So, the bottom of this page, for

18  example, Martin Diagnostics, you're saying that they are not

19  in dispute?

20              MR. WELDON:  Well, yeah.  I think those for --

21  especially are not in dispute.  Because they don't provide any

22  other justification for that.

23              THE COURT:  All right.

24              MR. WELDON:  Now, I know Ms. Durand testified that

25  it was after work and that she attended after work.  I'd ask

1   the Court to look at those vouchers, and you can see that she

2   claims that she is traveling from home to the clinic.

3              THE COURT:  Okay.

4              MR. WELDON:  And, so, I think, for those reasons,

5   you can just find that there is travel voucher fraud, because

6   there is really no dispute.  I have no documentation that

7   shows any difference.

8         Then the other thing is that there --

9              THE COURT:  Wait.  The amount here is $1,800.

10             MR. WELDON:  That's correct.  This is a minor

11  amount.

12             THE COURT:  What is -- is there a threshold?  A

13  jurisdictional amount on that?  I know that the alleged false

14  claims are well in excess of that.

15             MR. WELDON:  That's correct, Your Honor.

16             THE COURT:  Do these have to exceed $1,000 to be

17  relevant?

18             MR. WELDON:  They do not, Your Honor.

19             THE COURT:  This is just evidence that was used to

20  support the false claims.

21             MR. WELDON:  That's correct, Your Honor.

22             THE COURT:  All right.  Does it matter if it's one

23  or 60?

24             MR. WELDON:  It does not matter.

25             THE COURT:   Okay.  Go ahead.

1          MR. WELDON:  All right.  And, then, of course, there

2     really are -- there's the travel voucher fraud, and you've

3     seen reference to the medical expenses that she's received,

4     but then it's really about a wage loss that the Postal

5     Services has had to pay as a result of Ms. Durand.

6          And, so, with respect to the wage loss, for the counts

7     that identify from February 25th of 2013, to 7/26 of 2014, the

8     wage loss, based on the false claims of Ms. Durand, are

9     $43,009 -- $43,953.54.  And, remember, that was from Agent

10    Boynton, when he testified.

11         THE COURT:  All right.  Why that time period,

12    February of '13 until July of '14?

13         MR. WELDON:  That's the time that she was in

14    Montana, Your Honor.

15         THE COURT:  Okay.  That's the jurisdictional --

16         MR. WELDON:  Correct.

17         THE COURT:  Okay.  All right.  But the total amount

18    you're claiming in wages is over 300,000.

19         MR. WELDON:  Correct, Your Honor.

20         THE COURT:  All right.  What do you believe was the

21    first false -- so, the first false statement, you said, was

22    the travel voucher in February of '06.

23         MR. WELDON:  Correct.

24         THE COURT:  Okay.  And when was the first false

25    claim?

1          MR. WELDON:  I think that Doctor Strausser started

2     that process, and that's why you have him putting her back on

3     restrictions so that she can work.

4          THE COURT:  What year was that?

5          MR. WELDON:  That would have been 2008, Your Honor.

6          THE COURT:  That was in, roughly, January of '08?

7          MR. WELDON:  Correct.

8          THE COURT:  Okay.  That's when Agent Haywood went to

9     his office and showed him the video.

10          MR. WELDON:  That's correct.  (Nods head

11     affirmatively)

12          THE COURT:  So, he puts Ms. Durand back on

13     restrictions, and then the OWCP sends her a modified job

14     offer.

15          MR. WELDON:  That's correct.  And she rejects

16     that.

17          THE COURT:  All right.  So, you think from that

18     point, from '08 until when that we have false claims?

19          MR. WELDON:  Until the present.  But the Indictment

20     alleges until 2016, Your Honor.

21          THE COURT:  All right.  So, what is the wage loss

22     amount from '08 to 2016, as stated in the Indictment?

23          MR. WELDON:  The allegation is $268,892.18, Your

24     Honor.

25          THE COURT:  Okay.  For the period of January of 2008

1        through what period of '16?

2                MR. WELDON:  May of 2016, Your Honor.

3                THE COURT:  All right.  And you're claiming it's

4        going on up until now?

5                MR. WELDON:  No.  And the reason I can't, Your

6        Honor, is that that's not included within the Indictment.

7                THE COURT:  Okay.  So, that would -- if you

8        succeeded in a guilty verdict, then you would seek to forfeit

9        the amount up until now.

10               MR. WELDON:  That's correct, Your Honor.  And, so,

11       just so the Court's aware of the government's theory, really,

12       when you're talking about the wage loss, that is more of a --

13       first of all, we are discussing the fraud loss, but, then, of

14       course, once we get to the forfeiture aspect, if we get to

15       that point, then that would be the total amount that would be

16       forfeited.

17           And, of course, that would be separate and apart from

18       restitution.  And, so, when you and I spoke earlier about, for

19       example, the medical expenses, and you had some concerns about

20       that, then you don't even have to include that within the

21       conviction component, that can be the forfeiture aspect, Your

22       Honor.

23               THE COURT:  All right.  And, so, in '08, you think

24       she made false statements to Doctor Strausser, that he, then,

25       saw the video and changed his mind.

1        MR. WELDON:  That's correct.

2        THE COURT:  Okay.

3        MR. WELDON:  And what I can tell the Court, Your

4   Honor, just so I'm not tied to a specific date, I think that

5   the false statements had been discovered by that point.  So, I

6   think it's a little unclear when the last time it started

7   (sic), but I think it's --

8        THE COURT:  You mean, the false statements, where --

9   that you think were discovered by Agent -- Special Agent

10  Haywood.

11       MR. WELDON:  Correct.  (Nods head affirmatively)

12       THE COURT:  Through his interview and

13  investigation.

14       MR. WELDON:  Correct.

15       THE COURT:  Okay.  So, there's a couple of things

16  that I want to be clear about.  Did OWCP require Ms. Durand to

17  seek a medical review every three years?

18       MR. WELDON:  Your Honor, I think that right now, as

19  our record -- as we have it, I think that was a little

20  unclear.  I noticed that Mr. Harris made a reference that

21  there wasn't, but, I think -- my understanding is that there

22  was medical sought during that time period.  (Nods head

23  affirmatively)

24       THE COURT:  Did Ms. Durand file medicals?

25       MR. WELDON:  I believe she did, Your Honor.  (Nods

1    head affirmatively)

2              THE COURT:  Are they in the record somewhere?

3              MR. WELDON:  No.  (Shakes head negatively)

4              THE COURT:  Not in her file.

5              MR. WELDON:  I do believe they're in the file, Your

6    Honor.  (Nods head affirmatively)

7              THE COURT:  But you didn't present them here.

8              MR. WELDON:  That is correct.

9              THE COURT:  Okay.  They're not part of your case,

10   then, I guess, since you didn't present it.

11             MR. WELDON:  That is correct, Your Honor.

12             THE COURT:  All right.  So, how do you respond to

13   the defense's argument that in 2008, Ms. Durand, she's filing

14   these claims, the medical professionals evaluate her and

15   determine her to be total -- temporary totally disabled?

16             MR. WELDON:  Yes.

17             THE COURT:  All right.  And I know you believe that

18   she achieved that status through false statements.

19             MR. WELDON:  Correct.

20             THE COURT:  But from her perspective, now, she is

21   designated as temporary totally disabled, and she receives no

22   more modified job offers after January of '08; is that right?

23             MR. WELDON:  After September of 2008, yes.

24             THE COURT:  September, was it?

25             MR. WELDON:  Correct.  So, if we go to Government's

 1    Exhibit 18, Your Honor, and I can show you that in that

 2    exhibit --

 3         If we could scroll down, please, Agent Boynton?

 4         The ultimate decision, where she went there and it was

 5    approved, was September of 2008.  Right during the time period

 6    --

 7              THE COURT:  That's the PN status, right?

 8              MR. WELDON:  Correct.

 9              THE COURT:  But my question is did she receive any

10    modified job offers after January of '08?

11              MR. WELDON:  No, Your Honor.

12              THE COURT:  That last one, correct?  So, again --

13    well, look, Ms. Durand is out living her life, and no one ever

14    asked her to come in and accept a job so she builds herself up

15    and recovers from her back problems and is going on with her

16    life.

17              MR. WELDON:  Yes.

18              THE COURT:  No one ever told her not to do anything

19    at home.

20              MR. WELDON:  Correct.

21              THE COURT:  How do you respond?

22              MR. WELDON:  Well, the response would be why did she

23    obtain PN status?  And if you look --

24         If we could scroll up, Agent Boynton?

25         It even states it in there that it was based on the

1    second opinion of Doctor James Hood.  And why did Doctor James

2    Hood make his conclusions?  Because he relied on the

3    subjective statements of Ms. Durand, which he concluded were

4    inaccurate.

5              THE COURT:  Based upon his, what, review of the

6    video?

7              MR. WELDON:  Well, no, based on his -- well,

8    partially, yes (nods head affirmatively), based on a review of

9    the video.

10             THE COURT:  He decided that now.

11             MR. WELDON:  Yes.

12             THE COURT:  But in '08, he decided that she was

13   disabled, she is on PN status and --

14             MR. WELDON:  Absolutely.  And the reason he did is

15   because of what Ms. Durand was telling him.

16             THE COURT:  Okay.  But what was she supposed to do

17   after that point?  Was she supposed to come back and say, hey,

18   I'm okay now, put me back to work?

19             MR. WELDON:  No.  But that started the compensation

20   benefits that, otherwise, wouldn't --

21             THE COURT:  Right.  Having -- having achieved that

22   status, what then?  What should she have done in '10, '11, and

23   '12?  Turn herself in, or does she come back in and say, well,

24   I think I'm recovered now?

25             MR. WELDON:  Well, it's just like a drug conspiracy,

1   the same operation.  I mean, they don't -- they, obviously,

2   aren't going to turn themselves in.  That's why, then, we

3   started the undercover operation, to prove that she was

4   capable of working.

5          THE COURT:  And there's no statute of limitations

6   issue because she is continuing to get paid.

7          MR. WELDON:  Correct.

8          THE COURT:  Okay.

9          MR. WELDON:  And the reason, Your Honor, just so you

10  know, when you look at the charges, you're going to see, for

11  Count I, there is the shortened time frame of February of 2013

12  to July of 2014, then when you look at the wire fraud, that's

13  a clear continuing offense, that's why it goes back all the

14  way until 2006.

15      So, then, what happened is, Ms. Durand, as you can tell,

16  has been looked at.  She was looked at by Agent Haywood, and,

17  then, ultimately, when Agent Boynton looked at her, then the

18  various surveillance videos that were used for the sole

19  purpose of proof that she was more than capable of doing

20  things.

21      And then when you have the neighbors, who were right next

22  to her who explained all sorts of details about what Ms.

23  Durand could do, that she could jog, that she could saw, she

24  could do all of these activities, it sounded like it was a

25  very active establishment over there.

1          THE COURT:  All right.  What about the -- I'm still

2     not clear about your theory with regard to the medical claims.

3     Okay.  So, there were -- the government paid doctors and

4     pharmacists for medical care and drugs provided to Ms.

5     Durand.

6          MR. WELDON:  Correct.

7          THE COURT:  And you believe that all of that care

8     was illegitimate or unneeded?

9          MR. WELDON:  I don't think -- I don't think we're

10    saying that, Your Honor.  I think that what we're saying is,

11    certainly, the wage loss was illegitimate.

12         THE COURT:  Right.

13         MR. WELDON:  And, so, then, you also have the travel

14    vouchers, where there's claimed travel for those certain

15    expenses where it didn't occur.

16         THE COURT:  Right.

17         MR. WELDON:  And then you have the medical expenses,

18    which are considered also in the forfeiture aspect.

19         THE COURT:  Yeah.  But -- okay.  But with regard to

20    forfeiture, you want all of that money back.

21         MR. WELDON:  I think the statute says that, Your

22    Honor.  (Nods head affirmatively)

23         THE COURT:  Because -- because why?  I mean, Ms.

24    Durand says she had a number of diagnoses.

25         MR. WELDON:  Yes, Your Honor.

1          THE COURT:  Including a back issue.

2          MR. WELDON:  Absolutely, Your Honor.

3          THE COURT:  Depression.

4          MR. WELDON:  Yes, Your Honor.

5          THE COURT:  You don't think she had depression?

6          MR. WELDON:  Well, I think that she had a diagnosis

7  of that, yes, she did.

8          THE COURT:  Well, if she were employed by the Postal

9  Service, wouldn't the prescription for depression be covered?

10          MR. WELDON:  No, it's denied.

11          THE COURT:  No, I'm talking about the disability,

12  her physiological disability.  I'm talking about that she

13  would have a health plan with the Postal Service, right?

14          MR. WELDON:  Sure.  She would.

15          THE COURT:  And I assume that would cover

16  prescriptions, like most of the federal health plans do?

17          MR. WELDON:  It potentially could, yes, Your

18  Honor.

19          THE COURT:  So, how am I supposed to look at

20  these -- how do you think I should look at these medical

21  payments?  Do I need to decide whether some of them are

22  legitimate and some are not?

23          MR. WELDON:  I don't think you do at all.

24          THE COURT:  Why?

25          MR. WELDON:  Because I think that the wages are the

1     thrust of the government's case.

2              THE COURT:  No, I'm talking about the forfeiture.  I

3     understand your theory, but I've got to decide both tomorrow,

4     don't I?

5              MR. WELDON:  Absolutely.  I can just explain, and

6     let me get the case cite for you, Your Honor, because I put

7     this in the trial brief.  I figured that we would have this

8     discussion.  And, in that trial brief, we explain the case of

9     Weber.  And it's a Seventh Circuit case, it's 2008, and the

10    applicable statute that it cites is 5 U.S.C. Section 8148(a).

11         And, in that, it states that, "Any defendant who commits

12    fraud to obtain a benefit must forfeit all benefits that she"

13    -- I changed it to "she" -- "obtains during the period covered

14    by fraud."

15         So, that's the component of the forfeiture

16    proceedings.

17             THE COURT:  All right.  Well, let's go back to the

18    beginning.  The defense's theory, one of the main theories has

19    been that there is a -- the Federal Employee Compensation Act

20    has certain processes -- processes built in them, and that if

21    OWCP or the Office of Inspector General seek to challenge Ms.

22    Durand's total temporary disability designation -- temporary

23    total disability designation, they've got to follow these

24    processes.

25             MR. WELDON:  The administrative side, absolutely.

1  They 100 percent do.  We are in a criminal fraud trial.  So

2  that is investigated by the Office of Inspector General, they

3  are separate from the United States Postal Service, they do

4  not have the same rules that apply to them.

5      And, of course, there are two processes.  So, what could

6  have been done with Ms. Durand is it could have gone through

7  the administrative process, they could have had everything

8  that they wanted to do with those rules, if they would have

9  applied, then I think Mr. Harris's testimony would have been

10  relevant.

11      But since we're talking about the criminal aspect, we're

12  talking about 18 United States Code Section 1343, whether or

13  not there was a scheme to defraud.  We can cite the Code of

14  Federal Regulations all day, and that has no application to

15  this particular trial.

16          THE COURT:  Uh-huh.  All right.  So, your theory is

17  that the false statement is in '06, and there's the statements

18  to Doctor Strausser that, then, get compounded by the

19  statements to Doctor Hood --

20          MR. WELDON:  (Nods head affirmatively)

21          THE COURT:  -- and she is designated PN status.

22          MR. WELDON:  Correct.  That is the start.

23          THE COURT:  And, then, you think that that continued

24  up to the present, why?

25          MR. WELDON:  (Nods head affirmatively)

1          THE COURT:  What evidence supports your theory?

2          MR. WELDON:  Well, for example, even if you were to

3    look at Government's Exhibit 3, Your Honor, you can see the

4    warning for Ms. Durand that when you have these particular

5    types of --

6          THE COURT:  What is 3?

7          MR. WELDON:  Your Honor, this is the 1032.  In fact,

8    Mr. Harris talked about this, as well, where this is a way

9    that they can "fish," I think is the term that Mr. Harris

10   used --

11         THE COURT:  This is sent out on the questionnaire

12   asking about your income and your status.

13         MR. WELDON:  Correct.

14         THE COURT:  Okay.

15         MR. WELDON:  And, of course, on the very final page,

16   which is Page 5, you can see that Ms. Durand signs this

17   document.

18         THE COURT:  All right.  Where is the alleged false

19   statement?

20         MR. WELDON:  And it's --

21         THE COURT:  This is '06.

22         MR. WELDON:  Correct.  And it says --

23         THE COURT:  Where's the alleged false statement?

24         MR. WELDON:  It says, "I understand that I must

25   immediately report to OWCP any improvement in my medical

1   condition, any employment, any change in the status of claimed

2   dependents, any third-party settlement, any change in income

3   from federally assisted disability or federal programs."

4        So, Ms. Durand was put on notice at that point, based on

5   Government's Exhibit 3.  And that was the testimony that you

6   heard from Mr. Harris, where the government will fish, and

7   that is them explaining to her some of her obligations when

8   she is receiving benefits.

9            THE COURT:  So, one of your witnesses -- was it

10  Ms. -- I don't know if it was Ms. -- who was the Utah

11  director?

12           MR. WELDON:  Uhm, that was Ms. Taylor.  Oh, for,

13  uhm -- out of Utah?

14           THE COURT:  Was that Ms. Taylor?

15           MR. WELDON:  Well, I believe --

16           THE COURT:  Who testified about -- you put on some

17  evidence about what happened to Ms. Durand's file.

18           MR. WELDON:  Oh, yes, both Ms. Simmons and Ms.

19  Taylor.  Ms. Taylor was from the Denver office, but she worked

20  out of headquarters.  And what they explained -- and I think

21  that this is circumstantial evidence, Your Honor, but once the

22  lottery ticket has been hit by the PN status, then the way to

23  ensure that things are buried even more is to move.  Because

24  then your file is basically lost in the ether.

25           THE COURT:  All right.  And that was her testimony

1    about they tried to explain what happened to the file.

2         MR. WELDON:  Correct.  And you basically have it on

3    autopilot at that point.  Because it's run out of the Houston

4    area, but then the files and the locations of Ms. Durand's are

5    in different areas.  And, so, if you really want to make

6    sure --

7         THE COURT:  And that lays dormant until Agent

8    Boynton gets industrious and starts rooting around to see if

9    she has traveled --

10        MR. WELDON:  That's correct.  And one thing, Your

11   Honor, I do think it's important especially to address this

12   whole idea of the ruse kayak, that this is purely the evidence

13   that is proving the fraud that Ms. Durand is committing.  So,

14   going on a kayaking trip is not a crime.

15        THE COURT:  What about the claim that Agent Haywood

16   shouldn't have contacted Doctor Strausser directly with the

17   video, that he should have --

18        MR. WELDON:  (Nods head affirmatively)

19        THE COURT:  -- afforded the opportunity to

20   Ms. Durand?

21        MR. WELDON:  And if that -- if we were in the

22   administrative realm, I suspect that Mr. Harris and Mr.

23   Arvanetes would be dragging me through the coals.  I would

24   have no way to walk through those particular procedures.  But

25   we're talking about the criminal portion.  We're talking about

1  what Ms. Durand did when she was committing fraud.

2           THE COURT:  Is there any problem because Agent

3  Haywood can't produce a HIPAA release?

4           MR. WELDON:  The law applies, regardless, whether or

5  not there is a law enforcement exception.  So, whether it's by

6  a letter, or it's simply requested by a law enforcement

7  agency, it wouldn't matter.  (Shakes head negatively)

8           THE COURT:  What wouldn't matter?  That you had a

9  HIPAA release?

10          MR. WELDON:  Correct.  (Nods head affirmatively)  In

11 other words, the exception applies whether it's in a letter or

12 not, Your Honor.

13          THE COURT:  (Sigh)  All right.  Anything else?

14          MR. WELDON:  I'd be happy to answer any other

15 questions, Your Honor.  I know that you've seen the evidence,

16 so I can answer anything that you need.  But other than that,

17 I would just answer any questions.

18          THE COURT:  So, false statements, February of '06,

19 the false claims are laid out in the Indictment.

20          MR. WELDON:  Correct.  (Nods head affirmatively)

21          THE COURT:  And you think the forfeiture is all of

22 the benefits that she's received.

23          MR. WELDON:  That's correct.  So, when you are --

24          THE COURT:  So, if I have -- receive disability for

25 my back and I lie about a head injury and get more disability

1  and I am convicted for fraud, I would have to give back

2  everything between the back and head disabilities?

3          MR. WELDON:  That is the United States' position,

4  Your Honor.  Now, when you look at these cases, I do want the

5  Court to just know that they actually even explain in one of

6  the cases that I cited, the Weber decision, I believe, that

7  the way that this is done is -- in the criminal realm is

8  through forfeiture proceedings.  That's why, in the

9  Indictment, you have the forfeiture allegation that is

10  all-encompassing.

11          Now, when you talk about restitution, though, that's

12  at the sentencing process, assuming we get there, and then

13  that is only the components that Ms. Durand received

14  inappropriately.  So, she would not be -- for example, if you

15  found that the medical expenses were appropriate for her, or,

16  at least, you believed that, you would not, then, include that

17  within her fraud loss, for purposes of her guideline

18  calculation, and it would not be included for her restitution

19  amount.

20          THE COURT:  All right.  Anything else, Mr. Weldon?

21          MR. WELDON:  No, Your Honor.  Thank you.

22          THE COURT:  Thank you.

23      Mr. Arvanetes.  Whenever you're ready, please.

24          MR. ARVANETES:  Thank you, Your Honor.

25      Your Honor, in 2008, based upon her examination with

1   Doctor Hood, she was put on the Periodic, uh -- I can't

2   remember the name right now, PN status, Periodic Rolls,

3   technically, according to the Government's Exhibit 18, as of

4   9/14 of '08, and it was based upon the Hood report.

5        After that, she is -- after that, that's the way she has

6   been since then, until now.  The claims examiner and OWCP/DOL

7   could have sent her to a doctor to check her out, they didn't

8   do that.  The government didn't put on any evidence of these

9   three-year forms.

10       Uhm, Government Exhibit 3, if the Court can put -- or the

11  clerk can put that up again?  At the bottom it says to talk --

12  about any improvement, "that I must immediately report to OWCP

13  any improvement in medical condition."  As Doctor Ellis

14  testified, even if her medical condition improved, a doctor

15  would have been the only one who would have been able to

16  release her.

17       So, it goes back to your question of -- the claims

18  examiner never sent her to a doctor.  She fills out these

19  forms every year.  Uhm, the OIG could have done a ruse and

20  sent her to a doctor, if they wanted to, but that didn't

21  happen.

22            THE COURT:  Why would that have been okay when

23  you're challenging the ruse that they sent her on the kayak

24  trip?

25            MR. ARVANETES:  Because there is no medical --

1    because, well, one, I think it's -- the cost is outrageous.  A

2    medical appointment would have been $500 or $1,000.  Uhm, a

3    ruse with a doctor would have been with a medical professional

4    not -- you know, not really knowing -- I mean, looking at the

5    video, not knowing about the medication levels or her stamina

6    with the medication levels, that kind of thing.

7         So, I mean, yeah, we're challenging the ruse of the kayak

8    trip for a lot of different reasons.  How they lured her in,

9    for example.  I don't know how they would have done it with

10   the doctor, but it could have been just OWCP or DOL saying

11   you've got to go see a doctor.

12             THE COURT:  Well, was the surveillance in '08

13   improper?

14             MR. ARVANETES:  (Shrugs shoulders)  The surveillance

15   in '08?  It was -- I mean, Doctor -- or Mr. Harris talked

16   about it being -- being the way they handled it, improper.

17   But --

18             THE COURT:  No, I'm talking about the

19   surveillance -- what do you mean "the way they handled it"?

20   Was the surveillance -- they didn't go up to her door and say,

21   "We're going to film you walking around your house."

22             MR. ARVANETES:  Right.  Correct.

23             THE COURT:  They covertly videotaped her.

24             MR. ARVANETES:  Sure.

25             THE COURT:  Was that improper?

1          MR. ARVANETES:  They can do their investigation.  I

2     guess not.

3          THE COURT:  So, why was the kayak trip improper?

4     We're going to video you engaging in an activity that you may

5     not do, otherwise.

6          MR. ARVANETES:  Because they're apples and oranges.

7     I mean, they entrapped her in the kayak video.  And I go over

8     that in my trial brief.  The kayak video was totally

9     different.

10         But Agent Haywood just -- I mean, he wasn't even

11    undercover, he wasn't involved, he just sat in the background

12    and took video of her.  So, how is that the same as the extent

13    of the money and the push and unknowing --

14         THE COURT:  Agent Haywood wasted a number of days.

15    Look at his report, he's sitting across the street giving

16    half-hour increments of what's going on.  Isn't that a waste

17    of government money?

18         MR. ARVANETES:  Well, it's -- I don't think it's the

19    same as -- as what they did with the kayak trip, with the

20    letter, giving her a free trip, saying you can have more free

21    goodies later on, giving her a $50 card.  Uhm, no.  I mean,

22    look at the element -- I mean, look at the factors of

23    entrapment.

24         That is -- what Haywood did was not entrapment.  I don't

25    know how one can argue that it was entrapment.  Or is that

1   what the Court is implying?

2           THE COURT:  Well, no, I'm just trying to distinguish

3   it with what happened on the kayak trip.

4           MR. ARVANETES:  Well --

5           THE COURT:  We went through the elements earlier --

6           MR. ARVANETES:  Right.

7           THE COURT:  -- and that's it.  This wasn't a case

8   where the government induced Ms. Durand to seek disability

9   status falsely, this was a case where she was on disability

10  status, and they think she obtained that status through

11  fraudulent means.  And they wanted to try to figure it out

12  with evidence to that effect.

13          MR. ARVANETES:  Right.  But the bullets of -- the

14  bullet points I did under Black pertain to the kayak trip.

15  Haywood did not entrap her.  Haywood did undercover video.

16  And there may have been -- you know, we don't know if there

17  was a HIPAA form and all of that, but we also heard earlier in

18  my Rule 29 that he didn't raise his hand once to consider

19  fraud.

20      Now, once -- but here's the important thing, Judge, is --

21  or is once he changed her work status, the claims examiner had

22  a choice to make.  And the choice was to, first -- as

23  Mr. Harris said, first, to send her to A, to this Doctor - or

24  was it -- or it was an advisor.  And then -- I forgot.  It was

25  A, and it's in the record.

1          THE COURT:  A DMA.

2          MR. ARVANETES:  What?

3          THE COURT:  I think it was a DMA.

4          MR. ARVANETES:  A DMA.  And then he decided --

5          THE COURT:  He sent her to Doctor Hood.

6          MR. ARVANETES:  Right.  He sent her to Doctor Hood,

7  who it was clear to the Court that he doesn't do that often,

8  he doesn't say, hey, you're permanently disabled.  And, so,

9  what is she supposed to do?

10      Since then, the Department of Labor, which can only look

11  at objective medical evidence, they can't look at subjective

12  kind of things, they can't look at issues of subjective

13  credibility, they have to look at objective element --

14  evidence, and they --

15          THE COURT:  For what purpose?  You mean for --

16          MR. ARVANETES:  They never did anything.

17          THE COURT:  For changing her administrative status,

18  right?

19          MR. ARVANETES:  Yeah.  And they never did anything.

20  They didn't send her to a doctor.  They didn't do -- they --

21  if they put it in the forms, where are the forms?

22          THE COURT:  Well, I mean, we are mixing -- aren't

23  you mixing up the administrative process, regarding efforts

24  that may have been undertaken to change Ms. Durand's

25  disability status, versus the criminal investigation?

1          MR. ARVANETES:  I'm focusing on the administrative

2    process.  Because --

3          THE COURT:  What does that have to do with the

4    criminal -- the government's theory is that Ms. Durand lied to

5    her doctors, lied on -- signed forms claiming that she

6    couldn't do tasks, when, in fact, she could.

7          MR. ARVANETES:  Your Honor, under -- once you're on

8    Periodic Rolls, PN status, they are almost untouchable.  And

9    Congress --

10          THE COURT:  Wait.  "Untouchable" in terms of

11    changing your status.  But if you lied to get that status,

12    what is --

13          MR. ARVANETES:  But where's the lie?

14          THE COURT:  Well, the government claims the lies

15    were starting in '06, when she -- well, these were in '08,

16    when she told the --

17          MR. ARVANETES:  Told what?

18          THE COURT:  Told Doctor Strausser that she couldn't

19    engage in these activities.  That she had all of these

20    problems, that she was bedridden.

21          MR. ARVANETES:  (Shakes head negatively)  Your

22    Honor, --

23          THE COURT:  What do I do with the testimony of

24    neighbors?  How do you -- what -- when they testified, two of

25    them, that Ms. Durand was jogging regularly, she was on

1    horseback trotting sometimes, that she was clearing --

2         MR. ARVANETES:  And that was all in Haywood's

3    report, that the OWCP reviewed, and they decided to send her

4    to Hood.  So they had all of that information.

5         THE COURT:  And that's what they were supposed to do

6    if they wanted to change her status.

7         MR. ARVANETES:  Right.  And there's also --

8         THE COURT:  Are they precluded from -- is the Office

9    of Inspector General precluded from pursuing a criminal case,

10   as well?

11        MR. ARVANETES:  Your Honor, they -- all I'm saying

12   is Doctor Hay -- or Agent Haywood had that information in his

13   reports, gave it to the proper people, whoever he did, OWCP --

14        THE COURT:  Right.  And then they decide if we want

15   to potentially change her status, so we will send her to a

16   doctor.

17        MR. ARVANETES:  Send her to a doctor who, in 40

18   years, has only done this one time.

19        THE COURT:  Stop.  Why -- Why does that -- because

20   -- you don't get it.  I mean, the government's theory is not

21   that we're trying to get her off disability status, it's that

22   she lied to get there.  And that the lie perpetuated for all

23   of these years.

24        MR. ARVANETES:  But how can she lie about objective

25   pathology?  The Court knows that the doctors aren't just going

1    to rely on what a patient tells them, they rely on the

2    pathology.  They rely on the fact that she had an implant,

3    that she had two surgeries, she had a thoracic issue, all of

4    that.

5              THE COURT:  Doctor Hood testified regarding -- he

6    said that he relied largely on Ms. Durand's subjective

7    complaints, right?  I mean, and Doctor Strausser in a large

8    part, as well.  I mean, they did -- they -- I don't disagree

9    that Ms. Durand had a spinal fusion.  That she had this

10   stimulator put in.  There's no dispute about that.  The

11   question is whether those -- the injuries associated with

12   those procedures -- medical procedures rendered her

13   disabled.

14             MR. ARVANETES:  If they -- if -- she would have to

15   be -- I mean, she would have to be the greatest -- if they

16   only relied only (indicating), and that that's an absolute,

17   which Doctor Hood did not testify to, she did not say only

18   subjective, she would have to be the greatest liar in the

19   world over his 40 years (indicating) to have somehow --

20   (shakes head negatively) was the one person in the world who

21   she could talk out of, and that's not true.  That's an

22   absolute.  And that is not what the evidence showed.

23        Any doctor in their right mind would not simply only look

24   at the subjective.  Subjective is important.  What the patient

25   talks, their pain is important.  But they also have to look at

1    the pathology.  They also have to look at the objective.  And

2    if the OWCP had an issue with Doctor Hood's ruling, they could

3    have gone to the C option, which was the umpire, which they

4    did not.

5            THE COURT:  If they wanted to change her status.

6            MR. ARVANETES:  Well, they had the choice.

7            THE COURT:  Right.

8            MR. ARVANETES:  If they didn't like Hood's opinion,

9    they could have sent her to an umpire.

10           THE COURT:  The Office of Inspector General decided

11   to pursue criminal charges.

12           MR. ARVANETES:  In 2000-what, '15?

13           THE COURT:  Right.  Because she's still receiving

14   benefits.  Otherwise, you would have a statute of limitations

15   problem.

16           MR. ARVANETES:  So, what happened in -- so what

17   about Haywood's investigation?  What happened?  I mean, where

18   they had -- I mean, if we want to look at the evidence now, --

19   you know, hindsight's 20/20.  If we want to look at Haywood's

20   investigation, well, why wasn't she indicted then?  Why didn't

21   the OWCP do anything then?

22       I mean, there was more evidence then than there was with

23   just a kayak trip.  They had -- they had -- they had realtime,

24   closer to the time with the doctors information.  They had the

25   neighbors.  They had the video.  They had the Bowi or Bowi

1    with the riding in the car.  They had much more stuff back

2    in '07 and '08 than they have now, and that didn't even fly.

3    (Indicating)

4        And, so, now we're going to turn back the clock and say,

5    well, now, we're going to blame her and charge her with $1.2

6    million, potentially, because of some -- because of 2015?

7    They had more evidence then than they do now.  That's -- I

8    mean, that's it.  (Shakes head negatively)

9            THE COURT:  Well, I mean, you seem to be suggesting

10   that if they wanted to pursue a criminal prosecution, that

11   they had to do it in 2007 and '8.

12           MR. ARVANETES:  Well, they could have.  They could

13   either done that, or --

14           THE COURT:  If she had stopped getting benefits in

15   2012, I might agree with you, but she's still getting

16   benefits.  Doesn't that leave the statute open?

17           MR. ARVANETES:  All I'm saying is --

18           THE COURT:  And -- and --

19           MR. ARVANETES:  -- what's the better case?  In 2007,

20   they had a heck of a lot more stuff than they do -- than they

21   do now.  They have nothing now.  Except the kayak trip.

22           THE COURT:  Mr. Arvanetes, if they filed this

23   Indictment today and all they had was the video from '07/'08,

24   I don't think the factfinder would buy that.  They would say,

25   oh, well, that was 8, 9 years ago, things have changed.

1          MR. ARVANETES:  So, why -- so why are we even

2     talking about it now, then?

3          THE COURT:  Well, because they induced Ms. Durand to

4     go on a kayak trip.

5          MR. ARVANETES:  Yeah, but what does that have to do

6     with back then?

7          THE COURT:  It has to do with that she has an

8     ongoing obligation to report improvements in her medical

9     condition.

10          MR. ARVANETES:  Not if -- not under -- not from what

11     Ellis says, if there are improvements a doctor has to release

12     her.  And a doctor never gave her the choice.  What is she

13     supposed to do, run to a doctor and say, "Hey, wait, wait. You

14     know, I think, even though I'm in pain or even though I'm on

15     PT, and even though I'm on so many meds that I'm a zombie," is

16     what Hood said, "that I want to volunteer.  Hey, I want to

17     work."  (Indicating)

18        I mean, she could have done that, but the -- under the

19     rules they have to send her to a doctor, or a doctor has to

20     release her, and they didn't.

21          THE COURT:  If they want to change her PN status.

22     Not if they want to charge her with fraud, do they?

23          MR. ARVANETES:  No.  Yeah, the PN status.  But

24     that's what -- that's what the substance of the whole case is

25     about.

1          THE COURT:  How do you reconcile Ms. Durand's

2    statements to the agent in Boise with the conduct of the kayak

3    trip?

4          MR. ARVANETES:  (Pause)  Well, a couple of those --

5    I mean, I can't.  You know, I can't.  A couple of statements,

6    you know, as far as she made about believing that, you know,

7    this was for people with disabilities, she was -- she got that

8    impression.  Uhm, I mean that -- you know, I can't -- I mean,

9    the statements that she made in Boise, I mean, I kind of got

10   into it with Agent Boynton about that, you know, we got into

11   is this a typical day versus the kayak trip?

12        But, honestly, I don't --

13         THE COURT:  She told the agent in Boise that most of

14   her days are in a recliner or in bed, didn't she?

15         MR. ARVANETES:  And most of her days, who -- I

16   mean --

17         THE COURT:  So, for three days she goes out kayaking

18   with the -- with the whales, and then the rest of the time

19   she's in bed not able to move?

20         MR. ARVANETES:  Oh, no.  No, nobody says that.

21   Nobody says that.  I mean, it -- she doesn't have to be a

22   paraplegic.  She doesn't have to lay around like a dead person

23   because --

24         THE COURT:  I didn't say that.  That's what she told

25   the agents.

1        MR. ARVANETES:  -- she's on Periodic Rolls.

2        THE COURT:   That's what she told the agents.

3        MR. ARVANETES:  She said she lays around in bed.

4   Maybe, she was depressed that day.  I mean, I can't answer

5   that question.  I don't know.

6        THE COURT:  Well, Doctor Ellis testified, he said,

7   "Well, sure, she can do some work."

8        MR. ARVANETES:  Yeah.  Yeah.  If the OWCP sent her

9   to a doctor.  So, let them do that.  Let her do that.  Let

10  them do that to her --

11       THE COURT:  Well, that's if they want to get her off

12  PN status.

13       MR. ARVANETES:  Well --

14       THE COURT:  So, you don't think you can prosecute

15  someone until you've got them off PN status, but we can

16  prosecute them for getting on there fraudulently.

17       MR. ARVANETES:  I don't know what that is.

18       THE COURT:  Well, you keep talking about if they

19  wanted to do something, they could have made her go see a

20  doctor to get her off the PN status.

21       MR. ARVANETES:  That's the rule.

22       THE COURT:  That's the rule, the administrative

23  rules.

24       MR. ARVANETES:  Well, but, that's -- that's why

25  she's -- that's why we're here.  We're on -- I mean, we're

1    here because --

2          THE COURT:  We are here because the government

3    claims --

4          MR. ARVANETES:  -- because she's on administrative

5    status.  We can't ignore that.  It's done.  How can we

6    ignore --

7          THE COURT:  Wait.  Wait.  Wait a minute.  Wait a

8    minute.  She works at the post office -- an employee works at

9    the post office, they're a member of a union and they have

10   certain grievance rights under the union contract, and the

11   government thinks that they are stealing stamps.  We talked

12   about this earlier at the beginning.  If the government

13   decides not to go through the grievance process precisely, are

14   they precluded from prosecuting -- having the FBI come and

15   investigative and prosecute for stealing stamps?

16         MR. ARVANETES:  (Pause)

17         THE COURT:  You know, there's administrative -- they

18   have these rights under the union contract.

19         MR. ARVANETES:  There just should be more.  There

20   isn't enough proof beyond a reasonable doubt in this case.

21   (Nods head affirmatively)  if you want to go -- if you want to

22   go -- there's not.

23       I mean, Judge, you saw Doctor Strausser.  I don't want

24   to -- I don't want to belabor that point, but that was

25   embarrassing.  That what embarrassing.

1    THE COURT:  What was embarrassing?  Because he

2    didn't raise his hand?

3    MR. ARVANETES:  No.  Because he wouldn't -- he

4    didn't even want to be qualified as an expert.  He didn't even

5    bring a file.  He didn't even remember hardly anything about

6    it.  That was the worst witness I've ever seen.

7    THE COURT:  All right.  What about Doctor Hood?  He

8    said he was embarrassed, that he had been -- he had been

9    hoodwinked.

10   MR. ARVANETES:  Yeah.  I mean, you can say --

11   hindsight's 20/20.  I could say, you know, uhm -- (indicating)

12   I don't know, I could say that someone hoodwinked me ten years

13   ago, but there's a lot of, I don't know, subjective reasoning

14   going on in my mind than when I decide it now.

15   THE COURT:  Well, you may --

16   MR. ARVANETES:  That -- that -- that then --

17   THE COURT:  You made a lot of noise about problems

18   with Ms. Bowi.  Ms. Bowi testified that "I didn't have a

19   problem with Ms. Durand."

20   MR. ARVANETES:  Well, that's -- I mean, I respect

21   Ms. Bowi.

22   THE COURT:  That's what?  That's what?

23   MR. ARVANETES:  Well --

24   THE COURT:  I mean, she --

25   MR. ARVANETES:  That's a statement -- that's a

1    question of fact.  You heard from my client that --

2              THE COURT:  I know.

3              MR. ARVANETES:  -- there were a lot of problems.

4              THE COURT:  All right.  And I have to resolve

5    those.

6              MR. ARVANETES:  Right.  So, I'm not going to -- what

7    I meant was, look, I respect Ms. Bowi, but I also respect my

8    client's decision to testify about the fact that there were a

9    lot of problems.  To the point where she had to seek

10   psychiatric help, too.  You know, the OAP is this counseling

11   procedure that she went through, part of the Postal Service.

12   And then -- with Bricken.

13       And then she was -- she was -- you know, had the -- with

14   Bricken, I mean, she had mental health issues.  In part (nods

15   head affirmatively) -- well, because of what problems she went

16   through.  But, I mean, that's a question of fact.  You're

17   right.  As far as Ms. Bowi goes.

18             THE COURT:  All right.  And the neighbors, it's the

19   neighbors' word against Ms. Durand's word?

20             MR. ARVANETES:  That was already in Haywood's

21   file.

22             THE COURT:  So what.  So what.

23             MR. ARVANETES:  Well, so what -- why did -- again,

24   why didn't the --

25             THE COURT:  If you rob a bank in 2012, and I

1    investigate and don't prosecute you, and I come back in 2014

2    and a new prosecutor decides to press charges, they can't?

3            MR. ARVANETES:  Well, you've got to ask your

4    question about why didn't they prosecute in 2004?

5            THE COURT:  Right, some jury might ask that

6    question, but it doesn't prevent you from trying, does it?

7            MR. ARVANETES:  No, it doesn't prevent you from

8    trying, but you're going to fail.  Or you're going to more

9    likely fail than if you waited ten years versus 2004.

10       And that's what this case is about.  It's a burden of

11   proof.  They waited until, what, 10 years -- or eight years

12   later.

13           THE COURT:  Now, Doctor Strausser testified that Ms.

14   Durand never disclosed her activities at home, that she was

15   picking up her dogs and checking her mail and shoveling and

16   feeding horses, things of that nature.

17           MR. ARVANETES:  Wait.  What -- well, number one, he

18   never asked her.  Number one, he testified that he never asked

19   her those questions.

20           THE COURT:  He never asked her those specific

21   questions, but he asked her about her activities, though.

22           MR. ARVANETES:  Right.  (Nods head affirmatively)

23   And, actually, his restrictions increased after that

24   interview.  One of my first exhibits was showing the two

25   different work restrictions; one in September, when he saw her

1    and made these work restrictions of '07, and one in 2008, of

2    January.  And they actually increased in 2008 after the video.

3            THE COURT:  Now, you cross examined Doctor Strausser

4    about a patient/client (sic) relationship with Ms. Durand, and

5    you pressed him on that point and talked about a potential AMA

6    code of ethics violation.  Do you remember that?

7            MR. ARVANETES:  Exactly.  Yes, because --

8            THE COURT:  And your witness, Doctor -- or Mr.

9    Harris said there is no patient/client (sic) relationship.

10            MR. ARVANETES:  With Hood.  With Hood.

11            THE COURT:  No.

12            MR. ARVANETES:  With the one shot.

13            THE COURT:  No.

14            MR. ARVANETES:  Not with Strausser.  With the one

15    shot.  Which was -- which is Doctor Hood.  There is none.  And

16    that's what the claims examiner got wrong in March when he

17    assumed that Doctor Strausser was her primary care physician.

18    Which is why he initially followed the new work assignment

19    that Bowi filled out for her.  But then he realized he was

20    wrong and told -- and got a second opinion with Hood, who's

21    the one shotter.

22            THE COURT:  And how about the ruse engaged by the

23    government in inducing Ms. Durand to come to the Boise

24    interview, was that improper?

25            MR. ARVANETES:  It's part of my entrapment, as the

1     case law shows, if, you know, the government was involved from

2     the beginning, middle, and end, furnished everything,

3     financial, all of the equipment, everything.  (Indicating)

4          THE COURT:  All of the equipment that covered the

5     interview?

6          MR. ARVANETES:  Well, the -- the -- that was part of

7     the ruse -- the kayak ruse, so I would include that as the end

8     of the kayak ruse.

9          THE COURT:  How about the -- on the kayak trip, Ms.

10    Vantine testified sometimes in conflict with Ms. Durand about

11    problems -- that Ms. Durand had any problems, about whether

12    she -- Ms. Durand was able to keep up and paddle.

13         MR. ARVANETES:  Uh-huh.

14         THE COURT:  How do I resolve those disputes?

15         MR. ARVANETES:  Uhm, I mean, Ms. Durand said that

16    Ms. Vantine was -- I don't know if it was -- I don't know if

17    her words were awesome or nice, or whatever, it was very

18    positive.  And I tried to clear up a factual problem issue

19    with whether Ms. Vantine helped her actually out of the canoe

20    -- or kayak or not, and it was in concert with Ms. Vantine

21    that she kind of stabilized the kayak (indicating) so the

22    person could get out.  (Shrugs shoulders)  That's all.

23         THE COURT:  Well, Ms. Vantine testified on direct

24    that Ms. Durand had no problem paddling, that the kayak

25    weighed 100 pounds fully loaded, and Ms. Durand, in the video,

1    was depicted carrying the front end of one of the kayaks.

2    That at their campsite, Ms. Vantine testified that Ms. Durand

3    went along on the hike on Stuart Island, that Ms. Durand never

4    complained about any problems on the trip, that Ms. Durand had

5    no problems getting in and out of the kayaks, she never asked

6    for a break, never had any problems keeping up.  How do I

7    resolve the discrepancy in testimony between Ms. Vantine and

8    Ms. Durand?

9         MR. ARVANETES:  I think you look at Mr. Boynton's

10    testimony on that.  Mr. Boynton testified that at certain --

11    at a point he asked her about the second day, and she was in

12    pain, that she hadn't taken her meds yet.

13         THE COURT:  All right.  Ms. Vantine also testified

14    that Ms. Durand ran to the ferry.  It wasn't a walk quickly,

15    it was running to the ferry, she said.  Ms. Durand said, "I

16    hurried to the ferry."

17         MR. ARVANETES:  People on -- people on Hydrocodone,

18    morphine (shakes head negatively) can probably do a lot.

19         THE COURT:  And what about Ms. Vantine's testimony

20    that the person depicted on the Boise interview video was

21    completely different than the person on the kayak trip?

22         MR. ARVANETES:  (Indicating)  Uhm, I don't know -- I

23    don't know what to say about that.

24         THE COURT:  Well, okay.  Then we have Kimberly

25    Snyder, nurse practitioner, treats Ms. Durand for falling --

1    getting bucked off a horse.  She's riding horses in Montana in

2    2013.

3         MR. ARVANETES:  There's nothing wrong -- I mean,

4    nobody said she can't ride a horse.  She got bucked off a

5    horse.  That's -- that's -- I'm sorry about that.  But it's

6    not like she can't ride a horse.  (Shakes head negatively)

7    (Shrugs shoulders)

8         THE COURT:  But she wasn't treated for a back

9    injury, it was for a broken orbital bone.

10        MR. ARVANETES:  No, she was treated for -- she had

11   an MRI done on her head, and she was out.

12        THE COURT:  All right.  Anything else, Mr.

13   Arvanetes?

14        MR. ARVANETES:  No.

15        THE COURT:  All right.  Thank you.

16        MR. ARVANETES:  (Nods head affirmatively)

17        THE COURT:  All right.  The case is, then,

18   submitted.  I'm going to take it under advisement.  I will

19   have a verdict tomorrow at 4:00 p.m. in this courtroom.

20        Anything else, Mr. Weldon?

21        MR. WELDON:  No, Your Honor.  Thank you for your

22   time today.

23        THE COURT:  Mr. Arvanetes?

24        MR. ARVANETES:  No, sir.  Thank you.

25        THE COURT:  All right.  See you tomorrow at 4:00

1    o'clock.

2

3              (The evening recess was taken at 5:14 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE</u>**

I, Julie L. DeLong, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my knowledge, skill, and ability.


  /s/ Julie L. DeLong                     02/05/2018
Julie L. DeLong                          Date